1   **HUNTON ANDREWS KURTH LLP**
2   Ann Marie Mortimer (State Bar No. 169077)
    amortimer@HuntonAK.com
3   Jason J. Kim (State Bar No. 221476)
    kimj@HuntonAK.com
4   Jeff R. R. Nelson (State Bar No. 301546)
    jnelson@HuntonAK.com
5   550 South Hope Street, Suite 2000
    Los Angeles, California 90071-2627
6   Telephone:  (213) 532-2000
7   Facsimile:  (213) 532-2020
8
9   Attorneys for Plaintiff
    FACEBOOK, INC.
10

11              **UNITED STATES DISTRICT COURT**
12            **NORTHERN DISTRICT OF CALIFORNIA**
13            **OAKLAND/SAN FRANCISCO DIVISION**

14  FACEBOOK, INC., a Delaware           CASE NO.:  3:20-CV-07182
    corporation,
15                                        **COMPLAINT; DEMAND FOR JURY**
16              Plaintiff,                **TRIAL**
17
        v.
18
19  BRANDTOTAL LTD., an Israeli
    corporation, and UNIMANIA, INC., a
20  Delaware corporation,
21
22              Defendants.
23
24
25
26
27
28

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

Plaintiff Facebook, Inc. ("Facebook") alleges the following:

## INTRODUCTION

1.      Between September 2019 and October 1, 2020, Defendants BrandTotal Ltd. ("BrandTotal") and Unimania, Inc. ("Unimania") developed and distributed internet browser extensions ("malicious extensions") designed to improperly collect data from Twitter, YouTube, LinkedIn, Amazon, Facebook, and Instagram.  Defendants distributed the malicious extensions on Google's Chrome Web Store.  Anyone who installed one of Defendants' malicious extensions essentially self-compromised their browsers to run automated programs designed to collect data about its user from specific websites.  As to Facebook and Instagram, when a user visited those sites with a self-compromised browser, Defendants used the malicious extensions to connect to Facebook computers and collect or "scrape" user profile information (including name, user ID, gender, date of birth, relationship status, and location information), advertisements and advertising metrics (including name of the advertiser, image and text of the advertisement, and user interaction and reaction metrics), and user Ad Preferences (user advertisement interest information).  Defendants used the data collected by the malicious extensions to sell "marketing intelligence," and other services through the website brandtotal.com.  Defendants' conduct was not authorized by Facebook.

2.      Beginning no later than October 3, 2020, after Plaintiff revoked Defendants' access to its service and Google removed the malicious extensions from Google's Chrome Web Store, BrandTotal's Chief Product Officer ("CPO") created a new Facebook and Instagram account.  Furthermore, on or about October 12, 2020, Defendants published a new malicious extension on Google's Chrome Web Store designed to scrape Facebook.  Facebook brings this action to stop Defendants' violations of Facebook's and Instagram's Terms and Policies, the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (the "CFAA") and the California Comprehensive Computer Data Access and Fraud Act, California Penal Code § 502.  Facebook also

brings this action to obtain damages and disgorgement for breach of contract and unjust enrichment.

## **PARTIES**

3.      Plaintiff Facebook, Inc. is a Delaware corporation with its principal place of business in Menlo Park, San Mateo County, California.  Instagram is a subsidiary and product of Facebook.

4.      Defendant BrandTotal Ltd. was incorporated in Israel on November 20, 2016, and on information and belief, is headquartered in Israel.  Ex. 1.  BrandTotal Ltd. has a subsidiary named BrandTotal Inc. that was incorporated in Delaware on November 13, 2017, has an office in New York, New York, and sells BrandTotal's services in the U.S.  Exs. 2 – 4.  BrandTotal operates the website brandtotal.com, where it sells marketing intelligence through its software-as-a-service platform.   Ex. 5.  BrandTotal controls the malicious extension named "UpVoice" that was used to scrape data from social media services.  BrandTotal distributed the malicious extension on Google's Chrome Web Store under the developer name "UpVoice."  Ex. 6.  Despite its scraping practices, BrandTotal received approximately $8 million in venture capital funding between 2017 and 2018.  Ex. 7.

5.      Defendant Unimania, Inc. was incorporated in the State of Delaware on November 27, 2017.   Ex. 8.   Unimania developed and distributed the malicious extension named "Ads Feed" on Google's Chrome Web Store.  Ex. 9.   Unimania's website, unimania.xyz, consists of only a landing page. Ex. 10.  In May 2018, AdGuard Research reported that Unimania browser extensions for Chrome were designed to scrape data from Facebook.   *See* https://adguard.com/en/blog/unimania-spyware-campaign.html.  Those extensions were removed from Google's Chrome Web Store in 2018.

6.      Defendants shared common employees and agents.   For example, BrandTotal's CPO and General Manager (Ex. 5), created Facebook accounts in the

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

name of Unimania and the Ads Feed extension.  BrandTotal's Chief Technology Officer and co-founder (Ex. 5) also administered Unimania accounts on Facebook.

## JURISDICTION AND VENUE

7.   The Court has federal question jurisdiction over the federal causes of action alleged in this Complaint pursuant to 28 U.S.C. § 1331.

8.   The Court has supplemental jurisdiction over the state law causes of action alleged in the Complaint pursuant to 28 U.S.C. § 1367 because these claims arise out of the same nucleus of operative facts as Facebook's federal claim.

9.   Defendants had multiple Facebook accounts and thereby agreed to Facebook's Terms of Service and Commercial Terms.  The Court has personal jurisdiction over Defendants because Facebook's Commercial Terms contain a forum selection clause that requires this complaint be brought in the U.S. District Court for the Northern District of California or a state court located in San Mateo County, and that Defendants submit to the personal jurisdiction of either of those courts for litigating this matter.

10.   Defendants also agreed to the Instagram Terms of Use.  The Instagram Terms of Use contain a forum selection clause that requires this complaint be resolved by this Court, and that Defendants submit to the personal jurisdiction of this Court.

11.   Additionally, the Court has personal jurisdiction over Defendants because they knowingly directed and targeted their conduct at California and at Facebook, which has its principal place of business in California.  Defendants also transacted business and engaged in commerce in California by, among other things, distributing malicious extensions to California-based Facebook and Instagram users and using California-based services during their data harvesting scheme.

12.   By agreeing to the forum selection clause in the Facebook Terms of Service and Instagram Terms of Use, Defendants agreed that this Court is the proper venue for this matter.

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

## FACTUAL ALLEGATIONS

### A.    Background on Facebook and Instagram

13.    Facebook is a social networking website and mobile application that enables its users to create their own personal profiles and connect with each other on their personal computers and mobile devices.  As of August 2020, Facebook daily active users averaged 1.79 billion and monthly active users averaged 2.7 billion.  Facebook has several products, including Instagram.  Facebook owns and operates the Instagram service, platform, and computers.

14.    Instagram is a photo and video sharing service, mobile application, and social network.  Instagram users can post photos and videos to their profiles.  They can also view and comment on posts shared by others on Instagram.

15.    To create a Facebook or Instagram account, Facebook requires users to register with a unique username and password.  Registered users can create user profiles and include information about themselves, including email addresses, phone numbers, date of birth, and gender.

16.    Anyone with a Facebook or Instagram account can create and place ads on Facebook and Instagram.  Every week, users and businesses create millions of ads through Facebook's ad platform, which provides advertisers with many options for reaching audiences.

### B.    Facebook's Ad Library

17.    The    Facebook    Ad    Library    (available    at https://www.facebook.com/ads/library) allows anyone to search and view ads published on Facebook or Instagram.  It was first created as the Political Ad Archive in May 2018.  The current version was made public in March 2019 and expanded the scope of the library to include all active ads running in all countries and inactive ads if the ad is about social issues, elections or politics.  Ads from the latter category will be in the library for up to 7 years.  Only ads that have been viewed by a Facebook or Instagram user will appear in the library.

3:20-cv-07182

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

18.     The Ad Library displays information about the Facebook Page responsible for running the ads. The "page transparency" section in the library displays the creation date of the Page, Page name changes, mergers with other Pages, and total spent by the Page on social issues, elections or politics.

19.     The library is also searchable.  Ads can be searched using a key word and results display the text and image used in the ad.  Results can further be filtered by geographic region, platform, number of users that viewed the ad, and views on a particular day.

20.     The library does not contain information about the specific users who viewed an ad or a user's reaction or interactions with an ad.  Therefore, a user's name, ID, date of birth, gender, relationship status, location information, and Ad Preferences are not available in the Ad Library.  Similarly, the number of comments, likes, user shares, and other user interaction or reactions are not publicly available in the Ad Library.

**C.     Facebook and Instagram Terms and Policies**

21.     All Facebook users must agree to Facebook's Terms of Service (available at https://www.facebook.com/terms.php) and other rules that govern access to and use of Facebook, which may also include the Facebook Commercial Terms[1] (collectively, "Facebook Terms and Policies").

22.     Everyone who uses Instagram agrees to Instagram's Terms of Use and to other rules that govern access to and use of Instagram, including Instagram's Community Guidelines and Platform Policy (collectively, "Instagram Terms and Policies").

23.     Instagram's Terms of Use and Section 3.2.1 of the Facebook Terms of Service prohibit users from "do[ing] . . . anything unlawful, misleading, [ ] or fraudulent" or facilitate or support others in doing so.

---

[1] Facebook Commercial Terms apply to access and use of Facebook and Facebook Products for any business or commercial purpose.

24.     Section 3.2.2 of the Facebook Terms of Service prohibits users from "do[ing] anything that could . . . impair the proper working or appearance of [Facebook] Products."

25.     Instagram's Terms of Use also prohibit users from "do[ing] anything to interfere with or impair the intended operation of the [Instagram] Service."

26.     Section 3.2.3 of the Facebook Terms of Service prohibits "access[ing] or collect[ing] data from [Facebook] Products using automated means (without our permission) or attempt[ing] to access data you don't have permission to access."

27.     The Instagram Terms of Use also prohibit (a) "access[ing] or collect[ing] in unauthorized ways . . . [including] collecting information in an automated way without our express permission;" and (b) "violat[ing] someone else's rights, including intellectual property rights."

**D.     Background on Scraping**

28.     "Web scraping" refers to the process of extracting data from a website interface by using unauthorized automated means, such as specialized tools and software.  Websites, including the official Facebook site, are designed for human end-users and not for automated use, and employ anti-scraping measures to prevent and detect web scraping.

29.     Automation tools and software are necessary for scraping.  Facebook employs a number of measures to detect and disrupt unauthorized automated requests on its systems, including monitoring use patterns that are inconsistent with a human user, CAPTCHA, and disabling of accounts engaged in automated activity.

30.     When scrapers extract the desired data, they often restructure and format it, and save and store it for further use, such as lead generation, pricing competition, and ads optimization.

**E.     Background on Internet Browser Extensions**

31.     Internet browsers, such as Google Chrome, Opera, and Firefox, are used to access the internet.  Internet browsers follow instructions from websites, in computer

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

code, to render and display a website's content for users to see.  Website content is largely delivered in HTML code.  Internet browsers are designed to render the HTML code and display it in images and text for the user's screen.

32.     Internet browser extensions are software components that alter a browser's functionality.  Browser extensions can be installed to enhance user experience and the functionality of the browser.  For example, a browser extension can block pop-up ads.

33.     Browser extensions can also be used in illicit ways.  Browser extensions can be coded to access the full array of information available to the browser and its functionalities.  For example, a browser extension can be designed to monitor a user's browsing session, manipulate how the content of visited websites is displayed, and take other unauthorized actions.

34.     Browser extensions are available for download by users from online browser stores, which are often managed by the browser developer (*i.e.*, Google's Chrome Web Store).  In order for a browser extension to install, the user typically must grant permissions for the extension to download and install on the user's device.

**F.     Defendants Accepted Facebook's and Instagram's Terms and Policies**

35.     At all relevant times, Defendants were bound by Facebook's and Instagram's Terms and Policies.

36.     BrandTotal, through its agents and employees, created a Facebook account in the name of "BrandTotal Analytics" on or about June 13, 2017, and a BrandTotal Instagram account on or about December 5, 2016.  BrandTotal also created a Facebook business account on or about February 21, 2017.

37.     On or about September 3, 2019, BrandTotal, through its agents and employees, created a Facebook business account for UpVoice.  On or about June 8, 2020, BrandTotal, through its agents and employees, created a Facebook business account named UpVoiceUS.

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

38.     On July 4, 2018, Unimania, through its agents and employees, created a Facebook business account in the name of Unimania.

39.     Between 2017 and 2019, Defendants' employees and agents created and administrated three Facebook Pages.  The Pages were used to promote both malicious extensions and BrandTotal's marketing service.

40.     Between July 2018 and June 2020, Defendants' employees and agents created and controlled seven Facebook advertising accounts.   Defendants used Facebook to promote both malicious extensions and BrandTotal's marketing service as set forth in Figures 1 and 2.

| **Figure 1: BrandTotal Advertisement on Facebook** | **Figure 2: UpVoice Extension Advertisement on Facebook** |
|---|---|
|  |  |

41.     As explained below, BrandTotal's CPO created a new Facebook and Instagram account after the above described accounts were disabled.

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

**G.    Defendants Used at Least Two Malicious Browser Extensions to Scrape Facebook Until October 1, 2020**

**1.    Overview**

42.    Between September 2019 and October 1, 2020, Defendants developed and distributed at least two malicious extensions called UpVoice and Ads Feed.  Defendants distributed the malicious extensions on Google's Chrome Web Store.  Exs. 6 and 9. Since September 2019, the malicious extensions have been installed by thousands of users.  These malicious extensions were programmed to scrape data from various websites and deliver it to Defendants.

43.    BrandTotal enticed users to install the UpVoice extension from Google's Chrome Web Store by offering payments in exchange for installs, in the form of online gift cards, and claiming that the users who installed the extension became "panelists … [who] impact the marketing decisions and brand strategies of multi-billion dollars (sic) corporations."  Ex. 6.

44.    Similarly, Unimania promoted its Ads Feed extension on Google's Chrome Web Store by claiming that the users became "a panel member of an elite community group that impacts the advertising decisions of multi-billion dollar corporations!"  Ex. 9.

45.    Once installed by the users, however, Defendants used the users' browsers as a proxy to access Facebook computers, without Facebook's authorization, meanwhile pretending to be a legitimate Facebook or Instagram user.  The malicious extensions contained JavaScript files designed to web scrape the user's profile information, user advertisement interest information, and advertisements and advertising metrics from ads appearing on a user's account, while the user visited the Facebook or Instagram websites.  The data scraped by Defendants included both public and non-publicly viewable data about the users.

46.    Defendants' malicious extensions were designed to web scrape Facebook and Instagram user profile information, regardless of the account's privacy settings.

The malicious extensions were programmed to send unauthorized, automated commands to Facebook and Instagram servers purporting to originate from the user (instead of Defendants), web scrape the information, and send the scraped data to the user's computer, and then to servers that Defendants controlled.

47.     Defendants used the data collected by the malicious extensions to sell "marketing intelligence," and other services through the website brandtotal.com. BrandTotal publicly stated that it used the data obtained through the malicious extensions to provide marketing insights about users and advertisers.  Exs. 5 and 11.

### 2.    The UpVoice Malicious Extension

48.     Between September 2019 and October 1, 2020, BrandTotal developed, promoted, and distributed the UpVoice extension.   BrandTotal programmed the UpVoice extension to web scrape data from both Facebook and Instagram, as well as Amazon, Twitter, LinkedIn, and YouTube.   BrandTotal further programmed the UpVoice extension to send the scraped data to a server controlled by Defendants.

49.     BrandTotal maintained and operated the website joinupvoice.com, which it used to promote the UpVoice malicious extension.  Exs. 11-12.  To incentivize the installation of that malicious extension, BrandTotal offered gift cards to visitors who installed it.   Ex. 11.   For example, on its website, as shown in Figure 3 below, BrandTotal promoted the UpVoice browser extension as a way to "[g]et paid for the time you spend on" Facebook, YouTube, LinkedIn, Amazon and Twitter.  *Id*.  And visitors to the website were instructed to "[a]dd the UpVoice Chrome extension to your desktop browser [to] start earning gift cards."   *Id*.   Once a user registered on joinupvoice.com, the user would need to install the UpVoice malicious extension from Google's Chrome Web Store.

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

COMPLAINT; DEMAND FOR JURY TRIAL

1

**Figure 3: UpVoice Website**



Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

50.    BrandTotal deceived visitors to the website into believing Facebook and other social networks were working with UpVoice and BrandTotal by identifying Facebook and the other companies as "participating sites," (Exs. 11 and 13) when in fact, Facebook did not authorize Defendants to scrape data from its computers. Additionally, although Instagram was not included in the list of "participating sites," BrandTotal collected advertising data and Instagram user profile information from users who installed the malicious extension.  Ex. 13.

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

51.     BrandTotal programmed the malicious extension to web scrape user profile information and advertising data from Instagram users who installed the UpVoice malicious extension.  Ex. 14.  BrandTotal caused the malicious extension to scrape advertisements and advertising metrics, including information about the advertiser, the image and text of the advertisement, and user interaction and reaction metrics (*e.g.*, number of views, comments, likes) associated with an advertisement.  *Id.*

52.     BrandTotal programmed the malicious extension to scrape Instagram user profile information, including the user's name, account name, user ID, profile picture, and other information about the user's account.  *Id.*

53.     BrandTotal also programmed the UpVoice malicious extension to send automated requests to Facebook servers to obtain user profile information for Facebook users and advertising data.  Exs. 15-19.  The malicious extension was coded to scrape information when a user visited Facebook.  BrandTotal caused the user's ID, gender, date of birth, relationship status, and location information to be scraped, regardless of the user's privacy settings.  *Id.*  BrandTotal also scraped Ad Preferences information (Ex. 18), which is nonpublic information Facebook uses to determine what ads to show a user based on a user's activity on Facebook and Instagram, and other information.

54.     BrandTotal also coded the UpVoice malicious extension to send requests to Facebook servers to obtain advertisements and advertising metrics, including information about the advertiser, the image and text of the advertisement, and user interaction and reaction metrics (*e.g.*, number of views, comments, likes) associated with an advertisement.  Ex. 20.

### 3.    Ads Feed Malicious Extension

55.     Since at least November 2019, Unimania developed, promoted, and distributed the Ads Feed malicious extension on Google's Chrome Web Store.  Ex. 9.  Unimania programmed the Ads Feed extension to web scrape data from both Facebook and Instagram, as well as Amazon, Twitter, and YouTube.  The data collected through

the Ads Feed malicious extension was sent to the same servers as the data collected through the UpVoice malicious extension.

56.     According to the overview of the malicious extension on Google's Chrome Web Store, the malicious extension saves 90 days of advertisements from Twitter, Facebook, Instagram, YouTube, and Amazon and allows the user to "click back to those that interest you." *Id.*  Unlike the UpVoice malicious extension, BrandTotal did not offer users a financial incentive for installing the Ads Feed malicious extension.  *Id.*

57.     The Ads Feed malicious extension used code almost identical to the code used in the UpVoice malicious extension to scrape user profile data, advertisements and advertising metrics, and Ad Preference information from Facebook and Instagram.  For example, like the UpVoice extension, the Ads Feed malicious extension scraped the image and text of the advertisement, and user interactions with the ad (*e.g.*, number of views, comments, likes) from Facebook and Instagram ads, returned it to the user's browser, and then sent it to a server controlled by Defendants.

### H.     Facebook's Enforcement Efforts

58.     On or about September 30, 2020, Facebook took various technical enforcement measures against Defendants, including disabling Facebook and Instagram accounts and Pages.

59.     On October 1, 2020, Facebook filed a civil action in the Superior Court of California, County of San Mateo, case 20-CIV-04256, alleging violations of Facebook's and Instagram's Terms based on scraping activity by Defendants' UpVoice and Ads Feed browser extensions.

60.     On October 1, 2020, shortly after Facebook filed its civil action in state court, Google removed both extensions from Google's Chrome Web Store, which disabled them.

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

## I.    After Plaintiff Revoked Defendants' Access, BrandTotal Created New Accounts and Promoted a New Malicious Extension

61.    On October 3, 2020, after Facebook took technical enforcement measures against Defendants, including disabling Facebook and Instagram accounts, BrandTotal's CPO created a Facebook account using the fake name "Jack Buch."  A few minutes later, BrandTotal's CPO created an Instagram account using the name "Jack_Back."

62.    On October 12, 2020, in order to circumvent Facebook's technical restrictions against scraping, Defendants published a new malicious extension on Google's Chrome Web Store.  This new malicious extension was called "UpVoice" and published under the developer name the "UpVoice Team."  Ex. 21.  Defendants' new malicious extension was programmed to scrape data from Facebook by using the browser of the user of the extension as a proxy to connect with Facebook computers, without authorization, meanwhile pretending to be an authenticated user with proper login credentials.  The new malicious extension was designed to scrape data from Facebook's computers when the user was logged in and visited Facebook.  The data scraped from Facebook's computers included advertisements, advertising metrics, and data that was not publicly viewable and, in some cases, not even viewed by the user. The malicious extension was also coded to scrape data from LinkedIn.com, Twitter.com, YouTube.com, and Amazon.com and was installed by approximately 30 users.

63.    The new malicious extension was coded to return scraped data to the user's browser, and then send it to a server controlled by Defendants.

## J.    Defendants Unjustly Enriched Themselves and Harmed Facebook

64.    Defendants' violations of Facebook's and Instagram's Terms and Policies have harmed Facebook.   Defendants interfered and continue to interfere with Facebook's platforms.

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

65.    Facebook suffered damages attributable to the efforts and resources it used to investigate and remediate Defendants' conduct in an amount to be determined at trial.

66.    Since at least September 2019, Defendants have unjustly enriched themselves at Facebook's expense in an amount to be determined at trial.  Facebook is entitled to an accounting by Defendants and a disgorgement of all unlawful profits gained from their conduct.

## FIRST CAUSE OF ACTION

### (Breach of Contract)

67.    Facebook realleges and incorporates all preceding paragraphs here.

68.    Since December 2016, Defendants, through their employees and agents, created multiple Facebook and Instagram accounts and agreed to Facebook's and Instagram's Terms and Policies.  Facebook's and Instagram's Terms and Policies constitute an agreement between Defendants and Facebook.  Defendants also agreed to Facebook's and Instagram's Terms and Policies through the use of the service.

69.    Facebook has performed all conditions, covenants, and promises required of them in accordance with Facebook's and Instagram's Terms and Policies.

70.    Defendants' actions interfered and caused others to interfere with Facebook and Instagram, and engaged with Facebook and Instagram in unauthorized ways.

71.    Defendants have breached Instagram's Terms.  Defendants have also breached Facebook Terms 3.2.1, 3.2.2, and 3.2.3.  Facebook's Terms prohibit (a) using automated means without Facebook's permission to web scrape user profiles and account and advertising information from Facebook and Instagram; (b) scraping Facebook and Instagram user profile information and advertising data by sending code to Facebook that purported to originate from the user, which is "unlawful, misleading, [ ] or fraudulent;" (c) falsely representing to users that Facebook is a "participating site" in Defendants' scraping activity; and (d) scraping the intellectual property rights of

others by harvesting advertising images and text.   Instagram's Terms of Use also prohibit the same conduct.

72.    Defendants' many breaches have caused Facebook to incur damages in an amount to be proven at trial.

73.    Facebook likewise seeks injunctive relief.   As a direct result of Defendants' unlawful actions, Facebook has suffered and continues to suffer irreparable harm for which there is no adequate remedy at law, and which will continue unless Defendants' actions are enjoined.

## SECOND CAUSE OF ACTION

### (Unjust Enrichment)

74.    Facebook realleges and incorporates all preceding paragraphs here.

75.    Defendants' acts as alleged herein constitute unjust enrichment of the Defendants at Facebook's expense.

76.    Defendants accessed and used, without authorization or permission, Facebook's services, platforms, and computer network, all of which belong to Facebook.

77.    Defendants used Facebook's services, platforms, and computer network to, among other things, scrape data from Instagram and Facebook.

78.    Defendants received a benefit by profiting from the data they wrongfully scraped from Facebook and Instagram, which they used to sell "marketing intelligence" and services.   But for Defendants' wrongful, unauthorized, and intentional use of Facebook and Instagram, they would not have obtained such profits.

79.    Defendants' retention of the profits derived from their unauthorized use of Facebook's service, platform, and computer network, including data, would be unjust.

80.    Facebook seeks an accounting and disgorgement of Defendants' ill-gotten profits in an amount to be determined at trial.

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

### THIRD CAUSE OF ACTION

(Computer Fraud and Abuse Act, 18 U.S.C. § 1030)

81.     Facebook realleges and incorporates all preceding paragraphs here.

82.     Defendants violated and attempted to violate 18 U.S.C. § 1030.

83.     Facebook's computers are "protected computers" as defined by 18 U.S.C. § 1030(e)(2)(B) because they are "used in or affecting interstate commerce or communication."

84.     Defendants violated and attempted to violate 18 U.S.C. § 1030(a)(2) because they intentionally accessed and attempted to access Facebook's computers without authorization and obtained public and non-public information from Facebook. Defendants' access was without authorization because Facebook revoked Defendants' access to Facebook and filed a civil action against Defendants on October 1, 2020.

85.     Defendants violated 18 U.S.C. § 1030(a)(4) because they knowingly and with intent to defraud, accessed Facebook computers, by sending and attempting to send unauthorized commands and requests, and by means of such conduct furthered the intended fraud and obtained something of value.  Defendants' intended fraud included sending concealed commands and requests to Facebook computers that falsely represented themselves as requests from an authenticated, logged in user in order to access and obtain data from Facebook, the value of which exceeded $5,000.

86.     Defendants' actions caused plaintiff to incur a loss as defined by 18 U.S.C. § 1030(e)(11), in an amount in excess of $5,000 during a one-year period, including the expenditure of resources to investigate and remediate Defendants' conduct.  Plaintiff is entitled to compensation for losses and any other amount to be proven at trial.

### FOURTH CAUSE OF ACTION

(California Penal Code § 502)

87.     Facebook realleges and incorporates all preceding paragraphs here.

88.     Defendants violated California Penal Code § 502.

89.     Through the malicious extensions, Defendants knowingly accessed and without permission used Facebook's computers in order to both (a) devise and/or execute a scheme to defraud and deceive; and (b) wrongfully obtain data in violation of California Penal Code § 502(c)(1)(A) & (B).

90.     Through the malicious extensions, Defendants knowingly accessed and without permission took, copied, and/or made use of data from Facebook's computers in violation of California Penal Code § 502(c)(2).

91.     Defendants knowingly and without permission used Facebook's computer services, as defined by § 502(b)(4), in violation of California Penal Code § 502(c)(3).

92.     By knowingly and without permission accessing Facebook's computers, computer systems, and/or computer networks Defendants violated California Penal Code § 502(c)(7).

93.     Defendants' access was without permission because Defendants accessed Facebook's computers, computer systems, and/or computer networks after Facebook revoked Defendants' access to Facebook and Instagram and filed a civil action against Defendants on October 1, 2020.

94.     Facebook suffered and continues to suffer damages and a loss as a result of Defendants' actions.  Facebook, therefore, is entitled to compensatory damages, in an amount to be proven at trial, as well as injunctive relief under California Penal Code § 502(e)(1) and (2).

95.     Because Defendants willfully violated California Penal Code  § 502 and given the clear and convincing evidence that Defendants committed "fraud" as defined by 3294 of the California Civil Code, Plaintiff is entitled to punitive damages under California Penal Code § 502(e)(4).

## **FIFTH CAUSE OF ACTION**

(Interference with Contractual Relations)

96.     Facebook realleges and incorporates all preceding paragraphs here.

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

97.     All Facebook and Instagram users must agree to Facebook's and Instagram's Terms, which were valid and existing contracts at all relevant times.

98.     Under the Facebook Terms, among other things, all Facebook users agreed to "[n]ot share your password, give access to your Facebook account to others, or transfer your account to anyone else (without our permission)."  Similarly, under the Instagram Terms, among other things, all Instagram users agreed they would not "attempt to buy, sell, or transfer any aspect of your account (including your username) or solicit, collect, or use login credentials or badges of other users."

99.     Defendants knew of Facebook's contractual relationship with its users and of  Facebook's and Instagram's Terms because Defendants agreed to them themselves when they created accounts on Facebook and Instagram.

100.    Defendants intentionally interfered with Facebook's contractual relationship with its users by inducing them to share their Facebook and Instagram login credentials with Defendants in violation of the foregoing provisions.

101.    Defendants' acts were wrongful in that Defendants falsely represented to users that Facebook was a "participating site" that sanctioned Defendants' conduct; and solicited access to the users' account and Facebook through the malicious extensions. In fact, Facebook was never a "participating site," and it never sanctioned Defendants' conduct.  Moreover, as stated above, Defendants' conduct violated 18 U.S.C. § 1030 and California Penal Code § 502.

102.    As a result of Defendants' conduct, Facebook has incurred damages in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

(Unlawful, Unfair or Fraudulent Business Practices against Defendants)

103.    Facebook realleges and incorporates all preceding paragraphs here.

104.    Defendants' actions described above constitute unlawful, unfair, or fraudulent acts or practices in the conduct of a business, in violation of California's

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

Business and Professions Code Section 17200, *et seq.*, including actions that are forbidden by other laws.

105.   Defendants' business practices are unfair because Defendants have acted in a manner that is immoral, unethical, oppressive, unscrupulous and/or substantially injurious to Facebook.   Defendants falsely represented that Facebook was a "participating site" that sanctioned Defendants' conduct when, in fact, Facebook did not sanction Defendants' conduct.   Moreover, Defendants solicited and deceived users into installing Defendants' extensions which enabled Defendants to use the users' browsers as a proxy to access Facebook computers, without Facebook's authorization, meanwhile pretending to be a legitimate user in order to scrape data from Facebook.

106.   Scraping data and information from Facebook, as well as circumventing Facebook's ability to police its platforms for abusers, is substantially injurious because of the significant harm that can result to Facebook's and Instagram's users if information associated with those users is handled irresponsibly by third parties, including Defendants.  Further, the impact of the practice against Plaintiff far outweighs any possible justification or motive on the part of Defendants.  Facebook, and the public at large, have a strong interest in the integrity of Facebook's platforms, Facebook's policing of those platforms for abuses, and Facebook's protection of its users' privacy.

107.   Defendants' business practices are fraudulent for the same reason. Defendants falsely represented to Facebook's and Instagram's users that Facebook was a "participating site" that sanctioned Defendants' conduct when, in fact, Facebook did not sanction such conduct.  Moreover, Defendants deceived Facebook into providing them with access to its computer network by using the login credentials of other users, which Facebook did not and would not permit.

108.   Defendants' business practices also are unlawful.   As stated above, Defendants' conduct violated 18 U.S.C. § 1030 and California Penal Code § 502.

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

109.   As a result of Defendants' various acts and omissions, Facebook was injured and in fact and lost money and property in the form of, among other things, costs to investigate, remediate, and prevent Defendants' wrongdoings.

110.   As a result of Defendants' various acts and omissions, Facebook has suffered and continues to suffer irreparable harm for which there is no adequate remedy at law, and which will continue unless Defendants' actions are enjoined.

## **PRAYER FOR RELIEF**

Facebook seeks a judgment awarding the following relief:

(a)   A permanent injunction restraining Defendants from accessing and using Facebook and Instagram;

(b)   A permanent injunction requiring Defendants to identify the location of any and all data obtained from Facebook and Instagram, to delete such data, and to identify any and all entities with whom Defendants shared such data;

(c)   A permanent injunction restraining Defendants from developing, distributing, using, and causing others to use browser extensions and other products and devices designed to collect data from Facebook and Instagram, without first obtaining Facebook's express permission;

(d)   Compensatory damages in an amount to be determined at trial;

(e)   An accounting of each Defendant's profits resulting from their scraping activity;

(f)   Disgorgement of Defendants' profits resulting from their scraping activities;

(g)   Pre-judgment and post-judgment interest; and

/ / /

/ / /

/ / /

/ / /

/ / /

1    (h)    All other equitable or legal relief the Court deems just and proper.

2

3    Dated:  October 14, 2020                **HUNTON ANDREWS KURTH LLP**

4

5                                            By: ____/s/ Ann Marie Mortimer____

6                                                    Ann Marie Mortimer
                                                     Jason J. Kim
7                                                    Jeff R. R. Nelson
                                                 Attorneys for Plaintiff
8                                                FACEBOOK, INC.

9
                                                     Platform Enforcement and
10                                                   Litigation
                                                     Facebook, Inc.
11                                                   Jessica Romero
                                                     Michael Chmelar
12                                                   Stacy Chen

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

1

## DEMAND FOR JURY TRIAL

2   Plaintiff hereby demands a trial by jury on all issues triable to a jury.

3

4   Dated:  October 14, 2020                    **HUNTON ANDREWS KURTH LLP**

5

6                                              By:  ____/s/ Ann Marie Mortimer____

7                                                   Ann Marie Mortimer
                                                    Jason J. Kim
8                                                   Jeff R. R. Nelson
                                              Attorneys for Plaintiff
9                                             FACEBOOK, INC.

10
                                              Platform Enforcement and
11                                            Litigation
                                              Facebook, Inc.
12                                            Jessica Romero
                                              Michael Chmelar
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

**EXHIBIT 1**



**Corporate Authority** *Online*

Israeli Corporations Authority
Department of Justice

accessibility

Registrar of Partnerships | Registrar of Associations | Liens and mortgages | Registrar of Companies

Information and services online    ‹ Corporations Online

## Information and services online

You can search by corporation number or corporation name. The information as stated, is provided at no cost and eligibility to the public. This information may be missing, inaccurate or out of date.
To clarify the information and reports submitted to the Registrar of Companies or the Registrar of Partnerships as required by law, including regarding the address of the company / partnership, please refer to the corporation file (paid service)

**Support and use of the site**

**Registrar of Companies**
moked-tagid@justice.gov.il @

**Registrar of Associations**
moked-amutot@justice.gov.il @

**Registrar of Pledges**
moked-mashkonot@justice.gov.il @

5601 *

Company number | brandtotal | Company Name
site | | 

## Search Results - Company Name: brandtotal

| ...l Report | ...r of the law | ...poration status | Company type | Name in Hebrew ▼ | ...oration number ▼ |
|---|---|---|---|---|---|
| 2020 | | Active | Israeli | BrandTotal Ltd. | 515552065 |

### Corporation details

**Name in Hebrew:** BrandTotal Ltd.
**English name:** BRANDTOTAL LTD
**Date of incorporation:** 20/11/2016
**Sub-status:**
**Company description:**
**The purpose of the company:** To engage in any lawful business
**govermental company:** No | **restriction:** Limited
**Fee obligations:** nothing |

### Address

**Locality:** Ramat Gan | **Street:** Through Abba Hillel | **A number:** 16 | **Postal Code:** 5250608 |
**PO Box:** | **country:** Israel | **at:** Meitar Liquornik Geva & Leshem Brandwein & Co.

### Additional actions



Retrieve payment confirmation | ...cations to the Registrar
Order a portfolio | ...tion of a company draft | Ordering documents

|◄ ◄ 1 ► ►|    of 1 items 1 - 1

Please note that the actions performed by you on the site are maintained for the purpose of quality control and improvement of the service to the citizen ⊗

All rights reserved 2020 Ministry of Justice © Version Number: 4.1.0 Browser: Chrome 84    | Website of the Registrar of Companies | Corporate Authority website | To the website of the Ministry of Justice contact

**EXHIBIT 2**

*State of Delaware*
The Official Website of the First State

**Department of State: Division of Corporations**

Allowable Characters

**HOME**
About Agency
Secretary's Letter
Newsroom
Frequent Questions
Related Links
Contact Us
Office Location

**SERVICES**
Pay Taxes
File UCC's
Delaware Laws Online
Name Reservation
Entity Search
Status
Validate Certificate
Customer Service Survey

**INFORMATION**
Corporate Forms
Corporate Fees
UCC Forms and Fees
Taxes
Expedited Services
Service of Process
Registered Agents
GetCorporate Status
Submitting a Request
How to Form a New Business Entity
Certifications, Apostilles & Authentication of Documents

Entity Details

**THIS IS NOT A STATEMENT OF GOOD STANDING**

| | | | |
|---|---|---|---|
| File Number: | **6613286** | Incorporation Date / Formation Date: | **11/13/2017** (mm/dd/yyyy) |
| Entity Name: | **BRANDTOTAL INC.** | | |
| Entity Kind: | **Corporation** | Entity Type: | **General** |
| Residency: | **Domestic** | State: | **DELAWARE** |

**REGISTERED AGENT INFORMATION**

| | | | |
|---|---|---|---|
| Name: | **PHS CORPORATE SERVICES, INC.** | | |
| Address: | **1313 N MARKET ST STE 5100** | | |
| City: | **WILMINGTON** | County: | **New Castle** |
| State: | **DE** | Postal Code: | **19801** |
| Phone: | **302-571-1128** | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.
Would you like ○ Status ○ Status,Tax & History Information

Submit

View Search Results          New Entity Search

For help on a particular field click on the Field Tag to take you to the help area.

**EXHIBIT 3**



# NYS Department of State
## Division of Corporations
## Entity Information

### The information contained in this database is current through May 27, 2020.

Selected Entity Name: BRANDTOTAL INC.

| Selected Entity Status Information | |
|---|---|
| **Current Entity Name:** | BRANDTOTAL INC. |
| **DOS ID #:** | 5394869 |
| **Initial DOS Filing Date:** | AUGUST 16, 2018 |
| **County:** | NEW YORK |
| **Jurisdiction:** | DELAWARE |
| **Entity Type:** | FOREIGN BUSINESS CORPORATION |
| **Current Entity Status:** | ACTIVE |

**Selected Entity Address Information**

**DOS Process** (Address to which DOS will mail process if accepted on behalf of the entity)
BRANDTOTAL INC.
49 W 23RD ST
NEW YORK, NEW YORK, 10010

**Registered Agent**
NONE

This office does not record information regarding the names and addresses of officers, shareholders or directors of nonprofessional corporations except the chief executive officer, if provided, which would be listed above. Professional corporations must include the name(s) and address(es) of the initial officers, directors, and shareholders in the initial certificate of incorporation, however this information is not recorded and only available by viewing the certificate.

| *Stock Information | | |
|---|---|---|
| **# of Shares** | **Type of Stock** | **$ Value per Share** |
| | No Information Available | |

*Stock information is applicable to domestic business corporations.

| Name History | | |
|---|---|---|
| **Filing Date** | **Name Type** | **Entity Name** |
| AUG 16, 2018 | Actual | BRANDTOTAL INC. |

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in New York State. The entity must use the fictitious name when conducting its activities or business in New York State.

**NOTE:** New York State does not issue organizational identification numbers.

URL: https://appext20.dos.ny.gov/corp_public/CORPSEARCH.ENTITY_INFORMATION?
p_token=F085393DBFF563EE8BBC0BB1E7F8CA49A867E59DB8E4569138E8FA93ACFB2E5FA6DE574A29CD6AB5E4A22B77BC3C51E1&p_nameid=80550B2CD21DA617&p_corpid=ECA5FCCCE7FCFE1E&p_captcha=17151&p_captcha_check=F085393
DBFF563EE8BBC0BB1E7F8CA49A867E59DB8E4569138E8FA93ACFB2E5F844D33F58D6463B9685E535EE4F557D4&p_entity_name=%62%72%61%6E%64%74%6F%74%61%6C&p_name_type=%25&p_search_type=%43%4F%4E%54%41%49%4E%E%
53&p_srch_results_page=0

**EXHIBIT 4**



**Privacy Shield**
Framework

Self-Certify    Privacy Shield List    Audiences    About

**BrandTotal Inc.**

● Active Participant

Participation
Privacy Policy
Dispute Resolution

## Participation

**EU-U.S. PRIVACY SHIELD FRAMEWORK:** ACTIVE
Original Certification Date: 8/23/2018
Next Certification Due Date: 4/22/2021
Data Collected: NON-HR

**SWISS-U.S. PRIVACY SHIELD FRAMEWORK:** ACTIVE
Original Certification Date: 8/23/2018
Next Certification Due Date: 4/22/2021
Data Collected: NON-HR

**PURPOSE OF DATA COLLECTION**

BrandTotal Inc. is a subsidiary of BrandTotal Ltd. BrandTotal and BrandTotal Ltd. develop and provide marketers with real-time brand monitoring and competitive intelligence solutions on their and their competitors' online advertising activities, including in social networks (the "Service"). In order to perform the Service, we, BrandTotal Inc. may use personal information, namely, for the purpose of research and development and/or marketing of the Service. BrandTotal will process the personal data it receives for the purposes of offering and/or providing the Service to customers. To fulfill these purposes, We may, without limitation, use the personal data to, and/or to assist BrandTotal Ltd. to: contact data subjects, to discuss or execute contracts, to provide the Service, to provide support and maintenance, to correct and address technical or service problems, for marketing purposes, to comply with applicable laws, regulations and orders from public authorities or courts, and/or for the establishment, exercise or defense of legal claims, whether in court proceedings or in an administrative or out-of-court procedures.

## Privacy Policy

**NON-HR DATA**

Document: BrandTotal - Privacy Shield Notice
Description:

BrandTotal Inc. is a subsidiary of BrandTotal Ltd. BrandTotal and BrandTotal Ltd. develop and provide marketers with real-time brand monitoring and competitive intelligence solutions on their and their competitors' online advertising activities, including in social networks (the "Service"). In order to perform the Service, we, BrandTotal, Inc. may use personal information, namely, for the purpose of research and development and/or marketing of the Service. BrandTotal will process the personal data it receives for the purposes of offering and/or providing the Service to customers. To fulfill these purposes, We may, without limitation, use the personal data to, and/or to assist BrandTotal Ltd. to: contact data subjects, to discuss or execute contracts, to provide the Service, to provide support and maintenance, to correct and address technical or service problems, for marketing purposes, to comply with applicable laws, regulations and orders from public authorities or courts, and/or for the establishment, exercise or defense of legal claims, whether in court proceedings or in an administrative or out-of-court procedures.

Effective Date: 4/21/2020

**VERIFICATION METHOD**
Self-Assessment

## Dispute Resolution

**QUESTIONS OR COMPLAINTS?**

If you have a question or complaint regarding the covered data, please contact BrandTotal Inc. at:

Oren Dor                          oren@brandtotal.com
BrandTotal Inc.
49 W 23rd St, New York
New York, New York 10010

Privacy Shield organizations must respond within 45 days of receiving a complaint.

If you have not received a timely or satisfactory response from BrandTotal Inc. to your question or complaint, please contact the independent recourse mechanism listed below

**NON-HR RECOURSE MECHANISM**
JAMS Privacy Shield Program

Appropriate statutory body with jurisdiction to investigate any claims against BrandTotal Inc. regarding possible unfair or deceptive practices and violations of laws or regulations covering privacy Federal Trade Commission

Self-Certify          Privacy Shield List          Audiences              About

U.S. Businesses        Program Overview
European Businesses    Framework Text
EU and Swiss Individuals  Inactive Participants
Data Protection Authorities  News & Events
                       Contact
                       Privacy Program

Home | Website Feedback | Privacy Policy | Disclaimer | FOIA | USA.gov

The International Trade Administration (ITA), U.S. Department of Commerce manages this site to facilitate the Privacy Shield Framework in the United States. External links to other internet sites should not be construed as an endorsement of the views or privacy policies contained therein. This site contains PDF documents. A PDF Reader is available from Adobe Systems Incorporated.

U.S. Department of Commerce | EU-U.S. & Swiss-U.S. Privacy Shield | 1401 Constitution Avenue, N.W. | Room 13018 | Washington, D.C. 20230

**EXHIBIT 5**

**BrandTotal**                          About    News    Resources    Blog    Login    Request a Demo



# Smarter marketing begins with data.

Before digital, it was pretty straightforward to track the competition in print, on billboards and on TV. But today, with 90% of today's digital marketing hidden from view and fragmented across multiple channels, it can be challenging to understand how your brand marketing measures up to the competition.

By applying advanced cyber security techniques and artificial intelligence, BrandTotal uncovers and analyzes competitors' "dark" marketing efforts, illuminating their strategies and tactics. Many of the most recognizable consumer brands use our competitive marketing intelligence platform to discover marketing threats and opportunities in real time.

If you are interested in joining our team to help change the way marketers understand their competitive environment, please contact us!

## LEADERSHIP



**Alon Leibovich**, CEO & Co-Founder

**Amir Leshman**, CTO & Co-Founder

**Omer Ramote**, Chief Architect & Co-Founder

**Oren Dor**, Chief Product Officer

**Mark Mansfield**, SVP Global Head, Growth & Partnerships

**Backed By**

  

 

## Request a Demo

Find out what BrandTotal can show you about your competitors by requesting a demo today.

[                                        ]    Submit

About    News    Resources    Blog    GDPR Compliance    Careers    Contact us        **BrandTotal**    © 2020 BrandTotal Inc.

Get A Demo

Privacy Policy    Terms and Conditions    Cookie Policy    Privacy Shield

33

**EXHIBIT 6**

 chrome web store

⚙ Sign in

Home > Extensions > UpVoice

 **UpVoice**
Offered by: UpVoice

★★★★½ 10  |  Accessibility  |  👤 5,000+ users

**Available on Chrome**

Overview    Reviews    Support    Related



Earn $75 and up annually just for being you

Use Facebook, Instagram and other participating sites like you normally do and win up to $75 in the first year. Share your opinions and win even more!

○ ● ○ ○

## Overview

This extension allows you to earn rewards just for being you!

Earn a selection of gift cards of your choice including Amazon and prepaid Visa for using Facebook, YouTube, Amazon, and other participating sites like you normally do. Share your opinions and win even more!

As a qualified UpVoice panelist, you impact the marketing decisions and brand strategies of multi-billion dollars corporations, who compete for your attention online. This means that you have a direct influence on the online advertising campaigns of big brands.

Install the UpVoice extension and qualify to become a member of our panel. It's safe and won't impact your browser performance. As a qualified member, we will reward you for browsing your social feeds and other participating sites as you normally do. For more details, please visit our terms of service at: https://joinupvoice.com/tos and our rewards plan at: https://joinupvoice.com/faq/#rewards-plan.
Make sure to disable your ad blocker if you have one, otherwise, we cannot collect the ads that target you and therefore we cannot reward you.

Privacy & data collection
When you regularly visit Facebook, Instagram and other participating sites, we securely collect the ads that you see and anonymous demographic profile data. We never share your personal information with anyone, except if needed to send you your rewards.

We protect your data using the highest security standards and we comply with all privacy regulations. For more details, please visit our Privacy Policy at: https://joinupvoice.com/privacy and our Data & Privacy FAQ at: http://joinupvoice.com/faq/#upvoice-data-and-privacy
If you have any questions, please contact us at: contact@joinupvoice.com.

For more details please visit www.joinupvoice.com.

Read less

## Additional Information

🏠 Website    🚫 Report abuse

**Version**
2.10.1439

**Updated**
July 19, 2020

**Size**
341KiB

**Language**
English

**Developer**
contact@joinupvoice.com
Privacy Policy

## Related


SavvyConnect by SavvyS...
8,000+ users


PrizeRebel - Online Paid ...
★★★★½ 44


Loginhood
★★★★☆ 9


Microsoft Rewards
★★★★☆ 130


Get Fre...
★

This extension allows you to earn rewards just for being you!

**Available on Chrome**

**EXHIBIT 7**



← BACK ALL POSTS

# BrandTotal Raises $6 Million in Series A Round to Expand Rollout of Agile Marketing Platform [PRESS RELEASE]

September 25, 2018

BrandTotal, a New York- and Tel Aviv-based company whose agile marketing platform harnesses artificial intelligence, cyber security techniques and data science to empower brand marketers with competitive data and actionable insights by revealing the digital marketing activities of their top competitors, today announced the closing of a $6 million round of funding, bringing their total venture funding to $8 million.

## Flint Capital Leads Latest Funding

BrandTotal Marketing Intelligence Platform Shines Light on "Dark Marketing," Revealing Hidden Digital Marketing Strategies to Empower Brand Marketers

NEW YORK, Sept. 25, 2018 /PRNewswire/ — BrandTotal, a New York- and Tel Aviv-based company whose agile marketing platform harnesses artificial intelligence, cyber security techniques and data science to empower brand marketers with competitive data and actionable insights by revealing the digital marketing activities of their top competitors, today announced the closing of a $6 million round of funding, bringing their total venture funding to $8 million.

International venture capital firm **Flint Capital** led the Series A funding round, which included:

- **NHN Investment**, owner of Naver Corp., operator of Line, the most popular messaging app in Japan and South Korea.
- **One Way Ventures**, a Boston-based venture fund led by Semyon Dukach and Eveline Buchatskiy, former Directors of Techstars in Boston.
- **PJ Labs**, led by Fabrice Grinda, who was recently named the #1 Most Successful Angel Investor in the world by Forbes, [August, 2018]

**Giilot Capital Partners** and **Keshet Dick Clark Productions** also joined the funding in early 2018. Both were participants in BrandTotal's $2 million seed investment round, which closed July 2017. The Series A funding caps off an event-filled summer for BrandTotal, announcing a partnership with Microsoft via Microsoft's Dynamics 365, being selected to Oracle's Startup Cloud Accelerator and having presented at Morgan Stanley's prestigious Innovation Summit.

Funds from the Series A Round will be used to expand sales, marketing and data science efforts via BrandTotal's new offices in New York as well as internationally.

"The support from Flint Capital and our investment leaders has already created new growth opportunities for BrandTotal among Fortune 500 companies, by allowing us to optimize and expand the roll-out of our agile marketing platform," says Alon Leibovich, CEO and co-founder of BrandTotal. "Our proprietary data shows that 85% of sponsored posts on Facebook are 'dark' posts, meaning they are targeted to specific users. There is a massive gap in marketing visibility across digital platforms and we are illuminating these programs to empower marketers with actionable competitive insights."

"We are thrilled to put our support behind the outstanding management team at BrandTotal, a company that provides some of the world's largest organizations with unique and invaluable insights into digital marketing—a space which is projected to approach $120 billion in spend by 2021 in the U.S. according to Forrester Research," says Sergey Gribov, Partner at Flint Capital.

## About the BrandTotal Agile Marketing Platform

Launched in June 2017, BrandTotal's agile marketing intelligence platform is a SaaS-based solution that harnesses AI, cyber security techniques and data science to distill actionable insights. The technology was developed to provide brand marketers with valuable competitive intelligence about the digital marketing landscape within their industry. Through campaign aggregation, BrandTotal's technology detects creatives across various digital channels and clusters them into campaigns for analysis. Using signal detection, the platform identifies trends and outliers between brands within the industry-wide competitive landscape.

BrandTotal's SaaS-based platform collects and consolidates both public and targeted "dark" posts from numerous paid media channels, including Facebook, Instagram, Twitter, YouTube, Amazon and display banners across the web. With a lack of transparency in the ever-evolving digital marketing ecosystem, the platform can reveal a brand's opportunities and threats in real time, enabling marketers to become agile with a competitive edge.

The BrandTotal Agile Marketing Platform provides detailed reports and cross-platform competitive analytics to help quantify brand marketing initiatives, including:

- Target demographics
- Share of voice
- Advertising spend
- Creative assets
- Audience sentiment
- Active channels
- Engagement across multiple social platforms
- Organic content shares

## About BrandTotal

BrandTotal uses advanced cyber security techniques and artificial intelligence to reverse-engineer digital marketing programs, enabling brand marketers to see and understand the strategies their competitors are using to drive digital marketing.

With corporate marketing budgets increasingly shifting towards digital channels, hyper-targeted and personalized campaigns have become more popular and are inherently hidden from public view. Because digital marketing is targeted to individuals, the parts that can be seen in the open are just fragments of a larger strategy. There's no way to know how competing companies are deploying their campaigns, who is seeing them, or how effective they are.

In July 2018, BrandTotal announced a partnership with Microsoft in which the tech giant will provide access to select features from its Agile Marketing Platform to Microsoft customers through Microsoft Dynamics 365.

In August 2018, BrandTotal was selected to participate in Oracle's Startup Cloud Accelerator, a six-month partnership in which Oracle provides mentoring, access to technology, client and partner lists and other resources to the world's most promising startups.

For more information contact:

Jeffrey Keegan
The Odenscheimer Group
jkeegan@digi-nyc.com
914-482-0289

## About the author

 BrandTotal Staff

**VIEW ALL POSTS**

## Request a Demo

Find out what BrandTotal can show you about your competitors by requesting a demo today.

Enter your email                    Submit



**EXHIBIT 8**



**Department of State: Division of Corporations**

Allowable Characters

---

Entity Details

---

**THIS IS NOT A STATEMENT OF GOOD STANDING**

HOME
About Agency
Secretary's Letter
Newsroom
Frequent Questions
Related Links
Contact Us
Office Location

**SERVICES**
Pay Taxes
File UCC's
Delaware Laws Online
Name Reservation
Entity Search
Status
Validate Certificate
Customer Service Survey

Loading...

| File Number: | 6633597 | Incorporation Date / Formation Date: | 11/27/2017 (mm/dd/yyyy) |
|---|---|---|---|
| Entity Name: | UNIMANIA, INC. | | |
| Entity Kind: | Corporation | Entity Type: | General |
| Residency: | Domestic | State: | DELAWARE |

**REGISTERED AGENT INFORMATION**

| Name: | MWE CORPORATE SERVICES, LLC | | |
|---|---|---|---|
| Address: | 1007 NORTH ORANGE STREET, 4TH FLOOR, | | |
| City: | WILMINGTON | County: | New Castle |
| State: | DE | Postal Code: | 19801 |
| Phone: | | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ○ Status ○ Status,Tax & History Information

[ Submit ]

[ View Search Results ]        [ New Entity Search ]

---

For help on a particular field click on the Field Tag to take you to the help area.

**EXHIBIT 9**

 chrome web store



Home > Extensions > Ads Feed



# Ads Feed

Offered by: https://www.unimania.xyz

★★★★★ 8 | Accessibility | 👤 6,000+ users

**Available on Chrome**

Overview     Reviews     Related



**Select social channels to view ads, going back as far as 90 days**

All ▾
Twitter
Facebook
Instagram
Youtube
Amazon

○ ○ ●

## Overview

Automatically save the ads you see on social networks and finally know which advertisers find you the most attractive online.

This extension automatically saves the ads you are exposed to online so you can click back to those that interest you. Also, use Ads Feed to find out how many ads targeted you in the last period, who are the top 5 advertisers that competed for your attention online and what ads others like you saw.

We collect this data by monitoring which ads you and others like you see while you browse.

By installing the "Ads Feed" extension, you are officially becoming a panel member of an elite community group that impacts the advertising decisions of multi-billion dollar corporations!

Privacy Policy and Service Terms:
We care a lot about your privacy and we work hard to safeguard the data we collect and to comply will all relevant laws and regulations.

As a panel member, we collect anonymous Facebook demographics data and ad related data from the sites you visit of the advertising campaigns that target you and other panelists. We aggregate and use this data for market research purposes, namely, to build special advertising related insights and analyses for brands that work with us.

We do not collect, store, use, share or sell any of your personal information. In addition, we do not monitor your online behavior, track your activities or collect the web pages you visit.

Please review our service terms and privacy policy below to learn more about what data we collect about you and what we use it for. If you have any questions concerning your privacy, please contact us at: privacy@unimania.xyz.

Privacy policy: http://privacy.unimania.xyz/privacy_policy_af.pdf
Service terms: http://privacy.unimania.xyz/service_terms_af.pdf

Contact us:
We are here for you. If you find a bug or have a new feature in mind, or if you have a question about the extension or your privacy, please don't hesitate to contact us at: contact@unimania.xyz

**Read less**

### Additional Information

🔴 Report abuse

**Version**
2.10.1439

**Updated**
July 19, 2020

**Size**
780KiB

**Language**
English

**Developer**
contact@unimania.xyz
Privacy Policy

## Related

Turbo Ad Finder
★★★☆☆ 296

PreciseMagnetic for FB ...
★★★★☆ 62

Info and Ads Watch
★☆☆☆☆ 1

My Ad Finder
★★★★☆ 12

Ad Hunter

Automatically save the ads you see on social networks and finally know which advertisers find you the most attractive online.

**Available on Chrome**

**EXHIBIT 10**



Coming Soon...

**EXHIBIT 11**



# Get paid for the time you spend on

  

Add the UpVoice Chrome extension to your desktop browser and start earning gift cards for visiting our participating sites regularly. It's THAT easy!

**CONTINUE WITH FACEBOOK**    **WATCH VIDEO**

## How it works



### Install

After signing up, we will invite you to install the UpVoice Chrome extension. It's safe and won't impact your browser performance

### Browse

Continue your regular browsing activity

### Earn

When you browse through our participating sites, the Chrome extension anonymously captures your ads and gives you daily points that can later be redeemed for a variety of gift cards



# Who you are matters

As a qualified UpVoice panelist, you become a member of an exclusive market research community that impacts the marketing decisions and brand strategies of multi-billion dollar corporations who want to get your attention online.

This means that you have a direct influence on the online advertising campaigns of big brands.

That's what being a member of this exclusive community is all about!

# Users love it!



**Billie Lucas**
Aug 26, 2019
"Earning money for nothing, literally! Who wouldn't add this extension?! Seriously, get paid to visit sites you already do daily anyhow. Honestly, you would be crazy not to add this extension"
★★★★★

**Shelle Perry**
Aug 23, 2019
"You get paid just for having the extension and visiting websites you go to every day anyway. With so many scams out there it is awesome to find something that does what it says"
★★★★★

**Karen Smith**
Sep 12, 2019
"This is an awesome extension! Getting the ability to cash out by doing what I normally do is very easy!"
★★★★★

**Sandra Amory**
Jul 9, 2019
"I just received my first $10 from UpVoice. I am amazed how easy it is to accumulate points with this extension. I like it a lot"
★★★★★

**Debra Ann Elliott**
Sep 16, 2019
"To be honest, I forgot I installed this, but was surprised to get my first $10 gift card for doing nothing but surfing the Internet. Great!"
★★★★★

**Madhukar Bonkuri**
Sep 11, 2019
"I love this extension and it is real, you can get the cash out easily"
★★★★★



# Rewards

As soon as you're qualified as a member of our panel, you will begin collecting tokens, which can later be redeemed for a selection of e-gift cards. If you use our participating sites daily, you can earn even more rewards.

Earn more by completing periodical surveys from brands who want to know what you think.

Visit our rewards plan for more details.



# Privacy

We respect your privacy and protect your data using the highest security standards. We comply with all privacy regulations and we never share your personal information with anyone, except when we need to send you your rewards.

We anonymize and aggregate all the data we collect from you along with other panel members.

Please read our Privacy Policy and Data & Privacy FAQ for more details.



# It's not us, it's you!

UpVoice is the user panel of an innovative market research firm that helps top brands make better marketing decisions. By being an active member of our elite panel community, you are making a direct impact on how multi-billion dollar corporations promote their brands online.

**GET STARTED**

FAQ    Terms Of Use    Privacy Policy    Contact Us

© 2020 upVoice. All rights reserved.

**EXHIBIT 12**

Case 3:20-cv-07182   Document 1   Filed 10/14/20   Page 48 of 81

# Terms of Service

Last updated: **March, 2019**

**Table of content:**

1. Background
2. Ability to Accept
3. Eligibility
4. Tokens and Rewards
5. Data
6. App License and Use Restrictions
7. Account and Eligibility
8. Intellectual Property Rights
9. Information Description
10. Privacy
11. Third Party Sources and Content
12. Third Party Open Source Software
13. Warranty Disclaimers
14. Limitation of Liability
15. Indemnity
16. Export Laws
17. Updates and Upgrades
18. Term and Termination
19. Assignment
20. Modification
21. Governing Law and Disputes
22. General

IF YOU ARE NOT ELIGIBLE TO PARTICIPATE IN THE PANEL, THESE TERMS OF USE DO NOT APPLY TO YOU.

By clicking the "accept" or "ok" button, or installing and/or or by otherwise

accessing or using the UpVoicemobile software application or Chrome desktop extension (the "**Panel App**") you expressly acknowledge and agree that you are entering into a legal agreement with BrandTotal Ltd. and its affiliates(collectively, "**BrandTotal**", "**we**", "**us**" or "**our**"), and have reviewed, understood and agree to comply with, and be legally bound by, the terms and conditions of these Panel Terms and Conditions ("**Terms**"). You hereby waive any applicable rights to require an original (non-electronic) signature or delivery or retention of non-electronic records, to the extent not prohibited under applicable law.If you do not agree to be bound by these Terms, please do not download, install or use the Panel App.

# 1. Background

These Terms govern you participation in our online and/or mobile marketing research panel ("**Panel**") and your use of the Panel App, in connection with the Panel, as well as the grant of permission by you to us to use your Panel Data (as defined below), in consideration for the receipt of Rewards(as defined below), all in accordance with the terms and conditions set forth herein. You are using the Panel App as part of your participation in the Panel. BrandTotal uses Panel Data to monitor, identify, analyze and research marketing campaigns directed at Panel participantsand shares its insights in an anonymized and aggregated manner, as part of BrandTotal's marketing intelligence SaaS solution ("**BT Services**").

# 2. Ability to Accept

The Panel is intended for users eighteen (18) years of age or older, and by installing the Panel App, you affirm that you are at least eighteen (18) years of age. If you are under the age of eighteen (18),do not access or use this Panel App.

# 3. Eligibility

Your participation in any Panel conducted by BrandTotal is subject to certain eligibility criteria applicable to the Panel, such as: your age, location and other relevant demographic information. If BrandTotal decides that you are not eligible to participate in the Panel, you may not participate until such time that BrandTotal decides, at its sole discretion, that you are eligible and notified you or your eligibility.

# 4. Tokens and Rewards

## ◼ 4.1. Tokens

In consideration for your participation in the Panel (if you are found eligible), which requires your use of third party mobile applications and/or websites, which include: Facebook, Instagram, Twitter, YouTube and Amazon ("**Third Party Applications**") and your grant of the Permission to us, BrandTotal offers you virtual tokens which may be exchanged for Rewards ("**Tokens**"). You will be eligible to receive Tokens in accordance with the terms and conditions set forth in the Panel App. The Tokens won will be added and displayed in the balance of your Account (as defined below).

## ◼ 4.2. Restriction on Use of Tokens

Your Tokens shall be credited to your Account, and are non-transferrable. Tokens may be exchanged for Rewards (as defined below) solely for yourself, and you may not use Tokens to register to obtain Rewards for any other user other than yourself or for any third party. It is hereby clarified that, Tokens may not be redeemed or exchanged for any cash, or other monetary or non-monetary value, except for Rewards in accordance with these Terms. You shall not use any automated or fraudulent means to manipulate the Token balance on your Account.

## ◼ 4.3. Rewards

In consideration for, and subject to, your participation in our Panel and use of Third Party Application, and your grant of the Permission to us, BrandTotal will offer you the option to exchange your Tokens for certain rewards ("**Rewards**"), in accordance with the terms and conditions separately set forth in the Panel App. The nature, variety, availability, offering and scope of Rewards, the amount of Tokens required for each Reward, as well as any other terms and conditions related to the offering of Rewards in the Panel App, shall be determined by us, at our sole and absolute discretion. For example purposes only, Rewards may, without limitation, include cash payments, vouchers, coupons, gift cards or other rewards for participating in the Panel. Each time you redeem Tokens to receive a Reward, they will be deducted from the balance of your Account. Any exchange of Tokens for Rewards is final. Rewards cannot be cancelled or returned, and Tokens exchanged for a Reward will not be reimbursed or returned to a user, whether or not you have redeemed your Reward. You may exchange your tokens for a Reward only if you have in

your account balance the amount of Tokens required for such Reward (as set forth in the Panel App). If you have less than the amount of Tokens required for such Reward, as set forth in the Panel App, you shall not be entitled to exchange such Tokens for a Reward.

### ■ 4.4.

IT IS CLARIFIED THAT IF YOU DO NOT USE THIRD-PARTY APPLICATIONS, YOU SHALL BE CONSIDERED A NON-ACTIVE USER AND THEREFORE YOU WILL NOT BE ENTITLED TO RECEIVE ANY TOKENS IN ADDITION TO THOSE THAT EXIST IN YOUR ACCOUNT TOKEN BALANCE AT THE TIME THAT YOU BECOME AN IN-ACTIVE USER.

### ■ 4.5. Taxes

You have the sole responsibility for any taxes or other charges imposed by any government entity associated with any Rewards or other compensation which you may receive for using the Panel App and to the extent that any such taxes may be imposed upon us, we may deduct such amounts from any payments due to the you, including without limitation any withholding taxes.

### ■ 4.6. Account Data

All issuances of Rewards are subject to your Account Data (defined below) and other information and documentation as we may request from you from time to time. You understand that we may not, at our sole discretion, provide you with any Rewards if you fail to provide such information or documentation or if your Account Data is determined in our discretion to be incorrect or incomplete.

### ■ 4.7. Additional Terms

**4.7.1.** Your receipt and redemption of Rewards shall be subject to and conditioned upon granting us the permission to collect, access or use Panel Data (as defined below), as well complying with these Terms, and any other requirements displayed in the Panel App with respect to the relevant Reward.

**4.7.2.** The Rewards program is void where prohibited.

**4.7.3.** You acknowledge that upon termination of these Terms and/or your Panel participation for any reason, you shall no longer be eligible to receive and/or claim any Rewards, and any eligibility you may have under the App to receive Rewards shall be void, and you shall have no claim against us with respect to the foregoing,

**4.7.4.** You shall be solely responsible for claiming your Rewards, when applicable, before they expire.

**4.7.5.** You shall be responsible for paying all shipping and handling charges for any Reward selected, if applicable, as disclosed at the time of redemption, and our obligation regarding delivery of Reward redemptions is satisfied upon shipping the selected redemption item to the postal or email address you have provided with us in the Panel App. We are not responsible for lost or stolen Reward items. Once Rewards have been redeemed, they are no longer valid for any subsequent redemption and they may not be returned or refunded to your Account for any reason. No extensions, cash refunds or other exchanges will be allowed for expired Rewards.

**4.7.6.** We reserve the right to withhold from providing you with any Rewards in case we have reason to believe you have breached these Terms. In the event of your noncompliance, fraud or other inappropriate activity (as determined by us, in our sole and absolute discretion), BrandTotal may cancel or invalidate your Rewards, deny redemption of your Rewards, or restrict, block, limit, and prevent your access to and use of your Account and/or the Panel App and, further, all Rewards shall be subject to forfeiture.

**4.7.7.** Without prejudice to the above, we also reserve the right to invalidate Rewards from your Account if we determine that such Rewards were improperly credited to such Account or obtained fraudulently. Rewards expired for any reason will be forfeited without compensation and shall no longer be valid or usable.

**4.7.8.** BrandTotal shall not be responsible or liable for any printing, production, typographical, mechanical or other errors in the Rewards summaries that may be displayed in the Panel App, or for any delay or failure to credit Rewards to your Account.

**4.7.9.** Rewards are not redeemable for cash, transferable or assignable for any reason. The sale, barter, transfer or assignment of any Reward, other than by BrandTotal is strictly prohibited.

**4.7.10.** Rewards provided by or through third parties are governed by rules and Terms between you and such third parties.

**4.7.11.** BrandTotal may, at any time and at its sole discretion, change the Reward policies, including, without limitation, establishing additional means of accruing Rewards, modifying and deleting any or all of the recognized means of accruing Rewards existing at any given time, changing the Rewards available and their values and types and the Rewards redemption terms and expiration dates, and changing the applicable eligibility terms. SUCH

Case 3:20-cv-07182    Document 1    Filed 10/14/20    Page 53 of 81

CHANGES TO THE REWARD POLICIES MAY AFFECT THE REDEMPTION VALUE OF THE REWARDS ALREADY ACCUMULATED OR THE AVAILABILITY OF REDEEMABLE REWARDS. YOU AGREE THAT YOU WILL REVIEW THESE TERMS AND ANY APPLICABLE ADDITIONAL TERMS INCLUDED IN THE PANEL APP PERIODICALLY AND THAT YOU SHALL BE BOUND BY THESE TERMS AND ANY MODIFICATIONS HEREOF.

## 5. Data

**5.1.** In order to participate in the Panel and provide you with the Tokens and the Rewards, during your participation in the Panel, while you use third party mobile applications and/or websites (social media and/or others), (i) we will collect and store data which includes a randomly generated device ID and user ID as well as data about sponsored campaigns, sponsored posts or advertisements that target you directly or that have been shared with you on specific mobile applications, social media and/or other websites, as applicable; and (ii) we will complement these data with general demographic and profile information, which we collect from you as part of your registration/qualification to the Panel App and/or from your Facebook profile, like your age, your gender, where you live (by region), your relationship status and your general interests. You may also provide us with, and we may collect, additional information when you answer certain survey questions. All of the data collected and/or provided by you as described in this Section 5.1 shall be referred to hereinafter as "Panel Data".

**5.2.** BrandTotal shall use the results and information derived from your Panel Data in connection with the BT Services, as further described in our Privacy Policy.

**5.3.** IF YOU DO NOT WANT US TO COLLECT AND/OR USE YOUR DATA OR THE PANEL DATA, YOU WILL NOT BE ELIGIBLE TO PARTICIPATE IN THE PANEL, RECEIVE TOKENS OR CLAIM REWARDS.

**5.4.** If you request the deletion of your Panel Data or exercise a right available to you under applicable law, which restricts our ability to use your Panel Data and/or other personal data that you provide, then you will no longer be eligible to continue to participate in our Panel, these Terms shall terminate, and the terms of section 18 (Termination) shall apply.

**5.5.** If you make a request pursuant to Section 5.4, then:**(i)** We will anonymize your Panel Data and continue to use such data in an anonymized manner only;**(ii)** you shall not be entitled to receive Tokens in addition to those then existing in your Account balance; and**(iii)** if you request to delete or restrict us

from using any data required by BrandTotal for (a) verifying your eligibility for participation in the Panel and/or use of the Panel App, (b) communicating with you regarding your participation in the Panel, (c) offering and providing you with rewards in connection with your use of Third Party Applications; or (d) offering BT Services, then you will no longer be able to receive Rewards. IF YOU WISH TO EXCHANGE YOUR TOKENS FOR REWARDS AND ARE ELIGIBLE TO DO SO, IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT, YOU MAY ONLY DO SO PRIOR TO MAKING SUCH REQUEST.

# 6. App License and Use Restrictions

### ◼ 6.1. License

Subject to the terms and conditions of these Terms, we hereby grant you a personal, revocable, non-exclusive, non-sublicensable, non-assignable, non-transferable license ("**License**") to: **(i)** download, install and use the Panel App on a computer, mobile telephone, tablet or device (each a "**Device**") that you own or control; and **(ii)** access and use the Panel App on that Device in accordance with these Terms and any applicable Usage Rules (defined below), all solely for the term of these Terms and for the purpose of your participation in the Panel.

### ◼ 6.2. Restrictions

**You agree not to, and shall not permit any third party to:**

**(i)** sublicense, redistribute, sell, lease, lend or rent the Panel App;

**(ii)** make the Panel App available over a network where it could be used by multiple devices owned or operated by different people at the

**(iii)** disassemble, reverse engineer, decompile, decrypt, or attempt to derive the source code of, the Panel App;

**(iv)** copy (except for back-up purposes), modify, improve, or create derivative works of the Panel App or any part thereof;

**(v)** circumvent, disable or otherwise interfere with security-related features of the Panel App or features that prevent or restrict use or copying of any content or that enforce limitations on use of the Panel App;

**(vi)** remove, alter or obscure any proprietary notice or identification, including copyright, trademark, patent or other notices, contained in or displayed on or via the Panel App;

Case 3:20-cv-07182   Document 1   Filed 10/14/20   Page 55 of 81

**(vii)** use any communications systems provided by the Panel App to send unauthorized and/or unsolicited commercial communications;

**(viii)** use the BrandTotal name, logo or trademarks without our prior written consent; and/or (ix) use the Panel App to violate any applicable laws, rules or regulations, or for any unlawful, harmful, irresponsible, or inappropriate purpose, or in any manner that breaches these Terms.

### ◼ 6.3. App Usage Rules

If you are downloading the Panel App from a third party mobile device platform or service provider ("**Distributor**"), please be aware that the Distributor may have established usage rules which also govern your use of the Panel App ("**Usage Rules**"),depending on where the Panel App has been downloaded from.You acknowledge that, prior to downloading the Panel App from a Distributor, you have had the opportunity to review and understand, and will comply with, its Usage Rules.The Usage Rules that are applicable to your use of the Panel App are incorporated into this Agreement by this reference.You represent that you are not prohibited by any applicable Usage Rules and/or applicable law from using the Panel App; if you are unable to make such a representation you are prohibited from installing and/or using the Panel App.

## 7. Account and Eligibility

**7.1.** In order to use some of the Panel App features and as a conditions to participation in the Panel as a panelist, you would have to create or use an account (an "**Account**").If you create an Account, you must provide accurate, current and complete personal information about yourself ("**Account Data**") and you must maintain and update the Account Data and any other information you provide to us.You are solely responsible for the activity that occurs in your Account, and you must keep your Account password secure.You must notify us immediately of any unauthorized use of your Account. You are not permitted to create more than one Account to use the Panel App.

**7.2.** You agree not to provide inaccurate, misleading or false information in connection with your use of the Panel App. If information you have provided to us subsequently becomes inaccurate, misleading or false, you will promptly notify us of any change.

**7.3.** We have a right to refuse the registration for any reason, including but not limited to any suspicious activity regarding invalid or false Account Data. Registration can be limited, for example, in terms of territory.

# 8. Intellectual Property Rights

### ■ 8.1. Ownership

The Panel App is licensed and not sold to you under this Terms and you acknowledge that BrandTotal and its licensors retain all title, ownership rights and Intellectual Property Rights (defined below) in and to the Panel App (and its related software).We reserve all rights not expressly granted herein to the Panel App. "**Intellectual Property Rights**" means any and all rights in and to any and all trade secrets, patents, copyrights, service marks, trademarks, know-how, or similar intellectual property rights, as well as any and all moral rights, rights of privacy, publicity and similar rights of any type under the laws or regulations of any governmental, regulatory, or judicial authority, whether foreign or domestic.

### ■ 8.2. Content

The content on the Panel App, including without limitation, the text, information, documents, descriptions, products, software, graphics, photos, sounds, videos, interactive features, and services (the "**Materials**"), and the trademarks, service marks and logos contained therein ("**Marks**", and together with the Materials, the "**Content**"), is the property of BrandTotaland/or its licensors and may be protected by applicable copyright or other intellectual property laws and treaties. "BrandTotal" and the BrandTotal logo are Marks of BrandTotal and its affiliates. All other Marks used on the Panel App are the trademarks, service marks, or logos of their respective owners.

### ■ 8.3. Use of Content

The content on the Panel App is provided to you "as is" for your personal use only and may not be used, copied, distributed, transmitted, broadcast, displayed, sold, licensed, de-compiled, or otherwise exploited for any other purposes whatsoever without our prior written consent. If you download or print a copy of the content you must retain all copyright and other proprietary notices contained therein.

# 9. Information Description

We attempt to be as accurate as possible. However, we cannot and do not warrant that the content available on the Panel App is accurate, complete, reliable, current, or error-free. We reserve the right to make changes in or to the

Case 3:20-cv-07182 Document 1 Filed 10/14/20 Page 57 of 81

content, or any part thereof without the requirement of giving you any notice prior to or after making such changes to the content

## 10. Privacy

We will use any personal information that we may collect or obtain in connection with the Panel App in accordance with our privacy policy which is available [her](#).

**PLEASE READ OUR PRIVACY POLICY BEFORE ACCEPTING THESE TERMS.**

## 11. Third Party Sources and Content

**11.1.** The Panel App enables you to view, access, link to, and use content from Third Party Sources (defined below) that are not owned or controlled by us ("**Third Party Content**"). The Panel App may also enable you to communicate and interact with Third Party Sources. "**Third Party Source(s)**" means: (i) third party websites and services; and (ii) our partners and customers.

**11.2.** We are not affiliated with and have no control over any Third Party Sources. We do not assume any responsibility for the content, terms of use, privacy policies, actions or practices of, any Third Party Sources. Please read the terms of use and privacy policy of any Third Party Source that you interact with before you engage in any such activity.

**11.3.** We are not responsible for, and we expressly disclaim all warranties regarding, the accuracy, appropriateness, usefulness, safety, or Intellectual Property Rights (defined below) of, or relating to, any Third Party Content.

**11.4.** We do not endorse any advertising, promotions, campaigns, products, services or other materials that is included in any Third Party Content or that is communicated to you from a Third Party Source.

**11.5.** By using the Panel App you may be exposed to Third Party Content that is inaccurate, offensive, indecent, or objectionable. You always have the choice of deciding whether or not to interact with a Third Party Source or to view and use Third Party Content. Your interaction with a Third Party Source and your use of, and reliance upon, any Third Party Content is at your sole discretion and risk.

**11.6.** You are solely responsible and liable for your interaction with a Third Party Source. You agree to waive, and hereby do waive, any legal or equitable rights or remedies you may have against BrandTotal, and release BrandTotal from any and all liability, arising from your use of and interaction on any Third

Party Content and from your interaction with any Third Party Source. If you have any query or complaint regarding a Third Party Source or any Third Party Content, you agree to contact the Third Party Source directly.

## 12. Third Party Open Source Software

Portions of the Panel App may include third party open source software that are subject to third party terms and conditions ("**Third Party Terms**"). A list of any third party open source software and related Third Party Terms is available at:
privacy.joinupvoice.com/upvoice_3rd_party.pdf.
If there is a conflict between any Third Party Terms and the terms of these Terms, then the Third Party Terms shall prevail but solely in connection with the related third party open source software. Notwithstanding anything in these Terms to the contrary, BrandTotal makes no warranty or indemnity here under with respect to any third party open source software.

## 13. Warranty Disclaimers

**13.1.** THE PANEL APP IS PROVIDED ON AN "**AS IS**" AND "**AS AVAILABLE**" BASIS WITHOUT WARRANTIES OF ANY KIND INCLUDING, WITHOUT LIMITATION, REPRESENTATIONS, WARRANTIES AND CONDITIONS OF MERCHANT ABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, NON-INFRINGEMENT, AND THOSE ARISING BY STATUTE OR FROM A COURSE OF DEALING OR USAGE OF TRADE.

**13.2.** WE DO NOT WARRANT THAT THE PANEL APP WILL OPERATE ERROR-FREE, THAT THE PANEL APP IS FREE OF VIRUSES OR OTHER HARMFUL CODE OR THAT WE WILL CORRECT ANY ERRORS IN THE PANEL APP. YOU AGREE THAT WE WILL NOT BE HELD RESPONSIBLE FOR ANY CONSEQUENCES TO YOU OR ANY THIRD PARTY THAT MAY RESULT FROM TECHNICAL PROBLEMS INCLUDING WITHOUT LIMITATION IN CONNECTION WITH THE INTERNET (SUCH AS SLOW CONNECTIONS, TRAFFIC CONGESTION OR OVERLOAD OF OUR OR OTHER SERVERS) OR ANY TELECOMMUNICATIONS OR INTERNET PROVIDERS.

**13.3.** IF YOU HAVE A DISPUTE WITH ANY OTHER APP USER, YOU AGREE THAT WE ARE NOT LIABLE FOR ANY CLAIMS OR DAMAGES ARISING OUT OF OR CONNECTED WITH SUCH A DISPUTE. WE RESERVE THE RIGHT, BUT HAVE NO OBLIGATION, TO MONITOR ANY SUCH DISPUTE.

**13.4.** Applicable law may not allow the exclusion of certain warranties, so to

that extent such exclusions may not apply.

## 14. Limitation of Liability

**14.1.** UNDER NO CIRCUMSTANCES SHALL BRANDTOTAL BE LIABLE FOR ANY SPECIAL, DIRECT, INDIRECT, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES, OR FOR ANY LOSS OF DATA, REVENUE, BUSINESS OR REPUTATION, THAT ARISES UNDER OR IN CONNECTION WITH THESE TERMS, OR THAT RESULTS FROM THE USE OF, OR THE INABILITY TO USE, THE PANELAPP EVEN IF BRANDTOTAL HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**14.2.** IN ANY EVENT, BRANDTOTAL'S TOTAL AGGREGATE LIABILITY FOR ALL DAMAGES AND LOSSES THAT ARISE UNDER OR IN CONNECTION WITH THESE TERMS, OR THAT RESULT FROM YOUR USE OF OR INABILITY TO USE THE PANEL APP, SHALL NOT IN ANY CIRCUMSTANCE EXCEED THE TOTAL AMOUNTS, IF ANY, THAT BRANDTOTAL ACTUALLY PAYS YOU FOR USING THE PANEL APP WITHIN THE THREE (3) MONTHS PRECEDING THE DATE OF BRINGING A CLAIM.

## 15. Indemnity

You agree to defend, indemnify and hold harmless BrandTotal and our affiliates, and our respective officers, directors, employees and agents, from and against any and all claims, damages, obligations, losses, liabilities, costs and expenses (including but not limited to attorney's fees) arising from: **(i)** your use of, or inability to use, the Panel App; **(ii)** your violation of any of these Terms; and **(iii)** your violation, infringement or misappropriation of any applicable law or any third party right, including, without limitation, any copyright, property, publicity or privacy right. Without derogating from or excusing your obligations under this section, we reserve the right (at your own expense), but are not under any obligation, to assume the exclusive defense and control of any matter which is subject to an indemnification by you if you choose not to defend or settle it. You agree not to settle any matter subject to an indemnification by you without first obtaining our express approval.

## 16. Export Laws

You agree to comply fully with all applicable export laws and regulations to ensure that neither the Panel App nor any technical data related thereto are

exported or re-exported directly or indirectly in violation of, or used for any purposes prohibited by, such laws and regulations.

## 17. Updates and Upgrades

We may from time to time provide updates or upgrades to the Panel App (each a "**Revision**"), but are not under any obligation to do so. Such Revisions will be supplied according to our then-current policies, which may include automatic updating or upgrading without any additional notice to you. You consent to any such automatic updating or upgrading of the Panel App. All references herein to the Panel App shall include Revisions. These Terms shall govern any Revisions that replace or supplement the original App, unless the Revision is accompanied by a separate license Terms which will govern the Revision.

## 18. Term and Termination

**18.1.** You can terminate these terms at any time by sending us a request at: contact@joinupvoice.com or by uninstalling the App. These Terms and your membership in the Panel is effective until terminated by us or you for any reason. We reserve the right, at any time, to: **(i)** discontinue or modify any aspect of the Panel App; and/or **(ii)** terminate these Terms, your membership in the Panel and your use of the Panel App with or without cause, and shall not be liable to you or any third party for any of the foregoing. If you object to any term or condition of these Terms or any subsequent modifications thereto, or become dissatisfied with the Panel App in any way, your only recourse is to immediately discontinue use of the Panel App, thus ceasing your membership in the Panel. Upon Termination of these Terms and/or your Participation in the Panel, your Token balance will be nullified, and you will no longer be permitted to receive and/or redeem Rewards.

**18.2.** Upon termination of these Terms: **(i)** you shall cease all use of the Panel App; **(ii)** your membership of the Panel shall terminate and any Rewards to which you may be eligible will be void; **(iii)** your Token balance will be nullified, and you shall not be entitled to exchange any Tokens for Rewards after termination of this Agreement; **(iv)** we will anonymize your Panel Data and continue to use such data in an anonymized manner only; and (v) This Section 18.2 and Sections 5.2, 8 (Intellectual Property Rights), 10 (Privacy), 11 (Third Party Sources and Content), 12 (Third Party Open Source Software), 13 (Warranty Disclaimers), 14 (Limitation of Liability), 15 (Indemnity), and 19 (Assignment) to 22 (General) shall survive termination of these Terms. IF YOU WISH TO EXCHANGE YOUR TOKENS FOR REWARDS AND ARE ELIGIBLE TO

Case 3:20-cv-07182 Document 1 Filed 10/14/20 Page 61 of 81

DO SO IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT, YOU MAY ONLY DO SO PRIOR TO TERMINATING THIS AGREEMENT.

## 19. Assignment

These Terms, and any rights and licenses granted here under, may not be transferred or assigned by you but may be assigned by BrandTotal without restriction or notification. Any prohibited assignment shall be null and void.

## 20. Modification

We reserve the right to modify these Terms at any time by publishing the revised Terms at: https://joinupvoice.com/tos. Such change will be effective ten (10) days following the foregoing notification thereof, and your continued use of the Panel App thereafter means that you accept those changes.

## 21. Governing Law and Disputes

These Terms shall be governed by and construed in accordance with the laws of the State of Israel without regard to its conflict of laws rules. You agree to submit to the personal and exclusive jurisdiction of the courts located in Tel Aviv-Jaffa, and waive any jurisdictional, venue, or inconvenient forum objections to such courts. Notwithstanding the foregoing, we may seek injunctive relief in any court of competent jurisdiction.

## 22. General

These Terms, and any other legal notices published by us in connection with the Panel App, shall constitute the entire Terms between you and BrandTotal concerning the Panel App. In the event of a conflict between these Terms and any such legal notices, the terms of the applicable notice shall prevail with respect to the subject matter of such notice. No amendment to these Terms will be binding unless in writing and signed by BrandTotal. If any provision of these Terms is deemed invalid by a court of competent jurisdiction, the invalidity of such provision shall not affect the validity of the remaining provisions of these Terms, which shall remain in full force and effect. No waiver of any term of these Terms shall be deemed a further or continuing waiver of such term or any other term, and a party's failure to assert any right or provision under these Terms shall not constitute a waiver of such right or provision.

YOU AGREE THAT ANY CAUSE OF ACTION THAT YOU MAY HAVE ARISING OUT OF OR RELATED TO THE PANEL APP MUST COMMENCE WITHIN ONE (1) YEAR AFTER THE CAUSE OF ACTION ACCRUES.OTHERWISE, SUCH CAUSE OF ACTION IS PERMANENTLY BARRED. NOTHING IN THESE TERMS IS INTENDED TO EXCLUDE OR LIMIT YOUR RIGHTS UNDER APPLICABLE LAW THAT CANNOT BE EXCLUDED OR LIMITED.PLEASE READ THE FOLLOWING CAREFULLY BEFORE INSTALLING AND/OR USING THE PANEL APP.

---

Related: UpVoice Privacy Policy

BACK TO TOP  ↑

Case 3:20-cv-07182   Document 1   Filed 10/14/20   Page 63 of 81

10/1/20, 2:54 PM

**EXHIBIT 13**

Case 3:20-cv-07182   Document 1   Filed 10/14/20   Page 65 of 81
2020-07-20 - Screenshot from https://www.joinupvoice.com/#participating-sites






**UpVoice Participating sites currently include:**

- Facebook
- Twitter
- YouTube
- LinkedIn
- Amazon





# How it works



**Install**



**Browse**



**Earn**



# Who you are matters

# Users love it!





# Rewards



# Privacy



# It's not us, it's you!

**EXHIBIT 14**

```
        ig_media_reel_count: this.reelCount,
        ig_media_ad_action: I,
        ig_media_id: _,
        ig_media_user_id: p.media_or_ad.user.pk.toString(),
        ig_media_type: r(p.media_or_ad.media_type),
        ig_created_time: P,
        ig_media_shortcode: p.media_or_ad.code,
        ig_media_image_url: b,
        ig_media_video_url: v,
        ig_media_location_id: g,
        ig_media_text: A,
        ig_carousel_media_info: y,
        ig_media_comments_count: p.media_or_ad.comment_count,
        ig_media_likes_count: p.media_or_ad.like_count,
        ig_media_views_count: p.media_or_ad.view_count,
        ig_media_cta_text: p.media_or_ad.link_text,
        ig_user_username: p.media_or_ad.user.username,
        ig_profile_img_url: p.media_or_ad.user.profile_pic_url,
        ig_user_full_name: p.media_or_ad.user.full_name,
        ig_user_is_unpublished: p.media_or_ad.user.is_unpublished,
        ig_media_link: p.media_or_ad.link,
        ig_media_overlay_text: p.media_or_ad.overlay_text,
        ig_media_ad_title: p.media_or_ad.injected.ad_title,
        ig_media_content_type: C,
        ig_media_overlay_title: p.media_or_ad.overlay_title,
        ig_media_video_duration: p.media_or_ad.video_duration,
        debugging_info: {
          user: {
            is_unpublished: p.media_or_ad.user.is_unpublished,
            friendship_status: p.media_or_ad.user.friendship_status,
            full_name: p.media_or_ad.user.full_name,
            pk: p.media_or_ad.user.pk,
            profile_pic_url: p.media_or_ad.user.profile_pic_url,
            username: p.media_or_ad.user.username,
            has_anonymous_profile_picture: p.media_or_ad.user.has_anonymous_profile_picture,
            is_favorite: p.media_or_ad.user.is_favorite,
            is_private: p.media_or_ad.user.is_private,
            is_verified: p.media_or_ad.user.is_verified,
            profile_pic_id: p.media_or_ad.user.profile_pic_id
          },
          caption_is_edited: p.media_or_ad.caption_is_edited,
          comment_likes_enabled: p.media_or_ad.comment_likes_enabled,
          comment_threading_enabled: p.media_or_ad.comment_threading_enabled,
          has_audio: p.media_or_ad.has_audio,
          has_liked: p.media_or_ad.has_liked,
          inventory_source: p.media_or_ad.inventory_source,
          tab_id: this.tabId,
          instanceMagicHeader: this.magicHeader
        }
      }, this.log.info("instance " + this.magicHeader + " Found an ad! " + F.ig_media_shortcode, F, p), l.push(F)
} return this.reelCount++, this.max_id = f.next_max_id, t(), [2, {
```

**EXHIBIT 15**

```javascript
    }, t.prototype.interactionHash = function(t, e) {
      return {
        fb_post_hashed_entity_id: o.e.salted_hash(t.fb_post_entity_id, e),
        fb_user_hashed_id: this.getUserHashes(t.fb_user_id).fb_user_hashed_id
      }
    }, t.facebookMetadata = function(t) {
      return {
        fb_meta_gender: t.gender,
        fb_meta_dob_month: t.birthday.month,
        fb_meta_dob_year: t.birthday.year,
        fb_meta_relationship_status: t.relationshipStatus,
        fb_meta_user_locale: t.locale
      }
    }, t.geoData = function(t) {
      var e = t.countryIso2,
        n = t.state;
      return {
        geo_current_location_country: t.country,
        geo_current_location_country_iso: e,
        geo_current_location_state: n,
        geo_current_location_region: t.region,
        geo_current_location_metro_code: t.metro_code
      }
    }, t
  }()
  function(t, e, n) {
'use strict';

function r(t) {
  return d(this, void 0, void 0, function() {
    var e, n, r, a, c, l, h, d;
    return p(this, function(p) {
      switch (p.label) {
        case 0:
          return [4, f() ? u(t) : o(t)];
        case 1:
          return e = p.sent(), n = e.id, r = e.locale, a = e.userNameOnlyForAnonymizingTheHTMLDoNotSend, [4, s(t)];
        case 2:
          return c = p.sent(), l = c.birthday, h = c.gender, [4, i(t)];
        case 3:
          return d = p.sent(), [2, {
            id: n,
            birthday: l,
            gender: h,
            locale: r,
            relationshipStatus: d,
            userNameOnlyForAnonymizingTheHTMLDoNotSend: a
          }]
      }
    })
  })
}
```

**EXHIBIT 16**

```javascript
        };
        return a = {
            next: n(0),
            throw: n(1),
            return: n(2)
        }, "function" == typeof Symbol && (a[Symbol.iterator] = function() {
            return this
        }), a
    },
    _ = [],
    b = new Map([
        ["0", "Unspecified"],
        ["1", "Single"],
        ["2", "In a relationship"],
        ["5", "Engaged"],
        ["4", "Married"],
        ["10", "In a civil union"],
        ["11", "In a domestic partnership"],
        ["3", "In an open relationship"],
        ["6", "It's complicated"],
        ["8", "Separated"],
        ["9", "Divorced"],
        ["7", "Widowed"]
    ])
}, function(t, e, n) {
    "use strict";
    n_d(e, "a", function() {
```

**EXHIBIT 17**

```javascript
function c(t) {
  return d(this, void 0, void 0, function() {
    var e, n, r, i;
    return p(this, function(o) {
      switch (o.label) {
        case 0:
          return [4, t("https://mbasic.facebook.com/editprofile.php?type=basic&edit=birthday&r=" + Date.now())];
        case 1:
          return e = o.sent(), n = Object(h.j)(e), Object(h.q)(n), r = function() {
            var t = n.querySelector("select[name=year]");
            if (!t) return null;
            if (!t.value) return null;
            var e = Number.parseInt(t.value, 10);
            return Number.isNaN(e) ? null : e
          }(), i = function() {
            var t = n.querySelector("select[name=month]");
            if (!t) return null;
            if (!t.value) return null;
            var e = Number.parseInt(t.value, 10);
            return Number.isNaN(e) ? null : e
          }(), [2, {
            year: r,
            month: i
          }]
      }
    })
  })
}

function l(t) {
  return d(this, void 0, void 0, function() {
    var e, n, r;
    return p(this, function(i) {
      switch (i.label) {
        case 0:
          return [4, t("https://m.facebook.com/language.php?r=" + Date.now())];
        case 1:
          return e = i.sent(), n = e.match(/"?currentLocale"?: ?(\{[^}]+?\})/), n && n[1] && (r = n[1].match(/"?locale_code"?: ?"([^"]+?)"/)) && r[1] ? [
            1]] : [2, null]
      }
    })
  })
}
```

**EXHIBIT 18**

```javascript
function s(t) {
  return d(this, void 0, void 0, function() {
    return p(this, function(e) {
      return [2, t("https://m.facebook.com/profile/edit/infotab/section/forms/?section=basic-info").then(function(t) {
        var e = Object(h.j)(t);
        return Object(h.q)(e), e
      }).then(function(e) {
        return d(this, void 0, void 0, function() {
          var n, r, i, o, s;
          return p(this, function(a) {
            switch (a.label) {
              case 0:
                return n = e.querySelector("input[name=gender][type=radio][checked]"), r = null, n instanceof HTMLInputElement && (r = "1" === n.value ? "Female" : "2" === n.value ? "Male" : "Other"), [4, c(t)];
              case 1:
                return i = a.sent(), o = i.year, s = i.month, [2, {
                  birthday: {
                    year: o,
                    month: s
                  },
                  gender: r
                }]
            }
          })
        })
      })]
    })
  })
}

function a(t) {
  return t("https://www.facebook.com/ads/profile/interests/?dpr=1", [
    ["X-Requested-With", "XMLHttpRequest"]
  ], 12e4).then(function(t) {
    return JSON.parse(t.replace("for (;;);", ""))
  }).then(function(t) {
    return t.payload.interests
  })
}
```

74

**EXHIBIT 19**

```javascript
                }
            })
        })
    }, t.prototype.enrichInterestsEvent = function(e) {
        return a(this, void 0, void 0, function() {
            var n, r, i, o;
            return u(this, function(a) {
                switch (a.label) {
                    case 0:
                        return n = new Date, [4, Promise.all([this.getFacebookMetadataForUserOrNulls(e.fb_user_id), this.locationService.getLocation()])];
                    case 1:
                        return r = a.sent(), i = r[0], o = r[1], [2, s({
                            fb_user_interests: e.fb_user_interests,
                            event_time: n,
                            browser_time_zone: n.getTimezoneOffset() / 60 * -1
                        }, t.facebookMetadata(i), t.geoData(o), this.getUserHashes(e.fb_user_id), t.googleData(), {
                            third_party_id: this.thirdPartyId,
                            third_party_cookie: this.thirdPartyCookie,
                            device_id: this.deviceId,
                            user_agent: this.userAgent,
                            extension_id: this.extensionId,
                            extension_version: this.extensionVersion
                        })]
                }
            })
        })
    }, t.prototype.enrichYTAdVideo = function(e) {
```

**EXHIBIT 20**

```javascript
}, t.pickFieldsToSendSponsored = function(t) {
  return {
    fb_post_actionlink_url: t.fb_post_actionlink_url,
    fb_post_advertiser_page_pretty_name: t.fb_post_advertiser_page_pretty_name,
    fb_post_advertiser_page_id: t.fb_post_advertiser_page_id,
    fb_post_advertiser_thumbnail_url: t.fb_post_advertiser_thumbnail_url,
    fb_post_call_to_action_text: t.fb_post_call_to_action_text,
    fb_post_call_to_action_url: t.fb_post_call_to_action_url,
    fb_post_img_url: t.fb_post_img_url,
    fb_post_src: t.fb_post_src,
    fb_post_text: t.fb_post_text,
    fb_post_type: t.fb_post_type,
    fb_post_video_url: t.fb_post_video_url,
    fb_post_video_views: t.fb_post_video_views,
    fb_post_this_video_views: t.fb_post_this_video_views,
    fb_post_entity_id: t.fb_post_entity_id,
    fb_post_engage_angry: t.fb_post_engage_angry,
    fb_post_engage_comments: t.fb_post_engage_comments,
    fb_post_engage_haha: t.fb_post_engage_haha,
    fb_post_engage_like: t.fb_post_engage_like,
    fb_post_engage_love: t.fb_post_engage_love,
    fb_post_engage_sad: t.fb_post_engage_sad,
    fb_post_engage_shares: t.fb_post_engage_shares,
    fb_post_engage_wow: t.fb_post_engage_wow,
    fb_post_width: t.fb_post_width,
    fb_post_height: t.fb_post_height,
    fb_post_app_id: t.fb_post_app_id,
    fb_post_app_pretty_name: t.fb_post_app_pretty_name,
    fb_post_app_thumbnail_url: t.fb_post_app_thumbnail_url,
    fb_post_carousel_info: t.fb_post_carousel_info,
    fb_post_attachment_description: t.fb_post_attachment_description,
    fb_post_attachment_title: t.fb_post_attachment_title,
    fb_post_caption: t.fb_post_caption
  }
}, t.googleData = function() {
```

**EXHIBIT 21**



🔧 Sign in

chrome web store

Home > Extensions > UpVoice

## UpVoice

Offered by: UpVoice Team

★ ★ ★ ★ ★  0  |  Social & Communication

[Available on Chrome]

Overview    Reviews    Related

Earn $75 and up annually just for being you

Use Facebook, Instagram and other participating sites like you normally do and win up to $75 in the first year. Share your opinions and win even more!

● ○ ○ ○ ○ ○

## Overview

This extension allows you to earn rewards just for being you!

Win up to $75 US in the first year for using our participating sites like you normally do. Share your opinions and win even more! Our participating sites are Facebook, YouTube, Twitter, Amazon, and LinkedIn.

As a qualified UpVoice panelist, you impact the marketing decisions and brand strategies of multi-billion dollars corporations, who compete for your attention online. This means that you have a direct influence on the online advertising campaigns of big brands.

Install the UpVoice extension and qualify to become a member of our panel. It's safe and won't impact your browser performance. As a qualified member, we will reward you for browsing your social feeds and other participating sites normally. For more details, please visit our terms of service at: https://joinupvoice.com/tos.

Make sure to disable your ad blocker, if you have one, otherwise, we cannot collect the ads that target you and therefore we cannot reward you.

Privacy & data collection

When you regularly visit Facebook, Instagram and other participating sites, we securely collect the ads that you see and anonymous demographic profile data. We never share your personal information with anyone, except if needed to send you your rewards.

We protect your data using the highest security standards and we comply with all privacy regulations. For more details, please visit our Privacy Policy at: https://joinupvoice.com/privacy and our Data & Privacy FAQ at: https://www.joinupvoice.com/faq

If you have any questions, please contact us at: contact@joinupvoice.com.

For more details please visit www.joinupvoice.com.

[Read less]

## Additional Information

🏠 Website          ⓘ Report abuse

**Version**
2.10.1445

**Updated**
October 12, 2020

**Size**
358KiB

**Language**
English

**Developer**
Contact the developer
Privacy Policy

This extension allows you to earn rewards just for being you!

[Available on Chrome]

Page URL: https://chrome.google.com/webstore/detail/upvoice/igffacinpjkinncgnkmfpiocbmgbehem?hl=en-US