UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| FACEBOOK, INC. <br><br> Plaintiff, <br><br> v. <br><br> BRANDTOTAL LTD., et al., <br><br> Defendants. | Case No. 3:20-CV-07182 <br><br> **DECLARATION OF MIKE CLARK** |

I, Mike Clark, declare:

1. I submit this declaration in support of Facebook's Opposition to Defendants' *Ex Parte* Motion for Temporary Restraining Order in the above-captioned matter. I have personal knowledge of the facts set forth herein, and if called to testify as a witness, I could do so competently under oath.

2. I am a Director of Product Management at Facebook. In that role, I am personally involved in Facebook and Instagram's (collectively "Facebook") efforts to prevent data scraping on the Facebook and Instagram platforms. My team investigates potential violations of Facebook's terms and policies, and works with Facebook's policy and legal teams to enforce those policies when we determine they have been violated.

3. "Scraping" refers to the unauthorized automated extraction of user data. Scraping can be either "logged-in" or "logged-out." Logged-in scraping involves scraping of data that is behind password protection; logged-out scraping involves scraping of data available even without a password. Logged-in scraping can be difficult to identify and distinguish from other activity by the users.

4. Facebook restricts access to its website to authorized users who are logged-in for the purpose of expressing themselves, engaging with one another, and forming communities. Facebook restricts third-parties from using its service without authentication or logging-in, in order to protect its service and users. Facebook has approved means for users to share data with third-parties, such as through distinct Application Programming Interfaces ("APIs"). Facebook does permit third-parties, such as authorized developers and businesses, to use certain APIs as an access point to get data into and out of the Facebook platform with user consent. Third-party developers and businesses with apps or managed services for Facebook must also abide by Facebook's Terms and Platform Policies.

5. Scraping is a serious concern for technology companies and platforms, including Facebook, for many reasons. For example:

   a. Tools designed to scrape can often be used for other bad purposes. Most websites that attempt to defend against scraping have limitations in place that would restrict access

|   |   |   |
|---|---|---|
|   |   | or the ability to make unauthorized automated requests.  Technologies designed to circumvent these restrictions inherently make the sites less secure and can often be used for other harmful acts, like coordinated inauthentic behavior or submitting fraudulent content takedown requests.  Scraping evades system limits and makes it more difficult to employ technological solutions and systems that are designed to detect and differentiate normal user behavior from automated activity, including that caused by malware and other hacking tools. |
|   | b. | The use of unauthorized automation to extract data from degrades public trust and confidence. Users rightfully expect companies like Facebook to implement access and scraping restrictions. |
|   | c. | Scraping has adverse effects on privacy, free expression, and creative endeavors.  A user may provide data to a particular platform based on their trust that the platform will maintain control of their data.  Scraped data can include personal and private data as well as content, like photographs, protected by copyright.  And while users who install scraping extension may in theory have consented to the collection of their personal information, others who may use shared computers—family members, roommates, friends—have not so consented and may not even be aware that their personal information is being scraped.  In the case of advertisements and ad creatives, although advertisement on Facebook are considered publicly viewable, the creative content belongs to the user that created and posted the advertisement, not the user that views the advertisement. |
|   | d. | Scraping takes away users' control of their data. Facebook has a direct relationship with a user and commits to protecting the users' data from unauthorized users of its website, such as scrapers.  Facebook's third-party APIs are the authorized method by which Facebook can confirm that its users have consented to a third-party's collection of their data from Facebook. |
|   | e. | Due to their inherent commercial nature, ads often involve licensed copyrighted works.  When the content of a user's advertisement is improperly scraped and |

removed from Facebook, the user who created the advertising content, including the text and image used in the advertisement, has no ability to consent to its collection and removal from Facebook. If the URL for the advertisement is scraped, both users and non-users who have access to the advertisement URL can access and view the advertisement and advertising metrics even if they were not part of the advertisements intended audience. As a result, scraping can disaggregate content from the creator leading to repeated misuse of proprietary material without credit or payment to the creator.

f. Evasion of Facebook's anti-scraping terms or measures also undermines the integrity and operation of its network. Unauthorized automated requests for data, in circumvention of system limits, can burden the systems that support the service, causing slow speeds, limiting functionality, and overall consuming computer processing power intended to keep the network running. This also imposes costs on Facebook because of the infrastructure needed to respond to the automated requests. It also degrades the service being provided to real users.

g. Scraping can raise security concerns. Once data is scraped it can be used in ways that users would never have expected when the user posted that content or provided that data to a platform. It can put data in the hands of bad actors. For example, databases of scraped personal information can provide bad actors an easy way to target fraudulent communications. This can be true even if the user information is deidentified or aggregated.

For at least these reasons, almost all platforms have terms or policies against scraping, and take affirmative steps to enforce those policies, technologically and/or legally.

6. Facebook prohibits scraping of user data in their terms and employ a number of technical measures to detect and disrupt scraping. Facebook makes a substantial investment in technological solutions and policy efforts to prevent scrapers from improperly extracting user data through automation. Facebook maintains a variety of systems that monitor and detect suspicious activity on its website and restrict unauthorized automation from both logged-in and logged-out

scrapers. For example, Facebook limits the responses to server calls when we detect that behavior may be automated. Facebook also detects and disrupts unauthorized automated requests on its system by monitoring use patterns that are inconsistent with a human user, using challenge-response tests to determine whether a computer user is human or not, and disabling accounts engaged in automated activity.

7. Beyond these technical measures, Facebook has, and enforces, its policies against scraping. The Facebook Terms of Service expressly prohibit users to "access or collect data from our Products using automated means (without our prior permission) or attempt[s] to access data that you do not have permission to access." Likewise, Instagram's Terms of Use explicitly prohibit all Instagram users from "creating accounts or collecting information in an automated way without our express permission." Any user of either the Facebook or Instagram Platform must abide by the terms of service that govern the particular platform. I understand that Michael Duffey has submitted a declaration identifying and attaching the relevant Terms of Service.

8. Facebook's anti-scraping policies are part of Facebook's attempt to strike a careful and thoughtful balance between protecting user data and offering platform access to authorized third-parties. Facebook devotes substantial resources and works constantly to enforce its anti-scraping policies against anyone who engages in unauthorized extraction of user data.

9. The Facebook policies against scraping are important to protect user data. Although not every instance of scraping constitutes malicious behavior, I understand that it can be difficult to determine whether scraping is engaged in for benign or malicious purposes. Facebook therefore enforces its anti-scraping policies regardless of who is doing it or how they are using the scraped information. Facebook does not authorize users or developers to deviate from the terms of service.

10. Even beyond the security considerations as they relate to its user, Facebook's right to enforce its policies against scraping is important to protect user privacy more broadly by maintaining the integrity of its platform for the reasons I described above, and to deter third parties from engaging in unauthorized conduct.

11. And in addition to all of the considerations described above, processing personal data consistent with user expectations is essential to complying with modern data protection law and

regulation. It is therefore in the public interest for companies collecting personal data to properly limit unauthorized extraction and collection of that data through methods that are inconsistent with the purpose and scope of the original disclosure. To do so, companies must be able to guarantee to their users that they will only grant access to data in ways consistent with the user's expectations. Prohibiting companies such as Facebook from implementing technological and legal safeguards for user data is not only against the individual users' interests, it could also subject Facebook to fines or suits in many jurisdictions around the world.

12.     These concerns are not hypothetical. Facebook entered into a widely-publicized $5 billion settlement with the Federal Trade Commission resulting in a consent decree ordering Facebook to implement certain procedures to further enhance consumer protection and user privacy. A copy of the Federal Trade Commission Order is attached hereto as Exhibit 1. In compliance with the Federal Trade Commission Order, Facebook is required to report scraping covered incidents to the FTC.  Based on the investigation done in this case (I understand that Sanchit Karve has submitted a declaration describing the investigation and findings), the browser extensions distributed and used by BrandTotal and Unimania qualify as scraping covered incidents and will be reported to the FTC.  Failure to do so would subject Facebook to penalties.

13.     As a result of the above-mentioned investigation, we observed that Defendants were engaging at least two methods of scraping, which included (i) logged-in scraping by using the users' browser as a proxy, and (ii) misappropriating session tokens and user's session IDs, through their app, and then using them to gain access to Facebook to engage in logged-in scraping of user data. BrandTotal and Unimania's access to the Facebook and Instagram platforms has been revoked for violating Facebook's terms and policies against scraping.  Facebook is not improperly enforcing against BrandTotal and Unimania.

14.     Our enforcement process can give developers an opportunity to work with Facebook to address and remediate violations of our terms and policies. Those who provide fulsome cooperation, and whose violations are of a nature that do not require their outright ban from the platform, can sometimes have their access reinstated. I have personally been involved in multiple enforcement actions in which a developer was able to bring themselves into compliance with

Facebook's terms and policies such that Facebook was able to restore access. In this case, I am unaware of a request from BrandTotal and Unimania to access Facebook's platform for the purpose of collecting data through . Instead, I only aware of  BrandTotal' and Unimania's collection of data through illegitimate means.

I declare under penalty of perjury that the foregoing is true and correct. Executed at Oakland, California on the 21 day of October, 2020.

_____
Mike Clark