Pages 1 - 44

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JOSEPH C. SPERO, MAGISTRATE JUDGE

```
FACEBOOK, INC.,                    )
                                   )
            Plaintiff,             )
   VS.                             ) NO. 20-cv-07182-JCS
                                   )
BRANDTOTAL, LTD., ET AL.,          )
                                   )  San Francisco, California
            Defendants.            )
_____   )
```

Monday, October 26, 2020

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:  (By Zoom Webinar)

For Plaintiff:
                        WILMER CUTLER PICKERING HALE
                          AND DORR, LLP
                        2600 El Camino Real
                        Suite 400
                        Palo Alto, California  94306
                   **BY:  SONAL N. MEHTA, ESQ.**

                        WILMER CUTLER PICKERING HALE
                          AND DORR LLP
                        1875 Pennsylvania Avenue N.W.
                        Washington, D.C.  20006
                   **BY:  ARI HOLTZBLATT, ESQ.**

For Defendant BrandTotal Ltd.:
                        KRONENBERGER ROSENFELD, LLP
                        150 Post Street
                        Suite 520
                        San Francisco, California  94108
                   **BY:  KARL STEPHEN KRONENBERGER, ESQ.**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
              Official Reporter, U.S. District Court

(Appearances continued, next page)

**<u>APPEARANCES, CONTINUED</u>**:

For Defendant BrandTotal Ltd.:

                            HUSCH BLACKWELL LLP
                            190 Carondelet Plaza
                            Suite 600
                            St. Louis, Missouri  63105
                  **BY:  RUDOLPH A. TELSCHER, ESQ.**

                            HUSCH BLACKWELL LLP
                            120 South Riverside Plaza
                            Suite 2200
                            Chicago, Illinois  60606
                  **BY:  RYAN B. HAUER, ESQ.**

                            HUSCH BLACKWELL LLP
                            1801 Wewatta Street
                            Suite 1000
                            Denver, Colorado  80202
                  **BY:  DAVID M. STAUSS, ESQ.**

Also Present:

                            **STACY CHEN, ESQ.**
                            Facebook In-house Counsel

| | |
|---|---|
| 1 | **<u>Monday - October 26, 2020</u>**             **<u>2:31 p.m.</u>** |

<pre>
 1   <u>Monday - October 26, 2020</u>                         <u>2:31 p.m.</u>

 2                     P R O C E E D I N G S

 3         THE CLERK:  Calling Case No. 20-CV 7182, Facebook,

 4   Inc. versus BrandTotal, et al.

 5       Counsel, please state your appearances.  And first, let's

 6   start with the plaintiff side.

 7         MS. MEHTA:  Good morning, Your Honor.  Sonal Mehta

 8   from WilmerHale on behalf of the plaintiff Facebook.

 9       With me today is my partner Ari Holtzblatt, also from

10   WilmerHale.  And Stacy Chen, in-house counsel at Facebook, is

11   also on the line.

12         THE COURT:  Welcome.

13         MR. KRONENBERGER:  Good afternoon, Your Honor.  Karl

14   Kronenberger of Kronenberger Rosenfeld, here representing

15   defendants.

16       And I would like to turn it over to Mr. Telscher, who is

17   the lead counsel for the defendants on this matter.

18         MR. TELSCHER:  Good afternoon, Your Honor.  Rudy

19   Telscher with Husch Blackwell on behalf of BrandTotal.

20       On line with me as well are David Stauss and Ryan Hauer.

21         THE COURT:  Okay, welcome.  You'll see the name "Sam

22   Wheeler" on the screen.  That's my -- one of my law clerks who

23   has managed to hook up the AT&T line so the public can listen

24   to this.

25       I'm sorry for the problems that we have had, all day,
</pre>

1    actually, using the Zoom platform.  Hopefully they will be done

2    by tomorrow.

3          I wanted to start by covering a couple of questions.  And

4    then I'll talk, tell you a little bit about where I'm leading,

5    and then you can have at it.

6          The first question is I want to make sure I understand

7    what the Chrome extension does.

8          As I understand it, the Chrome extension -- the issue for

9    me is -- one of the issues for me is to identify what beyond

10   the information about the consenting user the Chrome extension

11   captures.

12         As far as I can see, there are a couple of categories of

13   information that are beyond information about the consenting

14   user.  Other than information about the consenting user -- by

15   "consenting user," I mean the person who, BrandTotal, paid

16   whatever they paid to get them to use the extension.

17         The information that is beyond information about that

18   consenting user is, number one, any information about a shared

19   computer user.  So that if the -- if the -- if my wife goes

20   onto my computer, gets Chrome, goes onto Facebook, it activates

21   the extension even if she signs onto her account instead of my

22   account, so there's -- the shared computer user's information

23   is accessed.

24         There's the ad engagement information.  That goes beyond

25   information that's just about the user who consented.  It's not

1  terribly extensive, but there are messages, reactions, things

2  of that nature, to the ads.

3      And then, of course, there are the ads, themselves, which

4  are not strictly about the user who consented, although those

5  are in the public library, so I'm not quite as sure about that.

6      Have I covered -- is there some -- am I right about what

7  I've said?  Or is there -- am I -- am I right about what I've

8  described, what is accessed beyond information about the user

9  who consented?

10      Maybe I'll start with the defendant, the moving parties.

11      **MR. TELSCHER:**  Your Honor, I think you have it right.

12  I think everything else is consented, and we're not aware of

13  this shared-computer thing being much of an issue, but

14  Facebook, I know, raised it.

15      **THE COURT:**  Well, why aren't you aware of it being

16  such an issue?  It would be an issue in my house.

17      **MR. TELSCHER:**  I can tell you at my house, all my

18  kids have their own stuff, so I wasn't being cute.  It

19  wouldn't have been an issue in my house.  But I assume it

20  would go on, to some extent.

21      **THE COURT:**  Right.

22      **MR. TELSCHER:**  So yeah, I think you have it.  Those

23  are limited instances of the things that would be in the

24  category you identified.

25      **THE COURT:**  And Ms. Mehta or Mr. Holtzblatt, do you

1    want to comment on that?

2           **MS. MEHTA:**  Yes, Your Honor.

3        So, we agree that those are areas.  The other areas that

4    we would add to the list are advertising interest information,

5    which is described in the Karve declaration at Paragraph 17 B.

6    And then also the URL information about the ad, which, once the

7    URL information is captured about the ad, then the ad can be

8    viewed, and the information about the IP, viewed offline on the

9    Facebook platform.  And that's described at the Karve

10   declaration at Paragraph 17 C.

11       But I would agree with you --

12          **THE COURT:**  So the ad interest information is about

13   -- is about the user, though, the consenting user.

14          **MS. MEHTA:**  That's true.  That's true.

15          **THE COURT:**  Okay.  And the URL for the ad, you can

16   also guilty to that by going to the public library and

17   clicking on the ad.

18          **MS. MEHTA:**  That's correct, although what you would

19   get from that, Your Honor, is the information that's in the

20   public library, which is the image of the ad, itself, and then

21   certain information that's provided.

22       What you can't get is a different URL which is scraped by

23   their application, which is not available in the ad library.

24   And once that different URL is scraped, then the ad can be

25   accessed by anyone that has that different URL.  And that URL

1    is not in the public ad library.

2              THE COURT:  What's the difference between the two?

3    Why do I care about that?

4              MS. MEHTA:  Because once you have the -- the

5    different URL, and you are able to access that information,

6    you have access to the ad, which does not belong to the user

7    that in this hypothetical consented to the UpVoice extension,

8    but to the advertiser.

9         And then you have access to the ad, and you can take that

10   ad and do things with the ad or the underlying ad creative,

11   which can include copyrighted work, for example, completely

12   offline of the Facebook platform, without any attribution.

13        And it's being able to take it through that separate URL

14   that basically disassociates it from the advertiser who created

15   the ad.

16             THE COURT:  So you can't do that through the public

17   library?

18             MS. MEHTA:  Correct.  That's my understanding, is

19   that that is a separate set of information.

20             THE COURT:  It's a separate set of information.  But

21   you couldn't take the ad off of that, click on it, manipulate

22   it in this fashion, in the same way you could if you were

23   doing the URL that you click on in the ad as it originally

24   appears in the Facebook password-protected area?

25             MS. MEHTA:  That's right.

1          **THE COURT:**  Okay.

2      Do you have any understanding different, or same, or none,

3  Mr. Telscher, about that?

4          **MR. TELSCHER:**  No, Your Honor.  The -- the ad is --

5   these are ads that are meant to be viewed by people.  They're

6   public ads.  And so, you know, much like in the old days, yes,

7   you can collect information about ads.

8      And when you have our client base, they want to know what

9  competitors are doing.  We're not altering the ads; we're not

10 publishing the ads.

11     There's no allegation --

12         **THE COURT:**  That's not the issue.

13         **MR. TELSCHER:**  Okay, fair enough.

14         **THE COURT:**  That's not the issue.  The issue is what

15  is being accessed, and what could be done with it.  Because

16  the question is the justification for the hoops that Facebook

17  makes one go through here.  And so that's the question.  All

18   right.  Well, that's a very interesting -- okay.

19     My second question is -- I'm going to jump around for a

20  little bit here, and then it will settle down.  But I've read

21  the FTC consent decree.  The FTC order.  And as I read it,

22  BrandTotal is a covered third party under that order.

23     Does BrandTotal agree with that?

24         **MR. TELSCHER:**  I would think that we would be,

25   Your Honor, yes.  But I would want to study that specific

1    question more, because it wasn't raised.

2        **THE COURT:**  Well, I don't know.  The FTC -- the order

3     is a centerpiece here.

4        So the next question -- and it has do with the question

5     that I sort of inartfully asked you before -- is:  What is the

6     Facebook process for getting -- for a commercial venture like

7     BrandTotal getting access to user data, and could it have been

8     used here?

9        Go ahead, Ms. Mehta.

10        **MS. MEHTA:**  Certainly, Your Honor.

11        So I will answer that in two parts.  On the first part,

12    which is what is the process, Facebook has something called the

13    graph API, which is a set of software APIs that a developer can

14    sign up to access, and then use established protocols to be

15    able to access a variety of data end points on the Facebook

16    platform, and can pull all sorts of information from the

17    Facebook platform through those authorized channels, going

18    through the proper process.

19        The second question, which is could they have used that

20    here, I don't know the answer to that.  Because one thing we

21    have never heard from them in any of the papers or any of the

22    discussions between the parties is what information they need

23    from Facebook's users that's either not available through those

24    APIs and through those authorized and established channels, or

25    that they wouldn't be able to somehow have a work-around

through those APIs and established channels.  And what is noticeable is in their papers, there's nothing that suggests that they ever tried to use the authorized channels and API to get access to this information.  From what we know, they've only ever tried do it by scraping the information using the extension, as opposed to working through the established channels.

But that's really a question for them.  And their silence on that question -- I don't know if it's because they didn't want to do the work to figure it out, or if they just -- they can't do it, but we've never heard from them.

**THE COURT:**  Yeah, I don't want to get into that at the moment.  I just want to find out what the situation is.

**MS. MEHTA:**  Sure.

**THE COURT:**  I just want to know whether or not it is possible.  And the answer is --

**MR. TELSCHER:**  Your Honor, Rudy Telscher, if I may?

**THE COURT:**  Yes, go ahead.

**MR. TELSCHER:**  So -- and this is before Ms. Mehta got involved, so she may not have known this.  We've actually had a discussion with Facebook.  We've explained all of the data that we need.

They said they were not authorized at that point to give us access to that data, but they would take it under advisement.

1          If you look at Mr. Karve's declaration, he sets forth

2     because he reverse-engineered what we did, the data that we are

3     collecting.  So we have a very specific set of data.

4          To our knowledge, Facebook does not offer that set of data

5     to users, but they have the ability to.  If you look at 3.2.3

6     they certainly could authorize that data.  But to our

7     knowledge, that's not part of any public offering that they

8     have.

9          We specifically discussed the data we need.  They said

10    they weren't in a position to authorize giving it to us at that

11    point, but they'd take it under consideration.

12          **THE COURT:**  Okay.  These are the brief settlement

13     discussions that happened last week.

14     Right?

15          **MR. TELSCHER:**  Yes, Your Honor.

16          **THE COURT:**  Okay.

17     Go ahead, Ms. Mehta.

18          **MS. MEHTA:**  And, and -- yes, Your Honor.  And one

19     thing is I'm getting a message from Mr. Chmelar, who was

20     directly involved in those discussions.

21          And his recollection is certainly that we did not receive

22     from them a list of information, specific information that they

23     need to be able to use the authorized channels, or any

24     explanation for why it wouldn't work.

25          But, it's neither here nor there.

1            **THE COURT:**  Yes.

2            **MS. MEHTA:**  I just want to make sure you have the

3    full answer.

4            **THE COURT:**  No.  My question is whether or not you

5    could, either in their current configuration or in some

6    configuration, that (Inaudible), use, if you -- is whether or

7    not they could, in the past or in the future, get this.

8        And then, that's my last -- that leads me to the question

9    that I propounded in my last order, which is:  Can this be

10   worked out?  And I guess that's a question for Facebook.

11           **MS. MEHTA:**  Well, Your Honor, you know, I would say

12   in some ways I think it's (Inaudible) while.  So from our

13   perspective, the ad library has a significant amount of public

14   information that we think they're after.

15       So they could start with the ad library, and figure out if

16   that gets them everything they need, or almost everything they

17   need.

18       Then they could go --

19           **THE COURT:**  Okay, they'll say no.  They'll say it

20   doesn't.

21       Okay, next?

22           **MR. TELSCHER:**  Correct.

23           **MS. MEHTA:**  Then we could go to the APIs which are

24   available through Facebook, which are publicly known to all

25   developers.  There's documentation about exactly what the

```
 1   endpoints that are available, how they can be used.  And they

 2   can see if whatever additional information they need, they can

 3   get through the APIs.

 4        And they've never said that they've tried that, or that it

 5   wouldn't work.  And then --

 6             THE COURT:  Except Mr. Telscher just said it didn't

 7   work.

 8        But, go ahead.

 9             MS. MEHTA:  Well, except there's nothing in the

10   record to suggest that they've tried that.

11        I will say, Your Honor, there's no evidence from their

12   technical witness in the declaration, that they've made an

13   effort to do that, and no explanation for what it is they say

14   they need to --

15             THE COURT:  So let me just -- this is not an

16   invitation to anybody to argue.  This is an invitation to see

17   whether or not there's a path forward here, other than

18   arguing.

19        So I'm not really asking you:  Well, they should try this

20   and they should try that, and they haven't tried it before.

21   I'm asking you whether or not you're willing to work it out.

22             MR. KRONENBERGER:  BrandTotal is yes, Your Honor.

23             MS. MEHTA:  For Facebook, the answer is if they can

24   do it within established channels and we can remediate the

25   data that's been scraped up until now, the answer is yes.
```

1          THE COURT:  Remediate the data that's been scraped up

2     to now.

3          MS. MEHTA:  I can explain that, if Your Honor wants

4     to --

5          THE COURT:  Yeah, what does that mean?

6       Yeah, go ahead.

7          MS. MEHTA:  There are a set of processes that

8     Facebook engages with, with somebody that has violated its

9     terms and scraped data.  And if the person that's violated the

10    terms is willing to engage in that remediation process, then

11    Facebook would allow them back on the platform.

12       And I'm happy to go -- there's a list of things.  I'm

13    happy to go through that with Your Honor, if you want.  But

14    ultimately, as long as they can make sure that they've gotten

15    rid of all the data that was scraped, so they're no longer in

16    possession of that, they're no longer scraping data, and their

17    tools have been cleared of scraping data, and certain other

18    procedural things we're going to need -- you know, who did they

19    share the data with, that kind of thing -- if they can go

20    through that remediation process which Facebook engages with,

21    with other people who have been found to violate the terms, and

22    then they can bring themselves on to the platform through the

23    APIs, then Facebook thinks it can be worked out.

24       And we've done that before in other cases.

25          THE COURT:  Mr. Telscher?

1          **MR. TELSCHER:**  Your Honor, we -- it's very easy for

2     us to give them the list of data that we need.  They already

3     know it, because the Karve declaration explains that they've

4     looked at it.  I'm highly skeptical that they're willing to

5     give it to us.

6          And, you know, as -- and I'm not arguing; I'm just saying

7     that you've seen -- I can tell you already studied the data

8     that we need.  They know what it is.

9          And as best I can tell, they're not willing to give that

10    to us.

11          **THE COURT:**  Okay.  No, I'm actually skeptical,

12     myself.

13          I mean, it's an interesting process they have going

14    through.  And maybe it's sufficient, as a matter of law.  I

15    don't -- I haven't decided that.  But -- and you can understand

16    why it would be the way it is, or one can understand the way it

17    is.

18          But my guess is now that they've done this process where

19    they've looked at the data that you actually gathered, they

20    know what you're gathering.  And having examined what you're

21    gathering, if somebody -- if it was something that they could

22    do through the APIs or something that they could do through

23    APIs with some adjustment, Ms. Mehta would just tell me that.

24          I assume that the answer's no.

25          **MR. TELSCHER:**  And Your Honor --

1          **THE COURT:**  That's actually for Ms. Mehta.

2          **MR. TELSCHER:**  Okay.

3          **MS. MEHTA:**  And Your Honor, I don't -- I'm sorry to

4     say this, because if the answer was a straightforward yes or

5     no, I would be happy to give it to you.

6          I'm genuinely hearing from the engineers at Facebook that

7     we need to know more about BrandTotal's systems, and exactly

8     what they're trying to do and what their offerings are, to be

9     able to tell them which API endpoint, and how they all fit

10    together.

11         It's not like we can go to the Karve declaration and say:

12    Oh, you want advertising interests; here's the API.  It's a lot

13    more complicated than that.  So it's not a yes-or-no answer.

14    And that's -- that's simply where we are.

15         **THE COURT:**  Okay.  Got it.

16         **MR. TELSCHER:**  May I respond briefly, Your Honor?

17         **THE COURT:**  Sure.

18         **MR. TELSCHER:**  They're running a directly competitive

19    business, gathering the same information.  If you look at

20    their user terms and conditions, they get the consent of users

21    for the same information that we're using, advertising trend

22    data interest.  They're already collecting the same

23    information, and using it in their competitive business.

24         We have offered -- I can show you the emails.  We've

25    offered three times to meet with them, to have this discussion.

1    They don't want to neat with us.  I don't -- and I don't think

2    they're interested in having us in this space.  I think that's

3    where we're at.

4            **THE COURT:**  That may be.  I don't know.  But that

5    doesn't really answer Ms. Mehta's question about how it's --

6    it's more than just some generalized description of what

7    people use to do data analytics.  It's a much more complicated

8    process than that, that everybody who does this does it

9    slightly differently.  They use slightly different

10   information; they gather it slightly differently.  And you're

11   talking about gathering information from users and

12   password-protected space from -- off Facebook.

13           I can understand that she doesn't have an answer to it.  I

14   may or may not understand the decisions they made, but I can

15   certainly understand the -- don't have an answer yet.

16           So okay, thank you.  That answers, at least in some

17   general way, the question that I had.

18           So here's where I'm at.  I'm skeptical of the -- that it's

19   -- that BrandTotal has carried its burden to get this immediate

20   relief.  I think that there are some things that are true.  I

21   think that, you know, on the likelihood-of-success element,

22   what it really comes down to is the question of legitimate

23   business purpose.  That's a complicated question.

24           I think the knowledge question, you can -- that the

25   defendants can get by the knowledge question.  They can get by

the disruption question.

Legitimate purpose of -- business purpose of Facebook, that's a really -- that is the meat of the problem here.  It's the meat for here; it's the meat for the public-interest component of an injunction, the balance of equities.  And so, you know, there are competing interests in that.

And so at best, I would say there's a serious question -- I don't think there is any doubt that there is a serious question on the merits as to -- ultimately as to the intentional interference with conduct -- with the contract.

Where I founder on this is in the public-interest component.  You may -- some of you may think this is part of balances the private equities.  I don't.  I think it's part of the private/public-interest component.  But the public has -- and this is my tentative ruling for you to argue against -- a -- I mean, this case presents pretty directly the balance between public access to and competition for data analytics on the one hand, and the, you know, sort of proactive data and privacy protection by prevention of access to automated data collection in password-protected areas without any vetting is presented pretty directly.

And I think the public has a great interest in both sides of that dispute.  They certainly have a strong interest in the integrity of the Facebook platform.  In having Facebook strongly police that platform, including prevention of

1    intrusion by a company that violates its terms of use.

2        And by the way, you violated their terms of use.  There is

3    no question in my mind, at this stage of the case, at least,

4    that if I had to say likelihood of success, they have a

5    likelihood of success on you violated their terms of use.  This

6    is clearly an automated method of gathering data.  The argument

7    to the contrary, to my mind, is quite frivolous.  So you

8    violated their terms of use.

9        And the question -- and so the public certainly has a

10   strong interest in policing the platform, and having the

11   platform, you know, aggressively police its terms of use,

12   rather than enter an order that says:  Let someone who you

13   think violated its terms of use do this for now, and we'll --

14   and we'll adjudicate later whether or not there's sufficient

15   evidence to justify it.

16       It seems to me that -- and it's sort of the same way that

17   Judge Hamilton came down on that public interest in her case --

18   there's no question that BrandTotal circumvents Facebook's

19   privacy settings.

20       You know, even consenting users, if they check their

21   privacy settings, are not going to see BrandTotal as a third

22   party with whom they have agreed to share information.  And

23   they can't change their privacy settings to exclude BrandTotal.

24   So it certainly circumvents the privacy protections that have

25   been put in.

It seems to me that mandating that Facebook set aside its rule that third parties seek and obtain Facebook's permission before they collect data is inconsistent with the privacy enforcement policies at Facebook, and would result in inconsistent enforcement that the FTC sued to prevent.

I mean, I think this is exactly the kind of case, it seems to -- this is the kind of case that it appears to fall within the strictures of the FTC consent decree, and require that Facebook demand compliance with its platform rules by BrandTotal.

Of course, you know, there's a huge public interest -- and the Ninth Circuit acknowledged this -- in not having an information monopoly, in the collection of data on advertising that is made public and that social media companies like Facebook use, themselves, to prevent what's called an information monopoly.  You know, that was a case where it wasn't password-protected space.

And I'm not -- and I'm pretty clear that that is not a sufficient public interest to require Facebook on a temporary retraining order to allow data gathering by a service that hasn't gone through its regulatory process, and gathers password-protected information without -- in clear violation of the terms of service.

It seems to me that the question, sort of at its core, is: Can Facebook have a prophylactic rule that requires people who

1  want to gather data inside the password -- can they have a

2  prophylactic rule that you have to go through an internal

3  vetting process?  Can you do that?

4      And it seems that right now, as far as I can tell -- and

5  this is just the very beginning, and I've had about three

6  minutes to work on the case, or maybe a couple of days -- that

7  there is great public interest in wanting to protect the

8  privacy of information.  And so they can have that kind of

9  prophylactic rule.

10     And so I -- that's where I'm coming out on the public

11 interest.  I don't -- you know, I don't know where this goes,

12 ultimately.  And I don't know whether or not, after a full

13 briefing and a trial or wherever else I get more briefing on

14 this I'll have the same opinion.  But on this shortened,

15 shortened briefing schedule, that's where I am.

16     So maybe I ought to turn to you, Mr. Telscher, and give

17 you an opportunity to address that.

18         **MR. TELSCHER:**  Thanks, Your Honor.

19     You know, so I -- I would have expected you to have had

20 front and center on your mind the user -- the user issue,

21 protecting user privacy.

22     Facebook is a large company, so no matter what you rule,

23 it's not going to hurt them.  They admit that they were

24 investigating us, in the Karve declaration, from April of 2020

25 to October 1, when they filed the lawsuit.  So they spent the

last six months investigating us, and never said a word to us.

And I can say that, you know, if they thought there was something nefarious and bad for users going on, they would have said something.  They would have approached us.  But their investigation admits they spent six months, and never once approached us.

You know, in my experience --

**THE COURT:**  That goes two ways.  Your client didn't approach them.  Your client didn't say: let's check with Facebook.  Because your client was afraid Facebook would say no, and they thought they'd done a work-around where they didn't have to get Facebook's -- they didn't have to let Facebook know at all.

Why didn't they go to Facebook and say, three years ago: We're going gather your data.  It's obviously in violations of -- by now, it's in violation of the terms of service.  But can we work something out?

Why didn't they do that?

**MR. TELSCHER:**  So we have been advertising our UpVoice program.  And they have to approve our ads.  We've been doing that for a couple of years.  Our -- it advertises our UpVoice program.  It says that it collects information from social feeds.  It's a browser extension.

So as far as we're concerned, we've been running this -- you know, it wasn't -- was it a formal dialogue?  No.  But they

1   have a --

2           THE COURT:  It wasn't even an informal dialogue.

3           MR. TELSCHER:  Well, they review -- they do review

4    the ads, and they do turn them down.  They'll admit to you

5    that they look at all of the ads.

6       But my bigger point is this.

7           THE COURT:  I don't think it's the security team that

8    is reviewing the ads.

9           MR. TELSCHER:  Probably not, but I would still expect

10   that they would notice something like this.

11      But let me go to the bigger point, Your Honor, and it's

12   this.  We have full user consent.  So, the *Stackla* case did not

13   have full user consent.

14          THE COURT:  Well, you don't have full user consent.

15   So you don't have full user consent from the other people who

16    are using the computer.

17      Right?  We at least know that.

18      There are lots of shared computers in the world.  And

19   anybody who uses this browser, whether or not they're the

20   person who signed up for the browser, if they go into

21   Facebook's page, you don't have their consent.

22      Right?

23          MR. TELSCHER:  But -- we don't, but we're not taking

24    any of their information, other than this ad feed.  And it's

25    -- I mean, hopefully, this part would -- we weren't trying to

```
 1    do that.  I mean, Facebook has identified something, and you
 2    picked up on it.
 3         We weren't trying to get -- in that occasion where
 4    somebody else jumps on a computer, that's not the information
 5    we wanted.  We wanted --
 6              THE COURT:  So that's my point.  That's my ultimate
 7    point here, is one of the reasons you have a prophylactic rule
 8    that you have to go through a vetting process is your
 9    technology may have unintended consequences.
10         And I take it completely as you say, that it was an --
11    would be an unintended consequence if some -- if you
12    accidentally got the private Facebook information of a
13    non-consenting user.  I'm 100 percent certain you've already
14    gotten it.  Not on purpose.  Hundred  percent certain there are
15    people who have co-used the same browser.  It would be bizarre
16    if there's nobody who used the same browser.  They access their
17    Facebook, and it comes up.
18         But my question -- but it seems to me that's the reason
19    why you have a prophylactic rule, and you go through a process,
20    and it gets vetted, to make sure that there's something that
21    your client didn't anticipate.
22              MR. TELSCHER:  But the only information we take,
23    Your Honor, is deidentified demographic information, and
24    advertising interest.  I mean, we're not -- we're not getting
25    user IDs, passwords, photos, friend links.  This is about as
```

1    innocuous of data as you can get.

2        And that's precisely -- in the *LinkedIn* case, you know,

3    when you look at that case carefully, *LinkedIn*, there was a bot

4    that was taking data without user consent.  And the Court

5    looked at it.  But the nature of the data wasn't sensitive

6    data.

7        We're not taking sensitive data; we're not using it for an

8    improper purpose.

9            **THE COURT:**  But it's all inside a password-protected

10   space.  In *LinkedIn*, it's not password-protected space.

11   Anybody can get that data.  In this, nobody can get that data

12   except someone who enters a password, except for the ads,

13   themselves.  Not URLs that Ms. Mehta was talking about.  But

14   other than the ads, themselves, all the other data you gather,

15   nobody can get it without a password.

16       Isn't that right?

17           **MR. TELSCHER:**  Correct.  But, we have the user

18   consent to get all of this information.  I mean, we've

19   identified a couple of public ads --

20           **THE COURT:**  So but you're going -- you know, you're

21   shifting the ground.  Where I started with this is you don't

22   have user consent to everything.  You don't have user consent

23   from the users who are not the people who ordered the browser,

24   but happened to be using the borrower extension that you have.

25   You don't have the user consents from the people who've

1    responded to the ads and the ad engagement information that

2    you gather.  The ups -- the pluses and minuses, the thumbs up

3    (Indicating), or the comments that you gather.  So you don't

4    have those users' permission.

5         **MR. TELSCHER:**  But Your Honor, all the people on

6    Facebook, I mean, that's a public forum.  And so we're --

7    they're taking information that this entire universe of people

8    are seeing.  We're not going in and taking somebody's trade

9    secrets or something sensitive.

10        Those likes and dislikes are all this -- there's

11   2.7 billion users who can all see all of that.  And that's the

12   information we're taking.  And that's what the *LinkedIn* case is

13   saying, is that --

14        **THE COURT:**  So you're -- so you think that,

15   therefore, all of the information, all of the information that

16   anybody who's got a password can see, all of the information

17   that anybody's got a password can see, anybody can take that.

18        **MR. TELSCHER:**  Yes.  It's a public forum.  I mean,

19   that's the points of the *LinkedIn* case is just because they

20   put a password on -- this is the point I would ask you to

21   think about.  Because Facebook -- any of these sites could put

22   a user name and password on.  Even LinkedIn could say if you

23   want to come onto LinkedIn, everybody who wants to enter has a

24   user name and password.  They almost all do.  I think LinkedIn

25   may be the only one that doesn't.

1          THE COURT:  Uh-huh.

2          MR. TELSCHER:  And so now, all of a sudden, they have

3   a monopoly over data.  And it doesn't matter -- you know,

4   again, it's just like the *LinkedIn* case.  We're talking about

5   the most non-sensitive data there is.

6          This is the type of data, advertising data that's been

7   collected through Nielsen; I gave you an example in our reply

8   brief of the "people meter."

9          I mean, I think there would be a bigger concern if

10  Facebook could point to something and say: Well, look at what

11  they took.  They shouldn't have taken that.

12         But everything we're talking about is just advertising

13  viewing.

14         THE COURT:  Well, it's demographic information.

15  Sometimes that's pretty sensitive.

16         MR. TELSCHER:  But, but deidentified.  We don't know

17  Ms. Jones's age.  All we know is I've got 100 people that are

18  males that are between the age of this and this, and that's

19  what they've looked at.

20         And your ruling -- I mean, this is where their terms and

21  conditions have gotten.  And I hear you on the argument about

22  why we're automated.  I'm not surprised to hear you say it.  I

23  was going to tell you point-blank, it's not my favorite

24  argument.  And do you know why it wouldn't have been?  Not only

25  because you say it's weak, but because they could have changed

1    their terms and conditions tomorrow.

2         And so all we are saying is that Facebook can make their

3    terms and conditions whatever they want, completely preclude

4    access to non-sensitive data.  And here, unlike *Stackla*, our

5    client did get the consent.  They find it the right way.

6         Under the GDPR and the CCPA, these people own their data.

7    It even says they have the right to monetize their data.  Our

8    client gets their permission; it pays them.  We submitted you

9    emails of users who are like:  Look, Facebook doesn't pay us

10   anything.  At least you guys pay us something.

11        And so we are taking user data about advertising,

12   innocuous, nothing private, using it for a good purpose.  And

13   Facebook is doing the exact same thing.  And what they

14   ultimately have here is any small competitors that go around

15   the Facebook ecosystem, they can shut down.  And if there isn't

16   any kind of temporary relief, there's just no way to survive.

17        And so when I look at that balancing, I'm on your side.

18   And I knew would you say this to me about what -- what is --

19   what's going -- is there risk to the users.  In this case, its

20   better than *LinkedIn*, better than *Stackla*, because we got their

21   consent.

22        And all of the information that we've identified that we

23   collect, we've identified public ads, some likes and dislikes,

24   and maybe somebody slipped on somebody else's computer.  I

25   mean, we've got minor amounts of data that's -- and it's all

1  still innocuous.  Almost everything we take is fine, and none

2  of what we take is sensitive.  And so, the public interest has

3  a strong interest in competition.  And these users have an

4  interest in getting paid.

5       And the CCPA and GDPR says these users own their data and

6  have the right to agree with us that they could do this.  And

7  you know, when we talk --

8            THE COURT:  I think that's not proper -- you're

9   incorrect on that law.  But it's sort of beside the point.

10      Your point is that this information is deidentified, it's

11  sufficiently innocuous, that it's the kind of information in

12  which there's a strong public interest in having a public

13  marketplace for that information.  As opposed to --

14            MR. TELSCHER:  Right.  And companies that probably

15   can't afford, you know, to stay -- I mean, it'd be different

16   if we had ten other products, and we could move on.  But

17   without data, we don't have a service to provide.

18      And so if there's not preliminary relief -- and this is

19  what they found in *LinkedIn* -- we're out of business.  It could

20  be a lawsuit as to why we shouldn't have been put out of

21  business.

22      But when we look at the balancing of those harms, there's

23  just nothing nefarious in play.  And Facebook is using the same

24  types of information to run the same business.  And so when I

25  look at all of that, this distinguishes us from *Stackla*.

1          And I understand your ruling, but I would -- I think it's

2     safe to say that we've done this by the book, and now we've

3     spotted a few things that, in my view, are minor.  Likes and

4     dislikes about public ads, 2.7 billion users could see all of

5     that.  All these ads they're talking about, 2.7 billion users

6     can see it.  Just because there's a user name and password,

7     2.7 billion people have access to that.  So -- you know.  And

8     the people whose families who might get tracked, they're the

9     ones that got the $5.

10         And if we have to submit a warning on our ad that says

11    that a family member who uses your compute might be -- we can

12    put that in.  But to put us out of business over that, I just

13    ask you to give some thought to it.

14         **THE COURT:**  Well, so, let me just -- let me just

15     throw it back at you a little bit differently.

16         One of the problems that I see with your position, or that

17    my brilliant staff sees and helps me see, is that you're saying

18    what Facebook has to do is they have to trust you.  You have to

19    be allowed to scrape data until they can prove that the program

20    is taking sensitive data.  Because right now, you know, it's:

21    We're in the -- we're in the lawsuit to prove it.  To prove it.

22         Facebook hasn't seen your source code.  They don't know

23    exactly what's happening.  They've got this very high-level

24    analysis that they have done, an even higher-level analysis

25    that you've disclosed to them.  But they have to take it on

1   that, that everything's fine.

2       And -- not that everything's fine, but they have to allow

3   it in until they can prove -- that is to say, we're going to --

4   and that's where I come down on this peculiar privacy balance,

5   is your presumption would be:  Well, if we've got some users'

6   permission, and we say we're only taking deidentified blah,

7   blah, blah, then you have to stop them from stopping us, Judge,

8   unless and until they win a trial where at trial, they prove

9   that we're actually taking something else.

10      So it's a -- that, I think, is the -- you know, maybe

11  that's the right answer, and it certainly is from your point of

12  view.  But that's the cost that it seems to me that you're

13  asking Facebook and the public -- I mean, I like Facebook well

14  enough, but the public to bear.

15          **MR. TELSCHER:**  Well, but Your Honor, they do have our

16  source code.  The Karve declaration says it right in there.

17  They have looked at our source code.  They know exactly what

18  it's getting.

19          **THE COURT:**  Source code?  They've got your source

20  code?

21          **MR. TELSCHER:**  Yes.  They've got our source code.

22  They know exactly what we're collecting.  Exactly.  There is

23  nothing hidden.

24      I'll pull it for you.

25          **THE COURT:**  I'd be surprised.

```
 1          Is it true?  Do you have their source code?
 2               MR. TELSCHER:  It is true.  It's in their
 3     declaration, Your Honor.  I'll cite the paragraph.
 4               MS. MEHTA:  We have the --
 5               THE COURT:  We have what?  Go ahead.
 6               MS. MEHTA:  We have the code from the extension
 7     that's available when you download the extension from the
 8     Chrome web store.
 9               THE COURT:  Okay.  Well, that's something.
10               MR. TELSCHER:  It says specifically, "source code."
11     They've got our source code.
12               THE COURT:  Okay.
13               MR. TELSCHER:  Let me find the paragraph.
14               THE COURT:  Forget about that.
15          Do they actually have your source code?  Because when you
16     download a program for an extension or anything else, you don't
17     get the source code.  You get a program.  And you can see how
18     it operates, but you don't get the source code.
19               MR. TELSCHER:  Paragraph 12.
20               THE COURT:  No, I'm not asking you what he says in
21      his declaration.
22          I'm asking you whether it's actually true, despite
23     whatever casual words are used in that declaration, is it
24     actual source code?  Or is it operative code?
25               MR. TELSCHER:  So here's how I'll answer it,
```

1    Your Honor.

2        He says what he had, and I will give you -- I know what

3    you're saying to me: Rudy, he might have said those words; Mr.

4    Telscher might have said those words.  He's then going to tell

5    you, based on his review, all the information we extract.

6    Based on his review of our code.

7        THE COURT:  I appreciate that.  Okay.

8        MR. TELSCHER:  Does that make sense, though?  It's

9    his declaration.  All the way, he goes through -- for example,

10   Paragraph --

11       THE COURT:  No; it may be true.  It may be true.  I

12   appreciate that.  I appreciate that.  That may be true.

13       Let me turn to Ms. Mehta, because I have a question for

14   you.  And the question is this:  The core of what Mr. Telscher

15   says is important is actually important.

16       And that is to say, there is a public interest in a -- a

17   public marketplace for non-sensitive deidentified advertising

18   data.  There's a clear public interest in that being not

19   monopolized by one company.  That's what Judge Chen's case was

20   about.

21       And, and why isn't it the case that if we could determine

22   -- and maybe this is not the place to determine, yet -- that,

23   you know, they had consent, they had -- and they were only

24   taking innocuous deidentified information about advertising

25   preferences and whatnot, why isn't that exactly the kind of

 1  thing that *IQ* (sic) -- it's *IQ*, right? -- *IQ* was talking about?

 2          **MS. MEHTA:**  So Your Honor, I think there's a question

 3  -- two different questions that are getting a little bit

 4  conflated here --

 5          **THE COURT:**  Uh-huh.

 6          **MS. MEHTA:**  -- in the defendant's position.  And they

 7  are what are you accessing, and how are you accessing it.  And

 8  the key thing that *hiQ* and *Power Ventures* focused on is how

 9  you're accessing it.

10      So if you are the defendant and what you want is

11  advertising information, there is an ad library that provides,

12  from what we can tell, most of what they want.  And there's a

13  variety of APIs.

14      And what we don't know yet is whether, if they tried to

15  take the APIs and ad library and combine them, and wrote their

16  software to take that information and process it, whether they

17  could offer the services they want to offer.  That's not in the

18  record.  I don't know that they've tried that.

19      If they go through those proper channels to get the

20  information, I think that's completely in furtherance of the

21  public interests that Your Honor just identified in providing

22  that information to the public.  But it's the going through the

23  proper channels that's critical to --

24          **THE COURT:**  What if Facebook doesn't have a channel?

25   What if Facebook doesn't have a channel?  What if Facebook

 1    doesn't have a channel where you can get all the deidentified

 2    demographic information associated with every advertisement?

 3         **MS. MEHTA:**  I would say a couple things.  One is

 4    that's a hypothetical.  We don't know whether that's actually

 5    the situation we have now.

 6         But even if that were the situation, the answer is not

 7    that you allow people to scrape the data in violation of the

 8    terms.  It can't be.  And the reason for that is because you

 9    cannot have a system in which you allow people to bypass the

10    proper established channels by arguing that they have consent,

11    because Facebook does not have a way of monitoring or

12    authorizing -- or confirming that there's consent that's off

13    the platform.  We cannot have a situation in which someone can

14    just come in and say: Well, we have consent, so everything's

15    fine.

16         The integrity of the system and the strong public interest

17    in making sure that we actually police what's happening on the

18    system require you to go through the established channels as a

19    way to enforce user consent.

20         So both public interests, I would submit, have to be at

21    least as significant, if not more significant, especially on a

22    record as we have here, where there's been no showing that the

23    public interests that you've identified to access the

24    information isn't already served by the channels that exist.

25         **THE COURT:**  Well, aren't we -- well, it's no showing,

1     either way.  Facebook has not shown that they could get even

2     one iota of the information, other than sort of the ads,

3     themselves, through the public library.  You haven't shown

4     that they can get the demographic information, you can get

5     this, you can get that.

6         There's no showing by any side, I would say, on whether or

7     not the accepted channels -- and that's what disturbs me,

8     actually, that's what disturbs me.  Because what strikes me is

9     you go -- we could go down in this lawsuit for a while, and we

10    could try to figure out whether Facebook has a system set up

11    that could actually provide this information, that the

12    information could be gotten with consent, that there's a way

13    to -- for Facebook to confirm that consent on the platform,

14    that it's to confirm that it's deidentified or whatever it is,

15    to make sure it's right.  Or, we might figure out that Facebook

16    just hasn't set up a system for that.  Even though it's a good

17    thing.

18        And the question is:  What does one do if it's a good

19    thing, and Facebook hasn't set up a system for it?  Do I just

20    say:  Well, too bad, you can't get in because it doesn't fit

21    within the -- it's a square peg in a round hole, even though

22    it's perfectly legitimate information?  Then what do I do?

23             MS. MEHTA:  So I have a couple of responses to that,

24    Your Honor.  The first response to is:  There hasn't been a

25    showing on that either way, so of course it's not our burden.

1          And whether there will be a showing on that once we get

2     more information as to what their services are that they're

3     trying to offer, whether there's a way to achieve that through

4     the established channels or not, I don't know.

5          And the what do you do, I do know the answer to the what

6     you do question, though, or least I can answer it one way,

7     which is:  I know what you can't do.  What you can't do is say:

8     Well, they should have this information, or I think maybe they

9     should have a way to get this information, so let's disregard

10    the terms of service, the contract that we have that governs

11    the access to this information, and let's disregard Facebook's

12    and the public's interest in maintaining the platform

13    integrity, and just let them grab it anyway, because we decide

14    after the fact maybe there's information that they should have

15    had access to.

16         So I don't know exactly where discovery is going to lead

17    us, in terms of whether they can get this through the

18    established channels or not, but I do know that the answer

19    cannot be in any circumstance that the way that we deal with

20    this is we let them continue to scrape, or that we let someone

21    who's been caught scraping come in on a TRO and say:  You must

22    reinstate our access until this all gets litigated out.

23              THE COURT:  The reason I'm saying this is because

24     it's a warning for the rest of the cases for Facebook.  There

25     is an interest here that you have to keep your eye on.  And

```
 1    that the Court will be keeping its eye on.  I mean, I must --
 2    I'm going to go back, and I'm going to certainly think about
 3    all the things Mr. Telscher has given me pause on today.
 4         But, this is just the TRO stage.  And it seems to me that
 5    at some point, we're going to have to get more deeply into what
 6    they do -- what they do, what they could do within the given
 7    API structure, and what they couldn't do.
 8         And it certainly is the case that -- or it's not certainly
 9    the case, but one would think it wouldn't be the case that
10    Facebook that could set up an API structure that was designed
11    to keep competitors out (inaudible).   it's the way it's said.
12    You can't disagree with it.
13         The question is whether we end up there.  Is it set up so
14    that somebody who wants to use the same kind it data can't get
15    it because of the way the system is set up?  Or is this data
16    that you can get through the system if you do it properly?
17    That'll be really important, I'm sure, to deciding the case.
18    But --
19              MR. TELSCHER:  Your Honor, Rudy Telscher.  May I
20    respond quickly?
21              THE COURT:  Yes, please.
22              MR. TELSCHER:  So the public library point.  In their
23    complaint, they do explain that there's limited information in
24    the public library, and what we're collecting is not in the
25    public library.  So I would respectfully suggest that is of
```

record.  And our client knows emphatically that we cannot get
through normal Facebook means, something that they offer, the
data we need.  We know that for sure.  Their own complaint
lists what's in that public library, and it's limited
information.  So we do know that for sure.

You know, I would normally be sympathetic to Facebook's
position that, you know, you violate our terms and conditions,
and that's a problem.  But the flip side of that is when you
set your terms and conditions where nobody can use any
automated means, which is the only practical way to collect
data -- I don't know if you read in the media, it's all over
the media right now that they just sent cease-and-desist
letters to New York University, shutting them down for
automatic collection of political ad information.

So when they talk about their terms and conditions,
they've set them where they have complete monopolization of
this database, so we can't get it from the public library.
That is, respectfully, answered within their complaint.  I can
tell you emphatically we can't get it through some normal
offering, or we would have done that.

Two, they've set their terms and conditions where they've
completely monopolized any realistic way to get this data.

And three, scraping, which, we cannot throw this term
around.  It has a nasty sound to it, so I don't blame them
using it.  Scraping is used by researchers and all kinds of

good people.  What that means is -- and even Facebook's papers
admit -- scraping has good uses, and it might have bad.  It
sounds like a bad term, so I get it.  But that's what
researchers do to go get mass information off of websites.

            **THE COURT:**  Seel, I just think you are getting too
far ahead of yourself.  You skip over some really critical
things here.

    The terms and conditions say you can't use automated ways
of gathering data, without permission.  You leave off the
without permission.

    Now, the without permission may be a fiction here.  It may
be we'll get into this, and it turns out that actually the way
they structured their APIs is such that it's just designed as
an anti-competitive device.  I have no idea, one way or
another.

    I'm sure Ms. Mehta was cringing, as I say it that way.
But we'll find out what that's about.

    But conceptually, the idea that you need to actually
engage with the platform, and discuss what you're doing, and
maybe have them vet what you're doing, you know, that's at
issue here.  That doesn't necessarily seem to me something that
is anti-competitive, or anything else, because there are two
competing issues here.

    One is we've got to protect the privacy of those 2 billion
users.  And we've got to protect the public interest in a free

1    marketplace of data which is -- which -- to the extent we can.

2        So they're competing interests, and the question is how

3    you balance them.  You don't balance them by saying one side

4    wins.  You balance them by figuring out what the details are.

5        And, you know, their terms and conditions do say "with

6    permission."  Now, we'll find out what that means, and maybe

7    it's in the end going to support you.  I don't know.

8        But, you know, failing to ask them for permission before

9    the litigation starts I think is a strike against -- it's a

10   strike against you for the TRO.  This is just the TRO.  This is

11   just the beginning of this.

12       You have this huge burden to get a temporary restraining

13   order, let alone a temporary retraining order that requires

14   Facebook to actually do something, other than stop doing

15   something.

16       But, it's a -- but, the reason that I said these things to

17   Ms. Mehta is my view is this is something the parties ought to

18   look at, together.  You do it; you don't do it.  It's up to

19   you.

20       But it seems to me there are competing interests on both

21   sides that will -- should drive the parties to not take a

22   hard-line position, and try to figure out whether or not

23   there's a way through it.  That's totally up to you, whether

24   you do it.  My job is just to make decisions.  But that

25   suggests -- you know, the competing interests are both

```
 1    important.
 2         Okay.  Let me just make sure I covered everything I want
 3    to cover, and then I'll ask you whether or not you have
 4    anything else you wanted to talk about.
 5         Anything else you want to talk about?
 6         MR. TELSCHER:  Nothing from BrandTotal, Your Honor.
 7    I think you've heard us.
 8         MS. MEHTA:  Nothing further, Your Honor.
 9         THE COURT:  All right.  So we'll take this under
10    submission.  And we'll get out an order shortly.  And then,
11    we'll see what goes on from there.
12         We have a case management scheduled down the road.
13    (Inaudible) move it up at the moment unless the parties want --
14    need the Court's intervention.  But you've heard my suggestions
15    about how you proceed from here.  And then we'll talk about it
16    at the next calling of the case.
17         Yes, sir.
18         MR. TELSCHER:  Your Honor, Rudy Telscher.
19         Trust me when I tell you that in the situation we're in,
20    of course, you can expect that we're going to explore any
21    resolution we can.  I mean, that's for sure what will happen.
22         THE COURT:  Of course.
23         MR. TELSCHER:  Absent that, is your order going to
24    contemplate -- if I'm understanding you correctly, are you
25    going to set it for a PI hearing?  Or what's the next steps?
```

1          **THE COURT:**  No, I wouldn't.  I wouldn't set it for a

2     PI hearing.  I would deny the temporary retraining order.  At

3     least -- you know, I don't want to get ahead of myself.  I

4     want to dig back into this, Mr. Telscher, so don't -- but if I

5     deny it, I'll just be denying the TRO.  And then you can make

6     a decision.

7          **MR. TELSCHER:**  Fair enough.

8          **THE COURT:**  You'll have the opinion.  And you can

9     make a decision whether you want to make a regularly-noticed

10    preliminary injunction motion, or whatever you do.  You know,

11    my guess is -- I don't know.  I don't know enough about the

12    landscape.

13         If the landscape is different than I understand it, then

14    maybe there's a reason to do something in terms of a

15    preliminary-injunction motion.  If it's not different than I

16    understand it, then maybe there's not.  Then maybe, you know,

17    have some other court take a look at it, instead of me.

18         Okay.

19         **MR. TELSCHER:**  Thank you.

20         **THE COURT:**  You bet.

21         All right.  Anything further?

22         Thank you all, and thank you all for your patience with

23    the pretty unusual process we had to go through here today.

24    But I'm glad we got it going.

25         **MS. MEHTA:**  Thank Your Honor.

1          **THE COURT:**  See you.

2          **MR. TELSCHER:**  Thank Your Honor.

3          **THE COURT:**  Thanks, Belle.

4          **THE CLERK:**  Court stands in recess.

5       (Proceedings concluded)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

### **CERTIFICATE OF REPORTER**

        I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_/s/ Belle Ball_

Belle Ball, CSR 8785, CRR, RDR

Wednesday, October 28, 2020