Rudolph A. Telscher, Jr.* (MO Bar No. 41072)
rudy.telscher@huschblackwell.com
Kara R. Fussner* (MO Bar No. 54656)
kara.fussner@huschblackwell.com
HUSCH BLACKWELL LLP
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
314-480-1500 Telephone

Ryan B. Hauer* (IL Bar No. 6320758)
ryan.hauer@huschblackwell.com
HUSCH BLACKWELL LLP
120 South Riverside Plaza Suite 2200
Chicago, IL 60606
312-526-1572 Telephone

*admitted *pro hac vice*

Karl Kronenberger (CA Bar No. 226112)
karl@krinternetlaw.com
Jeffrey M. Rosenfeld (CA Bar No. 222187)
jeff@krinternetlaw.com
KRONENBERGER ROSENFELD, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
415-955-1155 Telephone
415-955-1158 Facsimile

***Attorneys for Defendants Plaintiffs
BrandTotal, Ltd. and Unimania, Inc.***

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO/OAKLAND DIVISION

| | |
|---|---|
| FACEBOOK, INC., a Delaware corporation, | Case No.: 3:20-CV-07182-JCS |
| *Plaintiff*, | |
| v. | **DEFENDANTS' MEMORANDUM IN SUPPORT OF *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER** |
| BRANDTOTAL, LTD., an Israeli corporation, and UNIMANIA, INC., a Delaware corporation, | Judge:  The Hon. Joseph C. Spero |
| | Ctrm.:  Courtroom F – 15th Floor |
| | Date:   TBD |
| *Defendants*. | Time:   TBD |

# **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS ................................................................................................................ i

TABLE OF AUTHORITIES .......................................................................................................... ii

INTRODUCTION ......................................................................................................................... 1

STATEMENT OF ISSUES ........................................................................................................... 3

STATEMENT OF FACTS ............................................................................................................ 3

    A.    BrandTotal's Business Model ..................................................................... 3

    B.    Facebook's Public User Content ................................................................ 5

    C.    Congressional Findings Entered Just Days Following Facebook's Filing of the Complaint Find That Facebook Engages in Anticompetitive Conduct of the Very Nature Implicated Here ....................................................... 6

    D.    Facebook Shut Down BrandTotal's Business without Any Notice ...................... 7

    E.    The Immediate Harm to BrandTotal Has Been Immense ................................ 7

ARGUMENT ................................................................................................................................ 8

I.    BRANDTOTAL IS LIKELY TO SUCCEED ON THE MERITS ...................................... 9

    A.    BrandTotal Either Is Not in Breach of the Terms of Service or Else the Terms of Service as Applied are Unenforceable ................................. 9

        1.    BrandTotal Does Not Use "Automated" Means as That Phrase Was Intended. ................................................................................. 9

        2.    Facebook's Prohibition Against Opt-In User Disclosure of Data is Unenforceable and Void as a Matter of Public Policy. .......................... 10

            a.    The public interest in allowing users to disseminate and monetize their own data outweighs any interest in upholding Facebook's Terms of Service. .......................................... 12

            b.    The public interest in promoting competition outweighs any interest in upholding Facebook's Terms of Service. ...................... 14

    B.    BrandTotal Is Likely to Prevail on Facebook's Claims under the CFAA, the California Penal Code § 502(c), and Unjust Enrichment. .................................. 17

    C.    BrandTotal Is Likely to Prevail on Its Claim for Intentional Interference with Contract and Prospective Economic Advantage. .................................... 18

    D.    BrandTotal is Likely to Prevail on Its Claim against Facebook for its "Unlawful," "Unfair" and "Fraudulent" Acts. ............................................. 20

    E.    BrandTotal Is Likely to Prevail Facebook's Claim for Interference with Contractural Relations. ............................................................................ 20

        1.    Facebook's disruption of BrandTotal's contractual and prospective business relationships is unlawful and thus a violation of the UCL. ........ 21

        2.    Facebook's unjustified and anticompetitive conduct in cutting off BrandTotal's access to UpVoice user data is also an "unfair" practice under the UCL. ............................................................................ 21

II.    THE INTERIM IRREPARABLE HARM TO BRANDTOTAL FAR OUTWEIGHS ANY HARM TO FACEBOOK ........................................................................... 23

III.    THE PUBLIC INTEREST FAVORS AN INJUNCTION ................................................ 25

IV.     NO BOND SHOULD BE REQUIRED ........................................................................ 25

CONCLUSION .................................................................................................................... 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page(s)</u>

3

### <u>Cases</u>

4
*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,
   750 F.2d 1470 (9th Cir. 1985) ........................................................................................ 24

5

6
*Beer Nuts, Inc. v. King Nut Co.*,
   477 F.2d 326 (6th Cir. 1973) ......................................................................................... 11

7
*Blank v. Kirwan*,
   39 Cal. 3d 311 (1985) ............................................................................................ 15, 22

8

9
*Bower v. AT&T Mobility, LLC*,
   196 Cal. App. 4th 1545 (2011) ..................................................................................... 20

10
*C.B.C. Distribution & Mktg., Inc. v. Major League Baseball Advanced Media, L.P.*,

11
   505 F.3d 818 (8th Cir. 2007) ........................................................................................ 14

12
*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
   20 Cal. 4th 163 (1999) ................................................................................. 15, 21, 22

13

14
*CRST Van Expedited, Inc. v. Werner Enterprises, Inc.*,
   479 F.3d 1099 (9th Cir. 2007) ......................................................................... 19, 20, 21

15

16
*Doran v. Salem Inn, Inc.*,
   422 U.S. 922 (1975) ..................................................................................................... 24

17
*Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc.*,
   499 U.S. 340 (1991) ..................................................................................................... 14

18

19
*Freedom Holdings, Inc. v. Spitzer*,
   408 F.3d 112 (2d Cir. 2005) ......................................................................................... 23

20
*H&M Assocs. v. City of El Centro*,
   109 Cal. App. 3d 399 (1980) ........................................................................................ 19

21

22
*hiQ Labs, Inc. v. LinkedIn Corp.*,
   273 F. Supp. 3d 1099 (2017) ................................................................................. passim

23

24
*hiQ Labs, Inc. v. LinkedIn Corp.*,
   938 F.3d 985 (9th Cir. 2019) ................................................................................. passim

25
*Idaho Potato Comm'n v. M & M Produce Farm & Sales*,
   335 F.3d 130 (2d Cir. 2003) .................................................................................. 11, 12

26

27
*In re Tobacco II Cases*,
   46 Cal. 4th 298 (2009) .................................................................................................. 23

28

*Jorgenson v. Cassiday*,
 320 F.3d 906 (9th Cir. 2003) ................................................. 25

*Korea Supply Co. v. Lockheed Martin Corp.*,
 29 Cal. 4th 1134 (2003) ....................................................... 19

*Kwikset Corp. v. Super. Ct.*,
 51 Cal. 4th 310 (2011) ......................................................... 20

*Lear, Inc. v. Adkins*,
 395 U.S. 653 (1969) ............................................... 11, 14, 17

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*,
 708 F.2d 1081 (7th Cir. 1983) ..................................... 15, 22, 23

*McIlwain, LLC v. Berman*,
 No. 18-CV-03127 CW, 2020 WL 1308342 (N.D. Cal. Feb. 10, 2020) ................................. 13

*14859 Moorpark Homeowner's Ass'n v. VRT Corp.*,
 63 Cal. App. 4th 1396, 74 Cal. Rptr. 2d 712 (1998) ....................... 9

*Motors, Inc. v. Times Mirror Co.*,
 102 Cal. App. 3d 735 (1980) ................................................. 21

*Nat'l Basketball Ass'n v. Motorola, Inc.*,
 105 F.3d 841 (2d Cir. 1997) ................................................. 14

*Otter Tail Power Co. v. U.S.*,
 410 U.S. 366 (1973) ................................................. 15, 22, 23

*Pacific Gas & Electric Co. v. Bear Stearns & Co.*,
 50 Cal. 3d 1118 (1990) ....................................................... 19

*Patino v. Franklin Credit Mgmt. Corp.*,
 No. 16-cv-02695-LB, 2017 WL 1246853 (N.D. Cal. Apr. 5, 2017) .................................... 8, 9

*Phillips v. Crown Central Petroleum Corp.*,
 602 F.2d 616 (4th Cir. 1979) ................................................. 17

*Reeves v. Hanlon*,
 33 Cal. 4th 1140 (2004) .................................................. 18, 19

*Roso Lino Beverage Distributors, Inc. v. Coca Cola Bottling Co. of New York, Inc.*,
 749 F.2d 124 (2d Cir. 1984) ................................................. 24

*Saturday Evening Post Co. v. Rumbleseat Press, Inc.*,
 816 F.2d 1191 (7th Cir. 1987) ............................................... 11

*Shippers, Inc. v. Fontenot*,
 No. 13CV1349 JLS(MDD), 2013 WL 12092056 (S.D. Cal. Sept. 23, 2013)....................... 24

1

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co. Inc.*,
    240 F.3d 832 (9th Cir. 2001) ....................................................................................... 8

2

**<u>Statutory and Other Authorities</u>**

3

15 U.S.C. § 2 ................................................................................................... 15, 22

4

Cal. Bus. & Prof. Code § 17200 ............................................................................. 20

5

Cal. Bus. & Prof. Code § 17204 ............................................................................. 20

6

Cal. Civ. Code § 1667(2) ............................................................................... 12, 13

7

Cal. Civ. Code § 1798.100, et seq ...................................................................... 11, 13

8

Cal. Penal Code § 502(c) ............................................................................... 17, 18

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## INTRODUCTION

2     BrandTotal has successfully grown a high-end advertising consulting business during the

3 past four years – one that has since inception been based on analyzing social media advertising

4 data. Its customers include some of the most well-known companies in the world. BrandTotal

5 helps them set advertising strategies regarding how to most effectively spend advertising money in

6 social media – ironically, including lots of money with Facebook. In its most popular offering,

7 UpVoice, the life blood of BrandTotal is advertising user data that it collects with the full consent

8 and knowledge of the UpVoice users. *UpVoice users are paid* to allow BrandTotal to track their

9 advertising interactions using an Internet browser tool called UpVoice. Users who choose to

10 participate in UpVoice appreciate this service. As one participant recently noted, "websites . . .

11 take our data and sell it off for a profit while we get nothing back in return. At least [BrandTotal]

12 give[s] us a little money for our data." Leibovich Decl. ¶ 28, Ex. A at 5. Like an Uber driver, it's a

13 way for people to make a little extra money while doing what they would already do – surf the

14 web.

15     Facebook's Complaint brazenly labels the UpVoice browser extension "malicious" with no

16 explanation. Far from malicious, BrandTotal has at all times hired skilled data privacy lawyers to

17 make sure it is compliant with all privacy laws, and BrandTotal only analyzes deidentified and

18 aggregated user data to identify advertising trends. Indeed, large corporations, like BrandTotal's

19 clients, do not care about any individual user's data when spending millions to advertise with

20 companies like Facebook.

21     Approximately two weeks ago, without warning or discussion, Facebook disabled

22 BrandTotal's Facebook accounts and sent a takedown notice to Google to disable BrandTotal's

23 UpVoice browser extension, as well as others.[1] Just like that, BrandTotal was effectively out of

24 business with no due process to defend itself. Worse, Facebook also delayed discussions regarding

25 BrandTotal's products and possible resolution, which delayed BrandTotal's request for a TRO in

26 Superior Court, just to abruptly file a federal case with several additional causes of action, further

27 forcing BrandTotal to delay its request for immediate relief. Now before this Court, BrandTotal is

28

---

[1] This application for a TRO only relates to BrandTotal's UpVoice extension.

desperate for injunctive relief compelling Facebook to restore BrandTotal's data access until litigation on the merits can occur, else there will not be a company remaining to challenge Facebook's actions.

BrandTotal is substantially likely to win on all of its and Facebook's claims in large part because this case is on all fours with this Circuit's *hiQ v. LinkedIn* decision. The Ninth Circuit affirmed the district court's grant of a preliminary injunction against LinkedIn, ordering it to not interfere with hiQ's collection of public information, (i.e., its accused "scraping" of information) from LinkedIn's site to run its business of advising companies about employee issues and opportunities.

Here, as in *LinkedIn*, the issue is whether Facebook can monopolize deidentified social media user data for data analytics. Although Facebook paints BrandTotal as a bad actor, Facebook uses the same type of user data to offer its own competitive services, and is using this lawsuit as means to stamp out legitimate competition; not, as it feigns, to nobly protect users. But under the California Consumer Privacy Act (CCPA), the user, not Facebook, owns the data, and this is well-established law. To end-run controlling law, Facebook devised user "terms of service" provisions that effectively shift ownership of user data to Facebook, even though the law is to the contrary.

Facebook's purported justification for its terms of service provisions – that it is protecting user privacy rights – is belied by Facebook's infamous privacy violations. Facebook's privacy violations are well-known. In just the last two years, Facebook was fined an "unprecedented" $5 billion dollars by the Federal Trade Commission for privacy violations, and it recently entered into a $550 million class action settlement to resolve claims that it unlawfully processed users' facial templates without their consent. Facebook's goal with this lawsuit has nothing to do with privacy. It is to put a competitor out of business.

That Facebook wields this sort of immense anti-competitive power is no surprise. Congressional hearings were conducted over an extensive time period. Just days after Facebook filed its lawsuit in state court, seeking to put competitor BrandTotal out of business, Congress found that Facebook's amassed monopoly power has allowed it to swallow up and destroy competition (*see* Section II.C for detailed findings). Indeed, the users own their data and should

have every right to sign up for UpVoice and make a little money doing so. But Facebook says no. Rather, it filed this lawsuit, continuing the anticompetitive conduct that Congress warned against.

The irony is that BrandTotal analyzes the advertising data and advises its high-level customer base how to spend advertising dollars with Facebook. Why wouldn't Facebook be happy about this? Hasn't Facebook amassed massive wealth through its monopoly power over advertising on its site? Of course it has, but that wealth is not enough. It now endeavors to monopolize all use of user data relating to advertising activity, and any other activity for that matter. Its terms of service implicate no limit. The use of aggregated data and related analytics to provide consulting services is an entirely legitimate, time-honored business.

Like the *LinkedIn* case, finding "serious questions" pertaining to whether LinkedIn engaged in tortious interference and UCL violations, this Court should grant temporary injunctive relief to BrandTotal to restore the status quo of allowing BrandTotal to access user advertising data, as it has for years, while the Court ultimately determines the merits of this case. If this Court does not do so, the harm to BrandTotal is immense, occurring daily since the lawsuit filing, and ultimately leading to the destruction of the business. Further, the issues discussed herein are ones that are likely resolvable in summary judgment given that they are largely legal determinations. For these reasons, BrandTotal requests the Court issue the accompanying application for a TRO, and to set this matter for a preliminary injunction hearing.

## STATEMENT OF ISSUES

Whether Facebook's actions in causing BrandTotal's UpVoice extension to be shutdown, along with related actions on the Facebook platform, thereby effectively shutting down BrandTotal's business, is likely to constitute tortious interference and/or violate the UCL, including whether any of Facebook's claims or defenses lead to a different conclusion, and whether BrandTotal has established irreparable harm that outweighs harm to Facebook, thus entitling BrandTotal to a temporary restraining order to reestablish the status quo?

## STATEMENT OF FACTS

### A.    BrandTotal's Business Model

BrandTotal Ltd., and its subsidiary app developer, Unimania, Inc. (collectively,

"BrandTotal"), is a premier advertising consulting company offering competitive analyses of advertising efforts on social media sites like Facebook, Instagram, Twitter, YouTube, LinkedIn, Amazon and others. Leibovich Decl., ¶ 6. Just as companies used to track competitive advertising in print, on billboards, and on TV in years past, there is a need today to understand advertising across the many online channels that people see. *Id.*, ¶ 7. Fortune 500 companies and others want analytical intelligence not only about how their own advertising is received on social media sites, but also how competitors' ads are viewed and perceived. Leibovich Decl., ¶ 8. BrandTotal provides this service, and is very good at it.

In BrandTotal's most popular offering, willing participants download UpVoice and authorize BrandTotal to collect information about the participant's advertising interactions. *Id.*, ¶ 10. Unlike other companies, through UpVoice, BrandTotal offers participants incentives in exchange for the information, and only collects information with the participants' informed consent and deliberate opt-in. *Id.*, ¶¶ 9, 14. Basically, BrandTotal conducts the online equivalent of compensating participants to allow BrandTotal to follow them around, virtually, as they go about their normal, online activity, in order to see what advertising the user experiences.

As explained in more detail in the declaration of Oren Dor, individuals must voluntarily choose to sign up for UpVoice, confirm they have read the privacy policy which details the demographic and advertising (not privacy related at all) information BrandTotal collects, and then install the UpVoice Chrome browser extension. Dor Decl., ¶ 8. BrandTotal and its customers have no interest in what any individual is viewing; the data only matters as aggregated by general demographics and as related to advertising. The extension does not impact the performance on the individual's device or web browser. *Id.*, ¶ 22. Rather, with the user's explicit consent on UpVoice, it allows BrandTotal to collect data the user either owns or has a right to access and certain public information about the websites the user visits. *Id.*, ¶¶ 15-22. With the participant's consent and after they deliberately install the extension in exchange for compensation, BrandTotal is able to collect information about the ads they see and interact with on social media sites like Facebook, as they browse as usual on those sites. *Id.* In short, these UpVoice paid users help BrandTotal and its customers better understand effective advertising strategies, including advertising on Facebook.

BrandTotal's customers are companies that advertise on social media and whose competitors advertise on social media, and they seek generalized information about the ads participants see. Leibovich Decl., ¶ 11. They want to know which demographics are seeing which ads and at what times. *Id.* When an UpVoice participant navigates to Facebook, BrandTotal collects deidentified information about the user by using hashed values for the user's device and user IDs. Dor Decl., ¶ 15. BrandTotal does not collect the user's names or email addresses, although the user voluntarily provides that when they sign up. *Id.* BrandTotal does not keep or compile participants' private postings, passwords, photos, or web history, nor does BrandTotal mine "friend" information, or otherwise take data not expressly authorized. *Id.*; *see also* Leibovich Decl., ¶ 13. Rather, the information collected relates to who is seeing what advertisement, where and at what times. Dor Decl., ¶¶ 18-20. BrandTotal anonymizes and aggregates the data by demographic info (age, gender, high level location, marital status, interests), in order to provide summary information to companies about the viewership of advertisings. Leibovich Decl., ¶ 13.

## B.    Facebook's Public User Content

Facebook, including its Instagram product, comprises the world's largest social network, with over 2.7 billion monthly active users. Complaint ("Cmpt"), ¶ 12. Facebook users sign up, and then can choose to share information about themselves. Cmpt, ¶ 14. Anyone with a Facebook or Instagram account can create and place ads on Facebook and Instagram. Cmpt, ¶ 15. Every week, users and businesses place millions of ads through Facebook's ad platform, which provides advertisers with many options for reaching audiences. *Id.*

Facebook's terms of service (in their current form) state that "you may not access or collect data from our Products using automated means (without our prior permission) or attempt to access data you do not have permission to access." Ex. G[2], Facebook Terms of Service, Section 3.2.3. The "without our prior permission" means that Facebook purports to be able to pick and choose who accesses the information. Cmpt, ¶¶ 25, 27-29. At the same time, Facebook's terms and conditions acknowledge that users own the rights in their own information. Ex. G, Section 3. Facebook contends that BrandTotal cannot use automated software to collect data, even with the opt-in and

---

[2] All references to Exhibits F-O are to the Telscher Decl.

informed consent of UpVoice users, so that BrandTotal can provide consulting services to its customers, as it has done for several years; yet, Facebook uses the same type of information to provide advertising consulting services to its advertising customers. Cmpt, ¶ 51. Facebook's website confirms this extensive program, noting that it also aggregates and sells user data to advertisers and other companies. Ex. H. This data includes "the kinds of people" seeing advertisements on its platform (i.e., "general demographic and interest information") and user online activity (i.e., "activity off our Products, such as the websites you visit and ads you see" & interactions with "posts, listings, Pages, videos and other content on and off Facebook products"). *Id.*

### C.   Congressional Findings Entered Just Days Following Facebook's Filing of the Complaint Find That Facebook Engages in Anticompetitive Conduct of the Very Nature Implicated Here

In October 2020, just days after Facebook's complaint was filed, the Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary released a report regarding "the extent to which [Facebook] ha[s] exploited, entrenched, and expanded [its] power over digital markets in anticompetitive and abusive ways." Ex. K ("Report") at 6. The Subcommittee found that *"*Facebook has monopoly power in the market for social networking" and "in online advertising in the social networking market." Report, pp. 134, 170; *see also* pp. 137-139, 171-173. While Facebook "products appear to be 'free' [they] are monetized through people's attention or with their data," and "[t]he collection and use of this personal data by . . . Facebook for personalized advertising, in many cases with no or limited controls available to consumers, is another indication that these platforms do not face a strong enough competitive constraint." *Id.* at 18, 52-53; *see also* pp. 54-55. The Subcommittee found that "Facebook has also maintained its monopoly through a series of anticompetitive business practices," including "us[ing] its data advantage to create superior market intelligence to identify nascent competitive threats and then acquire, copy, or kill these firms." *Id.* at 14; *see also* pp. 161-166. Further, like here, "Facebook selectively enforced its platform policies based on whether it perceived other companies as competitive threats," and "[i]n doing so, it advantaged its own services while weakening other firms." *Id.* at 14; *see also* pp. 166-170. Indeed, "Facebook's data also enables it to act as a

gatekeeper because Facebook can exclude other firms from accessing its users' data" and it can "effectively pick winners and losers online" by choosing who can access user data. *Id.* at 149-150.

### D.   Facebook Shut Down BrandTotal's Business without Any Notice

Despite BrandTotal engaging in its data collection and advertising consulting business since 2016 and despite Facebook admitting that it employs sophisticated means to detect what it considers to be undesirable, competitive uses of "data scraping" (Cmpt, ¶ 28), it never once before contacted BrandTotal in any way to raise any concerns. Leibovich Decl., ¶ 21. Without any communication or warning, Facebook filed a complaint in California State Court on October 1, 2020 alleging one count of breach of Facebook's Terms of Service. Ex. F. BrandTotal learned about the lawsuit not from Facebook, but through the media. *Id.*, Ex. E.

In parallel with the filing of the State Court Complaint, Facebook suspended BrandTotal's Facebook and Instagram pages, as well as the personal pages of BrandTotal's principals and contacted Google to shut down BrandTotal's UpVoice browser extension. Cmpt, ¶ 56. On October 2, Google shut down the UpVoice extension, along with other BrandTotal-related extensions, leading to a near complete shutdown of BrandTotal's data that is essential to its consulting services. Leibovich Decl., ¶ 19. BrandTotal immediately endeavored to reach Facebook, and on October 8, informed Facebook that if a resolution could not be promptly reached, it would have no choice but to move the court for interim relief. Telscher Decl., ¶ 4. After requesting BrandTotal delay, and just before BrandTotal planned to move for a TRO in Superior Court, Facebook dismissed the California state law action and immediately refiled in this Court, adding the federal cause of action and other counts. *Id.*, ¶ 8.

### E.   The Immediate Harm to BrandTotal Has Been Immense

The impact on BrandTotal's business from the unilateral actions of Facebook are impossible to overstate. Leibovich Decl., ¶ 4. Without access to the vast majority of participant data, BrandTotal cannot compile advertising analytics for its customers. *Id*. Moreover, BrandTotal's current UpVoice participants cannot login to collect any rewards they have earned, and BrandTotal cannot recruit new participants. *Id*., ¶ 26. Already current customers—reputable large companies—are questioning their relationship with BrandTotal and prospective customers

that had completed trials and were in the final stages of negotiation are walking away. *Id*., ¶¶ 30-43. BrandTotal relies on receivables from its customers to fund its day-to-day operations. *Id.*, ¶ 31. Without injunctive relief, BrandTotal cannot deliver contractually-promised services to its customers. And without the ability to deliver content to existing and potential customers, BrandTotal has no incoming revenue. *Id*.

It also cannot secure lending or venture capital to see it through the crisis. Like many small start-up companies, BrandTotal is not yet profitable on an annual basis. *Id.*, ¶ 59. This means it does not have the ability to secure mainstream lending. *Id*. Instead, BrandTotal must rely on fundraising and venture capital to fill the gap, but this requires revenue projections. *Id.*, ¶ 58. With no projected revenue coming in and the cloud of being shut down indefinitely, BrandTotal has no ability to generate funding. Already one potential investor has walked away. *Id.*, ¶ 39.

Facebook's decision to bar BrandTotal from their platforms, and to send take down notices to Google without advance notice or dialogue with BrandTotal has already caused irreparable harm to BrandTotal. *Id.*, ¶ 63. BrandTotal is losing business every day and in jeopardy of having to close its doors forever. *Id*. If that occurs, approximately twenty-eight (28) people will lose their jobs, and the industry will lose a pioneering young company providing valuable advertising analytics that *increases* competition and is good for all. *Id.*, ¶ 68.

## ARGUMENT

BrandTotal meets the legal standard for a temporary restraining order here, including establishing (1) a likelihood of **immediate** irreparable harm that would result if an injunction were not issued, (2) a likelihood of success on the merits, (3) the balance of equities tips in favor of the plaintiff, and (4) an injunction is in the public interest. *Patino v. Franklin Credit Mgmt. Corp*, No. 16-cv-02695-LB, 2017 WL 1246853, at *1-2 (N.D. Cal. Apr. 5, 2017).[3] In addition, the court uses "a 'sliding scale' approach to these factors, according to which 'a stronger showing of one element may offset a weaker showing of another.' [] So, when the balance of hardships tips sharply in the plaintiff's favor, the plaintiff need demonstrate only 'serious questions going to the merits.'" *hiQ*

---

[3] The standard for granting a temporary restraining order is "substantially identical" to the standard for granting a preliminary injunction. *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co. Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).

*Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 992 (9th Cir. 2019) (affirming injunctive relief where a business would be destroyed without access to a social media platform). Here, the balance of the equities is also sharply tipped in BrandTotal's favor.

A temporary restraining order "preserves the status quo and prevents irreparable harm until a hearing can be held on a preliminary injunction application." *Patino*, 2017 WL 1246853, at *1. Here, BrandTotal seeks an injunction that restores the parties to the status quo. The status quo is normally defined as "the last actual peaceable, uncontested status which preceded the pending controversy." *14859 Moorpark Homeowner's Ass'n v. VRT Corp.*, 63 Cal. App. 4th 1396, 1408, 74 Cal. Rptr. 2d 712 (1998) (internal citations omitted). The injunction sought in this case endeavors to return the parties to the status quo before Facebook unilaterally removed BrandTotal from its platform and sent take down notices to Google. This will ensure the survival of BrandTotal until a preliminary injunction hearing, and ultimately litigation on the merits can occur.

As discussed, the Ninth Circuit affirmed similar preliminary relief in a case nearly identical to the current one, involving LinkedIn reversing actions to interfere with a third-party company using "bots" to automatically collect user data from the LinkedIn public site. *hiQ Labs, Inc. v. LinkedIn Corp.*, 273 F. Supp. 3d 1099, 1113 (2017). Like here, the court found LinkedIn's competitive use of the same information problematic for LinkedIn's assertion that it was out to protect users. *Id.* at 1118. Because the merits are judged on a sliding scale, and because the irreparable harm in this case is clear and devastating, BrandTotal, like *LinkedIn*, will suffer immense damage if preliminary relief is not granted to allow it access to the data.

I.   **BRANDTOTAL IS LIKELY TO SUCCEED ON THE MERITS**

    A.   **BrandTotal Either Is Not in Breach of the Terms of Service or Else the Terms of Service as Applied are Unenforceable.**

        1.   **BrandTotal Does Not Use "Automated" Means as That Phrase Was Intended.**

In its Complaint, Facebook alleges that BrandTotal violates Section 3.2.3 of Facebook's Terms of Service's prohibition on "accessing or collecting data from Facebook Products using automated means (without our permission)." Cmpt, ¶ 25. Additionally, Facebook contends that BrandTotal also violates Instagram's Terms of Use's prohibition on (a) "accessing or collecting in

unauthorized ways including collecting information in an automated way without our express permission" and (b) "violating someone else's rights, including intellectual property rights." Cmpt, ¶ 26. BrandTotal has the users' permission for the data it collects, so the only plausible allegation relates to whether BrandTotal collects data using "automated means."

An earlier version of these Terms of Service and an earlier high-profile situation provides important context for the meaning and scope of the "automated means" prohibition. The 2017 version of the terms and conditions stated "You will not collect users' content or information, or otherwise access Facebook, using automated means (*such as harvesting bots, robots, spiders, or scrapers*) without our prior permission." *See* Ex. I (emphasis added). "Data scrapers" collect as much information as they can through any means possible using automated tools, like bots and scripts. Leibovich Decl., ¶ 49. Cambridge Analytica infamously scraped millions of Facebook profiles, without disclosure or consent, in the run-up to the 2016 presidential election in order to target undecided voters. *Id.*; *see also* Ex. J. Facebook knew of this and permitted it, but users did not, leading to fines against Facebook. Ex. J. Facebook's allowance of election interference is obviously a societal problem, not implicated here.

Here, nothing is installed automatically or nefariously. Rather, participants have to: (1) sign up for the UpVoice; (2) agree to the terms and conditions which disclose the data collected; (3) go to the Google Chrome store and install the browser extension; and then (4) scroll and interact with social media and experience advertising. Dor Decl., ¶¶ 7-14. If these deliberate steps are not taken, no information is collected. Further, it is the user that makes the decision to allow data they own to be tracked using the UpVoice extension. While BrandTotal offers the service, ultimately it is the user who decides whether their data will be used for the analytics. And, in contrast to truly automated means, BrandTotal does not use "bots" or other software that surveys Facebook's entire site. Not only does BrandTotal act only with user consent, it is not engaging in the highly controversial purpose of Cambridge Analytica. There is nothing untoward about advertising consultancy, and nothing automatic in the sense of undisclosed universal collection of information.

### 2. Facebook's Prohibition Against Opt-In User Disclosure of Data is Unenforceable and Void as a Matter of Public Policy.

Even if BrandTotal is in breach of Facebook's unilaterally drafted Terms of Service,

BrandTotal is still likely to prevail, because Facebook's terms are unenforceable as against public policy. Under the guise of alleged violations of its user agreements, Facebook attempts to control information that it cannot otherwise prevent others–and particularly competitors–from collecting and using. The law is abundantly clear that *user data belongs to each individual* and not Facebook.[4] Similarly, public advertisements cannot be appropriated by Facebook at the exclusion of other firms. However, here, UpVoice users are voluntarily and knowingly permitting BrandTotal to track their demographic information and advertising activity (i.e., personal information owned by each user), but Facebook is simultaneously (1) obstructing users' rights to monetize each users' own data thereby inhibiting the free flow of information and (2) improperly stamping out competition. Since there is no practical way of collecting, aggregating, and utilizing users' personal (and publicly available) information without the use of some degree of automation, these broad terms are, in effect, designed to stifle competition and further reinforce Facebook's monopoly power for social networking and advertising in the social networking market.[5]

In the patent context, the Supreme Court has found contractual provisions unenforceable where the "strong federal policy favoring the full and free use of ideas in the public domain" outweighs the public interest against the "competing demands of patent and contract law." *Lear, Inc. v. Adkins*, 395 U.S. 653, 674-675 (1969). The *Lear* balancing approach has been applied to other areas of intellectual property law as well. *See, e.g., Idaho Potato Comm'n v. M & M Produce Farm & Sales*, 335 F.3d 130, 137-139 (2d Cir. 2003) (certification marks); *Beer Nuts, Inc. v. King Nut Co.*, 477 F.2d 326, 328-329 (6th Cir. 1973) (trademarks); *Saturday Evening Post Co. v.*

---

[4] For example, in 2018, California became the first state in the country to enact statewide online consumer privacy protection legislation through passage of the CCPA.  *See* California Civil Code § 1798.100, et seq.  As explained when the Act was introduced, "[the CCPA], is a simple bill. It is based on the principle that people should have the right to control their own personal data and should not be discriminated against for exercising that right."  Remarks of Assembly member Edwin Chau, June 28, 2018, Assembly Floor Session, from 2:14:00 to 2:17:57, *available at* https://www.assembly.ca.gov/media/assembly-floor-session-20180628/video.

[5] As the recent October 2020 Congressional report issued by the Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary found, "Facebook has monopoly power in the market for social networking." Report at 134; *see also* pp. 137-139 (Facebook's CEO said it controlled 95% of all social media in the U.S. in terms of monthly minutes of use). Additionally, "Facebook has monopoly power in online advertising in the social networking market." *Id.* at 170; *see also* 171-173.

*Rumbleseat Press, Inc.*, 816 F.2d 1191, 1200-1201 (7th Cir. 1987) (copyright).

Stated differently, "courts should weigh the federal policy embodied in the law of intellectual property against even explicit contractual provisions and render unenforceable those provisions that would undermine the public interest." *Idaho Potato*, 335 F.3d at 137. In the same vein, California's Civil Code recognizes that public policy can void a contract. Cal. Civ. Code § 1667(2) (a contract or a provision of a contract is unlawful if it is "[c]ontrary to the policy of express law, though not expressly prohibited"). Here, there are strong public policy considerations that users own their information (and therefore may monetize their own information), that favors the free flow of information in the public domain, and that prioritizes competition. Facebook's application of its terms is trampling on these policies solely for its own benefit. They are therefore void and unenforceable.

      **a.**      **The public interest in allowing users to disseminate and monetize their own data outweighs any interest in upholding Facebook's Terms of Service.**

Social media users own their personal information and can freely make choices about how they use their information without interference from Facebook. California enacted the CCPA for this reason—to give consumers more control over their personal information. As the primary author of the bill, Assembly member Edwin Chau, explained the CCPA:

> ensures that consumers enjoy choice and transparency in the treatment of *their* personal information when accessing the Internet. Californians should have a right to choose how *their* personal information is collected and used. [The Act provides] consumers *more control over their data*.

Ex. L at 7 (emphasis added).

The CCPA defines "personal information" broadly to include "information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household." This includes information such as:

- Identifiers such as a real name, alias, postal address, unique personal identifier, online identifier, internet protocol address, email address, account name, social security number, driver's license number, passport number, or other similar identifiers.

- Characteristics of protected classifications such as gender.

- Internet or other electronic network activity information, including, but not limited to, browsing history, search history, and information regarding a

consumer's interaction with an internet website, application, or advertisement.

- Geolocation data.

- Inferences drawn from any of the information identified in this subdivision to create a profile about a consumer reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes.

Cal. Civ. Code § 1798.140(o)(1). The user information collected by BrandTotal includes users' "personal information" under the CCPA's definition; information that users, not Facebook, owns.

Additionally, the CCPA allows businesses to "offer financial incentives, including payments to consumers as compensation, for the collection of personal information, the sale of personal information, or the deletion of personal information." *Id.*, § 1798.125(b)(1). Here, through UpVoice, BrandTotal provides this consumer option. As discussed in more detail below, Facebook should not be allowed to exclusively benefit from its users' personal information when that personal information belongs to the users or otherwise is publicly available.

Ultimately, what the CCPA recognizes is that the data that Facebook's Terms of Service attempt to regulate does not belong to Facebook. As is made clear under the CCPA, that data belongs to the individual. Moreover, the CCPA prohibits any modification of the broad rights enumerated within the statute. It specifically states that "[a]ny provision of a contract or agreement of any kind that purports to waive or limit in any way a consumer's rights under this title, including, but not limited to, any right to a remedy or means of enforcement, **shall be deemed contrary to public policy and shall be void and unenforceable.**" *Id.*, § 1798.192 (emphasis added). As a result, the Facebook Terms of Service are void and unenforceable. *See* Cal. Civ. Code §§ 1667(2) and 1798.192; *see also McIlwain, LLC v. Berman*, No. 18-CV-03127 CW, 2020 WL 1308342, at *10 (N.D. Cal. Feb. 10, 2020) ("the Court concludes that the agreement violates public policy and is therefore unenforceable").

This dovetails with the common law policy in favor of the free flow of information already in the public domain. Much of what BrandTotal collects are basic facts in the public domain (i.e., user information they have made public (for example a "like" on a sponsored ad), or advertisement information readily available to all). Long standing precedent makes clear that companies cannot claim a protected interest in another's own data and/or publicly available facts or data. For

example, compiling a collection of publicly available facts does not confer copyright protection. *Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 363-364 (1991) (a collection of facts such as names, towns, and telephone numbers were not copyrightable); *see also Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 847 (2d Cir. 1997) (facts from NBA broadcasts are not protected under copyright). Nor does the right of publicity permit one to restrict the use of information in the public domain. *C.B.C. Distribution & Mktg., Inc. v. Major League Baseball Advanced Media, L.P.*, 505 F.3d 818, 824 (8th Cir. 2007) (publicly available player statistics could be used without a license). So too here, Facebook cannot claim a protected interest in its users' advertisers' information in the public domain.

On similar facts, the Ninth Circuit questioned a social networking website's actions in blocking a competitor's access to public information:

> If companies like LinkedIn, whose servers hold vast amounts of public data, are permitted selectively to ban only potential competitors from accessing and using that otherwise public data, the result—complete exclusion of the original innovator in aggregating and analyzing the public information—may well be considered unfair competition under California law.

*hiQ Labs*, 938 F.3d at 998. In the same way, Facebook's Terms of Service effectively blocks access to public data, which in turn inhibits the free flow of information. Here, the public interest in allowing users to control their own data and to maintain the unrestrained access to public domain information far outweighs Facebook's interests in enforcing its asserted Terms of Service especially here where the obvious goal is to stamp out competition and not protect user data. *See Lear*, 395 U.S. at 674 ("[E]nforcing this contractual provision would undermine the strong federal policy favoring the full and free use of ideas in the public domain.").

    **b.**  **The public interest in promoting competition outweighs any interest in upholding Facebook's Terms of Service.**

Facebook's Terms of Service unquestionably stifle competition, and, in the process, remove choices about users' own data. As opposed to Facebook's insatiable accumulation of data without any monetary benefit to users, BrandTotal compensates its volunteers for their data. Rather than developing a system that rewards users for their valuable data, Facebook is using its market power in social networking to gain an unfair advantage in data analytics—over both the users who own the data and competitors that wish to use deidentified advertising data to run their businesses.

In determining whether a company is engaged in unfair business practices, i.e., those that "violate[] the policy or spirit of [the antitrust] laws, . . . or otherwise significantly threatens or harms competition," California courts look to federal antitrust law for guidance. *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999); *Blank v. Kirwan*, 39 Cal. 3d 311, 320 (1985). Federal antitrust law prevents a firm from using its monopolistic power in one market to secure a competitively unjustified advantage in a second ("leveraged") market. *See* 15 U.S.C. § 2; *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1106 (7th Cir. 1983); *Otter Tail Power Co. v. U.S.*, 410 U.S. 366, 377 (1973) (use of monopoly power to destroy threatened competition violates Sherman Act).

Facebook is using its dominant presence as the world's largest social networking platform to assume exclusive proprietary control over data that is owned not by Facebook, but by its users, and which those members have consented to granting BrandTotal access.[6] Facebook's actions suppress competition in the field of data analytics and violate the core principles and spirit of the antitrust laws. *See hiQ Labs*, 273 F. Supp. 3d at 1118 (enjoining a social media company because of evidence of a "decision to revoke [competitor's] access to its data was made for the purpose of eliminating [the competitor] as a competitor in the data analytics field, and thus potentially 'violating the policy or spirit' of the Sherman Act"). Through Terms of Service, Facebook is trying to control which companies may compete in data analytics in the social media.[7]

Now Facebook attempts to leverage its monopoly in these markets to impermissibly extend its monopoly power into data analytics, despite the *user's* control of the very information Facebook seeks to monopolize. By way of example, Facebook collects the following types of information—which are the same as those collected by BrandTotal—to provide the same

---

[6] As the Subcommittee report found, Facebook has monopoly power in both the market for social media networking and online advertising in the social networking market, and "selectively enforce[s] its platform policies based on whether it perceived other companies as competitive threats," and "[i]n doing so, it advantaged its own services while weakening other firms." Report, pp. 14, 134, 170; *see also* pp. 137-139, 166-173.

[7] As the Subcommittee report found, Facebook has monopoly power in both the market for social media networking and online advertising in the social networking market, and "selectively enforce[s] its platform policies based on whether it perceived other companies as competitive threats," and "[i]n doing so, it advantaged its own services while weakening other firms." Report, pp. 14, 134, 170; *see also* pp. 137-139, 166-173.

advertising consulting services as BrandTotal:

- We [Facebook] use the information we have (including your activity off our Products, such as the websites you visit and ads you see) to help advertisers and other partners measure the effectiveness and distribution of their ads and services, and understand the types of people who use their services and how people interact with their websites, apps, and services.

- We [Facebook] provide aggregated statistics and insights that help people and businesses understand how people are engaging with their posts, listings, Pages, videos and other content on and off the Facebook Products.

- We [Facebook] provide advertisers with reports about the kinds of people seeing their ads . . . For example, we provide general demographic and interest information to advertisers (for example, that an ad was seen by a woman between the ages of 25 and 34 who lives in Madrid and likes software engineering) to help them better understand their audience. We also confirm which Facebook ads led you to make a purchase or take an action with an advertiser.

- We [Facebook] share information about you with companies that aggregate it to provide analytics and measurement reports to our partners.

Ex. H. The only difference between Facebook's and BrandTotal's conduct is that due to Facebook's dominance in the social networking market, it does not compensate users for their own data. Indeed, as found by the Subcommittee, "dominant firms have the ability to impose 'complex and draconian' terms of service that can change suddenly to collect and use data more expansively and more intensely," and due to high switching costs "Facebook's users are effectively 'locked in' to its platform." Report at 56, 145-46.

As recognized by the Supreme Court in *Lear,* if those with enough economic incentive to challenge such anti-competitive conduct are prevented from doing so (here, BrandTotal, *not* the users who must provide their data to Facebook for free under the Terms of Service), "the public may continually be required to pay tribute to would-be monopolists without need or justification." *Lear*, 395 U.S. at 670. As such, the public interest in promoting competition far outweighs any justifiable interest Facebook may have in its Terms of Service. And, any argument Facebook may assert regarding its efforts to protect user privacy is belied by: (1) the fact that Facebook's Terms of Service do not prohibit a user from manually collecting the same data BrandTotal collects through UpVoice; and (2) Facebook collects the same information as BrandTotal to provide the same

advertising consulting services. *See hiQ Labs*, 938 F.3d at 998 (that users retain ownership over their data, intend for that data to be accessed by others, and LinkedIn itself developed a data analytics tool similar to hiQ's products, "undermin[e] LinkedIn's claim that it has its members' privacy interests in mind").

The asserted provisions are not about protecting users. Instead, they serve as tools for Facebook to prevent competition in data analytics, and, therefore, are unenforceable because they undermine the public interest against abuse of monopoly power. *See Lear*, 395 U.S. at 663 ("the grant of monopoly power to a patent owner constituted a limited exception to the general federal policy favoring free competition").

**B. BrandTotal is likely to Prevail on Facebook's Claims under the CFAA, the California Penal Code § 502(c), and Unjust Enrichment.**

As detailed throughout this brief, Facebook's revocation of BrandTotal's access to public and authorized content on their platforms violates the common law, unfair competition law principles, and Facebook's own Terms of Service. Any claim Facebook could otherwise legally bring against BrandTotal is therefore void and without force, as it would be brought for an improper purpose and with an improper effect. *Phillips v. Crown Central Petroleum Corp.*, 602 F.2d 616, 629 (4th Cir. 1979) ("A refusal to deal [] right is limited to situations where the seller has not put together an arrangement in restraint of trade."). Facebook's tactic of refiling with Federal Court with additional claims and interpreting the CFAA so broadly as to allow a *per se* prohibition of access to authorized or publicly available information on their platform would "turn a criminal hacking statute into a 'sweeping Internet-policing mandate.'" *hiQ Labs*, 938 F.3d at 1003 ("the rule of lenity favors our narrow interpretation of the 'without authorization' provision in the CFAA"). The Ninth Circuit recently rejected that interpretation holding that "when a computer network generally permits public access to its data, a user's accessing that publicly available data will not constitute access without authorization under the CFAA." *Id.*

BrandTotal cannot be held liable for violating the CFAA or California Penal Code § 502(c) for many reasons. First, the "CFAA's prohibition on accessing a computer 'without authorization' is violated only when a person circumvents a computer's generally applicable rules regarding access permissions, such as username and password requirements, to gain access to a computer

1  [not] when a computer network generally permits public access to its data" and a user "access[es]

2  that publicly available data." *Id.* Like *hiQ*, BrandTotal is only accessing "publicly available data,"

3  or data that a user has consented to be accessed, on Facebook's platforms; thus, BrandTotal is not

4  and cannot be in violation of the CFAA.

5      Similarly, Facebook's claim that BrandTotal allegedly violated Cal. Penal Code § 502(c)

6  would also fail. That provision is directed to hacking and other unauthorized conduct. Whereas

7  here, through UpVoice, BrandTotal had its panelists' explicit permission to access their data. Any

8  suggestion that BrandTotal accessed data since the start of this dispute, is simply not true.[8] Also,

9  since BrandTotal has done nothing improper, there is no unjust enrichment. BrandTotal is likely to

10  prevail on all claims brought by Facebook.

11      **C.  BrandTotal is likely to Prevail on its Claim for Intentional Interference with Contract and Prospective Economic Advantage.**

12      In California, "the law is settled that 'a stranger to a contract may be liable in tort for

13  intentionally interfering with the performance of the contract.'" *Reeves v. Hanlon*, 33 Cal. 4th

14  1140, 1148 (2004) (citing *Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118,

15  1126 (1990)). The elements of intentional interference with contract are: (1) a valid contract; (2)

16  the defendant's knowledge of that contract; (3) intentional disruption of the contractual

17  relationship; (4) actual breach or disruption; and (5) damage. *Reeves*, 33 Cal. 4th at 1148. To show

18  interference with prospective economic advantage, a plaintiff must also plead and prove "that the

19  defendant engaged in an independently wrongful act," which means an act that is "proscribed by

20  some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Id.*

21  at 1145 (quoting *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1159 (2003).

22      Here BrandTotal has valid contracts with its corporate customers, who benefit from

23  BrandTotal's data analytics derived from UpVoice. Leibovich Decl., ¶¶ 11. Facebook had

24  knowledge of these contracts through BrandTotal's advertising and corporate accounts on

25  Facebook, as well as knowledge regarding UpVoice's marketing intelligence function via

26

27  ───────────────

28  [8] As explained in the Dor declaration, BrandTotal had developed an UpVoice instance to be ready to go in the event this Court grants relief. Dor Decl. ¶ 24-29. For a short period of time it was inadvertently made public but it was non-operative and did not collect data. *Id.*

BrandTotal and UpVoice's websites. *See* Cmpt, ¶¶ 39, 41, 45, 47. BrandTotal's business is solely premised on performing data analytics regarding its users advertising activities. Terminating an essential service so that a company cannot perform under its contracts constitutes intentional interference. *H&M Assocs. v. City of El Centro*, 109 Cal. App. 3d 399, 405 (1980). The damage requirement is easily satisfied because, as detailed throughout the motion, BrandTotal will suffer lost business and possible bankruptcy if Facebook's disruptive activity is not restrained, indeed, email evidence from customers prove concrete losses that have already started to occur. Liebovich Decl., ¶¶ 57-65. Facebook obviously knows the data is the lifeblood of BrandTotal's advertising consulting business, because Facebook uses the same type of data to run its competitive business.

Further, for purposes of BrandTotal's claim for interference with prospective economic advantage, Facebook has committed an "independently wrongful act." *See Korea Supply Co*., 29 Cal. 4th at 1158. BrandTotal need only establish that Facebook's acts "were unlawful for a reason other than that they interfered with [plaintiff's] prospective economic advantage" in order to establish that the defendant committed an independently wrongful act. *CRST Van Expedited, Inc. v. Werner Enterprises, Inc.*, 479 F.3d 1099, 1110 (9th Cir. 2007).

Facebook committed two independently wrongful acts when it revoked BrandTotal's access to the UpVoice user information and took action to remove UpVoice from the Google Chrome store: (1) it breached Facebook's express promises (including that the pages are "public," *users* control the visibility of these pages, visitors may access and share these pages, and users own their own data); and (2) this constituted unfair competition, *infra*. Facebook should not be allowed to intentionally and wrongfully disrupt BrandTotal's contracts and prospective business dealings by revoking its access to UpVoice user information that it admittedly does not own.

### D.   BrandTotal is Likely to Prevail on Its Claim against Facebook for its "Unlawful," "Unfair," and "Fraudulent" Acts.

California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Facebook's decision to deny BrandTotal access to UpVoice's users' Facebook activities, along with its actions to remove UpVoice from the Google Webstore, is both unlawful and unfair.

BrandTotal has standing under Business & Professions Code § 17204 to seek injunctive

relief. To establish standing under the UCL, a plaintiff must: (1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, *i.e.*, economic injury; and (2) show that the economic injury was the result of, *i.e.*, caused by, the unfair business practice. *Bower v. AT&T Mobility, LLC*, 196 Cal. App. 4th 1545, 1554 (2011) (internal citations omitted). BrandTotal's injuries—the loss of current and prospective revenues from its business relationships its ultimate insolvency—are all economic and are all being caused by Facebook's decisions to seek removal of UpVoice from the Google Web Store and block BrandTotal's access to Facebook, preventing it from performing its data observation activities on that Platform. "Injunctions are 'the primary form of relief available under the UCL.'" *Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 337 (2011).

### E. BrandTotal is Likely to Prevail on Facebook's Claim for Interference with Contractual Relations.

BrandTotal is also likely to prevail on Facebook's claim for interference with contractual relations. That claim rests on Facebook's allegation that BrandTotal "intentionally interfered with Facebook's contractual relationship with its users by inducing them to share their Facebook and Instagram login credentials with [BrandTotal.]" But Facebook provided no evidence for this false allegation. BrandTotal has never, and will never, ask for a user's login credentials for any social media platform. *See* Dor Decl. ¶ 16. Such information would be completely useless to BrandTotal for providing its data analytics. Further, BrandTotal prides itself of being compliant with all applicable U.S. privacy laws. Obtaining its panelists' passwords, by any means, would put that legal standing, as well as the trust of all of BrandTotal's customers, in jeopardy. Therefore, BrandTotal is likely to prevail on this claim.[9]

#### 1. Facebook's disruption of BrandTotal's contractual and prospective business relationships is unlawful and thus a violation of the UCL.

The UCL borrows "violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Cel-Tech Commc'ns*, 20 Cal. 4th at 180. Thus, Facebook's tortious interference with BrandTotal's current and prospective contractual and business relationships gives rise to a claim under the "unlawful" business practices prong of the UCL. *CRST Van Expedited*, 479 F.3d 1099.

---

[9] Additionally, to the extent it was legally relevant to Facebook's claims, BrandTotal has removed all references to "participating sites."  Leibovich Decl., ¶ 29.

2.     **Facebook's unjustified and anticompetitive conduct in cutting off BrandTotal's access to UpVoice user data is also an "unfair" practice under the UCL.**

Under the UCL, "unfair" practices are viewed broadly: "In permitting the restraining of all 'unfair' business practices, section [17200] undeniably establishes only a wide standard to guide courts of equity; as noted above, given the creative nature of the scheming mind . . . (I)t would be impossible to draft in advance detailed plans and specifications of all acts and conduct to be prohibited, since unfair or fraudulent business practices may run the gamut of human ingenuity and chicanery." *Motors, Inc. v. Times Mirror Co.*, 102 Cal. App. 3d 735, 739-740 (1980) (internal quotations and citations omitted). Courts have defined "unfair" differently in cases involving direct competitors and consumers. *See Cel-Tech*, 20 Cal. 4th at 187 n.12. As between direct competitors, "unfair" includes conduct that "violates the policy or spirit of one of [the anti-trust] laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Id*. at 187. Any "practices that *have the effect* of harming competition may be unfair" under the UCL. *Id*. at 189 (emphasis added).

Facebook is unfairly leveraging its power in the social networking market to secure an anticompetitive advantage in the data analytics market. Under the *Cel-Tech* standard, Facebook's actions of using its market power to remove UpVoice from the Google Webstore and general access denial to Facebook's platforms "violates the policy or spirit of one of [the antitrust] laws . . . or otherwise significantly threatens or harms competition." *Cel-Tech*, 20 Cal. 4th at 187. California courts look to federal antitrust law for guidance. *See Blank*, 39 Cal. 3d at 320. And federal antitrust law prevents a firm from using its monopolistic power in one market to secure a competitively unjustified advantage in a second ("leveraged") market. *See* 15 U.S.C. § 2; *MCI Commc'ns*, 708 F.2d at 1106; *Otter Tail Power*, 410 U.S. at 377 (use of monopoly power to destroy threatened competition violates Sherman Act). Facebook is using its dominant presence as the world's largest social networking platform to assume exclusive proprietary control over data that is owned not by Facebook, but by its users, and which those members have consented to granting BrandTotal access. Facebook's actions suppress competition in the field of data analytics and violate the core principles and spirit of the antitrust laws. *See hiQ Labs*, 273 F. Supp. 3d at 1118 (enjoining a social

media company because of evidence of a "decision to revoke [competitor's] access to its data was made for the purpose of eliminating [the competitor] as a competitor in the data analytics field, and thus potentially 'violating the policy or spirit' of the Sherman Act").

Likewise, antitrust law has long recognized the "essential facilities" doctrine, which precludes a monopolist or attempted monopolist from denying access to a facility it controls that is essential to its competitors. Such anticompetitive conduct threatens the extension of the monopolist's control from one stage of production to another, or from one market to another. *MCI Commc'ns*, 708 F.2d at 1132-1133. The law thus imposes on firms controlling an "essential facility" "the obligation to make the facility available on non-discriminatory terms." *Id.* (evidence supported jury verdict in favor of plaintiff long distance phone on "essential facility" claim where "[n]o legitimate business or technical reason was shown for AT&T's denial of the requested interconnections"; "MCI was not requesting preferential access to the facilities"; and "it was technically and economically feasible for AT&T to have provided the requested interconnections"); *and see Otter Tail Power*, 410 U.S. at 377-78.

There is no viable alternative to Facebook's dominant member database to obtain a complete picture of how BrandTotal's corporate customer's social media campaigns compare to their competitors. Leibovich Decl., ¶ 18; Report at 145-46. Even if it were theoretically possible to create another competing networking platform and database, that is not a reality given Facebook's undeniable dominance. *See MCI Commc'ns*, 708 F.2d at 1132 (factors include practical ability to duplicate essential facility). Facebook has not identified any technical barrier or cost to BrandTotal providing access. And until recently, Facebook has been providing access to BrandTotal without burden or complaint and it still provides access to others. Report at 170.

Facebook's conduct also violates the "fraudulent" prong of the UCL because Facebook's promises of access by everyone to publicly shared or posted information are false and likely to deceive users and businesses alike. *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009) ("fraudulent" business practice under the UCL is one where users of the public are likely to be deceived). Here, Facebook's terms of use promise their users that only the users own their content and control their privacy settings, while Facebook holds only non-exclusive licenses to the content.

But contrary to those promises, by blocking UpVoice and requesting its removal from the Google Chrome store, Facebook is controlling who can access user content and whether the information will be public. These statements are false, likely to deceive the public, and violate the "fraudulent" prong of the UCL. Indeed, by causing UpVoice to be shut down, Facebook is depriving the users from being paid by BrandTotal to participate in the program involving data they own. That users are upset by this is illustrated in user emails to BrandTotal right after the lawsuit was filed and the UpVoice service was shut down.

## II.    THE INTERIM IRREPARABLE HARM TO BRANDTOTAL FAR OUTWEIGHS ANY HARM TO FACEBOOK

Irreparable injury is "the single most important prerequisite for the issuance of a preliminary injunction." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005). "The threat of being driven out of business is sufficient to establish irreparable harm." *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985). In addition, the loss of current and prospective customers "is considered to be irreparable harm that justifies equitable relief." *Shippers, Inc. v. Fontenot*, No. 13CV1349 JLS (MDD), 2013 WL 12092056 at *6 (S.D. Cal. Sept. 23, 2013).

Here, the harm to BrandTotal absent injunctive relief is immense, as it stands on the brink of collapse. While monetary damages are not typically sufficient to justify injunctive relief, many courts hold that "[t]he threat of being driven out of business is sufficient to establish irreparable harm" and justify an injunction. *Am. Passage Media*, 750 F.2d at 1474. Indeed, in the economic world there is no more irreparable harm than destruction of a business. *hiQ Labs,* 938 F.3d at 993 ("showing a threat of 'extinction' is enough to establish irreparable harm"). In addition, the loss of current and prospective customers "is considered to be irreparable harm that justifies equitable relief." *Shippers*, 2013 WL 12092056, at *6; *see also Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) (A "substantial loss of business and perhaps even bankruptcy" absent preliminary injunction relief shows "irreparable injury."). As the Second Circuit has explained, "[t]he loss of . . . an ongoing business representing many years of effort and the livelihood of its . . . owners, constitutes irreparable harm. What plaintiff stands to lose cannot be fully compensated by subsequent monetary damages." *Roso Lino Beverage Distributors, Inc. v. Coca Cola Bottling Co.*

1    *of New York, Inc.*, 749 F.2d 124, 125-126 (2d Cir. 1984) (per curiam).

2         Here, as set forth in the declaration of Mr. Leibovich, BrandTotal cannot long survive

3    absent an injunction that restores the company to the status quo. Leibovich Decl., ¶ 62. Already

4    customers, prospective customers, investors, and vendors are questioning the situation and/or

5    terminating their relationship with BrandTotal. *Id.*, ¶¶ 30-43. Without access to Facebook and the

6    Apps that facilitate BrandTotal's intelligence gathering, BrandTotal cannot provide contracted

7    services existing customers or secure new customers. *Id.* It has no way to generate revenue, no

8    access to lending or fundraising, put all existing funding reserves in jeopardy, and will fail in the

9    not-too-distant future if the injunction does not issue. *Id.*, ¶ 4. This will destroy a company that has

10   been built over the past almost four years, cost investors millions of dollars, and leave

11   approximately twenty-eight (28) people jobless. *Id.*, ¶ 64.

12        On the other side of the scale, Facebook suffers no harm by reinstating BrandTotal to the

13   status quo—*which has existed for years*—and allowing time for litigation on the merits. Indeed,

14   Facebook's lawsuit claims that it can be compensated for the allegedly improper actions of

15   BrandTotal. Facebook may wish to exercise exclusive control over all user data—with no

16   compensation to its users—but this is neither right nor fair to anyone. Nor can Facebook hide

17   behind its consent judgment with the Federal Trade Commission to stifle competition. Ex. O. That

18   document does not include advertising activity or in any way prevent user initiated transfers of

19   information, like BrandTotal's UpVoice program here.

20        Recognizing this, other courts have issued injunctions similar to what BrandTotal seeks

21   here. On April 15, 2019, another company cut off by Facebook obtained an injunction against

22   Facebook in the Federal Court of Australia, Victoria District, in the matter of *Dialogue Consulting*

23   *Pty Ltd. v. Instagram, Inc.,* VID 369/2019, preventing the destruction of its business. Ex. M. On

24   May 3, 2019, Instagram was also joined in that matter. *See* Ex. N. So too, the Ninth Circuit

25   affirmed similar injunctive relief against LinkedIn as detailed above. *hiQ Labs, Inc. v. LinkedIn*

26   *Corporation*, No. 17-16783 (No. 3:17-cv-03301-EMC (N.D. Cal.), *aff'd hiQ Labs*, 938 F.3d at

27   993. As the Ninth Circuit put it, "showing a threat of extinction" is sufficient for a business to

28   establish irreparable harm. *Id.* Here too, the balance tips strongly in favor of issuing the injunction

1    and saving this company from ruin.

2    **III.    THE PUBLIC INTEREST FAVORS AN INJUNCTION**

3         The requested injunction is aligned with the public interest. In *LinkedIn*, the district court

4    carefully examined the public interest factor in the context of automated data collection from a

5    social media platform where the information collected was for analytical purposes and not

6    sensitive, like here, and found the public interest favored grant of the preliminary relief sought, a

7    finding affirmed by the Ninth Circuit. *hiQ Labs*, 273 F.Supp.3d at 1118, *aff'd* 938 F.3d 985 (2019).

8    For the same reasons that make Facebook's terms of service unenforceable, the public's interests

9    are furthered by granting this temporary restraining order.

10   **IV.    NO BOND SHOULD BE REQUIRED**

11        No bond should be required by BrandTotal. Where no damage will result from a temporary

12   restraining order or preliminary injunction, no bond is necessary. *Jorgenson v. Cassiday*, 320 F.3d

13   906, 919 (9th Cir. 2003) ("The district court may dispense with the filing of a bond when it

14   concludes there is no realistic likelihood of harm to the defendant from enjoining his or her

15   conduct."). Here, BrandTotal seeks to reinstate the status quo so that BrandTotal has access to

16   UpVoice user-authorized content as it did before. This will not hurt Facebook in any legitimate

17   way. Even if wrongfully enjoined, Facebook will suffer no damages. Thus, no bond should be

18   required.

19                                        **CONCLUSION**

20        For the foregoing reasons, BrandTotal respectfully requests that the Court GRANT its

21   application for a temporary restraining order, seeking immediate injunctive relief to preserve the

22   status quo, requiring Facebook to: (1) rescind the takedown request to remove BrandTotal's

23   UpVoice browser extension from the Google Chrome Web Store and take other reasonable actions

24   in communication with Google to make the recession effective so that UpVoice is again available

25   on the Google Chrome Web Store; (2) reverse its "technical enforcement measures" blocking

26   UpVoice from Facebook's platform; and (3) restore the BrandTotal and other BrandTotal

27   principals' Facebook pages.

28

Date: October 16, 2020

Respectfully submitted,

By: */s/ Rudolph A. Telscher, Jr.*
Rudolph A. Telscher, Jr.*
rudy.telscher@huschblackwell.com
Kara R. Fussner*
kara.fussner@huschblackwell.com
HUSCH BLACKWELL LLP
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
314-480-1500 Telephone

Ryan B. Hauer*
ryan.hauer@huschblackwell.com
HUSCH BLACKWELL LLP
120 South Riverside Plaza Suite 2200
Chicago, IL 60606
312-526-1572 Telephone
*admitted *pro hac vice*

William E. Corum (to be admitted *pro hac vice*)
william.corum@huschblackwell.com
HUSCH BLACKWELL LLP
4800 Main Street, Ste. 1000
Kansas City, MO 64112
816-983-8000 Telephone

David Stauss (to be admitted *pro hac vice*)
david.stauss@huschblackwell.com
HUSCH BLACKWELL LLP
180 1 Wewatta Street, Suite 1000
Denver, CO 80202
303-749-7200 Telephone

Karl Kronenberger (CA Bar No. 226112)
karl@krinternetlaw.com
Jeffrey M. Rosenfeld (CA Bar No. 222187)
jeff@krinternetlaw.com
KRONENBERGER ROSENFELD, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
415-955-1155 Telephone
415-955-1158 Facsimile

***Attorneys for Defendants/Counterclaim Plaintiffs
BrandTotal, Ltd. and Unimania, Inc.***

1

## CERTIFICATE OF SERVICE

2

I hereby certify that on this 16th day of October, 2020, I caused the foregoing to

3

be filed electronically with the Clerk of Court and to be served via the Court's Electronic Filing

4

System upon all counsel of record, and to be served via email on all counsel of record at the

5

following:

6

7

HUNTON ANDREWS KURTH LLP
Ann Marie Mortimer (State Bar No. 169077)

8

amortimer@HuntonAK.com
Jason J. Kim (State Bar No. 221476)

9

kimj@HuntonAK.com
Jeff R. R. Nelson (State Bar No. 301546)

10

jnelson@HuntonAK.com
550 South Hope Street, Suite 2000

11

Los Angeles, California 90071-2627
Telephone: (213) 532-2000

12

Facsimile: (213) 532-2020

13

Attorneys for Plaintiff Facebook, Inc.

14

15

16

*/s/ Rudolph A. Telscher, Jr.*

17

18

19

20

21

22

23

24

25

26

27

28