## Declaration of Oren Dor

I, Oren Dor, state and declare under penalty of perjury as follows:

1. I am the Vice President Research and Development of Defendant-Counterclaim Plaintiff BrandTotal Ltd. and the President of Unimania, Inc., a subsidiary company that designs apps that work in connection with BrandTotal's business. Collectively, I refer to both entities herein as "BrandTotal."

2. I submit this declaration in support of BrandTotal's Motion for Temporary Restraining Order. I am over the age of eighteen and I have personal knowledge of the facts set forth below. If called as a witness, I could and would testify competently to these facts and statements.

*Advertising on Facebook*

3. In December 2016, BrandTotal opened a Facebook account on behalf of the company.

4. As a Facebook account holder, BrandTotal was able to pay Facebook to advertise BrandTotal's products, including UpVoice.

5. After 3.5 years without any complaint from Facebook and without warning, Facebook terminated BrandTotal's account. BrandTotal paid Facebook to advertise Brandtotal's services, including UpVoice throughout those 3.5 years. Facebook also terminated some of BrandTotal's employees' personal accounts.

6. BrandTotal's paid advertising on Facebook allowed it to secure panelists for its services, including UpVoice.

*UpVoice Panelist Experience*

7. BrandTotal's UpVoice platform pays individuals for their consent to collect panelist demographics and ads data for market research purposes while they use the internet.

1

8. Individuals who voluntarily consent to become UpVoice panelists sign up at www.joinupvoice.com.

9. As part of the signup process, individuals provide BrandTotal with their name, email address, and city.

10. Individuals are presented with UpVoice's Privacy Policy and must agree to it.

11. UpVoice's Privacy Policy contains detailed disclosures about the information that BrandTotal collects from individuals and how BrandTotal uses that information.

12. BrandTotal also makes available a Data & Privacy FAQ on its website, which provides further privacy disclosures.

13. After an individual signs-up, they are directed to the Google Chrome Web Store to install the UpVoice Chrome browser extension.

14. With the panelist's explicit consent, the extension allows BrandTotal to collect data the panelist either owns or has a right to access about the websites the panelist visits, as described more fully below.

*Data Collection from Facebook*

15. When an UpVoice panelist navigates to Facebook, we collect deidentified information about the panelist by using hashed values for the panelist's ID. We do not collect the panelist's names or email addresses from Facebook. In fact, as discussed, panelists already voluntarily provide their name and email addresses to us during the signup process. We also collect a browser user agent, which is a string format that helps to understand the product and version a panelist uses. The browser user agent is shared with every website an individual visits and is used for website traffic analytics purposes.

16. Through Facebook, we collect the deidentified panelist's gender, date of birth (month and year), location (state/country), relationship status and user interests. We do *not* collect or retrieve the panelist's Facebook password. With the exception of user interests, this data has been provided by our panelist to Facebook. Facebook's user interests are generated by Facebook based on analyzing the groups a Facebook user follows, the ads the user interacts with and other activities the user performs. In that respect, the user interests are generated using the personal data of the panelist – the same data that we have consent from the panelist to collect.

17. Like many websites, we also collect basic geolocation data from the panelist.

18. In addition, we collect certain information about the advertisements that our panelists encounter while using Facebook. Generally speaking, a panelist encounters these ads in one of two ways.

19. First, a panelist will encounter an ad if a company pays Facebook to show the ad to the panelist. In this instance, we collect the time that the ad was shown to the panelist, the panelist's hashed ID, the sponsored post's ID, and the hashed post's ID. Again, this information is collected on a deidentified basis and with the panelist's consent. Further, the information we collect from Facebook is publicly available to the panelist. In other words, a panelist can view the sponsored post's ID while on Facebook.

20. Second, a panelist may encounter an ad if one of their Facebook friends has liked or commented on the ad. In this instance, we collect the time that the ad was shown to the panelist, the panelist's hashed ID, and the hashed post's ID.

21. Finally, separate from our panelist collection, we collect certain public information about the ads themselves. Specifically, we collect the number of likes, shares, and comments.

22.     UpVoice does not alter or impair the working or appearance of Facebook, but simply collects data as described above.

*Sharing of Deidentified and Aggregate Information with Clients*

23.     When we share information with our clients it is done on an aggregate and deidentified basis. As discussed above, when we collect information from platforms such as Facebook, we do so only on a deidentified basis, i.e., we do not associate the information with a panelist's name or email address. Additionally, our clients only see aggregate information for all of our panelists, not individual-level information.

*The New UpVoice Instance*

24.     After the UpVoice browser extension was taken down from the Google Chrome store and Facebook sued BrandTotal in State Court, we began preparing these submissions (originally intended for State Court) with the expectation of moving for a temporary restraining order that would ultimately allow us to get our data feed up and running again.

25.     As part of the effort to have the infrastructure in place for us to restart if successful in our State Court actions, I prepared a new UpVoice instance and got it approved by Google.

26.     In the course of this approval process, the instance was inadvertently set-up as public, instead of unlisted.  This occurred on or around October 14, 2020 at 5 a.m. Eastern Time.

27.     As soon as we noticed the error (about 36 hours later), we changed it back to unlisted.

28.     Facebook has contended this was "deceptively" done, but there was nothing deceptive or malicious in this event.  The public listing was truly inadvertent.

29. Moreover, we did not promote this instance. We did not update the link on the UpVoice website. We did not communicate with current UpVoice users urging them to reinstall UpVoice using the new instance. And the instance itself was set to an internal development environment meaning no data flowed into production.

\* \* \*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 15th day of October 2020.

*Oren Dor*
Oren Dor