Rudolph A. Telscher, Jr.* (MO Bar No. 41072)
rudy.telscher@huschblackwell.com
Kara R. Fussner* (MO Bar No. 54656)
kara.fussner@huschblackwell.com
HUSCH BLACKWELL LLP
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
314-480-1500 Telephone

Ryan B. Hauer* (IL Bar No. 6320758)
ryan.hauer@huschblackwell.com
HUSCH BLACKWELL LLP
120 South Riverside Plaza Suite 2200
Chicago, IL 60606
312-526-1572 Telephone

*admitted *pro hac vice*

Karl Kronenberger (CA Bar No. 226112)
karl@krinternetlaw.com
Jeffrey M. Rosenfeld (CA Bar No. 222187)
jeff@krinternetlaw.com
KRONENBERGER ROSENFELD, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
415-955-1155 Telephone
415-955-1158 Facsimile

*Attorneys for Defendants/Counterclaim*
*Plaintiffs BrandTotal, Ltd. and Unimania,*
*Inc.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO/OAKLAND DIVISION

FACEBOOK, INC., a Delaware
corporation,

      *Plaintiff/Counterclaim*
*Defendant*,

v.

BRANDTOTAL, LTD., an Israeli
corporation, and
UNIMANIA, INC., a Delaware
corporation,

      *Defendants/Counterclaim*
*Plaintiffs*.

Case No.: 3:20-CV-07182-JCS

**DEFENDANTS' REPLY IN SUPPORT OF**
***EX PARTE* MOTION FOR TEMPORARY**
**RESTRAINING ORDER**

Judge:  The Hon. Joseph C. Spero
Ctrm.:  Courtroom F – 15th Floor
Date:   October 26, 2020
Time:   2:00 PM

# **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF AUTHORITIES .................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

ARGUMENT .......................................................................................................................... 3

I.  THE IMMINENT COLLAPSE OF A LEGITIMATE BUSINESS IS
    IRREPARABLE HARM. ........................................................................................... 3

    A.  The Requested Relief Is Specifically Tailored to Remedy the Harm Caused
        by *Facebook's* Actions ..................................................................................... 3

    B.  Without Relief, BrandTotal Faces Employee Lay-Offs, Customer Loss and
        Financial Ruin. ................................................................................................. 5

    C.  BrandTotal Acted Promptly to Secure Judicial Relief. ...................................... 7

II.  BRANDTOTAL HAS PRESENTED A SERIOUS QUESTION ON THE MERITS. ...... 8

    A.  BrandTotal Has Presented A Serious Question as to the Merits of Facebook's
        Breach of Contract Claim Either Because the Contract Is Not Violated or the
        Contract as Construed is Unenforceable. ........................................................... 8

    B.  BrandTotal Has Raised a Serious Question as to Whether Facebook Will
        Prevail on the CFAA and Section 502(c) Claims. .............................................. 10

    C.  BrandTotal Is Likely to Prevail on Its Counterclaims. ...................................... 12

III.  THE BALANCE OF EQUITIES FAVORS GRANTING THE TRO. ........................... 13

IV.  THERE ARE STRONG PUBLIC INTERESTS IN FAVOR OF GRANTING TRO. ...... 14

CONCLUSION ...................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Altera Corp. v. Clear Logic Inc.*,
424 F.3d 1079 (9th Cir. 2005) ............................................................................. 12

*American Passage Media Corp. v. Cass Communications, Inc.*,
750 F.2d 1470, 1474 (9th Cir. 1985) ...................................................................... 6

*Drakes Bay Oyster Co. v. Jewell*,
729 F.3d 967 (9th Cir. 2013) .................................................................................. 6

*Drakes Bay Oyster Co. v. Jewell*,
747 F.3d 1073 (9th Cir. 2014) ................................................................................ 6

*Drakes Bay Oyster Co. v. Salazar*,
921 F. Supp. 2d 972 (N.D. Cal. 2013) .................................................................... 6

*Facebook, Inc. v. Power Ventures, Inc.*,
844 F.3d 1058 (9th Cir. 2016) ......................................................................... 11, 12

*GenoSource, LLC v. Inguran, LLC*,
373 F. Supp. 3d 1212 (N.D. Iowa 2018) ................................................................. 8

*hiQ Labs, Inc. v. LinkedIn Corp.*,
273 F. Supp. 3d 1099 (N.D. Cal. 2017) ............................................................. 5, 13

*hiQ Labs, Inc. v. LinkedIn Corp.*,
938 F.3d 985, 998 (9th Cir. 2019) .................................................................. passim

*Nat'l Parks Conservation Ass'n v. Manson*,
414 F.3d 1 (D.C. Cir. 2005) .................................................................................... 4

*Portland Feminist Women's Health Ctr. v. Advocates for Life, Inc.*,
859 F.2d 681 (9th Cir. 1988) .................................................................................. 5

*Ramona Manor Convalescent Hospital v. Care Enterprises*,
177 Cal. App. 3d 1120 (Ct. App. 1986) ................................................................ 12

*Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*,
944 F.2d 597 (9th Cir. 1991) .................................................................................. 6

*Sierra Club v. U.S. Dep't of Energy*,
825 F. Supp. 2d 142 (D.D.C. 2011) ........................................................................ 4

*Stackla, Inc. v. Facebook Inc.*,
No. 19-CV-05849-PJH, 2019 WL 4738288 (N.D. Cal. Sept. 27, 2019) ................. 6

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*,
      240 F.3d 832, 841 (9th Cir. 2001) ............................................................................. 5, 6

*United States v. Holtzman*,
      762 F.2d 720 (9th Cir. 1985) ....................................................................................... 5

*United States v. Nosal*,
      676 F.3d 854 (9th Cir. 2012) ................................................................................. 10, 11

*U.S. v. Drew*,
      259 F.R.D. 449 (C.D. Cal. 2009)............................................................................... 11

*Utah v. Evans*,
      536 U.S. 452 (2002) ..................................................................................................... 4

# INTRODUCTION

Facebook does not deny it runs a competitive business, using deidentified data regarding aggregated user demographics and advertising interests (herein "Advertising Data") to advise companies how to spend advertising dollars on Facebook.  If user privacy interests are in jeopardy, then Facebook is no less guilty in running its competitive service.  *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 998 (2019) ("Further, there is evidence that LinkedIn has itself developed a data analytics tool similar to hiQ's products, undermining LinkedIn's claim that it has its members' privacy interests in mind").

Never once does Facebook identify any specific harm[1] to privacy interests or otherwise that anyone has experienced as a result of BrandTotal's UpVoice service that uses deidentified Advertising Data to advise companies how to spend money with Facebook and other prominent social media sites.  Despite years of being in business, Facebook cannot cite any UpVoice user complaint, nor a complaint from any company that advertises on Facebook involving BrandTotal's Advertising Data.  Never once does Facebook deny the harsh findings made by Congress just days after it filed the original state court action – findings that it is a monopolist that stamps out competition and detriments users -- keeping in mind the current procedural posture that only requires BrandTotal to raise "serious questions" about its defenses.  Perhaps most ironic is that Facebook uses its own deceitful conduct, as found by the FTC in connection with the Cambridge Analytica scandal, as a reason why it can now stop all competition in data analytics on its site.  Its own conduct cannot become its excuse to monopolize.  Its nearly 3 billion user platform is larger than most countries in the world, and it should not be permitted to leverage this position to monopolize and control data it does not own – by its terms of service it is a mere non-exclusive licensee.  Facebook admits that BrandTotal secures user consent. Facebook's Opposition ("Opp. Br.") at 6-7; Dor Decl., ¶¶ 15-22. Of course, once a user volunteers to share this non-sensitive Advertising Data on a non-confidential basis, it is public information.  Everyone has the right to decide what information about its life is public and what

---

[1] Facebook's gripes do not relate to any harm to it or users, but are instead directed to concepts as foolish as BrandTotal tracking consumer likes and sad faces.  Opp. Br. at 7.

1    is not.

2           This case has far larger implications than just the dispute between Facebook and

3    BrandTotal.  A ruling against BrandTotal allows Facebook to stamp out competitors (hurting

4    them), thereby limiting options for consulting services for companies worldwide that wish to

5    advertise in social media (hurting them), and precluding users from making choices about the

6    data they own, including the option to get paid for it (hurting them).  The Ninth Circuit

7    recognized this societal dilemma, stating that "[i]f companies like LinkedIn, whose servers hold

8    vast amounts of public data, are permitted selectively to ban only potential competitors from

9    accessing and using that otherwise public data, the result—complete exclusion of the original

10   innovator in aggregating and analyzing the public information—may well be considered unfair

11   competition under California law." *hiQ Labs*, 938 F.3d at 998.

12          The type of conduct involved in this case is age old and beneficial to companies needing

13   advertising consulting services.  In the older days, by way of just one example, a "people meter"

14   was placed in a home on a TV and it monitored the family's viewing behavior. Telscher Decl.,

15   ¶ 2; Ex. W.  But, according to Facebook's interpretation of "automated means," any practical

16   means of similarly tracking advertising interactions in the modern era on its site is precluded. A

17   user with a camera set up to record the computer screen while the user surfs the Facebook site

18   ("automated means") would be precluded, as would many other innovations that third parties

19   develop to collect and analyze deidentified data on these social media sites.  BrandTotal raised in

20   its opening brief, and Facebook does not deny, that the limits of its argument have no bounds –

21   well beyond this case – to preclude use of automated means to collect data with user consent for

22   any purpose.  Per Facebook's position, the only allowed way to collect data from its site is by

23   pencil and paper.  Of course, if "manual" collection, as opposed to "automated," is not precluded

24   by Facebook's Terms of Service, as it concedes, then what interest is it really protecting?  It's

25   simply foreclosing the only feasible means to gather and analyze data for anyone but itself.

26          Finally, as again in *LinkedIn*, when a large social media company shuts off the lifeblood

27   – data flow – to a company like BrandTotal, it cannot possibly run its business.  The irreparable

28   harm is serious, irreversible, and imminent.  Because Facebook runs a competitive advertising

service, and demands users to allow it to use the same types of Advertising Data, it knows this. Given the serious harm in play, BrandTotal, per *LinkedIn*, need only show "serious questions" regarding the merits.  On this record, it has made this showing.  BrandTotal collected Advertising Data through UpVoice without incident long before this case, and with Facebook's knowledge and approval.  There is no serious risk of harm in allowing it to continue to do so now while the case is pending.[2]

## ARGUMENT

## I.    THE IMMINENT COLLAPSE OF A LEGITIMATE BUSINESS IS IRREPARABLE HARM.

### A.    The Requested Relief Is Specifically Tailored to Remedy the Harm Caused by *Facebook's* Actions.

In the State Court action filed on October 1, 2020 (but removed from the allegations of the Federal complaint), Facebook alleged:

> **H.    Facebook's Enforcement Efforts**
>
> 56.    In September 2020, Facebook took various technical enforcement measures against Defendants, including disabling Facebook and Instagram accounts and Pages.  Facebook also made multiple requests to Google to remove and disable the extensions from the Chrome Store, but Google has not yet done so.

Ex. F (ECF No. 27-06).  These actions were taken without BrandTotal's knowledge, and just before Facebook filed the state court action.  Leibovich Decl., ¶ 21. Immediately after Facebook filed the action, Google took down BrandTotal's UpVoice extension.  *Id*. ¶ 24. This was not coincidence. The UpVoice extension had been on the Google Chrome Store since at least June 2019, and at no time prior to Facebook's actions had Google communicated any concern about it

---

[2]  Facebook raises in passing several undeveloped or irrelevant arguments.  Without any legal analysis contends that collecting advertising information about ads is somehow copyright infringement. Opp. Br. at n.4.  It is, of course, fair use to make copies of ads in the market for analysis and advice to customers.  In the old days, an ad agency would have photocopied ads from publications or videotaped competitor ads.  BrandTotal does not publicly display ads in violation of copyright law. Facebook also discusses alleged actions by BrandTotal since Facebook had BrandTotal's accounts terminated and business effectively shut down, which allegations are incorrect in what happened, but more importantly it fails to explain how BrandTotal is bound by Facebook's terms of service after Facebook terminated (*hiQ Labs*, 938 F.3d at 998 ("[f]inally, LinkedIn has not explained how it can enforce its user agreement against hiQ now that its user status has been terminated"). *See* Supp. Dor. Decl., ¶¶ 11, 13-17.

1    to BrandTotal. Supp. Leibovich Decl., ¶ 3. Nor has Facebook cited to any evidence that

2    BrandTotal is in violation of any other Google terms of service provision.

3          It is the above actions of *Facebook,* that precipitated the harm, and these same actions

4    that BrandTotal requests that this Court order Facebook to undo. While Facebook cannot directly

5    "turn a switch" and have the UpVoice extension re-activated, its opposition to third-party Google

6    turning the switch, guarantees BrandTotal cannot achieve that result.[3] As Facebook

7    acknowledges, (Opp. Br. at 4), Google's terms of service allow it to terminate a user (like

8    BrandTotal) for violating a third party's terms of service (as Facebook has alleged and told

9    Google). Until Facebook is ordered to rescind its take down request, the browser extension will

10   remain disabled, and BrandTotal will be unable to run its business.[4]

11         This is wholly distinguishable from the one case Facebook cites on this topic. Opp. Br. at

12   9 (citing *Sierra Club v. U.S. Dep't of Energy*, 825 F. Supp. 2d 142 (D.D.C. 2011). In *Sierra*

13   *Club*, an environmental group sought to enjoin government funding to a power company,

14   claiming injury to the members as a result of the anticipated operation of a partially-built coal

15   power plant. *Sierra Club*, 825 F. Supp. 2d at 149-150. There was affidavit evidence from the

16   power plant, that given the advanced state of build, the company would proceed with the project

17   regardless of government funding, and the harm to the Sierra Club members was so far removed

18   that the court questioned the group's standing. *Id.* at 151. This is plainly not the situation here.

19   Facebook's actions here were targeted against BrandTotal and designed to prompt Google's

20   takedown the UpVoice extension. Its reinstatement of BrandTotal on Facebook and rescission of

21   is takedown request to Google (the relief sought by this TRO) is highly likely to remedy the

22   harm caused.  This is all that is required to establish redressability.  *See Nat'l Parks*

23   *Conservation Ass'n v. Manson*, 414 F.3d 1, 7 (D.C. Cir. 2005) ("A significant increase in the

---

24   [3] Facebook concedes that to place an ad on its site, a company must have a Facebook
25   account.  BrandTotal requests that its account be reinstated.  Facebook has already approved ads
     for UpVoice on its site.  If Facebook refuses in view of this TRO to place ads that comply with
26   its own advertising requirements, BrandTotal will consider further legal action.  It would be our
     expectation that Facebook is not making such a threat.
27   [4] While it is possible that BrandTotal will have to take legal action involving Google, there is no
     reason to expect that to be necessary. Should the Court grant the TRO, and Facebook rescinds its
28   take down request, BrandTotal anticipates Google will comply with the import of this Court's
     order and reinstate the extension.

likelihood that the plaintiff would obtain relief that directly redresses the injury suffered"
suffices to show standing to seek the relief sought) (*quoting Utah v. Evans*, 536 U.S. 452, 464
(2002)).

Facebook also complains that the relief sought is not "specific" and "precise" so that
Facebook has notice of precisely what the injunction would require. Opp. Br. at 10. This is
disingenuous at best. Facebook knows what actions it took to disable UpVoice. It alleged as
much in the State Court complaint as noted above.[5] BrandTotal's requested TRO seeks to undo
these actions as it relates solely to UpVoice. "Injunctions are not set aside under Rule 65(d) ...
unless they are so vague that they have no reasonably specific meaning." *See Portland Feminist
Women's Health Ctr. v. Advocates for Life, Inc*., 859 F.2d 681, 685 (9th Cir. 1988) (quoting
United States v. Holtzman, 762 F.2d 720, 726 (9th Cir. 1985)). That is plainly not the case here.
Facebook understands precisely what BrandTotal seeks; namely the rescission of the steps it took
to disable it.[6]

### B.  Without Relief, BrandTotal Faces Employee Lay-Offs, Customer Loss and Financial Ruin.

Facebook contends BrandTotal's evidence of irreparable harm is insufficient or
speculative, but its analysis myopically focuses on certain elements of harm to the exclusion of
the broader picture. Opp. Br. at 10-12. The bottom line is that access to user data on Facebook is
essential for BrandTotal's product offering. Leibovich Decl., ¶ 30. Without it, BrandTotal cannot
provide the promised advertising analytics to customers. *Id*. To be clear, if the TRO is denied,
BrandTotal will notify its customers, and it will no longer receive the monthly fees paid by
existing customers. Supp. Leibovich Decl., ¶ 5. This is not a loss of one or two customers
(though BrandTotal has already lost one customer, *see* Supp. Leibovich Decl., ¶ 6, plus several
new customer opportunities, Leibovich Decl., ¶¶ 30-35), this is loss of *every* customer, and *every*
potential new customer, and all goodwill. This *is* irreparable harm. *hiQ Labs, Inc. v. LinkedIn
Corp*., 273 F. Supp. 3d 1099, 1106 (N.D. Cal. 2017), *aff'd and remanded*, 938 F.3d 985 (9th Cir.

---

[5] Facebook alone knows what it said to Google. BrandTotal has never seen its communications.
[6] BrandTotal disagrees that the words "reasonable actions" in communicating with Google is
ambiguous in this context, but welcomes further specificity if the Court believes it necessary.

2019) ("[e]vidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm") (*quoting Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001)). Moreover, without data, BrandTotal cannot compile analytics, and as stated in the original declaration of Alon Leibovich, if the TRO is denied it will *immediately* be forced to lay-off employees. Leibovich Decl. ¶ 56.

Facebook faults BrandTotal for not providing a date certain for when it would go out of business, noting that BrandTotal previously completed a round of venture capital funding. Opp. Br. at 11. But the law does not require a company to exhaust every drop of investor money before establishing irreparable harm. *See Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir.1991) (injury to goodwill and ongoing marketing efforts established irreparable harm); *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 841 (9th Cir.2001) (loss of goodwill resulting from failure to fill customer orders would result in irreparable harm); *Drakes Bay Oyster Co. v. Salazar*, 921 F. Supp. 2d 972, 994 (N.D. Cal.), *aff'd sub nom. Drakes Bay Oyster Co. v. Jewell*, 729 F.3d 967 (9th Cir. 2013), and *aff'd sub nom. Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073 (9th Cir. 2014). Just "[t]he threat of being driven out of business is sufficient to establish irreparable harm." *American Passage Media Corp. v. Cass Communications, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985). As in many small start-up companies, in BrandTotal the investors have considerable input into the strategic direction of the company and, in BrandTotal, they form most of the board of directors. Supp. Leibovich Decl. ¶ 9. BrandTotal's board of directors will ultimately determine when to shutter the business, but with no revenue coming in and no way to continue offering a product, as averred by Mr. Leibovich, that time will not be long in coming. Leibovich Decl. ¶ 62.

Facebook cites the *Stackla* case, which similarly involved a company accessing data on Facebook's platform and which, *on the facts of that case*, found no irreparable harm. Opp. Br. at 11 (citing *Stackla, Inc. v. Facebook Inc.*, No. 19-CV-05849-PJH, 2019 WL 4738288, at *4 (N.D. Cal. Sept. 27, 2019)). Importantly, there the court noted that "Stackla does not identify a single client that it will imminently lose (or even an exemplary client it has already lost)." *Stackla*, at *4. The same was true of prospective clients. According to the court, Stackla did not "identif[y]

1    prospective customers who have withdrawn from ongoing sales activities." *Id*. The Court was

2    unconvinced that Stackla's business was in jeopardy, at least before a preliminary injunction

3    hearing could be held, and interestingly, Stackla appears to still be going strong following a

4    settlement with Facebook, suggesting that Facebook allowed the use to ultimately continue. *See*

5    https://stackla.com/.

6         Here, in contrast, BrandTotal has provided names of customers and potential customers,

7    as well as supporting documentation, showing that they have either expressed concerns or

8    terminated contracts or further discussions. Leibovich Decl. ¶¶ 30-43; Supp. Leibovich Decl. ¶ 6.

9    Whatever the situation with *Stackla* may have been, BrandTotal is literally hanging on by its

10   fingertips for the Court's decision in this TRO motion. There is specific and detailed ongoing

11   and irreparable harm if this TRO does not issue.  This is precisely what the Ninth Circuit

12   affirmed under circumstances near identical to this case. *hiQ Labs*, 938 F.3d at 998.

13              **C.  BrandTotal Acted Promptly to Secure Judicial Relief.**

14        Facebook argues that the timing of BrandTotal's TRO request somehow undercuts its

15   request for emergency relief. Opp. Br. at 12-13.  But the opposite is true. On October 1, 2020,

16   the lifeblood of BrandTotal's business, the UpVoice extension, was unexpectedly shut down by

17   Facebook's anticompetitive and tortious actions.  Since then, BrandTotal has scrambled.

18   Facebook gave BrandTotal no warning of these actions, and unlike Facebook, BrandTotal did

19   not have a team of lawyers standing by ready redress complex legal allegations. Indeed, being a

20   small start-up company, BrandTotal had to marshal limited resources to assess the situation, find

21   counsel, get its counsel up to speed, and prepare a TRO motion with supporting declarations

22   against a behemoth that Congress found "ha[s] exploited, entrenched, and expanded [its] power

23   over digital markets in anticompetitive and abusive ways." Ex. K, Report, p.  6.

24        As described in BrandTotal's Response to the request for scheduling (ECF No. 29),

25   BrandTotal hoped to resolve the matter promptly and amicably with Facebook. After convincing

26   BrandTotal to delay filing a TRO, Facebook, however, came to the conference with no

27   settlement authority.  ECF No. 29. Instead, it dismissed the state court action only to file this

28   action in its apparent preferred venue for TRO and preliminary injunction proceedings. ECF No.

29. Realizing that Facebook was not interested in settlement, BrandTotal filed its motion for a TRO less than 48 hours after learning of Facebook's Federal Complaint.  BrandTotal reacted as quickly as it could given that Facebook added new counts, again with no warning. There was no delay and certainly not one that warrants denial of the requested TRO. *See, e.g., GenoSource, LLC v. Inguran, LLC*, 373 F. Supp. 3d 1212, 1226 (N.D. Iowa 2018) (finding delay of 21 days did not preclude granting TRO).  The TRO is timely.

## II.       BRANDTOTAL HAS PRESENTED A SERIOUS QUESTION ON THE MERITS.

### A.  BrandTotal Has Presented A Serious Question as to the Merits of Facebook's Breach of Contract Claim Either Because the Contract Is Not Violated or the Contract as Construed is Unenforceable.

Facebook claims that BrandTotal overlooked two provisions of the Facebook Terms of Service alleged to have been violated (1) Section 3.2.1 precluding misleading or fraudulent behavior, (2) Section 3.2.2 directed to impairing the appearance/working of a Facebook product. But BrandTotal did not overlook the allegations.  As set forth in the opening memorandum, nothing BrandTotal does is misleading or fraudulent—it has user consent—and the extension does not alter or impair Facebook. Leibovich Decl. ¶ 10; Supp. Dor Decl. ¶¶ 6-12. Facebook only claims otherwise by characterizing what UpVoice does in colorful language designed to make it seem nefarious.[7] For example, Facebook contends BrandTotal is "masquerading as an authenticated Facebook user with legitimate login credentials." Opp. Br. at 7. In fact, BrandTotal is giving users a way to monetize their own data by *voluntarily* and *deliberately* signing up for UpVoice and installing a browser extension that allows the user to share their Facebook experience with BrandTotal. Dor Decl. ¶¶ 7-14. There is nothing fraudulent about this, nor does it interfere or harm the Facebook platform. Dor Decl. ¶ 22.  Thus, as stated in the opening brief, the only even *plausible* contract provision surrounds "automated means."

---

[7] Facebook makes a passing reference to alleged misleading conduct (the language of its terms of service) but fails to mention that Facebook has procedures for approving ads, and never complained, prior to this lawsuit, that BrandTotal's use of "participating sites" was misleading.  While BrandTotal does not agree that the language is misleading, in part because it was approved by Facebook, it has also published other UpVoice ads that do not mention Facebook. Supp. Dor. Decl., ¶¶ 21-24. BrandTotal has already told Facebook that it will not use "participating sites" during any grant of preliminary relief to moot this minor dispute, and will so represent on the record.

As to this contract provision, Facebook has little to say. They do not address the 2017 Terms of Service that imply "automated means" connotes something different than what is occurring here. Instead, they effectively concede that they interpret "automated means" to be any computer-based data collection for any purpose whatsoever. Facebook does not contest that there would be no other practical way to collect data with this broad a reading of "automated." Even emailing handwritten notes is in a way "automated." And Facebook does not deny that they offer a competitive service using the same sort of "automated means" they contend others cannot use. Collectively, these facts show that Facebook's contractual restrictions on data collection with "automated means" are not about protecting user privacy, but instead all about monopolizing the data and hindering competition. Under these facts the restrictions are unenforceable as a matter public policy.

In effect, Facebook's Terms of Service places Facebook in a position of gatekeeper as to how users may monetize their own data and who can access user data.  Congress recognized Facebook's unrestrained power in its recent report.  *See* ECF No. 27-1 ("Defs' Memo") at 6-7 (summarizing the October 2020 Judiciary Subcommittee Report's findings).  Facebook does not substantively address or even contest BrandTotal's arguments that Facebook's Terms of Service (1) interfere with users' choices about how users use their information and (2) inhibit competition.

Instead, Facebook's narrow focus on the language of Section 3.2.3 as only concerning "unauthorized collection of data by third parties," Opp. Br. at 20, ignores the fundamental issues underlying the public interest reasons for why these contractual provisions are unenforceable. Namely, user data belongs to users (and not Facebook)[8] and Facebook's Terms of Service impermissibly hinders the free flow of information and stifles competition in data analytics.  A substantial body of law has developed from longstanding Supreme Court precedent that has found such "private" contractual provisions unenforceable.  *See* Defs' Memo at 11-12.

Here, Facebook has erected contractual barriers around access to and the use of certain

---

[8] Facebook not only agrees with BrandTotal that individual users may freely collect the data that BrandTotal collects, Facebook contends it "affirmatively enables each user to download their information and take it to another platform."  Opp. Br. at 19.

user information – information that is in the public domain and information that Facebook has no right to claim as its own. *See id.* at 12-14.  Facebook does not even attempt to suggest it has not done so.[9]

### B.   BrandTotal Has Raised a Serious Question as to Whether Facebook Will Prevail on the CFAA and Section 502(c) Claims.

The CFAA is a criminal hacking statute that dates from the 1980s. It was designed to target criminal hackers who might break and enter into computer systems, particularly the critical infrastructure of the United States Government. The CFAA's civil liability provisions at issue here track the criminal prohibition. As a result, the Ninth Circuit has explained that the rule of lenity mandates requires that it be "construed strictly" against those, like Facebook here, who assert it in civil cases. See *U.S. v. Nosal*, 676 F.3d 854 (9th Cir. 2012) ("*Nosal I*"). It is thus essential for this court to read the CFAA narrowly so that it does not "turn a criminal hacking statute into a 'sweeping Internet-policing mandate.'" *LinkedIn*, 938 F.3d at 1003 (quoting *Nosal I*, 676 F.3d at 858). As the Ninth Circuit explained further in *Nosal I*, "If there is any doubt about whether Congress intended [the CFAA] to prohibit the conduct in which [Defendant] engaged, then we must choose the interpretation least likely to impose penalties unintended by Congress." 676 F.3d at 863.

The relevant provision of the CFAA asserted by Facebook in this case prohibits a person from "intentionally access[ing] a computer without authorization or exceeds authorized access, and thereby obtain[ing] … information from any protected computer." 18 U.S.C. § 1030(a)(2). Under the required strict construction of the CFAA, the Ninth Circuit has repeatedly held that violations of the Terms of Service of a social network cannot fall within the CFAA's prohibition on accessing of a computer in a way that "exceeds authorized access." See, e.g., *LinkedIn,* 938 F.3d at 1000-01; *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067 (9th Cir. 2016) ("'[A] violation of the terms of use of a website— without more—cannot establish liability under the CFAA.'"); *Nosal* I, 676 F.3d at 862. See also *U.S. v. Drew* 259 F.R.D. 449 (C.D. Cal. 2009)

---

[9] Facebook contends that BrandTotal concedes that all elements accept breach are met.  Opp. Br. at 18. Facebook has not shown any real damage, but to be clear BrandTotal does not concede these points, it merely does not rely on them as a defense at the TRO stage.

1    (imposing criminal liability based upon social network Terms of Service violation is void for

2    vagueness). No doubt realizing that this avenue has been foreclosed, Facebook argues that

3    Defendants intentionally accessed a computer without authorization after Facebook filed its state

4    court action against Defendants. Complaint ¶ 84.

5         In *LinkedIn*, the Ninth Circuit noted that "the CFAA contemplates the existence of three

6    kinds of computer information that can be "accessed without authorization": "(1) information for

7    which access is open to the general public and permission is not required, (2) information for

8    which authorization is required and has been given, and (3) information for which authorization

9    is required but has not been given[.]" 938 F.3d 1001-02. Category One and Two cases fall

10   outside the statute, while Category Three cases can fall within in as analogous to the kind of

11   "breaking and entering" Congress tried to prevent in passing the CFAA. See *id.* at 1002.

12   *LinkedIn* involved a Category One case, the accessing of public LinkedIn profiles, while

13   Facebook proffers a Category Three case, *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058

14   (9th Cir. 2016). *Power Ventures* involved a company that allowed consumers to display their

15   social network updates from a variety of platforms. In order to do this, it obtained consumers'

16   user IDs and passwords from Facebook and other sites, logged into the social networks, extracted

17   data, and then displayed it for the consumers on its own site. Facebook banned Power Ventures

18   from accessing its site using its customers' passwords, and there was direct evidence that the

19   company conceded that it used Facebook's systems and that use was unauthorized. See *id.* at

20   1068. The Ninth Circuit thus concluded that this constituted "access[ing] without authorization"

21   within the strict meaning of the CFAA.

22        The present case is vastly different from *Power Ventures.* In *Power Ventures*, the

23   defendant was a bad actor. It never attempted to work with Facebook, it rejected Facebook's

24   efforts to discuss a business deal, it invited a lawsuit for publicity reasons, it had software that

25   involved automated messages going to users from Facebook, it secured friend leads from users

26   and contacted them directly to expand its business. *Power Ventures*, 844 F.3d at 1062-63.

27        The present case is simply not a Category Three case like *Power Ventures*. Unlike the

28   company in that case, BrandTotal does not "access" Facebook by logging in as someone else,

pull personal data out, and then display it elsewhere. It does not send out messages through Facebook, nor does it collect "friend" information to try to solicit them to become its customers. Instead, like the defendant in *LinkedIn*, BrandTotal does not violate the CFAA's "accesses without authorization" restriction. It merely (and contrary to Facebook's false and misleading assertions) provides a browser extension that tracks an Internet user's web-surfing – with their informed consent and in return for financial compensation. Further, unlike the company in *Power Ventures*, BrandTotal does not impersonate a Facebook user and does not log into Facebook using any Facebook user's credentials, nor does it extract personally identified information. Indeed, BrandTotal *cannot* do any of these things because it never obtains Facebook passwords or user IDs. *See, e.g.*, Supp. Dor Decl. ¶10. The entire anti-criminal hacking model of the CFAA is thus wholly inapposite. Rather than anything like unauthorized access of Facebook, BrandTotal merely studies its own customers with their full consent, just as if it were a marketing research scientist or a Neilsen ratings box sitting next to them at their computer (yet with no idea who they actually are). This, like the public profiles in *LinkedIn*, involves activity that BrandTotal has every right to engage in, and involves no illegal access of anything. It is a world away from the kind of "breaking and entering" envisioned by the CFAA and cannot form the basis for liability under it. *See LinkedIn*, 938 F.3d at 1002.

For similar reasons, BrandTotal does not violate California's analogue to the CFAA, Calif. Penal Code § 502(c). Nor is there any knowing intent to defraud as required by subsection (a)(4) of the CFAA.[10] And of course, even Facebook's case on any of these criminal law-based claims were significantly stronger, the rule of lenity would still apply to restrict liability to the kinds of clear violations that are simply not present in this case under any reasonable interpretation of Facebook's allegations.

### C.  BrandTotal Is Likely to Prevail on Its Counterclaims.

BrandTotal is likely to succeed on its counterclaims.  For its first set of counterclaims—

---

[10] Facebook alleges that BrandTotal "barely" addresses its claim for intentional interference.  Opp. Br. at 23.  However, BrandTotal does not "intentionally interfere" with Facebook users' contracts with Facebook at least for the same reasons that it does not breach Facebook's terms, as argued throughout BrandTotal's briefs.

1   intentional inference with contract and intentional interference with a prospective economic

2   advantage—Facebook argues that it should prevail because it did not have *specific knowledge* of

3   BrandTotal's valid customer contracts or economic relationships. Opp. Br. at 13. But specific

4   knowledge is not the standard.  Indeed, "[w]hen the defendant performs the act that causes the

5   interference, the defendant need not know exactly who is a party to the contract, so long as he

6   knows he is interfering with a contractual relationship." *Altera Corp. v. Clear Logic Inc.*, 424

7   F.3d 1079, 1092 (9th Cir. 2005); *see also Ramona Manor Convalescent Hospital v. Care*

8   *Enterprises*, 177 Cal. App. 3d 1120, 1133 (Ct. App. 1986) (finding the same regarding both

9   interference with contract and prospective economic advantage claims). Here, Facebook cannot

10  dispute that it had knowledge of BrandTotal's data analytics business, including its valid

11  customer contracts and relationships with investors. *See, e.g.*, ECF No. 1 at Ex. 7 (citing to press

12  release announcing funding for BrandTotal's data analytics business). Therefore, BrandTotal has

13  alleged that Facebook had knowledge of BrandTotal's contracts and economic relationships.

14          The rest of Facebook's arguments related to BrandTotal's intentional interference claims

15  similarly fail.  For example, there has been an "actual breach or disruption" of BrandTotal's

16  contracts and relationships, as well as "economic harm . . . proximately caused by" Facebook, as

17  discussed throughout the irreparable harm sections of this brief and BrandTotal's opening brief.

18  *See* Def's Memo at §§ E, II; *see also supra* § I.  Also, as discussed in relation to Facebook's

19  breach of contract claim, there is no "legitimate business purpose" in Facebook allegedly

20  enforcing its Terms of Service, which are squarely against public policy. *See supra* § II.A.

21  Along the same lines, Facebook cannot argue that it is "protecting its users" from UpVoice while

22  it cannot dispute that every UpVoice user explicitly consents to the information which UpVoice

23  collects.  *See* Supp. Dor. Decl., ¶¶ 6-10. Thus, BrandTotal is likely to prevail on its intentional

24  interference with contract and prospective economic advantage claims.

25          BrandTotal is also likely to succeed in its claims under each prong—"unlawful," "unfair,"

26  and "fraudulent"—of the UCL. For the "unlawful" prong, as discussed above, BrandTotal is likely

27  to prevail on its intentional interference claims—unlawful violations of the UCL. BrandTotal is

28  also likely to prevail on the "unfair" prong because, as discussed throughout BrandTotal's briefs,

Facebook has at a minimum violated the spirit of the antitrust laws by excluding a competitor in the data analytics market, *i.e.*, BrandTotal, from accessing UpVoice users' data, for which BrandTotal had consent.  *See* Def's Memo at § C; *hiQ Labs*, 273 F.Supp.3d at 1118 (finding "serious question" of UCL violation were defendant was a "dominant power in the market of professional networking" and "wanted exclusive control over … data for its own business purposes").  Finally, BrandTotal has also shown that it is likely to success under the "fraudulent" prong because, per Facebook's terms, the Facebook users own their own data, not Facebook.  *See* ECF No. 26 § I.A.2.  When using UpVoice, a user is simply granting BrandTotal access to data that the user believes to own. *Id*.  Facebook's removal of that access is against its own terms and fraudulent.  Thus, BrandTotal is likely to succeed under all three prongs of the UCL.

### III.    THE BALANCE OF EQUITIES FAVORS GRANTING THE TRO

The only "harm" to Facebook that Facebook can identify is that issuing an injunction "would force Facebook to allow a non-complaint developer back on its platform, and interfere with Facebook's ability to enforce its terms and policies and secure its platform." Opp. Br. at 23. But if the Court issues a TRO, it will have already concluded that there is a serious question as to whether Facebook may enforce its contract of adhesion in the manner it is doing. It is not a cognizable harm that Facebook will not get to enforce the very Terms of Service that BrandTotal contends are unenforceable under CCPA and designed to inhibit competition and the free flow of information.

Beyond the only argument Facebook offers is that BrandTotal is an actor with unclean hands because it chose to violate Facebook's Terms of Service. Opp. Br. at 23. BrandTotal cites *Power Ventures* as support this this proposition, ignoring the egregious facts of that case including serious discovery misconduct, but even so, the recent Congressional Report cast the equities in a new light. There is a growing understanding of the power that companies like Facebook wield, and how that can be used to the detriment of both users and competitors, and companies looking for alternatives for advertising consulting services. Balanced against the manifest harm to BrandTotal in denying an injunction, the equation is not even close. The harm to BrandTotal far outweighs any harm to Facebook. *LinkedIn*, 938 F.3d at 994-95.

### IV.    THERE ARE STRONG PUBLIC INTERESTS IN FAVOR OF GRANTING TRO

In what is perhaps the most ironic statement of Facebook's entire opposition, Facebook contends "[t]he public interest is better served by permitting Facebook to take all necessary steps to protect user privacy." Opp. Br. at 24. Facebook says this on the heels of a scathing Congressional Report and after being fined millions in the Cambridge Analytica scandal. If anyone should be the arbiter of privacy, it is not Facebook. But, then, this case is not about privacy. Facebook uses the data in exactly the same way (without compensation to users) and allows affiliates to do so too.  *See* Telscher Decl., ¶ 3, Ex. X. Facebook just wants to control access, thereby controlling competition. But the data is either public or does not belong to Facebook. As found in *hiQ v. LinkedIn*, allowing a social media platform to monopolize access to data is not in the public's interest. *hiQ Labs, Inc. v. LinkedIn Corp.,* 938 F.3d 985, 1005 (9th Cir. 2019) ("We agree with the district court that giving companies like LinkedIn free rein to decide, on any basis, who can collect and use data—data that the companies do not own, that they otherwise make publicly available to viewers, and that the companies themselves collect and use—risks the possible creation of information monopolies that would disserve the public interest"). Here, BrandTotal has permission from the users, no different than someone letting a company monitor their TV watching to see what commercials they see. This does not jeopardize the "integrity" of the Facebook platform; it jeopardizes only Facebook's monopoly power over data it does not rightfully control. The public and the public interest favors this TRO. Supp. Leibovich Decl., ¶¶ 10-11.

### CONCLUSION

For the foregoing reasons and as requested in its Opening Brief, BrandTotal respectfully requests that the Court GRANT its motion for a temporary restraining order.

Date: October 22, 2020

Respectfully submitted,

By: */s/ Rudolph A. Telscher, Jr.*
Rudolph A. Telscher, Jr.*
rudy.telscher@huschblackwell.com
Kara R. Fussner*
kara.fussner@huschblackwell.com
HUSCH BLACKWELL LLP
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
314-480-1500 Telephone

Ryan B. Hauer*
ryan.hauer@huschblackwell.com
HUSCH BLACKWELL LLP
120 South Riverside Plaza Suite 2200
Chicago, IL 60606
312-526-1572 Telephone

David Stauss*
david.stauss@huschblackwell.com
HUSCH BLACKWELL LLP
180 1 Wewatta Street, Suite 1000
Denver, CO 80202
303-749-7200 Telephone
*admitted *pro hac vice*

William E. Corum (to be admitted *pro hac vice*)
william.corum@huschblackwell.com
HUSCH BLACKWELL LLP
4800 Main Street, Ste. 1000
Kansas City, MO 64112
816-983-8000 Telephone

Karl Kronenberger (CA Bar No. 226112)
karl@krinternetlaw.com
Jeffrey M. Rosenfeld (CA Bar No. 222187)
jeff@krinternetlaw.com
KRONENBERGER ROSENFELD, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
415-955-1155 Telephone
415-955-1158 Facsimile

***Attorneys for Defendants/Counterclaim Plaintiffs
BrandTotal, Ltd. and Unimania, Inc.***

1

## CERTIFICATE OF SERVICE

2

I hereby certify that on this 22nd day of October, 2020, I caused the foregoing to be filed

3

electronically with the Clerk of Court and to be served via the Court's Electronic Filing System

4

upon all counsel of record, and to be served via email on all counsel of record at the following:

5

6

WILMER CUTLER PICKERING
HALE AND DORR LLP

7

SONAL N. MEHTA (SBN 222086)
sonal.mehta@wilmerhale.com

8

THOMAS G. SPRANKLING (SBN 294831)

9

thomas.sprankling@wilmerhale.com
JOSEPH M. LEVY (SBN 329318)

10

joseph.levy@wilmerhale.com
2600 El Camino Real, Suite 400

11

Palo Alto, CA 94306
Telephone: (650) 858-6000

12

13

ARI HOLTZBLATT

14

Ari.Holtzblatt@wilmerhale.com
ALLISON SCHULTZ

15

Allison.Schultz@wilmerhale.com
ROBIN C. BURRELL

16

robin.burrell@wilmerhale.com
1875 Pennsylvania Ave, NW

17

Washington, DC 20006
Telephone: (202) 663-6000

18

Facsimile: (202) 663-6363

HUNTON ANDREWS KURTH LLP

Ann Marie Mortimer (State Bar No. 169077)
amortimer@HuntonAK.com
Jason J. Kim (State Bar No. 221476)
kimj@HuntonAK.com
Jeff R. R. Nelson (State Bar No. 301546)
jnelson@HuntonAK.com
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627
Telephone: (213) 532-2000
Facsimile: (213) 532-2020

***Attorneys for Plaintiff/Counterclaim
Defendant Facebook, Inc.***

19

20

21

*/s/ Rudolph A. Telscher, Jr.*

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28