WILMER CUTLER PICKERING HALE AND
DORR LLP
SONAL N. MEHTA (SBN 222086)
sonal.mehta@wilmerhale.com
THOMAS G. SPRANKLING (SBN 294831)
thomas.sprankling@wilmerhale.com
JOSEPH M. LEVY (SBN 329318)
joseph.levy@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

ARI HOLTZBLATT (*pro hac vice*)
Ari.Holtzblatt@wilmerhale.com
ALLISON SCHULTZ (*pro hac vice*)
Allison.Schultz@wilmerhale.com
ROBIN C. BURRELL (*pro hac vice*)
robin.burrell@wilmerhale.com
1875 Pennsylvania Ave, NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

HUNTON ANDREWS KURTH LLP
Ann Marie Mortimer (State Bar No. 169077)
amortimer@HuntonAK.com
Jason J. Kim (State Bar No. 221476)
kimj@HuntonAK.com
Jeff R. R. Nelson (State Bar No. 301546)
jnelson@HuntonAK.com
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627
Telephone: (213) 532-200
Facsimile: (213) 532-2020

*Attorneys for Plaintiff/Counterclaim Defendant
Facebook, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| FACEBOOK, INC., a Delaware corporation,<br><br>           Plaintiff/Counterclaim<br>           Defendant,<br><br>   v.<br><br>BRANDTOTAL LTD., an Israeli corporation, and UNIMANIA, INC., a Delaware corporation,<br>           Defendants/<br>           Counterclaim<br>           Plaintiffs. | Case No. 3:20-CV-07182-JCS<br><br>**PLAINTIFF FACEBOOK INC.'S NOTICE OF MOTION AND MOTION TO DISMISS THE DEFENDANTS' COUNTERCLAIMS PURSUANT TO FED. R. CIV. P. 12(B)(6); MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Hon. Joseph C. Spero<br>Courtroom F – 15th Floor<br>Date: January 22, 2021<br>Time: 9:30 a.m. |

1

## TABLE OF CONTENTS

2

**Page**

3

I.    FACTUAL BACKGROUND ..................................................................................2

4

II.   Argument ........................................................................................................4

5
6

A.    The Court Should Dismiss BrandTotal's Request for Declaratory Relief
      Because BrandTotal's Allegations Show That It Violated Facebook's Terms
      of Service And Instagram's Terms of Use (Counterclaim IV) .....................4

7
8

B.    BrandTotal Fails To State A Claim For Intentional Interference With Contract
      (Counterclaim I)...........................................................................................5

9
10

      1.    BrandTotal has not alleged facts sufficient to show Facebook had  the
            requisite intent..................................................................................6

11

      2.    BrandTotal has not alleged facts sufficiently to show the actual breach
            or disruption of any contractual relationship ....................................8

12

      3.    Any alleged interference was justified................................................8

13
14

C.    BrandTotal Fails To State A Claim For Intentional Interference With
      Prospective Economic Advantage (Counterclaim II) .................................10

15
16

D.    BrandTotal Fails To State A Claim Under California's Unfair Competition
      Law (Counterclaim III).................................................................................13

17

      1.    BrandTotal alleges no "unlawful" business practice ......................14

18

      2.    BrandTotal alleges no "unfair" business practice ...........................14

19

      3.    BrandTotal alleges no "fraudulent" business practice ....................19

20

III.  CONCLUSION...............................................................................21

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Alaska Airlines, Inc. v. United Airlines, Inc.*,
    948 F.2d 536 (9th Cir. 1991) ............................................................................................17

*Aleksick v. 7-Eleven, Inc.*,
    205 Cal. App. 4th 1176 (2012) .........................................................................................14

*AlterG, Inc. v. Boost Treadmills LLC*,
    388 F. Supp. 3d 1133 (N.D. Cal. 2019) ......................................................................11, 12

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................................4

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................................4

*Berryman v. Merit Property Management, Inc.*,
    152 Cal. App. 4th 1544 (2007) .........................................................................................14

*Brandwein v. Butler*,
    218 Cal. App. 4th 1485 (2013) ...........................................................................................5

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*,
    20 Cal. 4th 163 (1999) ................................................................................................15, 18

*ChriMar Systems, Inc. v. Cisco Systems, Inc*,
    72 F. Supp. 3d 1012 (N.D. Cal. 2014) ..............................................................................15

*Daugherty v. American Honda Motor Co.*,
    144 Cal. App. 4th 824 (2006) ...........................................................................................14

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*,
    11 Cal. 4th 376 (1995) ......................................................................................................11

*Doe 1 v. Abbott Laboratories*,
    571 F.3d 930 (9th Cir. 2009) ............................................................................................17

*Dryden v. Tri-Valley Growers*,
    65 Cal. App. 3d 990 (1977) ................................................................................................8

*Ebner v. Fresh, Inc.*,
    838 F.3d 958 (9th Cir. 2016) ............................................................................................20

*Equinox Hotel Management, Inc. v. Equinox Holdings, Inc.*,
    2018 WL 659105 (N.D. Cal. Feb. 1, 2018) ............................................................... 19

*Federal Trade Commission v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) ................................................................................... 18

*Great Minds v. Office Depot, Inc.*,
    945 F.3d 1106 (9th Cir. 2019) ................................................................................... 4

*Guccione v. JPMorgan Chase Bank, N.A.*,
    2015 WL 1968114 (N.D. Cal. May 1, 2015) ............................................................ 19

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018) ................................................................................. 15

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    2020 WL 5408210 (N.D. Cal. Sept. 9, 2020) ............................................. 15, 17, 18

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    938 F.3d 985 (9th Cir. 2019) ..................................................................................... 9

*Image Technical Services, Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) ................................................................................. 16

*Imperial Ice Co. v. Rossier*,
    18 Cal. 2d 33 (1941) ................................................................................................. 9

*In re Sony Gaming Networks and Customer Data Security Breach Litigation*,
    903 F. Supp. 2d 942 (S.D. Cal. 2012) ..................................................................... 20

*In re Tobacco II Cases*,
    46 Cal. 4th 298 (2009) ...................................................................................... 14, 19

*Ixchel Pharma, LLC v. Biogen, Inc.*,
    9 Cal. 5th 1130 (2020) .............................................................................................. 8

*Knievel v. ESPN*,
    393 F.3d 1068 (9th Cir. 2005) ................................................................................... 3

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. 4th 1134 (2003) ........................................................................... 6, 11, 12, 13

*L.A. Taxi Cooperative, Inc. v. Uber Technologies, Inc.*,
    114 F. Supp. 3d 852 (N.D. Cal. 2015) ..................................................................... 19

*Levitt v. Yelp! Inc.*,
    765 F.3d 1123 (9th Cir. 2014) ................................................................................. 18

iii

*MetroNet Services Corp. v. Qwest Corp*,
    383 F.3d 1124 (9th Cir. 2004) ........................................................................16, 17

*Milman v. FCA U.S., LLC*,
    2019 WL 3334612 (C.D. Cal. Apr. 15, 2019) .......................................................14

*Mishiyev v. Alphabet, Inc.*,
    444 F. Supp. 3d 1154 (N.D. Cal. 2020) ...............................................................11

*National Rural Telecommunications Co-op v. DIRECTV, Inc.*,
    319 F. Supp. 2d 1059 (C.D. Cal. 2003) ...............................................................20

*Nestle U.S.A., Inc. v. Crest Foods, Inc.*,
    2017 WL 3267665 (C.D. Cal. July 28, 2017)........................................................11

*Pacific Bell Telephone Co. v. LinkLine Communications, Inc.*,
    555 U.S. 438 (2009)............................................................................................17

*Pacific Gas & Electric Co. v. Bear Stearns & Co.*,
    50 Cal. 3d 1118 (1990) ...............................................................................6, 7, 11

*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*,
    107 Cal. App. 4th 516 (2003) .............................................................................13

*People's Choice Wireless Inc. v. Verizon Wireless*,
    131 Cal. App. 4th 656 (2005) .............................................................................18

*Pirozzi v. Apple, Inc.*,
    966 F. Supp. 2d 909 (N.D. Cal. 2013) ................................................................19

*Prime Healthcare Services, Inc. v. Service Employees International Union*,
    2013 WL 3873074 (S.D. Cal. July 25, 2013), *aff'd*, 642 F. App'x 665
    (9th Cir. 2016)...................................................................................................16

*Rebel Oil Co. v. Atlantic Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ..............................................................................16

*Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*,
    2013 WL 3242245 (N.D. Cal. June 25, 2013) ......................................................16

*Richardson v. La Rancherita of La Jolla, Inc.*,
    98 Cal. App. 3d 73 (1979) ...................................................................................9

*Rivera v. Peri & Sons Farms, Inc.*,
    735 F.3d 892 (9th Cir. 2013) ................................................................................9

*Sebastian International, Inc. v. Russolillo*,
    162 F. Supp. 2d 1198 (C.D. Cal. 2001) .................................................................7

iv

*Semler v. General Electric Capital Corp.*,
     196 Cal. App. 4th 1380 (2011) ..................................................................................10

*Shell Gulf of Mexico Inc. v. Center for Biological Diversity, Inc.*,
     771 F.3d 632 (9th Cir. 2014) ......................................................................................5

*SIC Metals, Inc. v. Hyundai Steel Co.*,
     442 F. Supp. 3d 1251 (C.D. Cal. 2020) .....................................................................9

*Silicon Knights, Inc. v. Crystal Dynamics, Inc.*,
     983 F. Supp. 1303 (N.D. Cal. 1997) .........................................................................12

*SmileCare Dental Group v. Delta Dental Plan of California, Inc.*,
     88 F.3d 780 (9th Cir. 1996) ......................................................................................16

*Solyndra Residual Trust ex rel. Neilson v. Suntech Power Holdings Co.*,
     62 F. Supp. 3d 1027 (N.D. Cal. 2014) ........................................................................8

*Tanaka v. University of Southern California*,
     252 F.3d 1059 (9th Cir. 2001) ..................................................................................15

*Trindade v. Research Media Group, LLC*,
     2013 WL 3977034 (N.D. Cal. July 31, 2013) .............................................................7

*Vascular Imaging Professionals, Inc. v. Digirad Corp.*,
     401 F. Supp. 3d 1005 (S.D. Cal. 2019) .....................................................................11

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*,
     540 U.S. 398 (2004) .............................................................................................16, 17

*Webber v. Inland Empire Investments.*,
     74 Cal. App. 4th 884 (1999) ......................................................................................9

*Westside CenterAssociates v. Safeway Stores 23, Inc.*,
     42 Cal. App. 4th 507 (1996) .....................................................................................11

*Williams v. Apple, Inc.*,
     449 F. Supp. 3d 892 (N.D. Cal. 2020) .......................................................................19

*Zalkind v. Ceradyne, Inc.*,
     194 Cal. App. 4th 1010 (2011) .................................................................................13

## STATUTES, RULES, AND REGULATIONS

18 U.S.C. § 1030 ...............................................................................................................1

28 U.S.C. § 2201(a) ..........................................................................................................4

Cal. Bus. & Prof. Code § 17200 (UCL) ................................................................. *passim*

v

Cal. Penal Code§ 502 ................................................................................................1

Fed. R. Civ. P. 9(b) ................................................................................................19

Fed. R. Civ. P. 12(b)(6).........................................................................................1, 4

## OTHER AUTHORITIES

Data Policy, FACEBOOK, https://www.facebook.com/privacy/explanation#sharing-
    partner-information (last accessed Nov. 23, 2020)...............................................3

Facebook, *Terms of Service*, https://www.facebook.com/terms.php (last accessed
    Nov. 23, 2020) .......................................................................................3, 9, 13, 20

PLAINTIFF'S MOTION TO DISMISS THE DEFENDANTS' COUNTERCLAIMS PURSUANT TO FED. R. CIV. P. 12(B)(6)

## NOTICE OF MOTION AND MOTION TO DISMISS

PLEASE TAKE NOTICE THAT, on January 22, 2021 at 9:30 a.m. or as soon thereafter as the matter may be heard, in Courtroom F of the U.S. District Court for the Northern District of California, San Francisco Division, at 450 Golden Gate Avenue, San Francisco, California, plaintiff Facebook, Inc. will and hereby does move to dismiss all claims advanced in the Counterclaims ("Counterclaims") (Dkt. 23) for the failure to state a claim upon which relief can be granted.  Facebook's Motion to Dismiss is based on this Notice of Motion, the Memorandum of Points and Authorities, and Facebook's Request for Judicial Notice.

## STATEMENT OF REQUESTED RELIEF

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Facebook requests that the Court dismiss all of Defendants BrandTotal, Ltd. and Unimania, Inc.'s counterclaims.

## STATEMENT OF ISSUES TO BE DECIDED

Whether the Counterclaims must be dismissed in their entirety for failure to plead essential elements of Defendants' claims for intentional interference with contract, intentional interference with prospective economic advantage, violation of California's Unfair Competition Law, and for a declaratory judgment of no breach of contract.

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants BrandTotal, Ltd. and Unimania, Inc. (collectively "Defendants" or "BrandTotal") built a business around violating Facebook's Terms of Service and Instagram's Terms of Use. Facebook's and Instagram's terms prohibit the collection of data from its platforms (including Instagram) using automated means without prior authorization.  BrandTotal, without Facebook's authorization, designed a web-browser extension to automatically collect user- and advertising-related data while users browsed Facebook and Instagram (and other sites).  After discovering BrandTotal's conduct, Facebook filed this action alleging, among other things, that BrandTotal breached its contact with Facebook by violating Facebook's and Instagram's terms, and violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and the California Comprehensive Computer Data Fraud and Abuse Act, Cal. Penal Code § 502.

In response to Facebook's complaint, BrandTotal filed counterclaims alleging that Facebook interfered with its contractual and prospective economic relations and violated California's unfair competition law ("UCL"), Cal. Bus. & Prof. Code § 17200, when Facebook enforced its terms by disabling BrandTotal's Facebook accounts and asking non-party Google to remove BrandTotal's extensions from the Google Chrome Web Store.  BrandTotal's claims, in short, seek to hold Facebook liable for the justified enforcement of its Terms of Service and for Google's independent decision to remove BrandTotal's extensions from Google's Chrome Web Store.  Each of its claims should be dismissed for the following reasons:

*First*, BrandTotal is not entitled to a declaratory judgment that it did not violate Facebook's or Instagram's terms because its own allegations show that it did.

*Second*, BrandTotal fails to state a claim for intentional interference with contract because it has not plausibly pleaded facts sufficient to show that Facebook had the requisite intent to interfere with or cause the breach or disruption of any contractual relationships, and, moreover, any supposed interference was justified as Facebook was enforcing its existing terms.

*Third*, BrandTotal fails to state a claim for intentional interference with prospective economic advantage because, among other defects, it cannot establish that Facebook's conduct was independently wrongful.  Facebook did nothing more than enforce its own terms.

*Finally*, BrandTotal fails to state a claim under the UCL because it does not allege any unlawful, unfair, or fraudulent conduct.  Facebook was justified in enforcing its terms and its conduct was not unlawful.  BrandTotal's own allegations establish that Facebook does not generally restrict access to its data and therefore its conduct was not unfair.  And because Facebook's terms explicitly state that users may not access data by automated means and without permission, its conduct was not fraudulent.

## I.      FACTUAL BACKGROUND

Since at least 2019, BrandTotal has developed, promoted, and distributed browser extensions that collect information about users' advertising interactions across various social-media platforms and websites, including Facebook, Instagram, Twitter, YouTube, LinkedIn, and Amazon.  Answer ¶

42; Counterclaims ¶¶ 8-9.  The extensions were available for download from the Google Chrome Web Store.  Answer ¶ 42.  Once downloaded and installed on a user's browser, the "UpVoice" extension—the focus of BrandTotal's counterclaims—collected data about whoever happened to be using the browser onto which the extension had been installed, including not only information about the user but also any advertisements that they saw or with which they interacted (content not created by the users who purportedly consented to its collection).  Counterclaims ¶¶ 9, 14, 16, 17.  UpVoice collected that data, by automated means, anytime a user "browse[d] as usual" a target website, like Facebook. *Id.* ¶ 14.

Facebook's Terms of Service prohibit users from "access[ing] or collect[ing] data from [Facebook's] Products using automated means (without [Facebook's] permission) or attempt[ing] to access data [users] do not have permission to access." *Id.* ¶ 21.  Instagram's Terms of Use similarly prohibit users from "access[ing] or collect[ing] [data] in unauthorized ways … [including] collecting information in an automated way without [Facebook's] express permission."  Answer ¶ 27.  BrandTotal had agreed to abide by those terms by creating and maintaining multiple Facebook and Instagram accounts between 2016 and 2020.  *Id.* ¶¶ 36-41; Facebook, *Terms of Service*, https://www.facebook.com/terms (last accessed Nov. 23, 2020) (users bound by Facebook's Terms of Service by using its products).[1]

Facebook provides established and authorized means for people and application ("app") developers to access publicly available data.  For example, Facebook makes all ads on the platform publicly accessible through its Ad Library.  Answer ¶ 17; *see also* RJN Ex. A.  Facebook also enables app developers to send and receive user-related information through its application programming interface ("API"), Graph API.  *See* Data Policy, FACEBOOK, https://www.facebook.com/privacy/explanation#sharing-partner-information (last accessed Nov. 23, 2020);[2] RJN Ex. B.

---

[1]     The Counterclaims incorporate the Terms of Service by reference, *see* Counterclaims ¶ 21; they therefore may be considered in deciding this Motion to Dismiss, *Knievel v. ESPN*, 393 F.3d 1068, 1076-1077 (9th Cir. 2005) (considering website under "'incorporation by reference' doctrine").

[2]     The Counterclaims incorporate Facebook's Data Policy by reference, *see* Counterclaims ¶ 22; it therefore may be considered in deciding this Motion to Dismiss, *Knievel*, 393 F.3d at 1076-1077.

1    Facebook suspended defendants' Facebook and Instagram accounts on September 30, 2020.

2    Compl. ¶ 58; Counterclaims ¶ 25.  The next day, Facebook filed a civil action in California state court

3    alleging that defendants violated its Terms of Service.  Answer ¶ 59.  On October 2, Google removed

4    defendants' browser extensions from its Google Chrome Web Store.  Counterclaims ¶ 26.  On October

5    3, defendants created new Facebook and Instagram accounts using the fake names "Jack Buch" and

6    "Jack_Back." Answer ¶ 61.  Facebook then dismissed its state-court complaint and filed this action on

7    October 14, 2020, adding new allegations and claims under state and federal laws prohibiting

8    unauthorized access to computer systems.  *See generally* Compl.

9    **II.    ARGUMENT**

10       "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted

11   as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

12   (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In resolving a motion under

13   Rule 12(b)(6), the court "must take all well-pleaded allegations of material fact as true and construe

14   them in the light most favorable to the non-moving party."  *Great Minds v. Office Depot, Inc.*, 945

15   F.3d 1106, 1109 (9th Cir. 2019).  But a complaint must set forth "more than labels and conclusions,

16   and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.

17   Under this standard, each of BrandTotal's counterclaims must be dismissed.

18       **A.    The Court Should Dismiss BrandTotal's Request for Declaratory Relief Because**

19           **BrandTotal's Allegations Show That It Violated Facebook's Terms of Service And**

20           **Instagram's Terms of Use (Counterclaim IV)**

21       BrandTotal seeks a declaration that it has not breached Facebook's Terms of Service or

22   Instagram's Terms of Use.  The Court should dismiss BrandTotal's declaratory judgment claim

23   because it pleaded facts that demonstrate that it *did* violate Facebook's Term of Service and

24   Instagram's Terms of Use.  The Declaratory Judgment Act provides that, "[i]n a case of actual

25   controversy," courts "may declare the rights and other legal relations of any interested party seeking

26   such declaration."  28 U.S.C. § 2201(a).  "To determine whether a declaratory judgment action

27   presents a justiciable case or controversy, courts consider 'whether the facts alleged, under all the

28

circumstances, show that there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Shell Gulf of Mexico Inc. v. Center for Biological Diversity, Inc.*, 771 F.3d 632, 636 (9th Cir. 2014) (citation omitted).  Because there is no actual controversy surrounding BrandTotal's conduct and Facebook's and Instagram's terms,  BrandTotal's declaratory judgment claim should be dismissed.

BrandTotal admits that it created and maintained Facebook and Instagram accounts.  Compl. ¶¶ 36-41; Answer ¶¶ 36-41.  It also admits that Section 3.2.3 of Facebook's Terms of Service prohibits "access[ing] or collect[ing] data from [Facebook] Products using automated means (without [Facebook's] permission) or attempt[ing] to access data you don't have permission to access," Compl. ¶ 26; Answer ¶ 26, and that Instagram's Terms of Use prohibit "access[ing] or collect[ing] [data] in unauthorized ways … [including] collecting information in an automated way without [Instagram's] express permission," Compl. ¶ 27; Answer ¶ 27.  According to BrandTotal, the UpVoice extension collected data "as [users] browse[d] *as usual* on [target] sites." Counterclaims ¶ 14 (emphasis added); *see also* Order Regarding Mot. For TRO ("TRO Order"), Dkt. No. 58, at 29 (UpVoice "systematically identif[ied], capture[d], and transmit[ed] certain types of data from Facebook's products *without user intervention*" (emphasis added).  In other words, users who installed BrandTotal's extension did not need to actually *do* anything other than browse Facebook "as usual," while UpVoice operated in the background to collect advertising-related data.  That is automated by any ordinary, "reasonable meaning of that term.  *See* TRO Order at 28; *see also Brandwein v. Butler*, 218 Cal. App. 4th 1485, 1505 (2013) ("Contract terms are to be given their ordinary meaning … .").  Because BrandTotal alleges facts establishing that it *did* violate Facebook's Terms of Service and Instagram's Terms of Use, its claim for a declaratory judgment to the contrary must be dismissed.

## B.    BrandTotal Fails To State A Claim For Intentional Interference With Contract (Counterclaim I)

BrandTotal's claim for intentional interference with a contract should be dismissed because it has not pleaded facts sufficient to state a claim, and, in any event, Facebook was justified in taking steps to enforce and protect its own contracts.  To state a claim for intentional interference with

1  contract under California law, BrandTotal must allege: "(1) a valid contract between [BrandTotal] and

2  a third party; (2) [Facebook's] knowledge of this contract; (3) [Facebook's] intentional acts designed

3  to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the

4  contractual relationship; and (5) resulting damage." *Pacific Gas & Elec. Co. v. Bear Stearns & Co.*,

5  50 Cal. 3d 1118, 1126 (1990).  But BrandTotal failed to plead facts sufficient to show that Facebook

6  had the requisite intent to interfere with BrandTotal's contracts, or that blocking BrandTotal's access

7  to Facebook's networks caused the actual breach or disruption of those contracts.  Moreover, and in

8  any event, Facebook was justified in taking steps to enforce its terms.  BrandTotal's claim for

9  intentional interference with a contract should therefore be dismissed.

10  **1.    BrandTotal has not alleged facts sufficient to show Facebook had  the**

11  **requisite intent**

12          To satisfy the intent requirement, BrandTotal must plead facts sufficient to show that Facebook

13  knew "that the interference [was] certain or substantially certain to occur as a result of [its] action."

14  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1155-1156 (2003) (quoting

15  Restatement (Second) of Torts § 766 cmt. J (1979).  BrandTotal fails to allege facts sufficient to show

16  that Facebook knew, with the requisite certainty and at the time of the alleged interference, that

17  disabling BrandTotal's Facebook accounts and reporting BrandTotal's extension to Google would

18  interfere with BrandTotal's contracts.

19          *First*, BrandTotal utterly fails to allege that its Facebook and Instagram accounts were integral

20  to the collection of data from Facebook, let alone that Facebook was aware that BrandTotal's entire

21  business model depended on their unauthorized access of *Facebook* data.  Indeed, the very website to

22  which BrandTotal points to establish knowledge of its contracts (Counterclaims ¶ 34) lists the various

23  *other* social-media platforms and websites from which UpVoice collected data (including YouTube,

24  LinkedIn, Amazon, and Twitter, Compl. ¶ 49 & Fig. 3; *id.* Ex. 11; Answer ¶ 49), undermining any

25  plausible inference that Facebook knew with certainty that BrandTotal's "customer relationships and

26  business would be destroyed if BrandTotal's access to Facebook is denied," Counterclaim ¶ 36.

27

28

1    *Second*, as to contacting Google, BrandTotal does not allege any facts from which it can be

2    inferred that Facebook knew with substantial certainty that Google would respond remove

3    BrandTotal's extension.  As BrandTotal alleges, it was Google's conduct that ultimately resulted in

4    their extensions being disabled.  Counterclaims ¶ 26.  And BrandTotal fails to allege how Facebook

5    could have known with the requisite certainty that Google would take that step based on Facebook's

6    request.  Indeed, Google removed BrandTotal's extensions only *after* Facebook filed suit against

7    BrandTotal.  Compl. ¶ 60; Answer ¶ 60.  And BrandTotal does not allege, nor could it, that Facebook's

8    lawsuit interfered with its contractual relations.  *See Pacific Gas & Elec.*, 50 Cal. 3d at 1127, 1130-

9    1137 (holding it improper "to impose liability for inducing a potentially meritorious lawsuit").

10    Attempting to allege the requisite knowledge and intent, BrandTotal pleads only that Facebook

11    knew of its advertisements and website (Counterclaims ¶ 34), and that BrandTotal provided Facebook

12    with *after-the-fact* notice that its "business would be destroyed" if Facebook did not *reverse* its

13    allegedly interfering actions (*id.* ¶ 36).  Neither is sufficient to establish that Facebook intended to

14    interfere with BrandTotal's contracts or knew its acts were certain or substantially certain to cause a

15    breach or disruption of BrandTotal's contracts.  As to the websites and advertisements, the allegation

16    that Facebook had general knowledge that BrandTotal provides a "competitive intelligence platform,"

17    (Compl. Figs. 1 & 2; Answer ¶ 40) and pays users for spending time on Facebook *and* YouTube,

18    LinkedIn, Amazon, and Twitter (Compl. ¶ 49 & Fig. 3; *id.* Ex. 11; Answer ¶ 49), is insufficient to

19    show that Facebook knew that preventing BrandTotal from accessing *Facebook* was certain or

20    substantially certain to interfere with the performance of its contracts.  *See Trindade v. Research Media*

21    *Grp.,* LLC, 2013 WL 3977034, at *15-16 (N.D. Cal. July 31, 2013) (allegations of only generalized

22    knowledge of contracts insufficient to plead intent to interfere).

23    And as to BrandTotal's more specific notice—informing Facebook that BrandTotal's

24    "business would be destroyed" if "Facebook [did] not *rescind* its request to remove UpVoice from the

25    Google Chrome Web Store," (Answer ¶ 36 (emphasis added))—that came only *after* the allegedly

26    interfering conduct and is thus insufficient to establish the requisite knowledge. *See Sebastian Int'l,*

27    *Inc. v. Russolillo*, 162 F. Supp. 2d 1198, 1204 (C.D. Cal. 2001) (knowledge element "relates to the

28

PLAINTIFF'S MOTION TO DISMISS THE DEFENDANTS' COUNTERCLAIMS PURSUANT TO FED. R. CIV. P. 12(B)(6)

state of mind of the defendant at the time that the alleged tort occurred"); *Dryden v. Tri-Valley Growers*, 65 Cal. App. 3d 990, 996 (1977) (holding intentional interference claim "fatally defective" because complaint failed to allege requisite knowledge "at the time of [the allegedly interfering conduct]").

### 2.    BrandTotal has not alleged facts sufficiently to show the actual breach or disruption of any contractual relationship

The fourth element of an intentional interference claim requires either an express breach of contract or conduct that has made the plaintiff's performance of its contract more expensive or burdensome. *See Solyndra Residual Trust ex rel. Neilson v. Suntech Power Holdings Co.*, 62 F. Supp. 3d 1027, 1048-1049 (N.D. Cal. 2014). BrandTotal fails to allege either. It alleged only that its customers are "questioning their relationship with BrandTotal," (Counterclaims ¶ 29), that "customers contracts are endangered by Facebook's conduct," (*id.* ¶ 35), and that preventing it "from accessing Facebook will necessarily mean that BrandTotal cannot continue to perform under its contracts with its clients," (*id.* ¶ 37).[3] But BrandTotal does not allege that either it or any of its customers have actually breached any of their contractual obligations. And it has not alleged any facts giving rise to the plausible inference that the performance of its contracts has been made more expensive or burdensome. BrandTotal scrapes data from websites and platforms other than Facebook. *Id.* ¶ 8. It has not alleged that it is any more expensive or difficult to collect data from those other sources, or that its contracts require it to provide any particular amount of data or data from any particular sources, such that meeting its contractual obligations might be rendered more difficult without access to data from Facebook. Absent any specific factual allegations, BrandTotal's conclusory assertion that it "cannot continue to perform under its contracts" without access to Facebook's data is insufficient to state a claim.

### 3.    Any alleged interference was justified

Finally, BrandTotal's interference claim fails because Facebook was justified in taking steps

---

[3] Even if BrandTotal could allege that any current customers have declined to renew their contracts, that would not support a claim for intentional interference with contract. The failure to renew a contract can give rise only to a claim for intentional interference with prospective economic advantage. *See Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1147 (2020).

1    to enforce its terms and protect its own contracts and legal obligations.  As the Court knows, if a

2    party's "'conduct was lawful and undertaken to enforce its rights,' it cannot be held liable for

3    intentional interference with a contract even if it knew that such conduct might interrupt a third party's

4    contract."  *SIC Metals, Inc. v. Hyundai Steel Co.*, 442 F. Supp. 3d 1251, 1256 (C.D. Cal. 2020) (quoting

5    *Webber v. Inland Empire Invs.*, 74 Cal. App. 4th 884, 905 (1999)); *accord Imperial Ice Co. v. Rossier*,

6    18 Cal. 2d 33, 37 (1941) (a party "may resort to any legitimate means at his disposal to secure

7    performance of his contract even though the necessary result will be to cause a breach of the other

8    contract").  And while justification is an affirmative defense, an affirmative defense is grounds for

9    dismissal where it "is obvious on the face of a complaint," *Rivera v. Peri & Sons Farms, Inc.*, 735

10   F.3d 892, 902 (9th Cir. 2013).

11          By BrandTotal's own allegations, all Facebook did was enforce its terms in response to a clear

12   breach.[4]  As discussed above, Facebook's and Instagram's terms prohibit the automated collection of

13   data without prior permission.  Counterclaims ¶ 21.  BrandTotal agreed to those terms by creating and

14   maintaining Facebook and Instagram accounts, as did all of BrandTotal's users who had Facebook

15   or Instagram accounts.  Facebook, *Terms of Service*, https://www.facebook.com/terms (last

16   accessed Nov. 23, 2020) (users bound by Facebook's Terms of Service by using its products); Answer

17   ¶¶ 36-41 (BrandTotal created and maintained Facebook and Instagram accounts).  And BrandTotal's

18   extensions collected user and advertising-related data automatically while users "browse[d]

19   [Facebook] as usual."  *Id.* ¶ 14; *see supra* p. 5.

20          Moreover, Facebook's enforcement of its own terms in order to prevent the unauthorized

21   automated collection of data from its platform was consistent with Facebook's own contractual

22   _____

23   [4]       Enforcing one's own contracts is not subject to the general balancing test applicable to other
     justifications for inducing a breach of contract.  A business purpose for inducing a breach of contract

24   is generally subject to a balancing test that weighs the interest in contractual stability against the social
     value furthered by that business purpose.  *See hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 997

25   (9th Cir. 2019); *see also* TRO Order at 21-22.  "But the enforcement of one's own contract is a
     legitimate purpose unless shown to be a "sham … designed for the specific purpose of eliminating" a

26   competitive interest.  *Webber*, 74 Cal. App. 4th at 902; *accord Richardson v. La Rancherita*, 98 Cal.
     App. 3d 73, 81 (1979) (describing enforcement of one's own contract as a "protection" and

27   "privilege[]" so long as taken in good faith).  Indeed, the balancing test would make little sense where
     the purpose for inducing a breach of another's contract is the enforcement of one's own contract.  In

28   such circumstances, the interest in contractual stability is present on both sides of the scale.

9

obligations and the consent decree entered with the Federal Trade Commission in April 2020. "[C]omplying with legal requirements" is a "legitimate business interest[.]" *Semler v. General Elec. Capital Corp.*, 196 Cal. App. 4th 1380, 1393 (2011); *see also* TRO Order at 24 ("Facebook … had a legitimate business interest—i.e., complying with its legal obligations—in preventing BrandTotal's access."). The consent decree sets out Facebook's legal obligations in instances in which user data from 500 or more users is accessed or collected in violation of Facebook's terms. RJN Ex. C at 3, 9, 14. It applies with respect to the collection of "information from or about an individual consumer," and applies to "individual[s] or entit[ies] that use[] or receive[] Covered Information obtained by or on behalf of [Facebook] outside of a User-initiated transfer of Covered information as part of a data portability protocol or standard." *Id.* at 3 (defining "Covered Information" and "Covered Third Party," respectively). Under the consent decree, Facebook must (1) "[r]equir[e] an annual self-certification by each Covered Third Party that certifies … its compliance with each of [Facebook's] Platform Terms"; (2) "[d]eny[] or terminat[e] access to any type of Covered Information that the Covered Third Party fails to certify"; and (3) [e]nforc[e] against any Covered Third Party violations of [Facebook's] Platform Terms." Because BrandTotal collected information from individual users and not as part of a "User-initiated transfer … as part of a data portability protocol," BrandTotal is a covered third party under the consent decree and Facebook will report BrandTotal's conduct to the FTC. *See* Declaration of Mike Clark, Dkt. No. 41, at ¶ 12.

## C.   BrandTotal Fails To State A Claim For Intentional Interference With Prospective Economic Advantage (Counterclaim II)

BrandTotal has failed to state a claim for intentional interference with prospective economic advantage because it has not alleged sufficient facts to show that Facebook knowingly and wrongfully interfered with any beneficial economic relationship. And, as with the interference with a contract claim, Facebook's allegedly tortious conduct was justified.

To state a claim for tortious interference with prospective economic advantage under California law, BrandTotal must allege: (1) an economic relationship between it and a third party, "with the probability of future economic benefit"; (2) Facebook's "knowledge of the relationship"; (3)

"intentional acts on the part of [Facebook] designed to disrupt the relationship"; (4) "actual disruption of the relationship"; and (5) economic harm proximately caused by those intentional acts. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003). Additionally, because there is "a broader range of privilege to interfere … when the relationship or economic advantage interfered with is only prospective," *Pacific Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990), BrandTotal must also plead that Facebook's conduct "was wrongful by some legal measure other than the fact of interference itself," *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 393 (1995). BrandTotal's allegations fail to establish these elements.

*First*, BrandTotal fails to identify any specific economic relationships that had the probability of future economic benefit. In its counterclaim, BrandTotal alleges only that Facebook interfered with "BrandTotal's contracts, investor relationships, and prospective business dealings." Counterclaims ¶ 44. But that is insufficient. To state a claim for intentional interference with prospective economic advantage, BrandTotal must identify "a specific economic relationship" between it and a third party, *Mishiyev v. Alphabet, Inc.*, 444 F. Supp. 3d 1154, 1161 (N.D. Cal. 2020); "merely referring to customers in general is not sufficient to show a specific prospective relationship," *Vascular Imaging Professionals, Inc. v. Digirad Corp.*, 401 F. Supp. 3d 1005, 1013 (S.D. Cal. 2019) (quoting *Nestle U.S.A., Inc. v. Crest Foods, Inc.*, 2017 WL 3267665, at \*14 (C.D. Cal. July 28, 2017)).

And even if BrandTotal could identify specific prospective relationships, it fails to allege sufficient facts to show that any such relationships carried the probability of future economic benefit to it. That failure is fatal to its claim because the law does not protect "speculative expectancies," only "reasonably probable" prospective advantages. *Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 522 (1996). At most, BrandTotal alleges only that "prospective customers that had completed trials and were in the final stages of negotiations are walking away." Counterclaims ¶ 29. But without more, negotiations do not establish the probability of future economic benefit; negotiations fall apart all the time. Without specific facts giving rise to an inference of future benefit, such as, for example, a pattern of past dealing, BrandTotal cannot establish the requisite probability of future benefit. *See AlterG, Inc. v. Boost Treadmills LLC*, 388 F. Supp. 3d 1133, 1151 (N.D. Cal.

2019) (allegation that supplier "has long worked with AlterG" sufficient to allege probability of future economic benefit).

*Second*, BrandTotal does not allege any facts from which it can be plausibly inferred that Facebook had knowledge of any specific prospective economic relationships.  To state a claim for tortious interference with prospective economic advantage, BrandTotal must allege not only "the existence of a specific economic relationship" but also "knowledge by [Facebook] of this relationship." *Silicon Knights, Inc. v. Crystal Dynamics, Inc.*, 983 F. Supp. 1303, 1311 (N.D. Cal. 1997).  Aside from the wholly conclusory allegation that Facebook "intentionally interfered with BrandTotal's customer contracts and investor opportunities," (Counterclaims ¶ 43), BrandTotal alleges only that Facebook was aware of its ads and website, (*id.* ¶¶ 24, 34).  But neither the ads nor website contain identify any specific prospective relationships.  *See* Compl. Figs 1 & 2 (ads); Ex. 11 (website).

*Third*, because BrandTotal does not plausibly allege that Facebook had knowledge of any specific prospective economic relationships, it necessarily also fails to plausibly allege that Facebook acted with the requisite intent to disrupt those relationships.  To satisfy the intent requirement BrandTotal must "plead that the defendant knew that the interference was certain or substantially certain to occur as a result of its action." *Korea Supply Co.*, 29 Cal. 4th at 1154.  BrandTotal failed to do that.  Facebook could not have known that interference with any prospective economic relationships was substantially certain to follow without first having any knowledge of those prospective relationships.  Moreover, as discussed above, even if Facebook had knowledge of any specific prospective relationships, BrandTotal has not plausibly alleged that Facebook knew that disabling BrandTotal's accounts and asking Google to take down the extensions was substantially certain to interfere with those relationships.  *See supra* pp. 6-8.

*Fourth*, BrandTotal fails to allege any independently wrongful act.  "[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Korea Supply Co.*, 29 Cal. 4th at 1159.  The only independent legal wrongs BrandTotal alleges are the breach of Facebook's promise in its terms "that

1    its users control access to its information" and a violation of the California Unfair Competition Law

2    ("UCL").  Counterclaims ¶ 43.[5]  As set forth below, BrandTotal fails to allege a violation of the UCL.

3    *See infra* pp. 13-20.  And Facebook's Terms of Service do not support BrandTotal's argument.  Any

4    contractual term must be construed in light of "the whole of the contract," *Zalkind v. Ceradyne, Inc.*,

5    194 Cal. App. 4th 1010, 1027 (2011), and Facebook's Terms of Service expressly prohibit users from

6    "access[ing] or collect[ing] data from [Facebook's] Products using automated means (without

7    [Facebook's] prior permission)."  Compl. ¶ 26; Answer ¶ 26.  Facebook's promise that users have the

8    right share their content, *see* Facebook, *Terms of Service*, https://www.facebook.com/terms.php (last

9    accessed Nov. 23, 2020), read together with the restriction on automatic data collection, has only one

10   "reasonable and commonsense interpretation," *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*,

11   107 Cal. App. 4th 516, 526 (2003): users can share their own content outside of the Facebook platform

12   but may not authorize third parties to automatically collect content from the platform.  And in any

13   event, as BrandTotal alleges, it collected advertising-related data (Counterclaim ¶¶ 8-11), not content

14   that its own users "create[d] [or] share[d] on Facebook," Facebook, *Terms of Service*,

15   https://www.facebook.com/terms.php (last accessed Nov. 23, 2020).

16        *Finally*, as with the intentional interference with contract claim, the interference with

17   prospective economic advantage claim fails because Facebook was justified in taking steps to protect

18   its platform and enforce its own contracts and legal obligations, including its terms and the FTC

19   consent decree.  *See supra* pp. 8-10.  Accordingly, BrandTotal's interference with prospective

20   economic advantage claim is fatally and incurably flawed.

21        **D.     BrandTotal Fails To State A Claim Under California's Unfair Competition Law**

22        **(Counterclaim III)**

23        California's unfair competition law ("UCL") prohibits "any unlawful, unfair or fraudulent

24   business act or practice."  Cal. Bus. & Prof. Code § 17200.  "Therefore, under the statute 'there are

25

26   [5]      BrandTotal also alleges that "Facebook holds only non-exclusive licenses to its users'
     content, and visitors and the public may access and use its users' publicly available information."
27   Counterclaims ¶ 43. It does not, however, tie that allegation that to violation of any "constitutional,
     statutory, regulatory, common law, or other determinable legal standard," *Korea Supply Co.*, 29 Cal.
28   4th at 1159.

three varieties of unfair competition: practices which are unlawful, unfair or fraudulent.'"   *In re Tobacco II Cases*, 46 Cal. 4th 298, 311 (2009) (quoting *Daugherty v. American Honda Motor Co.*, 144 Cal. App. 4th 824, 837 (2006)).   BrandTotal tries, but fails, to state a claim under each prong.

### 1.    BrandTotal alleges no "unlawful" business practice

BrandTotal fails to state a claim under the "unlawful" prong of the UCL.  A plaintiff must allege "a violation of another law [as a] predicate for stating a cause of action under the UCL's unlawful prong."  *Berryman v. Merit Prop. Mgmt., Inc.*, 152 Cal. App. 4th 1544, 1554 (2007). BrandTotal's only allegation suggesting the requisite independent legal violation is that "Facebook's tortious interference with BrandTotal's current and prospective business, contractual, and investor relationships are unlawful."  Counterclaims ¶ 58.  Because Facebook's conduct was not "unlawful" and BrandTotal's tortious interference claims fail, *see supra* pp. 5-13, so too does the claim of "unlawful" practices under the UCL.  *See Aleksick v. 7-Eleven*, 205 Cal. App. 4th 1176, 1185 (2012) ("When a statutory claim fails, a derivative UCL claim also fails.").

Moreover, Facebook's actions in enforcing section 3.2.3 of its Terms of Service (and the applicable section of Instagram Terms of Use) are plainly not unlawful.  Consistent with its goal of protecting consumer privacy and its obligations under the FTC's consent decree, Facebook's and Instagram's terms forbid scraping of data from its computers using automated means.  *See supra* p. 3. There was nothing unlawful about Facebook taking steps to enforce its explicit terms against BrandTotal, who violated this policy.   BrandTotal has not plausibly alleged that Facebook's enforcement of its anti-scraping policies was unlawful. It has therefore failed to state a claim under the UCL's unlawful prong.  *See, e.g.*, *Milman v. FCA U.S., LLC*, 2019 WL 3334612, at *8 (C.D. Cal. Apr. 15, 2019) (claim under UCL's unlawful prong failed where all pled underlying crimes and torts failed).

### 2.    BrandTotal alleges no "unfair" business practice

BrandTotal likewise fails to state a claim under the "unfair" prong of the UCL.  BrandTotal alleges that Facebook is "unfairly limiting BrandTotal's ability to compete with Facebook's advertising offerings and with BrandTotal's industry competitors who also rely on content from

1    Facebook." Counterclaims ¶ 53.  "When a plaintiff who claims to have suffered injury from a direct

2    competitor's 'unfair' act or practice invokes section 17200," as BrandTotal does here, "the word

3    'unfair' in that section means conduct that threatens an incipient violation of an antitrust law ... or

4    otherwise significantly threatens or harms competition."  *Cel-Tech Commc'ns, Inc. v. Los Angeles*

5    *Cellular Tel. Co.*, 20 Cal. 4th 163, 186-87 (1999) (setting forth test for UCL claims asserted by one

6    competitor against another).

7        BrandTotal's claim under the "unfair" prong of the UCL invokes Section 2 of the Sherman

8    Act.  "In order to state a claim for monopolization under Section 2 of the Sherman Act, a plaintiff must

9    prove: (1) possession of monopoly power in the relevant market; (2) willful acquisition or maintenance

10   of that power; and (3) causal antitrust injury."  *Diva Limousine, Ltd. v. Uber Techs.*, Inc., 392 F. Supp.

11   3d 1074, 1090 (N.D. Cal. 2019) (dismissing UCL claim predicated on alleged antitrust violations).  As

12   to the first prong (monopoly power in the relevant market) BrandTotal appears to allege several

13   monopolization theories, but each theory fails because BrandTotal does not define the relevant product

14   market in which Facebook supposedly possesses market power.  Instead, BrandTotal relies solely on

15   conclusory allegations about "Facebook's total domination of the market." Counterclaims ¶ 54.  But

16   nowhere in its Counterclaims does BrandTotal even attempt to name the relevant market in which

17   Facebook is supposedly dominant, much less define its contours.  This is fatal to its claim.  "Failure

18   to identify a relevant market is a proper ground for dismissing a Sherman Act claim."  *Tanaka v.*

19   *University of S. Calif.*, 252 F.3d 1059, 1063 (9th Cir. 2001); *see also ChriMar Sys., Inc. v. Cisco Sys.,*

20   *Inc*, 72 F. Supp. 3d 1012, 1017 (N.D. Cal. 2014) (dismissal appropriate where "plaintiff fails to define

21   [the] proposed relevant market.").  A properly alleged market includes both "the product at issue as

22   well as all economic substitutes for the product." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th

23   Cir. 2018).  The Counterclaims fail to meet these minimum pleading requirements.[6]

24       Because BrandTotal does not allege any relevant market, each of its monopolization theories

25   also fail because it does not allege that Facebook has monopoly power in any such market.  Alleging

26   _____

27   [6]    On remand from the Ninth Circuit, Judge Chen recently dismissed *hiQ*'s monopolization
     claim against LinkedIn for precisely this reason:  because "the parameters of the people analytics
28   market … [we]re vague" and the complaint contained no specific allegations establishing a
     substitute.  *See also hiQ*, 2020 WL 548210, at *7.

monopoly power in the relevant market is necessary to plead an antitrust claim.  *Image Tech. Servs. Inc. v. Eastman Kodak Co*., 125 F.3d 1195, 1202 (9th Cir. 1997) (emphasizing that antitrust plaintiff must show that the defendant has monopoly power, which is "the power to control prices or exclude competition" in a defined market) (citation omitted); *see also Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc*., 2013 WL 3242245, at *14 (N.D. Cal. June 25, 2013) (granting motion to dismiss where complaint did not establish market share in markets defined by complaint).  As discussed above, a conclusory allegation of "total domination" of some unspecified market, Counterclaims ¶ 54, is insufficient to state a cognizable antitrust claim.  *See Prime Healthcare Servs., Inc. v. Serv. Emps. Int'l Union*, 2013 WL 3873074, at *15 (S.D. Cal. July 25, 2013), *aff'd*, 642 F. App'x 665 (9th Cir. 2016) (dismissing complaint that contained only conclusory allegations that defendants were the "dominant force" with "substantial market share and power").  BrandTotal's counterclaims fail to identify a single Facebook product, make no allegations as to the price Facebook charges for any of its products, and fail to allege that Facebook has the power to increase the price of its product to monopolistic levels. BrandTotal therefore fails to allege that Facebook has the ability to restrict output or impose supracompetitive prices, which are necessary to allege monopoly power.  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).

Beyond the failure to plead that Facebook possessed monopoly power in the relevant market, BrandTotal's counterclaims also fail on the second prong: that Facebook engaged in anticompetitive conduct.  *See SmileCare Dental Grp. v. Delta Dental Plan of California, Inc.*, 88 F.3d 780, 783 (9th Cir. 1996) (to establish second prong of monopolization claim plaintiff must show "predatory or anticompetitive conduct to accomplish the monopolization").  Although the allegations are thin, BrandTotal's monopolization claims appear to be premised on a theory that Facebook is required to provide access to data in a way that violated its own terms.  However, under the antitrust laws, "there is no duty to aid competitors."  *MetroNet Servs. Corp. v. Qwest Corp*, 383 F.3d 1124, 1131 (9th Cir. 2004) (quoting *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004)); *see also Trinko*, 540 U.S. at 407 ("Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law.").  Instead "businesses are

1   free to choose the parties with whom they deal, as well as the prices, terms, and conditions of that

2   dealing." *Pacific Bell Tel. Co. v. LinkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009); *see also Trinko*,

3   540 U.S. at 408 (making clear that Section 2 does not generally impose any limitations on a

4   competitor's ability to "exercise his own independent discretion as to parties with whom he will deal").

5        BrandTotal appears to advance three theories to justify forced sharing: (1) a monopoly

6   leveraging theory, namely that "Facebook is using its dominant presence as the world's largest social

7   media platform to assume exclusive proprietary control over public data," (2) an essential facilities

8   theory, alleging that Facebook is denying BrandTotal access to "publicly available data," and (3) a

9   duty to deal theory, alleging that "Facebook allows competitors of BrandTotal and others to access

10  this content without complaint."  Counterclaims ¶¶ 51, 53, 57.  None of these theories are remotely

11  viable.  To the extent BrandTotal relies on a monopoly leveraging theory, that claim is not cognizable

12  because any such theory "requires that there be anticompetitive conduct and leveraging by itself is not

13  inherently anticompetitive in nature."  *hiQ Labs, Inc. v. LinkedIn Corp.*, 2020 WL 5408210, at *12

14  (N.D. Cal. Sept. 9, 2020); *see also Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 541

15  (9th Cir. 1991) (rejecting monopoly leveraging as independent theory of liability).   Absent

16  independently anticompetitive conduct, such as "an antitrust refusal to deal (or some other

17  exclusionary practice) in the monopoly market or below-cost pricing in the second market[]," an

18  allegation of "monopoly leveraging" alone does not state a claim under federal antitrust law.  *Doe 1*

19  *v. Abbott Labs.*, 571 F.3d 930, 931 (9th Cir. 2009).

20        Likewise, BrandTotal's allegation that Facebook is denying access to an "essential facility"

21  fails for the simple reason that *Google*—and not Facebook—is the party that is supposedly "denying

22  access."  *See MetroNet Servs. Corp.*, 383 F.3d at 1129 (stating that essential facilities claim requires

23  plaintiff to show "*defendant* has refused to provide [plaintiff] access to the facility") (emphasis added).

24  BrandTotal fails to plead that Facebook controls an essential facility and has refused to provide access

25  to that facility.  Instead, BrandTotal alleges that Facebook "revok[ed] or limit[ed] BrandTotal's access

26  to publicly available data" (Counterclaims ¶ 53) while acknowledging that its browser extension was

27  removed by *Google* from Google's Chrome Web Store, *id.* ¶ 51.  Nowhere does BrandTotal allege

28

17

that Facebook had control of the "essential facility" to which BrandTotal was denied access, which here appears to be the Google Chrome Web Store. Whatever harm BrandTotal claims to have suffered flowed entirely from the removal of its extensions from the Google Chrome Web Store, which is not a "facility" in Facebook's control.

Finally, BrandTotal suggests that Facebook revoked its access to Facebook's data so it could "unfairly limit[] BrandTotal's ability to compete with Facebook's advertising offerings and with BrandTotal's industry competitors who also rely on content from Facebook." Counterclaims ¶ 53. But the Ninth Circuit recently reiterated that "the Sherman Act 'does not restrict the long recognized right'" of a firm to "'freely exercise [its] own independent discretion as to parties with whom [it] will deal.'" *Federal Trade Commission v. Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020) (citation omitted).[7]

Failing to allege any actual antitrust violation, BrandTotal pivots to contending that "Facebook's recent and threatened actions thus suppress competition and violate the core principles and spirit of the unfair competition and antitrust laws." Counterclaims ¶ 52. But the Ninth Circuit has rejected UCL claims where only a violation of the "spirit" of antitrust laws is alleged, where as here, a cognizable antitrust violation is not alleged. *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1136-1137 (9th Cir. 2014) (plaintiff's general UCL allegations did not suffice to allege what "amounts to a violation of antitrust laws"). And even looking at just the "spirit" of the antitrust laws, BrandTotal fails to allege a violation. A party's conduct "violates the policy or spirit of the antitrust laws" where "the effect of the conduct is comparable to or the same as a violation of the antitrust laws, [] or it otherwise significantly threatens or harms competition." *People's Choice Wireless Inc. v. Verizon Wireless*, 131 Cal. App. 4th 656, 662 (2005) (citing *Cel-Tech*, 20 Cal. 4th at 187). But as discussed above, BrandTotal fails to plead the requisite elements of an antitrust violation and its claims are ultimately premised on a theory that is at odds with the spirit of the antitrust laws.

---

[7]    BrandTotal has not even attempted to plead the limited exception to this general rule. *Id.* at 993-994; *see also*, *hiQ*, 2020 WL 5408210, at *9 (dismissing hiQ's antitrust claims to the extent they were predicated on a refusal to deal).

1

### 3.   BrandTotal alleges no "fraudulent" business practice

2      BrandTotal likewise fails to state a claim under the "fraudulent" prong of the UCL.

3  BrandTotal's allegations of fraud under the UCL are subject to the heightened pleading standard under

4  Rule 9(b) of the Federal Rules of Civil Procedure.  *Guccione v. JPMorgan Chase Bank, N.A.*, 2015

5  WL 1968114, at *17 (N.D. Cal. May 1, 2015).  The allegations in the complaint therefore "must be

6  specific enough to give defendants notice of the particular misconduct which is alleged to constitute

7  the fraud[.]"  *Pirozzi v. Apple, Inc.*, 966 F. Supp. 2d 909, 920 (N.D. Cal. 2013) (internal quotation

8  marks omitted).

9      As a preliminary matter, BrandTotal lacks standing to seek relief under the UCL's fraud prong

10  because it does not allege that it actually relied on Facebook's alleged misrepresentations.  Rather its

11  claims are predicated on the alleged misrepresentations targeted at *other Facebook's users*, not

12  BrandTotal.  Under California law, a claimant who asserts "a claim of misrepresentation as the basis

13  of his or her UCL action must demonstrate actual reliance on the allegedly deceptive or misleading

14  statements, in accordance with well-settled principles regarding the element of reliance in ordinary

15  fraud actions."  *In re Tobacco II Cases*, 46 Cal. 4th 298, 306 (2009).  Although California courts have

16  not addressed whether a competitor plaintiff must plead their own reliance or whether pleading

17  consumer reliance is sufficient, a majority of federal courts in California "have concluded that

18  Plaintiffs must allege their own reliance on the alleged misrepresentations, rather than the reliance of

19  third parties."  *Equinox Hotel Mgmt., Inc. v. Equinox Holdings, Inc*., 2018 WL 659105, at *13 (N.D.

20  Cal. Feb. 1, 2018) (holding that competitor plaintiff's claim under the fraudulent prong of UCL failed

21  because it had not alleged actual reliance); *see also L.A. Taxi Coop., Inc. v. Uber Techs., Inc.*, 114 F.

22  Supp. 3d 852, 866–867 (N.D. Cal. 2015) ("The Court joins the majority of courts to have addressed

23  this question and concludes that because Plaintiffs do not plead their own reliance on Uber's allegedly

24  false advertising, they lack standing to seek relief under the UCL's fraud prong.") Even if BrandTotal

25  could base its fraud claims on the reliance of other Facebook users, it makes no allegations that those

26  users "actually relied" on Facebook's alleged misrepresentation in creating their Facebook accounts.

27  *See e.g.*, *Williams v. Apple, Inc.*, 449 F. Supp. 3d 892, 914 (N.D. Cal. 2020) ("Plaintiffs have not

28

19

1    adequately alleged a UCL fraud claim based on misrepresentations in Defendants' Privacy Policy

2    because Plaintiffs have not adequately alleged that they 'actually relied' on Defendants'

3    misrepresentation contained within Defendants' Privacy Policy." (internal quotation marks and

4    citation omitted)).

5           Beyond reliance, BrandTotal's allegations under the fraud prong are plainly insufficient.  It

6    alleges that "Facebook's actions are also fraudulent because Facebook made clear promises to their

7    users in their terms of use that the users own their content, control their privacy settings, and that

8    Facebook holds only nonexclusive licenses to the content" but that "Facebook is actually controlling

9    who can access user content and whether the information will be public."  Counterclaims ¶¶ 59-60.

10   But "a business practice is fraudulent only if 'members of the public are likely deceived.'"  *National*

11   *Rural Telecomm. Co-op v. DIRECTV, Inc.*, 319 F. Supp. 2d 1059, 1077 (C.D. Cal. 2003).   And

12   Facebook's Terms of Service make clear to users that users may "[n]ot share [their] password, give

13   access to [their] Facebook account to others, or transfer [their] account to anyone else (without our

14   permission)" or "access or collect data from [Facebook's] Products using automated means (without

15   [Facebook's] prior permission) or attempt to access data [users] do not have permission to access."

16   Facebook, *Terms of Service* §§ 3.1, 3.2.3, https://www.facebook.com/terms.php (last accessed Nov.

17   23, 2020).  Considering those express provisions, no reasonable user would understand the Facebook

18   Terms of Service to mean that a user has the power to grant a third-party access to Facebook's

19   computer network for the purpose of scraping data from Facebook.  *See, e.g., Ebner v. Fresh, Inc.*,

20   838 F.3d 958, 966 (9th Cir. 2016) (concluding that disclosure defeated a claim under UCL's fraud

21   prong); *see also In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 903 F. Supp. 2d

22   942, 968 (S.D. Cal. 2012) (dismissing UCL claim where Privacy Policy contained "clear admonitory

23   language that Sony's security was not 'perfect,' [such that] no reasonable consumer could have been

24   deceived").   Facebook's terms expressly prohibit users from engaging in precisely the conduct

25   Defendants admit.  Defendants' bare-bones allegations are insufficient to state a claim under the fraud

26   prong of the UCL.

27

28

III.     **CONCLUSION**

For the forgoing reasons, the Court should dismiss Defendants' Counterclaims in their entirety.


Dated: November 23, 2020                              WILMER CUTLER PICKERING HALE AND
                                                      DORR LLP


                                            By:   */s/ Sonal N. Mehta*
                                                  Sonal N. Mehta

                                                  *Attorney for Plaintiff*
                                                  *Facebook, Inc.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

      I hereby certify that on November 23, 2020, I electronically filed the above document with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all registered counsel.


Dated:  November 23, 2020              By:    */s/ Sonal N. Mehta*
                                                Sonal N. Mehta

PLAINTIFF'S MOTION TO DISMISS THE DEFENDANTS' COUNTERCLAIMS PURSUANT TO FED. R. CIV. P. 12(B)(6)