**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1

2

Rudolph A. Telscher, Jr.* (MO Bar No. 41072)
rudy.telscher@huschblackwell.com
Kara R. Fussner* (MO Bar No. 54656)
kara.fussner@huschblackwell.com

3

HUSCH BLACKWELL LLP
190 Carondelet Plaza, Suite 600

4

St. Louis, MO 63105
314-480-1500 Telephone

5

6

Ryan B. Hauer* (IL Bar No. 6320758)
ryan.hauer@huschblackwell.com

7

HUSCH BLACKWELL LLP
120 South Riverside Plaza Suite 2200

8

Chicago, IL 60606
312-526-1572 Telephone

9

Dustin L Taylor* (IL Bar No. 6328158)

10

dustin.taylor@huschblackwell.com
HUSCH BLACKWELL LLP

11

1801 Wewatta Street, Suite 1000
Denver, CO 80202

12

        *admitted *pro hac vice*

13

Karl Kronenberger (CA Bar No. 226112)
karl@krinternetlaw.com

14

Jeffrey M. Rosenfeld (CA Bar No. 222187)
jeff@krinternetlaw.com

15

KRONENBERGER ROSENFELD, LLP
150 Post Street, Suite 520

16

San Francisco, CA 94108
415-955-1155 Telephone

17

415-955-1158 Facsimile

18

*Attorneys for Defendants/Counterclaim
Plaintiffs BrandTotal, Ltd. and Unimania,
Inc.*

19

20

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO/OAKLAND DIVISION**

21

22

FACEBOOK, INC., a Delaware
corporation,

Case No.: 3:20-CV-07182-JCS

23

        *Plaintiff/Counterclaim
        Defendant*,

**DEFENDANTS BRANDTOTAL, LTD.
AND UNIMANIA, INC.'S
MEMORANDUM IN SUPPORT OF ITS
MOTION FOR PRELIMINARY
INJUNCTION**

24

v.

25

BRANDTOTAL, LTD., an Israeli
corporation, and

26

UNIMANIA, INC., a Delaware
corporation,

Judge:  The Hon. Joseph C. Spero
Ctrm.:  Courtroom F – 15th Floor
Date:   April 9, 2021

27

        *Defendants/Counterclaim
        Plaintiffs*.

Time:   9:30 a.m.

28

Defendants' Motion for Preliminary Injunction          Case No. 3:20-CV-07182-JCS

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

PROCEDURAL BACKGROUND ........................................................................................ 3

STATEMENT OF ISSUES ................................................................................................... 4

STATEMENT OF FACTS .................................................................................................... 5

    A.    Facebook Knew of BrandTotal Long Before the Litigation and
        Concluded It was "Harmless" ................................................................... 5

    B.    Facebook Has No Process for Vetting Third Party Access, But Instead
        Uses Its Terms of Service to Conceal Dark Ad Strategies and Analytics. ............. 7

    C.    Expert Analysis Confirms BrandTotal Collects Information Panelists
        Have Agreed to Share to Provide Commercial Advertising Consulting. ............... 9

    D.    BrandTotal Cannot Survive Until Trial. ................................................. 11

ARGUMENT ...................................................................................................................... 14

I.    THE PUBLIC INTEREST STRONGLY FAVORS GRANTING BRANDTOTAL'S
    REQUESTED PRELIMINARY INJUNCTION. ......................................................... 14

    A.    The Public Does Not Have a Strong Interest in Restricting BrandTotal's
        Access to Data Because BrandTotal Revised UpVoice to Collect Only
        Advertising Data. ...................................................................................... 15

    B.    Facebook Lacks Any "Vetting" Process and Does Not Make Competitive
        Advertising Information Available Through Any "Approved" Means ................ 16

    C.    The Public Has a Strong Interest in Allowing BrandTotal to Collect
        Advertising Data About "Dark Ads." ..................................................... 18

II.   BRANDTOTAL IS SUFFERING IRREPARABLE HARM ........................................... 20

III.  BRANDTOTAL HAS AT LEAST RAISED SERIOUS QUESTIONS GOING TO
    THE MERITS OF THEIR CLAIMS. ......................................................................... 21

IV.  THE BALANCE OF EQUITIES TIPS IN FAVOR OF GRANTING THE
    REQUESTED PRELIMINARY INJUNCTION. ......................................................... 24

CONCLUSION ................................................................................................................... 25

## REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
### <u>TABLE OF AUTHORITIES</u>

1

2

<u>Cases</u>

3
*Alliance for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ............................................................................................ 14

4

5
*Altera Corp. v. Clear Logic, Inc.*,
  424 F.3d 1079 (9th Cir. 2005) ............................................................................................ 23

6
*Bernhardt v. Los Angeles County*,
  339 F.3d 920 (9th Cir. 2003) .............................................................................................. 15

7

8
*CTIA-The Wireless Association v. City of Berkeley*,
  928 F.3d 832 (9th Cir. 2019) .............................................................................................. 25

9

10
*hiQ Labs, Inc. v. LinkedIn Corp.*,
  273 F. Supp. 3d 1099 (N.D. Cal. 2017) ............................................................................. 19

11
*hiQ Labs, Inc. v. LinkedIn Corp.*,
  938 F.3d 985 (9th Cir. 2019) .................................................................................... *passim*

12

13
*Idaho Potato Commission v. M & M Produce Farm & Sales*,
  335 F.3d 130 (2d Cir. 2003) ............................................................................................... 24

14

15
*Lear, Inc. v. Adkins*,
  395 U.S. 653 (1969) ........................................................................................................... 24

16
*McIlwain, LLC v. Berman*,
  No. 18-CV-03127 CW, 2020 WL 1308342 (N.D. Cal. Feb. 10, 2020) .............................. 23

17

18
*Phillips v. Crown Central Petroleum Corp.*,
  602 F.2d 616 (4th Cir. 1979) .............................................................................................. 24

19

20
*Rent-A-Ctr., Inc. v. Canyon Television & Applicance Rental, Inc.*,
  944 F.2d 597 (9th Cir. 1991) .............................................................................................. 21

21
*Shippers, a Division of Illinois Tool Works, Inc. v. Fontenot*,
  No. 13CV1349 JLS(MDD), 2013 WL 12092056 (S.D. Cal. Sept. 23, 2013) .................... 21

22

23
*Stuhlbarg International Sales Co., Inc. v. John D. Brush & Co., Inc.*,
  240 F.3d 832 (9th Cir. 2001) .............................................................................................. 14

24

25
*United States v. American Tobacco Co.*,
  221 U.S. 106, 31 S. Ct. 632, 55 L. Ed. 663 (1911) ........................................................... 19

26
*Winter v. Natural Reserve Defense Council, Inc.*,
  555 U.S. 7 (2008) ............................................................................................................... 14

27

28

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**Statutory Authorities**

18 U.S.C. § 1030(a)(2) .................................................................................................................24

18 U.S.C. § 1030(a)(5)(C) ...........................................................................................................24

Cal. Civ. Code § 1667(2) ........................................................................................................23, 24

Cal. Civ. Code § 1798.192 ...........................................................................................................23

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

**<u>INTRODUCTION</u>**

1

2       The Ninth Circuit in *hiQ* recognized that "giving [social networking] companies . . . free

3   rein to decide, on any basis, who can collect and use data—data that the companies do not own,

4   that they otherwise make publicly available to viewers, and that the companies themselves collect

5   and use—risks the possible creation of information monopolies that would disserve the public

6   interest." *hiQ Labs, Inc. v. LinkedIn Corporation*, 938 F.3d 985, 1005 (9th Cir. 2019). Discovery

7   from Facebook files produced last month underscores the concerns raised in *hiQ* by demonstrating

8   Facebook facilitates and encourages "dark" advertising on its site, refuses to provide information

9   regarding these ads via any approved API or other method, and lacks any "vetting" procedure to

10  otherwise allow access to this information.

11      Since inception in December 2016, Defendants Unimania Inc. and BrandTotal Ltd have

12  collected deidentified user demographic information and advertising metric data with user consent,

13  analyze such data, and provide valuable advertising consulting services to large and well-known

14  companies. Most of BrandTotal's collected data relates to "dark" posts—advertisements Facebook

15  keeps hidden from the public. Following the Court's denial of the TRO, BrandTotal hired a

16  software expert to independently confirm BrandTotal collects only such information so as not to

17  harm users in any way. While Facebook's TRO Opposition was somewhat vague regarding user

18  data interests, depositions of its two declarants since confirm BrandTotal collects only basic

19  information, with user consent, and in a way that does not harm users or Facebook. As this Court

20  recognized in its TRO Order: "So long as BrandTotal's browser extension works as intended and

21  represented, it threatens at most only marginally greater than those the Ninth Circuit found

22  'relatively weak' in *hiQ*." TRO Order, Dkt. 58 ("Order") at 22-23.

23      But, BrandTotal listened even more carefully to the Court and has modified its software to

24  collect only advertising data. In its TRO Order, the Court expressed more (mere potential) concern

25  with user data (Order at 32) than with advertising data, which the Court saw as more directly

26  analogous to the data involved in *hiQ* (*id.* at 33). While discovery to date shows none of

27  UpVoice's collection practices were harmful to users (who all did, and do, consent to collection),

28  BrandTotal has modified its software for purposes of the limited remedy it seeks at this

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1  preliminary stage. The limited advertising (not user) data UpVoice collects will allow BrandTotal

2  to provide advertising consulting services to its customers and fulfill its contractual obligations

3  during the pendency of this lawsuit.

4       In its TRO opposition, Facebook defended its harsh actions based on alleged interests in

5  protecting users and having the ability to vet data collection from its site, which the Court noted

6  throughout its Order. Despite suggesting to this Court at the TRO hearing that information relevant

7  to this case is available through Facebook's Ad Library or APIs, the information regarding who is

8  seeing what commercial advertising is not available through any Facebook approved means for the

9  vast majority of advertising on Facebook. Just as feared by the *hiQ* court, Facebook is keeping an

10 information monopoly over commercial advertising data on its site.

11      Facebook also neglected to tell the Court it has no process for vetting companies desiring to

12 collect data. Facebook instead blanket-prohibits automated collection, regardless of whether

13 Facebook chooses to make the data otherwise available. Facebook's investigation of BrandTotal

14 merely established, as a technical matter, BrandTotal collects data by automated means and then

15 worked to remove BrandTotal. Under oath, Mr. Karve admitted ▓▓▓▓▓▓▓▓▓▓▓▓▓

16 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓: yet it took months. Despite this time, he could not identify

17 anything harmful to users. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

18 ▓▓▓▓▓▓▓▓▓▓▓. Facebook does not care.

19      That is not to say Facebook lacked the *opportunity* to vet BrandTotal. Discovery has

20 revealed ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

21 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

22 ▓▓▓▓▓▓▓▓▓▓▓, and ***never did anything***, including never once writing to express

23 concern. Just weeks before Facebook had BrandTotal's UpVoice extension shutdown in October

24 of last year, Facebook email evidence reflects ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

25 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, yet

26 instead, Facebook chose to shutdown dataflow to BrandTotal in early October, without notice or

27

28

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   warning to BrandTotal, and filed a crushing lawsuit against its smaller competitor.[1] Rather than

2   ████████████████████████, as Facebook contemplated, however, Facebook took action to put

3   BrandTotal out of business. These actions go to the heart of BrandTotal's counterclaims. For these

4   reasons, BrandTotal believes its case for each of the four injunctive factors have improved, and

5   that, like *hiQ*, preliminary injunctive relief is appropriate.

**PROCEDURAL BACKGROUND**

7       BrandTotal presumes the Court is well-familiar with the procedural background of this

8   matter and focuses only on the issues critical to resolution of the present dispute. After months of

9   investigating UpVoice ███████████████████████), in late September 2020, Facebook

10  shut down the Facebook and Instagram business pages of Defendants, and the personal pages of

11  Defendants' principals. Dkt. 1, ¶ 56. Facebook also denied BrandTotal access to its social media

12  data streams and utilized its friendly relationship with co-social media giant Google to have the

13  UpVoice extension removed from the Chrome Store, effectively eliminating BrandTotal as a

14  competitor. Collectively these actions devasted BrandTotal's ability to obtain advertising data and

15  provide its advertising consulting services.

16      Over the next few weeks, BrandTotal quickly moved for a Temporary Restraining Order

17  ("TRO") and the Court held a telephonic hearing on October 26 at which both Facebook and

18  BrandTotal appeared through counsel. On November 2, 2020, the Court denied BrandTotal's

19  motion, finding "BrandTotal has shown a risk of irreparable harm in the absence of relief, serious

20  issues going to the merits, and a balance of hardships that tips in its favor, perhaps sharply so. The

21  public interest, however, weighs against the granting the relief that BrandTotal seeks." Order at 34.

22  On the public interest factor, this Court found that while there is a public interest "favoring open

23  access to information and competition for data analytics," the Court was not persuaded that the

24  public interest, on a limited, early record, "require[es] Facebook to provide immediate access to an

25  automated data collection program that Facebook has not vetted." *Id.* at 31.

26  

---

[1] As detailed in BrandTotal's TRO Motion, there is no question Facebook routinely engages in
conduct found to be anticompetitive. *See* Dkt. 26 at 6. After the Court's TRO Order, the FTC
again sued Facebook over its prior acquisitions of potential rivals and seeks to, in part, "prohibit
Facebook from imposing anticompetitive conditions on software developers." Ex. BB.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

Following careful consideration of the Court's Order, on November 11 BrandTotal moved for limited expedited discovery and requested that the Court set a schedule for a preliminary injunction proceeding following the discovery. Dkt. 65. As set forth in that motion, BrandTotal believed limited discovery between the parties, as well as expert consideration of the technical issues, could fill in the gaps identified by the Court at the TRO and potentially lead to issuance of an injunction. *Id.* at 1. On November 20, the Court granted the motion for expedited discovery, and allowed BrandTotal to then file any motion for preliminary injunction. Dkt. 74.

Thereafter the parties diligently pursued discovery. BrandTotal: retained an independent expert, Mr. Robert Sherwood, to review BrandTotal's code and technical methodologies; took several depositions of Facebook witnesses; and defended two depositions sought by Facebook. Facebook, however, resisted certain discovery relating to its enforcement of its terms of use and reporting to the Federal Trade Commission, requiring a Court Order, Dkt. 91, that prompted Facebook to make its witness available for deposition on the last possible date, February 10.[2] BrandTotal now moves for a preliminary injunction as provided below.

## STATEMENT OF ISSUES

**Does the requested injunction serve the public interest?** Yes, as the Ninth Circuit has noted in *hiQ*, allowing Facebook to decide, on any basis, who can collect and use data—data Facebook not only does not own, but nevertheless collects and otherwise makes publicly available to Panelists—"risks the possible creation of information monopolies that would disserve the public interest." *hiQ*, 938 F.3d at 1005. Although the public interest may not support *wholly* preventing Facebook from vetting (which it did as early as 2019) or regulating BrandTotal, it does not allow Facebook to wholesale exclude third-party companies or create an information monopoly.

**Do Facebook's actions threaten immediate, irreparable harm to BrandTotal?** Yes, prohibiting BrandTotal Panelists from sharing what advertisements they have been shown forced BrandTotal to lose the vast majority of its incoming data. Since the Court's Order denying BrandTotal's TRO request, BrandTotal has lost many customers, potential customers, and

---

[2] Facebook waited until the start of the final deposition to produce a document detailing Facebook's procedure for investigating and reporting suspected scraping incidents. Ex. DD; Ex. W, Clark Dep., 23:25–25:21 (rough).

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

investment opportunities, ███████████████████████████████████
███████████████████████████████████████████████████████████
███████████—well before any trial can realistically be expected to occur.

Whether BrandTotal has shown a likelihood of success on the merits? <u>Yes</u>, this Court previously found BrandTotal had shown serious issues going to the merits of its claims, but that Facebook may be able to show it acted with a "legitimate business purpose." *See e.g.*, Order at 21–22. Discovery conducted after the Court's order proves Facebook cannot show it acted with a legitimate business purpose, but instead acted to completely foreclose potential competition.

Whether the balance of equities tips sharply in BrandTotal's favor? <u>Yes</u>, without an injunction, BrandTotal will be forced out of business prior to trial, while Facebook will suffer no appreciable harm while the merits are decided. Moreover, Facebook ████████████████
████████████████████████████

**STATEMENT OF FACTS[3]**

A. **Facebook Knew of BrandTotal Long Before the Litigation and Concluded It was "Harmless"**

Facebook initiated this lawsuit in October 2020 after it requested Google remove the UpVoice browser extension from the Google Chrome Store. Dkt. 1, ¶ 60. Although UpVoice represents the majority of the data BrandTotal collects, it is not the sole source. As part of an early organizational plan, BrandTotal was to be the customer-facing side of the business (i.e., the side that would interface with the commercial advertising customers) while BrandTotal's related entity, Unimania, was established as the user/Panelist facing side of the business. Dor Decl., ¶ 4; Beginning in 2017, Unimania offered several applications and extensions, including Who Is Following Me, Head Speed, Phoenix, Social One, Anonymous Story Viewer, Story Savebox, and Social Video Downloader, that provided a value-added feature for users in exchange for the users' consent to the collection of commercial advertising-related data of the sort described above. *Id.* at ¶ 5; Sherwood Report, ¶¶ 56, 58. ***All back-end data collection of these programs was the same***,

---

[3] BrandTotal recognizes the Court is familiar with the facts that are of record in this case from the TRO proceedings and thus focuses below on the additional facts learned through discovery following the Court's November 2020 Order. BrandTotal incorporates by reference the briefing and declarations from the TRO proceedings. Dkt. 26; Dkt. 27; Dkt. 49; Dkt. 50.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   but the value to the user, i.e., what the application or extension offered to the user on the front end,

2   varied. Dor Decl., ¶ 6; *see also* Dor Dep., 122:13–124:6. Thus, for example, Unimania offered an

3   application called Social One. Dor Dep., 76:7–12. Instead of incentivizing user participation with

4   cash rewards like UpVoice, Social One offered a value-added benefit to users in the form of an

5   interface that conveniently combined social media feeds. Dor Decl., ¶¶ 5–6.

6          In early 2018, AdGuard, a company that sells advertising blocking and privacy protection

7   software, published a blog post criticizing applications and extensions developed by Unimania.

8   Dkt. 42-1. In the article, the blogger criticized Unimania's use of a static salt in its data collection

9   of user information. *Id*. at 3. After the article, Unimania stopped using the static salt and began

10  using a random method in all its programs. Dor Dep., 148:10-13. As confirmed by both Mr.

11  Sherwood (the independent expert BrandTotal retained in this matter) and Facebook's Mr. Karve,

12  the use of a random salt, which is what UpVoice has always used, is a secure transmission method.

13  Sherwood ¶¶ 60, 80, 95; Ex. Y, Deposition of Mr. Karve ("Karve Dep."), 98:10–99:18.



14  _____, Facebook was aware of Unimania. Ex. J.[4]

15  _____

16  _____ Exs. K-M. Facebook's investigation

17  revealed _____

18  _____ Ex. K at 053. Facebook also concluded

19  _____

20  _____ Ex. M at 657. _____

21  _____ Karve Dep.,

22  114:22–115:6. To the contrary, Facebook continued to approve BrandTotal's advertising on

23  Facebook and accept BrandTotal's payments for that advertising. Dor Decl., ¶ 16.

24         On May 1, 2019, BrandTotal launched UpVoice via the Google Chrome Web Store. Ex. N

25  at 1562; Dor Dep., 70:15–18. Facebook learned of UpVoice by around March 2020, many months

26  before filing this lawsuit. Karve Dep., 25:11–23; Ex. CC; Ex. K. _____

27  _____

[4] All references to Exhibits A-I refer to exhibits to the declaration of Alon Leibovich ("Leibovich
28  Decl." and all references to Exhibits J-DD refer to exhibits to the declaration of Rudy Telscher,
filed contemporaneously with this brief.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

In September 2020, after Facebook allegedly had been investigating UpVoice for many months,

." Ex. O; *see also* Ex. P. Ultimately, Facebook

but instead demanded Google remove UpVoice. Ex. Q. The same week Facebook requested Google remove the UpVoice extension from the Chrome Store,

**B.    Facebook Has No Process for Vetting Third Party Access, But Instead Uses Its Terms of Service to Conceal Dark Ad Strategies and Analytics.**

Facebook has no process for vetting third parties that wish to collect advertising information from the Facebook Network. Facebook's investigation of BrandTotal was limited to

[6] Karve Dep. 36–38,

---

[5] Although Facebook produced the tickets for its earlier investigations into the Unimania applications Phoenix and Social One, Facebook inexplicably withheld documents regarding its investigation into UpVoice as privileged. This document includes ; information he could not expressly recall at his deposition. Karve Dep., 78:10–80:14, 111:6–9, 150:9–152:21.

[6] When BrandTotal first began operating in 2017, Facebook's terms of service prohibited collection of users' content "using automated means (such as harvesting bots, robots, spiders, or scrapers)" without prior authorization. Dkt. 27-9. However, Facebook revised their own Terms to

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

87–89. When asked ██████████████████████████████████████████████

████████████████████████████████████████████████████. *Id.* at 40.

According to Mr. Karve, ██████████████████████████████████ *Id.* His

investigation was limited to ████████████████████████████████

████████. *Id.* at 87–89, 99–100. He did not review the ██████████████████.

*Id.* at 99-100. He did not consider ██████████████████████. *Id.* at 76.

And when asked whether he investigated ██████████████████████████

████████████████████████████████████████████████████████

████████████████████ *Id.* at 104.

Facebook's position is that *any* data collection outside of the APIs and what is made

available for viewing in the Ad Library is improper and a violation of their Terms of Service.[7] *Id.*

at 36. In the TRO proceedings, Facebook suggested that BrandTotal could obtain much of the

information it needs through Facebook's public Ad Library of APIs. TRO Hearing Tr., Dkt. 57 at

12–13. This is incorrect. ***Facebook does <u>not</u> make information about who receives third-party***

***commercial advertising available through Facebook's Ad Library, <u>any</u> API, or any other***

***"approved" source.*** Sherwood, §5.3; Dor Decl., ¶ 11.

In the Facebook advertising environment, there are public ads (i.e., ads that appear on an

advertiser's public Facebook page and which the advertiser may also pay to be distributed) and

there are "dark ads." Dor Decl., ¶ 8. Unlike public ads, an advertiser does not publish dark ads on

their public page, but instead pays Facebook to display the dark ads ***only*** on the feeds of

individuals that comprise the advertiser's target audience (e.g., by age, gender, education, location,

and more). Dor Dep., 135:7–13; Karve Dep., 106:8–107:6. ***Dark ads account for 80-90% of the***

***ads on Facebook.*** Dor Decl., ¶ 9. BrandTotal specializes in providing analytics and information

---

prevent "automated means" without any examples or limitations in approximately 2019, Dkt. 27-4,
and confirmed in deposition its expansive understanding of this prohibition. Karve Dep. at 36.

[7] It is not clear whether Facebook would allow automatic collection from the Ad Library. Although
one witness testified ████████████████████████████████████████████
████████████ another witness testified ████████████████████
████████████████████████████████. *Compare* Newman Dep., 78:13–79:25 *with* Clark
Dep., 79:20–80:14 (rough).

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1    about competitors' dark advertising. *Id.* at ¶ 8.

2      Although Facebook has multiple APIs, including the marketing API and insights API, ▓

3    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

4    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Ex. AA, Deposition of Mr. Newman

5    ("Newman Dep."), 33:18–34:5, 94:15–21, 95:13–25; Appx. G to Sherwood; Sherwood § 5.3. This

6    was all Facebook offered for many years, including when BrandTotal began collecting Facebook

7    data in 2018. Following the Cambridge Analytica data scandal, in March 2019 (▓▓▓▓▓▓

8    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

9    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

10   ▓▓▓▓▓▓▓▓▓▓▓▓. *Id.* at 22:23–24:22.

11     Facebook does not treat all ads as equal, however. Facebook designates some

12   advertisements as pertaining to Social Issues, Elections, or Politics ("SIEP"). For those

13   advertisements, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

14   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. *Id.* at 87:1–89:13. BrandTotal

15   estimates non-SIEP advertisements make up approximately 95% of the posts on Facebook. Dor

16   Decl., ¶ 11. For these advertisements, Facebook ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

17   Newman Dep., 87:19–88:13. Even then, the Ad Library "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

18   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓." *Id.* at 96:1–12. In short, there is no vetting of

19   third parties wishing to collect dark ad advertising information, which is otherwise unavailable.

20     **C.**  **Expert Analysis Confirms BrandTotal Collects Information Panelists Have**
21         **Agreed to Share to Provide Commercial Advertising Consulting.**

22     As described in the TRO proceedings, BrandTotal is an advertising analytics company

23   providing corporate clients insights regarding social media advertising. Dkt. 26 at 3-4. BrandTotal

24   offers these services by collecting data regarding advertising interactions. *Id.* This collection is

25   done *with* user consent, and, in the case of the UpVoice extension, in exchange for cash rewards to

26   the users. *Id.*; Dkt. 27-3, at ¶ 9.

27     As part of these proceedings and to address the Court's concern that courts lack technical

28   expertise (Order at 34), BrandTotal engaged an independent expert, Mr. Robert Sherwood, to

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1  review BrandTotal's software code and collection methodology to independently confirm

2  "BrandTotal's browser extension works as intended and represented . . . ." Order at 22. As detailed

3  in his report, attached hereto, Mr. Sherwood, an expert that Facebook has itself retained in the past,

4  confirmed the version of UpVoice available in September 2020 collects only the information

5  identified in the UpVoice Terms of Service and uses a random salt to secure that data, as

6  BrandTotal represented in its TRO Motion. Sherwood, § 5.1. No information about a Panelist's

7  Facebook password, Facebook "friends" or other personal Facebook postings is collected or sent to

8  BrandTotal. *Id.* at ¶ 52. The collection methodology is safe and secure and does not harm

9  Facebook. *Id.* at § 5.1.3. This is consistent with ███████████████████████

10  ████████████████████ Ex. K at 053.

11        The information BrandTotal collects relates to commercial advertising interaction, **not**

12  personal social media expression. Dkt. 26, 3–5. For example, as the Panelist scrolls social media

13  BrandTotal collects the time the advertisement was shown to the Panelist, the post ID, and the

14  advertiser ID. Ex. N. Importantly, using the sponsored post ID, BrandTotal then collects

15  information about Facebook advertisements and advertisers from a portion of Facebook that does

16  **not** require a Facebook log-in or password. *See* Dkt. 41, ¶ 5(e). For example, BrandTotal collects

17  information about when the ad was created, the ad image, the ad text, the ad type, the ad's number

18  of reactions, shares, and video views (if applicable), the ad's video length and video URL (if

19  applicable), and anonymized comments associated with the ad. Sherwood, § 5.1.1.

20        Prior to this action, UpVoice also collected demographic information about the Panelist

21  (e.g., age, gender, location, interests), so that aggregate, deidentified information regarding who is

22  seeing what ads could be provided to customers. However, Panelists complete a form when they

23  sign up for UpVoice that provides the same basic demographic information. *Id.* at ¶¶ 27–31. Thus,

24  BrandTotal can operate without collection of this information from Facebook, and for purposes of

25  this proceeding, and for the duration of any injunction, BrandTotal will not collect this

26  information. Dor Decl., ¶ 22. Additionally, as to the issue of "shared computers" that was raised

27  for the first time by Facebook in the context of these proceedings, BrandTotal implemented a

28  procedure that requires a user to affirm they consent to BrandTotal's collection of data when the

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

user signs into a new social media account. *Id.* at ¶¶ 19–20; Sherwood, ¶ 94. Although BrandTotal is unaware of a real-life problem in this regard, the revision addresses the *potential* situation where a Panelist, who has agreed to share their information with BrandTotal, allows another individual to use the Panelist's computer and Chrome browser. *Id.*

### D.    BrandTotal Cannot Survive Until Trial.

As of September 30, 2020, ████████████████████████████████████████
████████████████████████████████████████. Dor Decl., ¶ 13. By using its friendly relationship with Google to remove UpVoice, Facebook substantially disrupted BrandTotal's data stream. BrandTotal continues to collect a small amount of Facebook data because: (1) two Unimania Android apps, SocialOne and Phoenix, remain operational;[8] and (2) even after Google's removal of the extensions a small (3.5%) percentage of accounts continue to generate data. Dor Decl., ¶ 18. This is less than 10% of the data previously collected. *Id.*

As stated in the TRO proceeding, and is still true today, BrandTotal cannot continue along this path without access to Facebook data. Dkt. 26 at 7–8; Leibovich Decl., ¶¶ 5–12. Facebook "is the core platform for the value proposition" BrandTotal supplies to its customers and "is one of the most unique and differentiated data sources that [BrandTotal has] and is why customers see much value in BrandTotal." Ex. Z, Deposition of Alon Leibovich ("Leibovich Dep."), 168:11–23. Without that data, BrandTotal is "as good as dead." *Id.* Facebook's continued prohibition on allowing Panelists to share their Facebook data with BrandTotal has significantly harmed BrandTotal's financial health—such that BrandTotal will be driven out of business before trial.

BrandTotal's cash balance as of January 31, 2021, was ████████. Leibovich Decl., ¶ 6. BrandTotal's "burn" rate on average approximately ████████. *Id.* at ¶ 5. In view of BrandTotal's average burn rate, BrandTotal's cash balance will be depleted well before any trial in this matter, which would force BrandTotal to shut down operations. *Id.* at ¶ 6.[9]  Further, in view of

---

[8] ██████████████████████████. Exs. K–M. ██████████████
████████████████, and both remain available for download on the Google Play Store. Dor Dep., 79:7–14, 80:10–13, 97:9–11.

[9] Trial has not yet been set and the parties last week submitted their Rule 26(f) statement. With the nationwide backlog of cases due to the global health pandemic, it is uncertain when trial in this

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   BrandTotal's current inability to obtain investments as a startup, coupled with its burn rate, case

2   reserves, and the risk-adverse nature of rational investors, BrandTotal could face immediate

3   liquidation if this preliminary relief is not granted. *Id*. at ¶ 8–12. ███████████████

4   ███████████████████████████████████████████. *Id*. at ¶ 12.

5        BrandTotal is also still losing customers and sales opportunities because BrandTotal cannot

6   access the Facebook data, creating a heavy burden to provide BrandTotal's full suite of services.

7   Facebook's has actions have caused BrandTotal to lose customers or potential customers,

8   including ████████████████████████████████████████

9   █████████████. Leibovich Dep., 38:22–39:13, 54:16–19; Leibovich Decl., ¶¶ 15–22.

10  Collectively, BrandTotal has lost approximately ██████ per month from these losses. Leibovich

11  Dep., 55:14–56:12. In addition, many customers have frozen their accounts with BrandTotal in

12  view of the pending lawsuit. *Id*. at 39:17–40:1 (identifying █████████████████████

13  ██████). *See also* Leibovich Decl., ¶¶ 9, 13-24, Exs. A-I. Facebook's lawsuit has also caused

14  BrandTotal to lose new business, which have been deterred from entering a relationship with

15  BrandTotal because of the intangible reputational harm BrandTotal incurred by being sued by

16  Facebook or from the loss of data. *Id.* Leibovich Dep., 39:17–23. For example, BrandTotal lost

17  prospective-customer ██████████ after they learned of the lawsuit. *Id*. at 65:7–12, 111:9–112:2;

18  *see also* Ex. C (electing not to pursue engagement "████████████████████████████

19  ██████."). Conversations with █████████████ (worth potentially ██████ per month) also "went

20  cold" after BrandTotal informed them of Facebook's lawsuit. Leibovich Dep., 104:20–15, 106:12–

21  23. Shortly after Facebook filed this lawsuit, on October 7, 2020, prospective-customer ██████s

22  (a marketing agency that could recommend BrandTotal to many of its own clients) chose not to

23  pursue a relationship with BrandTotal. Ex. B ███████████████████████████████████

24  ████████████████████████████ One day later, another advertising

25  agency—████████████, which represents clients such as ████████████████, and many

26  others—also suspended its relationship with BrandTotal in view of Facebook's lawsuit. Ex. S ("█

27  ─────────────────────

28  matter may occur, but even if the trial will occur in April 2022, as the parties proposed, BrandTotal
    will not come close to making it to trial.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1  ███████████████████████████████████████████████████

2        To retain those customers that remain, BrandTotal has been forced to re-negotiate customer

3  agreements and offer concessions. Leibovich Decl., ¶ 25. For example, ████████████████

4  ████████████████. Leibovich Dep., 80:7–83:6. BrandTotal has also begun to ████████

5  ████████████████████████████. Leibovich Decl., ¶ 25, Ex. I. Facebook's actions

6  have also caused BrandTotal to lose investment opportunities. Leibovich Dep., 44:14–23, 44:25–

7  45:13; Leibovich Decl., ¶¶ 8-9; Ex. A. Although BrandTotal continues to seek such investments,

8  which are enormously important for a startup company, the likelihood of success is low without

9  access to Facebook data. Leibovich Decl., ¶¶ 8–12.

10        Since Facebook filed this lawsuit, BrandTotal was able to gain only one additional

11  customer, ██████, with a monthly revenue of ██████. Leibovich Dep., 89:21–90:18; Leibovich

12  Decl., ¶ 24. To gain this customer, however, BrandTotal had ████████████████████████

13  ██████████████████████████. *Id.* Although Facebook may try to diminish these

14  harms by pointing to the business that BrandTotal has not (yet) lost, that is akin to akin to telling

15  the thousands passengers of the Titanic not to worry about the iceberg they just hit because there

16  are three life boats on board. BrandTotal does not deny it has not lost every customer, that some

17  customers have renewed without paying substantially less, or even that it has gained one (single)

18  customer. Although BrandTotal has worked to stop the bleeding and preserve its company while

19  this preliminary injunction process proceeds[10], there is no legitimate question that BrandTotal

20  cannot survive until trial. BrandTotal's efforts to survive until the preliminary injunction order can

21  be issued should not be used to preclude BrandTotal from receiving that injunction.

22        Facebook's conduct has also caused BrandTotal intangible harms. Since the Court's

23  November 2020 Order, BrandTotal has lost 10 employees. Leibovich Decl., ¶ 13; *see also*

24  Leibovich Dep., 161:13–25. In total, BrandTotal has lost approximately 25% its workforce

25

---

26  [10] Following the TRO proceedings, BrandTotal launched two other instances of UpVoice: one browser extension available through the Microsoft store, and another desktop application that

27  operates on Windows PCs and is browser-independent. Dor Decl., ¶ 17. *Neither UpVoice instance collects data from Facebook*. *Id*. Collectively, as of February 12, 2021, these instances allow

28  BrandTotal to collect data from approximately ██████ daily users—less than 25% of what BrandTotal was collecting from the Chrome extension. *Id.*.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   because of Facebook's lawsuit. *Id.* at 162:6–9. By removing BrandTotal's business accounts and

2   ability to advertise on Facebook.com, Facebook has also effectively eliminated BrandTotal's

3   ability to recruit Panelists for UpVoice. Ex. X, Deposition of Oren Dor ("Dor Dep."), 172:2–13.

4   <u>**ARGUMENT**</u>

5        A party seeking "a preliminary injunction must establish that he is likely to succeed on the

6   merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

7   balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat.*

8   *Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush &*

9   *Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). Courts in the Ninth Circuit employ a "sliding

10  scale" approach where "the elements of the preliminary injunction test are balanced, so that a

11  stronger showing of one element may offset a weaker showing of another." *All. for the Wild*

12  *Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Thus a "preliminary injunction may be

13  warranted upon a showing of 'serious questions going to the merits' as well as 'a hardship balance

14  that tips sharply toward the plaintiff,' so long as the plaintiff is likely to suffer irreparable harm

15  and the injunction or restraining order is in the public interest." Order at 12 (citing *All. for the Wild*

16  *Rockies*, 632 F.3d at 1132).

17       In the November 2020 TRO Order, this Court found BrandTotal had shown a risk of

18  irreparable harm in the absence of relief, possibly serious issues going to the merits, and a balance

19  of hardships that tips in its favor, perhaps sharply so, and denied the TRO based on the public

20  interest factor. Order at 34. In its motion for preliminary injunction, BrandTotal thus begins its

21  argument by showing, in view of the additional evidence, there is no public interest in allowing

22  Facebook to wholesale block third-party collection of competitive advertising information. There

23  is no public interest in allowing Facebook to entirely prohibit third-party access under the guise of

24  "regulation," but with the real goal being monopolization. After establishing the public interest

25  supports a preliminary injunction, BrandTotal then re-establishes that the remaining factors—proof

26  of irreparable harm, likelihood of success on the merits, and balance of hardships—also support

27  granting of a preliminary injunction that will allow BrandTotal to once again meet its contractual

28  obligations to its customers.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

I.     **THE PUBLIC INTEREST STRONGLY FAVORS GRANTING BRANDTOTAL'S REQUESTED PRELIMINARY INJUNCTION.**

"The public interest inquiry primarily addresses impact on non-parties rather than parties," and, in this case, "requires a balancing of the interests addressed by the Ninth Circuit in *hiQ*, favoring open access to information and competition for data analytics services, and those identified by Judge Hamilton in *Stackla*, favoring proactive data and privacy protection by companies like Facebook." Order at 31 (quoting *Bernhardt v. Los Angeles Cty.*, 339 F.3d 920, 931–32 (9th Cir. 2003). Although this Court—with the limited record of the TRO proceeding— was not persuaded the public interest favored the relief BrandTotal seeks (i.e., "requiring Facebook to provide immediate access to an automated data collection program that Facebook has not vetted," *id.*), additional information and evidence now show the public interest favors granting a preliminary injunction. Specifically, BrandTotal has revised UpVoice such that the public interest relates only to the collection of advertising (not user) data while discovery has shown Facebook does not have any "vetting" process and does not make available through any API or approved platform the competitive advertising information BrandTotal seeks. And, discussions with Facebook are clear that ███████████████████████████████████████ ███████████████████

**A.  The Public Does Not Have a Strong Interest in Restricting BrandTotal's Access to Data Because BrandTotal Revised UpVoice to Collect Only Advertising Data.**

BrandTotal has redesigned UpVoice such that the **only** information Panelists provide is the creative ID of the sponsored ad, the advertiser name, and the page name. Dor Decl., ¶ 21; Sherwood, ¶¶ 54, 76. Although BrandTotal maintains the public interest supports allowing Panelists to share their own demographic information, to save its company from extinction, BrandTotal has nevertheless agreed to forgo this information during the life of the preliminary injunction. Dor. Decl., ¶¶ 21-22. Once the Panelist has provided the creative ID, advertiser name, and page ID, BrandTotal collects all other information using the advertisement URL advertisement, which is accessible for the vast majority[11] of advertisements without username and

---

[11] The only advertising information that requires a Facebook account to access the URL relate to advertisements for gambling or alcohol services. The information for these types of advertisements remains inherently public as Facebook makes identical information available for all other types of advertisements.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   password requirements. *Id*. at ¶ 21. BrandTotal also retained an independent expert to examine and

2   confirm "BrandTotal's browser extension works as intended and represented . . . ." Order at 22–23.

3   BrandTotal's expert, Mr. Sherwood, whose report is attached hereto, confirms UpVoice operates

4   as intended and represented to this Court; ████████████████████████. *See*

5   Karve Dep., 93:3–94:3, 95:17–23.

6        BrandTotal has also revised UpVoice to address the specific concern this Court noted in its

7   TRO Order regarding the issue of shared computers and the risk that whenever *anyone* used the

8   Chrome browser, they would unwittingly risk their data being collected. Order at 33 n.18. Chrome

9   is a user-specific browser, meaning persons log in to the browser with their own credentials.

10  Chrome maintains extensions and passwords specific to the user, so if you do not wish for

11  extensions or passwords (including banking passwords) to be shared, then you must login as

12  yourself to Chrome. If a person logs into Chrome as themselves, and they have not installed

13  UpVoice (even if it is a shared computer and another user has installed UpVoice) UpVoice will not

14  collect Facebook data for that user. Indeed, BrandTotal is unaware of any instance where

15  information was collected from someone in such a shared computer situation. Regardless, to

16  address the remote concern about accidental collection stated by Facebook and this Court,

17  following the TRO proceedings, BrandTotal revised its UpVoice software so that when the user

18  attempts to sign into a new social media account, UpVoice notifies the user and seeks consent to

19  run UpVoice with the new Google Chrome account. Dor Decl., ¶¶ 19–20.

20       In summary, as confirmed by Mr. Sherwood, users consent to the collection of advertising

21  information shown to those users, and the information is collected in a manner that is safe and

22  secure. All other information is collected from a site that does not require user login. *hiQ*, 938 F.3d

23  at 1005. There is not countervailing privacy interest that could outweigh Facebook's information

24  monopoly. Moreover, BrandTotal's access does not "circumvent[] Facebook's privacy settings,"

25  Order at 32, as users are reminded of their agreement to share information with BrandTotal on a

26  periodic basis when they are compensated for sharing their data. Thus, if the injunction issues,

27  BrandTotal would no longer collect user data from Facebook, and there is no public interest in

28  preventing BrandTotal's access to other data.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

### B. Facebook Lacks Any "Vetting" Process and Does Not Make Competitive Advertising Information Available Through Any "Approved" Means

1

2    In denying BrandTotal's TRO, this Court found the public interest did not require

3 "Facebook to provide immediate access to an automated data collection Program that Facebook

4 has not vetted." Order at 31. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Further, no

7 other Facebook resource offers the data BrandTotal needs to run its business, and Facebook will

8 not otherwise allow third-party collection.

9    As established above, BrandTotal collects and aggregates advertising information on

10 Facebook and then provides that aggregated information to its customers. While many of

11 BrandTotal's customers use its services to monitor their own advertising efforts, or to evaluate the

12 services of Facebook or advertising agencies the customer has retained, all of BrandTotal's

13 customers also use BrandTotal's services for information regarding how others within the

14 customer's industry are advertising on Facebook. Dor Decl., ¶ 7. Although Facebook initially

15 represented to the Court that BrandTotal could have used APIs to obtain the information it needs to

16 provide these services (Dkt. 57, TRO Hearing Tr., 9:11–10:11, 12:23–13:3, 13:23–25), subsequent

17 discovery proves this to be false. The *only* way for BrandTotal to obtain the competitive

18 information it needs is to collect it from Facebook servers. SOF § B.

19    Facebook also does not have any formal procedure to "vet" any automated data collection

20 tool, regardless of whether it is impossible for a third-party, such as BrandTotal, to obtain the

21 information it needs from Facebook's limited APIs. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. SOF

24 § A. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25 ▮▮▮▮▮▮ Newman Dep., 67:10–68:12, 69:19–23. Despite Facebook's prior suggestions at the TRO

26 phase, there is no method by which BrandTotal can obtain Facebook's "permission" to collect the

27 information BrandTotal needs. Although the Court previously found the strong public interest in

28 access to advertising information did not "wholly prevent Facebook from vetting or regulating"

---

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

BrandTotal before providing such access, the record now shows Facebook ████████
████████████████████████████████████████████████████████████████████████
████████, and BrandTotal will make available any revised UpVoice extension code for Facebook to "vet" before any collection begins. Facebook can no longer disguise its wholesale prohibition of UpVoice as "vetting." Facebook does not want to vet BrandTotal; it wants only to stop it.

### C. The Public Has a Strong Interest in Allowing BrandTotal to Collect Advertising Data About "Dark Ads."

Facebook is monopolizing any use of data from its site, no matter how beneficial to society it claims its actions are. BrandTotal, in contrast, pays users for their data and helps companies understand how to advertise on Facebook through the mysterious world of dark ads. The public interest *strongly* favors allowing BrandTotal to collect advertising data from Panelists that have agreed to share it for these legitimate purposes where there is no actual[12] harm to Facebook, and it has already fully vetted the collection. *hiQ*, 938 F.3d at 1005; *see also* Order at 33 ("When it comes to advertising data—as opposed to user data—there are significant countervailing concerns.") Social media has become one of the most influential and important media in our society and advertising in that space is vitally important and valuable. Because of the nature of the media, advertisers can target segments of society and even tailor advertisements to different demographic groups of people. Dor Decl., ¶ 8. Of these social media giants, Facebook is by far most important, with 2.74 billion users as of January 2021. Ex. U. In January 2020, Facebook ads reached approximately 78% of the platform's monthly users and Ex. V at 101. In the United States, 65% of the population age 13 or older is reachable by Facebook advertising. *Id*. at 103.

The public has a strong interest in seeing how this advertising is used. As established in section B above, Facebook does not provide competitive advertising information through any "approved" or "vetted" means. Indeed, until March 2019—████████████████████████
████████████████████████████████████████████████████████████████—

Facebook did not offer *any* insight into how any advertisers were reaching the billions of users on

---

[12] Facebook's witnesses could only identify "potential harm" to Facebook. Clark Dep. 68:22–69:4 (rough). Facebook maintained the 'harm is in the collection' method, not what information is collected. *Id*. at 80:15–81:4, 83:8–20 (rough). Yet it is undisputed BrandTotal can only practically obtain this information via automatic collection. *See* SOF § B; Sherwood Rept. § 5.3

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   its site. Only after the Cambridge Analytica scandal did Facebook start providing limited

2   information regarding what advertisements are shown to which users and for how long. Dor Decl.,

3   ¶ 10. ██████████████████████████████████████████████████

4   Newman Dep., 78:13–17. ████████████████████████████████

5   ████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████

8   ████████████████ *Id*. at 87:1–89:3. Although Facebook is certainly capable of providing

9   this information for non-SIEP advertisements, it chooses not to do so while simultaneously

10  precluding third parties from being able to obtain this information via approved or automatic

11  means. The public is left to question, for example, whether Facebook is showing any specific non-

12  SIEP advertisement to only women over the age of 55. By prohibiting BrandTotal's access to non-

13  SIEP advertisements, Facebook keeps the public in the dark, and shuts down competition.

14         By prohibiting collection of competitive advertising information, even with the consent of

15  users, and by not otherwise making the information available, Facebook has unilaterally imposed

16  an information monopoly on commercial advertising metrics that is neither fair nor in the public

17  interest. Contracts or agreements that unduly restrict competition have, of course, long been held to

18  contravene the public interest. *U.S. v. Am. Tobacco Co*., 221 U.S. 106, 31 S. Ct. 632, 55 L. Ed. 663

19  (1911). Permitting Facebook to provide commercial advertising analytics (████████████

20  ████████████████████████████) while prohibiting other companies from doing the

21  same is not a public good. But more than this, Facebook's actions pose an "ominous threat to

22  public discourse and the free flow of information." *hiQ Labs, Inc. v. LinkedIn Corp*., 273 F. Supp.

23  3d 1099, 1119 (N.D. Cal. 2017), *aff'd and remanded*, 938 F.3d 985 (9th Cir. 2019). The public's

24  interest is not served by keeping targeted commercial advertising analytics in the dark. That

25  companies can target certain demographic groups with certain tailored advertisements and keep

26  those strategies secret from competitors and the public at large is not a societal good. Though

27  Facebook has seemingly deemed an "ethos" of secrecy (i.e., what it calls "privacy") in commercial

28  advertising within its own best interest, this does not make it a public good. Bringing advertising

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   strategies into the light, as BrandTotal has done, and will do, is a strong public interest. *hiQ*, 938

2   F.3d at 1005. ████████████████████████████. Exs. O, P.

3          Moreover, the public has an interest in allowing the automation of activity that could be

4   performed manually. Order at 13 (citing *hiQ*, 938 F.3d at 994–95) (discussing Ninth Circuit's

5   finding that LinkedIn's interests in protecting its users' desires that changes to their information

6   not be known to their current employers were outweighed "where nothing prevented employers

7   from monitoring employees' profiles for changes . . . ."). Although Facebook may here argue it has

8   an interest in protects its customers' desires to keep their advertising strategies secret and hidden, it

9   would remain possible for Panelists to monitor what advertisements they were shown and report

10  that information to BrandTotal. Sherwood, § 5.1.1.2. It is also possible for *anyone* to visit each

11  advertiser URL and manually record the advertising metrics data. *Id.* at ¶¶ 53, 89. Facebook

12  concedes ███████████████████████████. Newman Dep., 66:7–11; Dkt. 27-7

13  (restricting only access or collection of data using "automated means" in October 2020 Facebook

14  Terms and Conditions). Whatever interest Facebook has in preventing *automated* collection of this

15  advertising information is, at best, minimal, *hiQ*, 938 F.3d at 994–95, and this Court has found

16  Facebook does not own, and has already been compensated for, this information. *See* Order at 33.

17  "Allowing a third party like BrandTotal to compete with Facebook to provide data analytics

18  services about advertising campaigns on Facebook's networks . . . would be consistent with a

19  strong public interest in 'maximizing the free flow of information on the Internet' and fostering

20  competition and innovation." *Id.* (quoting *hiQ*, 938 F.3d at 1004.)

21  **II.      BRANDTOTAL IS SUFFERING IRREPARABLE HARM**

22         As detailed in the TRO proceeding and in the declaration of Alon Leibovich filed with this

23  motion, BrandTotal is suffering irreparable harm, and without relief may not survive until trial. *See*

24  SOF § D. "[L]ongstanding Ninth Circuit precedent has recognized that 'showing a threat of

25  'extinction' is enough to establish irreparable harm . . . ." Order at 13 (quoting *hiQ*, 938 F.3d at

26  993). Facebook's removal of UpVoice means BrandTotal will not survive until trial and has also

27  caused significant intangible injuries. Facebook's removal of UpVoice caused BrandTotal to lose

28  current and prospective customers, investment opportunities, and 25% of its work staff. SOF § D.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

Despite BrandTotal's efforts to stem the rising tide of water by developing two other, non-Google, instances of UpVoice and retain customers by offering reduced pricing and value add services, BrandTotal's cash flow means it will be run out of business by ▮▮▮▮▮▮▮▮▮▮—well before the anticipated trial date. *Id.*

Facebook's actions have, and continue to, caused BrandTotal additional intangible and other irreparable harm. Since the Court's TRO Order, BrandTotal has lost over a quarter of its workforce. SOF § D. As recognized by this Court at the TRO stage, the loss of current and prospective customers constitutes irreparable harm that justifies equitable relief. *Shippers, a Division of Illinois Tool Works, Inc. v. Fontenot*, No. 13CV1349 JLS (MDD), 2013 WL 12092056, at *6 (S.D. Cal. Sept. 23, 2013). Moreover, BrandTotal's reputation is suffering. It has no way to recruit Panelists due to Facebook's removal of its business accounts. "[I]ntangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm." *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991).

**III. BRANDTOTAL HAS AT LEAST RAISED SERIOUS QUESTIONS GOING TO THE MERITS OF THEIR CLAIMS.**

In the TRO proceeding, the Court found that BrandTotal had raised serious questions (but not a likelihood of success) as to the merits of its counterclaims of tortious interference with actual and prospective customers, and for unfair competition. Order at 26-28. Additional discovery has confirmed: Facebook's conduct has made BrandTotal's ability to perform under its contracts both more burdensome and expensive. Because Facebook caused the loss of Facebook data, BrandTotal has been placed in a weaker negotiating position until after the likely preliminary injunction order ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ BrandTotal incorporates by reference its briefing from the TRO proceedings, and will not restate the elements of each count here, but instead focuses on the Court's prior concerns and the additional information learned in discovery BrandTotal contends raises the equation from "serious question" to a "likelihood of success."

First, as the Court noted in TRO Order, "'[w]hether an intentional interference by a third party is justifiable depends upon a balancing of the importance, social and private, of the objective advanced by the interference against the importance of the interest interfered with, considering all

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

circumstances including the nature of the actor's conduct and the relationship between the parties.'" Order at 26 (quoting h*iQ*, 938 F.3d at 997) (further citation omitted). Whether or not Facebook was justified is a question that informs the analysis of each of the asserted counterclaims (i.e., tortious interference as well as the unlawful/unfair prong of the UCL claim). *Id.* at 26-27. This Court explained that:

> To the extent that Facebook's denial of access to BrandTotal was based on BrandTotal's failure to coordinate with Facebook and seek approval through established channels, and on Facebook's perception that BrandTotal had a history of collecting user data in irresponsible ways, the balance tips in favor of allowing Facebook to enforce its prohibition against unapproved automated access. On the other hand, to the extent that Facebook might have been motivated by a desire to prevent BrandTotal from competing against Facebook in the market for advertising analytics, the balance would favor granting relief in order to foster competition and innovation, and allow BrandTotal to honor its contracts with its customers.

*Id.* at 26. Discovery collected since the Court's TRO Order disproves any of the *potentially* legitimate reasons for Facebook's actions and reveals the anti-competitive and improper motivations behind Facebook's actions. As set forth in Section B of the facts, Facebook did not disable BrandTotal's accounts, revoke BrandTotal's access to data, and send a take-down notice to Google due to any concern with user consent, the security of BrandTotal's collection or BrandTotal's use of the information— . *See* SOF § A. Instead, Facebook acted because . Thus, Facebook is not policing access to protect user interests; it is restricting access altogether, keeping the data only for itself.

As this Court previously found: "So long as BrandTotal's browser extension works as intended and represented, it threatens interests at most only marginally better than those the Ninth Circuit found 'relatively weak' in *hiQ*." *Id.* at 22–23. This has proven to be the situation. Sherwood, § 5.1 (establishing UpVoice operates as represented).

Karve Dep., 99:5–18. Even if Facebook was concerned about possible issues with BrandTotal being able to accidentally collect information from individuals using a Google chrome account

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

other than their own—a concern that does not appear in Facebook's internal documents and was not raised until litigation—that issue is moot. Once the issue was identified, BrandTotal promptly provided a fix that now requires users to affirmatively agree to collection if the computer-user signs into a new social-media account. Sherwood, ¶ 94; Dor Decl., ¶¶ 19–20.

Nor can Facebook claim any purported legal obligation to the FTC justifies preventing Panelists from being able to share their information with BrandTotal. The FTC Order was designed to protect Facebook users from unknown third parties collecting information without their knowledge or permission. Here, expert analysis confirms that Panelists initiate the transfer of their information, including what advertisements they have seen, by downloading UpVoice and browsing Facebook. Moreover, BrandTotal's modification to UpVoice means going forward the extension no longer collects "Covered Information," which the FTC Order defines as "information from or about an individual consumer." Dkt. 41-1 at 3. In any event, Facebook should not be able to use an Order designed to protect users as justification for undermining user choice and monopolizing information. Facebook's improper justification establishes a likelihood of success on BrandTotal's claims (Dkt. 23) for tortious interference with contract (Count I), intentional interference with economic advantage (Count II)[13] and unfair competition (Count III).

Similarly, as interpreted and applied here, Facebook's Terms of Service are unenforceable. Facebook's ban against automated collection forecloses access to information—information about commercial advertising that Panelists have agreed to share—and thus violates public policy. *See* Cal. Civ. Code §§ 1667(2), 1798.192; *McIlwain, LLC v. Berman*, No. 18-CV-03127 CW, 2020 WL 1308342, at *10 (N.D. Cal. Feb. 10, 2020) ("[T]he Court concludes that the agreement violates public policy and is therefore unenforceable."). In examining whether terms of service are enforceable, "courts should weigh the federal policy embodied in the law of intellectual property against even explicit contractual provisions and render unenforceable those provisions that would

---

[13] While this Court in the TRO Order noted that "under California law, 'the defendant need not know exactly who is a party to the contract, so long as he knows he is interfering with a contractual relationship,'" Order at 21 (*quoting Altera Corp. v. Clear Logic, Inc*., 424 F.3d 1079, 1092 (9th Cir. 2005)), discovery produced evidence that Facebook *did* know of at least some BrandTotal customers, and understood the damage it was causing. *Supra* p. 7.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   undermine the public interest." *Idaho Potato Comm'n v. M & M Produce Farm & Sales*, 335 F.3d

2   130, 137-139 (2d Cir. 2003) (applying the Supreme Court-adopted *Lear* balancing approach, as

3   articulated in *Lear, Inc. v. Adkins*, 395 U.S. 653, 674-675 (1969)). Similarly, under California state

4   law, public policy can void a contract. Cal. Civ. Code § 1667(2) (a contract or a provision of a

5   contract is unlawful if it is "[c]ontrary to the policy of express law, though not expressly

6   prohibited"). Facebook's Terms are invalid as contrary to the public interests in preventing users

7   from disseminating and monetizing their own data and in promoting competition.

8        Lastly, any effort by Facebook to bring a claim under the CFAA, section 502(c) of the

9   California Penal Code, or for unjust enrichment would be brought for an improper purpose and

10   with an improper effect and would therefore be void and without force. *Phillips v. Crown Central*

11   *Petroleum Corp.*, 602 F.2d 616, 629 (4th Cir. 1979). The CFAA prohibits "intentionally

12   access[ing] a computer without authorization or exceed[ing] authorized access," 18 U.S.C.

13   § 1030(a)(2), as well as "intentionally access[ing] a protected computer without authorization" and

14   causing "damage and loss," 18 U.S.C. § 1030(a)(5)(C). In September 2019, the Ninth Circuit held

15   the "without authorization" requirement of the CFAA was likely inapplicable to cases, like here,

16   where the information accessed and collected is public. *hiQ*, 938 F.3d at 999–1004. The only

17   information "collected" from the password-protected portion of Facebook is the creative ID of the

18   advertisement, which provides the same information as the public URL. Sherwood, ¶¶ 53, 54, 85–

19   90. The data BrandTotal seeks to access is neither owned by Facebook nor private but is instead

20   available to anyone with internet-access. *Id.* BrandTotal has thus "raised serious questions about

21   whether [Facebook] may invoke the CFAA" with respect to public data (e.g., information about

22   the advertisement and metrics of engagement), and thus Facebook's CFAA claim cannot preclude

23   a preliminary injunction award. *See hiQ*, 938 F.3d at 1004.

24   **IV.    THE BALANCE OF EQUITIES TIPS IN FAVOR OF GRANTING THE**
         **REQUESTED PRELIMINARY INJUNCTION.**

25        Whatever minimal interest and risk of harm Facebook may have possessed last Fall no

26   longer exists. The harm to BrandTotal, in contrast, has only increased and places BrandTotal at

27   risk of cascading failure. Moreover, there is a large public interest in allowing Panelists to share

28

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   information regarding what advertisements they have seen, while there is no public interest in

2   allowing Facebook to hide that information. "The balance of equities requires a court to consider

3   'the interests of all parties and weigh the damage to each.'" Order at 30 (quoting *CTIA – The*

4   *Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 852 (9th Cir. 2019)).

5        The Court initially found Facebook possessed legitimate interests "in maintaining public

6   confidence in its products and avoiding potential liability for data privacy breaches. Ordering

7   Facebook to allow access by BrandTotal, without BrandTotal completing Facebook's usual vetting

8   process and using the standard APIs for obtaining users' permission to access their personal data,

9   risks some degree of harm to public confidence in Facebook's data protection." Order at 30. That

10  is no longer true. BrandTotal has modified the UpVoice extension such that it now only collects

11  advertising (not user) data from the password-protected portion of Facebook. Dor Decl., ¶¶ 21–22.

12  BrandTotal collects all remaining information from the public site. *hiQ*, 938 F.3d at 997–98.

13  Facebook thus lacks any legitimate interest. There is also no risk of harm to Facebook. Facebook's

14  actions in taking down UpVoice were done without regard to form or function, but instead for

15  wholesale preclusive reasons. There *remain* no major vulnerabilities that would result from

16  UpVoice, and Facebook is unlikely to face any liability for complying with an order of this Court

17  requiring it to allow BrandTotal to collect this public data. Order at 30. The harm to BrandTotal, in

18  contrast, is real and immediate. *See* § II.

19                                    **CONCLUSION**

20       For the foregoing reasons, BrandTotal respectfully requests the Court GRANT its motion

21  for a preliminary injunction and require Facebook to: (1) rescind the takedown request to remove

22  the UpVoice extension from the Google Chrome Web Store and not oppose the inclusion of a

23  replacement UpVoice extension on the Store; (2) reverse any "technical enforcement measures"

24  blocking UpVoice from Facebook's platform or otherwise prohibiting Panelists from sharing their

25  information with BrandTotal; and (3) restore the Facebook accounts of BrandTotal so BrandTotal

26  may resume advertising to recruit Panelists.

27

28

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1

Date: February 18, 2021

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

By: */s/ Rudolph A. Telscher, Jr.*
Rudolph A. Telscher, Jr.*
rudy.telscher@huschblackwell.com
Kara R. Fussner*
kara.fussner@huschblackwell.com
HUSCH BLACKWELL LLP
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
314-480-1500 Telephone

Ryan B. Hauer*
ryan.hauer@huschblackwell.com
HUSCH BLACKWELL LLP
120 South Riverside Plaza Suite 2200
Chicago, IL 60606
312-526-1572 Telephone

Dustin L. Taylor*
dustin.taylor@huschblackwell.com
HUSCH BLACKWELL LLP
180 1 Wewatta Street, Suite 1000
Denver, CO 80202
303-749-7200 Telephone
*admitted *pro hac vice*

Karl Kronenberger (CA Bar No. 226112)
karl@krinternetlaw.com
Jeffrey M. Rosenfeld (CA Bar No. 222187)
jeff@krinternetlaw.com
KRONENBERGER ROSENFELD, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
415-955-1155 Telephone
415-955-1158 Facsimile

***Attorneys for Defendants/Counterclaim
Plaintiffs BrandTotal, Ltd. and Unimania, Inc.***

## REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
### CERTIFICATE OF SERVICE

1

2      I hereby certify that on this 18th day of February 2021, I caused the foregoing to be filed

3  electronically with the Clerk of Court and to be served via the Court's Electronic Filing System

4  upon all counsel of record, and to be served via email on all counsel of record at the following:

5

6  WILMER CUTLER PICKERING
   HALE AND DORR LLP
7  SONAL N. MEHTA (SBN 222086)
   sonal.mehta@wilmerhale.com
8  THOMAS G. SPRANKLING (SBN 294831)
   thomas.sprankling@wilmerhale.com
9  JOSEPH M. LEVY (SBN 329318)
   joseph.levy@wilmerhale.com
10 2600 El Camino Real, Suite 400
   Palo Alto, CA 94306
11 Telephone: (650) 858-6000

12
   ARI HOLTZBLATT
13 Ari.Holtzblatt@wilmerhale.com
   ALLISON SCHULTZ
14 Allison.Schultz@wilmerhale.com
   ROBIN C. BURRELL
15 robin.burrell@wilmerhale.com
   1875 Pennsylvania Ave, NW
16 Washington, DC 20006
   Telephone: (202) 663-6000
17 Facsimile: (202) 663-6363

18

19 HUNTON ANDREWS KURTH LLP
   Ann Marie Mortimer (State Bar No. 169077)
20 amortimer@HuntonAK.com
   Jason J. Kim (State Bar No. 221476)
21 kimj@HuntonAK.com
   Jeff R. R. Nelson (State Bar No. 301546)
22 jnelson@HuntonAK.com
23 550 South Hope Street, Suite 2000
   Los Angeles, California 90071-2627
24 Telephone: (213) 532-2000
   Facsimile: (213) 532-2020
25

26 ***Attorneys for Plaintiff/Counterclaim
   Defendant Facebook, Inc.***

27
                                        */s/ Rudolph A. Telscher, Jr.*
28

---