UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FACEBOOK, INC.,<br><br>   Plaintiff,<br><br>   v.<br><br>BRANDTOTAL LTD., et al.,<br><br>   Defendants. | Case No. 20-cv-07182-JCS<br><br>**ORDER REGARDING MOTION TO DISMISS COUNTERCLAIMS**<br><br>Re: Dkt. No. 77 |

## I.    INTRODUCTION

Plaintiff Facebook, Inc. brought this action asserting various claims against Defendants BrandTotal Ltd. and Unimania, Inc. (collectively, "BrandTotal"[1]) based on BrandTotal's collection and marketing of data from Facebook's websites—specifically, its eponymous social network (hereinafter the "Facebook Network," in order to distinguish that product from the corporate entity) and Instagram.  BrandTotal asserts counterclaims based on Facebook blocking its access to those products, and the Court previously denied BrandTotal's application for a temporary restraining order ("TRO").  Facebook now moves to dismiss BrandTotal's counterclaims for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The Court held a hearing on February 19, 2021.  For the reasons discussed below, Facebook's motion is GRANTED, and BrandTotal's counterclaims are DISMISSED, with leave to amend some counterclaims as discussed below.  The shall file a joint letter proposing a schedule on February 22, 2021.[2]

---

[1] Unimania, Inc. is a software development subsidiary of BrandTotal Ltd.
[2] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

## II. BACKGROUND

### A. The Parties' Allegations and Claims

The following subsections summarize the parties' factual allegations as context for their respective claims and positions. Nothing in these subsections should be construed as resolving any issue of fact that might be disputed at a later stage of the case.

#### 1. Facebook's Allegations and Claims

Facebook is a social networking company with billions of individual users across multiple products, including the Facebook Network and the Instagram social network.[3] *See* Compl. (dkt. 1) ¶ 13. All users of the Facebook Network agree to contractual terms including that users will not do anything that would "impair the proper working or appearance" of Facebook's products, will not access or collect data from Facebook's products "using automated means" without Facebook's permission, and will not attempt to access data that the particular user lacks permission to access. *Id.* ¶¶ 21, 24, 26. All Instagram users similarly agree not to do "anything to interfere with or impair the intended operation" of Instagram, not to "collect[] information in an automated way without [Facebook's] express permission," not to access information "in unauthorized ways," and not to violate anyone else's rights, including intellectual property rights. *Id.* ¶¶ 22, 25, 27. Users of both networks agree not to do anything unlawful, misleading, or fraudulent, or to facilitate such activity. *Id.* ¶ 23. According to Facebook, BrandTotal agreed to these terms when it created accounts on the Facebook Network and Instagram. *See id.* ¶¶ 35–39.

Facebook employs various measures to prevent "scraping"—bulk automated collection—of content from its products, including monitoring usage patterns, using "CAPTCHA" tests to determine whether users are human as opposed to automated programs, and disabling accounts that violate its rules. *Id.* ¶ 29.

BrandTotal offered programs called UpVoice and Ads Feed that users could install as extensions for the Google Chrome internet browser, which Facebook alleges worked as follows:

---

[3] This case concerns only the Facebook and Instagram social networks. References herein to Facebook's products or social networks therefore refer to those two networks, and not to any other networks or products that Facebook, Inc. offers.

> Once installed by the users . . . [BrandTotal] used the users' browsers as a proxy to access Facebook computers, without Facebook's authorization, meanwhile pretending to be a legitimate Facebook or Instagram user. The malicious extensions contained JavaScript files designed to web scrape the user's profile information, user advertisement interest information, and advertisements and advertising metrics from ads appearing on a user's account, while the user visited the Facebook or Instagram websites. The data scraped by [BrandTotal] included both public and non-publicly viewable data about the users.
>
> [BrandTotal's] malicious extensions were designed to web scrape Facebook and Instagram user profile information, regardless of the account's privacy settings. The malicious extensions were programmed to send unauthorized, automated commands to Facebook and Instagram servers purporting to originate from the user (instead of [BrandTotal]), web scrape the information, and send the scraped data to the user's computer, and then to servers that [BrandTotal] controlled.

*Id.* ¶¶ 45–46. Facebook alleges that BrandTotal collected information including "the user's ID, gender, date of birth, relationship status, and location information," users' "Ad Preferences" information that Facebook used to determine what ads to show them, and—with respect to advertisements that users viewed while using the extension—"information about the advertiser, the image and text of the advertisement, and user interaction and reaction metrics (*e.g.*, number of views, comments, likes) associated with an advertisement." *Id.* ¶ 54. According to Facebook, the UpVoice and Ads Feed extensions used nearly identical code and functioned materially the same way. *See id.* ¶ 57.

Facebook provides a searchable public library of all advertisements published on its networks, which includes data such as the "Page" responsible for running the ad, the geographic region it is directed to, and the number of users that viewed the ad on a particular day. *See id.* ¶¶ 17–19. Facebook's public library does not include demographic information about users that viewed a particular ad, or information regarding how users interacted with an ad (e.g., "likes" and comments). *Id.* ¶ 20.

BrandTotal induced users to install these browser extensions by offering gift cards as payment for UpVoice users, by allowing Ads Feed users to review lists of ads they had seen in the last ninety days so that users could return to ads that interested them, and by telling users that they would serve as "panelists" to influence corporate marketing decisions. *Id.* ¶¶ 43–44, 49, 56.

3

BrandTotal analyzed and sold the data that it obtained from users to corporate clients. *Id.* ¶ 37. BrandTotal used different trade names for its browser extensions (which gathered data) and its marketing intelligence product (which incorporated that data), and advertised its products to both potential individual users (who might install the browser extensions and provide data) and potential corporate clients (who might purchase data) on the Facebook Network. *Id.* ¶¶ 39–40, 42, 47.

According to Facebook, BrandTotal made misleading representations to users of its browser extensions, both by including the Facebook Network in a list of "participating sites" when Facebook had not agreed to work with BrandTotal or authorized it to access Facebook's data, and by failing to include Instagram in the list of "participating sites" even though the browser extension scraped data from Instagram. *Id.* ¶ 50.

On September 30, 2020, Facebook disabled BrandTotal's accounts on Instagram and the Facebook Network and instated other technological measures to block BrandTotal's access to Facebook's products. *Id.* ¶ 58. On October 1, 2020, Facebook filed a civil action against BrandTotal in California state court alleging that the browser extensions breached Facebook's terms of service. *Id.* ¶ 59.[4] Later that day, Google removed the browser extensions from its Chrome Web Store, which disabled their functionality. *Id.* ¶ 60. On October 3, 2020, BrandTotal's chief product officer created accounts on Instagram and the Facebook Network using false names. *Id.* ¶ 61. On October 12, 2020, BrandTotal introduced a new UpVoice browser extension on the Chrome Web Store, listing the developer of the extension as "UpVoice Team." *Id.* ¶ 62. According to Facebook, the new UpVoice extension—like its predecessors—collected data when users accessed the Facebook Network and returned that data to BrandTotal, including data that was, "in some cases, not even viewed by the user." *Id.* Around thirty users installed this new extension. *Id.*

Facebook asserts the following claims: (1) breach of contract, based on the Facebook Network and Instagram terms of service, *id.* ¶¶ 67–73; (2) unjust enrichment, *id.* ¶¶ 74–80;

---

[4] Facebook voluntarily dismissed its state court action before bringing the present action in this Court, one day before BrandTotal had intended to seek a TRO in state court.

4

(3) unauthorized access in violation of the Computer Fraud and Abuse Act ("CFAA"), *id.* ¶¶ 81–86; (4) unauthorized access in violation of California Penal Code § 502, *id.* ¶¶ 87–95; (5) interference with contractual relations by inducing Facebook's users to share their login credentials with BrandTotal, in violation of Facebook's terms of service, *id.* ¶¶ 96–102; and (6) unlawful, unfair, or fraudulent business practices in violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 (the "UCL"), Compl. ¶¶ 103–10. Facebook seeks both injunctive and compensatory relief. *See id.* at 21–22, ¶¶ (a)–(h) (Prayer for Relief).

### 2. BrandTotal's Allegations and Counterclaims

BrandTotal is an advertising consulting company that offers its clients analysis of the clients' own advertising and their competitor's advertising on social media, including Instagram and the Facebook Network. Counterclaim (dkt. 23) ¶ 8.[5] BrandTotal alleges that it collects information only after receiving "informed consent and deliberate opt-in" from its users, which users grant in exchange for gift cards. *Id.* ¶ 10. BrandTotal's users must "confirm they have read the privacy policy which details the demographic and advertising . . . information BrandTotal collects" before they install the UpVoice browser extension. *Id.* ¶ 11.

According to BrandTotal, the UpVoice extension "allows BrandTotal to collect data the user either owns or has a right to access and certain public information about the websites the user visits," including "the ads they see and interact with on social media sites like Facebook, as they browse as usual on those sites," and "deidentified information about the user by using hashed values for the user's device and user IDs." *Id.* ¶¶ 13–14, 16.

> BrandTotal does not collect the user's names or email addresses, although the user provides that when they sign up. BrandTotal does not keep or compile participants' private postings, photos, or web history, nor does BrandTotal mine "friend" information, or otherwise take data not expressly authorized. Rather, the information collected relates to who is seeing what advertisement, where and at what times.

*Id.* ¶ 17. BrandTotal anonymizes the information it collects and provides aggregated data, broken out by demographic information ("age, gender, high level location, marital status, interests") to its

---

[5] BrandTotal's Answer and Counterclaim is filed as a single docket entry. Citations herein to the "Counterclaim" refer to paragraphs in the portion of that document so captioned, which begins on page 14.

5

clients. *Id.* ¶ 18.

BrandTotal acknowledges the provision in Facebook's terms of service prohibiting data collection by automated means without Facebook's permission, but implies that Facebook's claimed ability "to pick and choose who . . . will be allowed to access the information" conflicts with other provisions of the terms of service "acknowledg[ing] that users own the rights in their own information." *Id.* ¶ 21. BrandTotal also alleges that Facebook itself aggregates and sells user data as part of its own advertising consulting service. *Id.* ¶ 22.

According to BrandTotal, Facebook's actions to cut off BrandTotal's access to Facebook products and block BrandTotal's browser extensions from appearing in Google's Chrome Web Store prevent BrandTotal from compiling advertising analytics for its customers, prevent BrandTotal's users from logging in "to collect any rewards they have earned," and prevent BrandTotal from recruiting new participants. *Id.* ¶ 28. BrandTotal customers, including "reputable large companies," are questioning their relationship, prospective customers that were in negotiations are walking away, and BrandTotal cannot secure receivables, lending, or venture capital investment while it lacks access to Facebook's networks. *Id.* ¶¶ 29–30. As a result, BrandTotal is "in jeopardy of being insolvent." *Id.* 31.

BrandTotal asserts the following counterclaims: (1) intentional interference with contract, based on contracts with its corporate customers, *id.* ¶¶ 32–41; (2) intentional interference with prospective economic advantage, *id.* ¶¶ 42–48; (3) unlawful, unfair, and fraudulent conduct in violation of the UCL, *id.* ¶¶ 49–63; and (4) declaratory judgment that BrandTotal has not breached any contract with Facebook because its access "has never been unlawful, misleading, or fraudulent," because its products "have never impaired the proper working appearance or the intended operation of any Facebook product" or "accessed any Facebook product using automated means," and because the individual users own the information at issue and have the right to decide whether to share it with BrandTotal, *id.* ¶¶ 64–73. BrandTotal seeks both injunctive and compensatory relief. *Id.* at 23, ¶¶ A–E (Prayer for Relief).

**B.  Procedural History**

Facebook initially filed state law claims against BrandTotal in the California Superior

Court for San Mateo County, case number 20-CIV-04526, but later voluntarily dismissed that case and filed the present action in this Court, adding a federal claim under the CFAA. BrandTotal asserted its counterclaims in this action and moved for a temporary restraining order, which the Court denied in an order dated November 2, 2020. *See* Order Denying TRO (dkt. 63).[6] The Court determined that although BrandTotal raised serious issues (but failed to show a likelihood of success) as to at least some of its claims, *id.* at 20–30, and established a threat of irreparable harm and a balance of potential harms that tipped in its favor, *id.* at 15–20, 30–31, the public interest did not support issuing a TRO "where BrandTotal built its business on ignoring Facebook's prohibition on automated access without permission, created separate architecture to collect users' Facebook profile data in ways not reflected in those users' Facebook privacy settings, and now requests an immediate order preventing Facebook from taking any steps to limit its access despite an order requiring Facebook to enforce its terms of use and police such access," *id.* at 31–34.

Since denying the motion for a TRO, the Court has authorized BrandTotal to conduct early discovery in support of a motion for a preliminary injunction, but denied BrandTotal's request to set an expedited schedule for such a motion. BrandTotal filed its motion for a preliminary injunction (dkt. 104) on February 18, 2021, one day before the hearing on the present motion to dismiss.

### C. The Parties' Arguments

Facebook contends that BrandTotal's counterclaim for declaratory judgment should be dismissed because BrandTotal's allegations amount to admissions that it breached Facebook's terms of use under the Court's interpretation of those terms in the context of denying BrandTotal's motion for a TRO. Mot. (dkt. 77) at 4–5. With respect to BrandTotal's claim for interference with contract, Facebook argues that BrandTotal has not alleged intent by Facebook to hinder BrandTotal's performance of a contract, knowledge by Facebook that Google would remove the UpVoice browser extension from its store, or any actual breach or impairment of a contract with

---

[6] *Facebook, Inc. v. BrandTotal Ltd.*, No. 20-cv-07182-JCS, __ F. Supp. 3d __, 2020 WL 6562349 (N.D. Cal. Nov. 9, 2020). Citations herein to the Court's previous order refer to page numbers of the version filed in the Court's ECF docket.

7

BrandTotal's customers. *Id.* at 5–8. Facebook also argues that any interference was justified by Facebook's legitimate business interest in enforcing its terms of use and complying with an order of the Federal Trade Commission ("FTC"), which Facebook contends should not be subject to any balancing test. *Id.* at 9–10 & n.4. For interference with prospective advantage, Facebook contends that BrandTotal has not identified any specific relationship with a probability of economic advantage, knowledge by Facebook of any such relationship, or an independently wrongful act by Facebook. *Id.* at 10–13. Facebook moves to dismiss the "unlawful" prong of BrandTotal's UCL claim for the same reasons as the interference claims, *id.* at 14, the "unfair" prong for failure to allege elements of an antitrust claim like market definition and anticompetitive conduct, *id.* at 14–18, and the "fraudulent" prong for failure to allege any misrepresentation, much less BrandTotal's own reasonable reliance on a misrepresentation, *id.* at 19–20.

BrandTotal argues that its declaratory relief claim for non-breach of contract should proceed based on a theory that Facebook's terms of use are unenforceable as contrary to public policy, which BrandTotal has asserted as an affirmative defense to Facebook's claim for breach. Opp'n (dkt. 90) at 5–6. If the Court concludes that BrandTotal's failure to plead such a theory more clearly in its counterclaim is a barrier to pursuing it, BrandTotal requests leave to amend to conform its pleading to its argument. *Id.* at 6–7.

With respect to its claim for interference with contract, BrandTotal notes that the Court previously found in the context of denying at TRO that BrandTotal could likely show Facebook was aware that BrandTotal's contracts with customers relied on its collection of data, and argues that Facebook's knowledge and intent can be inferred from BrandTotal's allegations that the removal of UpVoice from Google's store (at Facebook's behest) effectively shut down BrandTotal's business, and from Facebook's status as the world's largest social media company. *Id.* at 7–10.[7] BrandTotal contends that its allegation that it now cannot provide advertising analytics for its customers is sufficient to allege that interference in fact resulted from Facebook's

---

[7] BrandTotal also notes that in opposing the previous motion for a TRO, Facebook did not challenge BrandTotal's allegations of intent. Opp'n at 7–8. BrandTotal does not argue, however, that failure to raise such an argument in that separate context has any legal consequence for Facebook's ability to do so here.

8

1  conduct, and that no legitimate justification for Facebook's interference with a competitor is
2  apparent from the pleadings. *Id.* at 10–12. Similarly, for interference with prospective advantage,
3  BrandTotal contends that its allegations of having lost customers and investment as a result of
4  Facebook's conduct are sufficient. *Id.* at 12–15.

5  Turning to its UCL claim, BrandTotal argues that it should be allowed to proceed on the
6  "unlawful" prong based on its tortious interference claims. *Id.* at 16. BrandTotal contends that it
7  should not be required to plead the elements of a Sherman Act claim to proceed on the "unfair"
8  prong, and that its allegations of Facebook leveraging its dominance, in conjunction with
9  allegations regarding removal of BrandTotal's accounts and the takedown notice to Google,
10 amount to a violation of the "spirit" of the antitrust laws that is sufficient for this claim. *Id.* at 16–
11 17. For the "fraudulent" prong, BrandTotal contends that it has alleged both its own and the
12 public's reliance on Facebook's representations that users own their data and control their privacy
13 settings—which, in BrandTotal's view, conflict with Facebook's efforts to block users from
14 sharing that data with BrandTotal through UpVoice and other products. *Id.* at 17–18. BrandTotal
15 seeks leave to amend if the Court determines that any of its allegations are insufficient. *Id.* at 18–
16 19.

17 Facebook argues in its reply that BrandTotal should not be allowed to amend or reconstrue
18 its declaratory judgment claim to argue that the terms of use are unenforceable, because such a
19 claim would be redundant to BrandTotal's already-pleaded affirmative defense and because the
20 laws that BrandTotal cites regarding data privacy rights do not conflict with the terms of use.
21 Reply (dkt. 100) at 2–3. Facebook contends again that BrandTotal's interference with contract
22 claim fails for lack of certainty that Google would comply with Facebook's request to remove
23 UpVoice from its store or that such removal would interfere with BrandTotal's contracts, and that
24 the inferences necessary to reach such a conclusion do not plausibly arise from BrandTotal's
25 allegations. *Id.* at 4–6. Facebook also argues that BrandTotal has not provided more than
26 conclusory allegations of actual disruption. *Id.* at 6–7. Even if BrandTotal could otherwise allege
27 interference, Facebook contends that its enforcement of its terms of use and compliance with the
28 FTC's order provide a complete defense. *Id.* at 7–9. Facebook argues that the related claim for

9

interference with prospective advantage requires a more specific showing of the particular relationship at issue, Facebook's knowledge of it, and an independently wrongful act, all of which, in Facebook's view, BrandTotal has not sufficiently alleged. *Id.* at 9–11. Facebook also argues again that BrandTotal cannot assert a UCL claim based on unfairness without alleging a relevant market and monopoly power, that its allegations describe vigorous competition rather than anticompetitive conduct, and that BrandTotal has not alleged any misrepresentation with particularity as required by Rule 9(b). *Id.* at 11–15.

## III. ANALYSIS

### A. Legal Standard

A complaint may be dismissed for failure to state a claim on which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure. "The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint." *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). Generally, a claimant's burden at the pleading stage is relatively light. Rule 8(a) of the Federal Rules of Civil Procedure states that a "pleading which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).

In ruling on a motion to dismiss under Rule 12(b)(6), the court takes "all allegations of material fact as true and construe[s] them in the light most favorable to the non-moving party." *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal may be based on a lack of a cognizable legal theory or on the absence of facts that would support a valid theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A pleading must "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 (2007) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "[C]ourts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Nor does a

complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Rather, the claim must be "'plausible on its face,'" meaning that the claimant must plead sufficient factual allegations to "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 570).

### B.  BrandTotal's Counterclaim for Declaratory Judgment

In its counterclaim, BrandTotal seeks declaratory judgment that it has not breached Facebook's terms of service because its process of obtaining data is not "automated," its access has never been "unlawful, misleading, or fraudulent," and it has not "impaired the proper working appearance or the intended operation of any Facebook product." Counterclaim ¶¶ 64–73. BrandTotal's opposition brief does not address any of those contentions, instead arguing only that the terms of service are unenforceable as contrary to public policy. *See* Opp'n at 5–7. As discussed in the Court's previous order denying a TRO, BrandTotal's own allegations and evidence described its products' "automated" access of Facebook's social networks. Order Denying TRO at 28–30; *see, e.g.*, Counterclaim ¶¶ 13–18 (describing BrandTotal's collection of data using UpVoice); *id.* ¶ 21 (acknowledging that Facebook's terms of service prohibit collection of data by automated means without permission). BrandTotal therefore violated the terms of service, as written, at least in that respect, and BrandTotal cannot state a claim for declaratory judgment that it did not do so. Facebook's motion to dismiss this claim is GRANTED

BrandTotal's current theory that the terms of service are unenforceable does not appear in its counterclaim, and its arguments are best construed as seeking leave to amend to assert such a counterclaim. Facebook is correct that the counterclaim BrandTotal wishes to assert would be duplicative of BrandTotal's fifth affirmative defense asserting that the terms of use are unenforceable as contrary to public policy. While there may be circumstances where a counterclaim for declaratory judgment could "serve [a] useful purpose" despite overlapping with an affirmative defense, BrandTotal has identified no such purpose here. *See Stickrath v. Globalstar, Inc.*, No. C07-1941 TEH, 2008 WL 2050990, at *4 (N.D. Cal. May 13, 2008) (citations and internal quotation marks omitted). To the contrary, granting leave to amend would

11

likely lead only to further litigation of the sufficiency of BrandTotal's allegations, without materially affecting the scope of the case. Leave to amend this counterclaim for declaratory relief is therefore DENIED, without prejudice to BrandTotal later moving for leave based on changed circumstances—for example, if Facebook withdraws its claim for breach of contract while BrandTotal believes it still has an interest in proving the terms of service unenforceable.

### C. BrandTotal's Counterclaims for Interference

BrandTotal asserts counterclaims for intentional interference with contract and intentional interference with prospective economic advantage. "'The elements which a plaintiff must plead to state the cause of action for intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.'" *HiQ*, 938 F.3d at 995–96 (quoting *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990)). While the typical case involves actual breach, the element of "disruption" of a contract can also be satisfied "where the plaintiff's performance has been prevented or rendered more expensive or burdensome." *Id.* at 996 n.8 (citation and internal quotation marks omitted). A claim for interference with prospective advantage also requires, among other elements, that interference occurred through an "independently wrongful act." *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1145 (2004).

Whether BrandTotal has included sufficient allegations of each of those elements is a close call, and Facebook might be correct that BrandTotal's counterclaim requires further specificity as to, for example, the nature of its contracts with customers, the extent to which it could perform those contracts relying only on non-Facebook data sources, and what BrandTotal believes Facebook knew or intended when it deactivated BrandTotal's accounts and asked Google to remove BrandTotal's products from Google's store.[8] At the very least, however, the liberal rules

---

[8] To briefly address one of Facebook's arguments, Facebook contends that BrandTotal cannot proceed on this claim because Facebook did not *know* that Google would comply with the request to remove UpVoice. *See* Reply at 4–5. Facebook's argument suggests that a business acting with

of pleading and the record submitted on the TRO motion suggest that BrandTotal could likely amend to cure any such defects.

As with the TRO, the more significant issue is Facebook's defense that it acted with a "legitimate business purpose," which can serve as a defense to interference. *See* Order Denying TRO at 21–26 (addressing that defense). While "plaintiffs ordinarily need not plead on the subject of an anticipated affirmative defense," such a defense can support a motion to dismiss if it is "obvious on the face of a complaint." *Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 902 (9th Cir. 2013) (citations and internal quotation marks omitted). Courts have applied the same principle where facts subject to judicial notice establish an affirmative defense. *See, e.g.*, *Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*, 243 F. Supp. 3d 1109, 1122 (E.D. Cal. 2017) (quoting *In re Shoretel Inc. Sec. Litig.*, No. C 08-00271 CRB, 2009 WL 248326, at *5 (N.D. Cal. Feb. 2, 2009)).

"Under California law, a legitimate business purpose can indeed justify interference with contract, but not just any such purpose suffices." *HiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 997 (9th Cir. 2019). "'Whether an intentional interference by a third party is justifiable depends upon a balancing of the importance, social and private, of the objective advanced by the interference against the importance of the interest interfered with, considering all circumstances including the nature of the actor's conduct and the relationship between the parties.'" *Id.* (quoting *Herron v. State Farm Mut. Ins. Co.*, 56 Cal. 2d 202, 206 (1961)). Courts must determine whether the defendant's interest outweighs societal interests in stability of contracts (the defendant's mere pursuit of economic advantage generally does not), "whether the means of interference involve no more than recognized trade practices," "whether the conduct is within the realm of fair competition," and—most importantly—"whether the business interest is pretextual or asserted in

---

the specific intent to interfere with a competitor's contract, and ultimately achieving success in that effort, may escape liability so long as it was not certain of success at the outset. Facebook cites no case endorsing such a broad loophole in the doctrine of tortious interference. The California Supreme Court decision on which both parties rely instead makes clear that knowledge of a substantially certain outcome may serve as an *alternative* to showing specific intent; it is not an additional requirement. *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1154 (2003). The Court does not reach the question of whether BrandTotal's current allegations sufficiently allege *either* substantial certainty *or* specific intent to interfere with a contract.

13

good faith." *Id.* (citations and internal quotation marks omitted).

Facebook argues that its interest in enforcing its own contract (its terms of use) is not subject to a balancing test. As discussed above in the context of BrandTotal's claim for declaratory judgment, the UpVoice extension very likely breached Facebook's terms of use. California courts have recognized, however, that even where a party accused of interference acted to enforce "a legally protected interest" such as a contract, the "determinative question" is whether the party acted in good faith. *Richardson v. La Rancherita*, 98 Cal. App. 3d 73, 81 (1979). In a case cited by Facebook, a California appellate court held that even where a contract authorized the defendants to conduct a foreclosure, the plaintiff could prevail on a claim for interference with his own contract by showing that the defendants "participation in a sham foreclosure designed for the specific purpose of eliminating the junior lien." *Webber v. Inland Empire Investments*, 74 Cal. App. 4th 884, 902 (1999).

Here, BrandTotal acknowledges that Facebook's terms of service prohibit automated collection of data without Facebook's prior permission. Counterclaim ¶ 21. Despite suggesting that Facebook acted in bad faith in its briefing on the present motion to dismiss and the previous motion for a TRO, BrandTotal has not alleged any particular motive by Facebook in its counterclaim. With the contractual provision that Facebook sought to enforce apparent from the face of BrandTotal's counterclaim and no allegation of bad faith, BrandTotal's counterclaim for interference with contract is DISMISSED based on Facebook's legitimate business purpose, although BrandTotal might be able to amend to cure that defect.

Facebook also has a potential defense based on the FTC order requiring it to police access to its platform. In the separate context of a public accommodation denying service to a customer in ways that might otherwise implicate state antidiscrimination law, California courts have recognized that "'complying with legal requirements'" can establish a defense based on a legitimate business purpose. *See Semler v. Gen. Elec. Capital Corp.*, 196 Cal. App. 4th 1380, 1393 (2011) (quoting *Harris v. Capital Growth Inv'rs XIV*, 52 Cal. 3d 1142, 1162 (1991)). BrandTotal does not dispute the principle that compliance with legal requirements can also serve as a defense to interference with contract or prospective advantage.

14

Among other potentially relevant provisions, the FTC ordered Facebook to "deny[] or terminat[e] access" by any "Covered Third Party" that fail to certify its compliance with Facebook's terms of use. *See* Request for Judicial Notice (dkt. 78) Ex. 3 (FTC Order) at 9, § VII.E.1.b;[9] Order Denying TRO at 23–24. BrandTotal appears to meet the definition of a "Covered Third Party" under that order, as it did not dispute in the context of its motion for a TRO and does not address in its opposition brief on the present motion. There is no indication that BrandTotal has complied with certification requirements of the FTC's order—nor could it, when its product plainly violates Facebook's terms of use.

The Court previously determined that although BrandTotal failed to show a likelihood of success, it had established serious issues as to the merits of its claim despite the FTC's order, because the extent to which Facebook might have been motivated to stifle competition—thus potentially negating any legitimate business interest—was not clear from the record. *See* Order Denying TRO at 26. BrandTotal relies solely on that previous order to negate any defense based on the FTC's order. *See* Opp'n at 11–12. On further reflection by the Court,[10] however, Facebook's motivation is not relevant when Facebook was *required* to block BrandTotal's access by an order of the FTC. Assuming for the sake of argument that Facebook acted for the subjective purpose of harming a competitor, the action that it took was no more than compliance with a legal obligation that it would have been compelled to meet regardless of its motive. Subjecting such conduct to a balancing test based on the defendant's motivations risks leaving parties with no choice to escape liability, either for shirking their obligations or for complying with them for the wrong reasons. BrandTotal's counterclaims for interference with contract and prospective advantage are therefore DISMISSED.

---

[9] The FTC's order is subject to judicial notice as a matter of public record. Facebook has also invoked section VII.E.1.d of that order, which requires Facebook to "[e]nforc[e] against any Covered Third Party violations of [Facebook's] Platform Terms based solely on the severity, nature, and impact of the violation; the Covered Third Party's malicious conduct or history of violations; and applicable law." Request for Judicial Notice Ex. 3 at 9, § VII.E.1.d. That provision may also be relevant to the merits of BrandTotal's claims, but its significance is somewhat less clear than VII.E.1.b's requirement that Facebook deny access to third parties that have not certified compliance.

[10] *See S. Or. Barter Fair v. Jackson County*, 372 F.3d 1128, 1136 (9th Cir. 2004) (discussing a court's discretion to reconsider issues addressed on a motion for preliminary injunctive relief).

### D. BrandTotal's Counterclaim for Unfair Competition

California's UCL broadly prohibits unlawful, unfair, and fraudulent business acts. *Kor. Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1143 (2003). "Unlawful acts are anything that can properly be called a business practice and that at the same time is forbidden by law . . . be it civil, criminal, federal, state, or municipal, statutory, regulatory, or court-made, where court-made law is, for example a violation of a prior court order." *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1151 (9th Cir. 2008) (ellipsis in original) (citations and internal quotation marks omitted). "Unfair acts among competitors means 'conduct that threatens an incipient violation of an antitrust law, or violates the spirit or policy of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.'" *Id.* at 1152 (quoting *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999)). "Finally, fraudulent acts are ones where members of the public are likely to be deceived." *Id.*

BrandTotal's counterclaim under the "unlawful" prong is based on its theories of tortious interference. That theory is DISMISSED for the reasons discussed above in the context of BrandTotal's interference counterclaims, based on Facebook's obligation to comply with the FTC's order.

As the parties agree, the "unfair" prong implicates antitrust law. *See Sybersound*, 517 F.3d at 1152. Facebook argues that BrandTotal has not alleged the elements of a Sherman Act violation, while BrandTotal contends that it is not required to do so in order to state a UCL claim based on violation of the "spirit" of the antitrust laws. *See* Mot. at 15–18; Opp'n at 16–17. Although a plaintiff need not always allege a Sherman Act violation to state a UCL claim based on "unfair" conduct, BrandTotal's allegations here are not sufficient. Perhaps the most fundamental "spirit" of the antitrust laws is that they "were enacted for 'the protection of *competition*, not *competitors*.'" *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)); *see Cel-Tech*, 20 Cal. 4th at 187 (identifying conduct that "significantly threatens or harms competition" as a predicate to an "unfairness" claim). BrandTotal has not alleged any injury to *competition*, as opposed to injury to BrandTotal

16

alone. To the contrary, BrandTotal alleges that "Facebook allows competitors of BrandTotal and others to access [the same] content without complaint." Counterclaim ¶ 57.

BrandTotal seeks to distinguish one of the cases on which Facebook relies, as having allowed a UCL "unfairness" claim to proceed based on violation of the "spirit" the antitrust laws even as that court dismissed the claim to the extent it was based on an actual violation of the Sherman Act. *See* Opp'n at 16 (addressing *Diva Limousine, Ltd. v. Uber Techs., Inc.*, 392 F. Supp. 3d 1074, 1090 (N.D. Cal. 2019)). In that case, however, the court based its conclusion on a California Supreme Court decision recognizing that the alleged employee misclassification at issue implicated both competition and legislative policies. *See Diva Limousine*, 392 F. Supp. 3d at 1090–91 (citing, *e.g.*, *Dynamex Operations W. v. Superior Court*, 4 Cal. 5th 903, 913 (2018)). BrandTotal cites no comparable recognition by the California courts or legislature that Facebook's conduct here impairs competition.

Accordingly, Facebook's motion is GRANTED as to BrandTotal's counterclaim under the "unfair" prong of the UCL. Because BrandTotal could conceivably amend to allege harm to competition, whether tracking the elements of a Sherman Act claim or by some other means, the Court grants leave to amend this claim. If BrandTotal chooses to amend, it should consider all arguments raised in Facebook's motion as to this claim. Moreover, while not specifically addressed by the parties in the context of the current motion, the parties should be prepared to address the extent to which Facebook's compliance with its obligations under the FTC's order might bar liability under the "unfair" prong of the UCL.

Finally, with respect to the "fraudulent" prong of the UCL, BrandTotal relies solely on Facebook's alleged "promises to their users in their terms of use that the users own their content, control their privacy settings, and that Facebook holds only nonexclusive licenses to the content." Counterclaim ¶ 59; *see* Opp'n at 17–18. BrandTotal fails to allege any specific purported misrepresentation with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure. More significantly, as discussed in the Court's previous order denying a TRO, no user could reasonably rely on broad statements regarding ownership of data as allowing the use of automated *means* to collect that data, when the same terms of use on which BrandTotal relies

specifically *prohibit* using such means without Facebook's permission.[11]  *See* Counterclaim ¶ 21 (acknowledging that prohibition); Order Denying TRO at 28.  BrandTotal's UCL claim is therefore DISMISSED with prejudice to the extent it is based on the "unfair" prong.

### E. Leave to Amend

It is not clear whether BrandTotal could successfully amend its tortious interference and UCL "unlawful" and "unfair" counterclaims in light of the FTC's order that required Facebook to block BrandTotal's access, although it is conceivable that BrandTotal might be able to state a claim for prospective relief to allow some form of access to Facebook's products even if it cannot base any claim on Facebook's past conduct.  At the hearing and in its recently-filed motion for a preliminary injunction, BrandTotal asserted that a new version of its product would not implicate the FTC's order, but BrandTotal acknowledged at the hearing that the new version has not yet been released, raising questions as to whether any claims based on that product are ripe for resolution.

As such issues have not yet been thoroughly briefed, the Court cannot say whether leave to amend would be futile.  The Court therefore grants BrandTotal leave to amend its counterclaims for intentional interference with contract, intentional interference with prospective economic advantage, and the "unlawful" and "unfair" prongs of the UCL.  The parties agreed at the hearing to file a joint letter on Monday, February 22, 2021 addressing a briefing schedule for BrandTotal's amended counterclaim, Facebook's anticipated motion to dismiss, and BrandTotal's motion for a preliminary injunction.

## IV. CONCLUSION

For the reasons discussed above, Facebook's motion to dismiss BrandTotal's counterclaims is GRANTED, and all counterclaims are DISMISSED.  BrandTotal's counterclaim under the "fraudulent" prong of the UCL is dismissed with prejudice.  BrandTotal may seek leave

---

[11] The Court concluded in that order that BrandTotal had "shown *at most* serious issues going to this claim, not a likelihood of success."  Order Denying TRO at 28 (emphasis added).  BrandTotal cites that decision, implying that it recognized some degree of merit to the claim.  *See* Opp'n at 15–16.  To the contrary, having recognized serious issues going to other claims, the Court considered BrandTotal's UCL fraud claim only to determine whether it made any stronger showing of likelihood of success, and determined that it did not.

to assert a counterclaim for declaratory judgment that Facebook's terms of service are unenforceable only if later events render such a claim no longer redundant to BrandTotal's existing affirmative defense.[12]  The parties shall file a joint letter on February 22, 2021 addressing a schedule for amendment of the remaining counterclaims and briefing of the preliminary injunction motion and anticipated motion to dismiss.

**IT IS SO ORDERED.**

Dated: February 19, 2021

JOSEPH C. SPERO
Chief Magistrate Judge

---

[12] The Court takes no position at this time on whether some other declaratory relief counterclaim based on any new version of BrandTotal's product can be stated.  Such a claim is not contained in the current pleadings, and the Court will address any such claim if it is added in any amended counterclaims.