Rudolph A. Telscher, Jr.* (MO Bar No. 41072)
rudy.telscher@huschblackwell.com
Kara R. Fussner* (MO Bar No. 54656)
kara.fussner@huschblackwell.com
HUSCH BLACKWELL LLP
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
314-480-1500 Telephone

Ryan B. Hauer* (IL Bar No. 6320758)
ryan.hauer@huschblackwell.com
HUSCH BLACKWELL LLP
120 South Riverside Plaza Suite 2200
Chicago, IL 60606
312-526-1572 Telephone

Dustin L Taylor* (CO Bar No. 54463)
dustin.taylor@huschblackwell.com
HUSCH BLACKWELL LLP
1801 Wewatta Street, Suite 1000
Denver, CO 80202
*admitted *pro hac vice*

Karl Kronenberger (CA Bar No. 226112)
karl@krinternetlaw.com
Jeffrey M. Rosenfeld (CA Bar No. 222187)
jeff@krinternetlaw.com
KRONENBERGER ROSENFELD, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
415-955-1155 Telephone

***Attorneys for Defendants/Counterclaim
Plaintiffs BrandTotal, Ltd. and Unimania,
Inc.***

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND/SAN FRANCISCO DIVISION**

| | |
|---|---|
| FACEBOOK, INC., a Delaware corporation, | Case No.: 3:20-cv-07182-JCS |
| *Plaintiff/Counterclaim Defendant*, | **DEFENDANTS' FIRST AMENDED COUNTERCLAIMS** |
| v. | |
| BRANDTOTAL, LTD., an Israeli corporation, and UNIMANIA, INC., a Delaware corporation, | |
| *Defendants/Counterclaim Plaintiffs*. | |

Defendants/Counterclaim Plaintiffs BrandTotal Ltd. ("BrandTotal") and Unimania, Inc. ("Unimania") (collectively, "Defendants") assert these counterclaims against Plaintiff/Counterclaim Defendant Facebook, Inc. ("Facebook") and hereby allege as follows:

**INTRODUCTION**

1.      Facebook is the world's largest social media network with approximately 2.74 billion users as of January 2021. Facebook collects information about these billions of users, including their age, gender, and location. Facebook then uses this data to facilitate and profit from advertising on its site.

2.      Although Facebook proclaims to (now) give its users choice over how their data may be used, Facebook does not allow users to opt out of advertising or to avoid being shown targeted advertisements based on the user's age, gender, location or other information.

3.      Moreover, Facebook does not make available through its Ad Library or developer APIs information about what commercial advertisements are shown to what groups of users. As reflected by Facebook's actions against Defendants, described below, Facebook improperly seeks to maintain an information monopoly over this data for its own anti-competitive purposes.

4.      Facebook's anticompetitive behavior harms consumers. It is currently impossible for the public to know whether an advertiser is targeting members of a specific demographic group (e.g., women over age 50 living in Texas) differently than members of another demographic group. Indeed, upon information and belief, it is a common practice of Facebook advertisers to target different demographic groups with different advertising creatives (i.e., different pictures and even text advertising the same or similar services). Advertisers can even offer one demographic group a different promotional price via Facebook's advertising services that it withholds from another group that does not know what offers are being made to others. This type of information is public in other forms of advertising, including television and print. Facebook's proactive actions to keep this information from the public (e.g., by distinguishing between SIEP and non-SIEP advertisements and publishing demographic data only for the former) harms competition and the public generally.

5.      Defendants' applications and extensions collect information related to commercial advertising interactions, with user consent, and in a manner that does not harm users or the Facebook network platforms. Facebook, through misleading communications to Google, had several of Defendants' programs removed. More recently, BrandTotal launched a new program that collects less information (no demographic information about users), but Facebook has refused to authorize the program, despite request, and maintains that *any* automated collection of data from its sites is improper.  Facebook certainly has a choice whether to allow such collection because its terms of service, Section 3.2.3 specifically acknowledges that it could grant permission.

6.      BrandTotal brings these counterclaims and alleges Facebook intentionally interfered with BrandTotal's contracts and committed unfair competition violations of the California Business & Professions Code § 17200, *et seq*. by both sending a takedown request to Google to have BrandTotal's products (*e.g.*, the "UpVoice") taken off the Google Chrome Web Store and denying BrandTotal's access to Facebook's social media platforms.

7.      BrandTotal further brings counterclaims under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and seeks a declaration from the Court that with respect to the modified and recently launched UpVoice program ("UpVoice 2021"), that BrandTotal has not violated, and will not violate, federal or state law, and has not intentionally interfered with any contractual relations belonging to Facebook by collecting wholly public information from Facebook's website. BrandTotal further seeks injunctive relief preventing Facebook from misusing the law or its business relationships to complete its attempted destruction of BrandTotal's business.

## **PARTIES**

8.      Upon information and belief, Facebook is a Delaware corporation with its principal place of business in Menlo Park, San Mateo County, California.

9.      BrandTotal Ltd. was incorporated in Israel on November 20, 2016 and is headquartered in Israel. BrandTotal Ltd. has a subsidiary named BrandTotal, Inc. that was

incorporated in Delaware on November 13, 2017, has an office in New York, NY, and sells BrandTotal's services in the U.S.

10.     Unimania, Inc. was incorporated in the State of Delaware on November 27, 2017.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over BrandTotal's First Amended Counterclaims pursuant to 28 U.S.C. § 1367 because the First Amended Counterclaims arise out of the same common set of facts and conduct as Facebook's alleged federal claims for relief.

12.     This Court has personal jurisdiction over Facebook because Facebook's principal place of business is within this judicial district. Facebook has also transacted business and engaged in commerce in this judicial district by, among other things, distributing its social media platforms, including Facebook and Instagram, to users in this judicial district.

13.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Facebook conducts substantial business within this judicial district and a substantial part of the acts or omission giving rise to BrandTotal's First Amended Counterclaims occurred in this judicial district.

## FACTUAL ALLEGATIONS

### A.     Facebook Has Become the World's Largest Public User Content

14.     Facebook, including its Instagram product, comprises the world's largest social network. Facebook users sign up, and then can choose to share information about themselves.  The number of users is more than the size of nearly all countries in the world.

15.     Facebook admits that it has complete control over its terms of service, and is exercising such control to maintain monopoly power of data on its platform and in the social networking platform market, which gives it control over the market concerning Third-Party Advertising Information (i.e., non-SIEP advertisements shown to the more than 1 billion users on Facebook). With the monopoly power Facebook exercises over its network and social networking, Facebook has created information and financial ecosystems that it, alone, controls.

16.     Within the platform ecosystems, Facebook sells advertising, and maintains

monopoly control over the information analytics surrounding the commercial advertising on its platforms.

17.     Anyone with a Facebook or Instagram account can create and place ads on Facebook and Instagram. Every week, users and businesses place millions of ads through Facebook's ad platform, which provides advertisers with many options for reaching audiences.

18.     Facebook advertises an "all-in-one tool for creating ads, managing when and where they'll run, and tracking how well your campaigns are performing."

https://www.facebook.com/business/tools/ads-manager

19.     There are several types of advertising on Facebook. Public ads are ads that can be seen on a company's public Facebook page. Dark ads, in contrast, are ads that are not published to a company's public Facebook page, but that the company pays to have disseminated to users on their feeds. Ads (both public and dark) that a company pays Facebook to display to users are called "sponsored" ads. Once paid, Facebook uses the information it has collected from its billions of users to identify those users that meet the demographic and audience criteria the advertiser has told Facebook it wants to target. Facebook then uses its platform to distribute those advertisements to the selected users.

20.     Dark ads can be the same for all users, or they can be dynamic ads.  Dynamic ads are ads specially tailored to a target audience and they vary depending on the user group.  For example, an advertiser could make the same ad a dark ad (by not posting to its page) and then tailor it to various groups (i.e., men over a certain age would see one version of the ad, women would see a different ad, etc. . . .) making it a dynamic dark ad.

21.     On information and belief dark ads account for 80-90% of the ads on Facebook.

22.     Most currently running ads, including dark ads (but *not* including all versions of dynamic ads), are included in Facebook's Ad Library. However, for commercial advertisements (as opposed to ads directed to social issues, elections or politics ("SIEP")), that repository only includes the image and text of the ad. There is no impression data or demographic data about the audience to whom the advertiser paid Facebook to show the ad.

23.     Nor is that information available through any Facebook API.

24.     Facebook takes steps to distinguish ads relating to "social issues, elections or politics" from ads relating to commercial advertising and deliberately makes *less* information available about commercial advertising (i.e., just the text and the image of most currently running commercial ads is available, unless you are the advertiser in relation to your own ads, in which case more information is available).

25.     Facebook's terms and conditions acknowledge that users own the rights in their own information. At the same time, however, Facebook's terms and conditions (in their current form) state that "you may not access or collect data from our Products using automated means (without our prior permission) or attempt to access data you do not have permission to access." *See* https://www.facebook.com/legal/terms. The "without our prior permission" means that Facebook purports to be able to pick and choose who will be allowed to access the information.

26.     Facebook contends in this litigation it does not provide permission to access or collect data from Facebook's products using automated means outside of previously developed developer APIs or the Facebook Ad Library, regardless of whether the information sought is available through those sources or whether users' have given the party requesting permission to access the data. On information and belief, Facebook does not grant permission regardless of whether users consent to have information collected about their ad experience on Facebook and regardless of whether the collected information is used for a lawful purpose and regardless of whether a user is not harmed. Facebook instead blanket-bans all automatic collection and will not grant "permission" outside of its APIs (through which Facebook decides which public information it will make available).

27.     Facebook uses its users' information to provide advertising consulting services to its advertising customers. Facebook's website confirms this extensive program, noting that it also aggregates and sells user data to advertisers and other companies. *See* https://www.facebook.com/privacy/explanation. This data includes "the kinds of people" seeing advertisements on its platform (i.e., "general demographic and interest information") and user

online activity (i.e., "activity off our Products, such as the websites you visit and ads you see" and interactions with "posts, listings, Pages, videos and other content on and off Facebook products").

### B. Facebook Was Punished by the FTC for Sharing Users' Data *Without Consent*

28.     In 2019, Facebook entered a Consent Order with the Federal Trade Commission arising from allegations that Facebook violated a 2012 settlement order, which prohibited Facebook from making misrepresentations about the privacy or security of consumers' personal information. Ex. A.

29.     The Consent Order followed a yearlong investigation into Facebook's failures to provide users control over how their data was shared, including by sharing users' personal information with third-party apps that were downloaded by the user's Facebook "friends." *Id.* The FTC alleged that many users were unaware that Facebook was sharing such information. *Id.*

30.     Upon information and belief, the Consent Order stemmed from allegations that Facebook knowingly allowed Cambridge Analytica to collect information from "friends" of users on the Facebook platform that had *not* consented to the data collection, information that was then used to influence the 2016 U.S. presidential election.

31.     Amongst other requirements, the Consent Order required Facebook to pay $5 billion, which is the largest penalty ever imposed on any company for violating consumers' privacy. *Id.*

32.     The Consent Order defines "Covered Information" as "information from or about an individual consumer including, but not limited to: (a) a first or last name; (b) geolocation information sufficient to identify a street name and name of city or town; (c) an email address or other online contact information, such as an instant messaging User identifier or a screen name; (d) a mobile or other telephone number; (e) photos and videos; (f) Internet Protocol ("IP") address, User ID, or other persistent identifier that can be used to recognize a User over time and across different devices, websites or online services; (g) a Social Security number; (h) a driver's license or other government issued identification number; (i) financial account number; (j) credit or debit

information; (k) date of birth; (l) biometric information; (m) any information combined with any of (a) through (l) above; or (n) Nonpublic User Information." Ex. C.

33.     The Consent Order defines "Covered Incident" as "any instance in which [Facebook] has verified or otherwise confirmed that the Covered Information of 500 or more Users was or was likely to have been accessed, collected, used, or shared by a Covered Third Party in violation of [Facebook]'s Platform Terms." *Id*.

34.     The Consent Order defines "Covered Third Party" as "any individual or entity that uses or receives Covered Information obtained by or on behalf of [Facebook] outside of a User-initiated transfer of Covered Information as part of a data portability protocol or standard, other than: (1) a service provider of [Facebook] that (i) uses the Covered Information for and at the direction of [Facebook] and no other individual or entity and for no other purpose; and (ii) does not disclose the Covered Information, or any individually identifiable information derived from such Covered Information, except for, and at the direction of, [Facebook], for the purpose of providing services requested by a User and for no other purpose; or (2) any entity that uses the Covered Information only as reasonably necessary: (i) to comply with applicable law, regulation, or legal process, or (ii) to enforce [Facebook]'s terms of use, or (iii) to detect, prevent, or mitigate fraud or security vulnerabilities." *Id*.

35.     The International Organization for Standardization defines "data portability" as the "ability to easily transfer data from one system to another without being required to re-enter data." Ex. B.

36.     The Consent Order defines "Platform Terms" as Facebook's written terms, policies, and procedures relating to the privacy, confidentiality, or Integrity of Covered Information that apply to Covered Third Parties." Ex. C.

37.     The purpose of the Consent Order was to punish (with a $5 billion penalty) Facebook for sharing data without user consent and to put into place procedures, protocols, and protections that ensure Facebook's users control their data.  Federal Trade Commission Act Section 5: Unfair or Deceptive Acts or Practices is designed only to protect the consuming public

from unfair or deceptive acts or practices.  The Consent Order details the misleading practices that Facebook was to discontinue.

38.     In a press release following announcement of the Consent Order, FTC Chairman Joe Simmons explained Facebook was punished because "[d]espite repeated promises to its billions of users worldwide that they could control how their personal information is shared, Facebook undermined consumers' choices." Ex. A.

39.     Section II of the Consent Order requires Facebook, prior to sharing any Nonpublic User Information with any Covered Third Party, to "Clearly and Conspicuously" disclose what information will be disclosed, to whom, and "that such sharing exceeds the restrictions imposed by the Privacy Setting(s) in effect for the User" **and** to obtain affirmative express consent prior to disclosure. Ex. C. If, however, the shared information is "initiated by another User authorized to access such information, provided that such sharing does not materially exceed the restrictions imposed by a User's Privacy Setting(s)," Facebook does not need to obtain affirmative express consent. *Id*.

40.     Similarly, Section VII of the Consent Order requires Facebook to establish, implement, and maintain a comprehensive privacy program (the "Privacy Program") that "protects the privacy, confidentiality, and Integrity of the Covered Information collected, used, or shared by [Facebook]." *Id*.

41.     Section VII.E.1.d requires Facebook to enforce against any Covered Third Party violations of Facebook's Platform Terms "based solely on the severity, nature, and impact of the violation; the Covered Third Party's malicious conduct or history of violations; and applicable law." *Id*.  The Consent Order therefore contemplates a Privacy Program that balances user interests with the needs of third parties to access data on the Facebook site.

42.     The Consent Order does *not* direct Facebook to ban *all* automated collection of data from its platforms.

43.     To the contrary, the Consent Order expressly contemplates the possibility of data transfers *with user consent*, and proportional responses by Facebook to any perceived privacy

violation. Facebook, however, has not established such a Privacy Program because it is applying the Consent Order to stop *any* data collection. Therefore, all competition that emanates from collection and analysis of data not published by Facebook on its site that precludes any entity from analyzing how Facebook itself is using the unpublished data. This is not the Privacy Program the Consent Order requires.

## C.   BrandTotal's Business Model

44.     BrandTotal is a premier advertising consulting company offering competitive analyses of advertising efforts on social media sites like Facebook, Instagram, Twitter, YouTube, LinkedIn, Amazon and others. Just as companies used to track competitive advertising in print, on billboards and on TV in years past, there is a need today to understand advertising across the many on-line channels that people see. Fortune 500 companies and others want analytical intelligence not only about how their own advertising is received on social media sites, but also how competitors' ads are viewed and perceived. BrandTotal provides this service.

45.     In BrandTotal's most popular offering, willing participants (who BrandTotal calls "Panelists") download an application or browser extension called "UpVoice," which allows Panelists to share information regarding what advertising information advertisers have paid Facebook to show the Panelist.

46.     Unlike other companies, BrandTotal offers participants cash gift cards in exchange for the information, and only collects information with the participants' informed consent and deliberate opt-in.

47.     Before being allowed to share their information with BrandTotal, prospective-Panelists must first "qualify" by completing an application:

48.     In completing this form, individuals willingly provide BrandTotal with their full name, email, relationship status, month and year of birth, gender, country, and city. Individuals must also confirm they have read and agree to the Terms of Service of the UpVoice panel, which detail the specific information BrandTotal collects.  Users have the right to share such information with BrandTotal or any other entity.

49.     Defendants also developed and/or operate mobile applications, including Social One and Phoenix, that operate on Android-based smart phones. Users of these applications also agree to share their information in exchange for an improved user-experience in interacting with social media. Other than the type of compensation offered to users of these "value add" applications and users of UpVoice, these programs operated functionality the same prior to October 2020.

50.     BrandTotal and its customers only desire a user's data as aggregated by general demographics and as related to advertising.  BrandTotal's business does not need to tie specific users to any demographic or advertising data.  This is known to Facebook because it too uses such data to advise its advertising customers. This is also known to Facebook because it has

investigated BrandTotal, knows of its ads on Facebook and BrandTotal's website, and has reviewed BrandTotal's source code, dating back to at least 2019. At no point has Facebook ever contacted BrandTotal following such investigations to tell BrandTotal that it was violating Facebook's terms of service, or otherwise had concerns about BrandTotal's data collection.

51.     The UpVoice extension does not impact the performance on the individual's device or web browser. Rather, with the user's explicit consent, and at the instigation of the user who downloads the extension and then scrolls social media, it allows BrandTotal to collect data the user either owns or has a right to access and certain public information about the websites the user visits.

52.     With the participant's consent and after they deliberately install the extension in exchange for compensation, BrandTotal is able to collect information about the ads they see and interact with on social media sites like Facebook, as they browse as usual on those sites.

53.     BrandTotal's customers are companies that advertise on social media and whose competitors advertise on social media, and they seek generalized information about the advertisements participants see.

54.     When an UpVoice Panelist utilizes Facebook, BrandTotal does not collect the user's name, email address, or password. BrandTotal does not keep or compile participants' private postings, photos, or web history, nor does BrandTotal mine "friend" information, or otherwise take data not expressly authorized. Rather, the information collected relates to whom is seeing and interacting with what advertisement, where, and at what times.

55.     BrandTotal anonymizes and aggregates the data by demographic info Panelists provide through the UpVoice qualification form (age, gender, high level location, marital status, interests) to provide summary information to companies about the viewership of advertisements.

56.     By collecting information regarding what advertisements Facebook is paid to show its users, BrandTotal collects information regarding how companies advertise on Facebook— including what advertising images and text are shown, to whom (e.g., women over the age of 50) Facebook shows these advertisements, and how users engage with the advertisements ("Third-

1   Party Advertising Information.").

2   **D.    Facebook Investigated Defendants' Applications for Approximately 18**
3   **Months Before Suddenly Shutting Down BrandTotal's Business Without**
        **Any Notice**
4

5   57.    Facebook was aware of Unimania since at least ▮▮▮▮▮▮▮▮.

6   58.    In March and April 2019, Facebook opened an investigation into two Unimania-
7   owned mobile applications, ▮▮▮▮▮▮▮▮▮▮▮. Ex. D; Ex. E. When Facebook opened its
8   investigation, it was aware that the applications ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
9   ▮▮▮▮▮▮▮▮▮▮▮▮." Ex. D. Almost immediately, the lead investigator for
10  Facebook knew how the applications operated. Ex. F.

11  59.    Contrary to Facebook's Complaint that calls BrandTotal software "malicious", as
12  part of Facebook's investigation, the member of the Facebook eCrime team (who would later be
13  primarily responsible for investigating UpVoice) concluded ▮▮▮▮▮▮▮▮▮▮▮
14  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
15  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. E.

16  60.    Facebook never took action to remove either the mobile applications ▮▮ or
17  ▮▮▮▮ and both remain available for download on the Google Play Store as of today.  These
18  applications collect the same type of information that UpVoice collects.  In fact, BrandTotal's
19  various extensions and programs each only collect *with user consent* and have all collected the
20  same types of deidentified demographic and advertising data.

21  61.    Facebook began its investigation into UpVoice in or around March 2020.

22  62.    Though this investigation should have taken, at most, only a few weeks, Facebook
23  did not promptly (or ever) contact Defendants or take any other action in relation to the UpVoice
24  program.  Defendants only learned of Facebook's alleged concerns through Facebook's filing of
25  the California state court complaint in October 2020.

26  63.    Despite BrandTotal engaging in its data collection and advertising consulting
27  business since 2016 and despite Facebook admitting that it employs sophisticated means to

28

1  detect what it considers to be undesirable, competitive uses of "data scraping," Facebook never

2  once before contacted BrandTotal in any way to raise any concerns. Upon information and

3  belief, Facebook did not contact BrandTotal because it had already concluded, in 2019, that

4  Defendants' software/extensions were ███████. Ex. E.

5       64.    Indeed, while BrandTotal ran ads about its services on the Facebook website since

6  at least 2018, Facebook never once contacted BrandTotal to raises concerns about anything

7  BrandTotal was doing. Facebook nevertheless continued to accept BrandTotal's payments for

8  advertising, including while Facebook was investigating Defendants' applications and

9  extensions.

10       65.    In September 2020, ████████████████████████

11  ██████████████████████████████████████████████████

12  ██████████████████████████████████████████████████

13  ██████████████████████████████████████████████████

14  ████████████████████████  Ex. G.  Despite its public statements about

15  Defendants and their software/extensions that severely tarnish BrandTotal's reputation and harm

16  its business, Facebook is hiding the foregoing information from the public by claiming it is

17  confidential.

18       66.    The same week Facebook contacted Google to shut down BrandTotal's UpVoice

19  browser extension, "someone on the [Facebook] marketing insights team ask[ed] about

20  BrandTotal/UpVoice" because "they've had several advertising partners asking [the Facebook]

21  sales team for their [Point of View] on it's capabilities." Ex. H. The Facebook employee

22  primarily responsible for investigating UpVoice—and who had investigated Defendants' other

23  extensions and applications, including ████████ and ████████—responded "[w]e're enforcing

24  on them this week." *Id*.  Facebook did not shut down BrandTotal's data collection to protect

25  users.  It took these actions for competitive reasons.  Despite contending in this litigation that

26  Facebook did not know Google would shut down BrandTotal's data collection, Facebook's

27  internal communications reflect that it knew with a very high degree of certainty that Google

28

would shut down Defendants' data collection. Google did, in fact, shut down Defendants' data collection.

67.     Facebook suspended BrandTotal's Facebook and Instagram pages, as well as the personal pages of BrandTotal's principals. This action has harmed BrandTotal by preventing BrandTotal's ability to advertise on Facebook, which was BrandTotal's largest source of recruitment for new Panelists. By removing this ability, Facebook harmed BrandTotal's ability to grow its business.

68.     On September 21, 2020, Facebook also contacted Google regarding BrandTotal's extensions, including UpVoice. Ex. Ex. I. Facebook represented to Google that BrandTotal's extensions "are improperly scraping user PII (e.g., gender, relationship status, ad interests, etc.) without proper disclosure." *Id.*

69.     Facebook did not inform Google that the users from whom BrandTotal's extensions collected data had agreed to provide the collected information to BrandTotal.

70.     Facebook did not inform Google that Defendants' privacy policy for UpVoice disclosed the information UpVoice collected, and that the information collected was with user consent and at the instigation of users.  Facebook's actions with Google were therefore misleading and fraudulent.

71.     On October 2, 2020, Google removed the UpVoice extension, along with other BrandTotal-related extensions, leading to a near complete shutdown of BrandTotal's data that is the life blood of its consulting services.

**E.     BrandTotal Revised UpVoice to Collect Only Advertising Data.**

72.     Following the removal of UpVoice from the Google Chrome Store in October 2020 and a lawsuit by Facebook against Defendants (first brought in state court, and dismissed once Defendants made clear they would fight Facebook's actions), BrandTotal sought a Temporary Restraining Order requiring Facebook to rescind its request that google remove the UpVoice browser extension, reverse any technological measures Facebook had used to block UpVoice from accessing the Facebook website(s), and restore the Facebook pages for

1   BrandTotal and its principals. ECF No. 27-5.

2      73.     On November 2, 2020, the Court issued its Order regarding BrandTotal's TRO

3   motion, finding in part:

> To the extent that Facebook's efforts to restrict BrandTotal's access might be motivated to
> stifle competition, it would raise some of the same concerns as in *hiQ* [*Labs, Inc. v.
> LinkedIN Corporation*, 938 F.3d 985 (9th Cir. 2019)], where the Ninth Circuit determined
> that for companies 'whose servers hold vast amounts of public data' to 'selectively . . . ban
> only potential competitors from accessing and using that otherwise public data' . . . 'may
> well be considered unfair competition under California law.' This case differs in that some
> of the information at issue is not 'public,' but BrandTotal is likely correct that the
> advertisements themselves are essentially public, *see* Compl. ¶¶ 17–19 [ECF No. 1]
> (Facebook's allegations discussing its public library of all ads on its services), that the users
> who consent to use BrandTotal's browser extension have the most significant interest in
> the data in their own profiles, and that Facebook has not articulated a significant privacy
> or intellectual property interest in any data outside of those categories, such as the
> 'advertising interests' that Facebook generates for (and shares with) its users, and the
> metrics of engagement (likes, comments, etc.) on particular advertisements. So long as
> BrandTotal's browser extension works as intended and represented, it threatens interests at
> most only marginally greater than those the Ninth Circuit found 'relatively weak' in *hiQ*."

ECF No. 58, 22–23 (citing *hiQ Labs, Inc. v. LinkedIN Corporation*, 938 F.3d 985, 998 (9th Cir.
2019)).

      74.     Ultimately, however, the Court found although "BrandTotal has raised serious

questions as to the merits" of its claims, it had not established a likelihood of success because

Facebook had shown it had at least one potential legitimate business interest supporting its

actions—including a claimed need by Facebook to prevent BrandTotal's access. *Id.* at 25.

      75.     The Court also found, while the public had an interest in allowing the regulation

and vetting of companies that sought to collect users' data, when it came to advertising data,

"there are significant countervailing concerns." *Id*. at 33.

      76.     After the Court issued its order denying BrandTotal's motion for a TRO,

BrandTotal revised UpVoice to not collect any user demographic information. Instead,

BrandTotal obtains demographic information about the user from the qualification form the

Panelist willingly provides to BrandTotal when applying to be an UpVoice Panelist, a practice

that predates the lawsuit. UpVoice 2021 only passively collects information (i.e., information the

Panelist is actually seeing) and does not make any background calls to Facebook servers.

77.     BrandTotal also revised UpVoice to address an issue raised by Facebook about shared computers and the risk that whenever anyone used a browser (e.g., Chrome), they would unwittingly risk their data being collected despite not having signed up for UpVoice. Chrome is a user-specific browser, meaning users sign-in to Chrome and Chrome saves users information like site passwords and extensions. Thus, if a user logs in to their Chrome account, even if on a shared computer, the UpVoice extension would not run unless that user had installed it.

78.     Nevertheless, and even though BrandTotal was not aware of any issues regarding shared computers and even though any data collected was deidentified, now, when a user that has downloaded UpVoice 2021 attempts to sign into a new social media account, UpVoice 2021 notifies the user that UpVoice is installed on the browser being used and seeks the user's consent to run UpVoice with the new social media account, and now to collect only advertising data. If the user does not opt-in, UpVoice 2021 does not collect data from that social media account.

79.     UpVoice 2021 is not subject to Facebook's Terms of Service, including the prohibition on automatic collection. Nevertheless, in an abundance of caution, on February 25, 2021 BrandTotal wrote to Facebook, through counsel, seeking Facebook's permission for automated collection on Facebook's platforms via the modified UpVoice program described above ("UpVoice 2021"). Ex. J.

80.     BrandTotal in this same correspondence, provided Facebook with access to the code for the extension version of UpVoice 2021 (which would be uploaded for the Microsoft Edge browser and Google Chrome browser) and an application/executable version that operates on computers running the Microsoft operating system ("Microsoft OS") version of UpVoice 2021.  BrandTotal has also informed Facebook that UpVoice 2021 collects the same advertising data as before, only without collecting any user demographic data.

81.     On March 4, 2021, Facebook responded to the correspondence.  It did not grant permission in that letter, but instead reiterated Facebook's position that "[d]ata scraping of any kind creates a wide range of harms that Facebook needs to prevent. The Facebook platform is

designed for human use only; any data collection by automated means risks burdening

Facebook's networks and therefore must be carefully controlled." Ex. K. Facebook again

suggested that BrandTotal design its products and services "around data available through

authorized channels", without regard to the fact that Facebook admittedly does not make any

information available through authorized channels about the reach of commercial

advertisements, and particularly dark ad commercial advertisements, on its platforms. *Id.* On

information and belief, dark ads comprise most advertising on Facebook's site. While Facebook

makes the above claims, internal documentation at Facebook contradicts its litigation induced

position.

82.     BrandTotal is expecting to launch UpVoice 2021 for the Microsoft Edge

extension, Microsoft OS, and Google Chrome this coming week.

83.     All versions of UpVoice 2021 collect/will collect only advertising information

(i.e., no "user information"), do not make any background calls to Facebook servers, and seek

express affirmative consent before collecting any information when the user signs into a social

media account other than those registered by the Panelist.

**F.     The Immediate Harm to BrandTotal Has Been Immense**

84.     The impact on BrandTotal's business from the unilateral actions of Facebook

have been and continue to be immensely harmful to BrandTotal. Facebook would know this

because it uses the same type of data to provide competitive advertising consulting services to its

customers.

85.     When Facebook prompted Google to remove Defendants' browser extensions and

applications BrandTotal lost access to most participant data, without which BrandTotal cannot

compile advertising analytics for its customers. As of September 30, 2020, approximately 68%

of BrandTotal's advertising information came from the UpVoice extension available on the

Google Chrome Store. Facebook knew this. In September 2020, just before filing the lawsuit, in

response to information that several of Facebook's own advertising customers were inquiring of

BrandTotal, Facebook's Mr. Karve told another Facebook employee that Facebook was taking

1  action against BrandTotal "this week." Ex. H.

2    86.    BrandTotal cannot operate its business using data from only non-Facebook

3  sources, because Facebook's size and monopoly power in the social media network space means

4  access to data from this space is imperative to any offering of social media advertising analytics.

5    87.    Moreover, Facebook's actions in disabling UpVoice meant that BrandTotal's

6  participants could not login to collect any rewards they had earned, and because Facebook

7  suspended BrandTotal's Facebook accounts, BrandTotal was hindered in its ability recruit new

8  participants.

9    88.    BrandTotal has lost current and prospective customers and has had to give credits of

10  monthly membership fees to customers. Ex. L. BrandTotal relies on receivables from its customers

11  to fund its day-to-day operations and has been deeply impacted by Facebook's actions to the point

12  that it has had to lay-off employees. *Id.*

13    89.    BrandTotal also cannot secure lending or venture capital to see it through the crisis

14  with no ability to collect data and provide advertising analytic services to its customers and

15  prospective customers from the world's largest social media company. *Id.*

16    90.    BrandTotal has suffered reputational harm as a result of Facebook's actions,

17  including its false and misleading statements to Google. *Id.*

18    91.    Facebook's decision to bar BrandTotal from their platforms, and to send take down

19  notices to Google without advance notice or dialogue with BrandTotal, has already caused

20  irreparable harm to BrandTotal. *Id.* BrandTotal is losing business every day and in jeopardy of

21  being insolvent. *Id.*

22    92.    Facebook's actions have made collection of this advertising information more

23  costly because BrandTotal has redesigned UpVoice to collect only advertising information, despite

24  Panelists agreeing to provide their demographic information via UpVoice. If Facebook is allowed

25  to interfere in UpVoice 2021, it will have a crushing impact on BrandTotal.  BrandTotal cannot

26  survive to case conclusion without the data that Facebook intentionally had shut down. *Id.*

27

28

1

2

3

## <u>COUNTERCLAIM I</u>

**Declaratory Judgment That BrandTotal Has Not Violated and Will Not Violate the
Computer Fraud and Abuse Act, 18 U.S.C. § 1030, by Accessing Public Data**

4

5

93.     BrandTotal hereby incorporates by reference the allegations of the preceding

paragraphs as though fully set forth herein.

6

7

94.     Under the Declaratory Judgment Act, courts may "declare the right and other legal

relations" of parties "to a case of actual controversy." 28 U.S.C. § 2201.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

95.     An actual controversy exists between BrandTotal and Facebook. On January 21,

2021, Facebook wrote BrandTotal to improperly demand that "BrandTotal immediately cease

collecting data from Facebook's platform", a demand reiterated by Facebook in correspondence on

February 4, 2021 specifically in reference to UpVoice 2021.  Facebook has alleged prior versions

of UpVoice and other extensions violate the CFAA. Facebook's Terms of Service do not allow

automatic collection without "permission." Despite BrandTotal requesting permission to

automatically collect Third-Party Advertising Information under Facebook's Terms of Service on

February 25, 2021, Facebook has not yet responded to confirm that it will grant such permission.

Facebook has stated in this litigation that it refuses to grant permission to any entity that would use

automated means to collect information from its site, including Third-Party Advertising

Information. BrandTotal thus has a real and reasonable apprehension that it will be subject to

liability if it continues to receive, via the UpVoice 2021 versions, data regarding advertisements

Panelists have seen on Facebook. Moreover, this apprehension was caused by Facebook's

actions—namely, Facebook's assertion of a claim under the Computer Fraud and Abuse Act

against prior versions of UpVoice and other applications and/or extensions owned and/or operated

by Defendants and continued refusal to allow automatic collection outside of the APIs and Ad

Library, which do not provide the majority of the information BrandTotal needs to operate its

business, which Facebook knows because it has investigated Defendants extensions/software

several times and Facebook provides competitive advertising services using the same types of data

that BrandTotal collects.

28

96.     UpVoice 2021 has not, and will not, intentionally access or attempt to access Facebook's computers to obtain non-public information from Facebook. UpVoice 2021 only receives public information Panelists willingly share. Users are not harmed in any way, and Facebook knows this.

97.     Facebook has not suffered any damage or loss resulting from any action by BrandTotal and thus cannot bring or maintain any civil action under section 1830(g).

98.     Facebook cannot bring or maintain a civil action against BrandTotal because BrandTotal's conduct does not involve any "of the factors set forth in subclauses (I), (II), (III),(IV), or (V) of subsection (c)(4)(A)(i)." 18 U.S.C. § 1030(g).

99.     Facebook cannot bring or maintain a civil action because Facebook is barred by the statute of limitations. 18 U.S.C. § 1030(g). Defendants have been engaged in the same or similar conduct Facebook alleges violates the CFAA for more than two (2) years prior to Facebook bringing any original action.

100.     BrandTotal seeks a declaration that the UpVoice 2021 versions have not, and will not, violate the CFAA by continuing to access and use public data and that Facebook cannot use the provisions of the CFAA for an improper purpose in a way that leads to independent violations of California law and infringes on BrandTotal's rights.

101.     BrandTotal prays for relief as set forth below.

## COUNTERCLAIM II

**Declaratory Judgment That BrandTotal Has Not Violated and Will Not Violate California Penal Code § 502**

102.     BrandTotal hereby incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

103.     An actual controversy exists between Facebook and BrandTotal. Facebook has previously alleged BrandTotal's UpVoice and other products violate California Penal Code § 502 without distinguishing the operation of those products on the collection of only user-demographic data. Facebook's Terms of Service do not allow automatic collection without "permission."

Despite BrandTotal requesting permission to automatically collect Third-Party Advertising Information under Facebook's Terms of Service on February 25, 2021, Facebook has not yet confirmed it will allow such collection. Upon information and belief, Facebook refuses to grant permission to any entity that would use automated means to collect any information from its site, including Third-Party Advertising Information. BrandTotal thus has a real and reasonable apprehension it will be subject to liability if it continues to receive, via the UpVoice 2021 versions, data regarding advertisements Panelists have seen on Facebook. Moreover, this apprehension was caused by Facebook's actions—namely, Facebook's continued refusal to allow automatic collection outside of the APIs and Ad Library, which do not provide the majority of the information BrandTotal needs to operate its business and assertion and maintenance of a claim under the California Penal Code § 502 against earlier versions of UpVoice and Defendants' other applications and extensions, which Facebook knows because it has investigated Defendants extensions/software several times and Facebook provides competitive advertising services using the same types of data that BrandTotal collects..

104.    BrandTotal did not, and will not, knowingly access and without permission use Facebook's computers to both: (a) devise and/or execute a scheme to defraud, deceive, or extort; **and** (b) wrongfully control or obtain money, property, or data. Panelists willingly provide permission and share their information via the UpVoice 2021 programs, which do not make any background calls or otherwise collect information the Panelist is not shown. Before being allowed to share their data with BrandTotal, prospective-Panelists must agree to the UpVoice Terms of Service, which expressly disclose the information BrandTotal collects and how it is used.

105.    BrandTotal did not, and will not, knowingly access and without permission take, copy, or make use of any data from a computer, computer system, or computer network or otherwise violate Section 502(c)(2). Panelists willingly provide permission and share information regarding advertisements Facebook was paid to show the Panelists. The UpVoice 2021 programs do not perform any background calls or otherwise collect information not shown to the Panelist.

106.    BrandTotal did not, and will not, knowingly and without permission use or cause to

be used any computer services or otherwise violate Section 502(c)(3). Panelists willingly provide permission and share information regarding advertisements Facebook was paid to show the Panelists. UpVoice 2021 does not perform any background calls or otherwise collect information not shown to the Panelist.

107.   BrandTotal did not, and will not, knowingly and without permission access or cause to be accessed any computer, computer system, or computer network, or otherwise violate Section 502(c)(7). Panelists willingly provide permission and share information regarding advertisements Facebook was paid to show the Panelists. UpVoice 2021 does not perform any background calls or otherwise collect information not shown to the Panelist.

108.   Facebook has not suffered any damages or loss resulting from Panelists sharing public advertising data with BrandTotal.

109.   BrandTotal seeks a declaration that it has not, and will not, be in violation of California Penal Code § 502.

110.   BrandTotal prays for relief as set forth below.

## COUNTERCLAIM III

### Declaratory Judgment That BrandTotal Has Not, and Will Not, Interfere with Facebook's Contractual Relations

111.   BrandTotal hereby incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

112.   An actual controversy exists between Facebook and BrandTotal. Facebook has previously alleged BrandTotal's UpVoice and other products intentionally interfered with Facebook's contractual relationship with its users by allegedly inducing those users to share their Facebook login credentials with BrandTotal in violation of purportedly valid agreements between Facebook and its users, without distinguishing the operation of those products on the collection of only user-demographic data. BrandTotal thus has a real and reasonable apprehension it will be subject to liability if it continues to receive, via UpVoice 2021, data regarding advertisements Panelists have seen on Facebook. Moreover, this apprehension was caused by Facebook's

actions—namely, Facebook's assertion and maintenance of a claim for interference with contractual relations against earlier versions of UpVoice and Defendants' other applications and extensions.

113.    No version of UpVoice—including UpVoice 2021 or other of Defendants' applications and extensions—collect users' login information, including passwords.

114.    UpVoice 2021 collects only public advertising data that Facebook refuses to make available through any of Facebook's APIs. BrandTotal has made the source code available to Facebook to review and confirm these facts.

115.    In connection with UpVoice 2021, BrandTotal has never represented Facebook was a "participating site" or otherwise stated or implied Facebook sanctioned BrandTotal's conduct. Since the launch of UpVoice 2021, BrandTotal's website makes clear that it is a third-party and has no connection with Facebook.

116.    BrandTotal seeks a declaration that it has not, and will not, interfere with Facebook's Contractual Relations.

117.    On information and belief, Facebook has not lost any users as a result of Defendants data collection, nor has it lost any prospective users.

118.    BrandTotal prays for relief as set forth below.

## COUNTERCLAIM IV

### Intentional Interference with Contract

119.    BrandTotal hereby incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

*Facebook intentionally interfered with valid contracts between BrandTotal and its clients.*

120.    BrandTotal has valid contracts with each of its clients.

121.    Facebook has knowledge of BrandTotal's valid client contracts at least because, as of the time of its Complaint, Facebook had knowledge of BrandTotal's advertisements on Facebook's platform as well as knowledge of BrandTotal and UpVoice's websites. Indeed, exhibit 5 to Facebook's complaint is a screenshot of BrandTotal's website, which includes the statement

that "[m]any of the most recognizable consumer brands use [BrandTotal's] competitive marketing intelligence platform to discover marketing threats and opportunities in real time."

122. Despite Facebook falsely contending prior to discovery exchange in this case that it was not aware of specific customers, Facebook internal documents show that it had knowledge of BrandTotal's valid customer contracts because ███████████████████████████ ████████████████████████████████████████████████████. Ex. G; Ex. H. Facebook is therefore at least aware of the valid contracts between BrandTotal and the specific customers (█████████████████████, Ex. G, and "several advertiser partners," Ex. H) that discussed BrandTotal with Facebook.

123. These customer contracts are endangered by Facebook's conduct. BrandTotal cannot perform its obligations under these contracts without data from Facebook at least because Facebook is the world's largest social media provider with the ability to reach an estimated 78% of the platform's monthly users. Simply put, BrandTotal's clients want to advertise on Facebook and want to know how others are advertising on Facebook. Indeed, in the months since Facebook acted to have UpVoice removed from the Chrome Store and stop BrandTotal's ability to access Third Party Advertising Information from Facebook, BrandTotal's relations with its clients has significantly suffered because of BrandTotal's lack of information from Facebook. BrandTotal has also lost numerous prospective clients for this same reason.

124. Facebook knew with a very high degree of certainty that Google would remove UpVoice when Facebook emailed Google in September 2020 based on Facebook's misrepresentations and fraudulent statements to Google regarding BrandTotal Specifically, Facebook misrepresented that UpVoice and other extensions were "improperly scraping user PII . . . without proper disclosure," Ex. I, when BrandTotal had not only disclosed to its users what information was being collected, but UpVoice-Panelists had even provided much of that information to BrandTotal, all of which Facebook would have known through its prior investigations of Defendants. *See* Ex. F. In addition, upon information and belief, Facebook had previously requested Google take down other competitors and knew Google would do as Facebook

1    requested.

2         125.    BrandTotal has given notice to Facebook that its customer relationships and

3    business would be destroyed if BrandTotal's access to Facebook is denied and Facebook again acts

4    to remove UpVoice from the Google Chrome Web Store or other source. In addition, upon

5    information and belief, from Facebook's investigation into BrandTotal, Facebook knew that its

6    actions would destroy BrandTotal as a company because Facebook's actions would necessarily

7    mean BrandTotal lacked access to the data for the world's largest social media company and could

8    not compete in the market for Third Party Advertising Information on Facebook, including the

9    highly coveted and competitive analytics of dark advertisements. Facebook knew of the

10   relationship between UpVoice and BrandTotal and had known for years Defendants' applications

11   and extensions collected advertising data to provide their advertising analytics services. *See* Ex. D,

12   Ex. E, Ex. F. Despite contending in its motion to dismiss, ECF No. 97, that Facebook was unaware

13   of how BrandTotal obtained its data, these documents disprove Facebook's claims.

14        126.    Moreover, Facebook continues to deny BrandTotal access to the Third Party

15   Advertising Information BrandTotal needs to meet its obligations to its clients. Facebook does not

16   provide this information through any API or other source and refuses to grant BrandTotal, or any

17   company, permission under its Terms of Service to automatically collet this information.

18        127.    Facebook's conduct has disrupted and, if allowed to be repeated with UpVoice

19   2021, will disrupt or cause the breach of BrandTotal's customer contracts. BrandTotal's entire

20   business is premised on access to content on social media, the vast majority of which comes from

21   Facebook. It is not merely more costly or burdensome to acquire this missing data from another

22   source, it is impossible. Facebook is the world's largest social media provider and uniquely

23   possesses Third Party Advertising Information, including dark ads, on its site. Preventing

24   BrandTotal from accessing Facebook will necessarily mean that BrandTotal cannot continue to

25   perform under its contracts with its clients. All or most customers will not ultimately do business

26   with BrandTotal if it cannot effectively advise its customers how to advertise on Facebook.

27   Facebook knows this because it uses the same types of data to advise its advertising customers

28

how to advertise effectively on Facebook and thus understands how important the data is to BrandTotal's clients. Moreover, by acting to have UpVoice removed from the Chrome Store, Facebook removed BrandTotal's ability to collect data from any site via UpVoice, not just from Facebook. BrandTotal incorporates by reference its factual allegations regarding the harm Facebook's actions have caused to BrandTotal in paragraphs 84–92 as if fully stated herein.

128.   Through its investigation of BrandTotal and its knowledge of how prominent its social media sites are, Facebook knew the harm it would cause. Indeed, in September 2020, just before filing the state lawsuit, Mr. Karve of Facebook responded to information that Facebook's own customers were inquiring about BrandTotal by stating Facebook was moving against BrandTotal "this week." Ex. H. The plain implication is that Facebook employees should no longer raise questions about BrandTotal or provide Facebook customers with information about BrandTotal because Mr. Karve authorized Facebook to shut BrandTotal down. Facebook's own actions show it thought BrandTotal would simply collapse. It filed the original lawsuit in state court with an initial firm and, when BrandTotal did not collapse, fold, or back down, Facebook quickly dismissed the state court case, filed a federal complaint with more counts, and brought in an additional firm to fight BrandTotal.

*Facebook intentionally interfered with valid contracts between BrandTotal and its Panelists.*

129.   BrandTotal had valid contracts with each of its Panelists.

130.   When applying to be a Panelist, each individual must acknowledge and agree to the UpVoice Terms of Service. In consideration of a Panelist sharing their information with BrandTotal, BrandTotal provides the Panelist with monetary compensation. Similarly, users of Defendants' other extensions were compensated for the data they chose to share through use of the extension that improved the user's social media experience. If Panelists are unable to share their data with BrandTotal, Panelists cannot perform their duties under the UpVoice Terms of Service.

131.   BrandTotal's Panelists and other users are also Facebook users and are known to Facebook. Upon information and belief, the identity of BrandTotal's Panelists are known or readily available to Facebook. Certainly, it knows that its users are involved and that its actions

would interfere with these relationships.

132.    BrandTotal has given notice to Facebook that its relationships with Panelists would be destroyed if Panelists are unable to share their data with BrandTotal's and Facebook again acts to remove UpVoice from the Google Chrome Web Store or other source. Yet, Facebook continues to interfere with these relationships. In addition, upon information and belief, from Facebook's investigation into BrandTotal, Facebook knew that its actions would interfere with BrandTotal's relationships with its Panelists because Facebook knew its actions would necessarily result in Panelists' inability to share their data with BrandTotal.

133.    Moreover, Facebook continues to deny Panelists' ability to share their information with BrandTotal by denying BrandTotal permission to receive information automatically collected from Panelists. Facebook refuses to grant BrandTotal, or any company, permission under its Terms of Service to automatically collet this information.

134.    Facebook suspended BrandTotal's Facebook and Instagram pages, as well as the personal pages of BrandTotal's principals. This action has harmed BrandTotal by preventing BrandTotal's ability to advertise on Facebook, which was BrandTotal's largest source of recruitment for new Panelists. By removing this ability, Facebook harmed BrandTotal's ability to grow its business and compete with Facebook.

135.    Facebook knew Google would remove UpVoice when Facebook emailed Google in September 2020 based on Facebook's misrepresentations and fraudulent statements to Google regarding BrandTotal. Specifically, Facebook misrepresented that UpVoice and other extensions were "improperly scraping user PII . . . without proper disclosure," Ex. I, when BrandTotal had not only disclosed to its users what information was being collected, but UpVoice-Panelists had even provided much of that information to BrandTotal when signing up. Collecting the same information with software/extensions would not harm a user if the same information is collected at sign-up.  In addition, upon information and belief, Facebook had previously requested Google take down other competitors and knew with a very high degree of certainty that Google would do as Facebook requested.  Indeed, Google took down BrandTotal's extensions and stopped the majority

1    of its data collection.

2          136.    Facebook's conduct has disrupted and, if allowed to be repeated with UpVoice

3    2021, will disrupt or cause the breach of BrandTotal's contracts with Panelists. Under the UpVoice

4    Terms of Service, BrandTotal provides compensation to Panelists only in exchange for Panelists'

5    sharing of their data. By removing the ability of Panelists and users to share their information with

6    BrandTotal, Facebook intentionally interfered with the obligations and duties of BrandTotal and

7    Panelists under these Terms. Preventing BrandTotal from accessing Facebook will necessarily

8    mean that BrandTotal cannot continue to perform under its contracts with its Panelists. Moreover,

9    by acting to have UpVoice removed from the Chrome Store, Facebook removed Panelists' ability

10   to share their data from any site via UpVoice, not just from Facebook. BrandTotal incorporates by

11   reference its factual allegations regarding the harm Facebook's actions have caused to BrandTotal

12   in paragraphs 84–92 as if fully stated herein.

13         137.    When Facebook removed BrandTotal's ability to recruit additional Panelists by

14   advertising, Facebook knew it was interfering with BrandTotal's ability to recruit additional

15   Panelists.

16   *Facebook intentionally interfered with valid contracts between BrandTotal and its investors.*

17         138.    BrandTotal had valid contracts with multiple investors.

18         139.    Facebook was aware of the identities of these investors and their relationship with

19   BrandTotal.

20         140.    Facebook has knowledge of BrandTotal's valid contracts with investors at least

21   because, as of the time of its Complaint, Facebook had knowledge of BrandTotal's relationships

22   with specific investors, including NHN Investment, One Way Venture, FJ Labs, Glilot Capital

23   Partners, and Keshet Dick Clark Productions. Indeed, Facebook acknowledges "BrandTotal

24   received approximately $8 million in venture capital funding" and cites to exhibit 7 to Facebook's

25   complaint, which is a screenshot from BrandTotal's website with the title *BrandTotal Raises $6*

26   *Million in Series A Round to Expand Rollout of Agile Marketing Platform* that identifies the above

27   investors with whom BrandTotal had valid contracts.

28

141.     BrandTotal incorporates by reference its factual allegations regarding the harm Facebook's actions have caused to BrandTotal in paragraphs 84–92 as if fully stated herein. BrandTotal has given notice to Facebook that BrandTotal's relation with its investors would be destroyed if Facebook again acts to remove UpVoice from the Google Chrome Web Store or other sources. Facebook, however, continues to interfere with these relationships even though it knows the harm it is causing by refusing to allow BrandTotal to collect data.  Facebook knew of this data collection since at least ███, and investigated in several times, yet never took any action until filing the lawsuit in October 2020. Facebook also knew its actions would harm BrandTotal's relation with its investors because Facebook had reviewed BrandTotal's website and knew BrandTotal had received funding based on its then-business model; a business model Facebook actively sought to destroy. By acting to have UpVoice removed from the Chrome Web Store, Facebook destroyed BrandTotal's ability to receive Panelists' information from any site, not just Facebook.

142.     Facebook knew with a very high degree of certainty that Google would remove UpVoice when Facebook emailed Google in September 2020 based on Facebook's misrepresentations and fraudulent statements to Google regarding BrandTotal. Specifically, Facebook misrepresented that UpVoice and other extensions were "improperly scraping user PII . . . without proper disclosure," Ex. I, when BrandTotal had not only disclosed to its users what information was being collected, but UpVoice-Panelists had even provided much of that information to BrandTotal. In addition, upon information and belief, Facebook had previously requested Google take down other competitors and knew Google would do as Facebook requested. Facebook knew all of this because it previously investigated Defendants software, applications, extension, advertisements and website. Facebook's suggestions to the contrary in its motion to dismiss were false.

**Facebook intentionally interfered with valid contract between BrandTotal and Google.**

143.     BrandTotal had a valid contract with Google under which BrandTotal was able to provide developer services and promote its product on the Chrome web store.

144.     Facebook knew of BrandTotal's valid contract with Google. In September 2020, Facebook emailed Google specifically because of Google's contract with BrandTotal.

145.     BrandTotal has given notice to Facebook that BrandTotal's relationship with its with Google would be destroyed if Facebook again acts to remove UpVoice from the Google Chrome Web Store.

146.     Facebook's past and continued conduct has caused and will disrupt or cause the breach of BrandTotal's valid contracts with Google.

147.     Facebook knew with a very high degree of certainty that Google would remove UpVoice when Facebook emailed Google in September 2020 based on Facebook's misrepresentations and fraudulent statements to Google regarding BrandTotal. Specifically, Facebook misrepresented that UpVoice and other extensions were "improperly scraping user PII . . . without proper disclosure," Ex. I, when BrandTotal had not only disclosed to its users what information was being collected, but UpVoice-Panelists had even provided much of that information to BrandTotal. In addition, upon information and belief, Facebook had previously requested Google take down other competitors and knew Google would do as Facebook requested.

148.     BrandTotal incorporates by reference its factual allegations regarding the harm Facebook's actions have caused to BrandTotal in paragraphs 84–92 as if fully stated herein. As a direct and proximate result of Facebook's conduct, BrandTotal has suffered and will continue to suffer damages, including but not limited to lost business, reputational damage, loss of investor funds, and insolvency. Unless Facebook is restrained by a temporary injunction, preliminary injunction, and a permanent injunction, BrandTotal will suffer severe and irreparable harm in that it will be forced to terminate its contracts with its clients and may be forced out of business entirely.  BrandTotal cannot stay in business until this case concludes without the data that Facebook caused to be shut down.

149.     BrandTotal has requested that it be reinstated, that it be allowed to provide explanatory information, that Facebook's takedown request to Google be rescinded, that its Facebook accounts be restored, and that access should be permitted during that process to avoid

irreparable harm. BrandTotal is informed and believes and thereon alleges that, unless the court grants injunctive relief, Facebook will continue to bar BrandTotal from its platform. Facebook's fraudulent and misleading statements to Google were known by Facebook to be false, and its actions were malicious.

150.    BrandTotal has no adequate remedy at law because monetary damages will not afford adequate relief for the loss of BrandTotal's business and customer relationships, client goodwill, reputation in the marketplace, investor relationships, and the ability to continue operating.

*Facebook lacks any legitimate business purpose to support its intentional interference.*

151.    Facebook does not have any legitimate business purpose in interfering with the valid contracts between BrandTotal and its clients, Panelists, investors, or Google.  Nor could there ever be justification for lying to Google.

152.    Any general interest Facebook may have in policing access to password-protected portions of its networks does not apply to users that have volunteered to share their information with BrandTotal.

153.    Facebook does not have any "general interest" in policing access to information contained on password protected portions of its network when Facebook makes the same or similar information available on non-password protected portions of its network, including through the advertising URL and/or the Ad Library.  Nor can information that is accessible to billions of users, that can be manually collected without violating Facebook terms of use be considered sensitive or involving meaningful user interests.

154.    Facebook does not have any procedure or method to vet or regulate any entity, including BrandTotal, that requests access to Third-Party Advertising Information. Although Facebook's Terms of Service state no party may "access or collect data from our Products using automated means (without our prior permission)" in reality Facebook does not ever grant such permission. Facebook also does not allow non-Facebook entities, including BrandTotal, to access Third Party Advertising Information via any API or other approved source. Facebook instead

keeps this information for itself and away from the public, who has a strong interest in the information being accessible. In doing so, Facebook acts in bad faith and for an improper purpose.

155.    Facebook does not have a legitimate business purpose in needing to review, vet, or regulate BrandTotal before allowing BrandTotal access to information Panelists elect to share with BrandTotal. Facebook has been aware of how Defendants' applications and extensions operate since April 2019 and have concluded such applications and extensions are ████████████████████████████████████████████████████████████. Ex. E. Facebook's statements to the contrary in its Complaint, specifically its allegations that Defendants' extensions/software are "malicious" were known by Facebook to be false and a sham when it made them. Facebook instead, in direct violation of the Ninth Circuit law, is merely denying a competitor access to the public Third Party Advertising Information needed to compete.

156.    The FTC Consent Order does not provide Facebook with any legitimate business purpose in interfering with the valid contracts between BrandTotal and its clients, Panelists, investors, or Google. The UpVoice 2021 programs do not collect Covered Information because they collect only advertising information that is not "from or about an individual consumer."

157.    BrandTotal is not a Covered Third Party and the FTC Consent Order thus does not apply to BrandTotal's collection using any version of UpVoice or any other application or extension because BrandTotal uses and/or receives information only as part of a User-initiated transfer of information as part of a data portability protocol or standard.

158.    Any valid construction or interpretation of the FTC Consent Order only justifies Facebook in terminating or restricting conduct where such conduct is deceptive or harmful to consumers. *See* Consent Order, § V. Any interpretation of the FTC Order that conflicts with the Ninth Circuit's holding in *hiQ Labs, Inc. v. LinkedIn Corp.,* 938 F.3d 985 (9th Cir. 2019), would render the FTC Order invalid and is therefore incorrect.  Federal Trade Commission Act Section 5: Unfair or Deceptive Acts or Practices is directed only to preventing deceiving and acting unfairly towards consumers.  It is unreasonable to interpret the Consent Order as requiring Facebook to

stop lawful conduct that does not harm users and is not deceiving or unfairly treating users. Indeed, by stopping BrandTotal, it harms users by not allowing them to be paid for sharing data and removing users' control over their own data.

159.     The doctrine of unclean hands bars Facebook from asserting the FTC Order requires Facebook to prevent Panelists from sharing their information, including Third-Party Advertising Information, with BrandTotal. Section VII of the Consent Order requires Facebook to establish, implement, and maintain a Privacy Program that requires Facebook to allow Covered Third Parties to provide an annual self-certification that certifies the Covered Third Party complies with Facebook's Platform Terms and that the information the Covered Third Party requests or continues to have access complies with said Terms. By preparing its Terms of Service to require Facebook's permission for automatic collection while *never* allowing non-Facebook entities to automatically collect Third-Party Advertising Information, Facebook has engaged in inequitable conduct. Facebook's inequitable conduct thus precludes BrandTotal from being able to certify compliance with Facebook's Terms, and relates to Facebook's claims relating to the Consent Order.  The FTC in its Consent Order did not require Facebook to stop all automated data collection from its site.

160.     BrandTotal prays for relief as set forth below.

## COUNTERCLAIM V

### Intentional Interference with Prospective Economic Advantage

161.     BrandTotal hereby incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

162.     As alleged herein, Facebook has intentionally interfered with BrandTotal's valid contracts with its clients, Panelists, investor opportunities, and Google. Facebook committed independent wrongs when it revoked access to Facebook because: (i) Facebook breached its express promises in its Terms of Use that Facebook's users, including BrandTotal's Panelists, control access to their information; (ii) Facebook holds only non-exclusive licenses to its users' content, and visitors and the public may access and use its users' publicly available information;

(iii) Facebook violated the California Unfair Competition Law as alleged herein; (iv) Facebook improperly reported BrandTotal as violating the Consent Order when BrandTotal was not a Covered Third Party; and (v) Facebook fraudulently reported BrandTotal to Google to secure the removal of UpVoice from the Google Chrome Store, as alleged herein.

163.    Facebook is intentionally and wrongfully disrupting BrandTotal's contracts, investor relationships, and prospective business dealings by taking actions to remove BrandTotal's ability to receive Panelists' Facebook information, upon which BrandTotal's business depends. In addition, by not complying with the requirement of the FTC Consent Order to allow a Privacy Program that allows users to control the sharing of their data with entities that have certified under the Order, Facebook improperly cuts off all data collection.

164.    Facebook knew the prospective relationships with which it was interfering. Any company that advertises on Facebook is a prospective relationship with which Facebook knowingly and willfully interfered. Indeed, shortly before Facebook acted against BrandTotal, several advertisers inquired with Facebook about BrandTotal. Ex. H. In response to knowledge of these prospective relationships, Facebook moved against BrandTotal that same week. *Id*.

165.    As a direct and proximate result of Facebook's conduct, BrandTotal has suffered and will continue to suffer damages, including but not limited to lost business, reputational damage, loss of investor funds, and insolvency. Unless Facebook is restrained by a preliminary injunction and a permanent injunction, BrandTotal will suffer severe and irreparable harm in that it will be forced to terminate its contracts with its clients and may be forced out of business entirely. BrandTotal incorporates by reference paragraphs 84–92 as if fully set forth herein.

166.    BrandTotal has requested that Facebook be ordered not to request the removal or otherwise act to remove UpVoice from the Chrome Web Store or any other source, that BrandTotal be allowed to provide explanatory information, and that access should be permitted during that process to avoid irreparable harm. BrandTotal is informed and believes and thereon alleges that, unless the court grants injunctive relief, Facebook will continue to bar BrandTotal from Facebook.

167.    BrandTotal has no adequate remedy at law because monetary damages will not afford adequate relief for the loss of BrandTotal's business and customer relationships, client goodwill, reputation in the marketplace, investor relationships, and the ability to continue operating.

168.    Facebook does not have any legitimate business purpose in intentionally interfering with BrandTotal's prospective economic advantages for the reasons stated above in paragraphs 151–159. Facebook knew of the types of prospective customers for the same reasons that it knew of BrandTotal's existing contracts.  Further, in September 2020, Facebook personnel knew of actual prospective customers asking Facebook about BrandTotal.  Facebook's Mr. Karve, in response to information that Facebook customers were inquiring about BrandTotal, responded Facebook was taking actions to remove BrandTotal, Ex. H, thus evidencing a specific intent to interfere with these prospective relationships. As with all prospective relationships, there was a reasonable probability that BrandTotal would consummate at least some of these prospective relationships if Facebook did not deceitfully persuade Google to shut down BrandTotal's data. Indeed, BrandTotal was engaged in advanced negotiations with many of its prospective clients before Facebook's conduct ruined those prospects. Ex. L. Facebook's continued refusal to allow BrandTotal to use UpVoice 2021 also constitutes tortious interference with prospective relationships for the foregoing reasons, and the additional reason that there is even less justification for not allowing mere advertising data collection.

169.    BrandTotal prays for relief as set forth below

## COUNTERCLAIM VI

**Unfair Competition Violations of California Business & Professions Code § 17200, *et seq***
**(Unlawful, Unfair, and Fraudulent Prongs)**

170.    BrandTotal hereby incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

171.    Facebook's actions described above constituted unlawful, unfair, and fraudulent acts or practices in the conduct of business, in violation of California's Business and Professions Code § 17200, *et seq*., including actions that are forbidden by other laws.

172.    BrandTotal has suffered loss of money and property and an economic injury in fact, specifically being forced to accept lower payments for client renewals resulting from Facebook's actions that prevent Panelists from sharing their data with BrandTotal and forgo repeat and additional client relationships due to the ongoing lawsuit, and thus has standing to seek relief under section 17200.

173.    Facebook's termination of access to Facebook and request to remove UpVoice from the Google Web Store violates the policy or spirit of antitrust law. Facebook is using its dominant presence as the world's largest social media platform to assume exclusive proprietary control over public data that is not owned by Facebook, but by its users, and which has explicitly been found to be public content.  The market comprises at least Facebook's site, which has more users than the size of by far most countries in the world.

174.    Facebook promises users that they will have the ability to control public access to its data to incentivize users to join Facebook. Facebook's recent and threatened actions thus suppress competition and violate the core principles and spirit of the unfair competition and antitrust laws. Facebook is harming all competition that involves collection of data from its site, and because advertising companies cannot fairly compete without being able to collect information from Facebook that does not harm users and is for a proper purpose, Facebook is precluding any company from building a business to provide advertising consulting services in social media. Indeed, if Facebook is allowed to do this, the other social media companies also have prohibitions against automated data collection and all will have the ability to shut down collection of data, including public information, on their sites.

175.    Facebook is not merely refusing to deal with other competitors but is instead wholly impairing competition for Third-Party Advertising Information. Facebook uses its unique and exclusive control over the demographic information of its users to offer advertisers the ability to reach the more than 2 billion users on its site based on their specific demographics. Facebook uniquely possesses information regarding how advertisers on its site target users based on their age, gender, location, and other factors. Facebook does not make this information available via any

API or other public source. Although Facebook makes visible aggregate information for SIEP-advertisements, Facebook intentionally takes the unnecessary and additional step to distinguish between SIEP and non-SIEP advertisements to exclude non-SIEP information from competitors and the public. Facebook also intentionally does not make even SIEP information available via any API and precludes automatic collection, retaining all the information only for itself.

176.    This harms consumers and the public has a strong interest in non-Facebook entities having access to Third Party Advertising Information on Facebook. Currently, it is impossible for the public to know whether an advertiser is targeting members of a specific demographic group (e.g., women over age 50 living in Texas) differently than members of another demographic group. Indeed, upon information and belief, it is a common practice of Facebook advertisers to target different demographic groups with different advertising creatives (i.e., different pictures and even text advertising the same or similar services). Advertisers can even offer one demographic group a different promotional price via Facebook's advertising services that it withholds from another group that does not know what offers are being made to others. This type of information is public in other forms of advertising, including television and print. Facebook's proactive actions to keep this information from the public (e.g., by distinguishing between SIEP and non-SIEP advertisements and publishing demographic data only for the former) harms competition and the public generally.

177.    Despite a potential partnership with BrandTotal benefitting Facebook by allowing it to "███████████████████████" (i.e., Facebook's own clients and customers), Ex. G, Facebook elected to immediately remove BrandTotal and retain monopoly power over Third Party Advertising Information on Facebook. Ex. H.

178.    By revoking or limiting BrandTotal's access to publicly available data, Facebook is unfairly limiting BrandTotal's ability to compete with Facebook's advertising insights and offerings.

179.    There is no viable alternative to Facebook's social media platforms for obtaining current content for marketing and advertising purposes. Facebook is the world's largest social

network with over 2.4 billion monthly active users. Facebook's advertisements reach approximately 78% of the platform's monthly users. In the United States, approximately 65% of the population age 13 or older is reachable by Facebook advertising. Although Facebook elects to make some information regarding non-SIEP advertisements available for viewing (while still improperly restricting automatic collection of that data), Facebook maintains its monopoly over the market concerning Third-Party Advertising Information (i.e., non-SIEP advertisements shown to the more than 1 billion users on Facebook). Indeed, the majority of these advertisements are "dark" ads, meaning information regarding to whom the advertisements are shown, for how long, and other information relating to the advertisements is known only to Facebook and the advertiser paying Facebook to show the advertisement that meet the advertiser's criteria (e.g., age, gender, location). Facebook understands it has this advantage and, on information and belief, markets it superiority to its customers so they will use Facebook and not other third party advertising companies.  Use of other social media platforms with available public user content is not a reality given Facebook's total domination of this market, and there are no economic substitutes for access to this Third-Party Advertising Information on Facebook.

180.    There is no technical barrier or subsequent cost to Facebook in providing access to BrandTotal.  Indeed, BrandTotal collected such information for several years with Facebook's knowledge and Facebook did nothing.  Even if the FTC Consent Order requires it to vet and monitor collection, to the extent the Order even applies, that is the punishment to Facebook for its actions.  It acted with unclean hands and has no legitimate basis to complain.

181.    The impact of Facebook's actions on BrandTotal is devastating; its contracts with clients, Panelists, and Google, in addition to its investor and employee relationships, are threatened and may be damaged beyond repair. BrandTotal incorporates by reference its factual allegations regarding the harm Facebook's actions have caused to BrandTotal in paragraphs 84–92 as if fully stated herein.

182.    Facebook lacks any legitimate justification for its actions. Facebook's actions are intended only to maintain a monopoly over the Third-Party Advertising Information on Facebook

marketplace. Facebook elects not to make this information available through any API or other public source while simultaneously denying permission for any entity to use automated means, the only practical way, to collect data for analytics and provision of services to customers wishing to advertise on Facebook. BrandTotal cannot meaningfully market to customers how to advertise on Facebook without robust analytics about the advertising practices and exposure on the Facebook site. Even with data from other social media sites, BrandTotal cannot meet its obligations to its own clients without this data from Facebook because of the sheer size and importance of Facebook in the social media realm.

183.    By wholly refusing any non-Facebook entity access to Third-Party Advertising Information on Facebook, Facebook harms all competition for this information. Facebook allows and facilitates advertisers' ability to reach users on the Facebook website based on their gender, age, location, and other demographic information. Facebook does not let users opt out or otherwise control how advertisers can use this information to advertise to those users. Facebook even allows dark advertisements, which are hidden from public view, while taking affirmative steps to preclude access to this information for anyone other than Facebook.  On information and belief, dark ads comprise the major majority of advertising on Facebook, thus by withholding information about dark ads, it creates a sizable advantage over any company trying to compete in advertising consulting.  Because Facebook sites are by far the largest sites, far larger than LinkedIn, the subject of the *hiQ v. LinkedIn* case, a company having no ability to provide meaningful consultancy services about the Facebook site will have serious difficulty attracting any customers.

184.    Although Facebook may claim its actions protect against the harm of automated collection and/or "scraping," Facebook's claim does not justify its actions. No "scraping" or "automatic" collection would be required if Facebook made this information available through any API or other source. Facebook's Terms of Service allow users to manually share this information, thus undermining its claim its terms of service provide protection. Thus, the information itself is not confidential or otherwise protected. Facebook only bars the automatic collection of this data. Further, Facebook's terms acknowledge that Facebook could grant permission, demonstrating that

1  Facebook knows it should where the purpose is proper and user interest protected, yet Facebook

2  admits that its terms of service are false in that it never grants such permission.

3      185.   Facebook's obligations under the FTC Consent Order also do not justify

4  Facebook's unfair busines practices. BrandTotal incorporates by reference its allegations in

5  paragraphs 151–159 regarding why the FTC Consent Order does not provide Facebook a

6  legitimate business purpose to justify its actions as if fully set forth herein.

7      186.   As alleged herein, Facebook's tortious interference with BrandTotal's current and

8  prospective business, contractual, and investor relationships are unlawful. Facebook's actions

9  establish a claim of unlawful competition on multiple grounds. Facebook's tortious interference

10  with BrandTotal's current and prospective contractual and business relationships, described above,

11  give rise to a claim under the "unlawful" business practices prong of the UCL.

12      187.   As a direct and proximate result of Facebook's conduct, BrandTotal has suffered

13  and will continue to suffer damages, including but not limited to lost business and potential

14  bankruptcy. BrandTotal has already suffered severe harm and incorporates by reference its factual

15  allegations regarding the harm Facebook's actions have caused to BrandTotal in paragraphs 84–92

16  as if fully stated herein.

17      188.   BrandTotal lacks any adequate remedy at law because monetary damages will not

18  afford adequate relief for the loss of BrandTotal's business relationships, client goodwill,

19  relationship with Panelists, and ability to continue operating.

20      189.   Facebook's actions are also fraudulent because Facebook intentionally

21  misrepresented the operation of UpVoice when requesting Google remove UpVoice from the

22  Chrome Store. On September 21, 2020, Facebook represented to Google that UpVoice was

23  "improperly scraping user PII (e.g., gender, relationship status, ad interests, etc.) without proper

24  disclosure." Ex. I.

25      190.   Facebook's representation to Google was false. BrandTotal was not improperly

26  scraping user PII without proper disclosure at least because BrandTotal's Terms of Service

27  expressly disclosed the information it collected, Panelists agreed to those terms before sharing any

28

data, and even share their information with BrandTotal.

191.   Facebook knew its statements were false at the time they were made at least because Facebook had thoroughly investigated UpVoice and BrandTotal over the previous several months. Facebook thus knew BrandTotal relied on the data it collected from Facebook via UpVoice to provide its advertising analytics services to its customers.

192.   Facebook had previously acted ███████████████████████████████ ███████████████████████ at least on that basis, knew Facebook's actions would cause BrandTotal's extensions to become unavailable for download and effectively shut down BrandTotal's business. Ex. E.

193.   Google reasonably relied on Facebook's representations that UpVoice improperly collected user PII. Indeed, although Facebook claims to have investigated UpVoice for many months, Google removed UpVoice from the Chrome Store just ten days after Facebook first contacted Google and only a few days after Facebook again contacted Google after not receiving a response to its September 21 communication.

194.   As a direct and proximate result of Facebook's conduct, BrandTotal has suffered and will continue to suffer the loss of money and property, including but not limited to lost business, lost investments, and imminent insolvency. BrandTotal incorporates by reference its factual allegations regarding the harm Facebook's actions have caused to BrandTotal in paragraphs 84–92 as if fully stated herein. As of September 30, 2020, when Facebook took fraudulent actions to have UpVoice removed from the Chrome Web Store, approximately 68% of BrandTotal's advertising data information came from the UpVoice extension available on the Google Chrome Store.

195.   Facebook lacked any good faith or legitimate business purpose behind its actions. BrandTotal incorporates by reference its allegations in paragraphs 151–159, as if fully stated herein.

196.   BrandTotal has no adequate remedy at law because monetary damages will not afford adequate relief for the loss of BrandTotal's customer and investor relationships, business

goodwill, and the ability to continue operating as a viable business.

197.    BrandTotal prays for relief as set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, BrandTotal prays for judgment against Facebook and each of them as follows:

A.    For a declaratory judgment in favor of BrandTotal and against Facebook that BrandTotal does not violate the Computer Fraud and Abuse Act or California Penal Code § 502 and has not intentionally interfered with any contractual relations belonging to Facebook.

B.    For preliminary, and permanent injunctive relief, pursuant to Federal Rule of Civil Procedure 65, to prevent Facebook from curtailing BrandTotal's access to publicly available information on Facebook's platforms that is essential to BrandTotal's business or otherwise engaging in unfair business practices as described herein;

C.    For damages in an amount to be proven at trial that are actually and proximately caused by Facebook's conduct, and prejudgment interest recoverable thereon at the legal rate;

D.    For attorney fees and costs of suit as permitted by law; and

E.    Such other and further relief as the Court may deem just and proper.

1    Date: March 5, 2021                    Respectfully submitted,

2                                           By: */s/ Rudolph A. Telscher, Jr.*
                                            Karl Kronenberger (CA Bar No. 226112)
3                                           karl@krinternetlaw.com
                                            Jeffrey M. Rosenfeld (CA Bar No. 222187)
4                                           jeff@krinternetlaw.com
                                            KRONENBERGER ROSENFELD, LLP
5                                           150 Post Street, Suite 520
                                            San Francisco, CA 94108
6                                           415-955-1155 Telephone
                                            415-955-1158 Facsimile
7
                                            Rudolph A. Telscher, Jr.*
8                                           rudy.telscher@huschblackwell.com
                                            Kara R. Fussner*
9                                           kara.fussner@huschblackwell.com
                                            HUSCH BLACKWELL LLP
10                                          190 Carondelet Plaza, Suite 600
                                            St. Louis, MO 63105
11                                          314-480-1500 Telephone

12                                          Ryan B. Hauer*
                                            ryan.hauer@huschblackwell.com
13                                          HUSCH BLACKWELL LLP
                                            120 South Riverside Plaza Suite 2200
14                                          Chicago, IL 60606
                                            312-526-1572 Telephone
15
                                            William E. Corum*
16                                          william.corum@huschblackwell.com
                                            HUSCH BLACKWELL LLP
17                                          4800 Main Street, Ste. 1000
                                            Kansas City, MO 64112
18                                          816-983-8000 Telephone

19                                          David Stauss*
                                            david.stauss@huschblackwell.com
20                                          HUSCH BLACKWELL LLP
                                            180 1 Wewatta Street, Suite 1000
21                                          Denver, CO 80202
                                            303-749-7200 Telephone
22                                          *to be admitted *pro hac vice*

23                                          ***Attorneys for Defendants/Counterclaim Plaintiffs
                                            BrandTotal, Ltd. and Unimania, Inc.***

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 5th day of March 2021, I caused the foregoing to be filed electronically with the Clerk of Court and to be served via the Court's Electronic Filing System upon all counsel of record.

<em>/s/ Rudolph A. Telscher, Jr.</em>