**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

Rudolph A. Telscher, Jr.* (MO Bar No. 41072)
rudy.telscher@huschblackwell.com
Kara R. Fussner* (MO Bar No. 54656)
kara.fussner@huschblackwell.com
HUSCH BLACKWELL LLP
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
314-480-1500 Telephone

Ryan B. Hauer* (IL Bar No. 6320758)
ryan.hauer@huschblackwell.com
HUSCH BLACKWELL LLP
120 South Riverside Plaza Suite 2200
Chicago, IL 60606
312-526-1572 Telephone

Dustin L Taylor* (IL Bar No. 6328158)
dustin.taylor@huschblackwell.com
HUSCH BLACKWELL LLP
1801 Wewatta Street, Suite 1000
Denver, CO 80202
        *admitted *pro hac vice*

Karl Kronenberger (CA Bar No. 226112)
karl@krinternetlaw.com
Jeffrey M. Rosenfeld (CA Bar No. 222187)
jeff@krinternetlaw.com
KRONENBERGER ROSENFELD, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
415-955-1155 Telephone
415-955-1158 Facsimile

*Attorneys for Defendants/Counterclaim
Plaintiffs BrandTotal, Ltd. and Unimania,
Inc.*

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO/OAKLAND DIVISION

| | |
|---|---|
| FACEBOOK, INC., a Delaware corporation, | Case No.: 3:20-CV-07182-JCS |
| *Plaintiff/Counterclaim Defendant*, | **DEFENDANTS' MEMORANDUM IN SUPPORT OF ITS RENEWED MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| BRANDTOTAL, LTD., an Israeli corporation, and UNIMANIA, INC., a Delaware corporation, | Judge:  The Hon. Joseph C. Spero<br>Ctrm.:  Courtroom F – 15th Floor<br>Date:   May 14, 2021<br>Time:   9:30 a.m. |
| *Defendants/Counterclaim Plaintiffs*. | |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION ............................................................................................................. 1

PROCEDURAL BACKGROUND ...................................................................................... 3

STATEMENT OF ISSUES ............................................................................................... 4

STATEMENT OF FACTS ................................................................................................ 6

    A.    Facebook Knew of BrandTotal Long Before the Litigation and Concluded ███████████ ............................................. 6

    B.    Facebook Has No Process for Vetting Third Party Access, But Instead Uses Its Terms of Service to Conceal Dark Ad Strategies and Analytics. ............. 9

    C.    Expert Analysis Confirms BrandTotal Collects Information Panelists Have Agreed to Share to Provide Commercial Advertising Consulting. ............. 11

        1.    The UpVoice Legacy Program ............................................. 11

        2.    UpVoice 2021 ............................................. 12

    D.    If Facebook Interferes with UpVoice 2021, BrandTotal Will Not Be Able to Survive Until Trial. ............................................. 15

ARGUMENT ................................................................................................................... 18

I.    THE PUBLIC INTEREST STRONGLY FAVORS GRANTING BRANDTOTAL'S REQUESTED PRELIMINARY INJUNCTION. ......................... 19

    A.    The Public Does Not Have a Strong Interest in Restricting BrandTotal's Access to Data Because It Has Always Been with User Consent and UpVoice 2021 Now Collects Only Advertising Data. ........................................ 20

    B.    Facebook Lacks Any "Vetting" Process and Does Not Make Competitive Advertising Information Available Through Any "Approved" Means ............... 21

    C.    The Public Has a Strong Interest in Allowing BrandTotal to Collect Advertising Data About "Dark Ads." .................................................... 22

    D.    The FTC Consent Order Is Not Justification for Facebook's Actions ................. 25

II.    BRANDTOTAL WILL SUFFER IRREPARABLE HARM ........................................ 28

III.    BRANDTOTAL HAS AT LEAST RAISED SERIOUS QUESTIONS GOING TO THE MERITS OF THEIR CLAIMS. ................................................... 29

IV.    THE BALANCE OF EQUITIES TIPS IN FAVOR OF GRANTING THE REQUESTED PRELIMINARY INJUNCTION. ................................................... 34

CONCLUSION ................................................................................................................ 34

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) .......................................................................................... 18

*Bernhardt v. Los Angeles County*,
339 F.3d 920 (9th Cir. 2003) ............................................................................................ 19

*CTIA-The Wireless Association v. City of Berkeley*,
928 F.3d 832 (9th Cir. 2019) ............................................................................................ 34

*hiQ Labs, Inc. v. LinkedIn Corp.*,
273 F. Supp. 3d 1099 (N.D. Cal. 2017) ............................................................................ 24

*hiQ Labs, Inc. v. LinkedIn Corp.*,
938 F.3d 985 (9th Cir. 2019) .....................................................................................*passim*

*Idaho Potato Commission v. M & M Produce Farm & Sales*,
335 F.3d 130 (2d Cir. 2003) ............................................................................................. 32

*Lear, Inc. v. Adkins*,
395 U.S. 653 (1969) .......................................................................................................... 32

*McIlwain, LLC v. Berman*,
No. 18-CV-03127 CW, 2020 WL 1308342 (N.D. Cal. Feb. 10, 2020) ............................ 32

*Rent-A-Ctr., Inc. v. Canyon Televison & Applicance Rental, Inc.*,
944 F.2d 597 (9th Cir. 1991) ...................................................................................... 29, 30

*Shippers, a Division of Illinois Tool Works, Inc. v. Fontenot*,
No. 13CV1349 JLS(MDD), 2013 WL 12092056 (S.D. Cal. Sept. 23, 2013) .................... 29

*Stuhlbarg International Sales Co., Inc. v. John D. Brush & Co., Inc.*,
240 F.3d 832 (9th Cir. 2001) ............................................................................................ 18

*United States v. American Tobacco Co.*,
221 U.S. 106, 31 S. Ct. 632, 55 L. Ed. 663 (1911) .......................................................... 24

*Winter v. Natural Reserve Defense Council, Inc.*,
555 U.S. 7 (2008) .............................................................................................................. 18

**Statutory Authorities**

18 U.S.C. § 1030(a)(2) .............................................................................................................. 33

18 U.S.C. § 1030(a)(5)(C) ......................................................................................................... 33

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

Cal. Civ. Code § 1667(2) ................................................................................................31, 32

Cal. Civ. Code § 1798.192 ............................................................................................31, 32

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

### INTRODUCTION

1

2     The Ninth Circuit in *hiQ* recognized that "giving [social networking] companies . . . free

3    rein to decide, on any basis, who can collect and use data—data that the companies do not own,

4    that they otherwise make publicly available to viewers, and that the companies themselves collect

5    and use—risks the possible creation of information monopolies that would disserve the public

6    interest." *hiQ Labs, Inc. v. LinkedIn Corporation*, 938 F.3d 985, 1005 (9th Cir. 2019). The Ninth

7    Circuit affirmed preliminary injunction relief on facts that now, with a more developed record, are

8    closely aligned with, arguably even more compelling than, the *hiQ* facts, and discovery from

9    Facebook in the last few months contradicts material assertions it made to defeat BrandTotal's

10    motion for a TRO.

11     On the critical point, Facebook falsely claimed in public filings that BrandTotal's data

12    collection was "malicious" and insinuated that it might harm users or might burden Facebook

13    networks, yet Facebook hides the actual investigative findings behind a protective order where its

14    investigation in 2019 concluded ████████████████████████████████ The

15    latter point is confirmed by BrandTotal's software expert – an expert that Facebook has used in

16    past litigation. The media has picked up on Facebook's false public allegations and has ravaged

17    BrandTotal's reputation in the market, as simple Internet research will reveal. Facebook's

18    inactions matched the wording of its 2019 investigation, as Facebook never contacted BrandTotal

19    to raise any concerns at any point, nor took any other action. Facebook knew its inaction would

20    undermine its "protection of users" theory, and it even misled BrandTotal and the Court to believe

21    that it did not know of BrandTotal until April 2020, and even inaction from that point would be

22    hard to explain if user interests were truly in jeopardy. *See* TRO Order, Dkt. 58 ("Order") at 30.

23     Further, Facebook emphatically denied that its actions were anti-competitive, yet

24    documents from September 2020, when Facebook was deciding to takedown BrandTotal, and

25    despite knowing about BrandTotal for nearly two years, show that Facebook customers had

26    started to ask Facebook about the prospect of using BrandTotal for advertising analytics. Just like

27    in *hiQ*, LinkedIn knew of the data collection for a couple of years, and then shut down *hiQ* only

28    when competitive interests were implicated.

---

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

Moreover, as it relates to the takedown of UpVoice, Facebook claimed this was Google's fault, and that its takedown notice to Google might not work. But discovery has proven this allegation false as well. The Google email is egregious and stunning. It falsely alleged personal information abuse, it shows just how cavalier Facebook was in shutting down a competitor, and Facebook never once invited BrandTotal to tell its side of the story, i.e., the truth. Consistent with its infamous reputation in the market to either "buy or kill" competitors (also the subject of House Findings and antitrust lawsuits by the federal and state governments), in September 2020, Facebook even considered "partnering" with BrandTotal (further undermining its "malicious" company allegations), yet instead Facebook chose to kill BrandTotal. Like *hiQ v. LinkedIn*, preliminary injunction relief to stop Facebook's intentional interference and unfair competition should be granted. To even more closely parallel the *hiQ v. LinkedIn* case, BrandTotal has just launched a new version of its UpVoice program ("UpVoice 2021") that collects only advertising data, and as with the original UpVoice program, with user consent. This too aligns with the Court's TRO Order and supports the requested relief. Dkt. 58 at 22-23, 33 (stating with regard to UpVoice Legacy that "[s]o long as BrandTotal's browser extension works as intended and represented, it threatens at most only marginally greater than those the Ninth Circuit found 'relatively weak' in *hiQ*" and noting the even greater countervailing public interest "when it comes to advertising data—as opposed to user data").

Facebook attempts to justify this conduct for two reasons: (1) its self-created terms of service allow it to violate state laws, harm competition, harm users so they cannot be paid for their data, and harm customers and potential customers who wish to understand Facebook's "dark advertising" program (described in detail below); and (2) an FTC Consent Order, the largest punishment in US history for Facebook abuse of user rights, justifies it in shutting down UpVoice. Neither is justification for violating state law. Facebook's Terms of Service argument is absurd because it could make its terms of service anything ("no women allowed" for example), and it is unenforceable in the context of restricting all automated collection of factual data. As for the FTC excuse, BrandTotal has now hired an expert on FTC Orders and privacy interests. The FTC Order does not justify Facebook's actions for several reasons: (1) for UpVoice 2021, no

### REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   Covered Information is collected; (2) for all BrandTotal programs, including UpVoice Legacy,

2   the collection of data is "user initiated" and is an exception to Covered Third Party, which is

3   consistent with FTC policy of only stopping data collection that harms users; and (3) even if

4   covered, Section VII does not mandate, and therefore does not justify, Facebook shutting down

5   UpVoice data collection, as section VII specifically contemplates allowing third parties to certify

6   and collect data with Facebook supervision, and that section even contemplates that the "Privacy

7   Program" safeguards can be lesser where lesser information interests are involved – here, the

8   interests are mostly non-existent because users consent and all data relates to who is seeing what

9   commercial advertisements.

10       For these reasons, BrandTotal respectfully requests the Court enter a preliminary

11   injunction

12                            **PROCEDURAL BACKGROUND**

13       Despite Facebook's complaint alleging that BrandTotal's UpVoice program is "malicious",

14   its investigation of code collecting the same data in March 2019, led Facebook technical personnel

15   to conclude exactly the opposite – it's ████████ Facebook had another chance to change its

16   mind when it reviewed, in April 2020, the UpVoice code, which collected the same data in the

17   same manner as the code it reviewed in March 2019. But Facebook did not change its mind. While

18   it hides the April 2020 investigation as "privileged/work product," it never once wrote to

19   BrandTotal around April 2020 or at any point thereafter to raise any concerns about any version of

20   BrandTotal's code. In late September 2020, Facebook shut down the Facebook and Instagram[1]

21   business pages of Defendants, and the personal pages of Defendants' principals. Dkt. 1, ¶ 56.

22   Facebook also denied BrandTotal access to its social media data streams when it utilized its

23   friendly relationship with co-social media giant Google to have the UpVoice extension removed

24   from the Chrome Store, effectively eliminating BrandTotal as a competitor. Collectively, these

25   actions devasted BrandTotal's ability to obtain advertising data and provide its advertising

26   consulting services.

27

28   _____

[1] UpVoice 2021 does not collect Instagram data. Ex. EE, Dor Dep. Tr., 16:13–15, March 10, 2021
(rough) ("Dor 2d Dep.").

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1       Over the next few weeks, BrandTotal quickly moved for a Temporary Restraining Order

2 ("TRO") and the Court held a telephonic hearing on October 26 at which both Facebook and

3 BrandTotal appeared through counsel. On November 2, 2020, the Court denied BrandTotal's

4 motion, finding "BrandTotal has shown a risk of irreparable harm in the absence of relief, serious

5 issues going to the merits, and a balance of hardships that tips in its favor, perhaps sharply so. The

6 public interest, however, weighs against the granting the relief that BrandTotal seeks." Order at 34.

7 On the public interest factor, the Court found that while there is a public interest "favoring open

8 access to information and competition for data analytics," the Court was not persuaded that the

9 public interest, on a limited, early record, "require[es] Facebook to provide immediate access to an

10 automated data collection program that Facebook has not vetted." *Id.* at 31. The Court made this

11 finding on Facebook's false allegation that it had not vetted BrandTotal's code; as it turns out,

12 Facebook had carefully considered BrandTotal's code and considered it █████████

13       Following careful consideration of the Court's Order, on November 11 BrandTotal moved

14 for limited expedited discovery and requested that the Court set a schedule for a preliminary

15 injunction proceeding following the discovery. Dkt. 65. As set forth in that motion, BrandTotal

16 believed limited discovery between the parties, as well as expert consideration of the technical

17 issues, could fill in the gaps identified by the Court at the TRO and potentially lead to issuance of

18 an injunction. *Id.* at 1. On November 20, the Court granted the motion for expedited discovery,

19 Dkt. 74, and the parties diligently pursued discovery. BrandTotal retained an independent expert,

20 Mr. Robert Sherwood, to review BrandTotal's code and technical methodologies; took several

21 depositions of Facebook witnesses; and defended two depositions sought by Facebook. Facebook,

22 however, resisted certain discovery relating to its enforcement of its terms of use and reporting to

23 the Federal Trade Commission, requiring a Court Order, Dkt. 91, that prompted Facebook to make

24 its witness available for deposition on the last possible date, February 10.[2]

25

26

27 ---

  [2] Facebook waited until the start of the final deposition to produce a document detailing

28 Facebook's procedure for investigating and reporting suspected scraping incidents. Ex. DD; Ex. W, Deposition of Mr. Clark ("Clark Dep."), 26:19–28:14.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

On February 18, BrandTotal moved for a preliminary injunction. Dkt. 104.[3] The next day, the Court held a hearing on Facebook's motion to dismiss BrandTotal's Counterclaims. The Court forecasted that it would be dismissing the Counterclaims with leave to replead at least some counts, and the next day the Court issued that Order. Dkt. 108. The Court was particularly concerned about the justification potentially created by Facebook's compliance with the FTC's Consent Order but noted BrandTotal's reference to a new UpVoice program that did not collect "covered information" as defined in that Order. Dkt. 108 at 14-18. The Court directed the parties to confer on a schedule moving forward, and thereafter BrandTotal agreed to withdraw the preliminary injunction motion, and the parties agreed on new dates to move the matter forward. Dkts. 109, 110, and 112.

Soon after, BrandTotal made the code for UpVoice 2021 available to Facebook, and on March 5, BrandTotal filed Amended Counterclaims pleading additional facts supporting claims for declaratory judgement that UpVoice 2021 does not constitute a violation of the CFAA, California Penal Code § 502 or any valid Facebook relations (Counts I-III), and alleging claims for intentional interference with contracts and prospective economic advantage (Counts IV and V) and Unfair Competition Under California Business & Professional Code § 17200 (Count VI). Dkt. 120.

This is BrandTotal's Renewed Motion for Preliminary Injunction.

## STATEMENT OF ISSUES

**Does the requested injunction serve the public interest?** Yes, as the Ninth Circuit has noted in *hiQ*, allowing Facebook to decide, on any basis, who can collect and use data—data Facebook not only does not own, but nevertheless collects and otherwise makes publicly available to Panelists—"risks the possible creation of information monopolies that would disserve the public interest." *hiQ*, 938 F.3d at 1005. Although the public interest may not support *wholly* preventing Facebook from vetting (which it did as early as 2019) or regulating BrandTotal, it does not allow

---

[3] In that motion, BrandTotal noted that it had a new version of UpVoice that would only collect advertising information. At that point in time, BrandTotal was still finalizing and testing the software. Dor 2d Dep., 27:23–29:14 (rough); Dor Decl., ¶¶ 17-20. Within a week BrandTotal had releasable versions of a Chrome and Edge extension and a Microsoft application of UpVoice 2021, and made them available to Facebook on February 25. Telscher Decl., ¶ 30; Ex. GG.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

Facebook to wholesale exclude third-party companies or create an information monopoly. Facebook's own white paper on data privacy acknowledges the strong public interest, embodied in certain laws including the GDPR and California Consumer Privacy Act, in data portability and user control. Ex. LL at 3, 6.[4]

**Do Facebook's actions threaten immediate, irreparable harm to BrandTotal?** Yes, prohibiting BrandTotal Panelists from sharing what advertisements they have been shown forced BrandTotal to lose the vast majority of its incoming data. Since the Court's Order denying BrandTotal's TRO request, BrandTotal lost many customers, potential customers, and investment opportunities, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. If Facebook is permitted to again interfere with BrandTotal's data stream, ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮—well before any trial can realistically be expected to occur. Just as in *hiQ v. LinkedIn*, the threatened interference with data collection gives rise to a strong inference of irreparable harm for a business that relies on the data to provide services to its customers.

**Whether BrandTotal has shown a likelihood of success on the merits?** Yes, discovery conducted after the Court's TRO Order proves Facebook cannot show it acted with a legitimate business purpose, but instead acted to completely foreclose competition and improperly monopolize data. The FTC Consent Order is not a justification for Facebook to violate third-parties' rights under state law, and in any event that Order does not apply to BrandTotal and its programs.

**Whether the balance of equities tips sharply in BrandTotal's favor?** Yes, without an injunction, BrandTotal will be forced out of business prior to trial, while Facebook will suffer no appreciable harm while the merits are decided. Moreover, Facebook ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[4] All references to Exhibits A-I refer to exhibits to the declaration of Alon Leibovich ("Leibovich Decl.") and all references to Exhibits J-LL refer to exhibits to the declaration of Rudy Telscher, filed contemporaneously with this brief

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1

### STATEMENT OF FACTS[5]

2

**A.  Facebook Knew of BrandTotal Long Before the Litigation and Concluded ████**

3   ████████

4   Facebook initiated this lawsuit in October 2020 after it requested Google to remove the

5   UpVoice browser extension from the Google Chrome Store. Dkt. 1, ¶ 60. Although UpVoice

6   represents the majority of the data BrandTotal collects, it is not the sole source. As part of an early

7   organizational plan, BrandTotal was to be the customer-facing side of the business (i.e., the side

8   that would interface with the commercial advertising customers) while BrandTotal's related entity,

9   Unimania, was established as the user/Panelist facing side of the business. Dor Decl., ¶ 4;

10  Beginning in 2017, Unimania offered several applications and extensions, including Who Is

11  Following Me, Head Speed, Phoenix, Social One, Anonymous Story Viewer, Story Savebox, and

12  Social Video Downloader, that provided a value-added feature for users in exchange for the users'

13  consent to the collection of commercial advertising-related data of the sort described above. *Id.* at

14  ¶ 5; Sherwood Report, ¶¶ 62, 64. ***All back-end data collection of these programs was the same***,

15  but the value to the user, i.e., what the application or extension offered to the user on the front end,

16  varied. *Id.* at ¶ 64; Dor Decl., ¶ 6; *see also* Dor Dep., 122:13–124:6. Thus, for example, Unimania

17  offered an application called Social One. Dor Dep., 76:7–12. Instead of incentivizing user

18  participation with cash rewards like UpVoice, Social One offered a value-added benefit to users in

19  the form of an interface that conveniently combined social media feeds. Dor Decl., ¶¶ 5–6.

20  In early 2018, AdGuard, a company that sells advertising blocking and privacy protection

21  software, published a blog post criticizing applications and extensions developed by Unimania.

22  Dkt. 42-1. In the article, the blogger criticized Unimania's use of a static salt in its data collection

23  of user information. *Id.* at 3. After the article, Unimania stopped using the static salt and began

24  using a random method in all its programs. Dor Dep., 148:10-13. As confirmed by both Mr.

25  Sherwood (the independent expert BrandTotal retained in this matter) and Facebook's Mr. Karve,

26  the use of a random salt, which is what UpVoice has always used, is a secure transmission method.

27  ---

[5] BrandTotal recognizes the Court is familiar with the facts that are of record in this case from the TRO proceedings and thus focuses below on the additional facts learned through discovery

28  following the Court's November 2020 Order. BrandTotal incorporates by reference the briefing and declarations from the TRO proceedings. Dkt. 26; Dkt. 27; Dkt. 49; Dkt. 50.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   Sherwood Report, ¶¶ 34, 66, 74, 90; Ex. Y, Deposition of Mr. Karve ("Karve Dep."), 98:10–99:18.

2   ███████████████████████, Facebook was aware of Unimania. Ex. J. ████████████

3   Facebook had thoroughly investigated Unimania-developed applications that also collected

4   advertising data in the same way as UpVoice later would. Exs. K-M. Despite Facebook's false

5   statements in its public Complaint that BrandTotal's data collection practices are "malicious",

6   Facebook's investigation actually revealed a much different truth - ████████████████████

7   ████████████████████████████████████████ Ex. K at 053. Facebook

8   also concluded ████████████████████████████████████

9   ████████████████████████████████████ Ex. M at 657.

10  ████████████████████████████████████████

11  ████████████████████████ Karve Dep., 114:22–115:6. To the contrary,

12  Facebook continued to approve BrandTotal's advertising on Facebook and accept BrandTotal's

13  payments for that advertising. Dor Decl., ¶ 16.

14          On May 1, 2019, BrandTotal launched UpVoice via the Google Chrome Web Store. Ex. N

15  at 1562; Dor Dep., 70:15–18. Facebook contends it learned of UpVoice by around March 2020,

16  many months before filing this lawsuit. Karve Dep., 25:11–23; Ex. CC; Ex. K. ████████

17  ████████████████████████████████████████

18  ████████████████████████████████████████

19  ████████████████████████████████████████

20  ████████████████████████████████████████

21  ████████████████████████████████████████

22  ████████████████████████████████

23          In September 2020, after Facebook allegedly had been investigating UpVoice for many

24  months, ████████████████████████████████

25

26  ───────────────────

    [6] Although Facebook produced the tickets for its earlier investigations into the Unimania

27  applications Phoenix and Social One, Facebook inexplicably withheld documents regarding its
    investigation into UpVoice as privileged. This document includes ████████████████████

28  ██████████████; information he could not expressly recall at his deposition. Karve Dep.,
    78:10–80:14, 111:6–9, 150:9–152:21.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

Ex. O; *see also* Ex. P. Ultimately, Facebook , but instead demanded Google remove UpVoice. Ex. Q. The same week Facebook requested Google remove the UpVoice extension from the Chrome Store, "someone on the [Facebook] marketing insights team ask[ed] about BrandTotal/UpVoice" because "they've had several advertiser partners asking [the Facebook] sales team for their [Point of View] on it's capabilities." Ex. R. Mr. Karve responded "[w]e're enforcing on them this week." *Id*. Those communications do not discuss any concerns about BrandTotal's data collection practices.

**B.     Facebook Has No Process for Vetting Third Party Access, But Instead Uses Its Terms of Service to Conceal Dark Ad Strategies and Analytics.**

Despite suggestions to the contrary in Facebook's opposition to the TRO, Facebook has no process for vetting third parties that wish to collect advertising information from the Facebook Network. Facebook's investigation of BrandTotal was limited to Karve Dep. 36–38, 87–89. When asked *Id.* at 40. According to Mr. Karve, *Id*. His investigation was limited to . *Id*. at 87–89, 99–100. He did not review the . *Id*. at 99-100. He did not consider . *Id*. at 76. And when asked whether he investigated

---

[7] When BrandTotal first began operating in 2017, Facebook's terms of service prohibited collection of users' content "using automated means (such as harvesting bots, robots, spiders, or scrapers)" without prior authorization. Dkt. 27-9. However, Facebook revised their own Terms to prevent "automated means" without any examples or limitations in approximately 2019, Dkt. 27-4, and confirmed in deposition its expansive understanding of this prohibition. Karve Dep. at 36.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1    ██████████████████████████████ *Id*. at 104. His elusive and non-responsive answers were

2    despite Facebook designating him as the 30(b)(6) witness on these topics.

3         Facebook's position is that *any* data collection outside of the APIs and what is made

4    available for viewing in the Ad Library is improper and a violation of their Terms of Service.[8] *Id*.

5    at 36. In the TRO proceedings, Facebook knowingly and falsely suggested that BrandTotal could

6    obtain much of the information it needs through Facebook's public Ad Library of APIs. TRO

7    Hearing Tr., Dkt. 57 at 12–13. This is incorrect. ***Facebook does <u>not</u> make information about who***

8    ***receives third-party commercial advertising available through Facebook's Ad Library, <u>any</u> API,***

9    ***or any other "approved" source.*** Sherwood Report, § 5.3; Dor Decl., ¶ 11.

10        In the Facebook advertising environment, there are public ads (i.e., ads that appear on an

11   advertiser's public Facebook page and which the advertiser may also pay to be distributed) and

12   there are "dark ads." Dor Decl., ¶ 8. Unlike public ads, an advertiser does not publish dark ads on

13   their public page, but instead pays Facebook to display the dark ads ***only*** on the feeds of

14   individuals that comprise the advertiser's target audience (e.g., by age, gender, education, location,

15   and more). Dor Dep., 135:7–13; Karve Dep., 106:8–107:6. ***Dark ads account for 80-90% of the***

16   ***ads on Facebook.*** Dor Decl., ¶ 9. BrandTotal specializes in providing analytics and information

17   about competitors' dark advertising. *Id.* at ¶ 8.

18        Although Facebook has multiple APIs, including the marketing API and insights API, ██████

19   ████████████████████████████████████████████████

20   ████████████████████████████████████. Ex. AA, Deposition of Mr. Newman

21   ("Newman Dep."), 33:18–34:5, 94:15–21, 95:13–25; Appx. G to Sherwood; Sherwood Report

22   § 5.3. This was all Facebook offered for many years, including when BrandTotal began collecting

23   Facebook data in 2018. Following the Cambridge Analytica data scandal, in March 2019 (█████

24   ████████████████████████████████████████

25

─────────────────────────

26   [8] It is not clear whether Facebook would allow automatic collection from the Ad Library. Although
     one witness testified ████████████████████████████████████

27   ████████████ another witness testified ████████████

28   ████████████████████████. *Compare* Newman Dep., 78:13–79:25 *with* Clark
     Dep., 81:11–82:4.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1

2         . *Id*. at 22:23–24:22.

3         Facebook does not treat all ads as equal, however. Facebook designates some

4 advertisements as pertaining to Social Issues, Elections, or Politics ("SIEP"). For those

5 advertisements,

6         . *Id.* at 87:1–89:13. BrandTotal

7 estimates non-SIEP advertisements make up approximately 95% of the posts on Facebook. Dor

8 Decl., ¶ 11. For these advertisements, Facebook

9 Newman Dep., 87:19–88:13. Even then, the Ad Library "

10         " *Id*. at 96:1–12. In short, there is no vetting of

11 third parties wishing to collect dark ad advertising information, which is otherwise unavailable.

12        **C.**      **Expert Analysis Confirms BrandTotal Collects Information Panelists Have**
                 **Agreed to Share to Provide Commercial Advertising Consulting.**

13

14         As described in the TRO proceedings, BrandTotal is an advertising analytics company

providing corporate clients insights regarding social media advertising. Dkt. 26 at 3-4. BrandTotal

15 offers these services by collecting data regarding advertising interactions. *Id.* This collection is

16 done *with* user consent, and, in the case of the UpVoice extension, in exchange for cash rewards to

17 the users. *Id.*; Dkt. 27-3 at ¶ 9.

18        **1.**      **The UpVoice Legacy Program**

19         When originally launch UpVoice collected, with user consent, two broad types of

20 deidentified information (1) user demographic information and (2) commercial advertisement

21 information. This information was deidentified and compiled so that BrandTotal could provide

22 advertising analytics information (i.e., what groups of people are being targeted with what ads) to

23 corporate clients. As part of these proceedings and to address the Court's concern that courts lack

24 technical expertise (Order at 34), BrandTotal engaged an independent expert, Mr. Robert

25 Sherwood, to review BrandTotal's software code and collection methodology to independently

26 confirm "BrandTotal's browser extension works as intended and represented . . . ." Order at 22. As

27 detailed in his report, attached hereto, Mr. Sherwood, ***an expert that Facebook has itself retained***

28

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1  ***in the past***, confirmed the version of UpVoice available before September 2020 ("UpVoice

2  Legacy") collected only the information identified in the UpVoice Terms of Service and used a

3  random salt to secure that data, as BrandTotal represented in its TRO Motion. Sherwood Report,

4  § 5.1. No information about a Panelist's Facebook password, Facebook "friends" or other personal

5  Facebook postings was collected or sent to BrandTotal. *Id.* at ¶ 52. The collection methodology

6  was safe and secure and did not harm Facebook. *Id.* at § 5.1.3. This is consistent with ▮▮▮▮

7  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. K at 053.

8        The information BrandTotal collected related to commercial advertising interaction, **<u>not</u>**

9  personal social media expression. Dkt. 26, 3–5. For example, as the Panelist scrolled social media

10  BrandTotal collected the time the advertisement was shown to the Panelist, the post ID, and the

11  advertiser ID. Ex. N at 570. BrandTotal also collected information about the advertisement, such

12  as when the ad was created, the ad image, the ad text, the ad type, the ad's number of reactions,

13  shares, and video views (if applicable), Sherwood Report, § 5.1.1. Importantly, using the

14  sponsored post ID, BrandTotal could then collect this same advertising information about

15  Facebook advertisements and advertisers from a portion of Facebook that does **<u>not</u>** require a

16  Facebook log-in or password. Sherwood Report, ¶¶ 56–60; *see also* Dkt. 41, ¶ 5(e).

17        UpVoice Legacy also collected demographic information about the Panelist (e.g., month of

18  birth, gender, location, relationship status) that the Panelist had already provided via the

19  qualification questionnaire, so that aggregate, deidentified information regarding who is seeing

20  what ads could be provided to customers. Dor 2d Dep., 91:22–92:18; Sherwood Report § 5.1.1.1.

21  This information was collected and compiled in a manner that protected user identity and did not

22  permit information to be tracked back to individual users. *Id.*, § 5.1.3.  Although UpVoice Legacy

23  also collected demographic information directly from Panelists via the qualification questionnaire,

24  BrandTotal also used information from the Panelists' Facebook feed because that was the

25  information advertisers used to target their advertisements. Dor 2d Dep., 91:22–92:18 (rough). A

26  Panelist could enter incorrect information on the qualification questionnaire (e.g., entering the

27  wrong date of birth), making BrandTotal's reporting features in correct. *Id*. Because Facebook

28  collection is crucial for BrandTotal to continue as a business, however, BrandTotal has coded

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1  UpVoice 2021 to not collect demographic information to address Facebook's stated concerns. *Id*.

2  ## 2. UpVoice 2021

3  As part of these proceedings, in February 2021, BrandTotal redesigned UpVoice to only

4  collect adverting information. Dor 2d Dep., 24:7–9, 24:25–25:2 (rough). Panelists complete a form

5  when they sign up for UpVoice that provides basic demographic information. Sherwood Report,

6  ¶¶ 24–31. Thus—while BrandTotal contends the collection of demographic information, with user

7  consent, is not improper—BrandTotal can operate without collection of this information from

8  Facebook. As confirmed by Mr. Sherwood, UpVoice 2021 operates the same as described above,

9  but it collects *less* information. *Id*. at § 5.1.1.2; *see also* Dor 2d Dep., 17:15–18, 40:22–41:18

10  (rough). It no longer collects user demographic information; instead it collects only advertising

11  information. Sherwood Report, § 5.1.1.2.

12  UpVoice 2021 collects data from Facebook much in the same way UpVoice Legacy did. It

13  is capable of reading web requests that a Panelist gets "into his computer." Dor 2d Dep., 40:22–

14  41:18 (rough). It passively monitors traffic and, when it recognized a social feed coming for a

15  specific process (e.g., Facebook's social feed coming from the web browser), it parses different

16  elements from the HTML code and the XHR requests, and extracts those fields before sending

17  them to BrandTotal. *Id*. This process is entirely passive, meaning UpVoice 2021 only reads HTML

18  traffic coming into the machine itself and does not make any requests to Facebook servers. *Id.* at

19  42:11–21, 42:16–18 ("Q. Does UpVoice 2021 make any background requests? A. No.").

20  Additionally, as to the issue of "shared computers" that was raised for the first time by

21  Facebook in the context of these proceedings, BrandTotal implemented a procedure that requires a

22  user to affirm they consent to BrandTotal's collection of data when the user signs into a new social

23  media account. Sherwood Report, ¶¶ 32, 93–96. Although BrandTotal is unaware of a real-life

24  problem in this regard, the revision addresses the *potential* situation where a Panelist, who has

25  agreed to share their information with BrandTotal, allows another individual to use the Panelist's

26  computer and that person fails to log in to the browser under their own account. *Id*.

27  BrandTotal created a browser extension version of UpVoice 2021 for release on Google

28  Chrome and Microsoft Edge and a Microsoft OS desktop application version, each of which

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1    operate in the same way and collect the same information (i.e., advertising data only). Dor 2d

2    Dep., 16:2–7, 96:14–97:5 (rough). It took BrandTotal "a few days" to remove code related to

3    Facebook collection of user demographics and rename some field names. *Id*. at 27:23–28:6.

4    BrandTotal then deployed UpVoice 2021 to its staging environment and tested it. *Id*. at 28:11–16.

5    That testing also took "a few days," meaning it took BrandTotal about one week to develop the

6    new code for UpVoice 2021. *Id*. at 29:6–14.

7         On February 25, 2021 BrandTotal made the code for UpVoice 2021 available to Facebook,

8    and, through counsel, sought Facebook's permission to use this means of data collection on the

9    Facebook social media site. Ex. GG.[9] In separate correspondence, BrandTotal's counsel inquired if

10    there was any possibility that Facebook would at least agree not to interfere with UpVoice 2021

11    potentially negating the need to trouble the Court with this motion. Ex. KK. On March 4, 2021,

12    Facebook, through counsel, did not respond to the March 1 email, but responded to BrandTotal's

13    February 25 correspondence rebuking BrandTotal for not utilizing Facebook's "secure, authorized

14    channels" of Facebook data, even though Facebook knows the relevant data is not available

15    through these "authorized channels". Ex. HH. Facebook stressed the expectations of *commercial*

16    *advertisers* on its platforms in others *not* learning of their advertising campaigns (i.e., an

17    expectation that what commercial advertisements are being shown to what groups of people will

18    be shrouded in secrecy by Facebook). *Id*. Because Facebook also complained that it had not had

19    enough time with the code, BrandTotal delayed the launch of UpVoice 2021, which it had

20    expected to release that day (March 4). BrandTotal sent additional correspondence to Facebook on

21    March 9. Ex. II. BrandTotal again sought permission or at least dialogue about UpVoice 2021. *Id.*

22    On March 10 Facebook deposed a BrandTotal witness about UpVoice 2021.[10] At this deposition,

23

[9] Facebook having disabled BrandTotal's accounts, BrandTotal was no longer bound by
24   Facebook's Terms of Service prohibiting automated means of data collection without permission.
Nevertheless, because BrandTotal seeks reinstatement on Facebook and resolution of this dispute,
25   BrandTotal has endeavored to forthright with Facebook, and sought its permission for the
UpVoice 2021 data collection.

26 [10] On February 25, BrandTotal provided links to the final built product for the extension and MS-
27   Application versions of UpVoice. Telscher Decl., ¶ 30. One week and one day later, at
approximately 4:00 PM CST on a Friday, Facebook requested to receive the MS-Application
28   code in a different format. *Id.*, ¶ 31. BrandTotal promptly produced that code the following
Monday. *Id.*, ¶ 32; Ex. JJ at 7. To allow Facebook time to review the code, BrandTotal agreed to

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

Facebook inquired whether BrandTotal would cease all data collection outside of UpVoice 2021 if Facebook authorized that program. Dor 2d Dep., 111:2–14 (rough). While the technical witness at the deposition was not able to answer that hypothetical on the fly, BrandTotal, through counsel, clarified that BrandTotal *would* be willing to work with Facebook to cease or avoid other data collection methods, and would agree to monitoring of UpVoice 2021 on an ongoing basis if Facebook would authorize the program. Ex. JJ at 1-2.

When subsequent communication did not include any commitment or even a response to BrandTotal's question of whether Facebook would potentially approve the program if its review revealed no harm (Ex. JJ), BrandTotal launched UpVoice 2021 on March 11, 2021 and filed this renewed motion per the schedule previously agreed. Given Facebook's position that it does not permit automated collection, and its continued refusal to engage BrandTotal on its repeated requests to permit UpVoice data collection dating back to the start of this case in October 2020, BrandTotal has no expectation that Facebook will affirmatively authorize UpVoice 2021, and requires a judicial remedy to prevent the same interference that derailed UpVoice Legacy.

**D.**   **If Facebook Interferes with UpVoice 2021, BrandTotal Will Not Be Able to Survive Until Trial.**

As of September 30, 2020, ████████████████████████████████████████████████████████████████████████████████████████████████████████████. Dor Decl., ¶ 13. By using its friendly relationship with Google to remove UpVoice Legacy, Facebook substantially disrupted BrandTotal's data stream. BrandTotal continued to collect a small amount of Facebook data because: (1) two Unimania Android apps, SocialOne and Phoenix, remained operational[11]; and (2) even after Google's removal of the extensions a small percentage of accounts continued to

_____

postpone the deposition of Mr. Dor until March 10. Telscher Decl., ¶ 33; Ex. JJ at 1. On March 10, Mr. Dor testified that although the coding language between the extension and application is different, "the fields that are collected are exactly the same fields" and the versions "operate[] the same way." Dor 2d Dep., 96:14-97:5 (rough); *see also* 16:2-12 (rough); Ex. JJ at 1. Mr. Dor also provided Facebook with a summary document that identifies the specific fields, by name in the code, UpVoice 2021 collects from Facebook for both the extension (for Microsoft Edge and Google Chrome) and the MS-Application versions. Ex. FF.

[11] ████████████████████████████████████████████. Exs. K-M. ████████████████, and both remain available for download on the Google Play Store. Dor Dep., 79:7–14, 80:10–13, 97:9–11.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   generate data. Dor Dep., 91:19–93:19; Dor 2d Dep., 98:24–99:12 (rough). As of "about a month

2   ago," however, BrandTotal is no longer receiving Facebook data from UpVoice Legacy or any

3   other Legacy application (e.g., Ads Feed). Dor 2d Dep., 21:4–21 (rough).

4   　　　As stated in the TRO proceeding, and is still true today, BrandTotal cannot continue along

5   this path without access to Facebook data. Dkt. 26 at 7–8; Leibovich Decl., ¶¶ 5–12. Facebook "is

6   the core platform for the value proposition" BrandTotal supplies to its customers and "is one of the

7   most unique and differentiated data sources that [BrandTotal has] and is why customers see much

8   value in BrandTotal." Ex. Z, Deposition of Alon Leibovich ("Leibovich Dep."), 168:11–23.

9   Without that data, BrandTotal is "as good as dead." *Id.* Facebook's prohibition on allowing

10  Panelists to share their Facebook data with BrandTotal significantly harmed BrandTotal's financial

11  health—such that, without data, BrandTotal will be driven out of business before trial.

12  　　　BrandTotal's cash balance as of January 31, 2021, was ████████. Leibovich Decl., ¶ 6.

13  BrandTotal's "burn" rate on average approximately ████████. *Id.* at ¶ 5. If BrandTotal's

14  data stream is again compromised, in view of BrandTotal's average burn rate, BrandTotal's cash

15  balance would be depleted well before any trial in this matter, which would force BrandTotal to

16  shut down operations. *Id.* at ¶ 6.[12] Further, in view of BrandTotal's current inability to obtain

17  investments as a startup, coupled with its burn rate, case reserves, and the risk-adverse nature of

18  rational investors, BrandTotal could face immediate liquidation if this preliminary relief is not

19  granted. *Id.* at ¶¶ 8–12. ████████████████████████████████

20  ████████████████████. *Id.* at ¶ 12.

21  　　　BrandTotal is also still losing customers and sales opportunities because BrandTotal cannot

22  access the Facebook data, creating a heavy burden to provide BrandTotal's full suite of services,

23  which will continue if Facebook is not enjoined. Facebook's actions caused BrandTotal to lose

24  customers or potential customers, including ████████████████████████

25  ████████████████████. Leibovich Dep., 38:22–39:13, 54:16–19;

26  _____

27  [12] Trial has not yet been set and the parties last week submitted their Rule 26(f) statement. With the nationwide backlog of cases due to the global health pandemic, it is uncertain when trial in this

28  matter may occur, but even if the trial will occur in April 2022, as the parties proposed, BrandTotal will not come close to making it to trial.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   Leibovich Decl., ¶¶ 15–22. Collectively, BrandTotal has lost approximately ▮▮▮▮ per month

2   from these losses. Leibovich Dep., 55:14–56:12. In addition, many customers have frozen their

3   accounts with BrandTotal in view of the pending lawsuit. *Id.* at 39:17–40:1 (identifying ▮▮

4   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). *See also* Leibovich Decl., ¶¶ 9, 13-24, Exs. A-I. Facebook's

5   lawsuit has also caused BrandTotal to lose new business, which have been deterred from entering a

6   relationship with BrandTotal because of the intangible reputational harm BrandTotal incurred by

7   being sued by Facebook or from the loss of data. *Id.* Leibovich Dep., 39:17–23. For example,

8   BrandTotal lost prospective-customer ▮▮▮▮▮ after they learned of the lawsuit. *Id.* at 65:7–12,

9   111:9–112:2; *see also* Ex. C (electing not to pursue engagement "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10  ▮▮▮▮▮▮"). Conversations with ▮▮▮▮▮▮▮ (worth potentially ▮▮▮ per month)

11  also "went cold" after BrandTotal informed them of Facebook's lawsuit. Leibovich Dep., 104:20–

12  15, 106:12–23. Shortly after Facebook filed this lawsuit, on October 7, 2020, prospective-customer

13  ▮▮▮▮▮ (a marketing agency that could recommend BrandTotal to many of its own clients)

14  chose not to pursue a relationship with BrandTotal. Ex. B ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ One day later, another

16  advertising agency—▮▮▮▮▮, which represents clients such as ▮▮▮▮▮▮▮▮, and

17  many others—also suspended its relationship with BrandTotal in view of Facebook's lawsuit. Ex.

18  S ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19      To retain those customers that remain, BrandTotal was forced to re-negotiate customer

20  agreements and offer concessions, which will continue if data is again lost. Leibovich Decl.,

21  ¶¶ 25–26. For example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Leibovich Dep., 80:7–

22  83:6. BrandTotal has also begun to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

23  Leibovich Decl., ¶ 25, Ex. I. Facebook's actions related to UpVoice Legacy also caused

24  BrandTotal to lose investment opportunities. Leibovich Dep., 44:14–23, 44:25–45:13; Leibovich

25  Decl., ¶¶ 8-9; Ex. A. Although BrandTotal continues to seek such investments, which are

26  enormously important for a startup company, the likelihood of success would be low without

27  access to Facebook data. Leibovich Decl., ¶¶ 8–12.

28      Since Facebook filed this lawsuit, BrandTotal was able to gain only one additional

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   customer, ███, with a monthly revenue of ███ Leibovich Dep., 89:21–90:18; Leibovich

2   Decl., ¶ 24. To gain this customer, however, BrandTotal had ████████████████

3   ████████████████████ *Id.* Although Facebook may try to diminish these

4   harms by pointing to the business that BrandTotal has not (yet) lost, that is akin to akin to telling

5   the thousands passengers of the Titanic not to worry about the iceberg they just hit because there

6   are three life boats on board. BrandTotal does not deny it has not lost every customer, that some

7   customers have renewed without paying substantially less, or even that it has gained one (single)

8   customer. Although BrandTotal has worked to stop the bleeding and preserve its company up to

9   the UpVoice 2021 launch[13], there is no legitimate question that BrandTotal would not be able to

10  survive until trial if Facebook again interferes with UpVoice 2021.

11      Facebook's conduct related to UpVoice 2021 also caused BrandTotal intangible harms.

12  Since the Court's November 2020 Order, BrandTotal lost 10 employees. Leibovich Decl., ¶ 13; *see*

13  *also* Leibovich Dep., 161:13–25. In total, BrandTotal lost approximately 25% its workforce

14  because of Facebook's lawsuit and the loss of data. *Id.* at 162:6–9. By removing BrandTotal's

15  business accounts and ability to advertise on Facebook.com, Facebook also effectively eliminated

16  BrandTotal's ability to recruit Panelists for UpVoice. Ex. X, First Deposition of Oren Dor ("Dor

17  Dep."), 172:2–13.

18                              **ARGUMENT**

19      A party seeking "a preliminary injunction must establish that he is likely to succeed on the

20  merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

21  balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat.*

22  *Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush &*

23  *Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). Courts in the Ninth Circuit employ a "sliding

24  scale" approach where "the elements of the preliminary injunction test are balanced, so that a

25  stronger showing of one element may offset a weaker showing of another." *All. for the Wild*

26  _____

27  [13] Following the TRO proceedings, BrandTotal launched two other instances of UpVoice: one browser extension available through the Microsoft store, and another desktop application that

28  operates on Windows PCs and is browser-independent. Dor Decl., ¶ 17. *Neither UpVoice instance collected data from Facebook. Id.*

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1  *Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Thus a "preliminary injunction may be

2  warranted upon a showing of 'serious questions going to the merits' as well as 'a hardship balance

3  that tips sharply toward the plaintiff,' so long as the plaintiff is likely to suffer irreparable harm

4  and the injunction or restraining order is in the public interest." Order at 12 (citing *All. for the Wild*

5  *Rockies*, 632 F.3d at 1132).

6        In the November 2020 TRO Order, this Court found BrandTotal had shown a risk of

7  irreparable harm in the absence of relief, at most serious issues going to the merits, and a balance

8  of hardships that tips in its favor, perhaps sharply so, but denied the TRO based on the public

9  interest factor. Order at 34. In its renewed motion for preliminary injunction, BrandTotal thus

10  begins its argument by showing, in view of the additional evidence, there is no public interest in

11  allowing Facebook to wholesale block third-party collection of competitive advertising

12  information. There is no public interest in allowing Facebook to entirely prohibit third-party access

13  under the guise of "regulation," but with the real goal being monopolization. Nor is Facebook

14  required to monopolize under the terms of the FTC Consent Order. After establishing the public

15  interest supports a preliminary injunction, BrandTotal then re-establishes that the remaining

16  factors—proof of irreparable harm, likelihood of success on the merits, and balance of hardships—

17  also support granting of a preliminary injunction that will allow BrandTotal to once again meet its

18  contractual obligations to its customers.

19  **I.    THE PUBLIC INTEREST STRONGLY FAVORS GRANTING BRANDTOTAL'S
        REQUESTED PRELIMINARY INJUNCTION.**

20        "The public interest inquiry primarily addresses impact on non-parties rather than parties,"

21  and, in this case, "requires a balancing of the interests addressed by the Ninth Circuit in *hiQ*,

22  favoring open access to information and competition for data analytics services, and those

23  identified by Judge Hamilton in *Stackla*, favoring proactive data and privacy protection by

24  companies like Facebook." Order at 31 (quoting *Bernhardt v. Los Angeles Cty.*, 339 F.3d 920,

25  931–32 (9th Cir. 2003). Although this Court—with the limited record of the TRO proceeding—

26  was not persuaded the public interest favored the relief BrandTotal seeks (i.e., "requiring Facebook

27  to provide immediate access to an automated data collection program that Facebook has not

28  vetted," *id.*), additional information and evidence now show the public interest strongly favors

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   granting a preliminary injunction. Despite Facebook's false allegations in its Opposition to the

2   TRO, its own investigation concluded that BrandTotal's data collection was "harmless." But, to

3   make this aspect even more straightforward, BrandTotal has revised UpVoice such that the public

4   interest relates only to the collection of advertising (not user) data while discovery has shown

5   Facebook does not have any "vetting" process and does not make available through any API or

6   approved platform the competitive advertising information BrandTotal seeks. The Court has

7   already found this data collection is akin to the data collection at issue in *hiQ v. LinkedIn*. Order at

8   22-23. And, discussions with Facebook are clear that Facebook will not in some other fashion

9   provide BrandTotal with the data it needs to run its business.

10
11
      **A.  The Public Does Not Have a Strong Interest in Restricting BrandTotal's Access to Data Because It Has Always Been with User Consent and UpVoice 2021 Now Collects Only Advertising Data.**

12        UpVoice 2021 collects **only** advertising information from Panelists as they browse

13   Facebook. Sherwood Report, ¶¶ 49–61, 92. BrandTotal designed UpVoice 2021 such that it is

14   entirely passive, meaning it does not make any requests to Facebook servers, but rather collects

15   information Panelists actually see as they browse Facebook. *Id.* at ¶ 52; *see also* Dor 2d Dep.,

16   40:22–42:18 ("Q. Does UpVoice 2021 make any background requests? A. No."). Although

17   BrandTotal maintains the public interest supports allowing Panelists to share their own

18   demographic information, to save its company from extinction BrandTotal has nevertheless agreed

19   to forgo this information during the life of the preliminary injunction. Dor. Decl., ¶¶ 21-22.

20   BrandTotal also retained an independent expert to examine and confirm "BrandTotal's browser

21   extension works as intended and represented . . . ." Order at 22–23. BrandTotal's expert, Mr.

22   Sherwood, whose report is attached hereto, confirms UpVoice operates as intended and

23   represented to this Court. Sherwood Report, §5.1. ████████████████████████.

24   *See* Karve Dep., 93:3–94:3, 95:17–23.

25        BrandTotal has also revised UpVoice to address the specific concern this Court noted in its

26   TRO Order regarding the issue of shared computers and the risk that whenever *anyone* used the

27   Chrome browser, they would unwittingly risk their data being collected. Order at 33 n.18. Chrome

28   (and Edge for that matter) is a user-specific browser, meaning persons log in to the browser with

---

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   their own credentials. Sherwood Report, ¶ 94. Chrome maintains extensions and passwords

2   specific to the user, so if you do not wish for extensions or passwords (including banking

3   passwords) to be shared, then you must login as yourself to Chrome. If a person logs into Chrome

4   as themselves, and they have not installed UpVoice (even if it is a shared computer and another

5   user has installed UpVoice) UpVoice will not collect Facebook data for that user. *Id.* Indeed,

6   BrandTotal is unaware of any instance where information was collected from someone in such a

7   shared computer situation. Regardless, to address the remote concern about accidental collection

8   stated by Facebook and this Court, following the TRO proceedings, BrandTotal revised its

9   UpVoice software so that when the user attempts to sign into a new social media account, UpVoice

10  notifies the user and seeks consent to run UpVoice with the new Google Chrome account. *Id*. at

11  ¶¶ 94–96.

12          In summary, as confirmed by Mr. Sherwood, users consent to the collection of advertising

13  information shown to those users, and the information is collected in a manner that is safe and

14  secure. All other information is collected from a site that does not require user login. *hiQ*, 938 F.3d

15  at 1005. There is not countervailing privacy interest that could outweigh Facebook's information

16  monopoly. Moreover, BrandTotal's access does not "circumvent[] Facebook's privacy settings,"

17  Order at 32, as users are reminded of their agreement to share information with BrandTotal on a

18  periodic basis when they are compensated for sharing their data. Thus BrandTotal no longer

19  collects demographic user data from Facebook and there is no public interest in preventing

20  BrandTotal's access to other data. BrandTotal thus respectfully requests the Court enter an

21  injunction prohibiting Facebook from again interfering with BrandTotal's business by requesting

22  the takedown of BrandTotal's UpVoice 2021.

23

24          **B.  Facebook Lacks Any "Vetting" Process and Does Not Make Competitive
                  Advertising Information Available Through Any "Approved" Means**

25          In denying BrandTotal's TRO, this Court found the public interest did not require

26  "Facebook to provide immediate access to an automated data collection Program that Facebook

27  has not vetted." Order at 31. This finding resulted from Facebook's false suggestion that it had not

28

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1  already fully vetted BrandTotal's code and concluded it was ████████████████████████

2  ████████████████████████████████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████████████████

4  ███████████████████████████. Further, again directly contrary to Facebook false allegations at

5  the TRO phase, no other Facebook resource offers the data BrandTotal needs to run its business,

6  and Facebook will not otherwise allow third-party collection.

7        As established above, BrandTotal collects and aggregates advertising information on

8  Facebook and then provides that aggregated information to its customers. While many of

9  BrandTotal's customers use its services to monitor their own advertising efforts, or to evaluate the

10 services of Facebook or advertising agencies the customer has retained, all of BrandTotal's

11 customers also use BrandTotal's services for information regarding how others within the

12 customer's industry are advertising on Facebook. Dor Decl., ¶ 7. Although Facebook initially

13 represented to the Court that BrandTotal could have used APIs to obtain the information it needs to

14 provide these services (Dkt. 57, TRO Hearing Tr., 9:11–10:11, 12:23–13:3, 13:23–25), subsequent

15 discovery proves this to be false. The *only* way for BrandTotal to obtain the competitive

16 information it needs is to collect it from Facebook servers. SOF § B.

17       Facebook also does not have any formal procedure to "vet" any automated data collection

18 tool, regardless of whether it is impossible for a third-party, such as BrandTotal, to obtain the

19 information it needs from Facebook's limited APIs. ████████████████████████████████

20 ████████████████████████████████████████████████████████████

21 ████████████████████████████████████████████████████████████████████. SOF

22 § A. ████████████████████████████████████████████████████

23 ██████████ Newman Dep., 67:10–68:12, 69:19–23. Despite Facebook's prior suggestions at the TRO

24 phase, there is no method by which BrandTotal can obtain Facebook's "permission" to collect the

25 information BrandTotal needs. Although the Court previously found the strong public interest in

26 access to advertising information did not "wholly prevent Facebook from vetting or regulating"

27 BrandTotal before providing such access, the record now shows Facebook ████████████████

28 ████████████████████████████████████████████████████████████████████████

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

and has now had the opportunity to "vet" UpVoice 2021. Facebook can no longer disguise its wholesale prohibition of UpVoice as "vetting." Facebook does not want to vet BrandTotal; it wants only to stop it.

### C.   The Public Has a Strong Interest in Allowing BrandTotal to Collect Advertising Data About "Dark Ads."

Social media has become one of the most influential and important media in our society and advertising in that space is vitally important and valuable. Of these social media giants, Facebook is by far most important, with 2.74 billion users as of January 2021. Ex. U. In January 2020, Facebook ads reached approximately 78% of the platform's monthly users. Ex. V at 101. In the United States, 65% of the population age 13 or older is reachable by Facebook advertising. *Id.* at 103.

Because of the nature of the media, advertisers can target segments of society and even tailor advertisements to different demographic groups of people. Dor Decl., ¶ 8. Facebook not only encourages this behavior, it fosters the "expectation" that competitors will not be able to find out about the campaigns, releasing only enough data to prompt more advertising on its site. Ex. HH. BrandTotal, on the other hand, pays users for their data and shines a light on commercial advertising on social media sites. The public interest *strongly* favors allowing BrandTotal to collect advertising data from Panelists that have agreed to share it for these legitimate purposes where there is no actual[14] harm to Facebook, and it has already fully vetted the collection. *hiQ*, 938 F.3d at 1005; *see also* Order at 33 ("When it comes to advertising data—as opposed to user data—there are significant countervailing concerns.")

The public has a strong interest in seeing how this advertising is used and to which groups different advertisements are shown. As established in section B above, Facebook does not provide competitive advertising information through any "approved" or "vetted" means. Indeed, until March 2019—                                                —Facebook did not offer *any* insight into how any

---

[14] Facebook's witnesses could only identify "potential harm" to Facebook. Clark Dep. 70:19–25. Facebook maintained the 'harm is in the collection' method, not what information is collected. *Id.* at 82:5–83:4, 84:20–85:7. Yet it is undisputed BrandTotal can only practically obtain this information via automatic collection. *See* SOF § B; Sherwood Report, § 5.3.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   advertisers were reaching the billions of users on its site. Only after the Cambridge Analytica

2   scandal did Facebook start providing limited information regarding what advertisements are shown

3   to which users and for how long. Dor Decl., ¶ 10. ████████████████████████████████

4   ██████████████████████████████████ Newman Dep., 78:13–17. ███████████████

5   ████████████████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████████████████████

7   ██████████████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████ *Id*. at 87:1–89:3.

9   Although Facebook is certainly capable of providing this information for non-SIEP

10  advertisements, it chooses not to do so while simultaneously precluding third parties from being

11  able to obtain this information via approved or automatic means. The public is left to question, for

12  example, whether Facebook is showing any specific non-SIEP advertisement to only women over

13  the age of 55. By prohibiting BrandTotal's access to non-SIEP advertisements, Facebook keeps the

14  public in the dark, and shuts down competition.

15          By prohibiting collection of competitive advertising information, even with the consent of

16  users, and by not otherwise making the information available, Facebook has unilaterally imposed

17  an information monopoly on commercial advertising metrics that is neither fair nor in the public

18  interest. Contracts or agreements that unduly restrict competition have, of course, long been held to

19  contravene the public interest. *U.S. v. Am. Tobacco Co*., 221 U.S. 106, 31 S. Ct. 632, 55 L. Ed. 663

20  (1911). Permitting Facebook to provide commercial advertising analytics (██████████████

21  ████████████████████████████) while prohibiting other companies from doing the

22  same is not a public good. But more than this, Facebook's actions pose an "ominous threat to

23  public discourse and the free flow of information." *hiQ Labs, Inc. v. LinkedIn Corp*., 273 F. Supp.

24  3d 1099, 1119 (N.D. Cal. 2017), *aff'd and remanded*, 938 F.3d 985 (9th Cir. 2019). The public's

25  interest is not served by keeping targeted commercial advertising analytics in the dark. That

26  companies can target certain demographic groups with certain tailored advertisements and keep

27  those strategies secret from competitors and the public at large is not a societal good. Though

28  Facebook has seemingly deemed an "ethos" of secrecy (i.e., what it calls "privacy") in commercial

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   advertising within its own best interest, this does not make it a public good. Bringing advertising

2   strategies into the light, as BrandTotal has done, and will do, is a strong public interest. *hiQ*, 938

3   F.3d at 1005. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Exs. O, P.

4       Moreover, the public has an interest in allowing the automation of activity that could be

5   performed manually. Order at 13 (citing *hiQ*, 938 F.3d at 994–95) (discussing Ninth Circuit's

6   finding that LinkedIn's interests in protecting its users' desires that changes to their information

7   not be known to their current employers were outweighed "where nothing prevented employers

8   from monitoring employees' profiles for changes . . . ."). Although Facebook may here argue it has

9   an interest in protecting its customers' desires to keep their advertising strategies secret and

10  hidden, it would remain possible for Panelists to monitor what advertisements they were shown

11  and report that information to BrandTotal. Sherwood Report, § 5.1.2. It is also possible for *anyone*

12  to visit each advertiser URL and manually record the advertising metrics data. *Id.* Facebook

13  concedes ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Newman Dep., 66:7–11; Dkt. 27-7

14  (restricting only access or collection of data using "automated means" in October 2020 Facebook

15  Terms and Conditions). Whatever interest Facebook has in preventing *automated* collection of this

16  advertising information is, at best, minimal, *hiQ*, 938 F.3d at 994–95, and this Court has found

17  Facebook does not own, and has already been compensated for, this information. *See* Order at 33.

18  "Allowing a third party like BrandTotal to compete with Facebook to provide data analytics

19  services about advertising campaigns on Facebook's networks . . . would be consistent with a

20  strong public interest in 'maximizing the free flow of information on the Internet' and fostering

21  competition and innovation." *Id.* (quoting *hiQ*, 938 F.3d at 1004.)

22       **D.  The FTC Consent Order Is Not Justification for Facebook's Actions**

23       In this litigation, Facebook has argued that a Consent Order entered into with the FTC

24  justified its actions against BrandTotal. *See, e.g.*, ECF No. 77 at 9–10. One would have expected

25  that if this were truly the case—that a court order *required* Facebook to act as it did—Facebook

26  would have led with this argument, clearly setting forth its obligations. Instead, Facebook, though

27  periodically raising the specter of the FTC Consent Order, did not elaborate on its obligations and

28  interpretations of the Consent Order; a Consent Order BrandTotal and this Court knew little about.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1    BrandTotal has since hired an FTC specialist and his declaration filed with this motion

2    provides context regarding the role of the FTC, the actions against Facebook, and the lack of

3    applicability of the Consent Order to this situation. Hartzog Report, ¶¶ 11-56. As described in that

4    declaration, the applicable Consent Order (what Mr. Hartzog calls the 2020 Modified Order)

5    stemmed from allegations that Facebook knowingly allowed Cambridge Analytica to collect

6    information from "friends" of users on the Facebook platform that had not consented to the data

7    collection, information that was then used to influence the 2016 U.S. presidential election.

8    Hartzog Report, ¶¶ 31-39. In a press release following announcement of the Consent Order, FTC

9    Chairman Joe Simmons explained Facebook was punished because "[d]espite repeated promises

10   to its billions of users worldwide that ***they could control how their personal information is***

11   ***shared***, Facebook undermined consumers' choices." Dkt. 120-1.

12    As explained in the declaration of Mr. Hartzog, the FTC's mission is to protect consumers,

13   including with respect to data privacy. Hartzog Report, ¶¶ 11-12. The 2020 Consent Order

14   involving Facebook—an Order designed to protect consumers and prevent collection of personal

15   data *without* consent –is *not* a justification for Facebook's anti-competitive actions in this case.

16   First, UpVoice 2021 does not collect "Covered Information," as defined in Definition D of the

17   Consent Order. Dkt. 120-3 at 4, Definition D. Moreover, and as it relates to all the applications

18   and extensions, including UpVoice Legacy, BrandTotal is not a "Covered Third Party." The

19   Consent Order defines "Covered Third Party" as "any individual or entity that uses or receives

20   Covered Information obtained by or on behalf of [Facebook] ***outside of a User initiated transfer***

21   ***of Covered Information as part of a data portability protocol or standard*** . . . ." *Id*. at Definition

22   E (emphasis added). As explained in the declaration of Mr. Sherwood, UpVoice—upon User

23   agreement—serves to facilitate the transfer of advertising information the Panelist has seen from

24   one service (Facebook) to another UpVoice/BrandTotal). Sherwood Report, ¶¶ 107–108.

25   Although the Panelist could certainly manually share or re-enter that information, UpVoice makes

26   the transfer process automatic and does not collect any information the Panelist could not

27   manually share. *Id.* at § 5.1.2. The International Organization for Standardization defines "data

28   portability" as the "ability to easily transfer data from one system to another without being

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   required to re-enter data." *Id.* at ¶ 108; Dkt. 120-2 at 36. Thus, BrandTotal's programs are user-

2   initiated transfers as part of a data portability protocol (i.e., a program that facilities transferring

3   data from one system to another), and BrandTotal is therefore not a Covered Third Party. Hartzog

4   Report, ¶¶ 43, 47-49. Though Facebook contends as part of this litigation that BrandTotal is a

5   "Covered Third Party" it did not report BrandTotal to the FTC until *after* the litigation

6   commenced in October 2020. Dkt. 95-6. This was despite starting its investigation of UpVoice by

7   at least April 2020 and having an obligation under the Order to promptly report. Dkt. 120-3 at 8, §

8   VII.D. Thus, even Facebook likely understands BrandTotal is not a Covered Third Party but,

9   taking advantage of the undefined nature of the term in the Order itself, chose to contend

10  otherwise for purposes of this case.

11       Facebook's own whitepaper entitled "Data Portability and Privacy" recognizes that

12  "portability" is a broad concept encompassing various user-directed transfers of data to third

13  parties. Ex. LL at 9-11. And Facebook contends in that paper that its "core principle is that users

14  control how their data is used." *Id.* at 6. Its positions in this case do not conform with that

15  principle or others expressed in that paper. *See e.g.*, *id.* at 7 ("people should be able to transfer

16  their information directly to a provider of their choosing, in a way similar to how people use

17  Facebook Login today"); *Id.* at 16 ("once we know (1) that we're dealing with a user-directed

18  transfer of data, (2) which types of data should be transferred, and (3) whose data should be

19  transferred, we next need to ask how to enable portability while protecting privacy") *Id*. ("Given

20  that portability is about helping people stay in control of their data, it seems clear that transferring

21  entities should focus on making sure that requesting users can make informed choices about

22  transferring their data."); *see also* Facebook statements compiled in Hartzog Report, ¶¶ 24-25.

23       A more balanced and inclusive reading of the Consent Order shows that it is directed to

24  protecting users and does *not* prohibit user-initiated data sharing of the sort at issue here. Hartzog

25  Report, ¶¶ 44-46. The Consent Order only mandated safeguards for Facebook's own systems,

26  user interfaces, and practices that facilitated the non-consensual exposure of consumers' personal

27  information. *Id.*, ¶¶ 43-44. By contrast, the UpVoice is not part of Facebook's system, user

28  interfaces, or practices, it is installed with the informed consent of BrandTotal Panelists, and it

---

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   does not facilitate the nonconsensual exposure of any personal information. *See generally*

2   Sherwood Report, § 5.1.

3        Even if the Consent Order could be construed broadly enough to cover BrandTotal, a

4   Federal Consent Order does not excuse violation of a third-parties' rights under State law. Parties

5   cannot settle in a manner that immunizes from third-party liability under unrelated State laws.[15]

6   *See Alexander v. Bahou*, No. 5:78-CV-392, 2021 WL 99496, at *8–9 (N.D.N.Y. Jan. 12, 2021)

7   (rejecting use of consent decree to insulate against otherwise unlawful conduct); *In re MMS*

8   *Builders, Inc.*, 101 B.R. 426, 431 (D.N.J. 1989) (recognizing "the inequity inherent in allowing

9   a consent order to stand which affected the rights of third parties"). Facebook's remedy in that

10   situation was to seek modification of the Consent Order, not violate a third-parties rights. *See* 16

11   C.F.R. § 2.51 (allowing parties to FTC consent orders the ability to modify an order).

12        Even without modification, nothing in the Consent Order required Facebook to act as it

13   did. The Consent Order specifically contemplates certification for data collection. Dkt. 120-3 at 9,

14   § VII.E.1.a; Hartzog Report, ¶¶ 46, 55. Facebook could have authorized BrandTotal's data

15   collection once its investigation revealed the data collection was *with* user consent and for a

16   legitimate business purpose. Despite repeated requests from BrandTotal since litigation inception,

17   including most recently with respect to the UpVoice 2021 program, it did not do so, and it has no

18   procedure in place to do so. Newman Dep., 67:10–68:12, 69:19–23. While the Consent Order

19   specifically contemplates a Privacy Program that balances user interests with the needs of third

20   parties to access data on the Facebook site, and does *not* direct Facebook to ban all automated

21   collection of data from its platforms, Facebook has no such program in place. Instead, it is using

22   the Consent Order to justify its anti-competitive action in stopping *any* data collection outside of

23   its own programs. At best, Facebook could contend (BrandTotal disagrees) that the Consent Order

24   ***allows*** stopping all data collection, the Order clearly does not ***require*** Facebook to do so, and

25

─────────────────────

26   [15] Even Congressionally promulgated Federal laws (absent certain narrow exceptions), do not
     preempt State laws that grant additional rights or protections to citizens. Wyeth v. Levine, 555
27   U.S. 555, 573 (2009) (discussing preemption and the historical presumption against preemption of
     state laws). Companies covered by both Federal and more stringent State laws, need to comply
28   with both. Id. (holding that Federal law did not preempt where drug manufacturer could comply
     with federal requirements and more stringent state law labeling requirements).

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1  hence, Facebook's anti-competitive, abusive conduct is not justified. The FTC's "Privacy

2  Program" is a "program" that required a number of steps, it was a punishment to Facebook, and it

3  plainly does not serve as a justification for Facebook to violate state law without responsibility.

4      Any valid construction or interpretation of the FTC Consent Order only justifies

5  Facebook in terminating or restricting conduct where such conduct is deceptive or harmful to

6  consumers. *See* Dkt. 120-3, Consent Order, § V; Hartzog Report, ¶ 11. Any interpretation of the

7  FTC Order that conflicts with the Ninth Circuit's holding in *hiQ Labs, Inc. v. LinkedIn Corp.*, 938

8  F.3d 985 (9th Cir. 2019), renders the FTC Order invalid and is therefore incorrect.

9  **II.     BRANDTOTAL WILL SUFFER IRREPARABLE HARM**

10      As detailed in the TRO proceeding and in the declaration of Alon Leibovich filed with this

11  motion, BrandTotal suffered irreparable harm after Facebook's actions related to UpVoice Legacy.

12  Without relief with respect to UpVoice 2021, BrandTotal will continue to suffer the same

13  irreparable harm and may not survive until trial. *See* SOF § D. "[L]ongstanding Ninth Circuit

14  precedent has recognized that 'showing a threat of 'extinction' is enough to establish irreparable

15  harm . . . ." Order at 13 (quoting *hiQ*, 938 F.3d at 993). Facebook's expected removal of UpVoice

16  2021 would mean that BrandTotal could not survive until trial and Facebook's actions will cause

17  further significant intangible injuries. Indeed, Facebook's removal of UpVoice Legacy caused

18  BrandTotal to lose current and prospective customers, investment opportunities, and 25% of its

19  work staff. SOF § D. Even considering BrandTotal's efforts to stem the rising tide of water by

20  developing two other, non-Google, instances of UpVoice and retain customers by offering reduced

21  pricing and value add services, without Facebook data or a Chrome extension, BrandTotal's cash

22  flow means it will be run out of business by ████████—well before the anticipated trial

23  date. *Id.*

24      Facebook's actions related to UpVoice Legacy also caused BrandTotal additional

25  intangible and other irreparable harm, which will continue if Facebook is permitted to interfere

26  with UpVoice 2021. Since the Court's TRO Order, BrandTotal has lost over a quarter of its

27  workforce. SOF § D. As recognized by this Court at the TRO stage, the loss of current and

28  prospective customers constitutes irreparable harm that justifies equitable relief. *Shippers, a*

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

*Division of Illinois Tool Works, Inc. v. Fontenot*, No. 13CV1349 JLS (MDD), 2013 WL 12092056, at *6 (S.D. Cal. Sept. 23, 2013). Moreover, BrandTotal's reputation is suffering. It has no way to recruit Panelists due to Facebook's removal of its business accounts. "[I]ntangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm." *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991).

## III. BRANDTOTAL HAS AT LEAST RAISED SERIOUS QUESTIONS GOING TO THE MERITS OF THEIR CLAIMS.

In the TRO proceeding, the Court found that BrandTotal had potentially raised serious questions (but not a likelihood of success) as to the merits of its counterclaims of tortious interference with actual and prospective customers, and for unfair competition. Order at 26-28. Additional discovery has revealed Facebook's conduct as both intentional and fraudulent, as alleged in the Amended Counterclaims.

First, as the Court noted in the TRO Order, "'[w]hether an intentional interference by a third party is justifiable depends upon a balancing of the importance, social and private, of the objective advanced by the interference against the importance of the interest interfered with, considering all circumstances including the nature of the actor's conduct and the relationship between the parties.'" Order at 26 (quoting h*iQ*, 938 F.3d at 997) (further citation omitted). In the motion to dismiss Order, this Court questioned whether the FTC Consent Order negated the need to consider balancing. As set forth in the declaration of Mr. Hartzog, and described in Section I.D., the Consent Order is not and cannot be a justification for Facebook's violations of BrandTotal's rights under State Law. *See, e.g.*, Hartzog Report, ¶ 46.

Whether or not Facebook was justified is a question that informs the analysis of each of the affirmative counterclaims (i.e., intentional interference with contract and prospective economic advantage and unfair competition). *Id.* at 26-27. This Court explained that:

> To the extent that Facebook's denial of access to BrandTotal was based on BrandTotal's failure to coordinate with Facebook and seek approval through established channels, and on Facebook's perception that BrandTotal had a history of collecting user data in irresponsible ways, the balance tips in favor of allowing Facebook to enforce its prohibition against unapproved automated access. On the other hand, to the extent that Facebook might have been motivated by a desire to prevent BrandTotal from competing against Facebook in the market for advertising

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1

analytics, the balance would favor granting relief in order to foster competition and innovation, and allow BrandTotal to honor its contracts with its customers.

2

*Id.* at 26. Discovery collected since the Court's TRO Order disproves any of the *potentially*

3

legitimate reasons for Facebook's actions and reveals the anti-competitive and improper

4

motivations behind Facebook's actions. As set forth in Section B of the facts, Facebook did not

5

disable BrandTotal's accounts, revoke BrandTotal's access to data, and send a take-down notice to

6

Google due to any concern with user consent, the security of BrandTotal's collection or

7

BrandTotal's use of the information— ███████████████████████████. *See* SOF

8

§ A. Instead, Facebook acted because ███████████████████████████

9

███████████████████████████████████████████

10

███████████████████████████. Thus, Facebook is not policing

11

access to protect user interests; it is restricting access altogether, keeping the data only for itself. If

12

Facebook had concerns about user interests, it would have acted in early 2019 after its first

13

investigation; instead it continued to collect advertising money from BrandTotal.

14

As this Court previously found: "So long as BrandTotal's browser extension works as

15

intended and represented, it threatens interests at most only marginally better than those the Ninth

16

Circuit found 'relatively weak' in *hiQ*." *Id.* at 22–23. This has proven to be the situation.

17

Sherwood Report, § 5.1 (establishing UpVoice operates as represented). ███████████

18

███████████████████████████████████████████

19

███. Karve Dep., 99:5–18. It was reckless for Facebook to suggest that the *AdGuard* incident

20

caused it concern, when just months later, it concluded that BrandTotal's code was ███████

21

Even if Facebook was concerned about possible issues with BrandTotal being able to accidentally

22

collect information from individuals using a Google chrome account other than their own—a

23

concern that does not appear in Facebook's internal documents and was not raised until

24

litigation—that issue is moot. Once the issue was identified, BrandTotal promptly provided a fix

25

that now requires users to affirmatively agree to collection if the computer-user signs into a new

26

social-media account. Sherwood Report, ¶¶ 93–96; Dor 2d Dep., 44:20–47:15 (rough).

27

Facebook also cannot justify its actions by citing to its own unilaterally drafted Terms of

28

Service. Those terms, as interpreted and applied here, are unenforceable. Facebook's ban against

1   automated collection forecloses access to information—information about commercial advertising

2   that Panelists have agreed to share—and thus violates public policy. *See* Cal. Civ. Code

3   §§ 1667(2), 1798.192; *McIlwain, LLC v. Berman*, No. 18-CV-03127 CW, 2020 WL 1308342, at

4   *10 (N.D. Cal. Feb. 10, 2020) ("[T]he Court concludes that the agreement violates public policy

5   and is therefore unenforceable."). Imagine a baseball stadium that required attendees to sign an

6   agreement upon entering decreeing that all factual data about the events viewed that day by the

7   attendees belonged to the stadium. Reporters could not report what they viewed, statistics

8   companies could not compile and monetize the data; rather the stadium monopolized and

9   monetized the factual data, releasing only what it deemed fit and using the information for its own

10  profit. This is what Facebook seeks to do on its virtual platform, and it is not lawful.

11         In examining whether terms of service are enforceable, "courts should weigh the federal

12  policy embodied in the law of intellectual property against even explicit contractual provisions and

13  render unenforceable those provisions that would undermine the public interest." *Idaho Potato*

14  *Comm'n v. M & M Produce Farm & Sales*, 335 F.3d 130, 137-139 (2d Cir. 2003) (applying the

15  Supreme Court-adopted *Lear* balancing approach, as articulated in *Lear, Inc. v. Adkins*, 395 U.S.

16  653, 674-675 (1969)). Similarly, under California state law, public policy can void a contract. Cal.

17  Civ. Code § 1667(2) (a contract or a provision of a contract is unlawful if it is "[c]ontrary to the

18  policy of express law, though not expressly prohibited"). Facebook's Terms are invalid as contrary

19  to the public interests in preventing users from disseminating and monetizing their own data and in

20  promoting competition. Facebook's own whitepaper shows that it knows its preclusion against the

21  only effective way of user data portability is against public policy. Ex. LL at 12-13.

22         The First Amended Counterclaims more fully alleges the above described lack of

23  justification, as well as the other elements of interference with contracts and prospective contracts

24  and unfair competition. Dkt. 120. For example, despite Facebook falsely contending prior to

25  discovery exchange in this case that it was not aware of specific customers, Facebook's internal

26  documents show that it had knowledge of BrandTotal's valid customer contracts. Dkt. 120, ¶ 122

27  with cited exhibits (Dkt. 120-7, Ex. G; Dkt. 120-8, Ex. H). Additionally, though Facebook initially

28  argued to this Court that it did not know if Google would remove the applications when it sent the

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

take-down notice, the correspondence with Google reflects that Facebook knew with a very high degree of certainty that Google would remove UpVoice when Facebook emailed Google in September 2020 based on Facebook's past dealings and misrepresentations and fraudulent statements to Google regarding BrandTotal. Specifically, Facebook misrepresented that UpVoice and other extensions were "improperly scraping user PII . . . without proper disclosure," Ex. I, when BrandTotal had not only disclosed to its users what information was being collected, but UpVoice-Panelists had even provided much of that information to BrandTotal, all of which Facebook would have known through its prior investigations of Defendants. Dkt. 120, ¶ 124 with cited exhibits (Dkt. 120-6, Ex. F; Dkt. 120-9, Ex. I). This conduct not only supports claims for interference, but unfair competition as well. As alleged in the Amended Counterclaims, Facebook's termination of access to the Facebook network and false allegations in the take-down notice to Google were monopolist and anti-competitive, not just as to BrandTotal, but as part of a corporate policy to stifle all competition and monopolize commercial advertising data on its site. Dkt. 120, ¶¶ 173-180, 183. The conduct is precisely what unfair competition law is designed to redress. *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999) (emphasis added) (UCL broadly prohibits actions that "threatens or harms competition").

Lastly, BrandTotal should prevail on Facebook's allegations under the CFAA, the California Penal Code § 502(c), and state law, and its own related declaratory judgment counterclaims. None of Facebook's claims excuse Facebook's actions or render the relief sought here unavailing. UpVoice 2021 does not collect private user information, and like all versions of UpVoice, collects data only with user consent and at user instigation. The CFAA prohibits "intentionally access[ing] a computer without authorization or exceed[ing] authorized access," 18 U.S.C. § 1030(a)(2), as well as "intentionally access[ing] a protected computer without authorization" and causing "damage and loss," 18 U.S.C. § 1030(a)(5)(C). In September 2019, the Ninth Circuit held the "without authorization" requirement of the CFAA was likely inapplicable to cases, like here, where the information accessed and collected is public. *hiQ*, 938 F.3d at 999–1004. UpVoice 2021 collects only advertising information of the sort at issue in hiQ. Sherwood Rept., §§ 4.1.1.2, 5.1.1.2; *see also* Appx. H to Sherwood Rept.; Dor 2d Dep., 49:10–51:17, 58:17–

66:7. Unlike in *hiQ*, however, BrandTotal has user consent as well, meaning it is not

"unauthorized." The data BrandTotal accesses now is neither owned by Facebook nor private,

consisting of commercial advertising viewable by millions of people. BrandTotal has thus "raised

serious questions about whether [Facebook] may invoke the CFAA" with respect to public data

(e.g., information about the advertisement and metrics of engagement), and thus Facebook's

CFAA claim cannot preclude a preliminary injunction award. *See hiQ*, 938 F.3d at 1004.

The same is true of Facebook's claims (and BrandTotal's declaratory judgment amended

counterclaims) under the penal code and state law interference counts. Panelists willingly provide

the collected data, and it is the panelists authorized scrolling that generates the factual data

regarding the commercial advertisements they encounter. This is not an unauthorized computer

access, nor is this in any way a "scheme to defraud, deceive, or extort" as contemplated in the

penal code. Nor is BrandTotal interfering with Facebook's contractual users. As described above,

the Terms of Service preventing all automated means of collecting data conflicts principles of user

control and data portability, rendering the Terms of Service, at least as applied here,

unenforceable. There is no harm to users or Facebook resulting from BrandTotal's programs, and

certainly no harm in allowing UpVoice 2021 to continue to operate.

## IV.   THE BALANCE OF EQUITIES TIPS IN FAVOR OF GRANTING THE REQUESTED PRELIMINARY INJUNCTION.

Whatever minimal interest and risk of harm Facebook may have possessed last Fall no

longer exists. The harm to BrandTotal, in contrast, has only increased and places BrandTotal at

risk of cascading failure. Moreover, there is a large public interest in allowing Panelists to share

information regarding what advertisements they have seen, while there is no public interest in

allowing Facebook to hide that information. "The balance of equities requires a court to consider

'the interests of all parties and weigh the damage to each.'" Order at 30 (quoting *CTIA – The*

*Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 852 (9th Cir. 2019)).

The Court initially found Facebook possessed legitimate interests "in maintaining public

confidence in its products and avoiding potential liability for data privacy breaches. Ordering

Facebook to allow access by BrandTotal, without BrandTotal completing Facebook's usual vetting

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1    process and using the standard APIs for obtaining users' permission to access their personal data,

2    risks some degree of harm to public confidence in Facebook's data protection." Order at 30. That

3    is no longer true. BrandTotal has modified the UpVoice extension such that it now only collects

4    advertising (not user) data from the password-protected portion of Facebook. Dor 2d Dep., 40:22–

5    41:18; Sherwood Report, § 5.1.1.2. This same information is available from a non-password

6    protected portion of Facebook. Dor Decl., ¶ 20. *hiQ*, 938 F.3d at 997–98. Facebook thus lacks any

7    legitimate interest. There is also no risk of harm to Facebook. Facebook's actions in taking down

8    UpVoice were done without regard to form or function, but instead for wholesale preclusive

9    reasons, and it refuses to authorize UpVoice 2021 for the same reasons. The harm to BrandTotal,

10    in contrast, is real and immediate. *See supra* § II.

11    **CONCLUSION**

12        For the foregoing reasons, BrandTotal respectfully requests the Court GRANT its motion

13    for a preliminary injunction and require Facebook to:

14        (1) Take no action to interfere with or have removed or disable UpVoice 2021;

15        (2) refrain from implementing or reverse any "technical enforcement measures" blocking

16    UpVoice 2021 from Facebook's platform or otherwise prohibiting Panelists from sharing their

17    information with BrandTotal; and

18        (3) restore the Facebook accounts of BrandTotal such that BrandTotal may resume

19    advertising efforts to recruit Panelists.

20

21

22

23

24

25

26

27

28

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Date: March 12, 2021

Respectfully submitted,

By: /s/ Rudolph A. Telscher, Jr.
Rudolph A. Telscher, Jr.*
rudy.telscher@huschblackwell.com
Kara R. Fussner*
kara.fussner@huschblackwell.com
HUSCH BLACKWELL LLP
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
314-480-1500 Telephone

Ryan B. Hauer*
ryan.hauer@huschblackwell.com
HUSCH BLACKWELL LLP
120 South Riverside Plaza Suite 2200
Chicago, IL 60606
312-526-1572 Telephone

Dustin L. Taylor*
dustin.taylor@huschblackwell.com
HUSCH BLACKWELL LLP
180 1 Wewatta Street, Suite 1000
Denver, CO 80202
303-749-7200 Telephone
*admitted pro hac vice

Karl Kronenberger (CA Bar No. 226112)
karl@krinternetlaw.com
Jeffrey M. Rosenfeld (CA Bar No. 222187)
jeff@krinternetlaw.com
KRONENBERGER ROSENFELD, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
415-955-1155 Telephone
415-955-1158 Facsimile

*Attorneys for Defendants/Counterclaim
Plaintiffs BrandTotal, Ltd. and Unimania, Inc.*

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

**CERTIFICATE OF SERVICE**

1

2          I hereby certify that on this 12th day of March 2021, I caused the foregoing to be filed

3    electronically with the Clerk of Court and to be served via the Court's Electronic Filing System

4    upon all counsel of record, and to be served via email on all counsel of record at the following:

5

6    WILMER CUTLER PICKERING
     HALE AND DORR LLP
7    SONAL N. MEHTA (SBN 222086)
     sonal.mehta@wilmerhale.com
8    THOMAS G. SPRANKLING (SBN 294831)
     thomas.sprankling@wilmerhale.com
9    JOSEPH M. LEVY (SBN 329318)
     joseph.levy@wilmerhale.com
10   2600 El Camino Real, Suite 400
     Palo Alto, CA 94306
11   Telephone: (650) 858-6000

12
     ARI HOLTZBLATT
13   Ari.Holtzblatt@wilmerhale.com
     ALLISON SCHULTZ
14   Allison.Schultz@wilmerhale.com
     ROBIN C. BURRELL
15   robin.burrell@wilmerhale.com
     1875 Pennsylvania Ave, NW
16   Washington, DC 20006
     Telephone: (202) 663-6000
17   Facsimile: (202) 663-6363

18
19   HUNTON ANDREWS KURTH LLP
     Ann Marie Mortimer (State Bar No. 169077)
20   amortimer@HuntonAK.com
     Jason J. Kim (State Bar No. 221476)
21   kimj@HuntonAK.com
     Jeff R. R. Nelson (State Bar No. 301546)
22   jnelson@HuntonAK.com
23   550 South Hope Street, Suite 2000
     Los Angeles, California 90071-2627
24   Telephone: (213) 532-2000
     Facsimile: (213) 532-2020
25

26   ***Attorneys for Plaintiff/Counterclaim***
     ***Defendant Facebook, Inc.***
27
                                    */s/ Rudolph A. Telscher, Jr.*
28

---