**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

WILMER CUTLER PICKERING HALE AND
DORR LLP
SONAL N. MEHTA (SBN 222086)
sonal.mehta@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

ARI HOLTZBLATT (*pro hac vice*)
Ari.Holtzblatt@wilmerhale.com
ALLISON SCHULTZ (*pro hac vice*)
Allison.Schultz@wilmerhale.com
ROBIN C. BURRELL (*pro hac vice*)
robin.burrell@wilmerhale.com
1875 Pennsylvania Ave, NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

HUNTON ANDREWS KURTH LLP
Ann Marie Mortimer (State Bar No. 169077)
amortimer@HuntonAK.com
Jason J. Kim (State Bar No. 221476)
kimj@HuntonAK.com
Jeff R. R. Nelson (State Bar No. 301546)
jnelson@HuntonAK.com
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627
Telephone: (213) 532-2000
Facsimile: (213) 532-2020

Attorneys for Plaintiff/Counterclaim Defendant
Facebook, Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| FACEBOOK, INC., a Delaware corporation,<br><br>　　　　　　　　Plaintiff/Counterclaim<br>　　　　　　　　Defendant,<br><br>　　v.<br><br>BRANDTOTAL LTD., an Israeli corporation, and UNIMANIA, INC., a Delaware corporation,<br>　　　　　　　　Defendants/<br>　　　　　　　　Counterclaim<br>　　　　　　　　Plaintiffs. | Case No. 3:20-CV-07182-JCS<br><br>**PLAINTIFF FACEBOOK INC.'S MOTION TO DISMISS THE DEFENDANTS' FIRST AMENDED COUNTERCLAIMS PURSUANT TO FED. R. CIV. P. 12(B)(6)**<br><br>Hon. Joseph C. Spero<br>Courtroom F – 15th Floor<br>Date: May 14, 2021<br>Time: 9:30 a.m. |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION TO DISMISS ............................................................1

STATEMENT OF REQUESTED RELIEF.........................................................................1

STATEMENT OF ISSUES TO BE DECIDED ...................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................1

I.      FACTUAL BACKGROUND ................................................................................3

II.     ARGUMENT ..........................................................................................................5

    A.    BrandTotal Cannot State A Claim For Intentional Interference With Contract (Counterclaim IV)................................................................................5

        1.   BrandTotal has not alleged any interference with respect to UpVoice 2021..............................................................................................6

        2.   Any alleged interference was justified.................................................6

        3.   BrandTotal has not alleged the breach or disruption of any contract with clients, panelists, investors, or Google...........................................11

    B.    BrandTotal Cannot State A Claim For Intentional Interference With Prospective Economic Advantage (Counterclaim V)................................................13

        1.   BrandTotal has not alleged any interference with respect to UpVoice 2021..............................................................................................14

        2.   Any alleged interference was justified.................................................14

        3.   BrandTotal has not alleged the existence of any prospective relationships with the probability of economic benefit............................................14

        4.   BrandTotal has not alleged independently wrongful conduct.........................15

    C.    BrandTotal Fails To State A Claim Under California's Unfair Competition Law (Counterclaim VI)................................................................................16

        1.   BrandTotal alleges no "unlawful" business practice ......................................16

        2.   BrandTotal alleges no "unfair" business practice ...........................................17

i

3. BrandTotal alleges no "fraudulent" business practice ................................... 21

D. The Court Should Dismiss BrandTotal's Declaratory Judgment Counterclaims (Counterclaims I-III) ............................................................................................. 22

1. BrandTotal's counterclaims are redundant of Facebook's claims ................... 22

2. BrandTotal's own allegations establish that it cannot succeed on the merits of its counterclaims ........................................................................................... 23

III. CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Aleksick v. 7-Eleven*,
205 Cal. App. 4th 1176 (2012) ........................................................16

*AlterG, Inc. v. Boost Treadmill LLC*,
388 F. Supp. 3d 1133 (N.D. Cal. 2019) ...........................................14

*Apple, Inc. v. Pystar Corp.*,
586 F. Supp. 2d 1190 (N.D. Cal. 2008) ...........................................19

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...........................................................................5

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985)......................................................................3, 20

*Bank of New York v. Fremont General Corp.*,
523 F.3d 902 (9th Cir. 2008) .............................................................6

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)...........................................................................5

*Berryman v. Merit Property Management, Inc.*,
152 Cal. App. 4th 1544 (2007) ........................................................16

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*,
20 Cal. 4th 163 (1999) .....................................................................17

*Creative Mobile Technologies, LLC v. Flywheel Software, Inc.*,
2017 WL 679496 (N.D. Cal. Feb. 21, 2017) ...................................18

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*,
11 Cal. 4th 376 (1995) ...............................................................13, 15

*Edwards v. Arthur Anderson LLP*,
44 Cal. 4th 937 (2008) .....................................................................15

*Facebook, Inc. v. Power Ventures*,
844 F.3d 1058 (9th Cir. 2016) .....................................................24, 25

*Federal Trade Commission v. Mandel Brothers, Inc.*,
359 U.S. 385 (1959)..........................................................................10

iii

*Great Minds v. Office Depot, Inc.*,
   945 F.3d 1106 (9th Cir. 2019) ............................................................................................5

*Hicks v. PGA Tour, Inc.*,
   897 F.3d 1109 (9th Cir. 2018) ..........................................................................................19

*hiQ Labs, Inc. v. LinkedIn Corp.*,
   938 F.3d 985 (9th Cir. 2019) ...............................................................................10, 11, 24

*Hiramanek v. Clark*,
   2014 WL 2855512 (N.D. Cal. June 20, 2014) ..................................................................21

*Honey Baked Ham, Inc. v. Honey Baked Ham Co. LLC*,
   2020 WL 5498077 (C.D. Cal. Aug. 17, 2020)..................................................................19

*Huth v. Hartford Insurance Co.*,
   298 F.3d 800 (9th Cir. 2002) ............................................................................................23

*Image Technical Services, Inc. v. Eastman Kodak Co.*,
   125 F.3d 1195 (9th Cir. 1997) ..........................................................................................19

*Imperial Ice Co. v. Rossier*,
   18 Cal. 2d 33 (1941) ...........................................................................................................7

*Jay Norris, Inc. v. Federal Trade Commission*,
   598 F.2d 1244 (2d Cir. 1979)............................................................................................11

*Jenni Rivera Enterprises, LLC v. Latin World Entertainment Holdings, Inc.*,
   36 Cal. App. 5th 766 (2019) .......................................................................................11, 12

*Korea Supply Co. v. Lockheed Martin Corp.*,
   29 Cal. 4th 1134 (2003) ..............................................................................................13, 15

*Loop AI Labs Inc. v. Gatti*,
   2015 WL 5158639 (N.D. Cal. Sept. 2, 2015) ..................................................................14

*Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.*,
   271 F.3d 825 (9th Cir. 2001) ............................................................................................14

*Medina v. Microsoft Corp.*,
   2014 WL 2194825 (N.D. Cal. May 23, 2014) ..................................................................22

*MetroNet Services Corp. v. Qwest Corp.*,
   383 F.3d 1124 (9th Cir. 2004) ..........................................................................................17

*Minifield v. Butikofer*,
   298 F. Supp. 2d 900 (N.D. Cal. 2004) .............................................................................18

iv

*National Rural Telecommunications Cooperative v. DIRECTV, Inc.*,
  319 F. Supp. 2d 1059 (C.D. Cal. 2003) ...................................................................21, 22

*Pacific Bell Telephone Co. v. Linkline Communications, Inc.*,
  555 U.S. 438 (2009) ..............................................................................................18

*Pacific Gas & Electric Co. v. Bear Stearns & Co.*,
  50 Cal. 3d 1118 (1990) ...........................................................................6, 13, 15, 16

*People's Choice Wireless, Inc. v. Verizon Wireless*,
  131 Cal. App. 4th 656 (2005) .........................................................................18, 19

*Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*,
  944 F.2d 597 (9th Cir. 1991) ...................................................................................11

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
  471 F. Supp. 3d 981 (N.D. Cal. 2020) ...................................................................20

*Rosenbluth International, Inc. v. Superior Court of Los Angeles County*,
  101 Cal. App. 4th 1073 (2002) ..............................................................................21

*Sebastian International, Inc. v. Russolillo*,
  162 F. Supp. 2d 1198 (C.D. Cal. 2001) ...................................................................11

*Threshold Enterprises Ltd. v. Pressed Juicery, Inc.*,
  445 F. Supp. 3d 139 (N.D. Cal. 2020) ...................................................................10

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004) .....................................................................................18, 19, 20

*VienPhuong Ti Ho v. City of Long Beach*,
  2020 WL 8617674 (C.D. Cal. Nov. 10, 2020) ........................................................23

*Watson Laboratories, Inc. v. Rhone-Poulenc Rorer, Inc.*,
  178 F. Supp. 2d 1099 (C.D. Cal. 2001) ...................................................................21

*Webber v. Inland Empire Investments*,
  74 Cal. App. 4th 884 (1999) .....................................................................................7

*Western Air Charter, Inc. v. Schembari*,
  2017 WL 10638759 (C.D. Cal. Oct. 6, 2017) .......................................................6, 23

## RULES, REGULATIONS, STATUTES

Cal. Bus. & Prof. Code § 17200 (California's Unfair Competition Law) ................................ *passim*

Cal. Pen. Code § 502 (CDAFA) ......................................................................................... *passim*

Fed. R. Civ. P. 12(b)(6) ...........................................................................................................1, 5

v

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

15 U.S.C. §§ 1-7 (Sherman Act) ........................................................................................20

18 U.S.C. § 1030 ................................................................................................... *passim*

### OTHER AUTHORITIES

AdGuard, *Unimania: I Need Your Facebook Data, Location, And Your Browsing
    History* (May 30, 2018), https://tinyurl.com/kuh6ebd5 ...........................................4

Amazon, *Conditions of Use*, https://tinyurl.com/y2mnmzap (last accessed Mar. 26,
    2021) ......................................................................................................................1

Chrome Web Store, *Desktop for Instagram*, https://tinyurl.com/4tz2ehzp (last
    accessed Mar. 26, 2021) ..........................................................................................13

Facebook, *Driving Innovation in Data Portability With a New Photo Transfer Tool*
    (Dec. 2, 2019), https://tinyurl.com/4txcm728 ..........................................................10

Google Chrome Developers, *Google Chrome Web Store Developer Agreement*,
    https://tinyurl.com/557xxxrc  (last accessed Mar. 26, 2021) .........................1, 12, 13

ISO, *Information Technology – Cloud computing – Interoperability and portability*,
    https://tinyurl.com/3c443pse (last accessed Mar. 26, 2021)....................................10

LinkedIn, *LinkedIn Service Terms*, https://tinyurl.com/37bt5svw (last accessed Mar.
    26, 2021) ..................................................................................................................1

Twitter, *Twitter Terms of Service*, https://tinyurl.com/2rxrremm (last accessed Mar. 26,
    2021) ......................................................................................................................1

YouTube, *Terms Of Service*, https://tinyurl.com/3rrtrfeu  (last accessed Mar. 26,
    2021) ......................................................................................................................1

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1

### NOTICE OF MOTION AND MOTION TO DISMISS

2    PLEASE TAKE NOTICE THAT, on May 14, 2021 at 9:30 a.m. or as soon thereafter as the

3  matter may be heard, in Courtroom F of the U.S. District Court for the Northern District of California,

4  San Francisco Division, at 450 Golden Gate Avenue, San Francisco, California, plaintiff Facebook,

5  Inc. will and hereby does move to dismiss all claims advanced in the Amended Counterclaims ("FAC")

6  (Dkt. No. 120) for the failure to state a claim upon which relief can be granted.  Facebook's Motion

7  to Dismiss is based on this Notice of Motion and the Memorandum of Points and Authorities.

8

### STATEMENT OF REQUESTED RELIEF

9    Pursuant to Federal Rule of Civil Procedure 12(b)(6), Facebook requests that the Court dismiss

10  all of Defendants BrandTotal, Ltd. and Unimania, Inc.'s counterclaims with prejudice.

11

### STATEMENT OF ISSUES TO BE DECIDED

12    The issue to be decided is whether the Amended Counterclaims must be dismissed in their

13  entirety for failure to plead essential elements of Defendants' claims for declaratory judgments,

14  intentional interference with contract, intentional interference with prospective economic advantage,

15  and violation of California's Unfair Competition Law.

16

### MEMORANDUM OF POINTS AND AUTHORITIES

17    Defendants BrandTotal and Unimania's (collectively, "BrandTotal") recklessly built a

18  business monetizing data it improperly harvested from Facebook and Instagram, in violation of

19  Instagram's Terms of Use and Facebook's Terms of Service, which prohibit the automated collection

20  of data without Facebook's permission.[1]  To facilitate their data harvesting activities, BrandTotal

21  developed, promoted, and distributed several browser extensions and mobile applications, all

22

23

---

24  [1] BrandTotal also improperly scraped data from Twitter, YouTube, LinkedIn, and Amazon.  Like
Facebook, those sites also prohibit the use of automated means to access and/or collect data from their

25  platforms. *See* Twitter, *Twitter Terms of Service*, https://tinyurl.com/2rxrremm (last accessed Mar. 26,
2021); YouTube, *Terms Of Service*, https://tinyurl.com/3rrtrfeu (last accessed Mar. 26, 2021);

26  Amazon, *Conditions Of Use*, https://tinyurl.com/y2mnmzap (last accessed Mar. 26, 2021); and
LinkedIn, *LinkedIn Service Terms*, https://tinyurl.com/37bt5svw (last accessed Mar. 26, 2021). And

27  Term 4.4.1.1 of the Google Chrome Store Developer Agreement prohibits developing or publishing
any materials that violates the terms of service for a third-party.  *See* Google Chrome Developers,

28  *Google Chrome Web Store Developer Agreement*, https://tinyurl.com/557xxxrc (last accessed Mar.
26, 2021).

programmed and designed to automatically scrape user and advertising-related data (without Facebook's permission) from Facebook and Instagram (and other sites) whenever a user visited those sites with a device on which one of BrandTotal's apps or extensions had been installed.  After investigating BrandTotal's conduct, Facebook filed an action alleging, among other things, that BrandTotal breached its contract with Facebook by violating Facebook's and Instagram's terms, and violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"), and the California Computer Data Access and Fraud Act, Penal Code § 502 ("CDAFA").

In response to Facebook's complaint, BrandTotal filed counterclaims alleging Facebook interfered with its contractual and prospective economic relations and violated California's unfair competition law ("UCL"), Cal. Bus. & Prof. Code § 17200, when Facebook enforced its Terms of Service by disabling BrandTotal's Facebook accounts and reporting two of BrandTotal's extensions to Google, which removed the extensions from the Google Chrome Store.  BrandTotal also sought a declaratory judgment that it did not violate Facebook's Terms of Service.

On February 19, 2021, this Court dismissed BrandTotal's counterclaims.  *See* MTD Order (Dkt. No. 108).  In dismissing the counterclaims, the Court held that BrandTotal violated Facebook's terms by using automated means to scrape data from Facebook's computers, *id.* at 11, that Facebook had a legitimate business purpose that justified its enforcement of those terms against BrandTotal, *id.* at 14-15, and that BrandTotal had failed to state any claim under any prong of California's Unfair Competition Law ("UCL").

BrandTotal has now filed six amended counterclaims.  In its amended counterclaim complaint, BrandTotal again asserts claims for intentional interference with contractual relations, intentional interference with prospective economic relations, and alleges violations of all three prongs of the UCL (including the fraudulent prong that this Court dismissed *with prejudice*).  BrandTotal has also added three new declaratory judgment claims, alleging that BrandTotal's use of automated means to scrape Facebook's computers, after Facebook revoked its access to Facebook, did not and would not violate the CFAA and CDAFA, and did not and would not cause Facebook users to breach their contracts with Facebook.

Each of BrandTotal's amended counterclaims should be dismissed for the following reasons:

2

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

*First*, BrandTotal's interference claims should be dismissed because Facebook had a legitimate business purpose in enforcing its terms and BrandTotal fails to allege any improper motive behind Facebook's enforcement actions.  Additionally, BrandTotal fails to allege facts sufficient to show that it lost any prospective relationships that held the probability of future economic benefit or that Facebook's conduct was independently wrongful.

*Second*, BrandTotal fails to state a claim under the "unlawful" prong of the UCL because it has once again predicated its claim on its failed theories of tortious interference.  BrandTotal fails to state a claim under the "unfair" prong because its claim is again premised on the same flawed refusal to deal theory, which does not violate the "policy" or "spirit" of the antitrust laws.  BrandTotal has not adequately alleged monopoly power in any relevant market, nor can BrandTotal fit its allegations into the narrow exception laid out by the Supreme Court in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985).  BrandTotal attempts to revive its "fraudulent" prong claim but this Court dismissed its original counterclaim ***with prejudice***.  BrandTotal cannot now seek to replead the claim, and, even if it could, BrandTotal's allegations fall far short of the pleading standard for such a claim.

*Finally*, BrandTotal's three new claims for declaratory relief should be dismissed because BrandTotal's own allegations show it violated the CFAA and CDAFA and caused users of BrandTotal's extension to breach their contracts with Facebook.  In other words, BrandTotal has not stated a claim because its own factual averments make its claims implausible.  BrandTotal's amended counterclaims for declaratory relief are also duplicative of issues the Court will necessarily resolve in adjudicating Facebook's claims.  Each of these defects independently warrants dismissal of all three of BrandTotal's claims for declaratory relief.

BrandTotal has had more than enough time and opportunity to attempt to state its claims.  Having failed to cure the defects in its claims even with substantial discovery and guidance from this Court, BrandTotal's amended counterclaims should be dismissed with prejudice.

## I. FACTUAL BACKGROUND[2]

Since at least 2019, BrandTotal has developed, promoted, and distributed numerous browser

---

[2] For purposes of this motion, Facebook takes the allegations in the FAC as true without conceding that they are correct.

extensions and mobile applications it used to scrape user and advertising-related information from various social-media platforms and websites, including Facebook, Instagram, Twitter, YouTube, LinkedIn, and Amazon. Answer (Dkt. No. 23) ¶ 42; FAC (Dkt. No. 120) ¶¶ 44-45, 49. UpVoice, BrandTotal's most widely used offering, scrapes information about ads that users see while they browse sites like Facebook. FAC ¶¶ 45, 52.

To protect the privacy of user data and the security of its network, Facebook prohibits the collection of data using automated means and without permission. *Id.* ¶ 25. Advertising data is "typically associated with personal information," including the advertiser's name (which, if the advertiser is an individual, is that person's first and last name), the user's geographic location, and non-public user information associated with other users' interactions with those ads. FAC Ex. K at 2 (quoting Deposition Tr. of Mike Clark 44:21-22). Scraping that information can make it vulnerable to exploitation and can burden Facebook's networks. *Id.*

BrandTotal has a history of scraping data in violation of Facebook's terms. FAC Exs. D & E. In 2018, the website AdGuard wrote about BrandTotal using several browser extensions to scrape Facebook data and using an insecure method to anonymize user information. *See* FAC Ex. E at 3; *see also* AdGuard, *Unimania: I Need Your Facebook Data, Location, And Your Browsing History* (May 30, 2018), https://tinyurl.com/kuh6ebd5. Then in March 2019, Facebook became aware of BrandTotal violating Facebook's policy against automated data collection. FAC Ex. E. At that time, BrandTotal's mobile apps, named "Phoenix" and "Social One," ████████████████████████████████████████████████████████████████████████ ████ Those apps were removed from the Google Play Store (most likely by Google) before Facebook took any enforcement action against them. *Id.* at 2.

In or around March 2020, Facebook again investigated BrandTotal—this time, in connection with browser extensions UpVoice and Ads Feed. FAC ¶ 61; Compl. (Dkt. No. 1) ¶¶ 48-57. On September 21, 2020, Facebook notified Google that it "believe[d]" the extensions were "improperly scraping user PII (e.g. gender, relationships status, ad interests, etc.) without proper disclosure" and asked "if there is a way to collaborate and better protect user privacy." FAC ¶ 67-68 & Ex. I. The next week, on September 30, 2020, Facebook revoked BrandTotal's access to Facebook and disabled

4

BrandTotal's Facebook and Instagram accounts.  Compl. ¶ 58; FAC ¶ 134.  Facebook filed suit in state court the next day, Answer ¶ 59, and on October 2, Google removed UpVoice and other BrandTotal extensions from the Chrome Web Store, FAC ¶ 71.

Nonetheless, BrandTotal continued to collect and use Facebook data.  Even after Google removed UpVoice from the Chrome Web Store and Facebook revoked BrandTotal's access to Facebook, the UpVoice extension continued to collect data through many computers onto which it had already been installed.  FAC Ex. K.  BrandTotal also continued to collect Facebook and Instagram data through various other apps and extensions, including Social One, Phoenix, Who Is Following Me, Anonymous Story Viewer, and others.  *Id.*  And BrandTotal redesigned its UpVoice extension—which it now calls UpVoice 2021—to continue collecting advertising-related information from Facebook by automated means.  FAC Ex. J.

## II.   ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In resolving a motion under Rule 12(b)(6), the court "must take all well-pleaded allegations of material fact as true and construe them in the light most favorable to the non-moving party."  *Great Minds v. Office Depot, Inc.*, 945 F.3d 1106, 1109 (9th Cir. 2019).  But a complaint must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.  Under this standard, each of BrandTotal's counterclaims must be dismissed.

### A.   BrandTotal Cannot State A Claim For Intentional Interference With Contract (Counterclaim IV)

BrandTotal argues interference with its contracts with clients, panelists, investors, and Google, based on Facebook's *anticipated* reaction to its (as of filing its FAC) yet to be released UpVoice extension ("UpVoice 2021"), and its enforcement against BrandTotal's earlier version of UpVoice.  FAC ¶¶ 129-159.  To state a claim for intentional interference with contract under California law, BrandTotal must allege: "(1) a valid contract between [BrandTotal] and a third party; (2) [Facebook's] knowledge of this contract; (3) [Facebook's] intentional acts designed to induce a breach or disruption

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and

2   (5) resulting damage." *Pacific Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990).

3   BrandTotal has failed to allege facts showing that Facebook has taken *any* action with respect to

4   UpVoice 2021.  Moreover, BrandTotal has, again, not alleged facts sufficient to overcome Facebook's

5   legitimate business purpose for enforcing its terms against BrandTotal.  *See* MTD Order (Dkt. No.

6   108) at 14 (Facebook's actions were "'undertaken to enforce its rights,' [and] it [therefore] cannot be

7   held liable for intentional interference with a contract").  And BrandTotal has failed to allege facts

8   sufficient to satisfy the elements of an interference claim with respect to any contracts with clients,

9   panelists, investors, or Google.

10      Because BrandTotal has failed—even after discovery—to state any claim for intentional

11  interference with contract, this claim should be dismissed with prejudice.

12      **1.    BrandTotal has not alleged any interference with respect to UpVoice 2021**

13      BrandTotal's interference with a contract claim based on its planned launch of UpVoice 2021

14  fails because BrandTotal nowhere alleges that Facebook has taken any step to interfere with that

15  launch and therefore nowhere alleges that Facebook has interfered with any contract as a result.

16  Intentional interference requires an "affirmative act," *Western Air Charter, Inc. v. Schembari*, 2017

17  WL 10638759, at *4 (C.D. Cal. Oct. 6, 2017) that "caused the [alleged] breach" or disruption, *Bank*

18  *of N.Y. v. Fremont General Corp.*, 523 F.3d 902, 909 (9th Cir. 2008).  BrandTotal alleges only that

19  Facebook "did not grant permission" for UpVoice 2021 to collect Facebook data.  FAC ¶ 81.  And it

20  has not alleged facts sufficient to show Facebook's non-action has caused the disruption of any

21  contractual relationships.  Indeed, as BrandTotal appears to concede, no such interference is possible

22  because, as of the time of BrandTotal's Amended Counterclaims, UpVoice 2021 had not yet even

23  launched.  *See* FAC ¶¶ 82, 136.  Accordingly, BrandTotal cannot state any claim for interference with

24  contract based on actions taken (or not taken) with respect to UpVoice 2021.[3]

25

26

---

27  [3] BrandTotal has failed to allege any facts or articulate any theory of how Facebook could have
    interfered with the anticipated launch of UpVoice 2021.  To the extent that BrandTotal attempts to
28  articulate any such theory in its opposition to this motion, Facebook reserves the right to respond.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

### 2.      Any alleged interference was justified

#### a.      *Facebook was justified in enforcing its own contracts*

Even if BrandTotal could plausibly allege an interference claim, any interference was justified because Facebook was acting to enforce the terms of its own contracts. *See* MTD Order at 14. Enforcing one's own contract is a legitimate purpose unless shown to be a "sham … designed for the specific purpose" of achieving some other impermissible objective. *Webber v. Inland Empire Invs.*, 74 Cal. App. 4th 884, 902 (1999); *accord Imperial Ice Co. v. Rossier*, 18 Cal. 2d 33, 37 (1941) (a party "may resort to any legitimate means at his disposal to secure performance of his contract even though the necessary result will be to cause a breach of the other contract"). As this Court already held, BrandTotal violated Facebook's terms by using automated means to scrape data from Facebook without permission.  MTD Order at 11.  Accordingly, any interference resulting from Facebook's enforcement of its terms was justified absent plausible allegations of bad faith. *Id.* at 14.  And despite receiving thousands of pages of documents in discovery, BrandTotal fails to plead facts in its amended counterclaims sufficient to show Facebook acted in bad faith.[4]

Facebook had every legitimate reason to take enforcement action against BrandTotal's repeated violations of its terms.  BrandTotal has scraped user information for years using various apps and extensions. *See supra* p. 4.  In 2019, Facebook identified two different BrandTotal apps, Social One and Phoenix, as presenting ███████████████████████████████████████████ ████████████████████████████████████ FAC Ex. E at 2-3.  Then in 2020, Facebook discovered that BrandTotal was again scraping user and advertising-related information, this time through browser extensions UpVoice and Ads Feed.  FAC ¶ 61; Compl. ¶¶ 48-57.  This kind of abuse, much less persistent violations of Facebook terms, requires enforcement because it can put associated user information at risk, undermine advertisers' expectations of control over their own data, and risk overburdening the Facebook networks. *See* FAC Ex. K at 2.

---

[4] To the extent that BrandTotal alleges an interference claim based on any anticipated interference with respect to UpVoice 2021, that claim, too, would be justified by Facebook's enforcement of its own contracts.  As explained below, *see infra* pp. 23-24, BrandTotal's conduct interferes with Facebook's valid contracts with its users.  Facebook, therefore, was and would be justified in taking steps to protect those contracts.

7

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

Given these facts, it is unsurprising that BrandTotal has not been able to muster factual allegations that would support a plausible inference of bad faith.  Instead, BrandTotal offers only conclusory assertions and mischaracterizations as it attempts to show Facebook acted in bad faith, all of which fall short of its burden.  *See* FAC ¶¶ 151-159.  BrandTotal broadly asserts "Facebook has no legitimate purpose in interfering with the valid contracts between BrandTotal and its clients, Panelists, investors, or Google."  *Id.* ¶ 151.  But a such a conclusory claim is insufficient to establish "a particular [bad faith] motive by Facebook" when it enforced its prohibition against automated collection against BrandTotal, MTD Order at 14.  BrandTotal also claims Facebook "does not allow non-Facebook entities, including BrandTotal, to access Third Party Advertising Information via any API or other approved source."  FAC ¶ 154.  Not only is that assertion inaccurate, but absent unlawful anti-competitive conduct, *see infra* pp. 17-21, BrandTotal fails to articulate how Facebook enforcing its terms to protect its users, including advertising users, and its platform from abuse is an improper purpose.  BrandTotal also claims Google removed the UpVoice extension based on Facebook misrepresenting to Google that the extension was "improperly scraping user PII (e.g. gender, relationship status, ad interests, etc), without proper disclosures."  FAC ¶ 124, 151 & Ex. I.  But UpVoice *was* scraping PII (gender, relationship status, ad interests), *see* Compl. Ex. 12 at 6 (UpVoice Terms of Service explaining that BrandTotal collects demographic information), and it had falsely claimed to it panelists that Facebook and Instagram were "participating sites," not to mention scraped that information from "panelists" that *never* agreed to its terms because of the shared computer problem that existed.  TRO Order at 25, n. 12.  And the suggestion (at ¶ 155) that Facebook acted in bad faith by taking an enforcement action in 2020 based on UpVoice and Ads Feed because it had determined in 2019 that Social One and Phoenix were "harmless" simply misrepresents the relevance of that finding.  In 2019, a Facebook malware researcher stated that the Social One "app [was] itself … 'harmless'" because ██████████████████████████████████████████ ████████████████████████████████████  FAC Ex. E at 3 (emphases added).  The researcher found Phoenix functioned in the same manner.  *Id.*  Facebook later learned that an enforcement action with respect to Social One and Phoenix was not required only because the "apps ha[d] already been actioned and taken down," *id.*, not because the apps were "harmless."  The fact that Facebook took an

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

enforcement action in 2020 against a recidivist violator of its terms is unsurprising, not bad faith.

At this point—after discovery on these very issues and multiple chances to plead a claim—it is clear that BrandTotal cannot plausibly plead bad faith or sham. To the contrary, the evidence in discovery and allegations have confirmed exactly what this Court has already found: that Facebook's actions were supported by Facebook's legitimate enforcement of its own contracts. BrandTotal's interference with contract counterclaim should be dismissed on this basis alone.

> b.    *Facebook was justified because it was acting in furtherance of its*
> *obligations under the FTC consent order*

As the Court already held, any alleged interference is separately justified in light of Facebook's obligation under the consent order entered with the FTC. MTD Order at 14-15. Under that order, Facebook is required to maintain a privacy program with "safeguards" that control for risks to Covered Information, including a policy for "[e]nforcing against any Covered Third Party violations of [its] Platform Terms based solely on the severity, nature, and impact of the violation; and the Covered Third Party's malicious conduct or history of violations." FAC Ex. C at 8-9. Under the order, "Covered Information" includes any form of "Nonpublic User Information," and "Covered Third Party" is defined as any "entity that uses or receives Covered Information … outside of a User-initiated transfer … as part of a data portability protocol or standard." *Id.* at 3.

BrandTotal does not dispute that the prior version of UpVoice—i.e. the only version relevant to Facebook's September 2020 notice to Google—collected nonpublic user information. *See* FAC ¶¶ 68-69, 76. And while BrandTotal alleges that UpVoice 2021 "do[es] not collect Covered Information because [it] collect[s] only advertising information," *id.* ¶ 156, "[a]dvertising information doesn't live in a vacuum," and "it's typically associated with personal information," including the advertiser's name—which, if the advertiser is an individual, is that person's first and last name—as well as the advertising user's geographic location and other non-public user information associated with other users' interactions with the ad." *Id.* Ex. K at 2 (quoting Clark Tr. 44:21-22; citing *id.* at 102:24-103:11). By BrandTotal's own allegations, therefore, it collects "Covered Information," and is a "Covered Third Party" under the FTC Order.

Despite previously agreeing that it was a Covered Third Party, TRO Order at 24, and having

1   been reported to the FTC for scraping data in violations of Facebook's terms, BrandTotal now argues

2   that it is not a "Covered Third Party" because it collects information "only as part of a User-initiated

3   transfer of information as part of a data portability protocol or standard." FAC ¶ 157.  Not so.  The

4   International Organization for Standardization, on which BrandTotal relies, describes data portability

5   as standard processes by which "cloud service customers … [can] move *their* data or applications

6   between non-cloud and one or more could services and between cloud services." ISO, *Information*

7   *Technology – Cloud computing – Interoperability and portability*, https://tinyurl.com/3c443pse (last

8   accessed Mar. 26, 2021) (emphasis added).[5]  This includes, for example, standard processes like

9   Facebook's photo sharing tool by which users can transfer their photos from Facebook to Google

10  Photos.  *See* Facebook, *Driving Innovation in Data Portability With a New Photo Transfer Tool* (Dec.

11  2, 2019), https://tinyurl.com/4txcm728.[6]  Scraping third-party content does not constitute a "protocol

12  or standard" for transferring a user's own data, and BrandTotal's conclusory assertion that it collects

13  data pursuant to data portability protocols or standards should be given no weight.

14          BrandTotal is also wrong (at ¶ 158) that interpreting the consent order to cover its conduct

15  would be somehow inconsistent with the FTC's authority or the Ninth Circuit's decision in *hiQ Labs,*

16  *Inc. v. LinkedIn Corp.*, 938 F.3d 985 (9th Cir. 2019).  To the first point, BrandTotal contends that the

17  FTC's authority is limited to preventing only acts that are unfair or deceptive towards consumers.

18  FAC ¶ 158.  But even assuming that BrandTotal's conduct is neither unfair nor deceptive, it has long

19  been "well settled that [the FTC] may fashion its relief 'as a prophylactic and preventive measure'"

20  that sweeps more broadly than the specific violation identified.  *Jay Norris, Inc. v. FTC*, 598 F.2d

21  1244, 1250 (2d Cir. 1979) (quoting *FTC v. Mandel Brothers, Inc.*, 359 U.S. 385, 392-393 (1959)).  To

22  the second point, *hiQ* cannot bear the weight BrandTotal is seeking to put on it.  BrandTotal nowhere

23  explains what part of the Ninth Circuit's decision creates the purported conflict with the FTC order,

24

25  ―――――――――――――――
26  [5] This webpage is included in part in Exhibit B to the Amended Counterclaims and is therefore
    incorporated by reference.

27  [6] The Court may take judicial notice of this website.  *See Threshold Enters. Ltd. v. Pressed Juicery,*
    *Inc.*, 445 F. Supp. 3d 139, 146 (N.D. Cal. 2020).  It cannot reasonably be disputed that Facebook
28  provides a data portability tool for photo sharing as that fact can be readily determined from sources
    whose accuracy cannot reasonably be disputed.  *See id.* at 145.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

nor how a decision on a preliminary injunction motion could render a final FTC order invalid.  To the contrary, *hiQ* recognized that contracts may prohibit scraping, just as contemplated in the FTC order. *See* 938 F.3d at 1004 (explaining that "victims of data scraping" can bring "breach of contract" actions).    And in any event, *hiQ* pertains only to information "available to anyone with an Internet connection" and without "password authentication," *id.* at 1001-1002, while the information BrandTotal scrapes is password-protected and "known only to Facebook and the advertiser paying Facebook to show the advertisement," FAC ¶ 179.

Finally, BrandTotal alleges (at ¶ 159) that "[t]he doctrine of unclean hands bar Facebook from asserting the FTC Order," but that doctrine is inapposite.  "Application of the unclean hands doctrine requires a finding of inequitableness or bad faith … ."  *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 602 (9th Cir. 1991).  BrandTotal alleges that Facebook acted inequitably by "never allowing non-Facebook entities to automatically collect Third-Party Advertising Information."  FAC ¶ 159.  Again, that information is, as BrandTotal alleges, information about an ad that "is known only to Facebook and the advertiser paying Facebook to show the advertisement," *id.* at ¶ 179—i.e., information known only to Facebook and a Facebook user.  BrandTotal thus argues that Facebook is barred from invoking the FTC order—an order designed to protect user information— because Facebook has taken steps to protect user information.  Once again, absent any unlawful anti-competitive conduct, BrandTotal fails to articulate how safeguarding user data and advertisers' control over their own data is improper.  BrandTotal has therefore failed to justify invoking the doctrine of unclean hands.

### 3.       BrandTotal has not alleged the breach or disruption of any contract with clients, panelists, investors, or Google

Though the Court need not reach the issue in light of Facebook's legitimate justifications, BrandTotal has nonetheless failed to state any claim for interference with contract.  To state an interference claim, BrandTotal must allege, among other things, that Facebook had "knowledge of the contract with which [it] interfer[ed]," *Jenni Rivera Enters., LLC v. Latin World Entm't Holdings, Inc.*, 36 Cal. App. 5th 766, 783 (2019), and that its contracts have either been breached or that its performance under those contracts has been rendered more expensive or burdensome*, see Sebastian*

11

*Int'l, Inc. v. Russolillo*, 162 F. Supp. 2d 1198, 1204-1205 (C.D. Cal. 2001).   As to its clients, BrandTotal fails to allege facts showing that Facebook knew of any contract with which it allegedly interfered.   BrandTotal points only to its ads, a reference on its website to "recognizable consumer brands," and an email dated *after* Facebook's notice to Google, about a BrandTotal client contract BrandTotal does *not* allege was disrupted.   FAC ¶¶ 121, 122 & Exs. G (Sept. 22, 2020 email regarding BrandTotal client), Ex. I at 2 (Sept. 21, 2020 email to Google).   None establishes the requisite "knowledge of the contract with which [Facebook is alleged to have] interfere[ed]."   *Jenni Rivera Enters.*, 36 Cal. App. 5th at 783.

As to panelists, BrandTotal alleges that panelists have been prevented from sharing their information with BrandTotal, *see* FAC ¶¶ 130, 133, 136, but not that they have any contractual obligation to do so.   And BrandTotal alleges (at ¶ 134) that its ability to recruit new panelists has been diminished, but that is irrelevant to the performance of any existing contract.

Similarly, BrandTotal alleges vaguely that its "relations with investors" have been harmed, FAC ¶ 141, but nowhere identifies any contract that has been breached or any duty the performance of which has been rendered more burdensome.   BrandTotal points to Facebook's knowledge of its series A investors and alleges that it now "cannot secure lending or venture capital," but does not allege that any investor either withdrew funding that it had agreed to provide or reneged on any obligation to provide additional funding.   Because BrandTotal has not alleged the breach or disruption of any contract with any investor, it cannot state a claim for interference with any such contract.

BrandTotal likewise fails to explain the nature of its contractual relationship with Google or how it has been disrupted.   Its conclusory allegation that "Facebook's past and continued conduct has caused and will disrupt or cause the breach of BrandTotal's valid contracts with Google," FAC ¶ 146, appears to hang on Google's removal of UpVoice, *see id.* ¶ at 147.   But Google took its enforcement action *pursuant to*, not in violation of, the Google Chrome Web Store Developer Agreement.   That agreement provides that Google may, at any time, remove extensions that violate a third party's terms of service.   *See* Chrome Web Store, *Google Chrome Web Store Developer Agreement* at §§ 4.4.1, 7.2,

https://tinyurl.com/557xxxrc  (last accessed Mar. 26, 2021).[7]  And removing an extension does not terminate the Developer Agreement, which exists between Google and a developer until terminated by either party.  *See id.* at § 10.  Indeed, Google has previously removed other BrandTotal apps and extensions without preventing BrandTotal from continuing to develop and publish programs pursuant to its Developer Agreement.  *See* FAC Ex. E (stating that Phoenix and Social One had been removed from the Google Play Store).  And BrandTotal continues to distribute at least one extension on the Chrome Web Store pursuant to its ongoing agreement with Google.  *See* Chrome Web Store, *Desktop for Instagram*, https://tinyurl.com/4tz2ehzp (last accessed Mar. 26, 2021); *see also* Compl. ¶ 62 (BrandTotal published a new UpVoice extension in October 2020 after Google removed its prior version).  Because BrandTotal has not alleged the breach or disruption of any contractual relationship with Google, it cannot state a claim for interference with contract.

**B.     BrandTotal Cannot State A Claim For Intentional Interference With Prospective Economic Advantage (Counterclaim V)**

To state a claim for tortious interference with prospective economic advantage under California law, BrandTotal must allege: (1) an economic relationship between it and a third party, "with the probability of future economic benefit"; (2) Facebook's "knowledge of the relationship"; (3) "intentional acts on the part of [Facebook] designed to disrupt the relationship"; (4) "actual disruption of the relationship"; and (5) economic harm proximately caused by those intentional acts. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003).  Additionally, because there is "a broader range of privilege to interfere … when the relationship or economic advantage interfered with is only prospective," *Pacific Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990), BrandTotal must also plead that Facebook's conduct "was wrongful by some legal measure other than the fact of interference itself," *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 393 (1995).  BrandTotal's allegations fail to establish these elements.  And, as above, BrandTotal cannot state an interference claim based on any action taken with respect to UpVoice 2021, and any alleged interference was justified.

---

[7] The FAC references Google's developer agreement, *see* FAC ¶¶ 143-150, thereby incorporating it by reference.

### 1. BrandTotal has not alleged any interference with respect to UpVoice 2021

As with the interference with contract claim, *see supra* p. 6, BrandTotal cannot state a claim for interference with prospective economic advantage with respect to UpVoice 2021 because it has not and could not allege that Facebook has taken any action at all with respect to UpVoice 2021.  *See* FAC ¶ 82; *Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.*, 271 F.3d 825, 831 n.8 (9th Cir. 2001) (requiring "intentional conduct designed to interfere" to for intentional interference claim).

### 2. Any alleged interference was justified

BrandTotal cannot state a claim for interference with prospective economic advantage based on Facebook's notice to Google because any resulting interference was justified.  Facebook acted to enforce its own contractual and legal obligations, and BrandTotal has not alleged that its enforcement was a "sham" or taken in bad faith.  *See supra* pp. 7-11.

### 3. BrandTotal has not alleged the existence of any prospective relationships with the probability of economic benefit

BrandTotal fails to identify any specific economic relationship that had the probability of future economic benefit.  *See AlterG, Inc. v. Boost Treadmill LLC*, 388 F. Supp. 3d 1133, 1151-1152 (N.D. Cal. 2019) (intentional interference with prospective economic advantage requires allegations of "specific economic relationships" with the "probability of future economic benefit").  BrandTotal alleges only that it was "engaged in advanced negotiations" with several prospective clients, FAC ¶ 168, but that is insufficient absent any facts supporting a plausible inference that those negotiations would have been fruitful, such as, for example, a term sheet or other statement of intent.  *See Loop AI Labs Inc. v. Gatti*, 2015 WL 5158639, at *5 (N.D. Cal. Sept. 2, 2015) (holding that plaintiff adequately stated interference claim where "[t]he parties had put pen to paper" and "executed a term sheet setting forth their agreement").  Beyond that, BrandTotal alleges only that "[a]s with all prospective relationships, there was a reasonable probability that BrandTotal would consummate at least some of [its] prospective relationships … ." FAC ¶ 168.  But were that enough, it would render the specific requirement to plead a reasonable probability of future benefit meaningless.  Any evidence of probable economic benefit would be in in BrandTotal's possession, and its failure to allege sufficient facts in

14

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1     its amended counterclaim complaint confirms that BrandTotal satisfy the pleading requirements.[8]

2                  **4.**       **BrandTotal has not alleged independently wrongful conduct**

3           Finally, an interference with prospective economic advantage claim cannot lie unless the

4     allegedly interfering conduct was independently wrongful. *Della Penna*, 11 Cal. 4th at 393. "[A]n act

5     is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory,

6     regulatory, common law, or other determinable legal standard." *Korea Supply Co.*, 29 Cal. 4th at

7     1159. And the allegedly wrongful act must have caused the resulting economic harm. *Edwards v.*

8     *Arthur Anderson LLP*, 44 Cal. 4th 937, 944 (2008).

9           BrandTotal alleges that "Facebook committed independent wrongs when it revoked access to

10    Facebook" by "persuad[ing] Google to shut down BrandTotal's data." FAC ¶¶ 162, 168. It alleges

11    that Facebook violated its own terms, which provide that users have the right to share their own

12    content, *id.* ¶ 162, but this Court already rejected this argument when it dismissed BrandTotal's UCL

13    counterclaim. MTD Order at 17-18. BrandTotal also alleges that Facebook violated the UCL, but

14    those allegations fail to state any wrongful conduct. *See infra* pp. 16-22. Finally, BrandTotal alleges

15    that Facebook acted improperly by reporting BrandTotal to the FTC and Google, but as discussed

16    above, BrandTotal is a "Covered Third Party" under the FTC order, *see supra* pp. 9-10, and Facebook

17    accurately reported to Google that BrandTotal was collecting "PII (e.g. gender, relationships status,

18    ad interests, etc.) without [a] proper disclosure," *see supra* p. 8.

19           And in any event, BrandTotal's own pleadings show that any alleged interference resulted not

20    from "persuad[ing] Google to shut down BrandTotal's data," FAC ¶ 168, but from filing this lawsuit.

21    ██████████████████████████████████████████

22    ██████████████████████████████████████████

23    ██████████████████████████████████████████

24    *See* FAC Ex. L ¶¶ 17, 18, 21. The filing of a lawsuit is independently wrongful only if it satisfies the

25    elements of a malicious prosecution claim—that is, only if the lawsuit was both "brought without

26

27 ──────────────────────

28    [8] Indeed, during his deposition, BrandTotal's CEO Mr. Alon Leibovich testified that ███████████
   ████████████████████████████████

probable cause" and "concluded in the plaintiff's favor." *Pacific Gas & Elec.*, 50 Cal. 3d at 1137. Because BrandTotal has not and cannot allege either that Facebook's claims against it are baseless or that those claims have been resolved in BrandTotal's favor, it cannot state a claim for intentional interference.

### C. BrandTotal Fails To State A Claim Under California's Unfair Competition Law (Counterclaim VI)

This Court dismissed BrandTotal's original counterclaims brought under all three prongs of the UCL. *See* MTD Order at 16-18. The Court dismissed BrandTotal's counterclaim under the "unlawful" prong as predicated on its failed theories of tortious interference. *Id.* at 16. It dismissed BrandTotal's "unfair" prong theory because BrandTotal had not alleged "any injury to *competition*, as opposed to injury to BrandTotal alone." *Id.* at 16-17. And it dismissed BrandTotal's claims under the "fraudulent" prong *with prejudice* because "no user could reasonably rely" on the alleged fraudulent statements. *Id.* at 17-18. While the Court granted BrandTotal leave to amend its "unlawful" and "unfair" prong claims, it admonished BrandTotal to "consider all arguments raised" in Facebook's original motion to dismiss regarding the requirements of antitrust law prior to amendment. *Id.* at 17. BrandTotal attempted—but failed—to restate a claim under each prong.

#### 1. BrandTotal alleges no "unlawful" business practice

BrandTotal fails to state a claim under the "unlawful" prong of the UCL, for the same reason that this Court dismissed the "unlawful" prong the first time around. *See* MTD Order at 16. A plaintiff must allege "a violation of another law [as a] predicate for stating a cause of action under the UCL's unlawful prong." *Berryman v. Merit Prop. Mgmt., Inc.*, 152 Cal. App. 4th 1544, 1554 (2007). BrandTotal's only allegation suggesting the requisite independent legal violation is that "Facebook's tortious interference with BrandTotal's current and prospective business, contractual, and investor relationships are unlawful." FAC ¶ 186. Because Facebook's conduct was not "unlawful" and BrandTotal's tortious interference claims fail, *see supra* pp. 5-16, so too does the claim of "unlawful" practices under the UCL. *See Aleksick v. 7-Eleven*, 205 Cal. App. 4th 1176, 1185 (2012) ("When a statutory claim fails, a derivative UCL claim also fails."); MTD Order at 16 (dismissing counterclaim under the "unlawful" prong that was "based on its theories of tortious interference").

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

### 2.     BrandTotal alleges no "unfair" business practice

BrandTotal likewise fails to state a claim under the "unfair" prong of the UCL.  "When a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act or practice invokes section 17200," as BrandTotal does here, the word "unfair" means "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition."  *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 186-187 (1999). BrandTotal bases its claim under the "unfair" prong on the theory that "Facebook's recent and threatened actions … violate the core principles and spirit of the unfair competition and antitrust laws." FAC ¶ 174.

This Court dismissed BrandTotal's previous "unfair" prong counterclaim because BrandTotal failed to allege "any injury to *competition*, as opposed to injury to BrandTotal alone."  MTD Order at 16-17.  In response, BrandTotal reiterated the same flawed theory from its original counterclaims.  *See* Counterclaims ¶¶ 51, 53, 57.   According to BrandTotal, Facebook has prevented unidentified companies (against whom Facebook supposedly competes) from "building a business to provide advertising consulting services in social media" by stopping them from "collect[ing] information from Facebook."  FAC ¶ 174; *see also id.* at ¶ 183 (claiming that Facebook violated the UCL by "wholly refusing any non-Facebook entity access to Third-Party Advertising Information on Facebook").  At bottom, then, BrandTotal's theory is that Facebook was (and is) required to aid its alleged competitors by providing them "Third-Party Advertising Information on Facebook."  *Id.*[9]  This theory—and not the challenged conduct—is anathema to the policy and spirt of the antitrust laws.  "[T]here is no duty to aid competitors."  *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1131 (9th Cir. 2004).  To the contrary, courts have recognized that "compelling negotiation between competitors may facilitate

---

[9] To the extent that BrandTotal continues to premise its "unfair" prong claim on harm to itself, *see, e.g.*, FAC ¶ 178 ("By revoking or limiting BrandTotal's access to publicly available data, Facebook is unfairly limiting BrandTotal's ability to compete with Facebook's advertising insights and offerings."), its claim must fail.  *See* MTD Order at 16-17 (dismissing BrandTotal's claim under the "unfair" prong for failure to allege "any injury to *competition*, as opposed to injury to BrandTotal alone").

the supreme evil of antitrust: collusion." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004).  For these reasons, federal antitrust law generally imposes no limitation on a competitor's ability to "exercise his own independent discretion as to parties with whom he will deal." *Id.*  Instead, "[a]s a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pacific Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 448 (2009).[10]

The same fundamental principle governs California's UCL statute.  *See* MTD Order at 16 (holding that "the 'unfair' prong implicates antitrust law").  While California law does not require an antitrust violation to state a claim under the UCL's "unfair" prong, such a claim still must hew closely to "cognizable antitrust evils to warrant intervention by a California court." *People's Choice Wireless, Inc. v. Verizon Wireless*, 131 Cal. App. 4th 656, 668 (2005).  Indeed, to adequately state a violation of the "policy or spirit" of the antitrust laws, a claimant must point to an "unusual aspect of the alleged conduct that would make that conduct something that violates the 'policy and spirit' of the antitrust laws without violating the actual laws themselves." *Creative Mobile Techs., LLC v. Flywheel Software, Inc.*, 2017 WL 679496, at *6 (N.D. Cal. Feb. 21, 2017).  Applying these principles, the California Court of Appeal has held that "the mere refusal to deal does not violate the spirit or policy of antitrust law." *People's Choice Wireless*, 131 Cal. App. 4th at 667.  Instead, a plaintiff alleging a refusal to deal theory under the UCL must satisfy the same standard as federal antitrust law: establishing that (1) the defendant has conducted "an abuse of monopoly power in a relevant market" and (2) an "exception" to the "sacrosanct" right to refuse to deal applies.  *Id.*  The amended counterclaim complaint satisfies neither requirement.

BrandTotal has not adequately alleged an abuse of monopoly power in a relevant market

---

[10] BrandTotal attempts to avoid this case law by summarily asserting that "Facebook is not merely refusing to deal with other competitors."  FAC ¶ 175.  But BrandTotal never alleges what else it is Facebook does that it challenges.  *Id.* ¶ 183.  Given BrandTotal's own concrete factual allegations, its conclusory assertions should be disregarded.  *See, e.g.*, *Minifield v. Butikofer*, 298 F. Supp. 2d 900, 903 (N.D. Cal. 2004) ("[C]onclusory allegations without more are insufficient to defeat a motion to dismiss for failure to state a claim.").  To the extent BrandTotal attempts to articulate some other basis for claiming that Facebook violates the "unfair" prong—though one is not apparent from the face of the counterclaims—Facebook will address that theory on reply.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

because BrandTotal fails to define the relevant product market in which Facebook supposedly possesses such power.  BrandTotal alleges only that the relevant market "concern[s] Third-Party Advertising Information" on "Facebook's site." FAC ¶¶ 173, 179.  But its allegations elsewhere make implausible a Facebook-specific market, as BrandTotal "offer[s] competitive analyses of advertising efforts on" numerous other social media sites, including "Instagram, Twitter, YouTube, LinkedIn, Amazon, and others." *Id.* at ¶ 44.  And, in any event, as the Ninth Circuit has recognized, "many courts have rejected antitrust claims reliant on proposed advertising markets limited to a single form of advertising." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1123 (9th Cir. 2018).  This Court should reject BrandTotal's attempt to arbitrarily gerrymander a market that is "not natural, artificial, and contorted to meet [its] litigation needs." *Id.* at 1121 (internal quotation marks omitted).

Attempting to allege a market comprised of only "Facebook's site" is doubly problematic because, in general, a company's "own products do not themselves comprise a relevant product market" and, accordingly, a company does not violate the antitrust laws "by virtue of the natural monopoly it holds over its own product," *Apple, Inc. v. Pystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008).  Such single-brand markets are, "at a minimum, extremely rare,"[11] *id.*, and courts routinely reject UCL claims premised on such markets, *see, e.g.*, *Honey Baked Ham, Inc. v. Honey Baked Ham Co. LLC*, 2020 WL 5498077, at *4 (C.D. Cal. Aug. 17, 2020) (dismissing UCL claim because "there are no plausible allegations about how the Honey Baked USA website constitutes a market").  This failure to adequately allege a relevant market is fatal to BrandTotal's refusal to deal theory of liability. *See, e.g.*, *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1203 (9th Cir. 1997) ("Without a proper definition of the relevant market, it is impossible to determine a party's influence over that market.").

Even beyond this threshold defect, BrandTotal also failed to establish that Facebook's conduct fits within an accepted "exception" to the otherwise "sacrosanct" "right to refuse to deal." *People's Choice Wireless*, 131 Cal. App. 4th at 667.  Courts are "very cautious" to recognize any exceptions to

---

[11] Single-brand markets have only been recognized in "aftermarkets" that arise "once consumers have purchased" a product in a primary market and are "locked in" to secondary parts and services compatible with the primary product. *Pystar*, 586 F. Supp. 2d at 1198.  There are no allegations—nor could there be—that Facebook constitutes an aftermarket.

the refusal to deal principle. *Trinko*, 540 U.S. at 408. The Supreme Court recognized such an exception in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), but that case is "at or near the outer boundary of [Sherman Act] § 2 liability," *Trinko*, 540 U.S. at 409. The Court in *Aspen Skiing* affirmed a jury verdict that the defendant had monopolized the market for downhill skiing services in Aspen, Colorado by discontinuing a successful joint ticket program with a nearby competitor. 472 U.S. at 605-611. The fact that the defendant had originally agreed to offer a joint lift ticket with the plaintiff suggested that the arrangement offered a net benefit to the defendant. The termination of that arrangement, the particular facts related to the negotiations—in which the defendant rejected favorable divisions of revenue—and the fact that the defendant refused even to sell lift tickets to the plaintiff at full retail price, when taken together, suggested that the defendant was willing to incur short-term losses to drive the plaintiff from the market and achieve a monopoly. The Supreme Court and the Ninth Circuit have thus laid out three "significant factors present in *Aspen Skiing*" that justified the exception to the "no duty to deal" rule: "(1) the unilateral termination of a voluntary and profitable course of dealing; (2) the defendant's refusal to sell tickets to the plaintiff even if compensated at retail price, thus suggesting a calculation that its future monopoly retail price would be higher; and (3) the defendant's refusal to provide to their competitors products that were already sold in a retail market to other customers." *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 1002 (N.D. Cal. 2020) (granting motion to dismiss, recognizing narrowness of *Aspen Skiing* exception).

BrandTotal has not even attempted to satisfy this limited exception to the general rule. To the contrary, its allegations affirmatively *defeat* several prerequisites to invoke the *Aspen Skiing* exception. For instance, rather than alleging the existence of a voluntary and profitable course of dealing, BrandTotal's counterclaims make clear that it built a business around collecting data using automated means without prior authorization or cooperation by Facebook. *See, e.g.*, FAC ¶ 95. BrandTotal certainly does not pay Facebook for the data. And far from establishing that Facebook withholds data from competitors that is otherwise available to non-competitors, the complaint alleges that Facebook withholds "Third-Party Advertising Information" from *everybody*. *See id.* at ¶ 183 (Facebook "wholly refus[es] *any* non-Facebook entity access to Third-Party Advertising Information

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

on Facebook" (emphasis added)).   In dismissing BrandTotal's previous counterclaim under the "unfair" prong, this Court granted BrandTotal leave to amend but warned that if it "chooses to amend, it should consider all arguments raised in Facebook's motion as to this claim."   MTD Order at 17. Facebook highlighted the shortcomings of a refusal to deal theory in both its initial motion to dismiss and its reply brief in support of that motion.   *See* MTD at 16-18; Reply at 12-13.   Because BrandTotal ignored this Court's warning and brought a claim premised on a refusal to deal theory anyway, the Court should dismiss BrandTotal's claim *with prejudice*.

### 3.      BrandTotal alleges no "fraudulent" business practice

This Court dismissed *with prejudice* BrandTotal's UCL claim "to the extent" it was based on the "fraudulent" prong.   MTD Order at 17-18.   BrandTotal's attempt to revive its "fraudulent" prong claim is in improper circumvention of this Court's dismissal with prejudice.   *See, e.g.*, *Hiramanek v. Clark*, 2014 WL 2855512, at *2 (N.D. Cal. June 20, 2014) (striking amended claims that, despite adding "new facts or circumstances," were "essentially the same legal claims previously dismissed with prejudice").   The claim should be dismissed on that basis alone.

Even if BrandTotal were somehow allowed to amend a claim dismissed with prejudice, BrandTotal's new allegations still fail to state a claim under the "fraudulent" prong.   BrandTotal now contends that Facebook "intentionally misrepresented the operation of UpVoice" to Google "when requesting Google remove UpVoice from the Chrome Store," causing BrandTotal to "suffer the loss of money and property."   FAC ¶¶ 189, 194.   Even if those allegations are taken as true (which they are not) for this motion, they are simply not enough.   The "fraudulent" prong requires a litigant "to show deception to some members of the public, or harm to the public interest, and not merely to the direct competitor."   *Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.*, 178 F. Supp. 2d 1099, 1121 (C.D. Cal. 2001).   Such a "direct competitor" is "not entitled" to the protection of the fraudulent prong of the UCL for alleged harm to itself "because it is not a member of the public or a consumer entitled to such protection."[12]   *Id*.   BrandTotal's claim is thus not viable under the "fraudulent" prong because

---

[12] Neither is Google a member of the public, as "[s]ophisticated companies … are not members of the 'general public.'"   *Nat'l Rural Telecommuniciations Co-op v. DIRECTV, Inc.*, 319 F. Supp. 2d 1059, 1078 n.28 (C.D. Cal. 2003) (quoting *Rosenbluth Int'l, Inc. v. Superior Court*, 101 Cal. App. 4th 1073 (2002)).

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

it has not alleged that Facebook "made deceptive statements to the public or that [its] actions harmed the public interest." *Medina v. Microsoft Corp.*, 2014 WL 2194825, at *3 (N.D. Cal. May 23, 2014). For this reason, BrandTotal's claim under the "fraudulent" prong should be dismissed as a matter of law. *See, e.g.*, *Nat'l Rural Telecommc'ns Co-op*, 319 F. Supp. 2d at 1078 (dismissing UCL claim under the "fraudulent" prong because plaintiffs did not make a showing that "the public was impacted at all" by the alleged actions).

**D.      The Court Should Dismiss BrandTotal's Declaratory Judgment Counterclaims (Counterclaims I-III)**

BrandTotal for the first time seeks a declaration from the Court that its past and future violations of Facebook's Terms of Service has not and will not interfere with Facebook's contractual relations (Counterclaim III) and it has not and will not violate the CFAA, and CDAFA (Counterclaims I and II).  BrandTotal's counterclaims suffer from the same defect that led this Court to dispose of the declaratory judgment counterclaim in BrandTotal's original complaint—the declaration is redundant of Facebook's complaint and BrandTotal's own allegations demonstrate that it is not entitled to the relief it seeks.

**1.      BrandTotal's counterclaims are redundant of Facebook's claims**

BrandTotal's counterclaims suffer from the same fatal flaw as the counterclaim in its original complaint: they simply repeat issues raised already in Facebook's complaint.  With respect to BrandTotal's interference counterclaim (counterclaim III), Facebook's complaint alleges that BrandTotal interfered with its contractual relations by inducing BrandTotal's users to violate Facebook's and Instagram's terms.  Compl. ¶¶ 96-102.  Facebook alleges, for example, that BrandTotal "solicited access to the users' account and Facebook through the malicious extensions." *Id.* at ¶ 101.  BrandTotal's counterclaim simply alleges the opposite: that BrandTotal did not and does not collect users' login information.  FAC ¶ 113.  The same is true of counterclaims I and II. Facebook's complaint alleges that BrandTotal violated the CFAA and the CDAFA by intentionally accessing Facebook's computers without permission, and after Facebook revoked BrandTotal's access.  Compl. ¶¶ 84, 89.  BrandTotal's counterclaims just alleges the opposite: that Facebook asserted a claim under the CFAA, creating an actual controversy and entitling BrandTotal to a

1   declaration that BrandTotal's conduct does not violate the CFAA or the CDAFA.  FAC ¶¶ 95-98; 103-

2   107.

3         The result, then, is that "the substantive suit in the instant matter will necessarily resolve the

4   … issue raised by the declaratory judgment action."  *Western Air Charter, Inc. v. Schembari*, 2017

5   WL 10638759, at *11 (C.D. Cal. Oct. 6, 2017).   This Court prejudicially dismissed BrandTotal's

6   earlier declaratory counterclaim to avoid precisely this sort of unnecessary repetition.  Here again, this

7   Court should exercise its discretion to dismiss the duplicative declaratory theories pressed in

8   counterclaims I, II, and III.  *See Huth v. Hartford Ins. Co.*, 298 F.3d 800, 802-03 (9th Cir. 2002)

9   (holding that court may properly decline to exercise jurisdiction over declaratory claim to "avoid

10  duplicative litigation"); *see also VienPhuong Ti Ho v. City of Long Beach*, 2020 WL 8617674, at *27

11  (C.D. Cal. Nov. 10, 2020) ("Courts have discretion to dismiss or strike requests for declaratory relief

12  where they are redundant of other claims raised in the same action, and therefore serve no useful

13  purpose.").

14              **2.      BrandTotal's own allegations establish that it cannot succeed on the**

15                       **merits of its counterclaims**

16        The Court should also dismiss BrandTotal's claims for declaratory relief to the extent that they

17  seek a declaration that BrandTotal has not and does not interfere with Facebook's contractual

18  relationship with users or violate the CFAA and CDAFA.  BrandTotal's own allegations demonstrate

19  that it is engaging in the very violations for which it seeks a declaration.  *See* MTD Order at 11

20  (dismissing BrandTotal's original declaratory counterclaim because "BrandTotal's own allegations

21  and evidence" established that BrandTotal had, in fact, "violated the terms of service, as written").

22              *a.      Interference with Facebook's contractual relationship with users*

23        With respect to counterclaim III, BrandTotal's own allegations demonstrate that it interfered

24  and continues to interfere with Facebook's contracts with its users.  BrandTotal admits that Facebook

25  has a "contractual relationship with its users."  FAC ¶ 112.  Under those terms, Facebook users agree

26  to not "access[] or collect[ data from [Facebook] Products using automated means (without

27  [Facebook's] permission)," Compl. ¶ 26, and "[n]ot share [their] password, give access to [their]

28  Facebook account to others, or transfer [their] account to anyone else (without our permission)."  *Id.*

23

¶ 98.  By BrandTotal's own allegations, it uses UpVoice to, "at the instigation of the user who downloads the extension and then scrolls social media … collect data the user either owns or has a right to access." FAC ¶ 51.  UpVoice, therefore, explicitly induces Facebook users to violate Facebook's terms because downloading the extension improperly grants BrandTotal access to the user's Facebook account to collect data by automated means. *Id.* at ¶¶ 51-54.  Because BrandTotal own allegations establish that BrandTotal did indeed cause Facebook's users to violate the Facebook Terms of Service, BrandTotal cannot maintain a counterclaim seeking a declaration to the contrary.

### b.    *Violation of CFAA and CDAFA*

BrandTotal's own allegations establish that it violated the CFAA and CDAFA by knowingly accessing Facebook's computers without authorization, after Facebook revoked its access.  The Ninth Circuit has held that an entity violates the CFAA when it continues to access data located in a password-protected location after an explicit revocation of permission.  *Facebook, Inc. v. Power Ventures*, 844 F.3d 1058, 1069 (9th Cir. 2016).  Similarly, the CDAFA explicitly prohibits accessing Facebook's computers "knowingly and *without permission*."  § 502(c)(7) (emphasis added).  As BrandTotal's FAC concedes, BrandTotal was notified that its permission to access Facebook computers was revoked through the filing of Facebook's state court complaint in October 2020.  FAC ¶ 62.  BrandTotal likewise concedes that Facebook again confirmed that "BrandTotal's access to Facebook *remains revoked*," *id.* Ex. K at 1 (emphasis added), when BrandTotal requested permission in February 2021 to "automatically collect Third-Party Advertising Information" from Facebook, FAC ¶ 95.  Nonetheless, as BrandTotal also admits, after October 2020 BrandTotal's extensions and apps continued to collect information when a user visited password-protected locations on Facebook.  *Id.* at ¶¶ 51-54, 60, 76.  Nothing more is required to establish that BrandTotal violated the CFAA and the CDAFA.

BrandTotal seeks to avoid that straightforward conclusion on meritless grounds.  *First*, BrandTotal is wrong that it can avoid liability simply by labeling the data it collects as "public."  FAC ¶¶ 96, 100, 108.  BrandTotal itself alleges that it collects data from Facebook only after a user "sign[s] into" his or her account, meaning the data is located entirely within password-protected locations.  *Id.* at ¶ 78.  That is the exactly the kind of data scraping that the Ninth Circuit in *hiQ* emphasized was

prohibited under the CFAA.  *hiQ*, 938 F.3d at 1002.  And BrandTotal emphasizes that the information it prioritizes collecting are "dark ads"—meaning ads that are "hidden from public view."  FAC ¶ 183. BrandTotal cannot insist that it collects only "public" data when its own allegations establish that the data is "hidden from public view" and is accessible only upon entering a password-protected area.

     *Second*, BrandTotal is also wrong that it can avoid the CFAA and the CDAFA just because users allegedly provide BrandTotal consent to scrape data from Facebook.  This is precisely the theory that the Ninth Circuit rejected in *Power Ventures*.  There, Facebook users who signed up for Power purported to give Power permission to disseminate messages through the Facebook system. 844 F.3d at 1067. But critically, Facebook "expressly rescinded" any purported permission with its cease and desist letter to Power and therefore, "[t]he consent that Power had received from Facebook users was not sufficient to grant continuing authorization to access Facebook's computers after Facebook's express revocation of permission." *Id.* at 1067-68. "[F]or Power to continue ... using Facebook's computers, it needed authorization *both* from individual Facebook users (who controlled their data and personal pages) *and* from Facebook (which stored this data on its physical servers)." *Id.* at 1068 (emphasis added). So too here.  Because Facebook has explicitly revoked BrandTotal's permission to access Facebook's computers, *see* FAC ¶ 95, the consent that BrandTotal allegedly obtains from its users is not enough; it *also* "need[s] authorization … from Facebook." *Power Ventures*, 844 F.3d at 1068.

## III.    CONCLUSION

     For the forgoing reasons, the Court should dismiss Defendants' first amended counterclaims.

Dated: March 26, 2021

WILMER CUTLER PICKERING HALE AND DORR LLP

By:    */s/ Sonal Mehta*
Sonal N. Mehta

*Attorney for Plaintiff*
*Facebook, Inc.*

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1

2

## **CERTIFICATE OF SERVICE**

3

    I hereby certify that on March 26, 2021, I electronically filed the above document with the

4

Clerk of the Court using CM/ECF which will send electronic notification of such filing to all registered

5

counsel.

6

7

 Dated:  March 26, 2021                                    By:    */s/ Sonal N. Mehta*

8                                                                              Sonal N. Mehta

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

26