**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

WILMER CUTLER PICKERING HALE AND DORR LLP
SONAL N. MEHTA (SBN 222086)
sonal.mehta@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

ARI HOLTZBLATT (*pro hac vice*)
Ari.Holtzblatt@wilmerhale.com
ALLISON SCHULTZ (*pro hac vice*)
Allison.Schultz@wilmerhale.com
ROBIN C. BURRELL (*pro hac vice*)
robin.burrell@wilmerhale.com
1875 Pennsylvania Ave, NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

HUNTON ANDREWS KURTH LLP
Ann Marie Mortimer (State Bar No. 169077)
amortimer@HuntonAK.com
Jason J. Kim (State Bar No. 221476)
kimj@HuntonAK.com
Jeff R. R. Nelson (State Bar No. 301546)
jnelson@HuntonAK.com
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627
Telephone: (213) 532-2000
Facsimile: (213) 532-2020

Attorneys for Plaintiff/Counterclaim Defendant
Facebook, Inc.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| FACEBOOK, INC., a Delaware corporation,<br><br>Plaintiff/Counterclaim Defendant,<br><br>v.<br><br>BRANDTOTAL LTD., an Israeli corporation, and UNIMANIA, INC., a Delaware corporation,<br><br>Defendants/ Counterclaim Plaintiffs. | Case No. 3:20-CV-07182-JCS<br><br>**PLAINTIFF FACEBOOK INC.'S OPPOSITION TO DEFENDANTS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hon. Joseph C. Spero<br>Courtroom F – 15th Floor<br>Date: May 14, 2021<br>Time: 9:30 a.m. |

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**TABLE OF CONTENTS**

Page

I.    FACTUAL BACKGROUND ........................................................................................3

    A.    Facebook Prohibits The Unauthorized Collection Of Data By Automated
           Means To Protect User Privacy And The Integrity Of The Platform ..........................3

    B.    To Promote User Control Over Data, Facebook Makes Advertising Data
           Available Through Authorized Means Subject To Advertiser Consent .......................5

    C.    BrandTotal Has Repeatedly Violated Facebook's Terms By Scraping User
           and Advertising-Related Information Without Authorization ....................................6

    D.    BrandTotal Continued To Scrape Data After The Filing Of This Lawsuit .................7

    E.    BrandTotal Continues To Sign New Customers And Bring In Revenue .....................9

II.   LEGAL STANDARD ................................................................................................9

III.  BRANDTOTAL HAS NOT ESTABLISHED IRREPARABLE INJURY .................................9

    A.    BrandTotal Has Not Shown That Irreparable Injury Is Likely ...................................11

    B.    BrandTotal Has Not Shown That It Faces An Imminent Risk Of Harm ...................12

    C.    Any Harm BrandTotal Has Shown Is Self-Inflicted...................................................14

IV.   BRANDTOTAL HAS NOT ESTABLISHED A LIKELIHOOD OF SUCCESS.....................15

    A.    BrandTotal Is Not Entitled To A Preliminary Injunction Because It Has Not
           Shown A Likelihood Of Success On Any Claim Related To That Relief...................16

    B.    BrandTotal Is Not Likely To Succeed On Its Intentional Interference Claims
           Or Unfair Competition Claims...................................................................................17

           1.    Facebook's Enforcement Actions Against BrandTotal Were Justified ..........17

           2.    BrandTotal Does Not Even Attempt To Show That It Is Likely To
                Succeed On The Elements Of Its Interference And Unfair Competition
                Claims ...........................................................................................................23

    C.    BrandTotal's Declaratory Judgment Claims Cannot Support The Preliminary
           Injunction That It Seeks .............................................................................................29

           1.    BrandTotal's Declaratory Judgment Claims Are Irrelevant ...........................30

i

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

2.    BrandTotal Is Not Likely To Succeed On Its Declarator Judgment Claims ................................................................................................30

V.    THE BALANCE OF EQUITIES WEIGHS AGAINST EXTRAORDINARY RELIEF..........31

VI.   THERE IS NO PUBLIC INTEREST IN PERMITTING ILLEGAL DATA SCRAPING ........33

VII.  CONCLUSION................................................................................................................35

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

Page(s)

## CASES

*A&A Int'l Apparel, Inc. v. Xu*,
   2015 WL 12850544 (C.D. Cal. Jan. 29, 2015) .................................................................9

*Al Otro Lado v. Wolf*,
   952 F.3d 999 (9th Cir. 2020) ........................................................................................14

*Alabama v. U.S. Army Corps of Engineers*,
   424 F.3d 1117 (11th Cir. 2005) ....................................................................................30

*Aleksick v. 7-Eleven*,
   205 Cal. App. 4th 1176 (2012) .....................................................................................27

*Alliance for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) ............................................................................9, 10, 15

*AlterG, Inc. v. Boost Treadmills LLC*,
   388 F. Supp. 3d 1133 (N.D. Cal. 2019) ........................................................................17

*Amazing Insurance, Inc. v. Dimanno*,
   2019 WL 3406941 (E.D. Cal. July 26, 2019) ...............................................................11

*Apple, Inc. v. Pystar Corp.*,
   586 F. Supp. 2d 1190 (N.D. Cal. 2008) ........................................................................28

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
   472 U.S. 585 (1985).................................................................................................28, 29

*Aspex Eyewear, Inc. v. Vision Service Plan*,
   389 F. App'x 664 (9th Cir. 2010) .................................................................................29

*California v. Azar*,
   911 F.3d 558 (9th Cir. 2018) ..........................................................................................9

*Caribbean Marine Services Co. v. Baldrige*,
   844 F.2d 668 (9th Cir. 1988) ........................................................................................11

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*,
   11 Cal. 4th 376 (1995) ..................................................................................................26

*Ebates Performance Marketing, Inc. v. Integral Technologies, Inc.*,
   2013 WL 75929 (N.D. Cal. 2013) .................................................................................13

*Epic Games, Inc. v. Apple, Inc.*,
   2020 WL 5993222 (N.D. Cal. Oct. 9, 2020)........................................................14, 28, 32

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

*Facebook, Inc. v. Power Ventures, Inc.*,
    252 F. Supp. 3d 765 (N.D. Cal. 2017), *aff'd*, 749 F. App'x 557 (9th Cir. 2019)...............32, 33

*Facebook, Inc. v. Power Ventures, Inc.*,
    844 F.3d 1058 (9th Cir. 2016) ...................................................................................31

*Freedom Holdings, Inc. v. Spitzer*,
    408 F.3d 112 (2d Cir. 2005)..........................................................................................9

*Garcia v. Google, Inc.*,
    786 F.3d 733 (9th Cir. 2015) ........................................................................................9

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018) ....................................................................................28

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    938 F.3d 985 (9th Cir. 2019) ..........................................................................2, 3, 31, 34

*Huawei Techs., Co, Ltd. v. Samsung Elecs. Co, Ltd.*,
    340 F. Supp. 3d 934 (N.D. Cal. 2018) .......................................................................28

*In re Excel Innovations*,
    502 F.3d 1086 (9th Cir. 2007) ....................................................................................11

*Ixchel Pharma, LLC v. Biogen, Inc.*,
    9 Cal. 5th 1130 (2020) ................................................................................................26

*Jenni Rivera Enterprises LLC v. Latin World Entertainment Holdings, Inc.*,
    36 Cal. App. 5th 766 (2019) .................................................................................23, 24

*Kiva Health Brands LLC v. Kiva Brand, Inc.*,
    402 F. Supp. 3d 877 (N.D. Cal. 2019) .........................................................................9

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. 4th 1134 (2003) ........................................................................................17, 25

*Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.*,
    271 F.3d 825 (9th Cir. 2001) ......................................................................................17

*McCoy v. Stronach*,
    2020 WL 4200084 (E.D. Cal. July 22, 2020) ...........................................................30

*MetroNet Services Corp. v. Qwest Corp.*,
    383 F.3d 1124 (9th Cir. 2004) ....................................................................................27

*Munaf v. Geren*,
    553 U.S. 674 (2008)......................................................................................................9

*National Rural Telecommunications Co-op v. DIRECTV, Inc.*,
    319 F. Supp. 2d 1059 (C.D. Cal. 2003) .....................................................................29

iv

*National Wildlife Federation v. National Marine Fisheries Service*,
   886 F.3d 803 (9th Cir. 2018) ................................................................................. 11

*Pacific Gas & Electric Co. v. Bear Stearns & Co.*,
   50 Cal. 3d 1118 (1990) ......................................................................................... 25

*Pacific Radiation Oncology, LLC v. Queen's Medical Center*,
   810 F.3d 631 (9th Cir. 2015) ................................................................................. 16

*People's Choice Wireless, Inc. v. Verizon Wireless*,
   131 Cal. App. 4th 656 (2005) ..........................................................................27, 28

*Perfect 10 Inc. v. Google, Inc.*,
   653 F.3d 976 (9th Cir. 2011) ................................................................................. 11

*Pulido v. Unitrin, Inc.*,
   2007 WL 781222 (E.D. Cal. Mar. 9, 2007) ........................................................... 19

*Reeves v. Hanlon*,
   33 Cal. 4th 1140 (2004) ....................................................................................16, 24

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
   471 F. Supp. 3d 981 (N.D. Cal. 2020) .................................................................. 28

*Rosenbluth International Inc. v. Superior Court of Los Angeles County*,
   101 Cal. App. 4th 1073 (2002) .............................................................................. 29

*Salt Lake Tribune Publishing Co., LLC v. AT&T Corp.*,
   320 F.3d 1081 (10th Cir. 2003) ............................................................................. 14

*Savage v. Pacific Gas & Electric Co.*,
   21 Cal. App. 4th 434 (1993) .............................................................................19, 22

*Semler v. General Electric Capital Corp.*,
   196 Cal. App. 4th 1380 (2011) .............................................................................. 22

*Sleep Science Partners Inc. v. Lieberman*,
   2010 WL 4316687 (N.D. Cal. Oct. 26, 2010) ....................................................... 23

*Stardock Systems, Inc. v. Reiche*,
   2018 WL 7348858 (N.D. Cal. Dec. 27, 2018) ...................................................... 13

*Stormans, Inc. v. Selecky*,
   586 F.3d 1109 (9th Cir. 2009) ............................................................................... 31

*TAP Manufacturing, LLC v. Signs*,
   2015 WL 12762269 (C.D. Cal. Mar. 6, 2015) ..................................................23, 26

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004) ..........................................................................................27, 28

*Watson Laboratories, Inc. v. Rhone-Poulenc Rorer, Inc.*,
178 F. Supp. 2d 1099 (C.D. Cal. 2001) ................................................................29

*Webber v. Inland Empire Investments*,
74 Cal. App. 4th 884 (1999) ................................................................................18

*Winter v. Natural Resources Defense Council, Inc.*,
555 U.S. 7 (2008)................................................................................................11

*Youst v. Longo*,
43 Cal. 3d 64 (1987) ...........................................................................................26

## RULES, REGULATIONS, STATUTES

15 U.S.C. §§ 1-7 (Sherman Act)................................................................................28

18 U.S.C. § 1030 (CFAA) (Consumer Fraud and Abuse Act) ...............................17, 32, 34

28 U.S.C. § 2201(a) (Declaratory Judgment Act) ........................................................2, 32, 33

Cal. Bus. & Prof. Code § 17200 (UCL)...................................................................26

Cal. Civ. Code §§ 1798.100 (CCPA) (Cal. Consumer Privacy Act)...........................20

Cal. Civ. Code § 1798.110.......................................................................................20

Cal. Civ. Code § 1798.115.......................................................................................20

Cal. Civ. Code § 1798.192.......................................................................................20

Cal. Penal Code § 502 (CDAFA) (Cal. Computer Data Access and Fraud Act) ....................2, 30, 31

## OTHER AUTHORITIES

Amazon, *Conditions Of Use*, https://tinyurl.com/y2mnmzap (last accessed Apr. 9,
2021) ..........................................................................................................................3

Chrome Web Store, *Desktop for Instagram*, https://tinyurl.com/4tz2ehzp (last
accessed Apr. 9, 2021)..........................................................................................25

Facebook, *Driving Innovation in Data Portability With a New Photo Transfer Tool*
(Dec. 2, 2019), https://tinyurl.com/4txcm728.......................................................21

Facebook, *What are the Facebook Products*, https://tinyurl.com/23y882ww (last
accessed Apr. 9, 2021) ...........................................................................................7

Google Chrome Developers, *Google Chrome Web Store Developer Agreement*,
https://tinyurl.com/557xxxrc (last accessed Apr. 9, 2021) .................................3, 25

ISO, *Information Technology – Cloud computing – Interoperability and portability*,
https://tinyurl.com/3c443pse (last accessed Apr. 9, 2021) .......................................21

vi

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

LinkedIn, *LinkedIn Service Terms*, https://tinyurl.com/37bt5svw (last accessed Apr.
9, 2021) ................................................................................................................................3

Twitter, *Twitter Terms of Service*, https://tinyurl.com/2rxrremm (last accessed Apr. 9,
2021) ...................................................................................................................................3

YouTube, *Terms Of Service*, https://tinyurl.com/3rrtrfeu (last accessed Apr. 9, 2021) ........................3

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1         Defendants-Counterclaim Plaintiffs BrandTotal and Unimania (collectively, "BrandTotal")

2   have known ████████████████████████████████████████████████████████████████

3   ████   BrandTotal nonetheless made a *conscious decision* to build a business around those violations,

4   knowing the impact an enforcement action by Facebook or Google would have on that business.  To

5   facilitate its data harvesting activities, BrandTotal developed, promoted, and distributed several

6   browser extensions and mobile applications, all programmed and designed to automatically scrape

7   user and advertising-related data from Facebook and Instagram (and other sites).  After a thorough

8   investigation, Facebook took an enforcement action against BrandTotal (a recidivist scraper) by

9   disabling BrandTotal's Facebook accounts, notifying Google of BrandTotal's extensions, and filing

10  this lawsuit.

11        BrandTotal has asked this Court to sanction its scraping operation.  It sought a temporary

12  restraining order, which this Court denied.  It filed counterclaims, which this Court dismissed.  And

13  in so doing, this Court confirmed that BrandTotal violated Facebook's terms.  During the pendency of

14  this litigation, and despite suggesting that it had stopped, BrandTotal continued to use multiple apps

15  and an extension, ████████████████████████████████.  BrandTotal now seeks

16  extraordinary equitable relief allowing its continued scraping through yet another extension that it

17  calls "UpVoice 2021."[1]  But BrandTotal is far from meeting the high bar required for such relief.

18        *First*, BrandTotal fails to show that it will likely face irreparable harm without the preliminary

19  relief it seeks.  Despite claiming to be on the brink of collapse in October 2020, BrandTotal has nearly

20  ████████   in cash on hand and continues to bring in considerable revenue from ██ active clients.[2]

21  And any harm that BrandTotal alleges it has suffered is self-inflicted and does not warrant the

22  extraordinary relief sought.  BrandTotal was ████████████████████████████████

23  ████████████████████████████████.  It may not now claim irreparable injury

24  from the utterly foreseeable consequences of its decision to disregard ████████.

25        *Second*, BrandTotal is not likely to succeed on the merits of any of its claims.  The evidence

26

27  [1] In this opposition, Facebook will refer to the redesigned UpVoice extension launched on March 11, 2021 as "UpVoice 2021" and previous iterations of the extension as "UpVoice Legacy."

28  [2] In its first amended counterclaim, BrandTotal alleged it faced "imminent insolvency" as a result of Facebook's enforcement action.  FAC ¶ 194.

1

has shown that Facebook neither tortiously interfered with BrandTotal's contracts or economic relationships, nor otherwise acted unfairly or unlawfully.  Facebook enforced its terms against BrandTotal because it determined BrandTotal to be aggressively scraping "sensitive user information" from over a million users. Ex. A at 1166, 1169. Facebook therefore had a legitimate business purpose enforcing its terms: enforcing its own contracts and complying with its obligations under a consent order with the FTC.  Accordingly, BrandTotal is not likely to succeed on its tortious interference or unfair competition claims.

BrandTotal's claims for declaratory relief does not entitle them to an injunction.  A declaration that BrandTotal's actions were legal would not establish that *Facebook* acted unlawfully—which is what BrandTotal must show to obtain the preliminary injunction that it seeks.  Further, BrandTotal seeks a preliminary injunction, not a preliminary declaration; and in any event, this Court lacks authority, under the Declaratory Judgment Act, to even grant a preliminary declaration.  And even setting aside all these issues, BrandTotal's own allegations show that *BrandTotal* interfered with Facebook's contracts with its users, and violated both the Computer Fraud and Abuse Act (the "CFAA") and the California Computer Data Access and Fraud Act (the "CDAFA").

*Third*, the balance of equities does not favor preliminary injunctive relief.  BrandTotal continues to derive revenue from its conscious and knowing decision to build a business around violating Facebook's terms.  The equities are not in its favor.

*Finally*, as this Court has already held, the public interest does not favor an order prohibiting Facebook from enforcing its terms.  The public has an interest in allowing Facebook to ensure the security of its platform.  Indeed, perhaps recognizing that the law and the facts of this case do not support the extraordinary remedy of preliminary injunctive relief, BrandTotal attempts to shoehorn this case into the mold of an entirely different case—*hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985 (9th Cir. 2019). But it does not fit.  *hiQ* concerned information that users "shared on their public profiles, available for viewing by anyone with a web browser[.]"  *Id.* at 989.  This case, by contrast, involves BrandTotal's reliance on its panelists' Facebook login credentials to scrape information from secure, password-protected locations.  The Ninth Circuit itself expressly recognized this distinction: "Facebook data, by contrast [to LinkedIn], is not generally accessible, and therefore is not an

2

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

equivalent … source of data." *Id.* at 993 (citation omitted).  The password-protected information that BrandTotal collects—information about advertising strategies and other users' interactions with ads—is information that, based on Facebook's terms, the public expects to be protected from automated collection.  The relief that it seeks would upend those expectations and undermine Facebook's ability to protect the integrity of its platform from future abuse.  That is not in the public interest.

## I.   FACTUAL BACKGROUND

### A.   Facebook Prohibits The Unauthorized Collection Of Data By Automated Means To Protect User Privacy And The Integrity Of The Platform

All data scraping presents a security and privacy risk to both Facebook users and to the Facebook platform.  Declaration of Sonal Mehta ("Mehta Decl."), Ex. 1 ¶ 5; Mehta Decl. Ex. 2.  Facebook, like almost all platforms, has terms that prohibit data scraping and takes affirmative steps to enforce those terms.  *Id.* ¶¶ 5-7.[3]  Even BrandTotal, despite all its complaints about the equity of Facebook's anti-scraping term, prohibits the same abusive behavior on its platform in its terms of service using almost precisely the same language.  *See* Mehta Decl. Ex. 3, BrandTotal, *Service Terms and Conditions* § 5.1, ("You shall not, and shall not allow any third party to: (i) copy, distribute or modify any part of the Site without our prior written authorization; … [and/or] (iv) use or launch any *automated* system … to access the Site" (emphasis added)).

Anti-scraping provisions, like those used by Facebook, BrandTotal, and others, exist because scraping degrades public trust and takes away users' control of their data.  Mehta Decl. Ex. 1 ¶¶ 5(b), (c) & (d).  Even where users, in theory, have the ability to consent to the scraping, scraping still has the potential to access information from a non-consenting user, as in the case of a shared computer.  *See id.* at ¶ 5(c).  Users expect Facebook to implement procedures to protect user data, and Facebook

---

[3] Twitter, YouTube, LinkedIn, and Amazon also prohibit the use of automated means to access and/or collect data from their platforms.  *See* Twitter, *Twitter Terms of Service*, https://tinyurl.com/2rxrremm (last accessed Apr. 9, 2021); YouTube, *Terms Of Service*, https://tinyurl.com/3rrtrfeu (last accessed Apr. 9, 2021); Amazon, *Conditions Of Use*, https://tinyurl.com/y2mnmzap (last accessed Apr. 9, 2021); and LinkedIn, *LinkedIn Service Terms*, https://tinyurl.com/37bt5svw (last accessed Apr. 9, 2021). And Term 4.4.1.1 of the Google Chrome Store Developer Agreement prohibits developing or publishing any materials that violates the terms of service for a third-party.  *See* Google Chrome Developers, *Google Chrome Web Store Developer Agreement*, https://tinyurl.com/557xxxrc (last accessed Apr. 9, 2021).

3

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   has done so.  But scraping threatens the security of data that Facebook has undertaken to protect,

2   allowing for the collection of personal or user information, including copyrighted information.  *Id.* at

3   ¶¶ 5(b), (c).

4          Scraping advertising-related data, too, creates risks to the security and privacy of user

5   information.  "Advertising data doesn't live in a vacuum," Clark Dep. Tr. (Ex. B) at 44:21-23; *see also*

6   *id.* at 84:13-16 (advertising data "does not exist on [an] endpoint by itself").  Even simply collecting

7   information on how many times an ad has been viewed—referred to as the ad's "impressions"—will

8   "include[] other, both personal identifiable information … as well as information about the

9   advertisement."  *Id.* at 84:16-19.  That can include the advertiser's name—which, if the advertiser is

10  an individual as "happens often," means that individual's first and last name—and geographic

11  location, as well as "other non-public user information associated with other users that interacted with

12  the ad."  *Id.* at 104:18-105:8.  Comments to and interactions with ads, for example, have users' "first

13  name/last name as well as user ID associated with" them.  *Id.* at 105:8-11.

14         Scraping also creates risks to the integrity of the Facebook platform. Mehta Decl. Ex. 1 ¶ 5(f).

15  Facebook is designed for human, not automated, use.  Ex. B at 81:15-18, 85:15-23.  Automated

16  methods can collect much larger quantities of information than any human user could, which requires

17  more processing capacity and can tax Facebook's networks.  *See* Newman Dep. Tr. (Ex. C) at 65:12-

18  17; Mehta Decl. Ex. 1 ¶ 5(g).  This can impair the functionality of the platform, imposing costs on

19  Facebook and degrading the service provided to real users.  Mehta Decl., Ex. 1 ¶ 5(f).

20         Finally, scraping creates security concerns.  "Scraping evades system limits" put in place to

21  protect the security of the platform from potential abuse, "mak[ing] it more difficult to employ

22  technological solutions and systems that are designed to detect and differentiate normal user behavior

23  form automated activity, including that caused by malware and other hacking tools."  *Id.* at ¶ 5(a).

24  And tools designed to scrape data (like BrandTotal's extensions and apps) can often be used for other

25  malicious purposes.  *Id.*  This "make[s] the site less secure," and more vulnerable to "harmful acts,

26  like coordinated inauthentic behavior or submitting fraudulent content takedown requests."  *Id.*  Once

27  data is scraped, Facebook has no way to monitor the security of that data or even to know how it may

28  be stored or used.  Ex. B at 74:15-19.  It is only when information is collected through Facebook's

4

authorized channels that Facebook can ensure that the information remains protected.  *Id.* at 74:20-75:4.   But when data is taken out of Facebook's secure environment, it can, even if only unintentionally, fall "in[to] the hands of bad actors."  Mehta Decl., Ex. 1 ¶ 5(a).  All data scraping, therefore, creates a risk of harm to data security and privacy.  Ex. B at 74:20-75:4.

**B.    To Promote User Control Over Data, Facebook Makes Advertising Data Available Through Authorized Means Subject To Advertiser Consent**

In addition to ensuring data security, Facebook's data access protocols are also designed to protect users' control over their own data.  User control is the "guiding principle" driving decisions with respect to data access.  Ex. C at 27:11-17; *accord id.* at 67:18-21, 89:4-7 ("[A]ny restriction in data is done to adhere to our principle of the owner of the advertisement owning the data associated with that advertisement.");  Mehta Decl., Ex. 4 ¶¶ 5, 9.   While Facebook makes a wide range of advertising-related information available through its application programming interfaces ("APIs"), *see* Ex. D  at 1-3; Ex. E, control over information about the performance of any ad campaign is limited to the user that created the campaign, Ex. C at 27:4-17, 28:22-25 ("Our products are built to provide control of data to the advertiser that create[d] the campaign"), *accord* 48:12-15.  As a general rule, access to "advertiser data [is] limit[ed] … to the advertiser itself."  *Id.* at 73:19-21.  ██████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████   Ex. C at 74:15-20.  This creates user expectations regarding the privacy of advertising campaign information.  *See* Mehta Decl., Ex. 1 ¶ 5(a) (users except Facebook to prohibit scraping).  Advertisers can, though, consent to share their advertising data with third parties through the API process.  Ex. C at 81:8-25.[4]  Any data collection outside of these authorized channels would undermine advertisers' legitimate expectations of control and privacy.

Consistent with its focus on maintaining advertisers' control over their own data, Facebook

---

[4] One common example is for advertisers to consent to share their advertising data with third-party measurement companies.  Ex. C at 44:9-20.  Certain vetted companies can become measurement partners, who have negotiated, enhanced access to data flow.  *Id.* at 43:3-8, 45:4-10, 65:7-11.  Potential measurement partners are evaluated for, among other things, the value that their services can bring to Facebook advertisers and their compliance with Facebook's terms.  *Id.* at 49:5-50:8.

1   does not make information about competitors' advertising strategies generally available to advertisers.

2   *See* Ex. C at 82:8-25.  Facebook does, on occasion, provide a "share of voice" report as a free service

3   to advertisers that compares the volume of impressions for an advertiser's own advertisements with

4   that of an aggregated, anonymized competitive set.  Ex. D at 5.  But the "ethos" guiding Facebook's

5   product development is that advertisers' control all information concerning their own advertising

6   campaigns.  Ex. C at 32:22-33:5, 48:12-15.

7         **C.**     **BrandTotal Has Repeatedly Violated Facebook's Terms By Scraping User and**

8                 **Advertising-Related Information Without Authorization**

9          BrandTotal has a long history of scraping data in violation of Facebook's terms.  FAC Exs. D

10  & E.  Since at least 2018, BrandTotal—often concealing its activity through its subsidiary Unimania[5]

11  —developed, distributed, and used a combined ten mobile apps and browser extensions designed to

12  improperly scrape data from Facebook and other social-media platforms.  Dor Dep. Tr. Vol. I (Ex. F)

13  at 18:3-4, 67:3-7, 68:12-14; Mehta Decl. Ex. 5. ¶¶ 5-6 & Ex. 1.  In April 2019, Facebook detected two

14  BrandTotal apps—Social One and Phoenix—that "scrape[d] Facebook user data," including "ad

15  targeting data." Dkt. 125-24 at 14656.  BrandTotal designed those apps ███████████████████

16  ████████████████████████████████████████████████████████████████  *Id.*

17  at 14656-57.  The apps had "already been actioned and taken down" from the Google Play Store before

18  Facebook took any enforcement action.  *Id.* at 745; Karve Dep. Tr. (Ex. G) at 51:16-53:7, 66:14-67:18.

19         BrandTotal came back to the platform within the next year, scraping non-public user profile

20  and ad data through browser extensions UpVoice, Anonymous Story Viewer, and Ads Feed.  Ex. G at

21  74:21-76:9; Ex. I; Ex. A at 1167-68.  An investigation in or around March 2020 revealed BrandTotal

22  to be "one of the most aggressive scrapers [Facebook had] encountered, … com[ing] back to the

23  platform, more aggressively and with greater sophistication."  Ex. A at 1169.  After determining that

24  BrandTotal was scraping non-public user-information including gender, date of birth, location, and

25   

26  [5] ████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1  advertising interests, Ex. G at 82:20-83:6, 93:3-16, 97:7-20, as well as advertising-related information,

2  Mehta Decl. Ex. 5 at ¶ 17(c)-(d), Facebook, in September 2020, disabled BrandTotal's Facebook

3  accounts and "contact[ed] Google to give them a heads-up about the extensions." Ex. G at 137:3-24;

4  Dkt. 126-11 at 16959. BrandTotal designed its apps and extensions to scape non-public user profile

5  information and ███████████████████████████████████████████████████

6  █████████████████████████████████████████████████████████████████

7  █████████████████████████████████████████████████████████████████

8  █████████████████████████████████████████████████████████████████

9  ████ [6] BrandTotal nonetheless designed its apps and extensions to automatically █████████

10  █████████████████████████████████████████████████████████████████

11  ████████████████, whenever a user visited Facebook or Instagram. Ex. F at 113:9-118:9

12  (explaining operation of UpVoice); *see also id.* at 71:5-7 (explaining that BrandTotal's different

13  extensions use "the same collection code"). BrandTotal collected that information ███████████

14  █████████████████████████████████████████████████████████████████

15  █████████████████████████████████████████████████████████████████

16  █████████████████████████████████████████████████████████████████

17  ████████████████████████

### D.  BrandTotal Continued To Scrape Data After The Filing Of This Lawsuit

19  Despite Google removing UpVoice from its Chrome Web Store, about 10 to 15% of installed

20  UpVoice Legacy extensions remained operational and continued collecting Facebook data ██████

21  ████████████████ Ex. F at 91:19-94:5; Dor Dep. Tr. Vol. II (Ex. L) at 23:23-24:12. And

22  notwithstanding this lawsuit, and ████████████████████████████████████

23  ███, BrandTotal continued to load that data into its databases and to sell that information to its

24  customers. Ex. F at 94:7-96:22. ████████████████████████████████████

---

[6] BrandTotal's counsel explained that "any data collected, using automated means, from what is defined products, cannot be collected." Ex. J at 1856. To reach the conclusion that the collection of ads that a user sees on Facebook was in a "grey area" with respect to that rule, BrandTotal's counsel concluded that ad data "is not part of the 'Products' definition." *Id.* at 1857. Facebook's terms define "Products" to include Facebook's "in app browser." *See* Facebook, *What are the Facebook Products*, https://tinyurl.com/23y882ww (last accessed Apr. 9, 2021).

1 █████████████████████████████████████████████████████████████████████

2 █████████████████████████████████████████████████████████████████████

3 ███████ *id.* at 77:4-78:7; *accord* Ex. L at 105:9-106:16.[7]

4 █████████████████████████████████████████████████████████

5 ██████████████████████████████████████████████ ███████████

6 ██████████████████████████████████████████████. Ex. F at 97:6-

7 8, 97:16-21. ████████████████████████████████████████. *Id.* at

8 97:22-98:19.  However, behind the scenes, BrandTotal re-designed a version of UpVoice specifically

9 to collect Facebook data.  As early as February 9, 2021, BrandTotal represented to its customers that

10 ███████████████████████████████████████ Ex. M.   But

11 BrandTotal did not inform either Facebook or the Court of its intention to redesign UpVoice to collect

12 Facebook data until the hearing on Facebook's first motion to dismiss on February 19, 2021, *see* Feb.

13 19, 2021 Hr'g Tr. 11:9-11, and did not provide Facebook with any specific information about the

14 redesigned UpVoice until February 25, 2021, a week before its planned launch.  Ex. N.

15     BrandTotal designed UpVoice 2021 to ████████████████████████

16 █████████████████████████████████████████████████████████████████████

17 █████████████████████████████████████████████████████████████████████

18 █████████████████████████████████████████████████████████████████████

19 █████████████████████████████████████████████████████████████████████

20 █████████████████████████████████████████████████████████████████████

21 █████████████████████████████████████████████████████████████████████

22 ██████████████████████████████████████████

23

24

25 _____

26 [7] █████████████████████████████████████████████████████████████████

27 █████████████████████████████████████████████████████████████████████

28 █████████████████████████████████████████████████████████████████████

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

### E.     BrandTotal Continues To Sign New Customers And Bring In Revenue

Despite contrary claims to this Court, according to BrandTotal's communications to its customers, the removal of UpVoice from the Google Chrome Web Store ████████████████████ ███████████████████████████████████████████████████████████. Ex. O.  Indeed, even without UpVoice 2021, ███████████████████████████████████ ███████████████████████████████████ Leibovich Dep. Tr. (Ex. P) at 53:23-54:11.  That includes ████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████     *Id.* at 85:17-87:2.

## II.     LEGAL STANDARD

BrandTotal seeks "an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689 (2008).  The bar for such relief is high, and BrandTotal falls far short.  To obtain a preliminary injunction, BrandTotal must establish that: (1) it is "likely to succeed on the merits," (2) it is "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in its favor," and (4) a preliminary injunction "is in the public interest."  *Kiva Health Brands LLC v. Kiva Brand, Inc.*, 402 F. Supp. 3d 877, 884 (N.D. Cal. 2019).  Moreover, to the extent that BrandTotal seeks a mandatory injunction ordering Facebook to take action, the burden is "doubly demanding." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015).  Such relief "is particularly disfavored," and to be entitled to it, BrandTotal "must establish that the law and facts ***clearly favor*** [its] position, not simply that [it] is likely to succeed."  *Id.*  A preliminary injunction, moreover, "must be no broader … than necessary to redress the injury shown."  *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018).

## III.     BRANDTOTAL HAS NOT ESTABLISHED IRREPARABLE INJURY

BrandTotal has not shown that it needs nor is entitled to the extraordinary relief it seeks. "[I]rreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *A&A Int'l Apparel, Inc. v. Xu*, 2015 WL 12850544, at *3 (C.D. Cal. Jan. 29, 2015) (quoting *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005)).  To succeed on its motion for preliminary relief, BrandTotal must show that irreparable harm is *likely*—a mere showing

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1  of "possibl[e]" irreparable harm is no longer sufficient, even if the other factors weighed heavily in

2  BrandTotal's favor. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

3        As a preliminary matter, BrandTotal has not shown that any irreparable harm is imminent nor

4  can it, because Facebook has not taken an action against UpVoice 2021. And even if it had, there

5  would be no *imminent* injury to BrandTotal. Throughout this litigation, BrandTotal has claimed to

6  stand "on the brink of collapse" and to be in danger of "imminent insolvency." Dkt. 27 at 23; Mot. at

7  16, 29-30; Dkt. 23 at 22. But discovery has revealed that, at best, BrandTotal overstated many of the

8  dire predictions it made about its financial situation in its motion for a TRO, including:

| Representation in TRO (October) | Reality (Post-Discovery) |
|---|---|
| BrandTotal "stands on the brink of collapse." Dkt. 68 at 23. | ███████████████████ |
| BrandTotal "cannot long survive absent an injunction that restores the company to the status quo." Dkt. 68 at 24. | ███████████████████ |
| BrandTotal "cannot … secure new customers." Dkt. 68 at 24. | ███████████████████ |
| BrandTotal "cannot provide contracted services [to] existing customers." Dkt. 68 at 24. | ███████████████████ |
| Losing access to Facebook will "leave approximately twenty-eight (28) people jobless." Dkt. 68 at 24. | ███████████████████ |

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   There was no imminent injury in October and there is none now. And in any case, the harms

2   BrandTotal points to now are compensable through damages—by definition they are not irreparable.

3   Finally, any harm that BrandTotal will possibly face is self-inflicted.

4       **A.      BrandTotal Has Not Shown That Irreparable Injury Is Likely**

5       BrandTotal cannot show that irreparable harm is "*likely* in the absence of an injunction."

6   *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  BrandTotal acknowledges as much,

7   positing that "*if* Facebook interferes with UpVoice 2021, BrandTotal will not be able to survive until

8   trial." Mot. 15.   But "[s]peculative injury cannot be the basis for a finding of irreparable harm."  *In*

9   *re Excel Innovations*, 502 F.3d 1086, 1098 (9th Cir. 2007).  Any potential irreparable injury is

10  expressly contingent on a future event—some action by Facebook with respect to UpVoice 2021.  But

11  BrandTotal has put forward no evidence—nor can it—that Facebook has taken any such action.

12  BrandTotal cannot base its theory of irreparable harm on some hypothetical future event, rather it must

13  demonstrate that the harm is imminent.  *Amazing Insurance, Inc. v. Dimanno*, 2019 WL 3406941, at

14  *3 (E.D. Cal. July 26, 2019) (citing *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th

15  Cir. 1988) ("A plaintiff must do more than merely allege imminent harm sufficient to establish

16  standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary

17  injunctive relief.")).

18      Second, the supposed harm it suffered is not related to the relief it seeks.  BrandTotal contends

19  that it "suffered irreparable harm after Facebook's actions related to *UpVoice Legacy*." Mot. 29

20  (emphasis added).  Not only is that assertion demonstrably false, but the relief BrandTotal seeks is an

21  injunction preventing Facebook from interfering with or implementing technical enforcement

22  measures against UpVoice 2021, not UpVoice Legacy.  This is insufficient, because "[t]here must be

23  a 'sufficient causal connection' between the alleged irreparable harm and the activity to be enjoined,

24  and showing that 'the requested injunction would forestall' the irreparable harm qualifies as such a

25  connection." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 819 (9th Cir. 2018)

26  (quoting *Perfect 10 Inc. v. Google, Inc.*, 653 F.3d 976, 981-82 (9th Cir. 2011)).  The required causal

27  connection is missing here because Facebook has taken no action, nor threatened to take any action,

28  with respect to UpVoice 2021.

11

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**B.     BrandTotal Has Not Shown That It Faces An Imminent Risk Of Harm**

Even if BrandTotal could show that the irreparable harm it has described is related to the relief it seeks, the evidence BrandTotal does marshal is insufficient to meet its burden.  While BrandTotal continues to paint itself as a fledgling enterprise that has been forced to suspend parts of its business, discovery paints a very different picture.  On January 14, 2021, BrandTotal's CEO, Alon Leibovich testified that BrandTotal had ███████████████████████.  Ex. P at 22:19-20; *see also* Ex. Q ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████████████, even without accounting for incoming revenues.  Ex. P at 30:6-11.[8]  And BrandTotal continues to generate revenue from █████████████████, *Id.* at 54:10-11, with an estimated █████████ in revenue in December 2020, *id.* at 33:3-9.  BrandTotal also continues to attract additional funding.  In addition to the $12 million in capital funding BrandTotal received in September 2020, Dkt. 39 at 11, BrandTotal's CEO testified ██████████████████ ████████████████████████████████████████.  Ex. P at 45:16-47:3, 48:4-45.

In addition to its significant cash reserves, ████████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████████     █████████████████████████████████ █████████████████████████████████████████.  That testimony directly contradicts BrandTotal's prior representations to this Court.  *See e.g.*, Dkt. 27-3 ¶ 4 ("Without relief, BrandTotal … cannot maintain current customers or secure new customers.").  Incredibly, the very month that BrandTotal's CEO made those representations, including attesting to the fact that "BrandTotal ha[d] no incoming revenue," *id.* at ¶ 3, BrandTotal continued receiving payments from its customers, ████████████████████████████████████████████████████████████████

---

[8] Even with legal fees, BrandTotal's burn rate is only ████████ per month.  Leibovich Decl. ¶ 5.

[9] ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1    ███████████████████████████████████████████████████████████

2    ████████████████████████████████

3        At most, BrandTotal has suffered reduced revenues and a few lost customers, but those "are

4    measurable and are best characterized as economic harms" that can be remedied through damages.

5    *Ebates Performance Mktg., Inc. v. Integral Techs., Inc.*, 2013 WL 75929, at *2 (N.D. Cal. 2013); *see*

6    *also Stardock Sys., Inc. v. Reiche*, 2018 WL 7348858, at *11 (N.D. Cal. Dec. 27, 2018) ("[L]oss of

7    revenue alone does not support a finding of irreparable harm.").   They do not, therefore, warrant

8    preliminary injunctive relief.

9        And while this Court recognized in its Order denying BrandTotal's request for a temporary

10   restraining order that layoffs could be sufficient to show irreparable harm, Dkt. 58 at 17, discovery

11   has again revealed that BrandTotal's claims were overstated, if not altogether untrue.  *See* Dkt. 27-3

12   ¶ 56 (stating that BrandTotal "will be forced to immediately lay off employees").  In his declaration,

13   BrandTotal's CEO states that ████████████████████████████████████████████

14   ███████████████████████████████████████████████████████████

15   ███████████████████████████████████████████████████████████

16   ███████████████████████████████████████████████████████████

17   █████     So, in truth, BrandTotal has ████████████████████  And BrandTotal

18   has made no showing that even that small net loss is not the result of normal turnover in tech startups

19   or the global pandemic or something else.

20       The idea that BrandTotal's business is facing massive disruption is further belied by evidence

21   that BrandTotal continues to provide the same services to its customers through newly developed data

22   collection strategies and continued unauthorized collection from Facebook's platform.  BrandTotal

23   has assured customers that it is ████████████████████████████████████████

24   ████████████████████████████████  Ex. O.  That statement came just over a

25   month after BrandTotal told this court in its motion for a temporary restraining order that it faced

26   "destruction of [its] business," Dkt. 27 at 3.  BrandTotal's CEO testified that ████████████

27   ███████████████████████████████████████████████████████████

28   ███████████████████████████████████████████████████████████

13

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████   Ex. F at 123:17 – 124:1; Ex. L at 105:9-13.  And BrandTotal apparently just launched

yet another iteration of UpVoice the day before filing its motion, UpVoice 2021, Mot. 15, ██████

████████████████████████████████████████████.  Ex. L at 20:11-16, 56:2-57:17.

BrandTotal's continued collection and provision of data to its customers undermines its claims,

including its prior statements to this Court, that its business is (or was) on the brink of destruction.

## C.    Any Harm BrandTotal Has Shown Is Self-Inflicted

As other cases in this district have recognized, the evaluation of irreparable harm "is guided

by the general notion that 'self-inflicted wounds are not irreparable injury." *Epic Games, Inc. v. Apple,*

*Inc.*, 2020 WL 5993222, at *17 (N.D. Cal. Oct. 9, 2020) (quoting *Al Otro Lado v. Wolf*, 952 F.3d 999,

1008 (9th Cir. 2020)).  "Further courts generally decline to find irreparable harm that 'results from the

express terms of [the] contract.'"  *Id.* (quoting *Salt Lake Tribune Publ'g Co., LLC v. AT&T Corp.*, 320

F.3d 1081, 1106 (10th Cir. 2003)).

BrandTotal relies entirely on the takedown of its UpVoice Legacy extension by Google to

establish the requisite harm.  But BrandTotal chose to structure its UpVoice Legacy extension in a

way that violates Facebook's Terms of Service, terms to which BrandTotal agreed when it became a

user of the Facebook Platform.  Documents produced by BrandTotal show that BrandTotal has known

of the risk that its products violate Facebook's Terms of Service for years. ████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

14

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1  ███████████████████████████████████████████████████████████████████

2  ███████████████████████████████████████████████████████████████████

3  ███████████████████████████████████████████████████████████████████

4  ███████████████████████████████████████████████████████████████████

5  ███████████████████████████████████████████████████████████████████

6  ███████████████████████████████████████████████████████████████████

7  ███████████████████████████████████████████    But that is not how contracts work.  Having

8  executed contracts agreeing not to engage in the automated collection of data from Facebook,

9  BrandTotal cannot now complain of the harm resulting from Facebook enforcing those terms.  Because

10  the harms it allegedly suffered as a result of the takedown of UpVoice Legacy are thus self-inflicted,

11  BrandTotal cannot meet its burden to show an irreparably injury.

12  **IV.     BRANDTOTAL HAS NOT ESTABLISHED A LIKELIHOOD OF SUCCESS**

13         BrandTotal must show a likelihood of success on the merits of its claims in order to obtain the

14  "extraordinary remedy" of a preliminary injunction.  *Alliance for the Wild Rockies v. Cottrell*, 632

15  F.3d 1127, 1131 (9th Cir. 2011).  It has not.  At the threshold, there is a fundamental disconnect

16  between the prospective preliminary injunction it seeks and its retrospective amended counterclaims.

17  BrandTotal's claims all challenge actions Facebook took with respect to UpVoice Legacy in

18  September 2020.  But the preliminary injunction BrandTotal seeks is tied exclusively to UpVoice

19  2021, which BrandTotal launched *without interference from Facebook* in March 2021.  Beyond that

20  basic flaw, BrandTotal's interference and unfair competition claims fail because Facebook had a

21  legitimate justification for taking action against BrandTotal's scraping in September 2020.  And

22  BrandTotal offers no evidence to show that is likely to satisfy the elements of its interference and

23  unfair competition claims, relying instead on allegations in its FAC.  It has therefore not met its burden

24  of *showing* that it is likely to succeed on the merits of its claims.  As for BrandTotal's declaratory

25  judgment claims, they are irrelevant to this motion because there is no connection between the

26  declarations that BrandTotal seeks and the preliminary *injunction* that is the subject of this motion.

27  Indeed, BrandTotal cannot obtain a preliminary declaration under the Declaratory Judgment Act.

28  Beyond that threshold issue, those claims fail on their own terms.  For all these reasons, BrandTotal

15

is not likely to succeed on the merits of any of its claims and its motion can be denied on that basis alone.

**A.   BrandTotal Is Not Entitled To A Preliminary Injunction Because It Has Not Shown A Likelihood Of Success On Any Claim Related To That Relief**

There must be a "sufficient nexus" between the relief sought in a preliminary injunction motion and the claims asserted in the underlying complaint. *Pacific Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015). There is no such nexus here. BrandTotal seeks an order enjoining Facebook from interfering with or taking any "technical enforcement measures" against UpVoice 2021 and requiring Facebook to restore BrandTotal's Facebook accounts, *see* Mot. at 35, but it has not and could not state any claim with respect to UpVoice 2021 or the removal of its Facebook accounts. BrandTotal is not, therefore, entitled to the relief it seeks.

BrandTotal cannot state any claim with respect to UpVoice 2021 because it has not even alleged that Facebook has taken any action whatsoever with respect to the operation of UpVoice 2021. BrandTotal alleges only that Facebook "did not grant permission" for UpVoice 2021, FAC ¶ 81, not that Facebook has taken any action to interfere with its launch. Indeed, UpVoice 2021 launched on March 11, 2021 with no interference. *See* Mot. at 15. It is therefore not surprising that BrandTotal's motion argues only that it is likely to succeed in showing that Facebook was not justified in taking action against UpVoice *Legacy*. *See* Mot. at 31. BrandTotal makes no effort to show that it is likely to succeed on any claim that Facebook interfered with or acted unfairly with respect to the launch of UpVoice 2021, so it is not entitled to any preliminary injunctive relief with respect to UpVoice 2021.

Nor has BrandTotal shown any likelihood of success on any claim concerning the disabling of its Facebook accounts. In its FAC, BrandTotal alleges that Facebook interfered with its existing contracts by "suspend[ing] BrandTotal's Facebook and Instagram pages" and thereby "preventing BrandTotal's ability to advertise on Facebook" to "recruit[] for new Panelists." FAC ¶ 134. But BrandTotal's motion makes no effort to show how any alleged disruption to *recruitment* has interfered with any existing contract. Indeed, BrandTotal's claim cannot satisfy even the first element of an intentional interference claim: "the existence of a valid contract." *See Reeves v. Hanlon*, 33 Cal. 4th 1140, 1148 (2004). BrandTotal puts forth neither any evidence nor even argument that it has a valid

16

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

contract with any *potential* panelist.  And to the extent that BrandTotal intended to state a claim for interference with prospective economic advantage on this basis, that, too, would not be likely to succeed.  An interference with prospective economic advantage claim requires the existence of "an economic relationship … with the probability of future economic benefit to the plaintiff."  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003).  BrandTotal has not put forth any facts showing that it was "reasonably probable" that a "prospective economic advantage would have been realized" with any prospective panelist "but for [Facebook's alleged] interference."  *AlterG, Inc. v. Boost Treadmills LLC*, 388 F. Supp. 3d 1133, 1151 (N.D. Cal. 2019).  Moreover, interference with prospective economic advantage requires an independently wrongful act.  *See Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.*, 271 F.3d 825, 831 (9th Cir. 2001).  There was nothing unlawful about terminating BrandTotal's Facebook accounts in response to BrandTotal's violation of Facebook's terms.  *See infra* pp. 17-23; *see also Marin Tug*, 271 F.3d at 834 (refusal to deal is "presumptively valid" and insufficient to support interference with prospective economic advantage claim).  BrandTotal's failure to connect the relief it seeks to any viable claim is alone grounds to deny the requested injunction.

**B.**      **BrandTotal Is Not Likely To Succeed On Its Intentional Interference Claims Or Unfair Competition Claims**

Rather than tie its claims to UpVoice 2021, BrandTotal argues for injunctive relief based on actions Facebook took against UpVoice Legacy (and BrandTotal's other apps and extensions).  Even setting aside the disconnect between such arguments and the relief BrandTotal seeks, BrandTotal fails to show that it is likely to succeed on any challenge to Facebook's enforcement of its terms against UpVoice Legacy in September 2020.  The extensive discovery BrandTotal collected only confirms that Facebook acted for legitimate business reasons—to enforce its terms of service and to fulfill its legal obligations under a consent order with the FTC—and not out of bad faith.  And BrandTotal makes no effort and submits no *evidence* to support any of the affirmative elements of its claims.

**1.**      **Facebook's Enforcement Actions Against BrandTotal Were Justified**

*a.      Facebook was justified in enforcing its own contracts*

BrandTotal is not likely to succeed on its interference claims because Facebook was justified

17

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

in enforcing the terms of its contracts.  Enforcing one's own contract is a legitimate purpose unless shown to be a "sham … designed for the specific purpose" of achieving some other impermissible objective. *Webber v. Inland Empire Invs.*, 74 Cal. App. 4th 884, 902 (1999).  Facebook's Terms of Service prohibit users from "access[ing] or collect[ing] data … using automated means (without [Facebook's] prior permission."  FAC ¶ 154.  BrandTotal violated those terms when, prior to the suspension of its accounts, it collected data by automated means through UpVoice Legacy and its other apps and extensions.  *See* Order on MTD (Dkt. 108), at 11 (holding that BrandTotal's data collection violated Facebook's terms).  That Facebook has a legitimate reason to enforce its prohibition on automated collection is further underscored by the fact that BrandTotal has *the same* provision in its own Terms of Service.  *See* Mehta Decl. Ex. 3, BrandTotal, *Service Terms and Conditions*.

Despite receiving thousands of pages of Facebook documents and deposing multiple 30(b)(6) designees, BrandTotal has not put forth any evidence of bad faith.  Rather, as the evidence shows, Facebook took action against BrandTotal because it was "one of the most aggressive scrapers [Facebook had] encountered, … com[ing] back to the platform, more aggressively and with greater sophistication."  Ex. A at 1169.  Facebook determined that BrandTotal's scraping put user information at risk by collecting personally identifying information ("PII").  Ex. EE at 1126-1127.  And because BrandTotal's extensions had been installed over a million times, Ex. A at 1166, they had a significant "attack surface" capable of "multiply[ing] [their] damage," Ex. G at 52:16-23.[10]

In the face of that evidence, BrandTotal suggests that Facebook's enforcement actions were taken in bad faith because Facebook had previously determined that "BrandTotal's code was 'harmless,'" Mot. at 31, but the evidence shows that not to be true.  Rather, Facebook determined that BrandTotal's earlier apps (not UpVoice or Ads Feed) presented "strong concern on the data security and business integrity front."  Dkt. 125-24 at 14655.  Analyzing the code revealed that while the apps themselves were "harmless" in that they did not ████████████████████████████████████ ██████████████████████████████████████████████  *Id.* at 14657 (emphases added).  Far from harmless,

---

[10] Indeed, in March 2020, Facebook detected 34 Google Chrome extensions scraping user and ad data.  Those extensions covered approximately 1.7 million users installs in total, with over 1 million of those accounted for by BrandTotal's extensions.  Ex. A at 1166.

Facebook considered that worthy of "enforcement" and possibly "legal action." *Id.* But before Facebook needed to take such action, the apps had already been "actioned and taken down" from the Google Play Store. *Id.* at 14656.

And BrandTotal is wrong as a matter of fact and law that any bad faith can be inferred from Facebook's email to Google. *See* Mot. at 32-33. Facebook communicated to Google its "belie[f]" that BrandTotal was "improperly scraping user PII (e.g. gender, relationship status, ad interests, etc.), without [a] proper disclosure." Dkt. 126-11 at 16959. That was accurate. BrandTotal misrepresented to its users that Facebook was a "participating site[]," calling into question the validity of any purported consent to collect users' information that BrandTotal may have received. *Cf. Pulido v. Unitrin, Inc.*, 2007 WL 781222 (E.D. Cal. Mar. 9, 2007) (consent to terms of contract invalid if obtained by means of material misrepresentation). And ███████████████████████████████ ████████████████████████████ Ex. L at 60:12-16, which can include personally-identifying information like an individual's first and last name, user ID, and location, Ex. B at 104:18-105:11, or from "Panelists" that never agreed to BrandTotal's terms because of the shared computer problem that existed, *see* TRO Order at 25, n. 12. And in any event, even an "unfounded opinion" regarding suspected misconduct is a protected statement that cannot form the basis of tort liability. *Savage v. Pacific Gas & Elec. Co.*, 21 Cal. App. 4th 434, 450-451 (1993) (holding that, given the "social value in allowing business contacts of enterprises dealing with the public to comment freely on matters affecting their own or the public interest," even "unfounded opinion" of misconduct could not form basis of interference claim).

Moreover, while BrandTotal attempts to conjure some anticompetitive motivation from the fact that several Facebook advertising partners inquired about BrandTotal, *see* Mot. at 9, the evidence shows that those inquiries were irrelevant to the decision to take enforcement action. Indeed, Facebook notified Google about BrandTotal's extensions *before* any of those inquiries. *Compare* Dkt. No. 126-11 at 16959 (Sept. 21, 2020 email to Google) *with* Dkt. 126-10 (Sept. 22, 2020 email regarding inquiries about BrandTotal), Dkt. 125-26 (same), Dkt. 126-12 (Sept. 24, 2020 communications regarding inquiries about BrandTotal). Contrary to the narrative that BrandTotal attempts to stitch together, Facebook's enforcement decision was not part of any anti-competitive

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

scheme to cut off access to commercial advertising metrics. It was, instead, a fairly routine enforcement of a common term also used by other sites (including BrandTotal), as part of Facebook's "agnostic" policy against scraping, Ex. G at 127:12-128:11; Dkt. 125-34. The evidence shows that Facebook regularly takes action to enforce its terms against data scraping of all forms, including of user information, Ex. Y, location data, Ex. Z, and photos, Exs. AA & BB; *see also infra* pp. 22-23; Dkt. 125-34. In this case, as a Facebook malware researcher testified, the decision to take enforcement action against BrandTotal was based solely on the severity of its conduct, not any consideration of the business purposes to which BrandTotal put the scraped data. *See* Ex. G at 76:21-77:8, 128:5-11. Indeed, BrandTotal's theory of anticompetitive motive is further belied by BrandTotal's own recognition that ████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

BrandTotal is also wrong that Facebook's legitimate enforcement of its terms of service can be disregarded on the ground that the terms are unenforceable. In pressing that argument, BrandTotal points only to the California Consumer Privacy Act ("CCPA"), which provides that contracts "that purport[] to waive or limit in any way a consumer's rights under [the CCPA] … shall be deemed contrary to public policy." Cal. Civ. Code § 1798.192. That is irrelevant here, because the CCPA does not grant consumers the right to authorize third-party data scraping. Rather, it grants consumers' limited rights to be informed about the personal information that a company has collected or will collect about them, Cal. Civ. Code §§ 1798.100, 1798.110, 1798.115, to request that their personal information be deleted, *id.* § 1798.105, to "opt-out" of the sale of their personal information, *id.* § 1798.120, and to not be discriminated against for exercising their rights under the CCPA, *id.* § 1798.125. None of those rights are implicated here. *See* Order on TRO (Dkt. 63), at 22 n.11.

                                 b.     *Facebook was justified in acting in fulfillment of its obligations under an FTC consent order*

Facebook was also separately justified in taking action against BrandTotal's scraping in light of Facebook's obligations under the FTC consent order. Under that order, Facebook is required to maintain a privacy program with "safeguards" that control for risks to Covered Information, including a policy for "[e]nforcing against any Covered Third Party violations of [its] Platform Terms based

20

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   solely on the severity, nature, and impact of the violation; [and] the Covered Third Party's malicious

2   conduct or history of violations."  FAC Ex. C at 8-9; *see also* Dkt. 125-34 (Facebook's procedures for

3   the investigation, enforcement, and reporting of scraping incidents).   Under the order, "Covered

4   Information" includes user IDs or any form of "Nonpublic User Information," and "Covered Third

5   Party" is defined as any "entity that uses or receives Covered Information … outside of a User-initiated

6   transfer … as part of a data portability protocol or standard."  *Id.* at 3.

7          BrandTotal appears to concede that UpVoice Legacy collected "Covered Information," *see*

8   Mot. at 26,[11] but now argues it is not a "Covered Third Party" because it collects data as part of a data

9   portability protocol.  *See* Mot. 26-27.[12]   This argument misses the mark.   The International

10  Organization for Standardization, on which BrandTotal relies, *see id.*, describes data portability as

11  standard processes by which "cloud service customers … [can] move *their* data or applications

12  between non-cloud and one or more could services and between cloud services."  ISO, *Information*

13  *Technology – Cloud computing – Interoperability and portability*, https://tinyurl.com/3c443pse (last

14  accessed Apr. 9, 2021) (emphasis added).   BrandTotal's own expert similarly explains that data

15  portability refers to procedures facilitating the transfer of users' *own* personal data.  Hartzog Decl. ¶¶

16  50-51.  Typically, this includes the "photos or posts" that a user has herself "uploaded to the service."

17  *Id.* ¶ 51; *see also* Ex. B at 98:25-100:2.  Data portability protocols, then, include standard processes

18  like Facebook's photo sharing tool by which users can transfer their photos from Facebook to Google

19  Photos.  *See* Facebook, *Driving Innovation in Data Portability With a New Photo Transfer Tool* (Dec.

20  2, 2019), https://tinyurl.com/4txcm728.

21          Scraping content without authorization—outside the data portability tools that Facebook has

22

---

23  [11] BrandTotal argues only that UpVoice 2021 does not collect Covered Information.  But whether
     UpVoice 2021 collects Covered Information is irrelevant to whether Facebook was justified in

24  taking enforcement action against UpVoice Legacy.  And in any event, BrandTotal is wrong that
     UpVoice 2021 does not collect Covered Information.  Through UpVoice 2021, ▓▓▓▓▓▓▓▓▓

25  ▓▓▓▓▓▓▓▓▓▓▓▓▓, Ex. L at 20:11-16—which, for individual advertisers, is that person's
     Facebook ID, Ex. B at 49:14-16—▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

26  ▓▓▓▓▓▓▓▓▓▓▓ Ex. L at 20:11-16; Ex. B at 102:25-103:11.

27  [12] In its Order dismissing BrandTotal's counterclaims, this Court noted that "BrandTotal appears to
     meet the definition of a 'Covered Third Party.'"  Dkt. 108 at 15.  And BrandTotal's own counsel at

28  the hearing on its motion for a TRO admitted he "thought [BrandTotal] would be" a Covered Third
     Party.  Dkt. 57 at 8:24-25.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   provided—does not constitute a "protocol or standard" for a user to transfer his or her own data.  That

2   is especially so because BrandTotal has collected and continues to collect information ████████

3   ████████████████████████████████████████████████████████████████████████

4   ████████████████        *See* Ex. L at 20:3-10; Ex. C at 28:2-4, 68:8-12, 80:23-81:1 (explaining that

5   advertising information belongs to the advertising users that created the ad).  And UpVoice Legacy

6   collected users' advertising-interest information that Facebook had inferred based on users' activities

7   on Facebook.  Mehta Decl. Ex. 5 at ¶ 17(b); *accord* Dkt. 126-21 at 13-15 (data portability protocols

8   should apply only with respect to a user's own personal data, not data that a "service provider infers

9   about" the user).  Accordingly, BrandTotal's scraping activity does not fall within the FTC order's

10  exception for user-initiated transfers as part of a data portability protocol.

11      BrandTotal also contends that "a Federal Consent Order does not excuse violation of a third-

12  parties' rights under State law."  Mot. at 28.  But it is state law itself that allows for a legitimate purpose

13  to excuse otherwise unlawful conduct.  *See Savage*, 21 Cal. App. 4th at 449-450 (explaining that under

14  California law, justification excuses any alleged interference).  The issue is not, therefore, whether the

15  consent order permits conduct that violates state law but whether, under state law, compliance with

16  the consent order justifies Facebook's conduct.  And California law is clear that "complying with legal

17  requirements" is a "legitimate business interest."  *Semler v. General Elec. Capital Corp.*, 196 Cal.

18  App. 4th 1380, 1393 (2011).  Accordingly, Facebook cannot be held liable for acting to fulfill its

19  obligations under the FTC order.

20      And even if Facebook's motivations for complying with its legal obligations were relevant,

21  *but see* Order on MTD at 15, BrandTotal has not set forth any evidence that Facebook's enforcement

22  actions were taken in bad faith.  Rather the evidence shows that, consistent with its obligations under

23  the FTC order, Facebook enforced against BrandTotal based solely on the severity, nature, and impact

24  of its violation.  *See supra* pp. 20-21.  Fulfilling its obligations under the consent order, Facebook has

25  neutral procedures for investigating, enforcing against, and reporting to the FTC scraping incidents

26  covered under the FTC Order.  *See* Ex. B at 86:24-89:4; Dkt. 125-34.  Facebook followed those

27  procedures here. Ex. B at 33:10-35:20. And there is no evidence that Facebook's compliance with its

28  obligations under the FTC order is in any way shaped by anti-competitive motivations.  Tellingly,

22

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

despite seeking discovery for the express purpose of attempting to show that Facebook "selectively report[s] entities [to the FTC] that … offer competitive advertising analytics services," Dkt. 95 at 1-3, BrandTotal nowhere argues that Facebook's reporting of BrandTotal to the FTC was anything other than a neutral application of its reporting procedures.  Indeed, of the ███ unique entities reported to the FTC between March 2020 and January 11, 2021, Facebook is aware of ████ that provide advertising analytic services.  Ex. D at 6-7; Ex. B at 119:14-121:6.  Discovery has thus confirmed what has been clear all along:  the nature of BrandTotal's business played no part in Facebook's decision to investigate and take enforcement action against UpVoice Legacy or BrandTotal's other apps and extensions.  *See* Ex. G at 76:21-77:8, 128:5-11.

> **2.**    **BrandTotal Does Not Even Attempt To Show That It Is Likely To Succeed On The Elements Of Its Interference And Unfair Competition Claims**

As to the actual elements of its claims, BrandTotal argues only that its FAC "*alleges* … the other elements of interference with contracts and prospective contracts and unfair competition."  Mot. at 32 (emphasis added).  But it has not met its burden to *show* a likelihood of success.  BrandTotal's failure to support its claims with actual evidence in its opening brief is alone grounds to deny the motion.  *See TAP Mfg., LLC v. Signs*, 2015 WL 12762269, at *1 (C.D. Cal. Mar. 6, 2015) (preliminary injunctive relief "requires factual support beyond the allegations of the complaint").  And in any event, the evidence shows that BrandTotal is not likely to prevail on its claims.[13]

> *a.*    *BrandTotal is not likely to prevail on its contract interference claim*

"The elements of a cause of action for intentional interference with contractual relations are (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationships; and (5) resulting damage." *Jenni Rivera Enters. LLC v. Latin World Entm't Holdings,*

---

[13] To the extent BrandTotal attempts to introduce new evidence to support its claims in its reply brief, that evidence should be disregarded.  Fairness requires that BrandTotal present its full case in its opening brief and forfeits reliance on any evidence or argument that appears for the first time in reply.  *See Sleep Science Partners Inc. v. Lieberman*, 2010 WL 4316687, at *2 (N.D. Cal. Oct. 26, 2010) (arguments first raised in reply "improperly deprive[] defendants of the opportunity to respond" and are therefore deemed waived).

*Inc.*, 36 Cal. App. 5th 766, 785 (2019).  BrandTotal has failed to show that it is likely to satisfy those elements with respect to its claims that Facebook has interfered with its contracts with clients, panelists, investors, or Google.

As to contracts with customers, BrandTotal presents no evidence that Facebook had "knowledge of the contract with which [it allegedly] interfere[ed]," as is required to state a claim.  *Id.* at 783.  BrandTotal points only to internal Facebook emails referencing BrandTotal's contractual relationship with Fiat Chrysler, *see* Mot. at 32 (citing Dkt. Nos. 120-7 & 120-8), but there is no evidence that that relationship has been disrupted in any way.  Indeed, in identifying ███████ ████████████████████████████████████████████████████████████████████ ███████████████████████  Ex. P at 39:10-40:1.  And in any event, those emails came *after* Facebook sent its notice to Google.  *See supra* pp. 19-20.  BrandTotal points to no evidence that Facebook had knowledge of any customer contract with which Facebook allegedly interfered.

Nor is there evidence that Facebook knew that any interference with BrandTotal's customer contracts "was certain or substantially certain to occur as a result of [Facebook's enforcement] action," as is required to satisfy this tort's intent element.  *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1148 (2004).  BrandTotal argues that Facebook knew that Google would respond to Facebook's email by removing BrandTotal's extensions, *see* Mot. at 32, but, even assuming that to be true, that is insufficient to establish the requisite knowledge of interference.  Prior to its email to Google, Facebook knew that an extension's "removal from [the] Chrome Store does not remove the plugin," Ex. A at 1174, meaning that already-installed extensions continue to operate even after Google takes them down.[14]  There is, therefore, no evidence that Facebook knew that its email to Google would interfere with BrandTotal's ability to perform any of its obligations under its existing contracts with customers.

Likewise, BrandTotal presents no evidence that panelists had any contractual obligation to share their information with BrandTotal.  It offers no argument that it is likely to succeed on that claim.

As to investors, BrandTotal's FAC alleges vaguely that its "relations with its investors" have been harmed, FAC ¶ 141, but there is no evidence that any contract has been breached or duty the performance of which has been rendered more burdensome.  In his declaration, Mr. Leibovich states

---

[14] And that is, indeed, ██████████████████.  *See* Ex. F at 91:19-93:6.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   only that ████████████████████████████████████████████████████████ Dkt.

2   125-10 at ¶ 9, but not that any *current* investor either withdrew funding that it had agreed to provide

3   or reneged on any obligation to provide additional funding.

4       Finally, BrandTotal similarly fails to provide any evidence or even argument showing that it

5   is likely to succeed in its claim that Facebook's "conduct has caused and will disrupt or cause the

6   breach of BrandTotal's valid contracts with Google," FAC ¶ 146.   This is, perhaps, because

7   BrandTotal's contract with Google has not been disrupted.   Prior to any enforcement by Facebook,

8   *Google* had removed several of BrandTotal's apps and extensions *pursuant to* its Google Chrome Web

9   Store Developer Agreement, which provides that Google may, at any time, remove extensions that

10  violate a third party's terms of services.   *See* Chrome Web Store, *Google Chrome Web Store Developer*

11  *Agreement* at §§ 4.4.1, 7.2, https://tinyurl.com/557xxxrc (last accessed Apr. 9, 2021).   And removing

12  an extension does not terminate the Developer Agreement, which exists between Google and a

13  developer until terminated by either party.   *See id.* at § 10.   As Mr. Dor testified, █████████████

14  █████████████████████████████████████████████, Ex. F at 97:10-11, and BrandTotal has at least

15  one extension available through the Chrome Web Store, *see* Chrome Web Store, *Desktop for*

16  *Instagram*, https://tinyurl.com/4tz2ehzp (last accessed Apr. 9, 2021).   BrandTotal, therefore, has not

17  shown a likelihood of success on any of its interference with contract claims.

18          b.      *BrandTotal is not likely to prevail on its interference with prospective*

19                  *economic advantage claim*

20      To prevail on its claim for tortious interference with prospective economic advantage,

21  BrandTotal must show: (1) an economic relationship between it and a third party, "with the probability

22  of future economic benefit"; (2) Facebook's "knowledge of the relationship"; (3) "intentional acts on

23  the part of [Facebook] designed to disrupt the relationship"; (4) "actual disruption of the relationship";

24  and (5) economic harm proximately caused by those intentional acts.   *Korea Supply Co. v. Lockheed*

25  *Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003).   And because there is "a broader range of privilege to

26  interfere … when the relationship or economic advantage interfered with is only prospective," *Pacific*

27  *Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990), BrandTotal must also show

28  that Facebook's conduct "was wrongful by some legal measure other than the fact of interference

itself," *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 393 (1995).

BrandTotal's motion presents neither evidence nor even any argument that it is likely to succeed in establishing any of these elements.   For this reason alone, BrandTotal is not entitled to any preliminary injunctive relief on the basis of its intentional interference with prospective economic advantage claim. *See TAP Mfg., LLC*, 2015 WL 12762269, at *1 (party seeking preliminary injunction must produce "factual support beyond the allegations of the complaint").

BrandTotal's silence on this point is not surprising, because the evidence shows that BrandTotal cannot establish that any of the prospective relationships with which Facebook allegedly interfered had any probability of future benefit.  During his deposition, Mr. Leibovich could offer only

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████ [15] Ex. P at 73:18-19, 105:20-106:8, 113:4-11, 120:22-121:24. *See also Youst v. Longo*, 43 Cal. 3d 64, 71 (1987) (plaintiff must show that it is "reasonably *probable* that the lost economic advantage would have been realized but for the defendant's interference").

The evidence also shows that Facebook's actions were not independently wrongful.  To the contrary, Facebook had every legitimate and neutral reason to take enforcement action against BrandTotal's repeated scraping activity. *See supra* pp. 17-23.  BrandTotal has not and could not show that it is likely to succeed on its interference with prospective economic advantage claim.

> ### c.     *BrandTotal is not likely to prevail on its unfair competition claim*

BrandTotal asserts that Facebook engaged in the three types of wrongful conduct prohibited by the California Business and Professions Code § 17200, *et seq.* ("UCL"): "unlawful" business acts or practice, "unfair" business acts or practice, and "fraudulent" business acts or practice. *See FAC* ¶¶ 170-197; Mot. at 32-33.  But the single paragraph that BrandTotal devotes to this argument in its motion for preliminary injunction falls far short of satisfying BrandTotal's burden to establish a

---

[15] During his deposition, Mr. Leibovich identified ████████████████████████████████
████████████████████████████ *See* Ex. P at 54:16-19, 56:13-23.  To be actionable, the failure to renew a contract must satisfy the elements of an interference with prospective economic advantage claim, not interference with contract. *See Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1147 (2020). Accordingly, there must have been a reasonable probability that the former customers would have renewed but for Facebook's alleged interference.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1    likelihood of success on any of these prongs.

2         ***Unlawful Prong.***   In its amended complaint, BrandTotal alleges that "Facebook's tortious

3    interference with BrandTotal's current and prospective business, contractual, and investor

4    relationships are unlawful."  FAC ¶ 186.  But, as described at *supra* pp. 23-25, BrandTotal has not

5    established any tortious interference violation, nor has it made any argument in its preliminary

6    injunction brief as to how Facebook's conduct is otherwise unlawful.  Because BrandTotal cannot

7    establish a likelihood of prevailing on its tortious interference claims, this derivative claim must also

8    fail.  *See Aleksick v. 7-Eleven*, 205 Cal. App. 4th 1176, 1185 (2012) ("When a statutory claim fails, a

9    derivative UCL claim also fails."); MTD Order at 16 (dismissing counterclaim under the "unlawful"

10   prong that was "based on its theories of tortious interference").

11        ***Unfair Prong.***   BrandTotal also asserts that "Facebook's termination of access to the Facebook

12   network and false allegations in the take-down notice to Google were monopolist and anti-competitive,

13   not just as to BrandTotal, but as part of a corporate policy to stifle all competition and monopolize

14   commercial advertising data on its site."  Mot. at 33.  BrandTotal's theory under the UCL's "unfair"

15   prong is that Facebook was (and is) required to aid its alleged competitors by providing them

16   "commercial advertising data on its site."  Mot. at 33.  This theory—and not the challenged conduct—

17   is anathema to the policy and spirit of the antitrust laws.  "[T]here is no duty to aid competitors."

18   *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1131 (9th Cir. 2004).  To the contrary,

19   "compelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion."

20   *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004).  Applying

21   these principles, the California Court of Appeal has held that "the mere refusal to deal does not violate

22   the spirit or policy of antitrust law."  *People's Choice Wireless, Inc. v. Verizon Wireless*, 131 Cal. App.

23   4th 656, 667 (2005).  Instead, a plaintiff relying on a refusal to deal theory under the UCL must satisfy

24   the same standard as federal antitrust law: establishing that (1) the defendant has conducted "an abuse

25   of monopoly power in a relevant market" and (2) an "exception" to the "sacrosanct" right to refuse to

26   deal applies.  *Id.*  BrandTotal does not come close to satisfying either requirement.

27        BrandTotal cannot establish an abuse of monopoly power in a relevant market because it has

28   provided no evidence of how the "relevant market" should be defined.  "Without a definition of the

27

1   relevant market, the existence of market power … cannot be assessed." *Epic Games, Inc. v. Apple*

2   *Inc.*, 2020 WL 5993222, at *9 (N.D. Cal. Oct. 9, 2020).  The determination of a "relevant market" is

3   "a highly factual question."  *Id.* at *8.  Accordingly, when a plaintiff fails to establish "the record to

4   define the relevant antitrust market," the plaintiff "has not established likelihood of success" on a

5   monopolization-based claim.  *Id.* at *12.  Here, BrandTotal offers *no evidence* to establish a relevant

6   market.  Instead, BrandTotal merely declares that the relevant market is "commercial advertising data

7   on [Facebook's] site."  Mot. at 33.  This is insufficient.  And the lack of such evidence is unsurprising,

8   as the Ninth Circuit has recognized that "many courts have rejected antitrust claims reliant on proposed

9   advertising markets limited to a single form of advertising."  *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109,

10   1123 (9th Cir. 2018).  BrandTotal cannot arbitrarily gerrymander a market that is "not natural,

11   artificial, and contorted to meet [its] litigation needs."  *Id.* at 1121 (internal quotation marks omitted).

12   Moreover, attempting to establish a market comprised of only Facebook's site is doubly problematic

13   because, in general, a company's "own products do not themselves comprise a relevant product

14   market."  *Apple, Inc. v. Pystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008).  Such single-

15   brand markets are, "at a minimum, extremely rare."  *Id.*

16          Even beyond this threshold defect, BrandTotal has also failed to establish that Facebook's

17   conduct fits within an accepted "exception" to the otherwise "sacrosanct" "right to refuse to deal."

18   *People's Choice Wireless*, 131 Cal. App. 4th at 667.  Courts are "very cautious" to recognize any

19   exceptions to the refusal to deal principle.  *Trinko*, 540 U.S. at 408.  The Supreme Court recognized

20   such an exception in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), but that

21   case is "at or near the outer boundary of [Sherman Act] § 2 liability," *Trinko*, 540 U.S. at 409; *Reveal*

22   *Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 1002 (N.D. Cal. 2020) (summarizing "three

23   significant factors" present in *Aspen Skiing* that justified exception).  BrandTotal has provided *no*

24   evidence to satisfy this limited exception to the general rule and thus cannot show a likelihood of

25   success on the merits.  *See, e.g.*, *Huawei Techs., Co, Ltd. v. Samsung Elecs. Co, Ltd.*, 340 F. Supp. 3d

26   934, 953 (N.D. Cal. 2018) ("Because Samsung has offered no evidence that Huawei has outright

27   refused to deal with Samsung, *Aspen Skiing* offers no relief here." (internal quotation marks omitted)).

28   To the contrary, BrandTotal's alleged facts affirmatively *defeat* several prerequisites to invoke the

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   *Aspen Skiing* exception.  *See* Dkt. 132 at 19-21.

2          The Ninth Circuit has affirmed the denial of a preliminary injunction when the movant failed

3   to offer "proof of some actual or threatened impact on competition." *Aspex Eyewear, Inc. v. Vision*

4   *Service Plan*, 389 F. App'x 664, 666 (9th Cir. 2010).  Here, like in *Aspex Eyewear*, given the lack of

5   evidence put forward by BrandTotal, "any conclusion on this record that [the alleged conduct] would

6   diminish competition in the relevant market would be speculative." *Id.*

7          ***Fraudulent Prong.***   The Court dismissed *with prejudice* BrandTotal's UCL claim "to the

8   extent" it was based on the "fraudulent" prong.  MTD Order at 17-18.  BrandTotal's attempt to revive

9   its "fraudulent" prong claim is in improper circumvention of this Court's dismissal with prejudice.

10  Moreover, BrandTotal's newest theory under the "fraudulent" prong is unlikely to succeed on the

11  merits.    BrandTotal  now  attempts  to  base  its  claim  on  "Facebook's  past  dealings  and

12  misrepresentations and fraudulent statements to Google." Mot. at 33.  But the "fraudulent" prong

13  requires a litigant "to show deception to some members of the public, or harm to the public interest,

14  and not merely to the direct competitor." *Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.*, 178 F.

15  Supp. 2d 1099, 1121 (C.D. Cal. 2001).  Such a "direct competitor" is "not entitled" to the protection

16  of the fraudulent prong of the UCL for alleged harm to itself "because it is not a member of the public

17  or a consumer entitled to such protection."[16]   *Id.*   For this reason, BrandTotal's claim under the

18  "fraudulent" prong is unlikely to succeed.

19          C.      **BrandTotal's Declaratory Judgment Claims Cannot Support The Preliminary**

20                  **Injunction That It Seeks**

21          BrandTotal's  claims  for  declaratory  relief  do  not  entitle  them  to  an  injunction  against

22  Facebook.  *First*, a declaration on the legality of BrandTotal's actions has no relation to its requested

23  relief, which seeks to enjoin some allegedly unlawful action by Facebook.  *Second*, BrandTotal has

24  not sought any sort of preliminary declaration, it seeks only a preliminary *injunction*.  But even if it

25  had, any request for a preliminary declaration would be improper under the Declaratory Judgment Act.

26

27  [16] Neither is Google a member of the public, as "[s]ophisticated companies … are not members of
    the 'general public.'"  *Nat'l Rural Telecommunications Co-op v. DIRECTV, Inc.*, 319 F. Supp. 2d
28  1059, 1078 n.28 (C.D. Cal. 2003) (quoting *Rosenbluth Int'l, Inc. v. Superior Court*, 101 Cal. App.
    4th 1073 (2002)).

1  Finally, BrandTotal's claims for declaratory relief are unlikely to succeed on their own terms because

2  its own conduct, as alleged, violates the very statutes under which it seeks declaratory relief.

3  **1.  BrandTotal's Declaratory Judgment Claims Are Irrelevant**

4  There is no need for the Court even to consider BrandTotal's claims for declaratory relief

5  because they have nothing to do with the preliminary injunction that BrandTotal seeks in this motion.

6  Through its claims for declaratory relief, BrandTotal seeks to establish that it did not violate the law—

7  and in particular that it did not violate the CFAA, CDAFA, or interfere with Facebook's contractual

8  relationships with users.  FAC ¶¶ 100, 109, 116.   To enjoin Facebook from taking some action,

9  however, BrandTotal must show not that BrandTotal acted lawfully, but that *Facebook* acted

10  unlawfully.  "An injunction is a 'remedy potentially available only after a plaintiff can make a showing

11  that some independent legal right is being infringed—if the plaintiff's rights have not been violated,

12  he is not entitled to any relief, injunctive or otherwise.'"  *Alabama v. U.S. Army Corps of Engineers*,

13  424 F.3d 1117, 1127 (11th Cir. 2005); *see also McCoy v. Stronach*, 2020 WL 4200084, at *2 (E.D.

14  Cal. July 22, 2020) ("[A]n injunction is only available when the 'complaint states a sound basis for

15  equitable relief.'" (citation omitted)).  Because resolving BrandTotal's claims for declaratory relief

16  would have no bearing on BrandTotal's entitlement to a preliminary injunction, they are irrelevant.

17  Moreover, BrandTotal seeks only a preliminary injunction; it has not requested any kind of

18  preliminary *declaratory* relief based on its three declaratory judgment claims.  But to the extent

19  BrandTotal attempts to seek such a declaration in its reply brief, such an attempt would not only be

20  waived; it would also be improper because the Court lacks authority to provide a preliminary

21  declaratory judgment.  The Declaratory Judgment Act authorizes courts to declare the parties' rights

22  in a "*final* judgment." 28 U.S.C. § 2201(a).  And if the requisite standards are met, this Court may

23  issue a preliminary *injunction*.  But no authorizes this Court to issue a preliminary *declaration*.  *See*

24  *Breedlove v. Am.'s Servicing Co.*, 2010 WL 1338089, at *1 n.1 (D. Ariz. Mar. 31, 2010) (declining to

25  issue preliminary declaratory relief because "[d]eclaratory relief and preliminary injunctions are

26  governed by different standards and are considered at different stages of litigation").

27  **2.  BrandTotal Is Not Likely To Succeed On Its Declarator Judgment Claims**

28  Beyond those threshold hurdles, BrandTotal's own allegations and the evidence show that it is

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1  engaging in the very violations for which it seeks declarations.  In Counterclaim III, BrandTotal seeks

2  a declaration that it has not interfered with Facebook's contracts with users.  But under their contracts

3  with Facebook, users agree not to "collect[] data from [Facebook] using automated means" or "give

4  access to their [Facebook] account."  Compl. ¶ 26.  UpVoice 2021 works by ██████████████

5  ███████████████████████████████████████████████████████████████

6  Ex. L at 47:12-16, by automated means, Order on MTD at 11.  By relying on its panelists to login to

7  their Facebook accounts to gain access to Facebook, BrandTotal caused panelists to violate the terms

8  of their contracts with Facebook.

9          In Counterclaims I and II, BrandTotal seeks declarations that it does not violate the CFAA and

10  CDAFA.  Both prohibit accessing a computer without permission or "after such permission has been

11  revoked explicitly."  *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067 (9th Cir. 2016).

12  BrandTotal concedes that Facebook revoked BrandTotal's permission to access the Facebook

13  networks, FAC ¶ 162, and admits that it continued to collect information from password-protected

14  locations on Facebook's computers after October 2020.  *Id.* at ¶¶ 51-54, 60, 76.  BrandTotal's

15  contention that the CFAA and CDAFA are inapplicable because it collects "public" information with

16  user consent has already been squarely rejected by the Ninth Circuit.  As the Ninth Circuit explained

17  in *hiQ*, the CFAA's "prohibition on unauthorized access" applies to "information delineated as private

18  through use of a permission requirement of some sort[,] … such as a password gate."  938 F.3d at

19  1001.  Accordingly, "gathering user data that was protected by Facebook's username and password

20  authentication system" without authorization violates the CFAA.  *Id.* at 1002.  BrandTotal is not likely

21  to succeed on the merits of any of its counterclaims against Facebook.  Its request for a preliminary

22  injunction can and should be denied on that basis alone.

23  **V.      THE BALANCE OF EQUITIES WEIGHS AGAINST EXTRAORDINARY RELIEF**

24          BrandTotal has not met its burden to show that the balance of equities tips in its favor.

25  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138-39 (9th Cir. 2009).  BrandTotal's claim that the equities

26  weigh in its favor because it purportedly faces extinction if it is not permitted to scrape Facebook's

27  platform is belied by the discovery to date.  While this Court "assume[d] for the sake of argument" in

28  its Order denying BrandTotal's motion for a TRO that the balance of equities tip in BrandTotal's favor,

31

1   Dkt. 58 at 31, the facts underlying that assumption are undermined by the record.  In making that

2   assumption, the Court concluded that "BrandTotal is not able to operate its business while it lacks

3   access to Facebook's products … [that] BrandTotal is losing customers, faces new difficulty attracting

4   investment, and is at risk of eventually shutting down."  *Id.*  As discussed *supra* pp. 11-14, BrandTotal

5   is continuing to access data from the Facebook platform through its Phoenix and Social One

6   applications, has hired new employees, signed new customers and renewed major contracts, is in open

7   discussion with investors about future investment, and has sufficient revenue to continue operating for

8   more than a year.

9           As this Court recognized in its Order denying BrandTotal's motion for a TRO, "Facebook has

10  legitimate interests in maintaining public confidence in its products and avoiding potential liability for

11  data privacy breaches."  Dkt. 58 at 30.  Given the lack of evidence of any precarity in BrandTotal's

12  financial position, the balance of equities tips in favor of Facebook.  That is especially true where

13  discovery has revealed further evidence of BrandTotal's unclean hands.  BrandTotal made the decision

14  to violate Facebook's terms, and thus is responsible for its dilemma.  *See Facebook, Inc. v. Power*

15  *Ventures, Inc.*, 252 F. Supp. 3d 765, 784 (N.D. Cal. 2017), *aff'd*, 749 F. App'x 557 (9th Cir. 2019)

16  (balance of hardships weighed in favor of permanent injunction even though injunction threatened

17  Power Ventures' livelihood).  Where BrandTotal has breached and continues to breach Facebook's

18  terms, "an injunction would potentially incentivize similar breaches among [scrapers]."  *Epic Games*,

19  2020 WL 5993222, at *21 (concluding that balance of equities weighed in Apple's favor where Epic

20  Games breached its agreements and Apple's guidelines).  BrandTotal's CEO testified that ███████

21  ████████████████████████████████████████████████████████████████████████████

22  █████████████████████████████████████████████████  Documents produced after that

23  deposition revealed that the conduct was more egregious.  ████████████████████████

24  ████████████████████████████████████████████████████████████████████████████

25  ███████████████████████████

26          As this Court has recognized, "BrandTotal built its business on ignoring Facebook's

27  prohibition on automated access without permission."  Dkt. 58 at 34.  Taking BrandTotal's inability

28

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1  to demonstrate anything even approaching irreparable harm together with its unclean hands, the

2  balance of equities tip sharply in Facebook's favor.

3  ## VI.   THERE IS NO PUBLIC INTEREST IN PERMITTING ILLEGAL DATA SCRAPING

4  Finally, BrandTotal continues to take the remarkable position that there is a public interest in

5  reinstating platform access to a third-party that engaged in impermissible data scraping, even after this

6  Court's conclusion in its Order denying BrandTotal's TRO that "the public interest requires denying

7  the extraordinary relief BrandTotal seeks." Dkt. 58 at 34.   This despite the fact that BrandTotal

8  enforces the same anti-scraping term on its own site, positioning itself as the sole gatekeeper of data

9  it has scraped from LinkedIn, Facebook, Instagram, YouTube, Twitter, and Amazon.  Mehta Decl. Ex.

10  3, BrandTotal, *Service Terms and Conditions* § 5.1.  It has not met its burden to establish that an

11  injunction would be in the public interest.

12  The public interest is served by permitting Facebook to take necessary steps to protect privacy

13  of users of the Facebook platform.  "In particular, the public has a strong interest in the integrity of

14  Facebook's platforms, Facebook's policing of those platforms for abuses, and Facebook's protection

15  of its users' privacy." *Stackla, Inc.*, 2019 WL 4738288, at *6; *Facebook, Inc. v. Power Ventures, Inc.*,

16  252 F. Supp. 3d 765, 782 (N.D. Cal. 2017), *aff'd*, 749 F. App'x 557 (9th Cir. 2019) ("The public has

17  an interest in ensuring that computers are not accessed without authorization.").  This is especially true

18  where BrandTotal has evinced little care for the user data it is collecting.  To take one example,

19  BrandTotal has acknowledged that its UpVoice extension ████████████████████████

20  ████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████

26  ██████████████████████████████████████████████

27

---

28  [17] Mr. Dor testified to that fact only *after* BrandTotal denied that such a problem existed in response to Facebook's Request for Admission.  *See* Ex. FF at 4.

33

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    Further, granting BrandTotal's preliminary injunction would have the effect of second-

2  guessing, through a federal civil action, Facebook's considered exercise of its authority to maintain

3  the integrity of its platforms.  Although BrandTotal now assures this Court that it is only collecting

4  so-called "public" data, allowing this exception to Facebook's prohibition on automated collection

5  would incentivize countless developers to send code to Facebook (and likely other sites that have a

6  similar prohibition) and demand Facebook undertake the burdensome project of reviewing and

7  approving code that could later change without Facebook's knowledge.  Not to mention that Facebook

8  has no way of monitoring or assuring that a third party is obtaining the consent of Facebook users

9  before collecting their data or piggybacking on their login information. It is impracticable to assume

10  Facebook could review the code and monitor the third-party consent processes of every entity that

11  wants to scrape data from the Facebook platform.  *See* Ex. GG ("[T]he number of developers who

12  access or collect advertising-related data from Facebook is enormous.").  Facebook has instead created

13  a workable solution of preventing automated collection unless it is done through Facebook's

14  authorized means.  BrandTotal believes it is entitled to a special set of permissions on the Facebook

15  platform that Facebook would then need to offer to every scraping entity.  There is no interest in

16  allowing BrandTotal to circumvent that system simply because it is unwilling to design its product to

17  work within those authorized means.

18    BrandTotal goes to great lengths to analogize its data scraping to the data collection in *hiQ*,

19  pointing to the Ninth Circuit's emphasis on the "maximizing the free flow of information on the

20  Internet," 938 F.3d at 1004, BrandTotal ignores the fact that it cannot get the advertising data it collects

21  without first piggybacking on a user's login to scrape information about the advertisement.  As Mr.

22  Dor testified, ██████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████. Ex. L at 57:2-

24  8.  The data is fundamentally different from the data in *hiQ*, which was publicly-available without

25  scraping any information from the user.  Indeed, *hiQ* itself recognized that platforms could protect

26  themselves from data scraping through enforcement of their own contract rights. *hiQ*, 938 F.3d at 1004

27  (reiterating that "victims of data scraping are not without resort" because "other causes of action, such

28  as … breach of contract … may also lie").  While BrandTotal frames the collection of advertising data

34

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

as innocuous, that data belongs to advertisers.  Mehta Decl. Ex. 4 ¶ 9 ("Advertisements and ad creatives belong to the user that created the advertisement and often involve copyrighted works."); Ex. C at 28:2-4 ("[O]ur products are built to provide advertisers control over their data.  They enter the advertising; they control their data.").  And as Mr. Clark testified, many advertisers on Facebook are individuals, meaning that when BrandTotal scrapes the information of the advertiser, it is scraping an individual's first and last name.  Ex. B at 104:18-20.  Further, Facebook provides a service to its advertisers; advertisers choose to advertise on the Facebook platform knowing its Terms of Service, and do not expect that Facebook will allow third parties to sell and monetize information about their advertisements.  Mehta Decl. Ex. 4 ¶ 9.

There is no public interest in requiring Facebook to allow third-parties to violate its terms simply because they proclaim their violation innocuous.  Facebook has developed its terms and extensive reporting and enforcement program to ensure the privacy of its users, including advertisers, and the integrity of its system.  Mehta Decl., Ex. 1 ¶¶ 5-9.   There is no public interest in forcing Facebook to make exceptions to those terms or to take BrandTotal at its word that it scrapes only public data or adequately gets user consent.  The ramifications for technology companies and their users would be far-reaching and at odds with the efforts that Facebook and other companies are taking every day to enhance protection for user data.

## VII.    CONCLUSION

The Court should deny the Plaintiffs' motion for a preliminary injunction.


Dated:  April 9, 2021                                WILMER CUTLER PICKERING HALE AND
                                                    DORR LLP


                                                By:   */s/ Sonal Mehta*
                                                    Sonal N. Mehta

                                                    *Attorney for Plaintiff*
                                                    *Facebook, Inc.*

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 9, 2021, I electronically filed the above document with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all registered counsel.


Dated:  April 9, 2021                                    By:    */s/ Sonal Mehta*
                                                                     Sonal N. Mehta

36