# Exhibit B

REDACTED VERSION OF
DOCUMENT SOUGHT TO BE SEALED

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO/OAKLAND DIVISION

```
---------------------------------X
FACEBOOK, INC., a Delaware       )
corporation,                     )
                                 )  Case No.
        Plaintiff/Counterclaim   )  3:20-CV-07182-JCS
        Defendant,               )
                                 )
        vs.                      )
                                 )
BRANDTOTAL, LTD., an Israeli     )
corporation, and UNIMANIA,       )
INC., a Delaware corporation,    )
                                 )
        Defendants/Counterclaim  )
        Plaintiffs.              )
---------------------------------X
```

** H I G H L Y    C O N F I D E N T I A L **

ATTORNEYS EYES' ONLY

VIDEOCONFERENCE VIDEOTAPED 30(b)(6) DEPOSITION OF

FACEBOOK, INC.

by corporate designee

MICHAEL CLARK

Wednesday, February 10, 2021

10:41 a.m. (MT)

Remotely Reported Stenographically By:
Mayleen Ahmed, RMR, CRR, CRC, CSR-CA 14380
Job No.: 001306

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 2

1              REMOTE APPEARANCES

2

   On behalf of the Plaintiff:
3
       ARI HOLTZBLATT, ESQ.
4      ROBIN BURRELL, ESQ.
       WILMER CUTLER PICKERING HALE AND DORR LLP
5      1875 Pennsylvania Avenue, NW
       Washington, D.C. 20006
6      202.663.6964
       ari.holtzblatt@wilmerhale.com
7      robin.burrell@wilmerhale.com

8

9
   On behalf of Defendant/Counterclaim Plaintiff:
10
       DUSTIN L. TAYLOR, ESQ.
11     HUSCH BLACKWELL LLP
       1801 Wewatta Street - Suite 1000
12     Denver, Colorado 80202
       dustin.taylor@huschblackwell.com
13

14

15  ALSO PRESENT:

16  JESSICA ROMERO, Counsel, Facebook, Inc.

17  MICHAEL CHMELAR, Counsel, Facebook, Inc.

18  STACY CHEN, Counsel, Facebook, Inc.

19  KEVIN JOHNSON, Videographer, TransPerfect

20                  ---o0o---

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 32

1              Do you know whether this document was

2   created before or after Facebook began its

3   investigation into BrandTotal?

4              MR. HOLTZBLATT:  Object to form.

5         A.   As there were multiple investigations,

6   could you be more specific?

7         Q.   Yes.

8              Do you know how many investigations

9   there were into BrandTotal?

10        A.   I believe I would classify them as two

11  investigations in the context of this time frame.

12        Q.   What do you mean by "this time frame"?

13        A.   Oh, I just -- referring to UpVoice and

14  Unimania as the time frame.

15        Q.   When you say "this time frame," are you

16  talking November of 2020?

17        A.   "Time frame" is probably the wrong word.

18             In the course of the two investigations:

19  UpVoice and Unimania.

20        Q.   I'd like to focus specifically on the

21  investigation into UpVoice.

22             Do you know whether Exhibit 2 was

23  created before or after Facebook began its

24  investigation into UpVoice?

25             MR. HOLTZBLATT:  Object to form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 33

1        A.     The document as a whole, which is

2    documented here and has a specific revision history,

3    was October 23rd.

4              The procedures themselves existed prior

5    to this date.

6        Q.     But it's correct, then, that the

7    document itself was created after Facebook began its

8    investigation into UpVoice?

9        A.     Based -- based on -- I believe so.

10       Q.     Does this document accurately describe

11   the protocol used in the investigation of UpVoice?

12             MR. HOLTZBLATT:   Object to form.

13   ███    ████████████████████████████

██ ████████████████████████████████████

██ █████████████████████████████████████

██ █████████████████████

17       Q.     And is that the process and procedure

18   used during the investigation of UpVoice?

19       A.     The technical investigation portion of

20   UpVoice was done by eCrime, by another team instead

21   of Facebook.

22       Q.     And is -- strike that.

23             Did the eCrime team use this protocol?

24       A.     The scraping covered incident reporting

25   portion of the UpVoice -- UpVoice investigation used

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    this protocol.

2         Q.    How many portions of the UpVoice

3    investigation are there?

4              MR. HOLTZBLATT:  Object to form.

5         A.    Could you be more specific?

6         Q.    Yeah.  So, I believe you stated the

7    scraping covered incident reporting portion of the

8    UpVoice investigation used this protocol; is that

9    correct?

10        A.    That is correct.

11        Q.    I'm trying to understand how many

12   portions of the investigation there are if the

13   scraping covered incident reporting is one portion.

14             Does that make sense?

15        A.    That makes --

16             MR. HOLTZBLATT:  Object to form.

17        A.    -- sense.

18        Q.    Go ahead.

19        A.    No.  Please.

20        Q.    I was just going to say -- I'll actually

21   strike that.  I want to hear what you have to say.

22             So to re-ask the question.  I'm trying

23   to understand how many portions there are if the

24   scraping covered incident reporting is one portion?

25        A.    As I've mentioned before, the technical

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 35

1    investigation, the enforcement, and the scraping

2    covered incident are the three primary portions.

3    And so the scraping covered incident portion of this

4    document and of the External Data Misuse team is

5    relevant to UpVoice.

6         Q.    So let me make sure I understand this.

7               There are three macro portions in the

8    investigation:  The first is the technical

9    investigation, the second is the enforcement, and

10   the third is the scraping covered incident portion;

11   is that correct?

12        A.    Correct.

13        Q.    The scraping covered incident portion

14   uses the protocol identified in Exhibit 2, correct?

15        A.    Correct.  And the other two for external

16   data misuse scraping investigations.

17        Q.    Are you saying the other two portions

18   also use this document for external data misuse

19   scraping investigations?

20        A.    Yes.

21        Q.    What team is responsible for the

22   technical investigation?

23              MR. HOLTZBLATT:  Object to form.

24        A.    The -- I'm slightly confused by your

25   question.  Could you be more specific?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 36

1      Q.    What aspect of the question is confusing
2   so I can clarify?
3      A.    Do -- could you ask it again?
4      Q.    I'll ask a little bit broader.
5            Who is responsible for the technical
6   investigation portion of an investigation?
7            MR. HOLTZBLATT:  Object to form.
8      A.    Of a scraping investigation?
9      Q.    Yes.
10     A.    Okay.  Normally, the External Data
11  Misuse team handles the technical investigation and
12  enforcement and scraping covered incident reporting
13  of scraping incidents.  There are other teams which
14  get involved at certain times in those
15  investigations.  The one other team would be eCrime,
16  which Sanchit, in your email, is a part of, which
17  helped in the UpVoice-specific investigation.
18     Q.    Are any other formal protocols used
19  during the -- either the technical or the
20  enforcement portions of the investigation?
21           MR. HOLTZBLATT:  Object to form.
22     A.    Today or --
23     Q.    Let's say in 2020.
24     A.    In 2020 --
25           MR. HOLTZBLATT:  I'm going to -- let me

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 43

1   engaged in the scraping incident?

2          A.    If -- I'm going to refer to Exhibit 3

3   for a moment.

4          Q.    Okay.

5          A.    ███████████████████   ███████████

    █ ████████████████████████████████████████

    █ ██████████████████████████████████████

    █ ███████████████████████████████████████

    █ ████████████████████████████████

10         Q.    Okay.

11         A.    ██████████████████████████████

    █ ████████████████████████████

13         Q.    Sure.  We can go with that.

14   ██████████████████████████████████████

    █ ████████████████████████████████████████

    █ ████████████████████████████████████

    █ ██████████████████████

18                Does that distinction make sense to you?

19         A.    In the context of this conversation,

20   yes.

21         Q.    Great.  Sorry.  I had to go back and

22   remember the original question before we went down

23   the naming rabbit hole we did.

24         A.    Okay.

25         Q.    In determining -- strike that.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 44

1 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇ ▇▇▇▇▇▇▇▇

4          MR. HOLTZBLATT:   Object to form.

5     A.    What do you mean by "consider"?

6     Q.  ▇▇▇▇▇▇▇▇▇▇▇

▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇ ▇▇▇▇▇▇▇▇

10    A.  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇ ▇▇▇▇▇▇▇▇▇▇▇▇

12     ▇ ▇▇▇▇▇▇▇▇▇▇

▇ ▇▇▇▇▇▇▇▇

14     ▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

15     ▇ ▇▇▇▇▇▇▇▇▇▇

▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇

▇ ▇▇▇▇▇▇▇▇▇▇▇▇

18          MR. HOLTZBLATT:   Object to form.

19    A.  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇

▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇ ▇▇▇▇▇▇▇▇▇▇▇▇

▇ ▇▇▇▇▇▇▇▇▇▇

▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 45



```
 1  ████████████████████████████████████
    ████████████████.
 3      Q.  ██████████████████████████
    ███████████████████████████████
    █████████████████████
 6          MR. HOLTZBLATT:  Object to form.
 7      A.  ███████████████████████████
    █████████████████████
 9      ██    █████   ████████████████████
    █████████████████████████████
    ████.
12          ██████████████████████████
    ████████████████████████████
    ██████████████
15      ██    █████████████████████████
    ███████████████████████████████████
    ███████████████████████████████████
    ███████████████████████████████
19          ████████████████████████
    ██████████████████████████████
```

21      Q.    What do you understand --

22            MR. HOLTZBLATT:  Dustin -- go ahead.

23            Dustin, I was -- I don't know where we

24  are in the line of questioning, but I -- you know,

25  we've been going for about an hour, so I just want

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 48

1    that.

2         Q.    What additional elements have a URL?

3         A.    The creative; the ad target where --

4    where it clicks through and the action after are two

5    examples.

6         Q.    Do you have any other examples?

7         A.    Not off the top of my head.

8         Q.    And the number of comments, reactions,

9    and shares associated with an advertisement is

10   something else I would include in "advertising

11   data."

12             Do you understand that?

13        A.    I do understand that.

14        Q.    All right.  So to summarize, that when I

15   use the term "advertising data," I'm referring only

16   to the advertisement, texts, images or video; the

17   sponsor of the advertisement; the URL of the

18   advertisement; and the number of comments,

19   reactions, or shares associated with the

20   advertisement.

21             Do you understand that?

22        A.    I do understand that.

23             And that is -- if that's how we're

24   referring to "advertising data," there are

25   additional things that are included around

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 49

1    advertising data.

2         Q.    Such as?

3         A.    And it's why I've been asking the

4    question.

5               Such as other target information that

6    are associated with the individual.

7         Q.    What do you mean by "other target

8    information associated with the individual"?

9         A.    For instance, things -- a non-exhaustive

10   list, but examples might include:  Why am I seeing

11   this?  Covered audience IDs.

12              You used the term "sponsor"; I think I

13   would use the term "advertiser."

14              The advertiser name and advertiser IDs.

15   If that's an individual, that is their first and

16   last name and their Facebook user ID.

17        Q.    What is a covered audience ID?

18        A.    A custom audience.  It's -- it's one

19   example of many pieces that are information included

20   in the -- in the ad when it's the data presented in

21   the ad for how to show it.

22        Q.    Mr. Clark, are you familiar -- strike

23   that.

24              ████████████████████████████

   █ ███████████████████████████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 50

1    ████████████████████████████████████

2            MR. HOLTZBLATT:  Object to form.

3    A.    Could you ask that again?

4    Q.    Yes.

5            ████████████████████████████████

6    ████████████████████████████████

7        ██      ██████████

8        ██      ████████████████████████████████

9    ████████████████████████

10   ██      ████████████████████████████████████

11   ████████████████████████████

12   Q.    If the --

13           MR. HOLTZBLATT:  Let me --

14   Q.    -- source code --

15           MR. HOLTZBLATT:  Sorry, Dustin.  Let me

16   just pause.  We've been joined by an additional

17   attorney to the Zoom, so I just want to note for the

18   record that Jessica Romero, in-house counsel at

19   Facebook, has just joined the deposition.

20           Sorry for the interruption, Dustin.

21           MR. TAYLOR:  Thank you, Counsel.

22   BY MR. TAYLOR:

23   Q.    ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 73

1             MR. HOLTZBLATT:  This witness was
2    prepared to answer questions within the scope of
3    Topic 7 and 9.  He's not been put forth by Facebook
4    to answer for Facebook with respect to tools that
5    Facebook makes available for the collection of
6    information through authorized means.  We provided a
7    different witness to answer those questions, who
8    you've already deposed.
9    BY MR. TAYLOR:
10       Q.    Mr. Clark, I'm afraid we may have gotten
11   a little off base.  I want to recenter us.
12            I am trying to understand what is the
13   harm to Facebook from an application that scrapes
14   only an advertisement's text, images, or video?
15            MR. HOLTZBLATT:  Object as asked and
16   answered.
17       A.    The harm is reflected directly in my
18   Declaration.  I can go back through those.  All --
19   all of those elements ties back to the individual.
20            The focus of our investigations is to
21   observe violations of the terms of service, which
22   are specific commitments made to protect both
23   Facebook and its consumers.
24            Scraping and the automated collection of
25   any of that data without permission means it is done

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 74

1   so by subverting controls which are built

2   intentionally into the application, and anything

3   outside of that creates risk for both Facebook as

4   well as the consumer.

5          Q.     Is that risk reduced if Facebook has had

6   the opportunity to review the source code for the

7   program and confirm that it, for example, is not

8   used for other harmful acts like coordinated

9   inauthentic behavior?

10               MR. HOLTZBLATT:  Object to form.

11          A.     From what I understand, the review was

12   static analysis of -- in the UpVoice case, static

13   analysis of what was occurring; in the Unimania

14   case -- or in the investigation, dynamic analysis of

15   traffic.  Which point -- we have no ability to

16   determine or know what happens once the data leaves

17   the client and goes to any third-party servers or

18   services, and how it may be used and what it may be

19   used.

20               What I can share is that data that has

21   been taken in that case in the past can be used for

22   these other purposes.  Therefore, any collection

23   that is done in automated ways without permission

24   happens outside of the channels built intentionally

25   to share where those controls are put in place and

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 75

1    those protections are put in place.

2              And when it happens outside of it, that

3    risk of harm happens whenever data is collected in

4    that way.

5         Q.    Do you understand the term "advertising

6    metrics" as it relates to Facebook advertisements?

7              MR. HOLTZBLATT:  Object to form.

8         A.    I would like -- can you tell me what you

9    mean by "advertising metrics"?

10        Q.    Have you ever heard the term

11   "advertising metrics" used in relation to Facebook

12   advertisement?

13        A.    I'm asking because -- do you mean the

14   metrics that are provided inside of the tool by

15   Facebook for advertisers, or do you mean something

16   else?

17        Q.    Have you heard the term "advertisement

18   metrics" used in relation to Facebook

19   advertisements?

20        A.    I'm going to ask my question again.  I

21   -- in our advertising tools that we provide to

22   businesses or we provide for advertisers, there are

23   metrics made available.  So I've heard the words

24   "advertising metrics," but I just --

25        Q.    Would --

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.    -- don't know if that's what you mean.

2      Q.    I apologize.

3            Would those metrics include the number

4   of comments and reactions or shares associated with

5   the advertisement?

6      A.    I do not know.  I do not work on that

7   tool.

8      Q.    Okay.  Do you understand what the number

9   of comments, reactions, or shares associated with an

10  advertisement means?

11     A.    I do understand what that means.

12     Q.    Okay.  Is --

13     A.    I --

14     Q.    Go ahead.

15     A.    I want to -- I want to follow up in my

16  last answer, that I do understand what that means,

17  and I do also know that when we share metrics of any

18  kind, or analytics, unless data is provided in -- as

19  part of a third-party developer platform, those

20  metrics are presented in an anonymized way.

21     Q.    And on page 4 of your Declaration, I

22  believe it is paragraph 5(e), starting in line 3,

23  you state, "If the URL for the advertisement is

24  scraped."  Do you see that?

25     A.    Line 3, yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 80

1   actions in which the developer has been able to
2   bring themselves into compliance.
3            In any of those instances where the
4   developer was able to bring themselves into
5   compliance, was the developer then able to gain
6   access to information not available through any
7   Facebook API?
8        A.    Thank you for clarifying.
9            None of the cases that I am aware of
10  were they able to get access to information that was
11  not a part of an API or where specific permission
12  was granted.
13       Q.    In any of the instances referenced in
14  paragraph 14 of your Declaration where a developer
15  was able to bring themselves into compliance, was
16  the developer able to gain access to advertising
17  information of a third party?
18            MR. HOLTZBLATT:  Object to form.
19       A.    Were they able to gain access to --
20            THE REPORTER:  We lost the witness.
21            THE WITNESS:  Sorry.  I had "Do Not
22  Disturb" on, and I don't know why that call still
23  came through.
24       A.    In your last question, can you clarify
25  if you mean via a third-party developer platform

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 81

1    API?

2         Q.    I mean, via any method whatsoever.

3              My question is:  In any of the instances

4    referenced in paragraph 14, was a developer able to

5    gain access to advertising information of another

6    party?

7              MR. HOLTZBLATT:  Object to form.

8         A.    I'm asking that clarification.

9              I will answer that, to the best of my

10   knowledge, in an automated means, no.

11        Q.    Mr. Clark, are you aware that Facebook

12   provides advertising information through the

13   Advertising Library, Ad Library?

14             MR. HOLTZBLATT:  Object as out of scope.

15        A.    I am aware, and I am aware that the

16   Advertising Library is intended for human viewing

17   and not built or intended for automated collection,

18   which is why I was very specific in my last answer.

19        Q.    Are you aware that Facebook provides

20   advertising metrics through the Advertising Library

21   for advertisements relating to social, economic, or

22   political issues?

23             MR. HOLTZBLATT:  Object as out of scope.

24        A.    I know that the External Data Misuse

25   team has built protections to prevent scraping or

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 82

1    automated collection of information from the

2    Ad Library.  I do not have detail on exact

3    information that is contained within the Advertising

4    Library.

5         Q.    Do you know what harm, if any, Facebook

6    would suffer by providing advertising metrics

7    information relating to nonsocial, economic, or

8    political issue advertisements?

9              MR. HOLTZBLATT:  Object as out of scope.

10        A.    The harm goes back to -- a very similar

11   question you've asked a few times.  The harm is the

12   violation of Facebook's terms of use around the

13   automated collection of data without permission

14   because that data contains information about

15   individuals and consumers, and the harm both to

16   Facebook as well as to the consumer from that

17   information being gotten and retrieved in unintended

18   ways without permission.

19        Q.    Mr. Clark, I am changing subjects right

20   now.  I'm not sure how long we've been going.  I

21   think about 45 minutes.  It is now 1:00 p.m.

22   Mountain time.

23              Would you like to take a break, or would

24   you like to keep pushing through?

25        A.    What is the next topic we're going into?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 83

1      Q.    The FTC Order.

2            MR. HOLTZBLATT:  Well, I would -- I

3    think I'm going to suggest that we take a lunch

4    break at this point.

5            THE WITNESS:  Yeah.

6            MR. HOLTZBLATT:  Just so we don't find

7    ourselves knee-deep into some new topic and then

8    wanting to eat food.

9            MR. TAYLOR:  Yep.  Let's go ahead and go

10    off the record.

11            THE VIDEOGRAPHER:  We're going off the

12    record.  It's 1:04 p.m.

13            (Lunch Recess taken.)

14            THE VIDEOGRAPHER:  We're back on the

15    record.  It's 1:39.

16    BY MR. TAYLOR:

17      Q.    Welcome back from lunch, Mr. Clark.

18            Before we broke, I know I said we were

19    going to talk about the FTC Order, and we will

20    momentarily.  I just want -- had a couple of

21    questions, looking at my notes on the break.

22            Before we broke, we were talking about

23    the harm to Facebook from the collection of

24    advertising metrics information.

25            Do you remember that?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 84

1       A.     We were talking about the harm in

2    collection of data without permission, automated

3    collection of data without permission.

4       Q.     In part of the discussion, you stated

5    the harm involved the fact that the information

6    contains information about individuals and

7    consumers, correct?

8              MR. HOLTZBLATT:  Object to form.

9       A.     That was one part of it, yes.

10      Q.     What harm is there to Facebook from the

11   automatic, without permission, collection of the

12   total number of impressions for an advertisement?

13      A.     The total number of impressions for an

14   advertisement cannot be gathered without other

15   associated information.  That number does not exist

16   on the endpoint by itself, and the collection of

17   data that comes with it includes other, both

18   personal identifiable information as -- as well as

19   information about the advertisement.

20      Q.     If that information could be gathered

21   without the other information, would there be a harm

22   to Facebook?

23              MR. HOLTZBLATT:  Object to form.

24      A.     Facebook provides the relevant

25   information to advertisers for their own ads.  It

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 85

1   also provides it in human visibility for

2   transparency's sake in the Ads Library.  And if it

3   were able to be made available without creating

4   other risk or harm, could be made available via a

5   part of the third-party developer platform,

6   otherwise, collection of that data is a violation of

7   Facebook terms.

8         Q.    I have a similar question except for the

9   number -- total number of shares.

10              If the total number of shares of an

11  advertisement could be gathered without information

12  about individuals and consumers, what would the harm

13  to Facebook be?

14              MR. HOLTZBLATT:  Object to form.

15        A.    I would give the same answer that I --

16  that I just did.  The harm is in the collection.  If

17  that information can be made available without

18  exposing other information or creating harm for

19  Facebook, the consumer, or the advertiser, it would

20  be made available via a third-party API or intended

21  only for human visibility and not made -- not

22  intended to be collected via automated means without

23  permission.

24        Q.    Was there any event in 2020 that changed

25  the way Facebook enforced automated scraping?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 86

1          MR. HOLTZBLATT:  Object to form.

2     A.     That's a really broad question.

3          Could you be more specific about what

4     you mean by "event"?

5     Q.     Yeah.  So I -- I'm looking at what we

6     have marked as Exhibit 2, the procedure, and note

7     that that was formalized in October 2020, correct?

8     A.     Correct.

9     Q.     I'm trying to understand if there was

10    some event or motivating factor, occurrence --

11    whatever you want to call the term -- that changed

12    the way Facebook enforced against automated

13    scraping, that provided an additional motivation?

14          Do you understand what -- what I'm

15    trying to get at?

16          MR. HOLTZBLATT:  I'm going to object to

17    form.

18    A.     I don't -- I don't exactly know what

19    you're trying to get at, so would ask you to provide

20    any clarity you can.

21    Q.     Yes.  Why was the procedure shown in

22    Exhibit 2 not formalized before October 2020?

23          MR. HOLTZBLATT:  Object to form.

24    A.     The procedure that's documented here is

25    to outline the procedure as part of the scraping

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 87

```
1    covered incident obligations, as part of obligations
2    attached to the FTC Order, or Exhibit 1 attached to
3    my Declaration.
4              This was to outline the process and
5    procedure that was in place and to document the
6    procedures that were happening at...
7        Q.    Why --
8              THE REPORTER:  I'm sorry.  That "was
9    happening at"?  I couldn't hear the end.
10             THE WITNESS:  At that time.
11             THE REPORTER:  Thank you.
12   BY MR. TAYLOR:
13       Q.    ███████████████████████████████
     ███████████████████████████████████████████
     ███████████████████████████████████████
     ███████████████████████████████████
     ██      ██     █████████████████
     ██      ██     ████████████     ██████████████
     ██    ████████████████████████████████
     ██    ███████████████████████████████████
     ██    ██████
22             MR. HOLTZBLATT:  Object to form.
23       A.    ████████████████████████████████
     ██    ███████████████     █████████████████
     ██    ███████████████████████████████
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 88



7     A.    The --

8           MR. HOLTZBLATT:  Object to form.

9     Q.    I apologize.  I'll rephrase.

14           MR. HOLTZBLATT:  Object to form.

15    A.

24     A.    It describes --

25           MR. HOLTZBLATT:  Object to form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 89



1        A.

7              MR. HOLTZBLATT:  Object to form.

8        A.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 90



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 97



1

4          MR. HOLTZBLATT:   I'm going to object as

5   calling for a legal conclusion and also on the

6   grounds of privilege.  And instruct the witness to

7   answer only insofar as you can do so without

8   revealing privileged information.

9          A.    Let me look here for a moment.

10          (Witness reviewing document.)

11          A.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 98



```
 1  ███████████████████████████████████

    ███████████████████████████████████

    ████████████████████████████████████████

    ██████████████████████████████████████

    ████████████████████████████

 6    ██   ██████████████████████████████████

    █████████████████████████████████████

    █████████████████████████████████████

    █████████████████████████████████

    █████████████████████████

11    ██   ██████████████████████

    ██   ██████████████████████████████████

    ██████████████████████████████████████████████

    █████████████████████████████████████████

    █████████████████████████████████████████
```

16          MR. HOLTZBLATT:  Object as vague as to

17     two different documents.

18          Q.   ████████████████████████████████████

```
    ███████████

    ████████████████████████████████████

    █████████████████████  ████████████████

    ████████████████████████████████████████

    █████████████████████████████████████████

    ██████████████

    ███████████████████████   ███████████████
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 99

1   ████████████████████████████████

    ████

    ███      ██    ████████████████████

    ███   ███████████████████████

5   Facebook has both built and provided the ability for

6   consumers to download their information in a service

7   called "DYI," or Download Your Information, which

8   lets you connect to your own account and download --

9   download your information, that includes photos

10  which you may have uploaded, videos which you may

11  have uploaded, texts and notes and other pieces of

12  information, including interests that you have

13  created.

14          There is a very specific protocol and

15  standard in that process when you download it or how

16  you can retrieve that data and then take that data

17  to be used elsewhere.

18          In addition, the data portability

19  standard is also integrated.  One example is being

20  able to take your photos and have them be portable

21  to Google Photos.

22          And those are -- those are a couple

23  examples of user initiated, where they are logged in

24  as themselves, and are initiated either via

25  authorized third-party developer transaction, or on

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 100

1    data portability, or are tied to the user actually

2    downloading a file for their consumption and use.

3         Q.    Looking back at Exhibit 6, the FTC

4    Order, the FTC Order in part defines a "covered

5    third party" such that the party must use or receive

6    covered information, correct?

7         A.    Correct.

8         Q.    On that same page, the FTC defines

9    "Covered Information" in part to mean "information

10   from or about an individual consumer"?

11        A.    It -- it -- "but not limited to," very

12   important language, first name or last name.  To --

13   "(a) first name or last name; (b) geolocation

14   information sufficient to identify a street name and

15   name of city or town; (c) an email address or other

16   online contact information, such as instant

17   messaging, user identifier, or a screen name; (d) a

18   mobile or other telephone number; (e) photos and

19   videos; (f) Internet protocol address, IP address,

20   user ID, or other persistent identifier that can be

21   used to recognize a user over time and across

22   different devices, websites or online services; (g)

23   a Social Security number; (h) a driver's license

24   number or other government-issued identification

25   number; (i) financial account number; (j) credit or

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 101

1  debit information; (k) date of birth; (l) biometric

2  information; (m) any information combined with any

3  of (a) through (l) above; or (n) non-public user

4  information," to be complete.

5       Q.   So it's a series of non-exhaustive

6  examples, correct?

7       A.   Yes.

8       Q.   That's what the "including but not

9  limited to" language you identified?

10      A.   I also believe the "non-public user

11  information."

12      Q.   ████████████████████████████

█   ████████████████████████████████

█   ████████████████████████████████████

█   ██████████████████████████████████

█   ████████████████████████████████████

17           MR. HOLTZBLATT:  I'm going to object on

18  the grounds of privilege and instruct the witness to

19  answer only insofar as doing so would not reveal

20  privileged information.

21      A.   Give me one moment.

22      Q.   I'm sorry.  Could you repeat that, sir?

23      A.   Let me -- let me look -- let me review

24  for a moment.

25      Q.   Yes, of course.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 102



1          A.    ██████████████████████████

██  ████████████████████████████

██  ████████████████████████

██  ████████████████████████████

██       ██████████████████████

██  ██████████████████████████

██  ████████████████████████████

██  ████████████████████████████

██  █████████████████

██       ████████████████████

██  ████████████████████████████

██  ████████████████████████████

██  ██████████████████████████

██  ████████████████████

██     ██  █████████████████████

██  ████████████████████████████

██  ████████████████

18          MR. HOLTZBLATT:  Object as vague.

19          A.    ████████████████████████████

██  ████████████████████

██     ██  ██  ████████████████████████

██  ██████████████████████████

██  ██████████████

24          A.    Perhaps -- perhaps I can be helpful.

25                If you pull up an advertisement, the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 103

1    information associated with an advertisement

2    includes, if it's an individual making that

3    advertisement, a first name and last name.  It

4    includes -- it includes a town.  It includes a

5    location.  It includes either an advertiser ID,

6    which is a persistent identifier that could be used

7    to recognize a user over time and across different

8    devices, websites or other online services, as well

9    as other non-public user information associated with

10   users of our -- the advertiser around likes,

11   comments, and such.

12            Does that help answer the question you

13   were trying to ask?

14       Q.    Yes.  Your description of the

15   information available in an advertisement, does that

16   assume that an individual as opposed to a

17   corporation is the advertiser?

18       A.    Where it is a corporation, there would

19   not be a first or last name.  However, there is a

20   persistent identifier that can be used to recognize

21   a user over time.

22       Q.    And when you use the word "user," are

23   you talking about an individual or corporation

24   advertiser?

25       A.    A Facebook account holder is what I'm

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 104

1   using that term as.  I don't -- I don't know what

2   you mean.

3        Q.    I'm trying to understand what you meant

4   by the word "user."

5             So when you say "a Facebook account

6   holder," I'm just trying to understand, are you

7   talking about an individual with a first/last name,

8   Social Security number, etcetera, or are you

9   talking -- when you say "Facebook account holder,"

10  is that broad enough to include a corporation as

11  well?

12       A.    In some cases, yes.

13       Q.    Yes, it is broad enough to include a

14  corporation?

15       A.    It is broad enough.  Sorry, I thought I

16  gave to you pretty concrete answers, and so I will

17  walk back through those.

18            If the advertiser was an individual,

19  the -- which happens often, the information included

20  is a first or last name.  If you look at the second

21  bullet, it includes a town, it includes user

22  identifier, it includes user ID, and it includes

23  other non-public user information associated with

24  the ad that you're targeting.

25            If the entity is a corporation, it

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 105

1    includes a town.  It includes -- it does include

2    other information.  It includes the -- the other

3    information would be the same: the user identifier

4    for the corporation, includes the user ID, the other

5    non-public user information in addition to

6    non-public user information associated with other

7    users that interacted with the ad in order to get

8    comments, information.  Comments have a first name

9    and last name associated with it, likes; and

10   interactions have first name/last name as well as

11   user ID associated with it.

12        Q.    Looking back at Exhibit 6, the FTC

13   Order, definition D is "Covered Information,"

14   correct?

15        A.    Definition D is "Covered Information."

16        Q.    And I apologize.  I actually misread my

17   note.  Covered -- definition "C," as in Charlie, is

18   "Covered Incident," correct?

19        A.    That -- yes, "Covered Incident."

20        Q.    And covered incidents are what Facebook

21   reports to the FTC?

22        A.    Covered incidents are what Facebook

23   reports to the FTC.

24        Q.    The FTC Order defines "Covered

25   Incident," in part, to mean the "access, collection

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 106

1   or use or sharing of Covered Information in

2   violation of Respondent's platform terms," correct?

3        A.    I would -- I believe that's a portion of

4   what is written there, correct.

5        Q.    And then if you look on the next page,

6   definition L, that defines "Platform Terms"?

7        A.    "L" is "Platform Terms," correct.

8        Q.    And "Platform Terms" simply means

9   Facebook's terms of service?

10             MR. HOLTZBLATT:  Object as --

11       A.    "Platform Terms" --

12             MR. HOLTZBLATT:  I'm going to object as

13  calling for a legal conclusion and mis-describing

14  the term as written.

15       A.    "Platform Terms" means "Respondent's

16  written terms, policies and procedures relating to

17  the privacy, confidentiality, or integrity of

18  covered information that applies to covered third

19  parties."

20       Q.    As part of Facebook's procedure for

21  complying with the FTC Order, does Facebook

22  interpret that to mean the Facebook terms of

23  service?

24             MR. HOLTZBLATT:  I'm going to object as

25  calling for a legal conclusion and also on the

Page 118

1          Can you please confirm that for me?

2     A.    Yes, I do have this.

3     Q.    Direct you to page 7 of 9 of the

4 document, and that, of course, is number 6 at the

5 bottom of the page.

6     A.    Thank you for clarifying.  Yes.

7     Q.    Do you see the sentence beginning on

8 line 24:  "Based on" -- strike that.  I'm going to

9 give you a foundation here.

10          MR. HOLTZBLATT:  Sorry, Dustin.  Before

11 we get too much into this document, I'm wondering,

12 it's been about an hour since our last break.  I'm

13 wondering if we should take another short break.  We

14 don't have to if Mike is feeling up to it.

15          But I just -- I know you're about to

16 start in on a new set of questions.

17          MR. TAYLOR:  Mr. Clark, that's your

18 decision.

19          THE WITNESS:  Let's get through -- let's

20 keep going.

21          MR. TAYLOR:  Okay.

22 BY MR. TAYLOR:

23     Q.    In this document, beginning at line 18,

24 the sentence:

25          ███████████████████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 119

1      ████████████████████████████████

██     ████████████████████████

██        ██████████████████████████████████

██     ███████████████████████████████████

██     ██████     ██████████████████████████

██        █████████████████████

██     ███████████████████████████████████████

██     ██████████████████████████████████████

██     ██████████████████████████████

██        █████████████████████

11     A.     Yes, I do.

12     Q.     That was a lot of foundation for the

13     question I want to know the answer to.

14        ███████████████████████████████████████

██     █████████████████████████████████████████

16           MR. HOLTZBLATT:  I'm going to --

17     A.     Let me --

18           MR. HOLTZBLATT:  -- object on privileged

19     grounds but only insofar as Mr. Clark can answer the

20     question without revealing privileged information,

21     which I believe he can.

22        ███     ████████████████████████████████████

██     ████████████████████████████████████

██     ██████████████████     ████████████████████

██     ███████████████████████████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 120

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 121

1      ████████████████████████████████████

       ████████████████████████████████

       ███████████████████████████████

       ████████████████████████████████████

       ████████████████████████████████████

       ███████████████████████████

7            Q.    Direct your attention to Exhibit 3.  You

8      may need to go to the eDepoze system for that.

9            A.    Yes.

10           Q.    And just tell me when you're there,

11     please, sir.

12           A.    Waiting for it to load.

13                 I now have Clark_Exhibit_3_Courtesy.pdf

14     open.

15           Q.    And the title of the first page is

16     "Scraping Covered Incident (SCI) Report,"

17     November 1, '20 to November 30, '20; is that

18     correct?

19           A.    That is correct.

20           Q.    Turn to page -- numbered page 4 of that

21     document, please.

22           A.    Page 4 of 5?

23           Q.    It is numbered page 4.

24           A.    I believe I'm on it.  The title is

25     "Scraping Covered Incidents (SCI) Remediation

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 122

1    Update"?

2

