# Exhibit C

REDACTED VERSION OF
DOCUMENT SOUGHT TO BE SEALED

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO/OAKLAND DIVISION

------------------------------------X
FACEBOOK, INC., a Delaware          )
corporation,                        )
                                    )
            Plaintiff/Counterlaim   ) Case No.
            Defendant,              ) 3:20-CV-07182
                                    ) JCS
        vs.                         )
                                    )
BRANDTOTAL, LTD., an Israeli        )
corporation, and UNIMANIA, INC.,    )
a Delaware corporation,             )
                                    )
            Defendants/Counterclaim )
            Plaintiffs.             )
------------------------------------X


     ** H I G H L Y   C O N F I D E N T I A L **

            ATTORNEYS EYES' ONLY


 VIDEOCONFERENCE VIDEOTAPED 30(b)(6) DEPOSITION OF

                FACEBOOK, INC.

            by corporate designee

                JOSH NEWMAN


          Friday, January 15, 2021

                11:40 a.m.


Remotely Reported Stenographically By:
Mayleen Ahmed, RMR, CRR, CRC, CSR-CA 14380
Job No.: 001106

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 2

```
 1                    REMOTE APPEARANCES

 2

 3   On behalf of the Plaintiff:

 4       ARI HOLTZBLATT, ESQ.
         ROBIN BURRELL, ESQ.
 5       WILMER CUTLER PICKERING HALE AND DORR LLP
         1875 Pennsylvania Avenue, NW
 6       Washington, D.C. 20006
         1.202.663.6964
 7       ari.holtzblatt@wilmerhale.com
         robin.burrell@wilmerhale.com
 8

 9
     On behalf of Defendant/Counterclaim Plaintiff:
10
         DUSTIN L. TAYLOR, ESQ.
11       HUSCH BLACKWELL LLP
         1801 Wewatta Street - Suite 1000
12       Denver, Colorado 80202
         dustin.taylor@huschblackwell.com
13

14

15   ALSO PRESENT:

16   JESSICA ROMERO, Counsel, Facebook, Inc.

17   MICHAEL CHMELAR, Counsel, Facebook, Inc.

18   STACY CHEN, Counsel, Facebook, Inc.

19   KEVIN JOHNSON, Videographer, TransPerfect

20
                     ---oOo---
21

22

23

24

25
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 26

1              It is true that an advertiser -- an

2       advertiser such as Ford could use Ad -- the

3       Ad Library for insight into how its competitor, for

4       example, Chevy, is advertising on Facebook, correct?

5              MR. HOLTZBLATT:  Object to form.

6       A.    They could use Ad Library -- to stick

7       with your example, Ford could use Ad Library to

8       understand the creative that its competitors have on

9       the site at present.

10             Given my experience in advertising, the

11      functional value of that is little different than an

12      advertising executive at a marketing firm watching

13      the Super Bowl and seeing that there are ads for

14      both Chevy and Ford.

15      Q.    What tools other than Ad Library that

16      Facebook provides could a competitor use to gain

17      knowledge regarding how -- strike that.

18             What tools other than Ad Library that

19      Facebook provides could a competitor -- I apologize.

20      I made the same mistake again.  Strike that.

21             What tools that Facebook provides, other

22      than Ad Library, could an advertiser use to gain

23      knowledge regarding how a competitor uses

24      advertising on Facebook?

25             MR. HOLTZBLATT:  Object to form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 27

1        A.     Let me answer that by explaining how the

2    products that my team and cross-functional partners

3    build actually work.

4               So if we think about Ad Manager, which

5    is the primary entry-point management tool and

6    system for all of Facebook advertising, it's where

7    the vast majority of our advertisements are entered

8    and managed.

9               In that tool, a marketer, a client can

10   come in and set up their campaigns and gain

11   understanding about those campaigns.  That access to

12   that information about any performance relative to

13   those campaigns is limited and in control of the

14   advertiser that set up the campaign.

15              That is the guiding principle of how our

16   team develops products and central to the way we

17   think about data access across Facebook.

18        Q.     Okay.  Then, is it correct, then, that

19   there are no tools Facebook provides other than

20   Ad Library that an advertiser could use to gain

21   knowledge regarding how a competitor uses

22   advertising on Facebook?

23              MR. HOLTZBLATT:  Object to form.

24        A.     I wouldn't want to speculate on all the

25   different ways that an advertiser could potentially

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 28

1    utilize their control of their own information.

2                Again, our products are built to provide

3    advertisers control over their data.  They enter the

4    advertising; they control the data.

5        Q.    And I'm not asking you to speculate,

6    Mr. Newman.

7                But is Facebook aware of any tools

8    advertisers use, other than the Ad Library, to gain

9    insight into how a competitor is using advertising

10   on Facebook?

11               MR. HOLTZBLATT:  Object to form.

12       A.    Aware of Facebook tools --

13       Q.    Correct.

14       A.    -- or aware of tools in the industry?

15       Q.    My apologies.  I spoke over you.

16               Aware of tools provided by Facebook.

17               MR. HOLTZBLATT:  Object to form.

18       A.    Again, I'm trying to be specific here

19   about the design of the tools as to -- as opposed to

20   imagining potential utilization by the

21   literal millions of advertisers that we work with.

22               Our products are built to provide

23   control of data to the advertisers that create the

24   campaign.  A competitor would not have access to

25   that data.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 29

1       Q.    I just want to make sure we're on the

2    same page here.  I'm not asking regarding the design

3    of the tools, and I'm not asking for you to imagine

4    or speculate.

5              My question is simply:  Is Facebook

6    aware -- such as with the example of the Ad Library

7    being able to see what creative a competitor is

8    running.  Is Facebook aware of any use of the tools

9    they provide by an advertiser to gain insight into

10   how a competitor is using advertising on Facebook?

11             MR. HOLTZBLATT:  Object to form.

12      A.    I'm afraid you lost me on that question

13   construct.  Okay?  I'm -- I'm trying to be very

14   specific.  So if you could either repeat or rephrase

15   the question, that would be helpful to me.

16      Q.    So I'll break it into some smaller

17   chunks.

18      A.    Thank you.

19      Q.    It was a long question.

20             Okay.  I'm not asking regarding how the

21   tool was designed to be used.

22             Do you understand that?

23      A.    The --

24             MR. HOLTZBLATT:  Object to form.

25      Q.    Sorry.  Go ahead and pause a second

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 31

1    creative, from my perspective, is not significant.

2            But I understand what you're saying

3    relative to an advertiser's ability to see and

4    organize information about creative of their

5    competitors.  The information essentially being what

6    creative is live on Facebook at any given time.

7            So, broadly, to answer your question, I

8    understand.

9       Q.    Let's talk a little bit more about your

10   understanding of the word "insight" and make sure

11   that we're on the same page --

12      A.    Sure.

13      Q.    -- moving forward.

14            Would you understand "insight" to

15   include the time an advertisement was seen by a

16   user?

17            MR. HOLTZBLATT:  Object to form.

18      A.    It is a data point.  To me insight

19   requires slightly more processing than a single data

20   point.  Again, I'm trying to speak from a -- my

21   expertise as a member of the product

22   cross-functional team that develops these products

23   with the goal of providing insight to our clients.

24            Our entire team starts with the process

25   of taking zeros and ones, converting those into

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 32

1    pieces of information; in other words, human-
2    readable numbers that are aggregated into concepts
3    that advertisers can understand.
4            And then the subsequent step is creating
5    products and capabilities that provide insight, or
6    the ability to manipulate those zeros and ones
7    turned into numbers, in a way that provides them
8    insight.  That's my broad construct when I think,
9    from a product standpoint, of what "insight" is.
10            So, to answer your question directly,
11   it's when an advertiser -- excuse me -- when an
12   individual saw a single piece of creative a single
13   time, at what time that occurred, is that insight?
14   No.  That is a data point.
15       Q.    Would you understand the number of
16   interactions users have with an ad to be an insight?
17       A.    Potentially.  It is definitely a data
18   point that we want to be able to provide users in
19   our measurement products.  When they create an
20   advertising campaign, it's critical that they
21   understand the amount of impressions.
22       Q.    Is Facebook aware of any tool that an
23   advertiser can use to ascertain the number of
24   interactions users have with the advertisement of a
25   competitor?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 33

1          MR. HOLTZBLATT:  Object to form.

2     A.    That is not a tool that we would build

3  within the Measurement Products team, and that is

4  contrary to the ethos and essence of how we guide

5  our product development.

6     Q.    My question, however, sir, is slightly

7  different.

8          Is Facebook aware of any tool an

9  advertiser can use to ascertain a number of

10  interactions users have with the advertisement of a

11  competitor?

12          MR. HOLTZBLATT:  Object to form.

13     A.    We have not built such a tool.

14     Q.    I apologize, sir.  I think we're

15  slightly talking past each other, and I just want to

16  narrow this down.

17          I understand that Facebook has not built

18  a tool.  Is Facebook aware of an advertiser using

19  any tool that Facebook has built to ascertain a

20  number of interactions users have had with the

21  advertisement of a competitor?

22          MR. HOLTZBLATT:  Object to form.

23     A.    We've discussed Ad Library.  I think

24  we've exhausted the competitive analysis potential,

25  say, for delving into the specific data points that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 34

 1    are available to the public and comparing those

 2    distinctions between political advertising and

 3    non-political advertising.

 4              Beyond that, I am not aware of products

 5    that would provide that capability.

 6         Q.    Earlier we talked about the Ads Manager

 7    tool.  Is that the correct name?

 8         A.    Ads Manager is a tool provided by

 9    Facebook, yes.

10         Q.    I just wanted to make sure I got the

11    name correct --

12         A.    Sure --

13         Q.    -- as we -- as we are shifting here.

14              Does the Ads Manager tool enable an

15    advertiser to know the targeted audience or

16    impressions the campaign reaches on a per-day level?

17         A.    Ads Manager provides a vast number of

18    data points.  I am not enough of an expert to delve

19    into each individual data point, but I can answer

20    affirmatively to that question.

21         Q.    So that was a "yes," correct?

22         A.    Yes.

23         Q.    Skipping back a few minutes.

24              Do you know who manages the Ad Library,

25    what team?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 43

```
 1  ████████████████████████████████████
    ███████████████████████████████
    ████████████████████████████████
    ██████████████████████████████████
    █████████████████████████████████
    ████████████████████████████████████
    ██████████████████████████████████
    █████████████████████
```

9        Q.    On lines 8 and 9, do you see where the

10  text begins: "[I]n order to obtain measurement

11  analytics beyond what is available through the

12  analytic tools that Facebook itself provides to

13  advertisers"?

14       A.    Yes.

15       Q.    What analytic tools do measurement

16  partners have access beyond what Facebook provides

17  to advertisers?

18             MR. HOLTZBLATT:  Object to form.

19       A.    The way I read this line 8 and 9, to me,

20  doesn't imply that the measurement partners receive

21  incremental analytic tools.

22             My understanding of what measurement

23  partners receive is access to capabilities, and that

24  could potentially be improvements to the amount of

25  data that flows through the system in a given time

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 44

1    frame, as a broad example.

2    ████████████████████████████████

█    ████████████████████████████████████

█    ███████████████████████████████

█    ████████████████████████████████████

█    ██████████████

7         Q.    And by your "clients," you mean

8    companies that advertise on Facebook?

9         A.    Correct.  So there are a number of

10   third-party measurement companies that are

11   measurement partners.  They provide services to

12   clients; they provide services to advertisers that

13   are not our clients.  Their services may not be

14   exclusively related to Facebook data.

15              A primary example, I would think -- and,

16   again, I'm not familiar with all of the nearly 50

17   measurement partners.  But it's important for

18   advertisers to be able to aggregate an understanding

19   of their spend and their audience as reached on

20   multiple platforms.

21              Those platforms could include

22   television, social media, other aspects of apps in

23   the Internet.  Obviously, Facebook is not the only

24   place where our clients advertise.  So the ability

25   to aggregate data across multiple different

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 45

1    locations, perhaps even outdoor advertising, that's

2    a service that is extremely valuable to an

3    advertiser.

4

17        Q.    Are you finished with your answer, sir?

18        A.    I am.

19        Q.    Do you recall before lunch we were

20   talking about competitive insight?

21        A.    Yes.

22             MR. HOLTZBLATT:   Object to form.

23        Q.    I -- I know we have perhaps not the same

24   definition of "insight," so I'm going to break this

25   down.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 46

1         A.    If you'll allow me to pause for a

2    moment, there's some lawnmowers in the background.

3    I'm going to close my window.

4              Please continue.

5         Q.    I have to say, your camera is really

6    cool.  It tracks you across the room.

7         A.    It is a Facebook product I highly

8    recommend, on the record.  The Facebook Portal.

9         Q.    I appreciate that, and I will actually

10   look into it.  That's really cool.  Okay.

11             Returning --

12        A.    It's great for the grandparents.  Just

13   put it in the kitchen.  Grandma loves it.

14        Q.    Okay.  For these measurement partners I

15   discussed in the supplemental response, do these

16   measurement -- strike that.

17             Do any of the measurement partners

18   discussed in the supplemental response provide

19   metrics of an advertiser's competitor -- strike

20   that.  Let me see if I can make this actually make

21   sense.

22             Do any of the measurement partners

23   discussed in the supplemental response provide to an

24   advertiser, metrics a competitor's advertisement

25   receives, such as the number of total impressions?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 47

1              MR. HOLTZBLATT:  Object to form.

2        A.    No.

3        Q.    Do any of the measurement partners

4    referenced in the supplemental response provide to

5    an advertiser any information on the advertiser's

6    competitors?

7              MR. HOLTZBLATT:  Object to form.

8        A.    Could you repeat the question?

9        Q.    Yes.

10             Do any of the measurement partners

11   referenced in the supplemental response provide to

12   an advertiser any information on the advertiser's

13   competitors?

14             MR. HOLTZBLATT:  Object to form.

15       A.    Perhaps you could clarify it with an

16   example.

17       Q.    Sure.  Let's take our now beloved

18   example of Ford and Chevy.

19             I believe you said there are nearly 50

20   measurement partners; is that correct?

21       A.    That's my understanding from

22   conversations I had with counsel and a member of our

23   products team that was formerly part of the

24   measurement partnerships team.

25       Q.    So of those approximately 50 measurement

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 48

```
 1   partners, could any of them provide information to

 2   Ford about any advertisement information Chevy is

 3   taking on the Facebook platform?

 4              MR. HOLTZBLATT:  Object to form.

 5        A.    Let me do two things.  One, I'd rather

 6   we use as examples fake companies --

 7        Q.    Okay.

 8        A.    -- rather than refer to companies that

 9   may or may not be our clients, just as a general

10   practice.  I can still answer this particular

11   question.

12              As I mentioned earlier, the tenet we

13   have in any flow of information is that the

14   advertiser creating the ad controls that flow of

15   information.  So the third-party measurement partner

16   itself has neither unlimited access nor unlimited

17   rights, as negotiated in those agreements, per my

18   understanding, to utilize that data as they see fit.

19              The data, in its inherent rights -- and,

20   again, I'm not a lawyer, but using "rights" broadly

21   as the ability to view and use -- those capabilities

22   are granted, essentially, by the advertiser to the

23   third party if there is a goal of creating a report

24   by that third-party measurement partner for the

25   advertiser.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 49

1           So in no case would we negotiate an

2   agreement that would allow a third party to provide

3   competitive information from one advertiser to

4   another.

5       Q.   How does an entity become an approved

6   measurement partner?

7       A.



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 50

1 ██████████████████████████████

██ ████████████████████████████

██ ████████████████████████ ████

██ ██████████████████████████████

██ ██████████████████████████████

██ ████████████████████████████

██ ████████████████████████████████

██ ████████

9      Q.    Did Facebook ever consider partnering or

10  engaging in a partnership with BrandTotal to

11  proactively bring insights for marketers?

12            MR. HOLTZBLATT:  Object as out of scope.

13            You can answer if you know.

14      A.    That is outside the scope of my

15  day-to-day and my knowledge in preparation for this

16  testimony.

17      Q.    Just to condense that.

18            Your answer, then, is "I don't know"?

19      A.    What is the question?

20      Q.    Did Facebook ever consider partnering or

21  engaging in a partnership with BrandTotal to

22  proactively bring insights for marketers?

23            MR. HOLTZBLATT:  Object to form and

24  object as out of scope.

25      A.    As I said, based on my preparation and

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 51

1   my day-to-day responsibilities, I do not know the

2   answer to that question.

3          Q.    Mr. Newman, do you know who Kim

4   Stonehouse at Facebook is?

5          A.    No.

6          Q.    Do you know who Gabriel Gontijo,

7   G-O-N-T-I-J-O, at Facebook is?

8          A.    No.

9          Q.    Do you know who Rita Procter at Facebook

10  is?

11         A.    No.

12         Q.    Do you know a Michelle Morris at

13  Facebook?

14         A.    No.

15         Q.    Do you know an Alejandra, and then the

16  last name is C-O-S, dash, P-E-R-A-Z-A, at Facebook?

17         A.    No.

18               And I assume that we're using the

19  colloquial definition of the term "no."  These are

20  not names that are immediately familiar to me and I

21  could not place the face.

22         Q.    Turning --

23         A.    Facebook, obviously, is a large company.

24         Q.    I am aware of that, and I appreciate

25  that clarification.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 64

1      A.    We've discussed, throughout the course

2   of my testimony, the advertising ecosystem.   There

3   are literally hundreds of thousands of participants

4   on the business side of that ecosystem, and tens

5   of millions of participants on the advertising side.

6           So, again, not trying to slice the onion

7   too thin here, but just making sure that we're --

8   that I am not discussing a permission acquisition

9   process that does not apply to the entity definition

10  that you might have in mind.

11          So if you could be more specific about

12  the entity in general as a participant in the

13  advertising ecosystem, that might help guide my

14  answer.   Either way, I'm aware of multiple avenues

15  to obtain permission which, as I said, was the focus

16  of my initial answer --

17     Q.    How many avenues are you --

18     A.    -- for --

19     Q.    I apologize.

20          How many avenues are you aware of?

21     A.    Well, when we think about this term, we

22  really subdivide it on two axes.   There is manual

23  access to data, and there is automated access to

24  data on one axis; on the other, there is authorized

25  and unauthorized.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 65

1          So a simple example of authorized
2   automated would be the use of an API.  The process
3   to obtain access to an API is publicly available,
4   and the standards by which you obtain that access
5   are readily displayed in the business section of the
6   Facebook website.
7              There are other instances where a more
8   negotiated access -- again, going back to our
9   measurement partner conversation -- where the focus
10  would likely be on the speed and volume of data, and
11  altering that in some way from the standard.
12             And when I speak of speed and volume,
13  I'm really thinking of processing capacity.  It
14  takes time to move a bit, those zeros and ones I've
15  spoken about all day, from one server to another.
16  Those capabilities have real-world investment in
17  hardware.
18             And, therefore, there may be times where
19  it benefits the ecosystem -- our clients, who are
20  our primary focus, from a business standpoint -- to
21  create augmented access on either of those two
22  parameters.
23             An example there would, essentially, be
24  a search engine, a major search engine in a given
25  region not applied via the API access workflow.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 66

1   That would be a negotiated agreement.

2              Nevertheless, all of the data access as

3   outlined here in this section you've highlighted

4   focuses on permission.

5              The area in which -- again, I'm not a

6   lawyer, but I would say permission is implied, is in

7   the manual access to data.  If a user logs in to

8   Facebook, sees advertising, writes down what that

9   advertising is, and provides that as a service

10  somehow, that would meet our terms and conditions,

11  as I understand it.  Again, I'm not a lawyer.

12       Q.    But if it was automated, it would not,

13  correct?

14             MR. HOLTZBLATT:  Object to form.

15       A.    Automated, unauthorized data access is,

16  per this term, prohibited under our services we

17  provide, terms of service.

18       Q.    And the -- I understand from your

19  answer -- and correct me if I'm wrong; I want to

20  make sure we're on the same page -- that the two

21  ways to become authorized are either to go through

22  the API process or to be subject of a negotiated

23  agreement; is that correct?

24             MR. HOLTZBLATT:  Object to form.

25       A.    You have highlighted two ways to obtain

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 67

1    authorized automated access.

2         Q.    What are those two ways?

3         A.    Two ways to obtain authorized automated

4    access to data are through our collection of APIs or

5    through some negotiated agreement.

6         Q.    And the example of a negotiated

7    agreement you provided earlier was the case of a

8    search engine, correct?

9         A.    That's correct.

10   ▮        ████████████████████████

▮ ████████████████████████████████████

▮ ███████████████████████████████████

▮    ▮    ████████████████████████████

▮ █████████████    ████████████████████

▮ ████████████████████████████████████████

▮ ██████████████████████████████████████

▮ ██████████████████████

▮         ███████████████████████████████

▮ ████████████████████████████████████████

▮ ███████████████████████████████████████

▮ ██████████████████████████████

▮    ▮    █████████████████████████

▮ ██████████████████████████████████████████

▮ █████████████████████████

25              MR. HOLTZBLATT:  Object to form, and

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 68

1    object as out of scope other than as limited to

2    current tools.

3         A.    ██████████████████████████████

     ████████████████████████████████████

     ██████████████████████████████████

     █████████████████████████████████████████

     █████████████████████

     ████████████████████████████████████

     ████████████████████████████████████████

     █████████████████████████████████

     ████████████████████████████████████

     █████████████████████████

13        Q.    In view of your response and your

14   counsel's objections, I'm going to rephrase my

15   question slightly.

16   ████████████████████████████████████

     ████████████████████████████████████████

     ██████████████████████████████████

     █████████████████████████

20        A.    Can you be more specific about what you

21   mean by "competitive"?

22        Q.    So I remember what you said earlier

23   about not wanting to use real-world companies.

24        A.    Thank you.

25        Q.    So I'm going to use company Acme, which

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 69

1    I think is everyone's favorite Road Runner supplier.

2    And I'll admit, I struggle to think of a second one,

3    so I'm going to go with Sweetums, and that's

4    S-W-E-E-T-U-M-S.

5              So let's assume Acme and Sweetums are

6    both providers of widgets, just to use the favorite

7    law school example.  Acme and Sweetums both provide

8    widgets.  Acme is an advertiser on the Facebook

9    platform.

10             Do you understand that so far?

11        A.    Yes.

12        Q.    Okay.  So has -- strike that.

13             Sweetums is interested in advertising on

14   Facebook and wants to know what success Acme has

15   seen with its own advertisements on Facebook.

16             Has -- my question, sir -- strike that.

17             Do you understand that scenario so far?

18        A.    Yes.

19   ███      ███     ████████████████████

██  ███████████████████████████████████████

██  █████████████████████████████████████

██  ████████████████████████████████

██        ███     ███

24             MR. HOLTZBLATT:  Josh, do you --

25             I don't know, Dustin, where you are in

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 72

1  pages.  I am not a developer, so the details of

2  those steps are best understood by me as publicly

3  available in terms of the broad guidelines, and

4  clearly delineated once one logs in to Facebook and

5  finds those pages in the developer section of our

6  website.



9           MR. HOLTZBLATT:  Object to form.

22        Q.   Let me present this slightly

23  differently, then, with the use of a hypothetical.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 73



1

2

3

4

5

6

7        MR. HOLTZBLATT:  Object to form.

8

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 74



```
21        Q.    All right.  Do you have Exhibit No. 2 in
22  front of you, the deposition topics?
23        A.    I will.  Yes, I have it open.
24        Q.    I direct your attention to Topic No. 6,
25  which begins on PDF page 5, approximately line 7.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 79

1        Q.    Mr. Newman, before the next line of

2    questioning, I want to establish a few terms to make

3    sure that we're on the same page about some issues.

4              If a company, let's say, Acme, posts --

5    strike that.

6              Acme has a page, correct, that is their

7    company's, essentially, profile page; is that right?

8              MR. HOLTZBLATT:  Object to form.

9        A.    A company can create a page within the

10   Facebook platform.

11       Q.    The term for that is a "page"?

12       A.    Yes.

13       Q.    And Acme, using our hypothetical, if

14   they create a post on their page that they do not

15   pay to be disseminated to users, it is just a post

16   that they host on their page.

17             Do you have a term for what that post is

18   called?

19             MR. HOLTZBLATT:  Object to form.

20       A.    In general, from a measurement product

21   perspective, there are two high-level kinds of

22   content: content for which advertisers pay, and

23   content that, like any other individual, an

24   advertiser can post free of charge on their own

25   Facebook presence.  We refer to content like that as

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 80

1    "organic."

2          Q.     So unpaid content would be organic?

3          A.     Generally, yes.

4          Q.     And if the host is then paid to be

5    distributed to advertisers, what is your term for

6    that?

7          A.     I'm pausing because there are -- we're

8    starting to get into the weeds of the mechanics of

9    advertising on Facebook, and I want to be specific.

10              It is possible to boost an organic post;

11   in other words, to pay to increase the likelihood

12   that that organic post reaches people that would

13   find it helpful and useful; again, following our

14   principle of Facebook advertising, that our job is

15   to create an ecosystem where both our users and our

16   advertisers are finding value.

17              So at that moment, I suppose an organic

18   post, by your framing, becomes a paid post, but --

19         Q.     Okay.  Sorry.

20         A.     -- in terms of our previous discussions

21   in the organization of who can see data related to a

22   post to an advertisement, the distinction is the

23   same.  The controlling entity -- advertiser,

24   individual, business -- who initiated the ad or the

25   content controls access to the data related to that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 81

1    content.

2              Even when a third party gets involved in

3    the aggregation or reformatting of that data, the

4    third party's ability to utilize that data, even if

5    they have access to an API, their ability to access

6    that specific data and present it back, is dependent

7    upon the original owner's consent.

8        Q.    Does Facebook offer tools by which an

9    advertiser can consent to share their advertising

10   data?

11             MR. HOLTZBLATT:  Object to form.

12       A.    Yes.

13       Q.    What tools are those?

14             MR. HOLTZBLATT:  Object to form.

15       A.    We've discussed a number of them.  I am

16   unfamiliar with the exact mechanics of what needs to

17   be clicked in order to authorize.

18             But, again, speaking to my high-level

19   understanding of how the APIs function, access to

20   data in an automated way for an API has a workflow

21   wherein the, quote/unquote, owner of the

22   advertisement, and thereby the data associated with

23   that advertisement, provides permissioning for that

24   data to be viewed/utilized/accessed in some way by

25   another party.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 82

1          Again, the party is in no case a

2    competitor, but it is a third party with which

3    Facebook has some negotiated agreement of which, to

4    my understanding, the standard terms and conditions

5    we discussed earlier in my testimony are a piece and

6    a requirement of the agreement.

7          Q.    Okay.  Returning to our situation in

8    which we have Acme and Sweetums.  If Acme and

9    Sweetums are both advertisers on Facebook and have

10   consented through this workflow that you just

11   discussed, would it be possible for an approved

12   partner to utilize that data to provide advertising

13   metrics on the industry of widgets that both Acme

14   and Sweetums provide?

15             MR. HOLTZBLATT:  Object to form.

16        A.    My understanding is that would be

17   prevented by our terms.

18        Q.    Are there any specific tools Facebook

19   provides to facilitate that type of analysis?

20             MR. HOLTZBLATT:  Object to form.

21        A.    No.  That type of analysis is not

22   consistent with the goals and ethos of the

23   measurement product team that I've described

24   previously, and, therefore, we would not build tools

25   to that end.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 83

1     Q.    Is Facebook aware of any authorized
2   third parties that provide such an analysis?
3              MR. HOLTZBLATT:  Object to form, and out
4   of scope.
5     A.    I can speak from my personal experience,
6   that I am not aware of any such agreements or
7   comments.
8     Q.    A few minutes ago we were speaking about
9   the types of organic versus paid host.
10             If I refer to a post made on a company's
11   page that is not boosted as a non-sponsored post,
12   does that term make sense to you?
13             MR. HOLTZBLATT:  Object to form.
14     A.    Are you asking if I've heard of the term
15   "non-sponsored post"?
16     Q.    No.  I'm just saying, if I use the term
17   "non-sponsored post" to refer to a post made on a
18   company's public page that is not boosted, does that
19   term make sense to you?
20             MR. HOLTZBLATT:  Object to form.
21     A.    I think we can agree on a non-sponsored
22   post as essentially being equivalent to organic
23   content.
24     Q.    If we then refer to a "sponsored post"
25   as an organic post that is then boosted, does that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 88

1    Ad Library was created to serve a public interest/

2    integrity goal.  The integrity goal for political

3    advertising, given Facebook's centrality to

4    political discussion, is to ensure that the public

5    is well-informed about the targets of Facebook

6    advertising by political entities or political

7    candidates.

8              We extended that capability to

9    non-political ads simply for the creative itself

10   that is currently running on Facebook in order to

11   ensure that the public had a view into our ads'

12   compliance with the public interest in highly

13   regulated industries such as housing or medicine.

14        Q.    On this same page of Exhibit 1, the

15   first row, "Time ad shown to user."

16              Do you see that?

17        A.    Yes.

18        Q.    On the second portion where it says

19   "Ad Library" in brackets, it says "non-SIEP will not

20   show end date."

21              Do you see that?

22        A.    Yes.

23        Q.    What is "SIEP"?

24        A.    I do not know what the acronym stands

25   for.  Broadly, it's making the distinction I've

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 89

1    already discussed, which is between political and

2    commercial advertising.  So a non-SIEP ad would be a

3    non-political ad.

4              Again, the delineations here, any

5    restriction in data is done to adhere to our

6    principle of the owner of the advertisement owning

7    the data associated with that advertisement.

8              As always, in a complex system, it's

9    incumbent upon the company running that system to

10   balance every stakeholder's rights and needs, and

11   this is an example of that balance.  To protect the

12   ownership of the data that we promise advertisers,

13   we do not show the end date.

14      Q.    So I understand that the third column of

15   this chart which says "source" is tools an

16   advertiser can use to view information about their

17   campaign.

18              What, then, is the distinction between

19   the source and the fourth column, which is

20   "Field/API"?

21              MR. HOLTZBLATT:  Object to form.

22      A.    That's simply incremental information,

23   slightly more technical, that would refer to

24   something akin to developer instructions.  So if a

25   developer in that first example was looking for

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 90

1   gender, they would look in the insights API as a

2   source, as outlined in column 3.  But the field they

3   would look for in order to obtain that data point,

4   as outlined in column 2, would be

5   "breakdowns-gender" as a field to guide their

6   development to bring that data point into whatever

7   application they're building.

8       Q.    And I believe we talked about this

9   earlier.  But for the insights API, that information

10  is available only for the advertiser's own

11  campaigns, correct?

12      A.    Available to who?

13      Q.    To the advertiser.

14      A.    Acme gets access to Acme's

15  advertisement; Acme gets access to Acme's

16  advertising data.

17      Q.    Turn to the third page of Exhibit 1, the

18  second column, "Advertisements URL."  Tell me when

19  you're there, please.

20      A.    I am there.

21      Q.    So an advertisement's URL is available

22  to the advertiser through the marketing API; is that

23  correct?

24      A.    Yes.

25      Q.    And then it would also --