UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FACEBOOK, INC., | Case No. 20-cv-07182-JCS |
| Plaintiff, | **ORDER REGARDING MOTION TO DISMISS AMENDED COUNTERCLAIMS** |
| v. | ~~*Provisionally Filed Under Seal*~~ |
| BRANDTOTAL LTD., et al., | |
| Defendants. | Re: Dkt. No. 132 |

## I.      INTRODUCTION

Plaintiff Facebook, Inc. brought this action asserting that Defendants BrandTotal Ltd. and Unimania, Inc. (collectively, "BrandTotal") improperly collected data from Facebook's social networks. BrandTotal, which is in the business of analyzing advertising data collected from social media websites, asserts counterclaims based on Facebook's efforts to block its collection of data. The Court previously denied BrandTotal's motion for a temporary restraining order ("TRO") and granted Facebook's motion to dismiss BrandTotal's counterclaims, with leave to amend. BrandTotal has now amended its counterclaims and moved for a preliminary injunction, and Facebook moves once again to dismiss. The Court held a hearing on May 28, 2021, at which the parties reached an agreement that rendered BrandTotal's motion for a preliminary injunction moot. For the reasons discussed below, Facebook's motion to dismiss is GRANTED in part and DENIED in part.[1]

## II.      BACKGROUND

The following summary of the facts, allegations, and procedural history of this case is intended for the convenience of the reader to provide context for the analysis below, and should

---

[1] The parties have consented to the jurisdiction of a magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

United States District Court
Northern District of California

1  not be construed as resolving any disputed issue of fact.  Specific allegations of the amended

2  counterclaims at issue are addressed in the Court's analysis.  Because this order addresses a

3  motion to dismiss under Rule 12(b)(6), which turns on the sufficiency of BrandTotal's allegations,

4  its analysis does not address the evidentiary record submitted in support of the motion for a

5  preliminary injunction or the earlier motion for a TRO, although some of that evidence is included

6  in this background section for context.

7      BrandTotal is an advertising consulting company that helps its corporate customers

8  analyze their own advertising and their competitors' advertising on social media and other

9  websites, by enlisting individual consumers—in BrandTotal's terminology, "panelists"—to agree

10  to share the advertisements they view on those websites.  In order to prepare valuable analysis for

11  its corporate customers, BrandTotal relies heavily on data collected from Facebook, as opposed to

12  other social media websites, due to Facebook's size.  BrandTotal's most popular consumer

13  product is UpVoice, an application or browser extension that offers panelists cash rewards to share

14  their demographic information and the advertisements they see and interact with on social media.

15  The particular form of UpVoice central to this case is an extension for the Google Chrome

16  browser, offered for download from Google's web store.  BrandTotal has also offered other

17  applications and browser extensions that operate similarly in their collection of data, but provide

18  different (non-cash) benefits to users, like a streamlined interface for browsing social media

19  networks.  BrandTotal began offering some of those programs multiple years ago.  BrandTotal

20  offers its consumer-facing products under the name of its subsidiary Unimania, in what was

21  intended as an effort to obscure the source of its analytical data from potential competitors.

22      The UpVoice product available before this case commenced—which the parties refer to

23  here as UpVoice Legacy for clarity—automatically collected multiple categories of information

24  when users who had installed it browsed Facebook, including demographic data about the user,

25  information about advertisements the user encountered on Facebook, and information that

26  Facebook had generated about that user's preferences.  Some such data was collected by the

27  product automatically querying Facebook for information that would not otherwise have been

28  transmitted to the user in the course of their browsing (although the user could have accessed that

United States District Court
Northern District of California

1   information if they chose to).  According to BrandTotal, it disclosed all of this data collection to

2   its users and obtained their consent, and did not collect personal data pertaining to any other

3   Facebook users.  All personal data was deidentified from a user's name and aggregated for the

4   purpose of analyzing the demographic groups to whom particular advertisements were presented.

5   One flaw in BrandTotal's consent system was that UpVoice Legacy could collect potentially

6   collect personal data from unsuspecting users who logged into Facebook on a shared computer

7   where someone else had installed UpVoice Legacy, although there is no evidence that either party

8   considered that issue before this litigation commenced.

9        BrandTotal uses UpVoice and similar products to obtain data about advertising on

10  Facebook that is not available from other sources.  Facebook maintains a public "Ad Library" of

11  all advertisements currently running on its platform, but with the exception of ads related to

12  politics and social issues—a category of ads that tends not to be of particular interest to

13  BrandTotal's corporate clients—that library does not provide information about ads that are no

14  longer running, the demographic groups to whom the ads were presented, the number of people

15  who saw an ad, or how users have engaged with an ad.  Facebook also offers certain approved

16  application programming interfaces ("APIs") to access data from its network, but none that

17  provide the sort of information that BrandTotal collects through UpVoice and its other products.

18       By automatically collecting data from users about the ads they see on Facebook and other

19  social networks, BrandTotal is able to provide analytical services to its corporate clients about

20  their own and their competitors' advertising efforts.  Facebook provides a more limited set of

21  similar information to at least some advertisers on its platform in at least some circumstances,

22  including metrics for "share of voice"—the portion of advertising within a particular category that

23  a particular advertiser accounts for.

24       In 2018, a third party (Adguard) published a report indicating that BrandTotal used

25  unsecure means to transmit personal data.  BrandTotal thereafter changed its encryption method to

26  a more secure standard.  Facebook began investigating some BrandTotal products in the spring of

27  2019 but closed its investigation after determining that Google had removed those products from

28  its store.  BrandTotal disputes that those products were removed.

United States District Court
Northern District of California

1    Among other potentially relevant provisions, Facebook's terms of service prohibit

2 "collect[ing] data from our Products using automated means (without [Facebook's] prior

3 permission)."  In March of 2019, BrandTotal received legal advice from its Israeli counsel

4 concluding that to the extent its products passively collected data served to users during their

5 browsing, that did not implicate Facebook's terms of service, based in part on a dubiously narrow

6 interpretation of the word "Products" in those terms to exclude advertisements—an interpretation

7 that, at least thus far, BrandTotal has not pursued here.  BrandTotal's attorneys determined that

8 with respect to "active" collection through "calls" initiated by BrandTotal's products, BrandTotal

9 was in a "grey area" because on one had the data collected might not implicate the terms of service

10 if it was not part of Facebook's "Products," but on the other hand that method of collection could

11 be considered as misuse of Facebook's APIs to access data for which BrandTotal lacked

12 permission.  BrandTotal did not change its practices in response to that opinion.

13    In the spring of 2020, Facebook began investigating UpVoice Legacy.  On September 21,

14 2020, Facebook employee Jeremy Brewer sent an email to Google employee Benjamin Ackerman

15 identifying "some Chrome extensions we believe are improperly scraping user PII[2] (e.g. gender,

16 relationship status, ad interests, etc.) without proper disclosure"—including UpVoice Legacy—

17 and requesting that Ackerman coordinate with Facebook security researcher Sanchit Karve, who

18 had conducted the investigation, to "see if there is a way to collaborate and better protect user

19 privacy."  1st. Am. Counterclaims ("FACC," dkt. 120) Ex. I.  Karve replied to note that Google

20 had removed certain other extensions that behaved similarly, produced by another developer.  *Id.*

21 Ackerman did not immediately respond.

22    In the days immediately following that exchange, a handful of internal Facebook emails

23 involving other Facebook employees reflect that Facebook had received inquiries from advertisers

24 who were either using BrandTotal's product or curious about its capabilities.  One Facebook

25 employee suggested that Facebook might consider partnering with BrandTotal.  FACC Ex. G.  An

26 employee who had received a request from Facebook's marketing team regarding BrandTotal's

27

28 ───────────────
[2] "PII" refers to "personally identifiable information."

United States District Court
Northern District of California

1    capabilities contacted Karve on September 24, 2020, who informed her that Facebook was

2    "enforcing on them this week."  FACC Ex. H.  The next day, Karve followed up with Ackerman

3    at Google, who responded three days after that on September 29, 2020 to say that Google would

4    investigate the browser extensions Facebook identified (including UpVoice Legacy), and that

5    based on a preliminary review of BrandTotal's privacy policy, "it does look like they are

6    collecting a bunch of information for advertising purposes which is a no no."  FACC Ex. I.

7          On September 30, 2020, Facebook disabled BrandTotal's accounts on its social networks.

8    On October 1, 2020, it filed a civil action against BrandTotal in state court.  Later that day, Google

9    removed UpVoice Legacy from its store, which disabled most installed copies of the browser

10   extension, although around ten to fifteen percent of installations continued to collect data (with

11   that number slowly declining over time) until relatively recently, when changes that Facebook

12   made caused them to cease sending data.  BrandTotal listed another version of UpVoice on

13   Google store on October 12, 2020, which it contends was a mistake arising from efforts to prepare

14   a new version to go live only if it prevailed in obtaining a TRO.

15         On October 14, 2020, Facebook dismissed its state court action and filed the present action

16   in this Court, adding a federal claim under the Computer Fraud and Abuse Act ("CFAA").

17   BrandTotal filed counterclaims and moved for a TRO, which the Court denied because, although

18   BrandTotal had shown serious issues going to the merits of its counterclaims, the public interest

19   did not favor requiring Facebook, through expedited judicial proceedings, to allow a third party to

20   scrape data from its network without BrandTotal having made any effort before deploying

21   UpVoice Legacy to coordinate with Facebook and confirm that its program would respect user

22   privacy.  Order re Mot. for TRO (dkt. 63).[3]  The Court later granted Facebook's motion to dismiss

23   BrandTotal's counterclaims because, among other reasons, an order by the Federal Trade

24   Commission ("FTC") requiring Facebook to block access to any "Covered Third Party" that did

25   not certify compliance with Facebook's terms of use appeared to apply to BrandTotal, but granted

26

27   _____

28   [3] *Facebook, Inc. v. BrandTotal Ltd.*, 499 F. Supp. 3d 720 (N.D. Cal. 2020).  Citations herein to the
     Court's previous orders in this case refer to page numbers of the versions filed in the Court's ECF
     docket.

leave to amend as to most of the counterclaims.  Order re Mot. to Dismiss Counterclaims ("1st MTD Order," dkt. 108).[4]

BrandTotal initially filed a motion for a preliminary injunction one day before the hearing on the first motion to dismiss, but withdrew that motion after that hearing and later filed its renewed motion for a preliminary injunction after amending its counterclaims.  The Court denied that motion as moot based on the parties' agreement at the May 28, 2021 hearing.  *See* dkt. 150. Facebook has moved once again to dismiss BrandTotal's counterclaims.

Just before filing its preliminary injunction motion, BrandTotal released a new version of UpVoice, which the parties refer to here as UpVoice 2021.  BrandTotal shared the source code for that program with Facebook two weeks before releasing it.  UpVoice 2021 does not collect users' demographic data from Facebook, instead relying on users to enter that information in a form when they sign up for the program.  The browser extension collects only identifying information for advertisements presented to the user while they are browsing, and does so passively by scanning the HTML code that Facebook serves to the user, without the UpVoice 2021 browser extension actively requesting any further information from Facebook.  UpVoice 2021 also prompts users to confirm whether they wish to continue sharing that data when a new user logs into a social media account.  Once the identifying information for an advertisement—a unique ID number, as well as the name of the page that sponsored the ad—is transmitted to BrandTotal, BrandTotal's servers (not the browser extension installed by a panelist) use that information to access the ad on a webpage visible to the general public that does not require logging in with a Facebook username and password, and gather further data about the ad from there.

BrandTotal now asserts the following counterclaims: (1) declaratory judgment that BrandTotal has not violated and will not violate the CFAA, FACC ¶¶ 93–101; (2) declaratory judgment that BrandTotal has not violated and will not violate section 502 of the California Penal Code, *id.* ¶¶ 102–10; (3) declaratory judgment that BrandTotal has not interfered and will not interfere with Facebook's contractual relations, *id.* ¶¶ 111–18; (4) intentional interference with

---

[4] *Facebook, Inc. v. BrandTotal Ltd.*, No. 20-cv-07182-JCS, 2021 WL 662168 (N.D. Cal. Feb. 19, 2021).

United States District Court
Northern District of California

1   contract, *id.* ¶¶ 119–60; (5) intentional interference with prospective economic advantage, *id.*

2   ¶¶ 161–69; (6) violation of California's Unfair Competition Law (the "UCL"), *id.* ¶¶ 170–97.

3   **III.    ANALYSIS**

4        **A.    Legal Standard**

5        A complaint may be dismissed for failure to state a claim on which relief can be granted

6   under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  "The purpose of a motion to dismiss

7   under Rule 12(b)(6) is to test the legal sufficiency of the complaint." *N. Star Int'l v. Ariz. Corp.*

8   *Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  Generally, a claimant's burden at the pleading stage

9   is relatively light.  Rule 8(a) of the Federal Rules of Civil Procedure states that a "pleading which

10  sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing

11  that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).

12       In ruling on a motion to dismiss under Rule 12(b)(6), the court takes "all allegations of

13  material fact as true and construe[s] them in the light most favorable to the non-moving party."

14  *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  Dismissal may be based on a

15  lack of a cognizable legal theory or on the absence of facts that would support a valid theory.

16  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  A pleading must "contain

17  either direct or inferential allegations respecting all the material elements necessary to sustain

18  recovery under some viable legal theory."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 (2007)

19  (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).  "A pleading

20  that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action

21  will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).

22  "[C]ourts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"

23  *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  "Nor does a

24  complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*,

25  556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  Rather, the claim must be "'plausible on its

26  face,'" meaning that the claimant must plead sufficient factual allegations to "allow the court to

27  draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting

28  *Twombly*, 550 U.S. at 570).

United States District Court
Northern District of California

1    With the exception of narrow doctrines of judicial notice, a court may not consider

2    extrinsic evidence in resolving a motion under Rule 12(b)(6) without converting it to a motion for

3    summary judgment, which the Court has not done here.  *Lee v. City of Los Angeles*, 250 F.3d 668,

4    688 (9th Cir. 2001).  Accordingly, even though an evidentiary record has been submitted in this

5    case for the purposes of BrandTotal's previous motion for a TRO and motion for a preliminary

6    injunction, the Court disregards that evidence for the purpose of Facebook's motion to dismiss,

7    and focuses instead on the allegations of BrandTotal's amended counterclaims.

8    ### B.    Declaratory Judgment Counterclaims

9    The Court previously dismissed BrandTotal's counterclaim seeking declaratory judgment

10   that it did not breach Facebook's terms of service, and denied leave to amend to assert a

11   declaratory judgment counterclaim seeking to establish that those terms of service were

12   unenforceable, holding that such a counterclaim would be redundant to Facebook's affirmative

13   claims.  1st MTD Order at 11–12.  BrandTotal now seeks declaratory judgment that its UpVoice

14   2021 product does not violate the CFAA or section 502 of the California Penal Code, and does not

15   interfere with Facebook's contractual relations.  FACC ¶¶ 93–118.

16   District courts have broad discretion whether to hear a counterclaim for declaratory

17   judgment, and "[n]umerous courts have used that discretion to dismiss [such] counterclaims . . .

18   where they are either the 'mirror image' of claims in the complaint or redundant of affirmative

19   defenses."  *Stickrath v. Globalstar, Inc.*, No. C07-1941 TEH, 2008 WL 2050990, at *3 (N.D. Cal.

20   May 13, 2008).  BrandTotal argued that these new claims were not redundant because Facebook's

21   original complaint did not address the new and distinct UpVoice 2021 product, "[a]ny litigation

22   over UpVoice needs to extend to UpVoice 2021[,] and BrandTotal properly included

23   counterclaims to ensure that it does."  Defs.' Opp'n (dkt. 138 at 2; *see also id.* at 22–23.

24   After briefing on the present motion to dismiss BrandTotal's counterclaims closed, the

25   parties stipulated to Facebook filing an amended complaint, which includes BrandTotal's release

26   of UpVoice 2021.  1st Am. Compl. (dkt. 148) ¶ 78.  The amended complaint asserts claims

27   including interference with contractual relations and violation of the CFAA and section 502, and

28   seeks injunctive relief to bar those purportedly ongoing alleged violations.  The case therefore now

United States District Court
Northern District of California

includes the issues BrandTotal wishes to adjudicate, without need for its mirror-image declaratory judgment counterclaims.  As a matter of discretion, the Court GRANTS Facebook's motion to dismiss BrandTotal's declaratory judgment counterclaims, without leave to amend at this time, but without prejudice to BrandTotal later moving for leave based on changed circumstances—for example, if Facebook withdraws any of its affirmative claims or limits them to prior versions of UpVoice while BrandTotal believes it still has an interest in proving that UpVoice 2021 does not violate the laws at issue.[5]

### C.    Interference with Contract

"'The elements which a plaintiff must plead to state the cause of action for intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.'"  *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 995–96 (9th Cir. 2019) (quoting *Pac. Gas & Elec. Co. v. Bear Stearns & Co.* ("*PG&E*"), 50 Cal. 3d 1118, 1126 (1990)).  While the typical case involves actual breach, the element of "disruption" of a contract can also be satisfied "where the plaintiff's performance has been prevented or rendered more expensive or burdensome."  *Id.* at 996 n.8 (citation and internal quotation marks omitted); *see also PG&E*, 50 Cal. 3d at 1129 ("[W]hile the tort of inducing breach of contract requires proof of a breach, the cause of action for interference with contractual relations is distinct and requires only proof of interference.").

"Under California law, a legitimate business purpose can indeed justify interference with

---

[5] In briefing its motion for a preliminary injunction, BrandTotal argues that a likelihood of success on its declaratory judgment counterclaims could support injunctive relief, which would suggest that these counterclaims have practical value separate from Facebook's affirmative claims.  The Court disagrees.  A determination that UpVoice 2021 does not violate the particular laws at issue in these counterclaims would not in itself require Facebook to allow the use of UpVoice 2021 on its social networks.  BrandTotal cites *hiQ*'s reference to the plaintiff in that case having asserted declaratory judgment claims (including claims to declare that it did not violate the CFAA and section 502), *see* 938 F.3d at 992, but the Ninth Circuit's analysis focused on the plaintiff's interference with contract claim, *id.* at 995–99, and addressed the CFAA only in the context of the defendant's argument that it preempted the interference claim, *id.* at 999–1004, not to consider the merits of the plaintiff's claim for declaratory judgment.

contract, but not just any such purpose suffices." *hiQ*, 938 F.3d at 997. "'Whether an intentional interference by a third party is justifiable depends upon a balancing of the importance, social and private, of the objective advanced by the interference against the importance of the interest interfered with, considering all circumstances including the nature of the actor's conduct and the relationship between the parties.'" *Id.* (quoting *Herron v. State Farm Mut. Ins. Co.*, 56 Cal. 2d 202, 206 (1961)). Courts must determine whether the defendant's interest outweighs societal interests in stability of contracts (the defendant's mere pursuit of economic advantage generally does not), "whether the means of interference involve no more than recognized trade practices," "whether the conduct is within the realm of fair competition," and—most importantly—"whether the business interest is pretextual or asserted in good faith." *Id.* (citations and internal quotation marks omitted).

The Court previously dismissed this claim based on the defense of a legitimate business purpose, which was satisfied as to the allegations of the original counterclaims both by Facebook's interest in enforcing its own terms of use, and by Facebook's obligation to comply with the FTC's order. 1st MTD Order at 14–15. The Court also noted that BrandTotal may not have satisfied the affirmative elements of its claim:

> Whether BrandTotal has included sufficient allegations of each of those elements is a close call, and Facebook might be correct that BrandTotal's counterclaim requires further specificity as to, for example, the nature of its contracts with customers, the extent to which it could perform those contracts relying only on non-Facebook data sources, and what BrandTotal believes Facebook knew or intended when it deactivated BrandTotal's accounts and asked Google to remove BrandTotal's products from Google's store.

*Id.* at 12.

### 1.    Legitimate Business Purpose Defense

The FTC order is an appropriate starting point for the Court's analysis here, because Facebook's obligations under that order provided the clearest basis for dismissal of BrandTotal's tortious interference counterclaims as originally pleaded. That order requires Facebook to deny access to any "Covered Third Party" that failed to certify its compliance with Facebook's terms of use, and BrandTotal did not dispute for the purpose of the previous motion to dismiss that it was a

"Covered Third Party." *See* 1st MTD Order at 15 (summarizing the FTC order).[6]  Since BrandTotal did not obtain Facebook's permission to use automated means to collect data, as required by Facebook's terms of use, BrandTotal could not and did not certify compliance with those terms.  The Court therefore held that, based on BrandTotal's original allegations, Facebook was required to deny BrandTotal access.

BrandTotal advances a number of arguments that are not particularly persuasive, including that the order was intended only to target third parties' collecting users' personal data without those users' consent, that the FTC only required Facebook to enforce violations in a manner proportionate to their severity (as opposed to necessarily blocking all access), and that construing the FTC order to apply in these circumstances would place it in conflict with the Ninth Circuit's decision in *hiQ*.  *See* Defs.' Opp'n at 2, 4–5, 13–15.

Requiring third parties to obtain permission from Facebook before engaging in automated data collection is consistent with the FTC's intent to protect users from unauthorized data collection, because without at least some form of vetting, a third party that purports to obtain consent might maliciously collect more data than users authorize, or even if a third party acts in good faith to obtain consent, its product might have unforeseen uses or vulnerabilities that would cause it to exceed that consent—as with the previous version of UpVoice potentially capturing data from users of shared computers who had not themselves consented to its use.

While BrandTotal is correct that one provision of the FTC order requires Facebook to enforce violations of its terms "based solely on the severity, nature, and impact of the violation; the Covered Third Party's malicious conduct or history of violations; and applicable law," FTC Order § VII(E)(1)(d),[7] a separate and more specific provision requires, "if the Covered Third Party

---

[6] In a footnote of its brief opposing a preliminary injunction, Facebook implies that BrandTotal conceded that it is a "Covered Third Party," relying on a statement by BrandTotal's counsel at the hearing on its motion for a TRO.  *See* Pl.'s Opp'n (dkt. 134) at 21 n.12.  The full statement, in response to the Court's question of whether BrandTotal was a "Covered Third Party," was as follows: "I would think that we would be, Your Honor, yes.  But I would want to study that specific question more, because it wasn't raised."  Oct. 20, 2020 Hr'g Tr. (dkt. 57) at 8:24–9:1.  In light of counsel's specifically-stated intent to further investigate the issue, his statement was not a concession.

[7] The FTC order is included in the record in a number of places, including as Exhibit C to BrandTotal's amended counterclaims.

1  fails to complete the annual self-certification, denying or terminating access to all Covered

2  Information unless the Covered Third Party cures such failure within a reasonable time, not to

3  exceed thirty (30) days," *id.* § VII(E)(1)(b).  There is no dispute that BrandTotal has not self-

4  certified compliance with Facebook's terms of use—which require Facebook's permission for any

5  automated data collection—as would be required for a Covered Third Party.

6         As for *hiQ*, that case concerned blocking a competitor's access to "otherwise public data."

7  *hiQ*, 938 F.3d at 998.  The opinion in *hiQ* repeatedly distinguished a scenario where information

8  was not available to the general public, noting, for example, that the defendant could "satisfy its

9  'free rider' concern by eliminating the public access option" and restricting the data at issue to

10  certain users of its platform.  *Id.* at 995.  Here, there is no dispute that while some of the

11  information BrandTotal gathered was "otherwise public," not all of it was—particularly with

12  respect to the original version of UpVoice, which captured user demographic data.  Principles of

13  *hiQ* might nonetheless inform the outcome here, but there is no clear conflict that would render the

14  FTC's order unenforceable, at least with respect to password-protected portions of Facebook's

15  network.

16         BrandTotal's strongest argument—at least for opposing the present motion to dismiss—

17  that the FTC order does not justify Facebook's conduct is that, as alleged for the first time in

18  BrandTotal's amended counterclaim, BrandTotal is not a "Covered Third Party" as that term is

19  used in the FTC order, because BrandTotal collects data "only as part of a User-initiated transfer

20  of information as part of a data portability protocol or standard."  FACC ¶ 157.  The FTC order

21  defines a "Covered Third Party" as one that collects certain information *outside* of such a user-

22  initiated transfer and protocol.  FTC Order at 3, ¶ E.  Accordingly, if BrandTotal only collects data

23  in that manner, it is not a Covered Third Party, not required to complete to annual self-

24  certification, and not subject to mandatory blocking by Facebook for its failure to certify

25  compliance with Facebook's terms of use.

26         Facebook argues that BrandTotal does not fall within that carve-out from the definition of

27  a Covered Third Party because it does not in fact use a "'protocol or standard' for transferring a

28  user's *own* data."  Pl.'s Mot. (dkt. 132) at 10 (emphasis added).  Both parties rely on vague

United States District Court
Northern District of California

1  language from ISO, an international standards organization, with BrandTotal attaching to its

2  counterclaims a screenshot of an ISO webpage defining "data portability" as "ability to easily

3  transfer data from one system to another without being required to re-enter data," FACC Ex. B,

4  and Facebook requesting judicial notice of an earlier portion of the same ISO webpage stating in

5  an "introduction" section that the "goal of portability is to enable cloud service customers (CSCs)

6  to move their data or applications between non-cloud and one or more cloud services and between

7  cloud services."[8]  Facebook also requests judicial notice of its own press release announcing its

8  own tool allowing a user to transfer their photos from Facebook to Google Photos, asserting that

9  feature is more in line with the type of data portability protocol contemplated by the FTC order.

10  Pl.'s Mot. at 10.

11      The parties' reliance on extrinsic evidence—even if some of it is subject to judicial

12  notice—drives home that this is not a matter suitable for resolution on the pleadings.  While the

13  original 2012 version of the FTC order was issued unilaterally, the operative version issued on

14  April 27, 2020 reflects a stipulation between the FTC and Facebook in a judicial enforcement

15  proceeding, and thus resembles a consent decree.  *See* FACC Ex. C at 1.  Interpreting ambiguous

16  language in such a document may require extrinsic evidence:

> Since a consent decree or order is to be construed for enforcement
> purposes basically as a contract, reliance upon certain aids to
> construction is proper, as with any other contract. Such aids include
> the circumstances surrounding the formation of the consent order, any
> technical meaning words used may have had to the parties, and any
> other documents expressly incorporated in the decree. [Footnote.]
> Such reliance does not in any way depart from the 'four corners' rule
> of [*United States v. Armour & Co.*, 402 U.S. 673 (1971)].
>
> [Footnote:] Assuming that a consent decree is to be interpreted as a
> contract, it would seem to follow that evidence of events surrounding
> its negotiation and tending to explain ambiguous terms would be
> admissible in evidence

24  *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 238 & n.11 (1975) (considering an FTC

25  consent order).

---

27  [8] ISO/IEC 19941:2017(en), Information technology—Cloud computing—Interoperability and

28  portability, https://www.iso.org/obp/ui/#iso:std:iso-iec:19941:ed-1:v1:en (accessed May 24, 2021); *see* Pl.'s Mot. at 10.

1    BrandTotal has alleged that it "receives information only as part of a User-initiated transfer

2    of information as part of a data portability protocol or standard."  FACC ¶ 157.  It alleges that

3    users chose to share with BrandTotal data that either they had previously provided to Facebook or

4    was presented to them on Facebook.  The Court takes those allegations as true.  Requiring more

5    detailed allegations as to the precise workings of BrandTotal's product or the facts underlying its

6    interpretation of this term in the FTC order would go beyond the requirements of Rule 8(a) and

7    *Iqbal*, and definitely resolving the ambiguous language of the order will likely at least some

8    degree of extrinsic evidence.  Facebook is aware of BrandTotal's theory, and based on

9    BrandTotal's allegations, that theory is sufficiently plausible to proceed.

10   Facebook's defense that enforcement of its own contract was a legitimate business purpose

11   is also inappropriate for resolution on the pleadings.  Adjudicating affirmative defenses on a

12   motion to dismiss is the exception rather than the rule.  "[P]laintiffs ordinarily need not plead on

13   the subject of an anticipated affirmative defense"; such defenses are relevant on a motion under

14   Rule 12(b)(6) only when they are "obvious on the face of a complaint" or from facts subject to

15   judicial notice.  *Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 902 (9th Cir. 2013) (citations

16   and internal quotation marks omitted); *see also*, *e.g.*, *Special Situations Fund III QP, L.P. v.*

17   *Marrone Bio Innovations, Inc.*, 243 F. Supp. 3d 1109, 1122 (E.D. Cal. 2017).  A defendant's

18   enforcement of its own contract is not an absolute defense to interference—even then, the

19   "determinative question" is whether the party acted in good faith.  *Richardson v. La Rancherita*,

20   98 Cal. App. 3d 73, 81 (1979); *see also Webber v. Inland Empire Invs.*, 74 Cal. App. 4th 884, 902

21   (1999).  Even if Facebook can show based on BrandTotal's allegations and facts subject to judicial

22   notice that it had a right to enforce its terms of service, it is not "obvious on the face of"

23   BrandTotal's counterclaims that such enforcement was done in good faith.  *See Rivera*, 735 F.3d

24   at 902.  And unlike the original counterclaim, which the Court dismissed because "BrandTotal

25   ha[d] not alleged any particular motive by Facebook," 1st MTD Order at 14, BrandTotal now

26   alleges that 'Facebook's fraudulent and misleading statements to Google were known by

27   Facebook to be false, and its actions were malicious," FACC ¶ 149, which BrandTotal supports

28   with additional factual allegations that Facebook's investigations of BrandTotal would have

United States District Court
Northern District of California

14

1    revealed that BrandTotal's terms of service disclosed to panelists the data it collected, *id.* ¶¶ 190–

2    91.

3    At the hearing, Facebook relied on arguments raised more clearly in its opposition to a

4    preliminary injunction than its briefing on the motion to dismiss, including that its statement to

5    Google was accurate because of potential issues around the margin of disclosing BrandTotal's

6    data collection activities: that BrandTotal described Facebook as a "participating site" on its

7    website; that BrandTotal did not obtain consent from advertisers, and might have obtained names

8    or location data for individuals who sponsored advertisements; and the potential issue with users

9    of shared computers.  Pl.'s Opp'n (dkt. 134) at 19.  None of those theories are necessarily what a

10   reader of the phrase "improperly scraping user PII (e.g. gender, relationship status, ad interests,

11   etc.), without proper disclosure," FACC Ex. I, would naturally take it to mean, and nothing on the

12   face of BrandTotal's counterclaims suggests such issues in fact motivated Facebook's employee

13   Jeremy Brewer to assert lack of proper disclosure to Google.  That incongruity, coupled with

14   Facebook following up with Google to press for a resolution days later after receiving inquiries

15   about BrandTotal's capabilities from advertising customers, raises at least a specter of bad faith

16   sufficient to render BrandTotal's allegation plausible.

17   Facebook cites *Savage v. Pacific Gas & Electric Co.*, 21 Cal. App. 4th 434 (1993), for the

18   proposition that an "unfounded opinion" may be protected speech for the purpose of an

19   interference claim, based on the "social value in allowing business contacts of enterprises dealing

20   with the public to comment freely on matters affecting their own or the public interest."  21 Cal.

21   App. 4th at 450; *see* Pl.'s Opp'n at 19.  It is possible that Brewer's characterization of BrandTotal

22   was merely an "unfounded opinion," offered in good faith, which would not defeat Facebook's

23   legitimate business purpose of enforcing its terms of use.  It is also possible that it was made in

24   bad faith, with knowledge of falsity (or at least omission) or reckless disregard as to its truth, for

25   the purpose of inducing Google to remove UpVoice Legacy.  BrandTotal has alleged the latter,

26   and its allegation is sufficiently plausible to proceed.[9]

27   _____

28   [9] BrandTotal also relies heavily, and mistakenly, on a 2019 report by Facebook's researcher

United States District Court
Northern District of California

United States District Court
Northern District of California

1  The Court therefore declines to dismiss BrandTotal's interference claims based on

2  Facebook's asserted defense of a legitimate business interested.

3  **2.    Contracts at Issue**

4  The first element of a claim for interference with contract is the existence of a valid

5  contract between the plaintiff and a third party.  *hiQ*, 938 F.3d at 995.  BrandTotal identifies four

6  classes of contracts at issue: contracts between BrandTotal and its corporate customers, FACC

7  ¶ 120, contracts between BrandTotal and its individual "Panelists," *id.* ¶ 129, contracts between

8  BrandTotal and its investors, *id.* ¶ 138, and a contract between BrandTotal and Google, *id.* ¶ 143.

9  This order addresses the remaining elements of the claim—the defendant's knowledge of the

10  contract, the defendant's intentional act to disrupt, actual disruption, and damage, *hiQ*, 938 F.3d at

11  995–96—for each class of contract separately.

12  a.    Contracts with Customers

13  Other than the affirmative defenses discussed above, Facebook moves to dismiss

14  BrandTotal's claim for interference with customer contracts primarily on the basis that Facebook

15  was not aware of any specific contracts between BrandTotal and its customers.  Pl.'s Mot. at 12;

16  Pl.'s Reply (dkt. 142) at 7.

17  "'To be subject to liability [for inducing a breach of contract], the actor must have

18  knowledge of the contract with which he is interfering and of the fact that he is interfering with the

19  performance of the contract.'"  *Jenni Rivera Enters., LLC v. Latin World Ent. Holdings, Inc.*, 36

20  Cal. App. 5th 766, 783 (2019) (quoting *Little v. Amber Hotel Co.*, 202 Cal. App. 4th 280, 302

21  (2011)) (alteration in original).  But under California law, "the defendant need not know exactly

22  who is a party to the contract, so long as he knows he is interfering with a contractual

23

24  Sanchit Karve characterizing a separate BrandTotal mobile app, Social One—which BrandTotal
contends functioned in a materially identical manner to UpVoice Legacy—as "harmless."  FACC

25  ¶¶ 59, 63, 155 & Ex. E.  In context, Karve clearly distinguishes between the code included in the
"app itself," which he concluded did not "contain any spyware/code within it," and a script that he

26  determined the app "inject[ed]," which he concluded appeared to suggest scraping of "profile info
and ads," necessitating further analysis "to see what they're stealing exactly" and perhaps "legal

27  action against these guys."  *Id.* Ex. E.  Taken as a whole, the report cannot reasonably be
interpreted as indicating that Karve believed Social One was "harmless."  But regardless of the

28  merits of the "harmless" characterization, BrandTotal has included sufficient allegations of bad
faith with respect to Facebook's assertion that it lacked sufficient disclosures, as discussed above.

relationship." *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1092 (9th Cir. 2005).  Courts have found this element satisfied where a hair product company informed pharmacies selling "diverted" products that it had a "salon-only" distribution policy and all authorized buyers were bound by contract not to distribute them to non-salon resellers, even though the pharmacies did not know the specific other parties to those contracts, *Sebastian Int'l, Inc. v. Russolillo*, 162 F. Supp. 2d 1198, 1203–04 (C.D. Cal. 2001), and where the operator of a nursing facility overstayed its lease with knowledge that the facility had been leased to a new operator, but did not know the identity of that new lessee, *Ramona Manor Convalescent Hosp. v. Care Enters.*, 177 Cal. App. 3d 1120, 1132 (1986).

Here, BrandTotal alleges that Facebook knew of its relationships with customers based on BrandTotal's advertisements, BrandTotal's statement on its website that "'[m]any of the most recognizable consumer brands'" used its product, specific customers' communications with Facebook, and through Facebook's investigation of various BrandTotal products over the course of multiple years.  FACC ¶¶ 121–22, 125 & Exs. D–H.  Facebook argues that such potential sources of information fall short of showing actual knowledge of any contract, particularly when the first internal Facebook email referencing a particular customer actually using BrandTotal was dated September 22, 2020, one day after Facebook reported UpVoice to Google as potentially scraping user information on September 21, 2020.[10]  Pl.'s Mot. at 12; Pl.'s Reply at 7.  But BrandTotal is not required to prove its case in its complaint.  BrandTotal has alleged that Facebook knew of its contracts to sell the data it gathered from Facebook, FACC ¶ 121, and the alleged potential sources of such knowledge render that allegation plausible.  On a motion to dismiss under Rule 12(b)(6), that is enough.

Facebook also somewhat indirectly attacks BrandTotal's showing of actual disruption,

---

[10] The Court notes that although Facebook employees sent their first two emails to Google one day before the internal email discussing a customer who used BrandTotal, Google did not immediately respond, and Facebook employee Sanchit Karve followed up several days later "to ask if [Google] had a chance to look into our request."  FACC Ex. I.  BrandTotal is also correct that the September 22 email refers to Facebook having "learned"—in the past tense—that the customer used BrandTotal, which leaves a possibility that Facebook obtained that knowledge before reporting UpVoice to Google.

United States District Court
Northern District of California

asserting that the internal email concerned "a BrandTotal client contract that BrandTotal does *not* allege was disrupted." Pl.'s Mot. at 12. But BrandTotal alleges that its "entire business is premised on access to content on social media, the vast majority of which comes from Facebook," and that "by acting to have UpVoice removed from the Chrome Store, Facebook removed BrandTotal's ability to collect data from any site via UpVoice, not just from Facebook." FACC ¶ 127. BrandTotal also alleges that it "has lost current and prospective customers and has had to give credits of monthly membership fees to customers," *id.* ¶ 88, and that Facebook has made BrandTotal's "collection of this advertising information more costly" by forcing BrandTotal to redesign UpVoice before resubmitting it to the Google Chrome Store, *id.* ¶ 92. Those allegations do not carve out any particular customer contracts from the disruption BrandTotal has alleged. Facebook does not pursue this argument in its reply, and the Court declines to dismiss BrandTotal's counterclaim on this basis.

Facebook's motion to dismiss is therefore DENIED as to BrandTotal's counterclaim for intentional interference with customer contracts.

b.     Contracts with Panelists

Facebook argues that BrandTotal's counterclaim for interference with its contracts with individual users or "panelists" must be dismissed because BrandTotal has not alleged that those users had any obligation to share their data with BrandTotal. Pl.'s Mot. at 12. BrandTotal describes its contracts with its panelists as follows:

> 129. BrandTotal had valid contracts with each of its Panelists.
>
> 130. When applying to be a Panelist, each individual must acknowledge and agree to the UpVoice Terms of Service. In consideration of a Panelist sharing their information with BrandTotal, BrandTotal provides the Panelist with monetary compensation. Similarly, users of Defendants' other extensions were compensated for the data they chose to share through use of the extension that improved the user's social media experience. If Panelists are unable to share their data with BrandTotal, Panelists cannot perform their duties under the UpVoice Terms of Service.

FACC ¶¶ 129–30.

Facebook may be correct that BrandTotal has not plausibly alleged an *obligation* by panelists to share data with BrandTotal. Despite its characterization of panelists' sharing data as

18

their "duties" under the UpVoice terms of service, the overall relationship BrandTotal describes tends to resemble a unilateral contract, in which the offeree has no obligation to perform, but the offeror is bound to reciprocate if the offeree in fact performs. *See Sateriale v. R.J. Reynolds Tobacco Co.*, 697 F.3d 777, 785 (9th Cir. 2012) ("In contrast to a bilateral contract, a unilateral contract involves the exchange of a promise for a performance. The offer is accepted by rendering a performance rather than providing a promise. Typical illustrations are found in offers of rewards or prizes." (cleaned up)). Here, it seems likely that BrandTotal agreed to provide rewards to panelists *if* they shared their data, and less likely that panelists committed to providing any particular amount of data such that they could be held responsible for breach of contract if they ceased using UpVoice. With only a cursory description of BrandTotal's terms of service included in its counterclaim, and no clear allegation that panelists were *obligated* to use UpVoice, it is difficult to say.

The distinction is not the knockout blow that Facebook suggests, but also not entirely insignificant (as BrandTotal appears to assume). While not addressed by either party here, the California Supreme Court has recently held that a claim for interference with an at-will contract requires showing wrongfulness beyond mere interference, based on its resemblance to a claim for interference with prospective relations—in particular, the lack of any "legal basis in either case to expect the continuity of the relationship or to make decisions in reliance on the relationship." *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1147 (2020). The same considerations would seem to apply to a contract that did not require panelists to use UpVoice in the future. If panelists had no obligation to provide data, BrandTotal would need to allege and prove wrongfulness.

But in any event, BrandTotal has sufficiently alleged that the same conduct by Facebook was unlawful for interfering with its *customer* contracts, where Facebook has not disputed that BrandTotal had a sufficiently binding obligation. The alleged conduct is therefore tortious for intentionally interfering with customer contracts. If the conduct is a tort with respect to customer contracts, it is "wrongful" for a reason independent of its effect on panelist contracts. BrandTotal has alleged that Facebook's interference with panelist contracts was wrongful at least on that

1   basis, and perhaps also based on its plausible allegations of bad faith discussed above in the

2   context of Facebook's legitimate business interest defense.[11]

3          Facebook's motion is therefore DENIED as to BrandTotal's counterclaim for intentional

4   interference with panelist contracts.

5                          c.      Contracts with Investors

6          BrandTotal's only allegations regarding its contracts with investors are that it "had valid

7   contracts with multiple investors," that Facebook was aware of the identities of certain specific

8   investors, and that BrandTotal had raised several million dollars in investment.  FACC ¶¶ 138–40.

9   Facebook contends that BrandTotal has not "identifie[d] any contract that has been breached or

10  any duty the performance of which has been rendered more burdensome."  Pl.'s Mot. at 12.

11  Facebook is correct.  Unlike with customers, where there is at least some basis for an inference

12  that BrandTotal was contractually obligated to deliver analytics services that Facebook's conduct

13  rendered impossible or more burdensome, a typical investor relationship would involve investors

14  providing funding in return for an ownership stake in BrandTotal, not a specific obligation on

15  BrandTotal to provide any particular service.  BrandTotal's only response is to cite its allegations

16  of harm, which in turn cite a declaration discussing BrandTotal's difficulties attracting *new*

17  investment.  Defs.' Opp'n at 16; FACC ¶¶ 84–92 & Ex. L, ¶¶ 8–10.

18         BrandTotal cites no authority for the proposition that harm to a company constitutes

19  interference with its existing investor contracts merely on the basis that it reduces investors'

20  expected returns.  Such a rule would elide basic distinctions of the corporate form, and would

21  threaten to bring virtually any vigorous competition within the scope of an intentional interference

22  claim.  *Cf. Ixchel*, 9 Cal. 5th at 1148 (considering the risk of "chilling legitimate business

23  competition" and "expos[ing] routine and legitimate business competition to litigation" in setting

24  the contours of intentional interference with at-will contracts).

25         Facebook's motion is GRANTED as to BrandTotal's counterclaim for intentional

26  interference with investor contracts.  BrandTotal has not identified any way it could further amend

27

28  _____
    [11] Since the parties have not briefed this issue of independent wrongfulness in detail, this order is
    without prejudice to arguments that either party might present on that issue at summary judgment.

*United States District Court*
*Northern District of California*

1   its counterclaims to allege interference with any existing contract with investors beyond mere

2   diminished returns.  The Court nevertheless grants leave to amend if BrandTotal believes it can

3   cure the defects identified above.

4              d.       Contract with Google

5       BrandTotal alleges that it "had a valid contract with Google under which BrandTotal was

6   able to provide developer services and promote its product on the Chrome web store," which

7   Facebook disrupted by "fraudulently" reporting that BrandTotal was scraping users' personal

8   information "without proper disclosure."  FACC ¶¶ 143–50.

9       Facebook, requesting judicial notice of the developer agreement on Google's website,

10   argues that "Google took its enforcement action pursuant to, not in violation of, the Google

11   Chrome Web Store Developer Agreement," which "provides that Google may, at any time,

12   remove extensions that violate a third party's terms of service."  Pl.'s Mot. at 12.  Facebook also

13   contends that the removal of UpVoice Legacy did not prevent BrandTotal from listing other

14   products in the Google Chrome store, including later versions of UpVoice.  *Id.* at 13.  BrandTotal

15   responds that the developer agreement was tied to particular products (citing its introductory

16   paragraph stating that the "Web Store is a publicly available site on which Developers can publish

17   Products"), and that the allegation that Google removed UpVoice Legacy based on Facebook's

18   misrepresentation of BrandTotal's data gathering and disclosures must be taken as true on a

19   motion under Rule 12(b)(6).  Defs.' Opp'n at 16–17.  Facebook reiterates in its reply that Google

20   reserved the right to suspend or remove products from its store, and argues that, "absent a

21   contractual right or obligation that has been disrupted, BrandTotal can state no claim for relief."

22   Pl.'s Reply at 8.

23       While BrandTotal's characterization of the developer agreement as pertaining to a specific

24   product is somewhat questionable, and Facebook is correct that the agreement did not grant

25   BrandTotal a *right* to continue offering UpVoice Legacy or impose any *obligation* on Google to

26   continue hosting it, the availability of UpVoice Legacy in Google's store was nevertheless one

27   benefit of BrandTotal and Google's contractual relationship that BrandTotal had enjoyed until the

28   time of Facebook's alleged interference.  *See PG&E*, 50 Cal. 3d at 1127 ("[I]t is the contractual

United States District Court
Northern District of California

21

relationship, not any term of the contract, which is protected against outside interference."). Google's contractual right to remove UpVoice Legacy from its store resembles in some ways the right of a party to terminate an at-will contract—which the California Supreme Court has held may support a claim for intentional interference when it is provoked a defendant's wrongful act. *See Ixchel*, 9 Cal. 5th at 1148.

For the purpose of Facebook's present motion, the Court takes as true BrandTotal's allegation that Facebook misrepresented BrandTotal's practices by asserting that UpVoice Legacy collected personal information without proper disclosures, and that this misrepresentation caused Google to remove UpVoice Legacy from its store.  Those issues may warrant further exploration on a factual record—for one thing, there is some reason to believe that Google removed UpVoice Legacy based on its own determination that the product violated Google's policy against sharing data for advertising purposes, rather than any improper disclosure or violation of Facebook's terms of use.  *See* FACC Ex. I (email from a Google employee to Facebook employees stating that, based on "quickly looking through [BrandTotal's] privacy policy[,] it does look like they are collecting a bunch of information for advertising purposes which is a no no").  But BrandTotal has met its relatively low burden to proceed beyond the pleadings on this claim.

### D.   Interference with Prospective Economic Relations

A claim for intentional interference with prospective economic relations is similar to intentional interference with contract.  "A plaintiff asserting this tort must show that the defendant knowingly interfered with an 'economic relationship between the plaintiff and some third party, [which carries] the probability of future economic benefit to the plaintiff.'"  *Ixchel*, 9 Cal. 5th at 1141 (quoting *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003)) (alteration in original).  "Although this need not be a contractual relationship, an existing relationship is required."  *Roth v. Rhodes*, 25 Cal. App. 4th 530, 546 (1994) (citing *Buckaloo v. Johnson*, 14 Cal. 3d 815, 829 (1975), *abrogated on other grounds by Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376 (1995)).  As with a claim based on an at-will contract, discussed above, the plaintiff "must plead as an element of the claim that the defendant's conduct was 'wrongful by some legal measure other than the fact of interference itself.'"  *Id.* at 1142

United States District Court
Northern District of California

1     (quoting *Della Penna*, 11 Cal. 4th at 393).

2            BrandTotal alleges, and attaches to its counterclaim a declaration stating, that certain

3     potential investors and customers walked away from negotiations (and some current customers

4     froze their accounts) after Facebook's alleged interference.  FACC ¶ 168 & Ex. L, ¶¶ 9, 17–22.

5     The customers who froze their accounts are presumably encompassed within BrandTotal's

6     interference with contract claim.  As for potential new customers and investors, BrandTotal has

7     not alleged any existing relationship at the time of interference, as required to proceed on this

8     claim.  *See Roth*, 25 Cal. App. 4th at 546.  At least one district court has held that where

9     "negotiations and discussions . . . never crystalized into something more . . . no specific,

10    identifiable economic relationship was disrupted" sufficient to support an interference claim.

11    *Medina v. Microsoft Corp.*, No. C 14-0143 RS, 2014 WL 2194825, at *4 (N.D. Cal. May 23,

12    2014).  BrandTotal is correct that a case cited by Facebook holding a relationship sufficient where

13    parties had "had put pen to paper" and executed a term sheet[12] does not necessarily set the

14    minimum standard for interference with prospective relations, but BrandTotal cites no authority

15    allowing a claim to proceed based merely on the sort of negotiations it has alleged.

16           Even if BrandTotal alleged a sufficient prospective relationship, it has not plausibly

17    alleged that Facebook knew of such a relationship.  BrandTotal relies on an internal Facebook

18    email noting "several advertiser partners asking [Facebook's] sales team for their [point of view]

19    on [BrandTotal's] capabilities."  FACC ¶ 164 & Ex. H.  Curiosity about BrandTotal's capabilities

20    does not plausibly suggest any existing relationship between those advertisers and BrandTotal.

21           A claim for interference with prospective economic relations can lie where parties have

22    entered a contract that is unenforceable.  *See Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Vill.*

23    *Square Venture Partners*, 52 Cal. App. 4th 867, 879 (1997).  In an abundance of caution, Court

24    therefore allows this claim to proceed in the alternative to BrandTotal's interference with contract

25    claim as to its relationship with *existing* customers, *existing* panelists, and Google.  As for merely

26

27    ──────────────────────

28    [12] *Loop AI Labs Inc v. Gatti*, No. 15-cv-00798-HSG, 2015 WL 5158639, at *5 (N.D. Cal. Sept. 2, 2015).

23

United States District Court
Northern District of California

1   *prospective* customers and investors,[13] however, this claim is DISMISSED, with leave to amend if

2   BrandTotal can cure the defects identified above.

3       **E.   UCL Claim**

4       California's UCL broadly prohibits unlawful, unfair, and fraudulent business acts.  *Korea*

5   *Supply*, 29 Cal. 4th at 1143.  "Unlawful acts are anything that can properly be called a business

6   practice and that at the same time is forbidden by law . . . be it civil, criminal, federal, state, or

7   municipal, statutory, regulatory, or court-made, where court-made law is, for example a violation

8   of a prior court order."  *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1151 (9th Cir.

9   2008) (ellipsis in original) (citations and internal quotation marks omitted).  "Unfair acts among

10  competitors means 'conduct that threatens an incipient violation of an antitrust law, or violates the

11  spirit or policy of those laws because its effects are comparable to or the same as a violation of the

12  law, or otherwise significantly threatens or harms competition.'"  *Id.* at 1152 (quoting *Cel-Tech*

13  *Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999)).  "Finally, fraudulent acts

14  are ones where members of the public are likely to be deceived."  *Id.*

15       **1.    "Unlawful" Prong**

16      BrandTotal's counterclaim under the "unlawful" prong is based on its theories of tortious

17  interference, and the parties agree that it rises or falls with those counterclaims.  Because the Court

18  denies Facebook's motion to dismiss at least some aspects of those counterclaims as discussed

19  above, Facebook's motion to dismiss BrandTotal's counterclaim under the unlawful prong of the

20  UCL is also DENIED.

21       **2.    "Unfair" Prong**

22      As the Court noted in its previous order, an "unfair" claim by a competitor under the UCL

23  generally must implicate the antitrust laws.[14]  1st MTD Order at 16 (citing *Sybersound*, 517 F.3d

---

[13] BrandTotal has not asserted interference with prospective economic advantage as to potential
prospective panelists.  *See* FACC ¶¶ 161–69.  If it had, the Court would similarly dismiss that
aspect of the claim for failure to allege existing relationships or Facebook's knowledge of such a
relationships.

[14] There may be other circumstances were wrongful conduct can support an "unfair" UCL claim,
*see, e.g.*, *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1214–15 (9th Cir. 2020), *cert. petition
docketed*, No. 20-1374 (U.S. Mar. 26, 2021), but those theories are limited to claims by consumers

24

United States District Court
Northern District of California

at 1152). "When a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act or practice invokes section 17200, the word 'unfair' in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999). Courts have dismissed competitors' claims under this prong of the statute where plaintiffs fail to identify "any 'unusual' aspect of the alleged conduct that would make that conduct something that violates the 'policy and spirit' of the antitrust laws without violating the actual laws themselves," comparable to the *Cel-Tech* defendant's "'privileged status as one of two holders of a lucrative government-licensed duopoly.'" *Synopsys, Inc. v. ATopTech, Inc.*, No. C 13-2965 MMC, 2015 WL 4719048, at *10 (N.D. Cal. Aug. 7, 2015) (quoting *Cel-Tech*, 20 Cal. 4th at 190); *see also Creative Mobile Techs., LLC v. Flywheel Software, Inc.*, No. 16-cv-02560-SI, 2017 WL 679496, at *6 (N.D. Cal. Feb. 21, 2017).

BrandTotal contends that it has remedied its previous failure to show injury to competition, as opposed to mere injury to itself, by adding allegations to "detail how Facebook is harming all competition that involves collection of data from its site," having "structured its policies and actions in such a way as to monopolize data about commercial advertising on its site and prevent competition for third-party advertising information." Defs.' Opp'n at 19. Facebook argues that BrandTotal has not sufficiently alleged either monopoly power in a relevant product market or an exception to the usual rule that unilateral refusal to deal with a competitor is not an antitrust violation, both of which would be necessary for it to proceed on its claim. Pl.'s Mot. at 18.

BrandTotal has not alleged unusual circumstances that would allow something other than an antitrust violation to support an "unfair" prong claim here. Its theory of what makes Facebook's conduct unfair is relatively straightforward: Facebook is extremely large and powerful, it controls a product that BrandTotal would like to access, it has denied BrandTotal that access both by refusing to permit it and by pressuring another company (Google) to alter its

---

rather than competitors, *see Morgan v. AT&T Wireless Servs., Inc.*, 177 Cal. App. 4th 1235, 1254 (2009), and BrandTotal has not asserted them here, *see* Defs.' Opp'n at 19–21.

dealings with BrandTotal, and it also denies other potential competitors access, all to further Facebook's own competitive advantage and "maintain a monopoly over the Third-Party Advertising Information on Facebook." *See* FACC ¶¶ 173–83. The antitrust laws are equipped to deal with such a theory, and to determine whether it should be considered monopolization (or otherwise anticompetitive) or merely vigorous competition by a powerful market participant.

As a starting point to state such a claim, BrandTotal must identify a product market:

> Plaintiffs must plead a relevant market to state an antitrust claim under the Sherman Act, unless they assert a per se claim. While plaintiffs need not plead a relevant market with specificity, there are some legal principles that govern the definition of an antitrust "relevant market," and a complaint may be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially unsustainable.

> The relevant market must include both a geographic market and a product market. The latter . . . must encompass the product at issue as well as all economic substitutes for the product. Economic substitutes have a reasonable interchangeability of use or sufficient cross-elasticity of demand with the relevant product. Including economic substitutes ensures that the relevant product market encompasses the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business.

*Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120–21 (9th Cir. 2018) (cleaned up). "[O]ne method of determining whether a proposed market is viable is assessing 'whether a monopolist in the proposed market could profitably impose a small but significant and nontransitory price increase." *Id.* at 1122–23 (quoting *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1002 (9th Cir. 2018)). A complaint that "merely restate[s] a test for market definition without any factual elaboration" is not sufficient. *Id.* at 1122.

BrandTotal's amended counterclaim is inconsistent as to a relevant market. It asserts that the "market comprises at least Facebook's site, which has more users than the size of by far most countries in the world." FACC ¶ 173. Certain other allegations similarly reference a "market for Third Party Advertising Information on Facebook." *Id.* ¶ 125; *see also id.* ¶¶ 15, 179, 182. But a market definition of "at least" one product is no definition at all, and BrandTotal has not explained why data regarding advertising on other social media networks—or perhaps other media entirely—is not an economic substitute for information about Facebook ads. Some of

BrandTotal's other allegations tend to suggest a larger market, including that BrandTotal offers "competitive analyses of advertising efforts on social media sites like Facebook, Instagram, Twitter, YouTube, LinkedIn, Amazon and others," *id.* ¶ 44, and that Facebook has used its terms of service "to maintain monopoly power of data on its platform and in the social networking platform market," *id.* ¶ 15.[15]

"[M]any courts have rejected antitrust claims reliant on proposed advertising markets limited to a single form of advertising," *Hicks*, 897 F.3d at 1123, and "[s]ingle-brand markets are, at a minimum, extremely rare," *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008). While it is still conceivable that BrandTotal might be able to allege such a market here, some broader market in which Facebook holds power, or perhaps multiple potential markets in the alternative, it has not clearly done so, and certainly has not supported any such a market definition with sufficient factual allegations to render them plausible.

The general rule that a market participant may permissibly refuse to deal with its rivals is also an impediment to BrandTotal's claim. *See, e.g.*, *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407–08 (2004). BrandTotal argues that this is not a refusal-to-deal case because "Facebook is not merely a competitor, but also the operator of a social media site that reaches more than 2 billion users," because it has "interfere[d] with" rather than merely refused to aid BrandTotal's efforts to collect advertising data, and because "Facebook is not structuring deals to favor certain distributors; it is monopolizing data surrounding commercial advertisements that it displays to millions of users and taking steps to block anyone that would access that data." Defs.' Opp'n at 19–20. Ultimately, though, so long as Facebook generally has a right to set rules for accessing the password-protected portions of its website—a principle not reasonably in dispute—its refusal to authorize the access BrandTotal seeks is a refusal to deal with a potential competitor.

---

[15] BrandTotal's opposition brief further muddles its theory of a relevant market, asserting that, "[t]hough BrandTotal contends that the Facebook network is not itself a market, given the dominance of Facebook in the social media sphere, as alleged in the Amended Counterclaims, [FACC] ¶ 182, Facebook's monopolization of data on the Facebook network is crippling to any company engaged in social media commercial advertising." Defs.' Opp'n at 21.

United States District Court
Northern District of California

1       BrandTotal also argues that even if this is a refusal-to-deal case, the right to refuse to deal

2    is not absolute, as recognized by the Supreme Court in *Aspen Skiing Co. v. Aspen Highlands*

3    *Skiing Corp.*, 472 U.S. 585 (1985).  Defs.' Opp'n at 20.  BrandTotal contends that its counterclaim

4    need not track the precise elements of that case because the Court "did not set forth express

5    prerequisites."  *Id.*  This Court is bound by recent Ninth Circuit precedent to the contrary, which

6    provides that "[t]he one, limited exception to this general rule that there is no antitrust duty to deal

7    comes under the Supreme Court's decision in *Aspen Skiing*," and that the three key features of that

8    case—(1) unilateral termination of a voluntary and profitable course of dealing; (2) that could only

9    be intended to sacrifice short-term benefits for long-term monopolist profits; (3) involving

10   products already sold to other similarly situated customers—are "required elements for the *Aspen*

11   *Skiing* exception." *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 994–95 (9th Cir. 2020).

12      BrandTotal's counterclaim under the "unfair" prong of the UCL is therefore DISMISSED.

13   Although it is not obvious how BrandTotal would further amend to avoid the refusal-to-deal

14   doctrine, the Court grants it leave to attempt to do so if it believes it can.

15              **3.    "Fraudulent" Prong**

16      The Court previously dismissed a counterclaim under the "fraudulent" prong with

17   prejudice, because BrandTotal could not plausibly allege that references in Facebook's terms of

18   use to users owning their data or controlling their privacy settings were fraudulent when the

19   purportedly conflicting truth—that Facebook barred automated data collection—was also

20   contained in the terms of use.  1st MTD Order at 17–18.  BrandTotal's new version of this

21   counterclaim is distinct: it contends that Facebook's request that Google investigate or remove

22   UpVoice Legacy from Google's store was fraudulent in asserting that BrandTotal lacked proper

23   disclosures as to the personal data it collected, and rather than deceiving individual Facebook

24   users, Facebook deceived Google.  FACC ¶¶ 189–90.  Facebook contends that the previous

25   dismissal with prejudice is reason enough to dismiss this counterclaim again.  Perhaps BrandTotal

26   should have sought leave before reasserting a new version of this counterclaim previously

27   dismissed with prejudice, but given the significant factual differences between the new

28   counterclaim and the old, as well as Rule 15's general policy favoring amendment, the Court

United States District Court
Northern District of California

28

1  likely would not deny leave to attempt to assert this new and distinct counterclaim based solely on

2  the previous dismissal.

3        That said, the new counterclaim fails on its merits.  Facebook is correct that BrandTotal

4  cannot state a claim under the fraudulent prong of the UCL without showing a likelihood that

5  *members of the public* would be deceived:

> The "fraud" contemplated by section 17200's third prong bears little
> resemblance to common law fraud or deception. The test is whether
> the public is likely to be deceived." Stated otherwise, "Fraudulent,"
> as used in the statute, does not refer to the common law tort of fraud
> but only requires a showing members of the public are likely to be
> deceived.

10  *S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 888 (1999) (cleaned

11  up);[16] *see also, e.g.*, *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012) ("A

12  business practice is fraudulent under the UCL if members of the public are likely to be

13  deceived."); *Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.*, 178 F. Supp. 2d 1099, 1121 (C.D.

14  Cal. 2001) ("Though many courts have described the scope of business activities prohibited by

15  § 17200 in sweeping terms, there is no case authority that 'fraudulent' business acts are separately

16  actionable by business competitors absent a showing that the public, rather than merely the

17  plaintiff, is likely to be deceived.").  BrandTotal cites no authority recognizing a UCL

18  "fraudulent" claim under comparable circumstances of a third-party corporation allegedly being

19  deceived by a one-time communication directed to that corporation.  *See* Defs.' Opp'n at 22.

20        Because BrandTotal has not alleged any statement likely to deceive the public, and its

21  current theory could not be amended to do so, its new counterclaim under the "fraudulent" prong

22  of the UCL is DISMISSED with prejudice.

23  **IV.  CONCLUSION**

24        For the reasons discussed above, Facebook's motion to dismiss is GRANTED as to:

25  (1) BrandTotal's declaratory judgment counterclaims, which are dismissed without leave to amend

26  but without prejudice to seeking such leave if changed circumstances warrant; (2) BrandTotal's

27

28  [16] Facebook's reply brief slightly misquotes *South Bay Chevrolet*, omitting the phrase referencing
"the common law tort of fraud" without ellipsis or other indication.  *See* Pl.'s Reply at 14.

interference with contract counterclaim to the extent it is based on contracts with investors, which is dismissed with leave to amend; (3) BrandTotal's interference with prospective economic advantage counterclaim as to potential (but not existing) customers and investors, which is dismissed with leave to amend; (4) BrandTotal's counterclaim under the "unfair" prong of the UCL, which is dismissed with leave to amend; and (5) BrandTotal's counterclaim under the "fraudulent" prong of the UCL, which is dismissed with prejudice.

Facebook's motion is DENIED as to: (1) BrandTotal's interference with contract counterclaim to the extent it is based on contracts with existing customers, existing panelists, and Google; (2) BrandTotal's interference with advantage counterclaim as an alternative theory with respect to those same entities; and (3) BrandTotal's counterclaim under the "unlawful" prong of the UCL. Those counterclaims may proceed.

If BrandTotal believes it can cure the defects identified above as to the claims dismissed with leave to further amend, it may file a second amended counterclaim no later than June 25, 2021.

**IT IS SO ORDERED.**

Dated: June 3, 2021

_____
JOSEPH C. SPERO
Chief Magistrate Judge

United States District Court
Northern District of California