1

2
WILMER CUTLER PICKERING HALE AND
DORR LLP
3
SONAL N. MEHTA (SBN 222086)
sonal.mehta@wilmerhale.com
4
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

5

6
ARI HOLTZBLATT (*pro hac vice*)
Ari.Holtzblatt@wilmerhale.com
7
ALLISON SCHULTZ (*pro hac vice*)
Allison.Schultz@wilmerhale.com
8
ROBIN C. BURRELL (*pro hac vice*)
robin.burrell@wilmerhale.com
9
1875 Pennsylvania Ave, NW
Washington, DC 20006
10
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

HUNTON ANDREWS KURTH LLP
Ann Marie Mortimer (State Bar No. 169077)
amortimer@HuntonAK.com
Jason J. Kim (State Bar No. 221476)
kimj@HuntonAK.com
Jeff R. R. Nelson (State Bar No. 301546)
jnelson@HuntonAK.com
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627
Telephone: (213) 532-2000
Facsimile: (213) 532-2020

11

12
Attorneys for Plaintiff/Counterclaim Defendant
Facebook, Inc.

13

14
**UNITED STATES DISTRICT COURT**

15
**NORTHERN DISTRICT OF CALIFORNIA**

16
**SAN FRANCISCO DIVISION**

17
FACEBOOK, INC., a Delaware corporation,

18
                              Plaintiff/Counterclaim
                              Defendant,

19
        v.

20
BRANDTOTAL LTD., an Israeli corporation, and
UNIMANIA, INC., a Delaware corporation,
21
                              Defendants/
                              Counterclaim
22
                              Plaintiffs.

Case No. 3:20-CV-07182-JCS

**PLAINTIFF FACEBOOK INC.'S
REPLY IN SUPPORT OF MOTION
TO DISMISS THE DEFENDANTS'
SECOND AMENDED
COUNTERCLAIMS PURSUANT TO
FED. R. CIV. P. 12(B)(6)**

Hon. Joseph C. Spero
Courtroom F – 15th Floor
Date: August 27, 2021
Time: 9:30 a.m.

23

24

25

26

27

28

PLAINTIFF'S REPLY ISO MOTION TO DISMISS SECOND AMENDED COUNTERCLAIMS

**TABLE OF CONTENTS**

**Page**

I.      ARGUMENT ...................................................................................................................2

        A.      BrandTotal Cannot Avoid The Antitrust Laws ...............................................2

        B.      BrandTotal Still Fails To Plausibly Allege A Relevant Market ....................3

                1.      Third-Party Commercial Advertising Information On Personal Social
                        Networking Services In The United States .........................................3

                2.      Third-Party Commercial Advertising Information On The
                        Facebook.com And Instagram Platforms ............................................5

        C.      BrandTotal Still Fails To Plausibly Allege Monopoly Power .......................7

        D.      BrandTotal Still Fails To Allege An Exception To The Right To Refuse To
                Deal ................................................................................................................8

II.     CONCLUSION .............................................................................................................10

CASE NO. 3:20-CV-07182-JCS                                    PL.'S REPLY ISO MOT. TO DISMISS

1

**TABLE OF AUTHORITIES**

2
                                                                                          **Page(s)**

3
                                              **CASES**

4
*Apple, Inc. v. Psystar Corp.*,

5
    586 F. Supp. 2d 1190 (N.D. Cal. 2008) .................................................................................6

6
*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,

7
    472 U.S. 585 (1985).................................................................................................9, 10

8
*Bell Atlantic Corp. v. Twombly*,

    550 U.S. 544 (2007)........................................................................................................4

9
*Creative Mobile Technologies, LLC v. Flywheel Software, Inc.*,

10
    2017 WL 679496 (N.D. Cal. Feb. 21, 2017) ..............................................................2

11
*Diva Limousine, Ltd. v. Uber Techs., Inc.*,

    392 F. Supp. 3d 1074 (N.D. Cal. 2019) ......................................................................2

12

13
*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,

    504 U.S. 451 (1992)........................................................................................................6

14
*Federal Trade Commission v. Facebook, Inc.*,

15
    2021 WL 2643627 (D.D.C. June 28, 2021).........................................................7, 8, 10

16
*Federal Trade Commission v. Qualcomm Inc.*,

    969 F.3d 974 (9th Cir. 2020) ..................................................................................8, 10

17

18
*Flaa v. Hollywood Foreign Press Ass'n*,

    2020 WL 8256191 (C.D. Cal. Nov. 20, 2020).........................................................4, 6

19
*Hicks v. PGA Tour, Inc.*,

20
    897 F.3d 1109 (9th Cir. 2018) .....................................................................................5

21
*hiQ Labs, Inc. v. LinkedIn Corp.*,

    485 F. Supp. 3d 1137 (N.D. Cal. 2020) .................................................................9, 10

22

23
*In re ATM Fee Antitrust Litig.*,

    2010 WL 2557519 (N.D. Cal. June 21, 2010) ...........................................................6

24
*Korea Kumho Petrochemical v. Flexsys America LP*,

25
    2008 WL 686834 (N.D. Cal. Mar. 11, 2008).............................................................7

26
*LiveUniverse, Inc. v. MySpace Inc.*,

    304 F. App'x 554 (9th Cir. 2008) ............................................................................10

27

28

ii

*Newcal Industries, Inc. v. IKON Office Solutions*,
     513 F.3d 1038 (9th Cir. 2008) .................................................................................3, 4

*Novell, Inc. v. Microsoft Corp.*,
     731 F.3d 1064 (10th Cir. 2013) ...................................................................................10

*Oltz v. St. Peter's Community Hospital*,
     861 F.2d 1440 (9th Cir. 1998) .......................................................................................3

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
     471 F. Supp. 3d 981 (N.D. Cal. 2020) .........................................................................10

*Rheumatology Diagnostics Laboratory, Inc. v. Aetna, Inc.*,
     2013 WL 3242245 (N.D. Cal. June 25, 2013) .................................................................7

*Wolf v. Pacific National Bank*,
     2010 WL 5888778 (S.D. Fla. Dec. 28, 2010) ..................................................................2

**DOCKETED CASES**

*Federal Trade Commission v. Facebook, Inc.*,
     No. 1:20-cv-03590 (D.D.C. Dec. 9, 2020).......................................................................5

**OTHER AUTHORITIES**

Staff of S. Comm. on Antitrust, Commercial and Administrative Law of the
     Committee on the Judiciary, 116th Cong., Report and Recommendations on
     the Investigation of Competition in Digital Markets,
     https://judiciary.house.gov/uploadedfiles/competition_in_digital
     _markets.pdf?utm_campaign=4493-519 .......................................................................5

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
     Principles and Their Application* ¶ 533b (4th and 5th eds., 2021 Cum. Supp.).........................4

iii

1
2
3
4
5
6

Facebook's motion established that BrandTotal failed to cure the defects in its UCL counterclaim that had caused the Court to dismiss it twice before. Rather than confront those defects, BrandTotal repeats arguments already rejected by this Court. Its opposition confirms that, even after multiple opportunities to plead its best claim and specific guidance from the Court on what would be needed for it to do so, BrandTotal cannot state a viable UCL claim. This Court should dismiss the UCL claim with prejudice.

7
8
9
10

*First*, BrandTotal incorrectly argues that it need not establish a violation of the antitrust laws themselves to adequately maintain an unfair prong claim. The Court previously rejected this argument, explaining that a competitor can avoid the requirements of antitrust law only in "unusual" cases implicating a legislatively-defined policy. BrandTotal does not identify any such policy.

11
12
13
14
15
16
17
18

*Second*, BrandTotal fails to explain how its allegations plausibly define either of the two markets mentioned in the SAC. BrandTotal now contends that one of the markets—for Third-Party Commercial Advertising Information on personal social networking services—is really a "submarket," and that the other market—for Third-Party Commercial Advertising Information on the Facebook.com and Instagram platforms—is something that it calls a "derivative market." But BrandTotal never explains how these buzzwords excuse BrandTotal's failure to plausibly allege the basic elements of a relevant market. Indeed, its contradictory allegations render both markets implausible—one of the very problems that led this Court to dismiss this claim the last time around.

19
20
21
22
23
24

*Third*, BrandTotal fails to plausibly plead that Facebook holds monopoly power in the markets that it purports to define. Instead, it relies exclusively on a single conclusory allegation that Facebook controls 95% of a different market—for all social media in the United States. But the SAC nowhere defines any social media market; BrandTotal's own allegations contradict that Facebook has such a high market share; and common sense compels the conclusion that Facebook cannot possibly have a 95% market share in a market that includes YouTube, LinkedIn, and Amazon.

25
26
27
28

*Finally*, despite its denials, BrandTotal's UCL claim relies on a refusal to deal theory. And yet, it fails to establish the only exception to the Ninth Circuit's general no-duty-to-deal rule. BrandTotal does not plead any joint, cooperative venture of the type that courts have required, has not plausibly alleged that the only conceivable rationale for the alleged conduct was to exclude competition, and

1

1   has not adequately alleged that the relevant products are available to similarly situated customers.

2   Because BrandTotal still cannot allege a UCL claim, it should be dismissed with prejudice.[1]

3   **I.    ARGUMENT**

4   BrandTotal relies on four primary arguments to salvage its UCL claim. All fail.

5   ## A.    BrandTotal Cannot Avoid The Antitrust Laws

6   BrandTotal again argues that it can state a plausible claim under the UCL's unfair prong even

7   if it has not pleaded a violation of the antitrust laws. Opp. 8-10; Second MTD Order at 24. But "an

8   'unfair' claim by a competitor under the UCL generally must implicate the antitrust laws," except in

9   "other circumstances" that are "limited to claims by consumers rather than competitors." Second MTD

10  Order at 24-25 & n.14. This case does not present those "other circumstances," nor does BrandTotal

11  allege them. To state a claim based on those "other circumstances," BrandTotal would have to allege

12  an "unusual aspect of the alleged conduct that would make that conduct something that violates the

13  'policy and spirit' of the antitrust laws without violating the actual laws themselves." *Creative Mobile*

14  *Techs., LLC v. Flywheel Software, Inc*., 2017 WL 679496, at \*6 (N.D. Cal. Feb. 21, 2017). It does not.

15  The holding in *Diva Limousine, Ltd. v. Uber Techs., Inc.*, 392 F. Supp. 3d 1074 (N.D. Cal.

16  2019), upon which BrandTotal relies, is not to the contrary. *See* Opp. 9-10. This Court already

17  considered and rejected the holding of *Diva Limousine* as inapplicable because, unlike the claimants

18  in that case, BrandTotal points to "no comparable recognition by the California courts or legislature

19  that Facebook's conduct here impairs competition." First MTD Order at 17. Nothing has changed.

20  While BrandTotal waves its hands at Facebook's "legal obligations under the FTC Order," Opp. 9, it

21  does not cite any "legislatively declared policy" to which Facebook's alleged misconduct can be

22  "tethered," *Diva Limousine*, 392 F. Supp. 3d at 1091. A bargained-for consent agreement with an

23  executive agency is not a legislatively declared policy. *See, e.g.*, *Wolf v. Pac. Nat'l Bank*, 2010 WL

24  5888778, at \*5 (S.D. Fla. Dec. 28, 2010) (holding that a "consent order is not a statute or ordinance"

25  because an "executive agency" is "not a legislative body"). Moreover, BrandTotal's argument that

26  Facebook's "practice of flatly refusing" all requests to automatically collect data, Opp. 9-10, is a

27

28  [1] BrandTotal admits that its claim under the "unlawful" prong of the UCL premised on defamation rises and falls with its defamation claim. *See* Opp. 17.

2

1   rejection of its obligations under the FTC Order is merely a dressed-up refusal-to-deal theory, which

2   fails for the reasons discussed *infra*.[2] *See infra* pp.8-10.  BrandTotal's argument is nothing more than

3   an improper request for reconsideration of this Court's previous holding, and it should be rejected.

4   **B.      BrandTotal Still Fails To Plausibly Allege A Relevant Market**

5          Nothing in the opposition changes the fact that the SAC does not plausibly allege a relevant

6   market. As Facebook explained (Mot. 9-10), the SAC contains none of the ingredients necessary to

7   plausibly allege BrandTotal's first proposed market—for Third-Party Commercial Advertising

8   Information On Personal Social Networking Services. And as Facebook also explained (Mot. 10),

9   BrandTotal cannot fill that gap by invoking markets proposed by the FTC and HJC because those

10  markets have different boundaries and are for different products. Confronted with these problems,

11  BrandTotal contends that it has actually alleged a "submarket" of the FTC and HJC markets, but that

12  (mis)label cannot make those very different markets relevant to this case.

13         BrandTotal similarly errs in attempting to justify its alternative "market" for information from

14  Facebook's platforms. Trying to evade the general rule against such single-brand markets (Mot. 11),

15  BrandTotal labels this a "derivative market." But this Facebook-only "market" has none of the features

16  that could even conceivably make it a derivative market. BrandTotal's failure to plausibly allege any

17  relevant market requires dismissal. *Newcal Indus., Inc. v. IKON Office Sol.*, 513 F.3d 1038, 1045 (9th

18  Cir. 2008) (Rule 12(b)(6) dismissal appropriate when "the alleged market suffers a fatal legal defect").

19         **1.      Third-Party Commercial Advertising Information On Personal Social**

20                  **Networking Services In The United States**

21         As Facebook explained in its motion (at 9-10), the SAC contains no factual allegations that

22  would support its market definition of "Third-Party Commercial Advertising Information on personal

23  social networking services in the United States" and thus completely omits the basic ingredients of a

24  legally-sufficient relevant market. *See, e.g.*, *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1446 (9th

25  Cir. 1998) (complaint must plausibly exclude alternatives that consumers could substitute for the same

26  purpose ("reasonable interchangeability") and allege sufficient facts to establish consumer switching

27

28  [2] BrandTotal does not actually claim that Facebook is violating the FTC Order, but even if it had so
    claimed, that order can be enforced only by the FTC.

CASE NO. 3:20-CV-07182-JCS                                            PL.'S REPLY ISO MOT. TO DISMISS

1    in response to price increases ("cross-elasticity of demand")). The opposition offers no persuasive

2    response. BrandTotal asserts that its alleged market has "unique customers and specialized vendors,"

3    Opp. 11, but it identifies no *factual allegations* in the SAC about these customers or vendors. Beyond

4    these unsupported assertions, BrandTotal points only to conclusory allegations that there are "no

5    viable alternative[s]" to Facebook's social media platforms and "no economic substitutes" for access

6    to this information. *See* Opp. 11 (quoting SAC ¶ 166); *see Newcal*, 513 F.3d at 1045 (holding that the

7    presence or absence of viable alternatives and economic substitutes is the legal test for market

8    definition.). But BrandTotal cannot avoid dismissal just by conclusorily alleging that the operative

9    legal test is satisfied. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("[O]n a motion

10   to dismiss, courts are not bound to accept as true a legal conclusion couched as a factual allegation.").

11           Rather than offering any factual development of its own, BrandTotal tries to piggyback off the

12   HJC's and the FTC's attempts to define markets. As Facebook explained (Mot. 10), however, those

13   purported markets are completely different from BrandTotal's alleged market. BrandTotal's only

14   response is to claim that its alleged market is actually a "submarket" of the "market for personal social

15   networking." Opp. 11. The SAC never claimed that this market was a "submarket" and BrandTotal

16   cannot fill in its pleading gaps through argument in its opposition brief. *See, e.g.*, *Flaa v. Hollywood*

17   *Foreign Press Ass'n*, 2020 WL 8256191, at *7 (C.D. Cal. Nov. 20, 2020) (rejecting attempt to

18   recharacterize proposed relevant market as a submarket because "it is axiomatic that the complaint

19   may not be amended by briefs in opposition to a motion to dismiss"). But in any event, BrandTotal's

20   submarket argument makes no sense: what BrandTotal describes is not a submarket of "personal social

21   networking," but a completely different market for a completely different product with completely

22   different consumers. *See, e.g.*, Opp. 11 (contending that the alleged submarket has "unique

23   customers"). "[A] 'submarket' that is not even a smaller grouping within the main market is nonsense."

24   Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their*

25   *Application* ¶ 533b at n.4 (4th and 5th eds., 2021 Cum. Supp.). As alleged, in the "personal social

26   networking" market, the consumers are users of a personal social networking service, *see* FTC

27   Complaint ¶ 52, whereas in the proposed Third-Party Commercial Advertising Information market,

28   advertisers are the consumers of information about advertising. And, if either market is broader, it is

1  the supposed market for Third-Party Commercial Advertising, not the market for personal social

2  networking. As explained (Mot. 11-12), the HJC and FTC both attempt to exclude YouTube, LinkedIn,

3  and Amazon from the personal social networking market, whereas the SAC expressly alleges that

4  BrandTotal scrapes advertising data from these specific "social media sites." *See* SAC ¶ 44. This Court

5  previously dismissed BrandTotal's complaint based, in part, on this very "inconsisten[cy]," Second

6  MTD Order at 26-27, yet BrandTotal still fails to address it.[3]

7      Further, in attempting to craft a market for information about a sliver of online advertising,

8  BrandTotal ignores the clear guidance of both the Ninth Circuit and this Court that "many courts have

9  rejected [on motions to dismiss] antitrust claims reliant on proposed advertising markets [including

10 submarkets] limited to a single form of advertising." *Hicks*, 897 F.3d at 1123; Second MTD Order at

11 27 (same); *see also* Mot. 10-11. This Court has previously identified this precise problem. *See* Second

12 MTD Order at 27. Yet, as with so many other defects, BrandTotal again fails to explain why it should

13 be allowed to arbitrarily gerrymander a market that is "not natural, artificial, and contorted to meet

14 [its] litigation needs." *Hicks*, 897 F.3d at 1121 (internal quotation marks omitted).

15          **2.     Third-Party Commercial Advertising Information On The Facebook.com**

16                  **And Instagram Platforms**

17      As Facebook explained (Mot. 11), BrandTotal's other market—Third Party Commercial

18

19 [3] At times, BrandTotal appears to equate the market for "social media" with the market for "personal
20 social networking." *E.g.*, SAC ¶ 166. To the extent this is intentional, that would render BrandTotal's
   reliance on the FTC's and HJC's purported market definitions all the more incomprehensible because
   the FTC and HJC go to great lengths to distinguish those supposed markets in a (failed) attempt to
21 define a market so unnaturally narrow that they can try to argue that Facebook possesses monopoly
   power. *See* Complaint, *FTC v. Facebook, Inc.*, No. 1:20-cv-03590, ECF No. 3 at ¶ 59 ("FTC
22 Complaint") (D.D.C. Dec. 9, 2020) ("Personal social networking is distinct from … services primarily
   for the passive consumption and posting of specific media content."); Staff of S. Comm. on Antitrust,
23 Commercial and Administrative Law of the Committee on the Judiciary, 116th Cong., Report and
   Recommendations on the Investigation of Competition in Digital Markets ("House Judiciary Report")
24 at 88 ("Social Networks are Distinguishable from Social Media"). And even then, the HJC still
   excludes Amazon from its broader social media market. *See* House Judiciary Report at 15 (alleging
25 that "Amazon has significant and durable market power in the U.S. online retail market"). Moreover,
   the notion that Facebook controls 95% of any social media market that includes YouTube, Amazon,
26 Twitter, and LinkedIn—which, at times, appears to be BrandTotal's contention—so defies common
27 sense and real-world experience as to render any such market definition implausible. *E.g.*, *Hicks v.
   PGA Tour*, 897 F.3d 1109, 1121 (9th Cir. 2018) (courts should use "common sense" in evaluating
28 market definition on motion to dismiss); *see also infra* pp.7-8.

1   Advertising Information on the Facebook.com and Instagram Platforms—is a single-brand market

2   nearly identical to the one this Court already rejected. This Court has already held that "single-brand

3   markets are, at a minimum, extremely rare." Second MTD Order at 27. In general, a company's "own

4   products do not themselves comprise a relevant market" and, accordingly, a company does not violate

5   the antitrust laws "by virtue of the natural monopoly it holds over its own product." *Apple, Inc. v.*

6   *Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008). Moreover, here again, BrandTotal's

7   single-brand market is "inconsistent," *see* Second MTD Order 27, with BrandTotal's own allegation

8   that it offers "competitive analyses of advertising efforts on social media sites like Facebook,

9   Instagram, Twitter, YouTube, LinkedIn, Amazon, and others," SAC ¶ 44—an allegation that, as this

10  Court explained, "tends to suggest a larger market," Second MTD Order 27.

11          BrandTotal's only response is to argue that it is actually alleging a "derivative market." Opp.

12  12; *see also* Mot. 11 n.3 (noting that single-brand markets have only been recognized in derivative

13  aftermarkets). Again, the SAC does not allege a derivative market and BrandTotal cannot fill its

14  pleading gaps through argument in its opposition brief. *See Flaa*, 2020 WL 8256191, at *7. But even

15  if it could, BrandTotal never explains how its alleged market is a derivative market at all. A valid

16  single-brand derivative market "follows a particular model: First, a consumer purchases a particular

17  brand of a good or service. Second, the nature of that good or service requires the *same* consumer to

18  purchase a follow-on good or service in a derivative aftermarket." *In re ATM Fee Antitrust Litig.*, 2010

19  WL 2557519, at *7 (N.D. Cal. June 21, 2010). For example, derivative aftermarkets might exist in

20  situations like in *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451 (1992) (cited at Opp. 12),

21  in which the Supreme Court found a fact issue as to whether "single-brand aftermarkets—markets for

22  parts and service for Kodak equipment—arose once customers have purchased and are 'locked in' to

23  Kodak photocopiers or equipment." *Psystar Corp.*, 586 F. Supp. 2d at 1197. Facebook's platforms are

24  a poor fit for this framework because users of those products do not pay for their use—the services are

25  free and so there is no lock in. But that issue aside, users of these platforms are not required to purchase

26  "Third-Party Commercial Advertising Information" in any follow-on market. Indeed, BrandTotal's

27  only attempt to fit its allegations into this paradigm is an incomplete sentence that is missing any

28  reasoning. *See* Opp. 12 ("Third-Party Commercial Advertising on Facebook is not interchangeable

6

1   with Third-Party Commercial Advertising Information on other sites (e.g., YouTube, Twitter, etc.)

2   because …"). Especially in light of BrandTotal's own allegations, it has not provided and cannot

3   provide any basis for this Court to depart from the ordinary rule against single-brand markets.

4       **C.    BrandTotal Still Fails To Plausibly Allege Monopoly Power**

5       The opposition's short discussion of monopoly power is, if anything, even more deficient than

6   its discussion of the SAC's market definition. BrandTotal incorrectly asserts that it has adequately

7   alleged monopoly power based on a single unsupported—indeed, unsupportable—allegation that

8   Facebook has "control of 95% of *all social media in the United States*." Opp. 13 (citing SAC ¶ 157)

9   (emphasis added). Despite BrandTotal's protestations, this bald assertion suffers from the same defects

10   that led Judge Boasberg to dismiss the FTC's antitrust claims against Facebook because the FTC had

11   failed "to plead enough facts to plausibly establish … that Facebook has monopoly power in the

12   market." *FTC v. Facebook, Inc.*, 2021 WL 2643627, at *1, 11 (D.D.C. June 28, 2021). As in that case,

13   BrandTotal fails to explain what the alleged share refers to, let alone how it could be calculated. *See*

14   *id.* at *2, *12-13; *accord Korea Kumho Petrochemical v. Flexsys Am. LP*, 2008 WL 686834, at *9

15   (N.D. Cal. Mar. 11, 2008) (plaintiff "must assert some *facts* in support of its assertions of market

16   power that suggest those assertions are plausible."). Worse, BrandTotal's "only market share

17   allegation does not establish [Facebook's] market share in the actual market[] defined by the

18   Complaint." *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, 2013 WL 3242245, at *14 (N.D. Cal.

19   June 25, 2013). BrandTotal's 95%-figure purports to measure Facebook's share of the user-side

20   market of "social media in the United States," not its share of the entirely different advertiser-side

21   market of Third-Party Commercial Advertising Information on personal social networking services in

22   which BrandTotal supposedly competes. SAC ¶ 158. As Judge Boasberg held, allegations about share

23   in one market are not probative of power in a different market. *See FTC*, 2021 WL 2643627, at *13;

24   *accord Rheumatology Diagnostics Lab*, 2013 WL 3242245, at *14.[4]

---

[4] BrandTotal is wrong that it can distinguish *FTC* on the ground that its single allegation about market share rests on a "Congressional report and Facebook's own claims"—both of which trace back to two alleged "internal [Facebook] documents" described on page 138 of the HJC report. Opp. 13. These 2012 documents are almost a decade old and measure monthly minutes of use as compared to "all other social media." *Id.* at 13-14. At most, this discussion of the *user*- and not *advertiser*-side of any supposed market is irrelevant, especially in light of the other defects in BrandTotal's allegations.

CASE NO. 3:20-CV-07182-JCS      PL.'S REPLY ISO MOT. TO DISMISS

1    Moreover, BrandTotal's assertion that Facebook controls 95% of a "social media" market is

2    facially implausible given BrandTotal's other allegations and common sense. Although the opposition

3    points only to this 95%-figure, the SAC also bases its theory of monopoly power on the fact that the

4    FTC "currently maintains a lawsuit against Facebook that alleges Facebook holds monopoly power in

5    the market of personal social networking services in the United States." SAC ¶ 156. The complaint in

6    that case contains an entirely different market share allegation ("in excess of 60%"), *FTC*, 2021 WL

7    2643627, at *12, an allegation that the district court rejected as insufficient, and the SAC and

8    opposition never even attempt to reconcile these substantially different measures. Nor does BrandTotal

9    ever explain how Facebook could plausibly control 95% of a market that includes large companies

10   like YouTube, LinkedIn and Amazon—a critical question given BrandTotal's own allegation that it

11   offers "competitive analyses of advertising efforts" on these "social media sites." *See* SAC ¶ 44. These

12   internal contradictions are fatal to BrandTotal's assertion of monopoly power.

13   **D.     BrandTotal Still Fails To Allege An Exception To The Right To Refuse To Deal**

14   BrandTotal likewise fails to satisfy (or avoid) the "one, limited exception to [the] general rule

15   that there is no antitrust duty to deal," *FTC v. Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020), once

16   again largely repackaging arguments that this Court has already rejected. BrandTotal argues that the

17   SAC presents two different UCL theories—one based on Facebook notifying Google about

18   BrandTotal and one based on Facebook disabling BrandTotal's Facebook user accounts and revoking

19   access to Facebook, including to advertise. *See* Opp. 14. But these are not actually distinct UCL

20   theories; they are just two actions that Facebook took to achieve what BrandTotal claims is a single

21   anticompetitive objective: restricting access to Third Party Commercial Advertising Information from

22   Facebook's platforms. *See* SAC ¶ 163, 171.

23   However framed, this is a refusal-to-deal theory, because BrandTotal seeks to force Facebook

24   to conduct business with potential rivals. Indeed, that is what this Court already held when BrandTotal

25   made the materially identical argument that this is "not a refusal-to-deal case" because Facebook "has

26   ***interfere[d]*** with rather than merely refused to aid BrandTotal's efforts to collect advertising data."

27   Second MTD Order at 27 (emphasis added). As this Court explained, "so long as Facebook generally

28   has a right to set rules for accessing the password-protected portions of its website—a principle not

1    reasonably in dispute—its refusal to authorize the access BrandTotal seeks is a refusal to deal with a

2    potential competitor." *Id.* To avoid dismissal, BrandTotal must establish how its allegations fit into an

3    exception to the right to refuse to deal. It has not—and cannot.

4        Further, BrandTotal's theory concerns not just a refusal to deal but a refusal to deal in *Third-*

5    *Party Commercial Advertising Information*. That is the market that BrandTotal attempts to define and

6    the market in which BrandTotal claims Facebook harmed competition. Accordingly, BrandTotal must

7    show that Facebook's restriction of *Third-Party Commercial Advertising Information* fits into the

8    "three key features" of *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985).

9    Second MTD Order at 28. On this threshold requirement, BrandTotal falls short. It does not even

10   attempt to show that Facebook voluntarily and profitably transacted to provide BrandTotal Third-Party

11   Commercial Advertising Information, that the only conceivable rationale for terminating BrandTotal's

12   scraping was sacrifice of short-term benefits to exclude competition, and that Facebook withholds data

13   from competitors that is otherwise available to non-competitors. *See also* Mot. 15-17.

14       Instead, BrandTotal tries to fit Facebook's restricting of BrandTotal's *accounts* and *advertising*

15   into the *Aspen Skiing* framework. But BrandTotal does not explain how this conduct alone—divorced

16   from its impact on BrandTotal's access to Third-Party Commercial Advertising Information—could

17   possibly be anticompetitive. BrandTotal does not define any market in advertising *purchases* or user

18   *accounts*; it does not allege that Facebook had monopoly power in any such markets; and it does not

19   explain how Facebook's blocking of BrandTotal harmed *competition*, as opposed to a *competitor*, in

20   either of those unalleged markets. *See* First MTD Order at 16-17 ("BrandTotal has not alleged any

21   injury to *competition*, as opposed to injury to BrandTotal alone.").

22       In any event, even (erroneously) focusing just on the enforcement actions Facebook took

23   against BrandTotal's accounts—including its advertising accounts—BrandTotal's claims would still

24   fail. For instance, BrandTotal has not alleged the requisite "profitable course of dealing" between

25   competitors (the first *Aspen Skiing* factor). In *Aspen Skiing*, as in the very few other cases to recognize

26   a duty to deal, the plaintiff and defendant put forward a *joint* offering. 472 U.S. at 587-95. Here, the

27   SAC contains no allegations of "an agreement or an 'implicit understanding' between" BrandTotal

28   and Facebook to cooperate in any way. *hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137, 1151

9

(N.D. Cal. 2020). At most, BrandTotal alleges business dealings between Facebook and BrandTotal, *see* SAC ¶ 169 (Facebook enjoyed "a mutually beneficial and profitable course of dealing" because it "received approximately $125,000 from Defendants to advertise on Facebook")—not the kind of joint, cooperative venture that is an essential predicate for *Aspen Skiing*'s applicability.

Likewise, the SAC does not come close to pleading that the *only* conceivable rationale for suspending BrandTotal's accounts and advertising was anticompetitive (the second *Aspen Skiing* factor). Indeed, nothing in the SAC or BrandTotal's opposition plausibly suggests that Facebook's decision to terminate BrandTotal's accounts was "irrational but for its tendency to harm competition." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1076 (10th Cir. 2013).  Instead, the SAC makes plain another equally conceivable rationale—that Facebook wanted to protect its platform and prevent BrandTotal from violating Facebook's Terms of Service. *See* Mot. 15-16. While the SAC says this was not the actual basis for Facebook's actions, it fails to offer any factual allegations supporting the conclusion—as the law requires—that Facebook's rationale was not even "conceivable." *Qualcomm*, 969 F.3d at 993. And while BrandTotal contends that this issue cannot be resolved at this stage of the litigation, *see* Opp. 15-16, courts—including this Court—do not hesitate to reject refusal-to-deal arguments on a motion to dismiss. *See, e.g.*, Second MTD Order at 27-28; *FTC*, 2021 WL 2643627, at *17; *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 1000-03 (N.D. Cal. 2020); *hiQ*, 485 F. Supp. 3d 1149-51; *see also LiveUniverse, Inc. v. MySpace Inc.*, 304 F. App'x 554, 555-57 (9th Cir. 2008) (affirming Rule 12(b)(6) dismissal of refusal-to-deal claim).

Finally, BrandTotal fails to adequately allege that Facebook provides the supposedly relevant products—advertising services and pages on Facebook's platform—to "similarly situated customers" (the third *Aspen Skiing* factor). *See* Second MTD Order at 28. Facebook's Terms (cited at SAC ¶ 25) prohibit collection of data using automated means and provide that Facebook can "remove or restrict access to content that is in violation of these provisions." BrandTotal alleges no facts showing that Facebook offers advertising services and pages to non-competitors who are *similarly situated to BrandTotal*—i.e., entities that Facebook has caught scraping data in violation of Facebook's Terms.

## II.   CONCLUSION

The Court should dismiss **with prejudice** BrandTotal's UCL counterclaim.

1

2

Dated: August 4, 2021

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WILMER CUTLER PICKERING HALE AND
DORR LLP


By:   */s/ Sonal Mehta*
      Sonal N. Mehta

      *Attorney for Plaintiff*
      *Facebook, Inc.*

11

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on August 4, 2021, I electronically filed the above document with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all registered counsel.

Dated: August 4, 2021                                      By:     */s/ Sonal N. Mehta*
                                                                              Sonal N. Mehta

12