UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FACEBOOK, INC.,

Plaintiff,

v.

BRANDTOTAL LTD., et al.,

Defendants.

Case No. 20-cv-07182-JCS

**ORDER REGARDING MOTION FOR LEAVE TO AMEND AND MOTION TO DISMISS SECOND AMENDED COUNTERCLAIMS**

Re: Dkt. Nos. 161, 169

## I.  INTRODUCTION

Plaintiff Facebook, Inc. brought this action asserting that Defendants BrandTotal Ltd. and Unimania, Inc. (collectively, "BrandTotal") improperly collected data from Facebook's social networks.  BrandTotal, which is in the business of analyzing advertising data collected from social media websites, asserts counterclaims based on Facebook's efforts to block its collection of data. The Court previously dismissed some of BrandTotal's counterclaims, including a counterclaim under the "unfair" prong of California's Unfair Competition Law (the "UCL"), which the Court dismissed with leave to amend.  BrandTotal has amended that counterclaim and seeks leave to assert a new counterclaim for defamation.  Facebook opposes adding the new defamation counterclaim and moves again to dismiss the amended UCL "unfairness" counterclaim.  The Court held a hearing on August 27, 2021.  For the reasons discussed below, BrandTotal's motion for leave to add a defamation counterclaim is DENIED, and Facebook's motion to dismiss the "unfairness" counterclaim is GRANTED.  Facebook shall answer the surviving counterclaims, which are not affected by this order, no later than September 14, 2021.[1]

---

[1] The parties have consented to the jurisdiction of a magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

## II.     BACKGROUND

This order assumes the parties' familiarity with the background of the case, which is set forth at greater length in the Court's previous orders denying BrandTotal's motion for a temporary restraining order, Order Denying TRO (dkt. 63),[2] granting Facebook's motion to dismiss BrandTotal's original counterclaims with leave to amend, Order re 1st MTD (dkt. 108),[3] and granting in part Facebook's motion to dismiss BrandTotal's first amended counterclaims, Order re 2d MTD (dkt. 158).[4]  The factual allegations summarized here are drawn from BrandTotal's counterclaims, which are taken as true for the purpose of Facebook's motion to dismiss.  Nothing in this order should be construed as resolving any issue of fact that might be disputed at a later stage of the case.

### A.     BrandTotal's Allegations

In brief, and as is relevant to the present motions, Facebook operates social networks with billions of users, including the eponymous Facebook network and Instagram.  BrandTotal collects advertising data from various social networks, including Facebook's, to prepare analysis that it sells to corporate advertisers.  One of the means that BrandTotal has used to collect such data is a program called UpVoice, where users whom BrandTotal calls "panelists" voluntarily install a browser extension that tracks and records the advertisements displayed to those users through social media, and in return, BrandTotal provides those panelists gift cards as compensation.  The version of UpVoice in use before commencement of this litigation automatically recorded not only data about the ads that users saw, but also users' demographic information, which the browser extension collected from Facebook.

On September 21, 2020, Facebook wrote to Google that UpVoice was "improperly scraping user PII (e.g., gender, relationship status, ad interests, etc.) without proper disclosure." 2d Am. Counterclaim ("SACC," dkt. 161-2) ¶ 69.  Google removed UpVoice from its Chrome

---

[2] *Facebook, Inc. v. BrandTotal Ltd.*, 499 F. Supp. 3d 720 (N.D. Cal. 2020).  Citations herein to previous orders in this case refer to page numbers of the versions filed in the Court's ECF docket.
[3] *Facebook, Inc. v. BrandTotal Ltd.*, No. 20-cv-07182-JCS, 2021 WL 662168 (N.D. Cal. Feb. 19, 2021).
[4] *Facebook, Inc. v. BrandTotal Ltd.*, No. 20-cv-07182-JCS, 2021 WL 2354751 (N.D. Cal. June 3, 2021).

United States District Court
Northern District of California

web store, significantly limiting UpVoice's availability and effectiveness, which in turn limited BrandTotal's ability to gather data for its corporate customers.  *Id.* ¶ 72.  Facebook has also removed BrandTotal's accounts from Facebook's networks.  *Id.* ¶ 68.

During this litigation, BrandTotal modified UpVoice to automatically collect only data about ads and to rely on panelists self-reporting their demographic information, and Facebook has agreed not take action against that modified version of UpVoice pending the outcome of this case without providing advance notice to BrandTotal.  *See* Order Denying as Moot Mot. for Prelim. Inj. (dkt. 160).

### B.    Previous Orders and Relevant Procedural History

The Court previously dismissed BrandTotal's claim for violation of the "unfair" prong of the UCL, with leave to amend, for failure to allege at least a threatened violation of the antitrust laws, or some special circumstances that would allow that a claim to proceed without a clear connection to the antitrust laws.  Order re 1st MTD at 16–17; Order re 2d MTD at 24–28.  The Court noted that BrandTotal had not alleged either a coherent and plausible product market or an exception to the general rule that a market participant may permissibly refuse to deal with a rival. Order re 2d MTD at 26–28.

At a case management conference on February 19, 2021, the Court set a deadline of March 22, 2021 for the parties to seek leave to amend their pleadings, adopting the date jointly proposed in the parties' case management statement.  Civil Minute Order (dkt. 106); *see* Case Mgmt. Statement (dkt. 99) at 12.  On March 18, 2021, the Court granted the parties' stipulation to extend the deadline to amend pleadings from March 22, 2021 to May 21, 2021 to accommodate the time needed for BrandTotal to produce discovery that might be relevant to Facebook amending its complaint.  *See* dkt. 130.  As an exception to that deadline, the Court's June 3, 2021 order on Facebook's second motion to dismiss allowed BrandTotal to amend certain claims the Court dismissed without prejudice—for interference with BrandTotal's contracts with investors, for interference with BrandTotal's prospective economic advantage with respect to potential customers, and for violation of the "unfair" prong of the UCL—no later than June 25, 2021. Order re 2d MTD at 30.

United States District Court
Northern District of California

### C.   Counterclaims at Issue

BrandTotal's second amended counterclaims include counterclaims the Court previously allowed to proceed (which are not at issue in the present motion), as well as a new counterclaim for defamation, SACC ¶¶ 140–51, and an amended counterclaim for violation of the UCL's "unfair" prong, *see id.* ¶¶ 152–77.  The latter now rests on an alleged "market for Third-Party Commercial Advertising Information on personal social networking services in the United States," or in the alternative, such information pertaining to advertising "on the Facebook.com site and Instagram platform." *Id.* ¶¶ 155–59.  "Third-Party Commercial Advertising Information" is defined as "analytics about non-SIEP advertisements run by third-party business[es]." *Id.* ¶ 15.[5]

### D.   The Parties' Arguments

BrandTotal moves for leave to add the new defamation counterclaim, arguing there is good cause to modify the scheduling order under Rule 16(b)(4) of the Federal Rules of Civil Procedure because "facts of this case are unusual and identifying the cause of action that fits and redresses the full harm of this situation, complex." Defs.' Mot. (dkt. 161) at 6.  BrandTotal also argues that amendment should be allowed under the liberal standard of Rule 15(a)(2).  *Id.* at 6–7.  Facebook contends that BrandTotal learned of the relevant facts underlying its defamation counterclaim months before it filed its first amended counterclaims in March of 2021, and thus was not diligent in waiting until well after the May 2021 deadline for amendment to seek to add this new counterclaim.  Pl.'s Mot. & Opp'n (dkt. 169) at 5–7.  Facebook also argues that leave to amend would be futile because its statement to Google about BrandTotal's failure to provide sufficient disclosures was true, citing a potential issue with shared computers.  *Id.* at 7–8.

Facebook moves to dismiss once again BrandTotal's counterclaim under the UCL's "unfair" prong for failure to allege a plausible relevant market, *id.* at 9–12, failure to allege monopoly power, *id.* at 12–13, and failure to allege an exception to the rule allowing refusal to

---

[5] "SIEP" refers to "social issues, elections or politics."  Facebook provides more public information about SIEP advertisements than it provides about to other ads.  *See* SACC ¶ 22.  SIEP ads are not directly at issue in this case and are generally not relevant to BrandTotal's clients.

deal, *id.* at 13–17.[6]  BrandTotal argues that it has alleged a violation of the spirit of the antitrust laws because Facebook is unfairly relying on an order the Federal Trade Commission ("FTC") to exclude competitors from the market for advertising data.  Defs.' Opp'n & Reply (dkt. 170) at 8–10.  BrandTotal also contends that it has sufficiently alleged a product market (or more specifically, two potential product markets in the alternative) and monopoly power.  *Id.* at 10–14.  As for refusal to deal, BrandTotal argues that it "is not asking Facebook to authorize BrandTotal's access" to advertising data, but instead seeking to bar Facebook from using third parties like Google and the FTC to interference with BrandTotal's business, and challenging Facebook's removal of BrandTotal's accounts on Facebook, which eliminated BrandTotal's ability to advertise its own services on Facebook.  *Id.* at 14–16.  BrandTotal contends that Facebook's reports to Google and the FTC do not implicate the refusal-to-deal rule, and that BrandTotal's accounts and past course of dealing in advertising on Facebook fall within the exception recognized by *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985).  Defs.' Opp'n & Reply at 10–14.

In a "Notice of Supplemental Event" filed after briefing on the present motions had closed, BrandTotal submitted: (1) an August 3, 2021 press release by Facebook indicating that it had disabled access by certain New York University researchers who had been collecting advertising data in a manner at least arguably similar to BrandTotal, with Facebook having acted purportedly to protect user privacy and comply with an order by the FTC; and (2) an August 5, 2021 letter from an FTC official to Facebook's CEO asserting that the FTC's order did not prohibit Facebook allowing the sort of research at issue, that Facebook had failed to comply with a commitment to update the FTC about significant events, and that Facebook's press release was misleading.  *See* dkt. 173.  These developments are not relevant to the Court's analysis of the present motions.

---

[6] Facebook also moves to dismiss BrandTotal's counterclaim under the "unlawful" prong of the UCL to the extent that it rests on the new defamation counterclaim.  The parties agree that to the extent that counterclaim is based on the defamation counterclaim (as opposed to the tortious interference counterclaims the Court previously allowed to proceed) they rise or fall together.  *See* Defs.' Opp'n & Reply at 17.

1

III.   **ANALYSIS**

2

    A.   **Motion for Leave to Amend**

3

        1.   **Legal Standard**

4

       Deviations from scheduling orders, including with respect to amendment of pleadings, are

5

governed by Rule 16 of the Federal Rules of Civil Procedure, which provides that such orders

6

"may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4).

7

BrandTotal concedes that Rule 16(b)(4) governs its motion in this case.  *See* Defs.' Opp'n &

8

Reply at 3–4.

9

       The Ninth Circuit has established a standard for such modification that focuses on the

10

diligence of the party seeking relief from a deadline:

11

> Unlike Rule 15(a)'s liberal amendment policy . . . , Rule 16(b)'s

12

> "good cause" standard primarily considers the diligence of the party
> seeking the amendment. The district court may modify the pretrial
> schedule "if it cannot reasonably be met despite the diligence of the

13

> party seeking the extension." Fed. R. Civ. P. 16 advisory committee's
> notes (1983 amendment). Moreover, carelessness is not compatible

14

> with a finding of diligence and offers no reason for a grant of relief.
> Although the existence or degree of prejudice to the party opposing

15

> the modification might supply additional reasons to deny a motion,
> the focus of the inquiry is upon the moving party's reasons for seeking

16

> modification. If that party was not diligent, the inquiry should end.

17

*Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992) (citations omitted).

18

Courts look to a party's diligence not only in complying with the scheduling order after it has been

19

issued, but also "in creating a workable Rule 16 scheduling order," as well as "in seeking

20

amendment of the Rule 16 order, once it became apparent that [the party] could not comply with

21

the order."  *Jackson v. Laureate, Inc.*, 186 F.R.D. 605, 607 (E.D. Cal. 1999).

22

        2.   **BrandTotal Has Not Shown Diligence**

23

       "BrandTotal does not dispute that it learned of Facebook's false statement to Google

24

through discovery in the December 2020–January 2021 timeframe and then sought to amend in

25

June 2021," but argues that the complexity of factual and legal issues in this case, and its good

26

faith attempt to assert a related claim under the "fraudulent" prong of the UCL in the first instance,

27

demonstrate good cause for delay.  Defs.' Opp'n & Reply at 4–5.

28

       While this case contains a number of complex issues, the question of whether a

United States District Court
Northern District of California

United States District Court
Northern District of California

purportedly false statement about BrandTotal that harmed BrandTotal's business interests might support a defamation claim is not among them.  BrandTotal has identified no complexity with respect to that counterclaim that would have prevented BrandTotal from including it in BrandTotal's March 5, 2021 first amended counterclaims (which included all of the factual allegations on which BrandTotal now rests its defamation counterclaim)—much less anything that prevented BrandTotal from at least raising the possibility of amendment and seeking an extension of the amendment deadline before it expired on May 21, 2021, several months after BrandTotal discovered the facts at issue.

District courts have rejected motions to amend a scheduling order to permit amendment based on facts previously alleged:

> In sum, the allegations Plaintiff seeks to add to the complaint are not comprised of newly discovered facts, but facts that have already been known and pled by Plaintiff in the FAC or facts that Plaintiff has known, or should have known since the inception of the lawsuit or at the time he amended his complaint in 2012, but failed to raise. Thus, the basis for amendment does not establish Plaintiff's diligence in seeking to amend the complaint to include these allegations.

*Bever v. CitiMortgage, Inc.*, No. 1:11-cv-01584-AWI, 2014 WL 1577250, at *9 (E.D. Cal. Apr. 18, 2014), *aff'd on other grounds*, 708 F. App'x 341 (9th Cir. 2017).  BrandTotal identifies no case holding a party's failure to recognize a legal theory implicated by the facts it has already alleged to be consistent with diligence under Rule 16(b)(4).  Instead, the cases BrandTotal cites that permitted comparable amendments were decided under Rule 15's liberal standard for amendment, not the more stringent standard applicable to modifying a scheduling order.  *See* Defs.' Opp'n & Reply at 5–6 (citing *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1053 (9th Cir. 2003); *Ill. Tool Works, Inc. v. MOC Prod. Co.*, No. 09CV1887 JLS (AJB), 2010 WL 4314296 (S.D. Cal. Oct. 26, 2010)).

In the first amended counterclaims that BrandTotal filed before the amendment deadline, it chose to pursue a relatively complex claim under the "fraudulent" prong of the UCL based on Facebook's purported misrepresentation to Google.  It is not clear why BrandTotal chose that claim over a relatively more straightforward defamation claim, or why it did not bring both claims—BrandTotal states only that it "admittedly struggled to identify the right cause of action

(almost all of which pre-date the Internet age)." Defs.' Opp'n & Reply at 4.  If BrandTotal made a tactical choice to pursue only the UCL claim in the first instance, it did so knowing the risk that the amendment deadline would expire before the Court assessed that claim's viability.  If BrandTotal merely overlooked its potential defamation claim, "carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief." *Johnson*, 975 F.2d at 609.

Because BrandTotal has not shown diligence in seeking to comply with the scheduling order, the motion for leave to amend to add a defamation counterclaim, and to expand BrandTotal's counterclaim under the "unlawful" prong of the UCL to encompass defamation as a predicate, is DENIED.  The Court does not reach the parties' arguments as to whether amendment would be futile.

### B.    Motion to Dismiss

#### 1.    Legal Standard

A complaint may be dismissed for failure to state a claim on which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  "The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint." *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  Generally, a claimant's burden at the pleading stage is relatively light.  Rule 8(a) of the Federal Rules of Civil Procedure states that a "pleading which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).

In ruling on a motion to dismiss under Rule 12(b)(6), the court takes "all allegations of material fact as true and construe[s] them in the light most favorable to the non-moving party." *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  Dismissal may be based on a lack of a cognizable legal theory or on the absence of facts that would support a valid theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  A pleading must "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 (2007) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action

will not do.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).

"[C]ourts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"

*Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  "Nor does a

complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*,

556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  Rather, the claim must be "'plausible on its

face,'" meaning that the claimant must plead sufficient factual allegations to "allow the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting

*Twombly*, 550 U.S. at 570).

### 2. The UCL

California's UCL broadly prohibits unlawful, unfair, and fraudulent business acts.  *Korea

Supply*, 29 Cal. 4th at 1143.  "Unlawful acts are anything that can properly be called a business

practice and that at the same time is forbidden by law . . . be it civil, criminal, federal, state, or

municipal, statutory, regulatory, or court-made, where court-made law is, for example a violation

of a prior court order."  *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1151 (9th Cir.

2008) (ellipsis in original) (citations and internal quotation marks omitted).  "Unfair acts among

competitors means 'conduct that threatens an incipient violation of an antitrust law, or violates the

spirit or policy of those laws because its effects are comparable to or the same as a violation of the

law, or otherwise significantly threatens or harms competition.'"  *Id.* at 1152 (quoting *Cel-Tech

Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999)).  "Finally, fraudulent acts

are ones where members of the public are likely to be deceived."  *Id.*

An "unfair" claim by a competitor under the UCL generally must implicate the antitrust

laws.  *See Sybersound*, 517 F.3d at 1152.  "When a plaintiff who claims to have suffered injury

from a direct competitor's 'unfair' act or practice invokes section 17200, the word 'unfair' in that

section means conduct that threatens an incipient violation of an antitrust law, or violates the

policy or spirit of one of those laws because its effects are comparable to or the same as a violation

of the law, or otherwise significantly threatens or harms competition."  *Cel-Tech*, 20 Cal. 4th at

187.  Courts have dismissed competitors' claims under this prong of the statute where plaintiffs

fail to identify "any 'unusual' aspect of the alleged conduct that would make that conduct

something that violates the 'policy and spirit' of the antitrust laws without violating the actual laws themselves," comparable to the *Cel-Tech* defendant's "'privileged status as one of two holders of a lucrative government-licensed duopoly.'"  *Synopsys, Inc. v. ATopTech, Inc.*, No. C 13-2965 MMC, 2015 WL 4719048, at *10 (N.D. Cal. Aug. 7, 2015) (quoting *Cel-Tech*, 20 Cal. 4th at 190); *see also Creative Mobile Techs., LLC v. Flywheel Software, Inc.*, No. 16-cv-02560-SI, 2017 WL 679496, at *6 (N.D. Cal. Feb. 21, 2017).

### 3.    BrandTotal's Theories of Unfair Competition

BrandTotal primarily pursues three theories of unfair competition: (1) the theory that "Facebook's failure to give permission to any entities to collect Third-Party Commercial Advertising Information . . . allows Facebook to shirk its legal obligations under the FTC Order by failing to establish a Privacy Program," violating the spirit of the antitrust laws, *see* SACC ¶ 155;[7] (2) the theory that Facebook has "has refused to deal with [BrandTotal] by terminating both the business and personal Facebook accounts of [BrandTotal] and [its] principals and by refusing to accept advertising from [BrandTotal]," *id.* ¶ 168; and (3) the theory that "Facebook interjects itself into the marketplace and takes active steps to destroy competitors" by, for example, having "contacted Google and made false and misleading statements about the operation of UpVoice and another of [BrandTotal's] applications, knowing that Google would remove those applications from the Google Chrome Store," *id.* ¶ 163.

#### a.    Failure to Grant Permission

BrandTotal contends that Facebook's refusal to grant BrandTotal and others permission to

---

[7] The extent to which BrandTotal intends to pursue a theory based on Facebook's refusal to provide permission to access data is unclear.  *Compare* Defs.' Opp'n & Reply at 8 (asserting that Facebook violates the spirit of the antitrust laws by "using the FTC Order to gain a competitive advantage by intentionally refusing to provide permission to any entity that seeks to collect Third-Party Commercial Advertising Information from Facebook's sites"); *with id.* at 14 ("BrandTotal's SAC presents two theories under which Facebook's behavior violates the unfair prong of the UCL. First, BrandTotal alleges Facebook interjects itself into the marketplace by petitioning Google to remove applications and extensions that compete with Facebook's advertising services. . . . Second, BrandTotal alleges Facebook stifles competition by punishing entities by removing the business and personal account pages of its competition and their principals and employees."). Despite BrandTotal's assertion that it "is not asking Facebook to authorize BrandTotal's access," *id.* at 14, the Court addresses in an abundance of caution BrandTotal's allegation that failure to authorize such access is anticompetitive, *see id.* at 8; SACC ¶ 155.

access advertising data violates the *spirit* of the antitrust laws, such that BrandTotal need to track the precise contours of a Sherman Act claim to pursue a claim under the "unfair" prong of the Sherman Act. Defs.' Opp'n & Reply at 8–9. As described in a decision from this district, the California Supreme Court has recognized "that it is not just conduct that threatens a violation of an actual antitrust law that supports a UCL unfairness claim," but also "conduct that 'violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.'" *Diva Limousine, Ltd. v. Uber Techs., Inc.*, 392 F. Supp. 3d 1074, 1090–91 (N.D. Cal. 2019) (quoting *Cel-Tech*, 20 Cal. 4th at 187). Such a violation must be "be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition." *Cel-Tech*, 20 Cal. 4th at 186–87.

As a starting point, the U.S. Supreme Court has recognized that a market participant's right to refuse to deal with competitors generally serves procompetitive purposes, and that restricting that right can have anticompetitive effects:

> Firms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers. Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities. Enforced sharing also requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill suited. Moreover, compelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion. Thus, as a general matter, the Sherman Act "does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919).

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407–08 (2004) (alteration in original). That general rule is subject to "one, limited exception" involving termination of a course of past dealing, which is not applicable to advertising data that Facebook has never authorized anyone to access. *See Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 994–95 (9th Cir. 2020) (citing *Aspen Skiing*, 472 U.S. 585). In light of Supreme Court precedent treating the right to refuse to deal as generally procompetitive, BrandTotal faces an uphill battle to show that Facebook's refusal to grant permission to access advertising data violates the spirit of

the antitrust laws.

The only case BrandTotal cites allowing a UCL unfairness claim to proceed based on the spirit of the antitrust laws is *Diva Limousine*, 392 F. Supp. 3d 1074, which involved allegations that Uber had misclassified its drivers as independent contractors rather than employees.  In holding that the plaintiff stated a claim under the "unfair" prong, Judge Chen cited the California Labor Code's statement of "'the policy of this state to vigorously enforce minimum labor standards in order . . . to protect employers who comply with the law from those who attempt to gain a competitive advantage at the expense of their workers by failing to comply with minimum labor standards,'" and the California Supreme Court's recognition of "'the unfair competitive advantage the business may obtain over competitors that properly classify similar workers as employees.'"  *Id.* at 1091 (quoting Cal. Lab. Code § 90.5(a); *Dynamex Operations W. v. Superior Court*, 4 Cal. 5th 903, 913 (2018)) (emphasis omitted).

Here, BrandTotal has not identified any legislatively declared policy *related to competition* implicated by Facebook's alleged conduct.  In a footnote, BrandTotal cites a provision of the California Consumer Privacy Act ("CCPA") defining "personal information" as including "'information regarding a consumer's interaction with an internet website, application, or advertisement.'"  Defs.' Opp'n & Reply at 8 n.4 (quoting Cal. Civ. Code § 1798.140(o)(1)(F)) (emphasis omitted).  The Court has previously rejected BrandTotal's scattershot citations to the CCPA that failed to tie that law's actual requirements to the conduct at issue in this case.  *See* Order Denying TRO at 22 n.11.  So too here.  The fact that information about advertising interactions falls within the statute's definition of "personal information" does not, in itself, say anything about whether Facebook must provide BrandTotal access to such information, nor whether the legislature has identified restrictions of such access as implicating competition.

BrandTotal also relies heavily on the FTC's April 27, 2020 order requiring Facebook to take certain steps to protect user privacy.  *See* SACC Ex. C.  Nothing on the face of the FTC's order requires Facebook to allow BrandTotal the sort of access it seeks.  BrandTotal cites the order's requirement that Facebook create a "Privacy Program," which it argues Facebook breached by failing to grant any third parties permission to collect advertising data.  Defs.' Opp'n

& Reply at 8–9; SACC ¶¶ 40–43, 155. While BrandTotal is correct that the FTC's order "does *not* direct Facebook to ban *all* automated collection of data from its platforms," SACC ¶ 42, it also does not *require* Facebook to authorize any such collection. The FTC issued its order to protect user privacy, *see* SACC ¶ 37, not to facilitate competition, and denying third parties access to user data is consistent with the mandate in section VII of that order (which calls for the establishment of a "Privacy Program") to "protects the privacy, confidentiality, and Integrity of the Covered Information collected, used, or shared by [Facebook]," SACC Ex. C at 8, § VII. BrandTotal has raised colorable arguments that the order may not have required Facebook to block its access, *see* Order re 2d MTD at 12–14, but it has not shown that the order required Facebook to provide access, or that it was in any way motivated by protecting competition in the market for advertising analytics.

Neither the FTC's order nor the CCPA resembles the sort of policy specifically linked to competition that supported the decision in *Diva Limousines*. Even if they did, BrandTotal has not shown a violation of either of those authorities. Having failed to identify any legislatively declared policy related to competition implicated by Facebook's failure to grant BrandTotal permission to access advertising data, BrandTotal cannot proceed on its counterclaim for a violation of the "spirit" of the antitrust laws. Facebook's motion to dismiss BrandTotal's unfairness counterclaim is GRANTED to the extent it rests on that theory.

                **b.**    <u>Deactivation of Accounts and Advertising; Interference with Google</u>

As for BrandTotal's theories based on Facebook's deactivation of its accounts, refusal to allow it to advertise on Facebook,[8] and successfully petitioning for Google to remove UpVoice

---

[8] BrandTotal argues that its claims based on deactivation of accounts and refusal to permit advertising fall within the *Aspen Skiing* exception to the refusal-to-deal doctrine, which requires three elements: (1) unilateral termination of a voluntary and profitable course of dealing; (2) that could only be intended to sacrifice short-term benefits for long-term monopolist profits; (3) involving products already sold to other similarly situated customers. *See Qualcomm*, 969 F.3d at 994–95. Here, Facebook purportedly terminated BrandTotal's accounts and advertising based on BrandTotal's violation of Facebook's terms of service, including a prohibition of automated data collection without Facebook's permission. Given a party's general right to refuse to deal from the outset, it seems likely that a party may set conditions on such dealing and enforce those conditions if violated by terminating the relationship. The parties have not addressed that question in detail, however, and the Court need not resolve that issue in light of the separate basis

United States District Court
Northern District of California

from its store, BrandTotal asserts that even if it cannot proceed on a violation of the "spirit" of the

antitrust laws, it has sufficiently alleged a product market and market power to proceed on a more

conventional claim for actual or threatened violation of the antitrust laws.

As the Court noted previous in dismissing this claim with leave to amend, an antitrust

plaintiff generally must identify a plausible product market.  Order re 2d MTD at 26.

> Plaintiffs must plead a relevant market to state an antitrust claim
> under the Sherman Act, unless they assert a per se claim. While
> plaintiffs need not plead a relevant market with specificity, there are
> some legal principles that govern the definition of an antitrust
> "relevant market," and a complaint may be dismissed under Rule
> 12(b)(6) if the complaint's 'relevant market' definition is facially
> unsustainable.

> The relevant market must include both a geographic market and a
> product market. The latter . . . must encompass the product at issue as
> well as all economic substitutes for the product. Economic substitutes
> have a reasonable interchangeability of use or sufficient cross-
> elasticity of demand with the relevant product. Including economic
> substitutes ensures that the relevant product market encompasses the
> group or groups of sellers or producers who have actual or potential
> ability to deprive each other of significant levels of business.

*Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120–21 (9th Cir. 2018) (cleaned up).  "[O]ne method of

determining whether a proposed market is viable is assessing 'whether a monopolist in the

proposed market could profitably impose a small but significant and nontransitory price increase."

*Id.* at 1122–23 (quoting *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1002 (9th

Cir. 2018)).  A complaint that "merely restate[s] a test for market definition without any factual

elaboration" is not sufficient.  *Id.* at 1122.  That said, "[t]here is no requirement that these

elements of the antitrust claim be pled with specificity," and an "antitrust complaint therefore

survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the

alleged market suffers a fatal legal defect."  *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038,

1045 (9th Cir. 2008).

BrandTotal's alleges a market for "Third-Party Commercial Advertising Information,"

defined as "analytics about non-SIEP advertisements run by third-party business," either "on

_____

for dismissal discussed below.  Regardless, the refusal-to-deal doctrine does not apply to the
extent BrandTotal's claim is based on Facebook's communication with Google.

United States District Court
Northern District of California

personal social networking services in the United States," or in the alternative, "on the Facebook.com site and Instagram platform."  SACC ¶¶ 15, 155; *see also id.* ¶¶ 158–59.  The second amended counterclaims include few if any factual allegations to support the conclusion that such a market definition meets the criteria for a viable product market in the antitrust context, and the markets proposed in an FTC enforcement action and congressional report that BrandTotal cites are of little value, because both concerned markets for social networking rather than for advertising analytics.  *Cf.* SACC ¶¶ 156–57.

Nevertheless, there is some logic to this market, and Facebook's arguments for dismissal generally miss the mark.  Facebook contends that courts have generally been skeptical of markets based on a single form of advertising that fail to treat other forms of advertising as potential substitutes.  Pl.'s Mot. & Opp'n at 10–11 (citing *Hicks*, 897 F.3d at 1123).  Here, however, BrandTotal's proposed market is not for advertising, but instead for analysis of advertising.  A company that has chosen to advertise on social media would presumably not consider analysis of, say, billboard advertising to be a substitute for analysis of the advertising it has already placed on Facebook or other social networks.  And while single-brand markets are also disfavored, *see Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008), the market for analysis of advertising on Facebook and Instagram bears at least some resemblance to the sort of "derivative aftermarket" that courts have recognized as an exception to that rule, because a company that has purchased advertising on Facebook might have little to gain from analysis of other platforms where its ads do not appear, *see id.* at 1196–97 (citing *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992); *Newcal Indus.*, 513 F.3d at 1049).  Neither party's arguments on this point—BrandTotal's incomplete sentence that advertising on Facebook "is not interchangeable with Third-Party Commercial Advertising Information on other sites (e.g., YouTube, Twitter, etc.) because," Defs.' Opp'n & Reply at 12, or Facebook's conclusory assertion that "this Facebook-only 'market' has none of the features that could even conceivably make it a derivative market," Pl.'s Reply at 3—are particularly helpful.  BrandTotal's failure to address potential substitutes and to define the market clearly, including its failure to allege any particular definition of "personal social networking services" that would help the parties and the

15

1   Court determine which platforms fall within the alleged market, raise concerns.  The Court

2   nevertheless assumes for the sake of argument that BrandTotal's alleged markets are sufficiently

3   plausible to survive the limited scrutiny of Rule 12(b)(6).

4         The next issue is market power, which "the Supreme Court has defined . . . as the power to

5   'control prices or exclude competition.'"  *Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*, 99 F.3d

6   at 950 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966)).  "Whether monopoly

7   power exists depends on a variety of factors," with market share relevant to that analysis but not

8   the only factor; depending on market conditions, courts have found both market power and a lack

9   of market power when a defendant's market share is in the sixty to seventy percent range.  *Hunt-*

10   *Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 924 (9th Cir. 1980).  The typical way in

11   which an incomplete monopolist—a defendant with less than full control of the market—can

12   nevertheless exert monopoly power is when that party controls enough of the market that "by

13   restricting its own output, it can restrict marketwide output and, hence, increase marketwide

14   prices."  *Rebel Oil v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995); *see also Ohio v. Am.*

15   *Express Co.*, 138 S. Ct. 2274, 2288 (2018) ("'Market power is the ability to raise price profitably

16   by *restricting output*.'" (quoting a treatise; emphasis added in *Am. Express*)).  "Prices increase

17   marketwide in response to the reduced output because consumers bid more in competing against

18   one another to obtain the smaller quantity available."  *Rebel Oil*, 51 F.3d at 1434.

19         Here, BrandTotal alleges that a Congressional subcommittee reported that Facebook has

20   claimed to control ninety-five percent of the market for social media.  SACC ¶ 157.  While market

21   share alone does not determine market power, a share that high could likely support a plausible

22   inference of market power sufficient to survive dismissal under Rule 12(b)(6), although

23   BrandTotal's failure to allege clearly that Facebook actually *has* that market share or to define

24   how it is measured does not help its cause.  *Cf. Fed. Trade Comm'n v. Facebook, Inc.*, __ F. Supp.

25   3d __, 2021 WL 2643627, at *12–13 ("Even accepting that merely alleging market share 'in

26   excess of 60%' might sometimes be acceptable, it cannot suffice in this context, where Plaintiff

27   does not even allege what it is measuring.").  The larger problem is that this case is not about the

28   market for social media—a market in which BrandTotal does not participate.  This case concerns

United States District Court
Northern District of California

advertising analytics, and BrandTotal's allegation that by virtue of "[p]ossessing a monopoly in the market of personal social networking services . . . Facebook also necessarily possesses a monopoly market [sic] in Third-Party Commercial Advertising Information on personal social networking services," *id.* ¶ 158, is wholly conclusory, and undermined by the fact that BrandTotal holds at least some share of the market for social media advertising analytics without participating in the market for social media.  Even to the extent Facebook can regulate control of automated data collection on its platforms, an advertising consulting company could presumably produce at least some degree of analysis of advertising on Facebook based on other methods like surveys and focus groups.  BrandTotal has wholly failed to address the degree of competition in the market it has alleged—including the market share Facebook controls, whether there are other competitors besides BrandTotal and Facebook, and whether Facebook has the power to unilaterally restrict marketwide output of the analytical services at issue.[9]  Facebook's motion to dismiss BrandTotal's unfairness claim under the UCL is therefore GRANTED for failure to present plausible allegations of market power.

It is at least conceivable that this defect could cured by further amendment.  In considering whether to grant leave to amend, the Supreme Court has identified as an incomplete list of relevant factors "'undue delay, bad faith or dilatory motive on the part of the [party seeking to amend], repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment, etc.'" *Eminence Cap.*, 316 F.3d at 1051–52 (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  Multiple attempts at amendment do not always support a conclusion to deny further leave, and "it is the consideration of prejudice to the opposing party that carries the greatest weight."  *Id.* at 1052.

Here, BrandTotal has made three unsuccessful attempts to state a UCL unfairness claim.

---

[9] At the hearing, BrandTotal cited its allegation that Facebook has taken similar actions against at least six other entities.  *See* SACC ¶ 164.  That allegations says nothing about Facebook's position in the market for the advertising information at issue, or whether other competitors exist that have not been subject to any such action by Facebook, or whether other competitors have been able to compete successfully despite Facebook taking similar action.

*See* Order re 1st MTD at 16–17; Order re 2d MTD at 24–28.  Unlike *Eminence Capital*, this *is* " a case where plaintiffs took 'three bites at the apple' by alleging and re-alleging the same theories in an attempt to cure pre-existing deficiencies."  316 F.3d at 1053 (reversing a district court's decision to dismiss with prejudice and deny leave to amend, based on the Ninth Circuit's conclusion that it was not such a case, and the plaintiff had instead sought to present new legal theories).  BrandTotal's repeated failure to state a viable claim, as well as its failure to identify at the hearing specific allegations it could add to cure the defects addressed in this order, suggests that further leave to amend is likely to be futile.  Moreover, continuing to litigate the pleadings would require at least a narrow exception to the scheduling order's deadline for amendment (which, as discussed above, expired months ago), and would require extending fact discovery— currently scheduled to close in November of this year—by many months if not much longer.  Such delay would prejudice Facebook not only in delaying a resolution of BrandTotal's counterclaims against it, but also in delaying resolution of Facebook's affirmative claims against BrandTotal. The Court therefore denies leave to amend further, and dismisses BrandTotal's counterclaim under the "unfair" prong of the UCL with prejudice.

## IV.   CONCLUSION

For the reasons discussed above, BrandTotal's motion for leave to amend to add a defamation counterclaim (and to expand its counterclaim under the "unlawful" prong of the UCL to encompass defamation) is DENIED, and Facebook's motion to dismiss BrandTotal's counterclaim under the "unfair" prong of the UCL with prejudice is GRANTED.

For convenience and clarity, BrandTotal is instructed to file its second amended counterclaims as a separate docket entry no later than September 7, 2021.  Facebook shall file its answer to the surviving counterclaims no later than September 14, 2021.

**IT IS SO ORDERED.**

Dated: August 31, 2021

JOSEPH C. SPERO
Chief Magistrate Judge

United States District Court
Northern District of California