**PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

Rudolph A. Telscher, Jr.* (MO Bar No. 41072)
rudy.telscher@huschblackwell.com
Kara R. Fussner* (MO Bar No. 54656)
kara.fussner@huschblackwell.com
HUSCH BLACKWELL LLP
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
314-480-1500 Telephone

Ryan B. Hauer* (IL Bar No. 6320758)
ryan.hauer@huschblackwell.com
HUSCH BLACKWELL LLP
120 South Riverside Plaza Suite 2200
Chicago, IL 60606
312-526-1572 Telephone

Dustin L Taylor* (IL Bar No. 6328158)
dustin.taylor@huschblackwell.com
HUSCH BLACKWELL LLP
1801 Wewatta Street, Suite 1000
Denver, CO 80202
        *admitted *pro hac vice*

Karl Kronenberger (CA Bar No. 226112)
karl@krinternetlaw.com
Jeffrey M. Rosenfeld (CA Bar No. 222187)
jeff@krinternetlaw.com
KRONENBERGER ROSENFELD, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
415-955-1155 Telephone

*Attorneys for Defendants/Counterclaim
Plaintiffs BrandTotal, Ltd. and Unimania,
Inc.*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO/OAKLAND DIVISION

| | |
|---|---|
| FACEBOOK, INC., a Delaware corporation, | Case No.: 3:20-CV-07182-JCS |
| *Plaintiff/Counterclaim Defendant*, <br> v. | **DEFENDANTS BRANDTOTAL, LTD. NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| BRANDTOTAL, LTD., an Israeli corporation, and UNIMANIA, INC., a Delaware corporation, | Judge:   The Hon. Joseph C. Spero Ctrm.: Courtroom F – 15th Floor <br> Date:    April 29, 2022 <br> Time:    9:30 a.m. |
| *Defendants/Counterclaim Plaintiffs*. | |

PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ............................................................................................. i

TABLE OF AUTHORITIES ..................................................................................... iii

NOTICE OF MOTION AND MOTION ..................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................ 1

INTRODUCTION ...................................................................................................... 1

STATEMENT OF ISSUES ........................................................................................ 3

STATEMENT OF FACTS .......................................................................................... 4

    A.    BrandTotal and the History of Advertising Analytics ............................. 4

    B.    UpVoice 2021 and BrandTotal's Backend Collection ............................ 5

    C.    UpVoice 2021 Does Not Impede Facebook's Operations or Alter User Experience in Any Way ...................................................................... 8

    D.    Facebook's Terms of Service ................................................................... 9

    E.    Facebook's Data Collection and Advertising Sales and Analytics ...... 11

    F.    Facebook Has No Process for Vetting Third Party Access, But Instead Uses Facebook's Terms of Service to Conceal Advertising Metrics. .......................... 13

RELEVANT LEGAL STANDARDS ....................................................................... 14

ARGUMENT ............................................................................................................ 14

I.    SECTION 3.2.3 OF THE TERMS OF SERVICE IS UNENFORCEABLE AGAINST UPVOICE 2021 BECAUSE IT IS CONTRARY TO PUBLIC POLICY ...................... 14

    A.    Enforcement of Section 3.23 Contravenes the Public Interest by Depriving Users of Control Over Their Own Online Data .................................. 15

        1.    The Public Has a Deep And Established Interest in Promoting User Control Over Online Data ...................................................... 15

        2.    Section 3.2.3 Deprives Users of the Ability to Control and Benefit From Their Own Data, and Thus Contravenes Established Public Policy Objectives .................................................. 17

    B.    Enforcement of Section 3.23 Subverts the Compelling Public Interest in Competition in the Market for Advertising Analytics. .......................... 18

        1.    The Public Has Deep Interest in Promoting Competition Generally, and in the Advertising Data Analytics Market Specifically ................ 18

        2.    Facebook and BrandTotal Compete to Provide Advertising Data Analytics ............................................................................. 19

        3.    Facebook's Enforcement of Section 3.2.3 Extinguishes This Competition and Deprives the Market of an Independent Check on Facebook's Internal Data Analytics ........................................ 20

    C.    Enforcement of Section 3.2.3 Undermines the Public's Deep Public Interest in the Free-flow of Information and Imposes Impermissible Restraints on Speech ............................................................................ 22

1.   There Is a Strong Public Interest in Promoting the Free-Flow of Information on the Internet ........................................................................ 22

2.   Enforcement of Section 3.2.3 Throttles the Flow of Socially Valuable Information............................................................................ 23

3.   Enforcement of Section 3.2.3 Chills Protected Expression ..................... 26

D.   Facebook's Various Justifications for Its Blanket Automated Enforcement Ban Are Unavailing.............................................................................. 27

II.   SECTION 3.2.3 OF THE TOS IS UNENFORCEABLE AGAINST UPVOICE 2021 BECAUSE ENFORCEMENT WOULD BE UNCONSCIONABLE .............................. 30

A.   The TOS Are a Procedurally Unconscionable Adhesion Contract...................... 30

B.   Section 3.2.3 and Related Provisions of the TOS Are Substantively Unconscionable ................................................................................. 32

III.   BRANDTOTAL IS ENTITLED TO SUMMARY JUDGMENT ON FACEBOOK'S CFAA (COA 4) AND CDAFA (COA 5) CLAIMS WITH RESPECT TO UPVOICE 2021 AND ONGOING SERVER-SIDE COLLECTION.................................................. 33

IV.   BRANDTOTAL IS ENTITLED TO SUMMARY JUDGMENT ON FACEBOOK'S UNFAIR BUSINESS PRACTICE CLAIM (COA 6)...................................... 35

CONCLUSION ................................................................................................. 35

PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams ex rel. Harris v. Boy Scouts of Am.-Chickasaw Council,*
   271 F.3d 769 (8th Cir. 2001) ........................................................................................... 14

*Alexander v. Bahou,*
   512 F. Supp. 3d 363 (N.D.N.Y. Jan. 12, 2021) ................................................................ 29

*Altschul v. Sayble,*
   83 Cal. App. 3d 153 (Ct. App. 1978) ............................................................................... 15

*Armendariz v. Found. Health Psychcare Servs., Inc.,*
   24 Cal. 4th 83 (2000) ................................................................................................ 30, 31

*Avila v. Citrus Cmty. Coll. Dist.,*
   38 Cal. 4th 148 (2006) ..................................................................................................... 14

*Baltazar v. Forever 21, Inc.,*
   62 Cal. 4th 1237 (2016) ................................................................................................... 31

*Bass v. Facebook, Inc.,*
   394 F. Supp. 3d 1024 (N.D. Cal. 2019) ........................................................................... 32

*Beer Nuts, Inc. v. King Nut Co.,*
   477 F.2d 326 (6th Cir. 1973) ........................................................................................... 23

*C.B.C. Distribution & Mktg., Inc. v. Major League Baseball Advanced Media, L.P.,*
   505 F.3d 818 (8th Cir. 2007) ........................................................................................... 24

*Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc.,*
   499 U.S. 340 (1991) ......................................................................................................... 24

*Glen Holly Ent., Inc. v. Tektronix Inc.,*
   343 F.3d 1000 (9th Cir. 2003) ......................................................................................... 18

*hiQ Labs, Inc. v. LinkedIn Corporation,*
   938 F.3d 985 (9th Cir. 2019) ......................................................................... 3, 23, 28, 34

*Idaho Potato Comm'n v. M & M Produce Farm & Sales,*
   335 F.3d 130 (2d Cir. 2003) ............................................................................................ 23

*In re MMS Builders, Inc.,*
   101 B.R. 426 (D.N.J. 1989) ............................................................................................. 29

*Kasky v. Nike, Inc.,*
   27 Cal. 4th 939 (2002) ..................................................................................................... 22

*Kelton v. Stravinski,*
   138 Cal. App. 4th 941 (2006) .......................................................................................... 14

*Lear, Inc. v. Adkins,*
   395 U.S. 653 (1969) .................................................................................................. 23, 24

*Madsen v. Women's Health Ctr., Inc.,*
   512 U.S. 753 (1994) ......................................................................................................... 27

*McIlwain, LLC v. Berman,*
   No. 18-CV-03127-CW, 2020 WL 1308342 (N.D. Cal. Feb. 10, 2020) ............................ 15

*McIlwain, LLC v. Hagens Berman Sobol Shapiro LLP,*
   855 F. App'x 427 (9th Cir. 2021) .................................................................................... 15

*Nat'l Basketball Ass'n v. Motorola, Inc.,*
   105 F.3d 841 (2d Cir. 1997) ............................................................................................ 24

*OTO, L.L.C. v. Kho*,
   8 Cal. 5th 111, 447 P.3d 680 (2019) ....................................................................30
*Packingham v. North Carolina*,
   137 S. Ct. 1730, (2017) ..........................................................................24, 33
*Sako v. Wells Fargo Bank. N.A.*,
   No. 14CV1034-GPC(JMA), 2016 WL 2745346 (S.D. Cal. May 11, 2016)...........30
*Saturday Evening Post Co. v. Rumbleseat Press, Inc.*,
   816 F.2d 1191 (7th Cir. 1987)..............................................................................23
*Sonic-Calabasas A, Inc. v. Moreno*,
   57 Cal. 4th 1109 (2013) .......................................................................................32
*Universal City Studios, Inc. v. Corley*,
   273 F.3d 429 (2d Cir. 2001) ................................................................................27
*Virginia State Bd. of Pharm. v. Virginia Citizens Consumer Council, Inc.*,
   425 U.S. 748 (1976)...............................................................19, 22, 25, 27
*VL Sys., Inc. v. Unisen, Inc.*,
   152 Cal. App. 4th 708 (2007) .............................................................................27
*Wyeth v. Levine*,
   555 U.S. 555 (2009) .............................................................................................29

**Statutes**

15 U.S.C. § 1 ...............................................................................................................18
18 U.S.C. § 1030(a)(2), § 1030(a)(4).........................................................................34
18 U.S.C. § 1030(a)(4).................................................................................................34
Cal. Civ. Code § 1667(2) .............................................................................................14
Cal. Civ. Code § 1798.140(o)(1)..................................................................................16
CAL. CONST. ART. I, § 7 .................................................................................................22
California Business and Professions Code § 16600................................................14, 18
California Business and Professions Code § 17200.....................................................35
California Penal Code § 502 .................................................................................1, 35
U.S. CONST. AMEND. I ...................................................................................................22

**Rules**

Fed. R. Civ. P. 56(a)......................................................................................................14

**Regulations**

16 C.F.R. § 2.51 ...........................................................................................................34

**Other Authorities**

California Consumer Privacy Act ................................................................................15
California Privacy Rights Act .......................................................................................15
Computer Fraud and Abuse Act................................................................................1, 35

**PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1

## NOTICE OF MOTION AND MOTION

2      PLEASE TAKE NOTICE that on April 29, 2022, in Courtroom F on the 15th floor of the

3  above-entitled court, at 9:30 a.m., Defendants/Counterclaim Plaintiffs BrandTotal, Ltd. and

4  Unimania, Inc. (collectively, "BrandTotal" or "Defendants") will move this Court for partial

5  summary judgment.

6      BrandTotal respectfully requests the Court enter judgment in its favor that: **(i)** Section 3.2.3

7  of Facebook's Terms of Service is unenforceable as against public policy and/or unconscionable

8  and thus, BrandTotal is entitled to judgment as a matter of law on Plaintiff's breach of contract

9  (Count 1), tortious interference with contractual relations (Count 5), and unjust enrichment (Count

10  2) counts to the extent those counts are based on violation of that section; **(ii)** Plaintiff's claims

11  under the Computer Fraud and Abuse Act (Count 3) and the California Penal Code § 502 (Count

12  4) fail as a matter of law as to UpVoice 2021 due to the lack of server access; and **(iii)** Plaintiff's

13  Unfair Business Practices (Count 6) claim fails as a matter of law as to UpVoice 2021, which was

14  never the subject of the purportedly deceptive language that is the basis for Plaintiff's claim.

15      This motion is based on this Notice of Motion, the accompanying Memorandum of Points

16  and Authorities, the Declaration of Kara R. Fussner and accompanying exhibits, the Declaration of

17  Oscar Padilla and accompanying exhibits, the pleadings on file in this matter, and on any

18  additional argument or evidence the Court may permit.

19

## MEMORANDUM OF POINTS AND AUTHORITIES

20

## INTRODUCTION

21      Through this motion, BrandTotal asks the Court to find Section 3.2.3 of Facebook's Terms

22  of Service unenforceable—a pure issue of law that the Court can and should decide now—and that

23  as to UpVoice 2021, Facebook's other causes of action fail as a matter of law.[1] Ultimately,

24  however, this motion is about much more than Facebook's attempt to eliminate BrandTotal from

25  the marketplace through costly litigation. It is about whether Facebook's billions of users control

26  their own online data and are free to use it as they see fit, or whether Facebook exercises a veto

27

---

28  [1] Throughout this motion, "Facebook" refers to the Plaintiff Meta Platforms, Inc., which changed
its name from Facebook, Inc. late in this litigation.

**PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1  power—and thus *de facto* control—over user choices. It is about whether a social media company

2  (whose number of users equates to over a third of the world's population) can assert ownership of

3  otherwise public content simply by requiring a username and password to view the content. It is

4  about whether small startups engaged in fully user-authorized and socially beneficial collection

5  and analysis of advertising information—the digital equivalent of familiar broadcast media data

6  collection efforts such as Nielsen ratings—will be permitted to survive and compete, or instead

7  will have their businesses snuffed out by massive corporate competitors that assert unilateral

8  control over an entire body of commercial knowledge. And it is about public access to

9  information—specifically, whether the public, or indeed ***anyone other than Facebook***

10  ***executives***—will be permitted to know what advertising actually occurs on the world's largest

11  public forum and marketplace.

12       As explained in detail below, California and national public policy on these issues is clear.

13  First, social media users should have control of, ***and the ability to benefit from***, their own online

14  data. Second, the public benefits from vigorous competition, including in the market for online

15  advertising data collection and analysis. Third, there is a compelling public interest in preserving

16  the free flow of information online, including information regarding what advertisements are being

17  displayed on the world's largest social network.

18       Enforcement of Section 3.2.3 of Facebook's Terms of Service ("Section 3.2.3") against

19  BrandTotal's UpVoice 2021 would subvert these public policy objectives. It is undisputed that the

20  ***only*** data UpVoice 2021 collects is advertising information that Facebook users have ***consciously***

21  ***decided to share with BrandTotal, in return for compensation***. This is precisely the type of

22  transparent, user-empowering relationship California public policy seeks to promote. Section

23  3.2.3's broad-brush ban on all automated data collection, however, renders such arrangements

24  impossible. By preventing any meaningful collection and aggregation of advertising data from

25  Facebook, moreover, Section 3.2.3 not only eliminates any competition for Facebook's own

26  advertising analytic services, but it also prevents anyone other than Facebook from knowing

27  which users Facebook is being paid to target with advertisements. In other words, by giving

28  Facebook "free rein to decide, on any basis, who can collect and use data," Section 3.2.3 creates

**PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1    precisely the type of "information monopol[y] that would disserve the public interest" that

2    California public policy seeks to prevent. *hiQ Labs, Inc. v. LinkedIn Corporation*, 938 F.3d 985,

3    1005 (9th Cir. 2019). To prevent this malign outcome, and for all the reasons explained below,

4    the Court should find that Section 3.2.3 is unenforceable as against public policy or alternatively

5    unconscionable because Facebook can use the provision to constrain, in perpetuity, otherwise

6    legal data collection by those who no longer have Facebook accounts. Either finding supports

7    granting BrandTotal partial summary judgment on Facebook's claims of breach of contract and

8    tortious interference with contract, as well as the claim for unjust enrichment to the extent those

9    claims are based on supposed violation of Section 3.2.3.

10        Facebook's other causes of action under the CFAA, CDAFA and Unfair Business

11    Practices—at least as they relate to UpVoice 2021—also fail as a matter of law. UpVoice 2021

12    does not access Facebook servers, a requirement of the anti-hacker CFAA and CDAFA

13    provisions. As to the Unfair Business Practices claim, BrandTotal removed the "sponsored sites"

14    language objected to by Facebook before launching UpVoice 2021. Thus, BrandTotal asks this

15    Court to enter judgment as a matter of law as to those claims as they relate to UpVoice 2021.

16                                           **<u>STATEMENT OF ISSUES</u>**

17        **Is Section 3.2.3 of Facebook's Terms of Service unenforceable as contrary to public**

18    **policy?** <u>Yes</u>. Section 3.2.3 denies users the ability to control and monetize their own data, stifles

19    competition in the social media analytics market, and creates an information monopoly regarding

20    Facebook advertising—all of which is contrary to well-established public policy principles.

21        **Is Section 3.2.3 of Facebook's Terms of Service unenforceable under the doctrine of**

22    **unconscionability?** <u>Yes</u>, Section 3.2.3 is procedurally unconscionably because it is part of a

23    classic adhesion contract that users have no opportunity to negotiate, no meaningful opportunity to

24    review, and must take-or-leave. Further, it is substantively unconscionable because its terms are

25    malleable and may change at Facebook's sole discretion even after a user has joined Facebook,

26    and it purports to impose significant, life-long obligations on users even after cancellation of their

27    Facebook accounts. Although users may choose to terminate their relationship with Facebook,

28    Facebook's Terms of Service dictate that Section 3 governs users' behavior indefinitely, even after

**PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1    a user's account is terminated.

2    **Do Facebook's Claims Under the CFAA and CDAFA Fail as to UpVoice 2021?** Yes,

3    UpVoice 2021 does not access Facebook's servers.

4    **Is BrandTotal Entitled to Judgment on the Claim of Unfair Business Practices as it**

5    **Relates to UpVoice 2021?** Yes, the language in dispute was removed before the launch of

6    UpVoice 2021.

7    **STATEMENT OF FACTS[2]**

8        A.    **BrandTotal and the History of Advertising Analytics**

9        Formed in 2016 to be a premiere advertising intelligence resource, BrandTotal[3] offers

10   insights and analytics about on-line social media advertising. Ex. A; Ex. B at pp. 42:25-44:25,

11   63:2-65:23.[4] For decades advertising intelligence companies (like BrandTotal) collected, analyzed,

12   and formulated creative insights regarding commercial advertisements. Ex. C, Wilcox Rep., ¶¶ 21-

13   43. This provided important information to companies regarding the effectiveness of brands and

14   specific advertising—both their own and that of their competitors—in the robust and diverse

15   marketplace of goods and services, and in the then-prevalent advertising forums of print, radio, and

16   television. Id. In recent years, however, more and more advertising has moved to digital platforms.

17   Id. at ¶ 44. For example, 2020 marked the first time ever that investments in digital advertising

18   surpassed spending in traditional platforms, and 2021 digital ad spend is estimated to have

19   exceeded $200 billion. Id. at ¶ 44. BrandTotal recognized the important trend towards online

20   advertising, and in particular the importance of social media advertising. Padilla Decl., ¶¶ 3-5.

21   While social networks like Facebook are premier venues for online advertising, little information

22   is available to advertisers or the public about what advertisements social network users are actually

23

24      [2] BrandTotal recognizes the Court is familiar with many of the key facts of this case from prior
     filings; for purposes of this filing BrandTotal focuses on the facts that are important to
25   understanding its motion. Many facts are included purely for context and not because they are
     essential or material to the substance of BrandTotal's request for partial summary judgment, which
26   hinges on pure questions of law.
        [3] Unless otherwise specified, as used herein "BrandTotal" refers collectively to BrandTotal Ltd.,
27   and Unimania, Inc.
        [4] All citations to Exhibits A-EE herein refer to attachments to the Declaration of Kara R. Fussner
28   and citations to Exhibits 1-4 herein refer to attachments to the Declaration of Oscar Padilla.

**PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1    seeing. Ex. C, ¶¶ 44-49. Even after Facebook created the Ad Library in response to the Cambridge

2    Analytica scandal, it has chosen to withhold information regarding to which users (including their

3    gender, age, and other demographic details) Facebook targeted commercial advertisements, after

4    advertisers paid it to disseminate advertisements. Dkt. 103-11, Sherwood PI Rep., ¶¶ 106-107.

5    BrandTotal recognized that just as companies track the quantity and impact of their own and

6    competitive advertising in print media, on billboards, and on broadcast media such as TV and

7    radio, companies have a pressing—but then largely unmet—need to understand the volume and

8    effect of advertisements being broadcast to the billions of social media users across the world. Dkt

9    26-5, ¶¶ 7-8; Padilla Decl., ¶¶ 4-5, 13. However, at least in the Facebook environment, the

10   overwhelming majority of advertisements are ████████████████████████████████

11   ████████████████   Ex. D at 19:17-21:10. BrandTotal provided valuable intelligence

12   regarding "dark ad" and other social medial advertising and, before the damage inflicted by

13   Facebook's wrongful interference, had become a top-level advertising consulting company

14   offering competitive analyses of advertising efforts on social media sites like Facebook, Instagram,

15   Twitter, YouTube, LinkedIn, and Amazon to a wide variety of clients, from Fortune 500

16   companies to small startups. Ex. A; Padilla Decl., ¶ 12.

17       **B.    UpVoice 2021 and BrandTotal's Backend Collection**

18           BrandTotal's flagship data acquisition product, and the only one relevant to this motion, is

19   UpVoice 2021. Padilla Decl., ¶ 8. As the Court is aware from prior filings, all data that UpVoice

20   2021 collects derives from the activities of willing participants who download the UpVoice

21   browser extension and authorize BrandTotal—through a transparent, deliberate opt-in process—to

22   collect information about advertisements that participant encounters through their normal use of

23   social media sites like Facebook. Dkt. 26-5, ¶ 10. Critically, and in sharp contrast to Facebook and

24   other social media sites that generate revenue by collecting and selling data about their users,

25   BrandTotal ***pays participants*** (to which it refers as "panelists") in exchange for the information it

26   collects. Padilla Decl., ¶¶ 6, 9-11. Since UpVoice's launch, BrandTotal panelists have earned

27   hundreds of thousands of dollars from BrandTotal. Padilla Decl., ¶ 11. BrandTotal's opt-in

28   procedures for UpVoice 2021 are robust. As this screenshot from www.joinupvoice.com

**PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   illustrates, BrandTotal explains to prospective panelists that, in return for downloading the

2   UpVoice browser extension and allowing UpVoice to "anonymously capture[] your ads"

3   encountered "[w]hen you visit your social feeds," prospective panelists receive "daily points that

4   can later be redeemed for a variety of gift cards." Ex. E.



13      Further, before BrandTotal collects *any* information from a panelist's social media

14  activities, that panelist must first (1) choose to sign up for UpVoice 2021, (2) confirm they have

15  read the privacy policy which explains that demographic and advertising information BrandTotal

16  collects, and then (3) install the UpVoice Chrome browser extension. Ex. F, Martens Opening

17  Rep., ¶¶ 509-514; Dkt. 103-11, ¶¶ 23-32. UpVoice 2021 requires each panelist to again affirm

18  their consent to BrandTotal's collection of data *each time* the user signs into a new social media

19  account. Dkt. 103-11, ¶ 94. Consequently, even in a hypothetical situation in which a BrandTotal

20  panelist allows another individual to use the Panelist's computer and Chrome browser, the other

21  individual will nevertheless be on notice regarding BrandTotal's data collection. *Id.* The

22  information that UpVoice 2021 collects pertains to commercial advertising interaction, **not**

23  personal social media expression or personal demographic information. Dkt. 26, at 3-5; Dkt. 103-

24  11, ¶¶ 51-52. For example, as the Panelist scrolls social media, UpVoice 2021 collects the time

25  the advertisement was shown to the Panelist, the post ID, and the advertiser ID. Ex. F, ¶¶ 491,

26  495-496; Dkt. 125-25. Panelists provide BrandTotal with personal demographic information (e.g.,

27  age, gender, location, interests) when they sign up for UpVoice, but that information (which is

28  aggregated and deidentified) *is not collected from Facebook*. UpVoice 2021 does not keep or

**PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

compile participants' private postings, passwords, photos, or web history, nor does UpVoice 2021 mine "friend" information, or otherwise take data that users have not expressly authorized it to access. Dkt. 103-11, ¶¶ 51-52. Instead, the information UpVoice 2021 collects relates to which particular advertisements Facebook shows to particular demographics of Facebook users, and where and when those advertisements are displayed. Ex. F, ¶¶ 495-496. BrandTotal anonymizes and aggregates the data UpVoice 2021 collects by demographic info (age, gender, geographic region, marital status, interests), to provide summary information about advertising viewership to its clients. Dkt. 103-11, ¶ 18.

Facebook's technical expert Mr. David Martens does not dispute, and indeed confirms the material features of UpVoice 2021. As Mr. Martens explains, UpVoice 2021 performs only what he calls "reactive" data collection—it collects only advertising data that Facebook *sends* to a user. *See* Ex. F, ¶ 481 ("UpVoice 2021 performs Reactive Collection of advertising-related information made available to UpVoice 2021 in response to user interactions with Facebook."). This passive, "reactive" method extracts data solely from the user's own browser without interacting with Facebook's servers. *Id.*, ¶¶ 481-488. For example, Mr. Martens explains that UpVoice 2021 ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ *Id.* at ¶ 486. Indeed, Mr. Martens confirms that UpVoice 2021 is analogous to a user's conscious use of a camera to record advertisements and associated advertising information that the user sees on their own computer screen while on Facebook. *Id.*, ¶ 104.

Using the sponsored post ID that UpVoice Panelists shared, BrandTotal's "backend"[6] then collects information about Facebook advertisements and advertisers from a portion of Facebook that does **not** require a Facebook log-in or password. *See* Dkt. 41, ¶ 5(e). Again, Facebook's expert

---

[5] "DOM" stands for Document Object Model.
[6] The parties have referred to this as the BrandTotal "backend," BrandTotal's "server-side collection," and "direct collection" interchangeably.

**PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1    Mr. Martens agrees that the only data collected by the BrandTotal backend pertains to advertising

2    information. Ex. F, ¶ 326 ("BrandTotal's Direct Collection Software collects Advertising

3    Interaction Data from Facebook and Instagram. Specifically, it collects the following data fields:

4    ███████████████████████████████████████████████████████████

5    In most instances, BrandTotal's backend collects this advertising data from a public-URL

6    and no username or password is required to access the content. Dkt. 148, ¶ 18 ("The Facebook Ad

7    Library (available at https://www.facebook.com/ads/library) allows anyone to search and view ads

8    published on Facebook and Instagram."); Ex. G at Response to Rog No. 3; Dkt. 103-11, ¶ 53.

9    Although Facebook may implement measures to restrict these pages to human users (versus

10   automated collection), Facebook does not restrict access to these pages to specific users. Dkt. 148,

11   ¶ 18; Ex. G; Dkt. 103-11, ¶ 53. These pages are thus outside the "privacy sphere." Ex. H, Thaw

12   Rep. at 13. Limited pages, however, are "restricted" because of the content of the advertisement.

13   For example, an advertisement for alcohol may be restricted to users that are over 21-years. Since

14   October 2021, BrandTotal's backend no longer collects data from these "restricted" pages.

15   BrandTotal instead now uses a new extension—███████████████████████████

16   ███████████████████████████████████████████████████████

17   ███████████████████████████████████████████████████████████

18   ███████████████████████████████████████████████████████████

19   █████████████████████████████████████████████████████████

20   ███████████████████████████████████████████████████████████

21   ███████████████████████████████████████████████████████████████

22   █████████████████████████████████████████████████████████████

23   █████████████████████████████████████████████████████████████

24   ███████████

25   **C.    UpVoice 2021 Does Not Impede Facebook's Operations or Alter User
         Experience in Any Way**

26   Despite continued Facebook insinuations, suggestions, and speculation otherwise, there is

27   no evidence of record showing or even suggesting that UpVoice 2021—or any other BrandTotal

28

**PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1  product, for that matter—damages Facebook software or hardware or degrades Facebook's

2  performance in any way.[7] BrandTotal's independent expert, Mr. Robert Sherwood, reviewed

3  UpVoice 2021's software code and collection methodology and confirmed that the collection

4  methodology is safe and secure and does not harm Facebook. Dkt. 103-11, § 5.1.3. Mr. Sherwood

5  also opined that, although BrandTotal's collection method makes limited calls to Facebook's

6  servers, the total of BrandTotal's collections (both from its backend, direct, collection and from its

7  applications and extensions that collect from the user's device as the user uses Facebook as

8  normal) from June 1, 2017, to December 31, 2021, amounts to less than one user on

9  Facebook.com. Ex. K, Sherwood Rebuttal Rep., ¶¶ 131–137.

10       Facebook has not identified any operational harm. When asked to identify what damages it

11  suffered from Defendants' actions, Facebook identified only employee time and resources in

12  connection with its investigation into BrandTotal. Ex. L. Dr. Thaw, Facebook's purported

13  cybersecurity expert, also could not identify any evidence that BrandTotal's conduct actually

14  interfered with the operation of Facebook's system. Ex. M at 125:14–126:3 ████████████

15  ████████████████████████████████████████████████████

16  ████████████████████████████████████████████████

17  ████████ *id.* at 158:6–10. Consistent with these findings, Facebook's damages expert, Stephen

18  Prowse, does not contend that Facebook is entitled to damages to compensate for any such harm.

19  Simply put, there is no evidence that such harm ever occurred.

20       **D.      Facebook's Terms of Service**

21       Facebook, including its Instagram product, comprises the world's largest social network,

22  with over 2.7 billion monthly active users. Complaint, ¶ 12; Ex. N. Facebook's user population

23  exceeds that of China, the most populous country in the world, by 1.2 billion, and constitutes over

24  one-third of the world's population. According to Facebook, Facebook "helps give people the

25

26  [7] In the expert report of Dr. Thaw, Facebook recites a parade of theoretical harms without
    quantifying or detailing specific harm that happened in *this* case. BrandTotal has filed a separate

27  *Daubert* motion on this topic. Facebook's expert Mr. Martens also references supposed "inherent
    harm" and alleged "burden" on Facebook's network that was either unquantifiable or less

28  than the equivalent "burden" of one user on the network. Ex. K, ¶¶ 131–137.

**PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1  power to build community and bring the world closer together" by providing "a place for people to

2  share life's moments and discuss what's happening, nurture and build relationships, discover and

3  connect to interests, and create economic opportunity." Ex. N at 7. Joining this community,

4  however, comes with (often hidden) costs.

5        Anyone wishing to join Facebook must first enter their demographic and personal

6  information. Ex. F, ¶¶ 63-65. After providing Facebook with their personal information, the

7  prospective user clicks on the "Sign Up" icon to complete their enrollment. *Id.* at ¶ 66. In so doing,

8  according to Facebook, the user "accept[s] the Terms of Service, Data Policy, and Cookie Policy

9  for Facebook," by virtue of the fine print above the "Sign Up" icon that states "By clicking Sign

10 Up, you agree to our Terms, Data Policy and Cookies Policy." *Id*. Prospective users are not

11 advised that they may review the Terms of Service ("TOS"), Data Policy, and Cookies Policy

12 before clicking "Sign Up," although users may review them if they recognize and click on

13 hyperlinks embedded in the "Sign Up" page.

14       Facebook users have no ability to negotiate Facebook's TOS, Data Policy, or Cookies

15 Policy, or to opt-out or modify any of them—they must either accept all terms and policies in full,

16 or be barred from participation in Facebook's multi-billion member global community. Further,

17 Facebook users must not only accept the TOS as they exist at time of account creation. According

18 to Section 4.1 of the TOS, ***Facebook may unilaterally change the TOS at any time***. Dkt. 27-7,

19 Facebook Terms of Service.

20       That Facebook might change the TOS after user sign up is not a hypothetical concern.

21 When BrandTotal first began operating in 2017, Facebook's terms of service prohibited collection

22 "using automated means (such as harvesting bots, robots, spiders, or scrapers)" without prior

23 authorization. Dkt. 27-9. In approximately 2019, Facebook expanded Section 3.2.3 to its current

24 form: "you may not access or collect data from our Products using automated means (without our

25 prior permission) or attempt to access data you do not have permission to access." Dkt. 27-7,

26 Section 3.2.3. Further, user obligations to Facebook—according to Facebook, at least—do not end

27 with the cancellation of user's Facebook account. Instead, Facebook contends that several

28 provisions, including Section 3.2.3, remain in effect indefinitely, even after a user's account has

Defendants' Motion for Partial Summary
Judgment
    10    
Case No. 3:20-CV-07182-JCS

**PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   been terminated. *Id.* at § 4.1–4.2.

2          **E.      Facebook's Data Collection and Advertising Sales and Analytics**

3          Facebook makes money by selling advertisements. Indeed, it recently represented to the

4   Securities and Exchange Commission that its "Family of Apps" business—which includes

5   Facebook, Instagram, Facebook Messenger, and WhatsApp—"generate[s] substantially all of our

6   revenue from selling advertising placements to marketers." Ex. N at 7. Those advertisements,

7   according to Facebook, "enable marketers to reach people based on a variety of factors including

8   age, gender, location, interests, and behaviors." *Id.*

9          Enabling marketers to reach people based on those factors requires extensive data collection,

10  *including scraping of user data outside of Facebook*, as Facebook's own Data Policy makes clear:

11  - We [Facebook] use the information we have (*including your activity off our Products,
       such as the websites you visit and ads you see*) to help advertisers and other partners
12     measure the effectiveness and distribution of their ads and services, and understand the
       types of people who use their services and how people interact with their websites, apps,
13     and services.

14  - We [Facebook] provide aggregated statistics and insights that help people and
       businesses understand how people are engaging with their posts, listings, Pages, videos
15     and other content *on and off the Facebook Products*.

16
17  - We [Facebook] provide advertisers with reports about the kinds of people seeing their
       ads … For example, we provide general demographic and interest information to
18     advertisers (for example, that an ad was seen by a woman between the ages of 25 and
       34 who lives in Madrid and likes software engineering) to help them better understand
19     their audience. We also confirm which Facebook ads led you to make a purchase or take
       an action with an advertiser.

20
21  - We [Facebook] share information about you with companies that aggregate it to
       provide analytics and measurement reports to our partners.

22  Dkt. 27-8[8]. Indeed, Facebook recently represented to the SEC—in a document certified by both

23  Facebook CEO Mark Zuckerberg and Facebook's CFO—that data about user activity outside of

24  Facebook products was essential to its business: "*We rely on data signals from user activity on*

25  *websites and services that we do not control in order to deliver relevant and effective ads to our*

26  *users. Our advertising revenue is dependent on targeting and measurement tools that*

27  *incorporate these signals*, and any changes in our ability to use such signals will adversely affect

28
---
[8] All emphasis supplied unless otherwise noted.

PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    our business." Ex. N at 17. Despite the importance of Facebook's surveillance of user activity to its

2    business, Facebook does not financially compensate users for the data it collects.

3         As the Court is aware, Facebook has faced censure over its own practices, including by

4    virtue of the FTC Consent Order previously discussed in this litigation.[9] That Order has no

5    applicability to UpVoice 2021, which does not collect "Covered Information." Dkt. 120-3 at 4.

6    Beyond that, though, the FTC has already cautioned Facebook against using the FTC Consent

7    Order to stifle legitimate activity. After Facebook moved against NYU's academic research

8    project, Ad Observatory, the FTC wrote to Mr. Zuckerberg cautioning against "invoking privacy –

9    much less the FTC consent order – as a pretext to advance other aims." Ex. R; *see also* Exs. P & Q.

10   The FTC stated that it "is committed to protecting the privacy of people, ***and efforts to shield***

11   ***targeted advertising practices from scrutiny run counter to that mission***." *Id*. This sentiment was

12   echoed in a report to Congress where the FTC noted that "recent events are surfacing in which the

13   pretext of privacy may be weaponized to undermine competition…" Ex. S. Congressman Ken

14   Buck, in fact, urged the FTC to specifically investigate Facebook's actions against BrandTotal in

15   this case. In a letter to the FTC dated February 7, Congressman Buck wrote that "because the

16   BrandTotal and NYU situations are similar, the FTC should consider publicly clarifying that the

17   privacy order is not meant to stifle legitimate business competition in brand analytics in either a for

18   profit setting or NYU's legitimate non-profit research." Ex. T.

19        The integrity of the analytics that Facebook provides to its advertisers has also faced harsh

20   scrutiny. Senator Cantwell, for example, recently called for an FTC investigation into Facebook

21   because "[r]ecent revelations and public documentation suggest that Facebook may have misled its

22   advertising customers and the public about its processes for ensuring brand safety and about the

23   reach of its advertisements, both core aspects of Facebook's business model." Ex. EE at 1.

24   Facebook's questionable advertising metrics have spawned class action lawsuits by advertisers,

25   which in turn have led to the disclosure of inculpatory emails in which Facebook executives

26

27   [9] *See* Dkt. 103-08 at 23. Cambridge Analytica was not Facebook's only malfeasance. Facebook
     recently agreed to pay $90 million to settle a 10-year data privacy case alleging Facebook tracked
28   subscribers' internet use even after they logged off the site. Ex. O.

**PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

admitted to serious flaws in Facebook's analytics. *See, e.g.*, Padilla Decl. ¶ 18 & Ex. 1. Indeed, flaws and failures in Facebook's advertising analytics and reporting have become so common that one prominent industry publication characterized its advertising data as "digital snake oil:"

> Reset yer counters: Facebook has had to 'fess up to yet another major ad reporting fail. This one looks like it could be costly for the tech giant to put right — not least because it's another dent in its reputation for self-reporting. (For past Facebook ad metric errors check out our reports from 2016 here, here, here and here.)…The discovery of the flaw has since led the tech giant to offer some advertisers millions of dollars in credits, per reports this week, to compensate for miscalculating the number of sales derived from ad impressions (which is, in turn, likely to have influenced how much advertisers spent on its digital snake oil).

Padilla Decl., ¶ 19 & Ex. 2.

> **F.      Facebook Has No Process for Vetting Third Party Access, But Instead Uses Facebook's Terms of Service to Conceal Advertising Metrics.**

Despite the growing alarm over Facebook's tactics, Facebook deliberately conceals advertising analytics and has no process for vetting third parties that wish to collect advertising information from Facebook. Facebook abruptly terminated BrandTotal's Facebook account and those of its principals without warning or explanation on September 30, 2020 and has never reinstated them. Dkt. 148, ¶ 70; Ex. L at Response to Interrogatory No. 22. Facebook's investigation of BrandTotal was limited to determining whether BrandTotal collected data by automated means, an action that Facebook terms "scraping," and which Facebook contends violates its Terms of Service. Ex. U at pp. 36–38, 87–89. When asked why it matters to Facebook whether an app scrapes advertising data, Mr. Karve, the e-crime investigator that examined BrandTotal, could not answer the question. *Id.* at 40. According to Mr. Karve, ▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ His investigation was limited to determining, as a technical matter, that BrandTotal engages in data collection. *Id.* at 87–89, 99–100. He did not review the BrandTotal privacy policy or terms of use. *Id.* at 99-100. He did not consider what use BrandTotal was making of the collected data. *Id.* at 76. And when asked whether he investigated whether users consented to the data collection, Facebook claimed privilege, with Mr. Karve ultimately contending again that this was ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆ *Id.* at 104.

Facebook's unchanged position is that *any* data collection outside of the APIs and what is

**PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   made available for viewing is improper and a violation of their Terms of Service. *Id*. at 36. In the

2   TRO proceedings, Facebook suggested that BrandTotal could obtain much of the information it

3   needs through Facebook's public Ad Library of APIs. TRO Hearing Tr., Dkt. 57 at 12–13. This is

4   incorrect. ***Facebook does <u>not</u> make information about who receives third-party commercial***

5   ***advertising available through Facebook's Ad Library, <u>any</u> API, or any other "approved" source.***

6   Sherwood Rep., § 5.3. Although Facebook long-contested this position, the February 3, 2022,

7   rebuttal report of their expert, Mr. Martens concedes the point. Ex. FF, Martens Rebuttal Rep.,

8   ¶ 64. ("Mr. Sherwood opines that the majority of the information that BrandTotal 'needs to

9   conduct its business' cannot be obtained from public accessible sources such as the Facebook Ad

10  Library. **I agree with his opinion in this regard**.").

11  **RELEVANT LEGAL STANDARDS**

12          A party is entitled to summary judgment on a claim or defense, or a "part of [a] claim or

13  defense," if "the movant shows that there is no genuine dispute as to any material fact and the

14  movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Pure issues of law, like

15  virtually all the issues raised in this motion, are especially well-suited to summary disposition. *See*

16  *Adams ex rel. Harris v. Boy Scouts of Am.-Chickasaw Council*, 271 F.3d 769, 775 (8th Cir. 2001)

17  ("Where the unresolved issues are primarily legal rather than factual, summary judgment is

18  particularly appropriate."); *Avila v. Citrus Cmty. Coll. Dist.*, 38 Cal. 4th 148, 161 (2006)

19  ("[I]ssue[s] of law [are] to be decided by a court, not a jury").

20  **ARGUMENT**

21  **I.   SECTION 3.2.3 OF THE TERMS OF SERVICE IS UNENFORCEABLE AGAINST
          UPVOICE 2021 BECAUSE IT IS CONTRARY TO PUBLIC POLICY**

22          "In general, a contract contrary to public policy will not be enforced." *Kelton v. Stravinski*,

23  138 Cal. App. 4th 941, 949 (2006). This doctrine is not only an established feature of California

24  common law, it is codified in California's statutes. *See* Cal. Civ. Code § 1667(2) (a contract or a

25  provision of a contract is unlawful if it is "[c]ontrary to the policy of express law, though not

26  expressly prohibited"); Business and Professions Code § 16600 (in general, "every contract by

27  which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is

28

**PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1  to that extent void"). Courts applying this doctrine "may declare void as against public policy

2  contracts, which, though not in terms specifically forbidden by legislation, are clearly injurious to

3  the interest of society." *Altschul v. Sayble*, 83 Cal. App. 3d 153, 162 (Ct. App. 1978) (citation

4  omitted). "Whether a contract is unenforceable based on these principles is a question of law."

5  *McIlwain, LLC v. Berman*, No. 18-CV-03127-CW, 2020 WL 1308342, at *7 (N.D. Cal. Feb. 10,

6  2020), *aff'd sub nom. McIlwain, LLC v. Hagens Berman Sobol Shapiro LLP*, 855 F. App'x 427

7  (9th Cir. 2021).

8        The Court should exercise its statutory and common law authority to render contract terms

9  unenforceable because Section 3.2.3 of the TOS contravenes multiple tenets of public policy.

10  Specifically, Section 3.2.3 prevents users from controlling and benefitting from their own data,

11  destroys competition, improperly restricts the free flow of information, and even undermines the

12  First Amendment rights of UpVoice 2021 panelists. Any of these reasons is alone sufficient to

13  render the provision unenforceable; together they underscore the deep injury that Section 3.2.3, if

14  enforced, would inflict on the public good.

15        A.    **Enforcement of Section 3.23 Contravenes the Public Interest by Depriving
              Users of Control Over Their Own Online Data**

16
              1.    **The Public Has a Deep And Established Interest in Promoting User
17                  Control Over Online Data**

18        A single theme animates all recent California policy regarding the use of data online:

19  social media and other internet consumers should have control over, and the ability to benefit

20  from, their own online data. This pillar of California public policy is apparent from the text and

21  legislative purposes of both landmark pieces of legislation that California recently enacted: the

22  California Consumer Privacy Act (CCPA) and the California Privacy Rights Act (CPRA).

23        There can be no real question as to whether user control of online data is a pressing public

24  policy objective because the people of the California—by passing the CPRA via referendum—

25  have expressly said as much. For example, the CPRA states that "[t]he people of the State of

26  California hereby find and declare" that "the ability of individuals to control the use, including the

27  sale, of their personal information" is "fundamental to" their right of privacy under the California

28  Constitution. CPRA § 2 (A). The CPRA further states that "[c]onsumers should be able to control

---

**PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1    the use of their personal information" and "should have meaningful options over how it is

2    collected, used, and disclosed." CPRA § 3(A)(2). Finally, as expressed in the CPRA, it is the

3    policy of the State of California that "[c]onsumers should benefit from businesses' use of their

4    personal information." CPRA § 3(A)(7).

5          These express policy aims focused on empowering users match those motivating the earlier

6    CCPA. For example, one of the principal authors of the CCPA, Assembly Member Edwin Chau,

7    stated, "Californians should have a ***right to choose*** how ***their*** personal information is collected and

8    used." Dkt. 27-12 at 7. Indeed, according to Member Chau, one of the core objectives of the CCPA

9    was to give "consumers more control over their data." *Id.*

10          Under both the CCPR and CPRA, "personal information" is defined broadly to include

11    "***[i]nternet or other electronic network activity information, including***, but not limited to,

12    browsing history, search history, and ***information regarding a consumer's interaction with an***

13    ***internet website, application, or advertisement***." Cal. Civ. Code § 1798.140(o)(1). Plainly, this

14    definition encompasses the user interactions with Facebook advertisements that users consciously

15    permit BrandTotal to collect via the UpVoice 2021 browser extension.[10] In other words, under

16    California law, ***the fact that Facebook choose to broadcast a particular advertisement to a***

17    ***specific user is not Facebook's property***—that information belongs to the user.

18          This recognition that users, not social media providers, own and should control their own

19    data is part of a long-term policy trend in favor of user-controlled data portability that even

20    Facebook has recognized. In its White Paper on "Data Portability and Privacy," Facebook

21    acknowledged both the growing public consensus in favor of data portability, and that portability

22    is a broad concept encompassing various user-directed transfers of data to third parties. Dkt. 126-

23    21 at 9-11. Indeed, according to Facebook, that "users control how their information is used" is a

24

---

25    [10] To be clear, the analytical products that BrandTotal generates from the data it collects do not
include personal information because the data is deidentified and aggregated. *Accord* CPRA §
26    14(v)(3)("'Personal information' does not include consumer information that is deidentified or
aggregate consumer information."). To the extent the information UpVoice 2021 collects does not
27    meet the CPRA definition of "personal information," the data would qualify as "publicly
available" information under the CPRA since it is "lawfully made available…by the consumer").
28    CPRA § 14(v)(2).

"core privacy principle[]." *Id.* at 6. This recognition of the importance of user control is reflected in numerous Facebook statements about the obligation of providers to facilitate data portability. *See id.* at 7 ("people should be able to transfer their information directly to a provider of their choosing, in a way similar to how people use Facebook Login today"); *id.* at 16 ("Once we know (1) that we're dealing with a user-directed transfer of data, (2) which types of data should be transferred, and (3) whose data should be transferred, we next need to ask how to enable portability while protecting privacy…[g]iven that portability is about helping people stay in control of their data, it seems clear that transferring entities should focus on making sure that requesting users can make informed choices about transferring their data.").

> **2.      Section 3.2.3 Deprives Users of the Ability to Control and Benefit From Their Own Data, and Thus Contravenes Established Public Policy Objectives**

Facebook's *de facto* ban[11] on automated collection is contrary to its own representations regarding the importance of data portability and, more importantly, subverts California's express policy goal of giving consumers control over their own online data. Every UpVoice 2021 panelist has made a conscious, knowing choice to provide BrandTotal with access to limited aspects of the panelist's personal experience on Facebook, in return for compensation. This is precisely the type of transparent, consumer-empowering arrangement that California public policy seeks to encourage. UpVoice 2021's arrangement with panelists is not only consistent with California's express goal of allowing consumers to "control the use of their personal information" and "benefit from businesses' use of their personal information," it affirmatively advances those public policy goals. Facebook's wholesale ban on automated collection, in contrast, replaces consumer control with unilateral corporate control, and thus frustrates California's policy of empowering consumers.

If Section 3.2.3 is enforced in the manner Facebook seeks, consumers will not only lose the ability to enter mutually beneficial data licensing arrangements like those upon which UpVoice 2021 is based, they will be potentially subject to legal liability for doing so. Facebook has been

---

[11] As discussed *supra*, Facebook in fact has no policies in place to approve automated collection. Even if it did, for the reasons discussed herein it would be contrary to public policy to give Facebook unchecked authority to eliminate automated collection of an entire category of socially important information.

**PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   clear in this litigation that it considers Facebook users who choose to become panelists and share

2   their Facebook experience with BrandTotal to themselves be "in violation of" Section 3.2.3. Dkt.

3   148 at 23. Facebook's enforcement of Section 3.2.3 thus not only denies consumers control over,

4   and the ability to benefit from, their own data it—chillingly—confronts consumers with the

5   prospect of a lawsuit for exercising their rights to choose how their data is used and who is allowed

6   to see it. This penalization and intimidation of consumers who simply to want to control and

7   benefit from their own online activity—and intimidation of businesses like BrandTotal, that

8   provide them the opportunity to do—is the antithesis of what California public policy seeks to

9   achieve. The Court should find Section 3.2.3 unenforceable for this reason alone.

10      **B.      Enforcement of Section 3.23 Subverts the Compelling Public Interest in
                Competition in the Market for Advertising Analytics.**

11

12              **1.      The Public Has Deep Interest in Promoting Competition Generally,
                        and in the Advertising Data Analytics Market Specifically**

13          The public's profound interest in promoting competition is well-settled and is reflected in

14   both federal and state antitrust and unfair competition statutes. *See generally* 15 U.S.C. § 1

15   (declaring "contract[s]…in restraint of trade" illegal"); Business and Professions Code § 16600 (in

16   general, "every contract by which anyone is restrained from engaging in a lawful profession, trade,

17   or business of any kind is to that extent void"). As the Ninth Circuit succinctly explained, "[t]he

18   central purpose of the antitrust laws, state and federal, is to preserve competition. ***It is competition***

19   ***… that these statutes recognize as vital to the public interest***." *Glen Holly Ent., Inc. v. Tektronix*

20   *Inc.*, 343 F.3d 1000, 1010 (9th Cir. 2003) (citation omitted).

21          Here, the Court has already determined that the public has a strong interest in "competition

22   and innovation" in the relevant market, "the market for advertising analytics." Dkt. 63. The public

23   interest in competition in this market, moreover, is magnified by the tremendous volume of

24   advertising revenue that the analytics market impacts. In 2021, for example, Facebook's Family of

25   Apps business reported ***$115 billion in advertising revenue***. Ex. N at 65. This mammoth sum—

26   which is larger than the annual GDP of thirteen US states and 148 countries[12]—flows to Facebook

27   _____

28   [12] *See* Ex. V at 8 (identifying 13 states with annualized GDPs less than $115 billion); Ex. W
     (identifying 148 countries with annual GDPs less than $115 billion).

**PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

based on representations it makes to the public regarding the size of its user base and "the reach and effectiveness of our ads." *Id.* at 29. According to Facebook, these "key metrics" are ***calculated using internal company data*** based on the activity of user accounts." *Id.* at 27. Facebook admits, moreover, that its metrics—including those relating to "the reach and effectiveness of our ads"—"involve the use of the use of estimations and judgments, and ***our metrics and estimates are subject to software bugs, inconsistencies in our systems, and human error***." *Id.* at 29; *see also* Padilla Decl., ¶ 20, Ex. 3 ("Facebook's 'conversion lift' tool overestimated some campaign results for 12 months, the company quietly told its advertisers this month. The glitch skewed data that advertisers use to decide how much money to spend with the company.").

The ramifications of these admissions are stunning. A massive chunk of economic activity—greater than the entire GDP of countries like Ethiopia (population 115 million)—is devoted to advertising on Facebook, based on undisclosed, internal metrics that Facebook admits are subject to a host of errors. The public indisputably has a deep, abiding interest in fostering competition for data analytics to help ensure that advertisers understand what return they are getting for the hundreds of billions they spend on Facebook advertisements. *Accord Virginia State Bd. of Pharm. v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 765 (1976) ("***It is a matter of public interest that [private economic] decisions, in the aggregate, be intelligent and well informed***.").

### 2. Facebook and BrandTotal Compete to Provide Advertising Data Analytics

The advertising services Facebook provides to its customers go well beyond the mere sales of advertising space. Instead, Facebook provides its customers with sophisticated advertising analytics, such as "aggregated statistics and insights that help people and businesses understand how people are engaging with their posts, listings, Pages, videos and other content on and off the Facebook Products," and "reports about the kinds of people seeing their ads." Dkt. 27-8 at 7; *see also* Ex. D at 22:6-13 ███████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

**PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1 ███████ Those reports include "general demographic and interest information to advertisers (for

2 example, that an ad was seen by a woman between the ages of 25 and 34 who lives in Madrid and

3 likes software engineering) to help them better understand their audience." Dkt. 27-8 at 7.

4 Facebook's advertising analytic offerings thus overlap and compete with those provided by

5 BrandTotal. Padilla Decl., ¶¶ 14-19. Indeed, Facebook's 10-K specifically identifies companies

6 that "develop tools and systems for managing and optimizing advertising campaigns" as

7 competitors. Ex. N at 7-8 ("*We compete with* companies providing connection, sharing, discovery,

8 and communication products and services to users online, as well as *companies that* sell

9 advertising to businesses looking to reach consumers and/or *develop tools and systems for*

10 *managing and optimizing advertising campaigns*."). Thus, Facebook and BrandTotal compete to

11 provide advertisers valuable data about the effectiveness of their advertisements on Facebook.

12       **3.** **Facebook's Enforcement of Section 3.2.3 Extinguishes This Competition and Deprives the Market of an Independent Check on**
13       **Facebook's Internal Data Analytics**

14 The Section 3.2.3 ban on automated collection makes it impossible for BrandTotal to

15 compile any meaningful data about what advertisements users are actually seeing on Facebook. If

16 permitted to stand, Facebook's aggressive enforcement of Section 3.2.3—coupled with the absence

17 of any genuine, good faith Facebook process for approving any third party automated data

18 collection—*prevents anyone outside of Facebook* from collecting usable data about the

19 advertisements being broadcast on the world's largest social network. Thus no one will be able to

20 fill the void left by BrandTotal. Not only that, but the same economic forces that make it

21 effectively impossible for BrandTotal to offer social media advertising analytics services that do

22 not include Facebook apply equally to any other company that seeks to provide independent social

23 media advertising analytics. Consequently, Facebook's automated collection ban not only

24 completely extinguishes all competition for analysis of Facebook advertising, but also has a malign

25 ripple effect on competition in the advertising analytics market more broadly.

26 Without the competitive, independent analysis provided by outside companies like

27 BrandTotal, moreover, Facebook advertisers will have no ability to spot check and evaluate the

28 accuracy of Facebook's representations regarding advertisement reach and effectiveness. Unlike

PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1  Facebook, independent data analysis companies like BrandTotal have no incentive to inflate data

2  relating to advertising impressions and reach. To the contrary, their clients want to know and are

3  paying them to find the truth about the effectiveness of their own and competitor advertisements—

4  which Facebook has documented struggles with providing. *See* Padilla Decl., ¶ 20, Ex. 3 at 2-3

5  (reporting advertising agency statement that Facebook analytics error "has the potential to be

6  extremely serious," "led to a systematic overstatement of ad performance," and resulted in

7  "misallocations [that] came at the expense of both advertiser media efficiency and Facebook's

8  competitors"). Likely for that reason, BrandTotal clients have specifically asked BrandTotal to

9  evaluate the effectiveness of their own advertising campaigns on Facebook in order to get an

10  independent, "second opinion" regarding the data Facebook was sending them. Padilla Decl., ¶¶

11  14-22. Without the independent data provided by products like UpVoice 2021—data that

12  Facebook's enforcement of Section 3.2.3 renders impossible to collect—such independent checks

13  will be impossible, and the only source of information regarding the effectiveness of that $115

14  billion in advertising spend will be Facebook itself.

15       Such an information monopoly appears to be precisely the result Facebook seeks to achieve

16  through this lawsuit. Facebook has come forward with no evidence of actual harm to its products,

17  systems, or users caused by any BrandTotal activity (much less by UpVoice 2021) and the only

18  compensatory "damages" it seeks are (in a remarkable display of circular reasoning) ***the costs***

19  ***Facebook itself created by investigating BrandTotal***. Ex. L at Response to Rog No. 13; *See also*

20  Ex. Y, Prowse Op. Rep., ¶¶ 2-3. Facebook has admitted, moreover, that it is threatened by anyone

21  that, like BrandTotal, is in a position to cast doubt on the accuracy of Facebook's internal metrics:

22       ***Where marketers, developers, or investors do not perceive our metrics or estimates to be***
       ***accurate***, or where we discover material inaccuracies in our metrics or estimates, ***we may***
23       ***be subject to liability, our reputation may be harmed, and marketers and developers may***
       ***be less willing to allocate their budgets or resources to our products that deliver ad***
24       ***impressions***, which could negatively affect our business and financial results.

25  Ex. N at 29. No one likes to have someone else check their work, and independent evaluations are

26  no doubt all the less welcome when hundreds of billions of dollars in advertising revenue are at

27  stake. Thus it is no surprise that Facebook seeks to silence voices, like those of BrandTotal, that

28  are in a position to provide an independent, disinterested check on Facebook's assertions about the

1   reach and effectiveness of advertisements placed on its platform. After all, such independent

2   voices could lead "marketers, developers, or investors [to] not perceive [Facebook's] metrics or

3   estimates to be accurate," a circumstance that—as discussed in the fact section above—has already

4   led to class action lawsuits by advertisers, Congressional calls for investigations into Facebook's

5   advertising analytics, and overwhelmingly negative media coverage. In other words, such

6   independent voices—despite the small size of the companies that provide them—represent a

7   significant threat to Facebook's only revenue stream.

8          Facebook's gain from silencing these voices, however, is society's loss. The public has a

9   compelling interest in fostering vigorous, healthy competition in the advertising data analytics

10  market, so that advertisers and the public can know what the hundreds of billions of dollars spent

11  on Facebook advertisements are in fact buying, and whether that massive allocation of resources is

12  well-spent. Section 3.2.3's blanket ban on automated collection suppresses all such competition

13  and should be held unenforceable for that reason.

14  **C.    Enforcement of Section 3.2.3 Undermines the Public's Deep Public Interest in
        the Free-flow of Information and Imposes Impermissible Restraints on
15      Speech**

16         **1.    There Is a Strong Public Interest in Promoting the Free-Flow of
                Information on the Internet**
17

18         Few public policy principles are more well-settled than that the public has a profound

19  interest in promoting and maintaining the free flow of information. *See generally* U.S. CONST.

20  AMEND. I; CAL. CONST. ART. I, § 7. That public interest applies broadly to commercial speech such

21  as advertising. As the Supreme Court has explained, "***the free flow of commercial information is***

22  ***indispensable***." *Va. Pharm.*, 425 U.S. at 770; *see also Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 951

23  (2002) ("The high court observed that 'the free flow of commercial information is indispensable'

24  not only 'to the proper allocation of resources in a free enterprise system' but also 'to the

25  formation of intelligent opinions as to how that system ought to be regulated or altered.'" (quoting

26  425 U.S. 748, 770)).

27         The public interest in the free flow of information also animates intellectual property

28  jurisprudence. In the patent context, the Supreme Court has found contractual provisions

**PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

unenforceable where the "strong federal policy favoring the full and free use of ideas in the public domain" outweighs the public interest against the "competing demands of patent and contract law." *Lear, Inc. v. Adkins*, 395 U.S. 653, 674-675 (1969). The *Lear* balancing approach has been applied to other areas of intellectual property law as well. *See, e.g., Idaho Potato Comm'n v. M & M Produce Farm & Sales*, 335 F.3d 130, 137-139 (2d Cir. 2003) (certification marks); *Beer Nuts, Inc. v. King Nut Co.*, 477 F.2d 326, 328-329 (6th Cir. 1973) (trademarks); *Saturday Evening Post Co. v. Rumbleseat Press, Inc.*, 816 F.2d 1191, 1200-1201 (7th Cir. 1987) (copyright). Stated differently, "courts should weigh the federal policy embodied in the law of intellectual property against even explicit contractual provisions and render unenforceable those provisions that would undermine the public interest." *Idaho Potato*, 335 F.3d at 137. Finally, the Ninth Circuit and this Court have both recognized "a strong public interest in maximizing the free flow of information on the internet." Dkt. 63 at 33 (quoting *hiQ,* 938 F.3d at 1004).

### 2. Enforcement of Section 3.2.3 Throttles the Flow of Socially Valuable Information

As explained above, BrandTotal only collects two types of data in connection with UpVoice 2021 (1) undisputedly public data about Facebook advertisements that anyone, including those without Facebook accounts, can access through the internet and (2) advertising information broadcast to BrandTotal panelists while browsing Facebook that those panelists have consciously decided to share with BrandTotal. The Court should not permit Facebook to use Section 3.2.3 to choke off the flow of this commercially and socially significant body of information.

As to the first bucket—information about Facebook advertisements that Facebook itself posts on its public, non-password protected website—Facebook's enforcement of Section 3.2.3 against BrandTotal's collection amounts to an attempt to selectively claw back information that Facebook itself placed in the public domain, and plainly undermines the public's interest in the free flow of information. There is no genuine dispute that this so-called server-side collection by BrandTotal collects information that is otherwise in the public domain. It collects from URLs that are not password protected and which Facebook's own expert describes "publicly available areas." Ex. H at 13. Moreover, Facebook itself makes available very similar information through its Ad

**PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   Library that it has averred is available to anyone with a computer and internet access. *See* Dkt. 148

2   ("The Facebook Ad Library (available at https://www.facebook.com/ads/library) allows anyone to

3   search and view ads published on Facebook and Instagram."). Remarkably, Facebook has

4   nonetheless taken the position that BrandTotal's automated collection from a ***public library*** is

5   impermissible. Ex. HH at 81:11-82:4, 84:20-85:23.[13] This plainly contravenes public policy.

6          As the Supreme Court has recognized, the internet—and social media sites in particular—

7   constitute the "modern public square." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1732,

8   (2017). Facebook's Ad Library is not only a part of this "public square" by default, but Facebook

9   designed it and represents it to be for the public. Dkt. 148, ¶ 18. Yet Facebook persists in

10  attempting to use Section 3.2.3 as a weapon to deny BrandTotal access to information that it has

11  told the world is available to all comers. This attempt to selectively restrict access by asserting

12  what amounts to a quasi-intellectual property interest in information Facebook already dedicated to

13  the public is inconsistent with settled intellectual property principles and disserves the public

14  interest. *Accord Lear,* 395 U.S. at 674-675 (the "strong federal policy favoring the full and free use

15  of ideas in the public domain" outweighs the public interest against the "competing demands of

16  patent and contract law"); *Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 363-

17  364 (1991) (a collection of facts such as names, towns, and telephone numbers were not

18  copyrightable); *see also Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 847 (2d Cir. 1997)

19  (facts from NBA broadcasts are not protected under copyright); *C.B.C. Distribution & Mktg., Inc.*

20  *v. Major League Baseball Advanced Media, L.P.*, 505 F.3d 818, 824 (8th Cir. 2007) (publicly

21  available player statistics could be used without a license).

22          To the extent BrandTotal's use of computer scripts to access this public information alters

23  the public policy analysis, it only bolsters the case for unenforceability. In addition to the public's

24  general interest in access to information already in the public domain, the public has a

25  particularized interest in advertising information specifically because advertising is a

26  _____

27  [13] It does so despite representing to the Court that collection from the Ad Library could in fact be a
    viable substitute for BrandTotal's browser extension-based collection. *See, e.g.*, Dkt. 57 at 34:10-13

28  ("So if you are the defendant and what you want is advertising information, there is an ad library
    that provides, from what we can tell, most of what they want.").

**PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   "dissemination of information as to who is producing and selling what product, for what reason,

2   and at what price." *Va. Pharm.*, 425 U.S. at 765. BrandTotal's systematic collection of advertising

3   information from public sites—advertisements that Facebook itself tells advertisers that "once

4   displayed" are public (Ex. GG)—thus serves the public interest by aggregating this commercially

5   and socially valuable information in an efficient manner that would be effectively impossible to

6   replicate through "manual" means. The public benefits from this computer-implemented

7   augmentation of the free flow of information.

8        These public benefits hold equally true for the second bucket of information—information

9   that UpVoice 2021 collects from a panelist's browser regarding advertisements that Facebook has

10   broadcast to that particular panelist. As explained above, without automated collection of

11   advertising data by third parties like BrandTotal, the public has no ability to evaluate Facebook's

12   internal data regarding who views advertisements on its platform. This yawning information gap

13   has implications far beyond the damage to competition described above.

14        Absent automated collection from Facebook, entire categories of research will become

15   effectively unavailable. Researchers attempting to detect the presence of structural bias in online

16   algorithms, for example, often use automated scripts to do so. *See, e.g.*, Ex. Z at 92; Ex. AA at 1, 7.

17   Section 3.2.3 makes such research into potential biases in advertisement placements on the world's

18   largest social network effectively impossible.

19        Automated data collection is a key tool for journalists as well. As certain *amici curiae*

20   explained to the Ninth Circuit while *hiQ* was pending, "ProPublica journalists, for example,

21   investigated Amazon's algorithm for ranking products by price via a 'software program that

22   simulated a non-Prime Amazon member' and 'scrapped[sic] product listing pages;' their research

23   uncovered that Amazon's pricing algorithm was hiding the best deals from many of its customers."

24   Ex. BB at 23. If Section 3.2.3 is enforceable, journalists seeking to investigate Facebook's

25   advertising practices could end up as defendants in a breach of contract suit.

26        Finally, automated data collection is an increasingly key tool for academic researchers. As

27   one scholar noted, the practice of "non-restrictively allowing researchers to use automated tools to

28   mine the scholarly literature" has "ensur[ed] rapid and widespread access to research findings such

**PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1    that all communities have the opportunity to build on them and participate in scholarly

2    conversations." Ex. X at pp. 3, 5. Online advertising is a particularly significant area for academic

3    research. NYU, for example, established an "Ad Observatory" that, according to Facebook,

4    "gathered data by creating a browser extension that was programmed to evade our detection

5    systems and scrape data such as usernames, ads, links to user profiles and 'Why am I seeing this

6    ad?' information, some of which is not publicly-viewable [sic] on Facebook." Dkt. 173-1.

7         Facebook's harsh treatment of the NYU Ad Observatory shows that the negative effects of

8    Section 3.2.3 on such research are not conjectural. Claiming that the NYU researchers "knowingly

9    violated our Terms against scraping" by using "unauthorized means to access and collect data from

10   Facebook"—and justifying its actions by reference to alleged privacy concerns and a purported

11   need to comply with the FTC Order—Facebook repeatedly sent NYU cease and desist letters, and

12   then finally "disabled the accounts, apps, Pages and platform access associated with NYU's Ad

13   Observatory Project and its operators." Dkt. 173-1. It was only after the FTC took the

14   extraordinary step of publicly chiding Facebook for its "inaccurate" suggestion that "its

15   actions…were required by the company's consent decree with the Federal Trade Commission,"

16   that Facebook relented. Dkt. 173-2. Plainly, as long as Section 3.2.3 remains enforceable,

17   Facebook retains almost unchecked power to use it to "shield targeted advertising practices from

18   scrutiny" in the manner that the FTC expressly criticized. *Id.*

19                    **3.    Enforcement of Section 3.2.3 Chills Protected Expression**

20        Section 3.2.3 not only prevents competitors and the public from learning about

21   commercially and socially significant information, in impermissibly infringes on panelist's

22   freedom of expression. In principle, UpVoice 2021's browser extension is no different from an

23   activity or video log that panelists consciously choose to create and communicate BrandTotal. In

24   other words, by choosing to tell BrandTotal (via UpVoice's algorithmic collection and report

25   generation process) information about what advertisements Facebook is showing them, panelists

26   are not only exercising their proprietary rights in their own data, ***they are exercising their***

27   ***Constitutional right to speak as well***.

28        That Panelist speech consists of purely of facts does not take it outside the First

**PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1  Amendment's ambit: "[e]ven dry information, devoid of advocacy, political relevance, or artistic

2  expression, has been accorded First Amendment protection." *Universal City Studios, Inc. v.*

3  *Corley*, 273 F.3d 429, 446 (2d Cir. 2001). It is similarly irrelevant to the constitutional analysis

4  that panelists receive financial compensation for the reports they generate. *Va. Pharm*, 425 U.S. at

5  761 ("Speech likewise is protected even though it is carried in a form that is 'sold' for profit.").

6  And although Facebook, as a private entity, is not subject to First Amendment regulation directly,

7  its attempts to enforce Section 3.2.3 here expressly invoke the injunctive power of the Court. Dkt.

8  148, ¶ 89. Judicial injunctions are not only governed by the First Amendment, but are subject to

9  heightened scrutiny. *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 764 (1994).

10  Here, BrandTotal panelists have made a conscious decision to communicate important

11  information relating to Facebook advertisements to BrandTotal. Under Facebook's interpretation

12  of Section 3.2.3, such panelist speech is a breach of contract. The injunction Facebook seeks

13  against UpVoice 3.2.3, moreover, would force the Court to impose a prior restraint on panelist

14  speech. Enforcement of Section 3.2.3 against UpVoice 2021 thus threatens to undermine

15  constitutionally protected speech interests of BrandTotal's thousands of panelists—another reason

16  for the Court to hold it unenforceable. *See VL Sys., Inc. v. Unisen, Inc.*, 152 Cal. App. 4th 708, 713

17  (2007) (contract unenforceable on policy grounds because it "seriously impact[s] the rights of a

18  broad range of third parties").

19        **D.**     **Facebook's Various Justifications for Its Blanket Automated Enforcement**

20                **Ban Are Unavailing**

21  Facebook has never asserted that it actually owns any of the data that UpVoice 2021

22  collects.[14] Instead, its primary justifications for enforcing Section 3.2.3 against UpVoice 2021

23  focus on purported privacy and proprietary interests of the advertisers themselves. The Court

24  correctly rejected these arguments at the TRO phase of the case, as its findings below illustrate,

25  and discovery has produced nothing to disturb its conclusions:

26  _____

27  [14] Facebook's expert Dr. Thaw asserted in deposition the information Facebook collects about user
preferences, demographics, and advertisement interactions was "Meta's information" (Ex. M at

28  137:16-142:23), but this is inconsistent with both California law and Facebook's own statements
about user-owned data.

PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1
2
3
4
5
6

> Facebook does not own the contents of advertisements placed on its networks, and already makes all such ads available for public viewing. *See* Compl. ¶17.While Facebook notes that its advertisers maintain intellectual property rights to the content of their ads, it has not suggested that BrandTotal's use of that content is anything but fair use. Facebook also has not suggested that it "owns" the related information that BrandTotal collects about advertisements, such as the number of likes and comments, or which users are presented with a given ad. Allowing a third party like BrandTotal to compete with Facebook to provide data analytics services about advertising campaigns on Facebook's networks—advertising for which Facebook is already compensated by the advertisers—would be consistent with a strong public interest in "maximizing the free flow of information on the Internet" and fostering competition and innovation. *See hiQ*, 938 F.3d at 1004.

7

8

9

Dkt. 63 at 33. There is simply no colorable argument that UpVoice 2021 violates any intellectual property right or proprietary interest of advertisers that consciously choose to make their advertisements public.

10

11

12

13

14

15

16

Facebook's contention that BrandTotal's collection is improper because it could somehow encroach on an advertiser's proprietary marketing schemes only underscores the weakness of its position. Certainly, third parties may be able to speculate as to broad features of an advertiser's strategy by reviewing BrandTotal's data. But that is no different in principle from a company, for example, deducing that a competitor is targeting certain demographics by noting that the competitor bought ads during NFL games or placed signs in a baseball stadium. Such public acts may be the output of a proprietary marketing strategy, but they cannot themselves be proprietary.

17

18

19

20

21

22

None of Facebook's other public policy justifications withstand scrutiny. Its argument that the FTC Consent Order somehow requires it to enforce Section 3.2.3 against UpVoice 2021 fails for multiple reasons. First, the FTC expressly stated in its letter criticizing Facebook's action that "the FTC supports efforts to shed light on opaque business practices, especially around surveillance-based advertising." Dkt. 173-2. As explained above, UpVoice 2021 provides precisely this service—it illuminates and allows the world to see Facebook's "Dark" advertising practices.

23

24

25

26

27

28

Second, UpVoice 2021 does not collect "Covered Information," as defined in Definition D of the Consent Order. Dkt. 120-3 at 4, Definition D. Moreover, BrandTotal is not a "Covered Third Party." The Consent Order defines "Covered Third Party" as "any individual or entity that uses or receives Covered Information obtained by or on behalf of [Facebook] *outside of a User initiated transfer of Covered Information as part of a data portability protocol or standard* . . . ." *Id*. at Definition E (emphasis added). As explained in the declaration of Mr. Sherwood, UpVoice—upon

**PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   User agreement—serves to facilitate the transfer of advertising information the Panelist has seen

2   from one service (Facebook) to another UpVoice/BrandTotal). Dkt. 103-11, ¶¶ 107–108. Although

3   the Panelist could certainly manually share or re-enter that information, UpVoice makes the transfer

4   process automatic and does not collect any information the Panelist could not manually share. *Id.* at

5   § 5.1.2. The International Organization for Standardization defines "data portability" as the "ability

6   to easily transfer data from one system to another without being required to re-enter data." *Id.* at

7   ¶ 108; Dkt. 120-2 at 36. Thus, BrandTotal's programs are user-initiated transfers as part of a data

8   portability protocol (i.e., a program that facilities transferring data from one system to another), and

9   BrandTotal is therefore not a Covered Third Party. Ex. CC, Hartzog Rep., ¶¶ 43, 47-49. Tellingly,

10  Facebook did not report BrandTotal to the FTC until *after* the litigation commenced in October

11  2020. Dkt. 95-6. This was despite starting its investigation of UpVoice by at least April 2020 and

12  having an obligation under the Order to promptly report. Dkt. 120-3 at 8, § VII.D. This strongly

13  suggests that Facebook understood that even BrandTotal's legacy products—much less UpVoice

14  2021—did not make BrandTotal a Covered Third Party, and that Facebook's invocation of the

15  Consent Order was "a pretext to advance other aims"—exactly what the FTC told Facebook it must

16  not do. Dkt. 173-2.

17      Finally, even if the Consent Order could be construed broadly enough to cover BrandTotal,

18  a Federal Consent Order does not excuse violation of a third-parties' rights under State law. Parties

19  cannot settle in a manner that immunizes from third-party liability under unrelated State laws.[15]

20  *See Alexander v. Bahou*, 512 F. Supp. 3d 363, 374-375 (N.D.N.Y. Jan. 12, 2021) (rejecting use of

21  consent decree to insulate against otherwise unlawful conduct); *In re MMS Builders, Inc.*, 101 B.R.

22  426, 431 (D.N.J. 1989) (recognizing "the inequity inherent in allowing a consent order to stand

23  which affected the rights of third parties"). Facebook's remedy in that situation was to seek

24  modification of the Consent Order, not violate a third-parties rights. *See* 16 C.F.R. § 2.51 (allowing

25

26

27

28

---

[15] Even Congressionally promulgated Federal laws (absent certain narrow exceptions), do not preempt State laws that grant additional rights or protections to citizens. *Wyeth v. Levine*, 555 U.S. 555, 573 (2009) (discussing preemption and the historical presumption against preemption of state laws). Companies covered by both Federal and more stringent State laws, need to comply with both. *Id.* (holding that Federal law did not preempt where drug manufacturer could comply with federal requirements and more stringent state law labeling requirements).

**PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   parties to FTC consent orders the ability to modify an order). Indeed, the FTC expressly stated that

2   "it is not our role to resolve individual disputes between Facebook and third parties." Dkt. 173-2.

3   And it make clear that "efforts to shield targeted advertising practices from scrutiny"—exactly

4   what Facebook is doing here through its enforcement of Section 3.2.3—"run counter to [the

5   FTC's] mission." *Id.* Refusing to enforce Section 3.2.3 against UpVoice 2021 affirmatively

6   supports the FTC's stated policy goals.

7   **II.    SECTION 3.2.3 OF THE TOS IS UNENFORCEABLE AGAINST UPVOICE 2021
        BECAUSE ENFORCEMENT WOULD BE UNCONSCIONABLE**

8
        "A contract is unconscionable if one of the parties lacked a meaningful choice in deciding

9   whether to agree and the contract contains terms that are unreasonably favorable to the other

10  party." *OTO, L.L.C. v. Kho*, 8 Cal. 5th 111, 125, 447 P.3d 680, 689 (2019). Contract

11  unconscionability is a pure issue of law for the Court to decide. *Sako v. Wells Fargo Bank. N.A.*,

12  No. 14CV1034-GPC(JMA), 2016 WL 2745346, at *1 (S.D. Cal. May 11, 2016) ("[T]he issue of

13  unconscionability . . . is an issue of law not to be decided by a jury."). The unconscionability

14  analysis has two prongs: procedural and substantive unconscionability. *OTO*, 8 Cal. 5th at 125

15  ("Both procedural and substantive unconscionability must be shown for the defense to be

16  established, but they need not be present in the same degree.").

17       Section 3.2.3 of the TOS satisfies both easily. Under the terms of the TOS, as enforced by

18  Facebook, a prospective user's simple of act of clicking a "Sign Up" icon binds them ***for life*** to

19  oppressive terms that were never presented to the user and that users likely never read. This is the

20  very definition of unconscionability.

21       **A.    The TOS Are a Procedurally Unconscionable Adhesion Contract**

22       An analysis whether a contract is unconscionable, and therefore unenforceable, "begins

23  with an inquiry into whether the contract is one of adhesion." *Armendariz v. Found. Health

24  Psychcare Servs., Inc.*, 24 Cal. 4th 83, 113 (2000). If so, the procedural unconscionability analysis

25  turns to whether, it is an "ordinary contract[] of adhesion," which "contain a degree of procedural

26  unconscionability even without any notable surprises, and 'bear within them the clear danger of

27  oppression and overreaching,'" or the ever more unconscionable "[c]ontracts of adhesion that

28

PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   involve surprise or other sharp practices." *Baltazar v. Forever 21, Inc.*, 62 Cal. 4th 1237, 1244

2   (2016) (citation omitted).

3          The TOS are not only adhesion contract, but their imposition is procedurally

4   unconscionable even by adhesion contract standards. An adhesion contract is "a standardized

5   contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the

6   subscribing party only the opportunity to adhere to the contract or reject it." *Armendariz*, 24 Cal.

7   4th at 88. The Facebook enrollment process, as described by Facebook's own expert (*see* Martens

8   Opening Rep., ¶¶ 63-66), not only easily meets this standard, it also includes other sharp and

9   oppressive practices. Potential Facebook users not only have no ability to negotiate any aspect of

10  the standardized, take-it-or-leave-it TOS, ***they are never given the opportunity to affirmatively***

11  ***agree to the TOS***. Instead, as described above, at the conclusion account creation process they are

12  presented with and invited to click on a large "Sign Up" icon. This icon itself says nothing about

13  the TOS or any agreement. Instead, it is only above the icon, in grayed out fine print, that the

14  following words appear: "By clicking Sign Up, you agree to our Terms, Data Policy and Cookies

15  Policy. You may receive SMS notices from us and can opt out any time." Facebook's position is

16  that, purely because of the existence of that gray fine print above the "Sign Up" icon, a user's

17  decision to click the "Sign Up" icon constitutes a meeting of the minds between Facebook and its

18  users as to dozens of pages of terms and policies, including terms ***that bind its users for life***.

19         Nonsense. The TOS are never in fact displayed to users, and users are never advised that

20  they can review them by clicking on the tiny hyperlinks that appear in the fine print.[16] Even more

21  importantly, Facebook never presents users with a clear option of either affirmatively accepting or

22  rejecting its TOS and other policies. Wholly absent, for example, is a separate box that users must

23  check to signify their affirmative agreement to the TOS. Instead, through its use of gray, easy-to-

24  miss fine print, Facebook deceptively conflates a user's choice to "Sign Up" for a Facebook

25  account with the user's affirmative consent to Facebook's entire portfolio of terms and policies.

26

27  [16] Independent evidence suggests few users ever do. According to a Pew Research Center survey,
    as of 2018 74% of adult Facebook users were unaware that Facebook was collecting personal

28  demographic and trait information about them and providing it to advertisers. Ex. DD.

PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

No prospective Facebook user could reasonably expect that the act of clicking "Sign Up" would create a binding, lifetime commitment to Facebook that would survive even the termination of the user's Facebook account. Further, the second sentence of the fine print confusingly suggests that the user "can opt out any time" from the "Terms, Data Policy and Cookies" referenced in the prior sentence—the precise opposite of what the TOS actually say. Thus Facebook's TOS are characterized by precisely the type of surprise and sharp dealing that courts have found to create the highest degree of procedural unconscionability.[17]

**B.      Section 3.2.3 and Related Provisions of the TOS Are Substantively Unconscionable**

"Substantively unconscionable terms may take various forms, but may generally be described as unfairly one-sided." *Sonic-Calabasas A, Inc. v. Moreno*, 57 Cal. 4th 1109, 1133 (2013) (citation omitted). "Unfairly one-sided" fits the TOS to a tee. As explained above, the TOS do not only prevent a user from using automated means to gather information from Facebook while the user's account is active. Instead, by virtue of language buried in § 4 stating that "the following provision will remain in place: 3, 4.2-4.5" in the event of account termination, Facebook asserts a ***permanent right*** to enjoin ***any*** automated collection from Facebook by any of its billions of current and former users. In other words, in return for access to Facebook's massive global forum and marketplace, users must not only consent to Facebook's surveillance and data exploitation, they must surrender the right to collect meaningful data from Facebook *forever*.

Not only that, but the TOS includes provisions—which Facebook has vigorously enforced—that insulate Facebook from any liability for its own failures to honor its contract obligations. Specifically, the TOS state that "***under no circumstance will we be liable to you*** for any lost profits, revenues, information, or data, or consequential, special, indirect, exemplary,

---

[17] Judge Alsup's decision in *Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024 (N.D. Cal. 2019) does not disturb this conclusion. The facts in *Bass* are dramatically different from those here. The *Bass* plaintiff was a Facebook user *seeking to enforce the TOS against Facebook* while simultaneously alleging that the liability limitations in the TOS were unconscionable. *Id.* at 1037-1038. Further, because of the limited allegations in the pleadings, Judge Alsup's relatively truncated unconscionability analysis did not address the procedural unconscionability of Facebook's Sign Up process, and Judge Alsup signaled that this was a significant omission by granting to leave to amend "because facts may conceivably be alleged which go towards determining whether procedural unfairness existed upon entering into the contract." *Id.* at 1041. Further, *Bass* did not address the substantive unconscionability of Section 3.2.3 and its indefinite duration.

**PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1  punitive, or incidental damages arising out of or related to these Terms or the Facebook Products,

2  even if we have been advised of the possibility of such damages." TOS Section 4.3. The TOS go

3  on to state that "[o]ur aggregate liability arising out of or relating to these Terms or the Facebook

4  Products will not exceed the greater of $100 or the amount you have paid us in the past twelve

5  months." *Id.* In other words, if Facebook breaches the TOS, users have no meaningful recourse

6  against one of the wealthiest companies in the world. But if a former Facebook user uses a

7  computer script to collect commercially and socially important advertising information from

8  Facebook, under Facebook's view of the world, Facebook is entitled to use the TOS as a weapon

9  to shut down the former user's activity and confiscate 90 cents of every dollar she ever earned.

10       This is grossly one-sided and unfair. To be sure, Facebook's users (like the parties to

11  virtually all unconscionable contracts) are not literally forced to join Facebook. But they lose a lot

12  if they do not. Seventy percent of American adults have a Facebook account. Ex. DD. The

13  Supreme Court has recognized social media sites like Facebook "for many are the principal

14  sources for knowing current events, checking ads for employment, speaking and listening in the

15  modern public square, and otherwise exploring the vast realms of human thought and knowledge."

16  *Packingham*, 137 S. Ct. at 1737. Indeed, "these websites can provide perhaps the most powerful

17  mechanisms available to a private citizen to make his or her voice heard." *Id.* Facebook's TOS

18  leverage Facebook's position as an almost indispensable social network and public forum to coerce

19  users into surrendering, ***for life***, the ability to meaningfully collect information from that same

20  indispensable public forum. Given the profound procedural unconscionability described above, the

21  Court should find Section 3.2.3 unenforceable under the doctrine of unconscionability.[18]

22  ### III.   BRANDTOTAL IS ENTITLED TO SUMMARY JUDGMENT ON FACEBOOK'S CFAA (COA 4) AND CDAFA (COA 5) CLAIMS WITH RESPECT TO UPVOICE 2021 AND ONGOING SERVER-SIDE COLLECTION

23

24       Facebook's CFAA claim fails as a matter of law as to UpVoice 2021. To prevail, Facebook

25  must show that UpVoice 2021 "accesses" a Facebook computer without authorization. Facebook

26  ─────────────────

27  [18] At a minimum, the Court should find that enforcement of Section 3.2.3 against ***former*** Facebook account holders like BrandTotal—who could not have reasonably anticipated that Terms of ***Service*** would create obligations that extend indefinitely even after the "Service" in

28  question was terminated—is unconscionable.

**PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1  cannot make this showing. As explained above, there is no genuine dispute that the UpVoice 2021

2  browser extension accesses a Panelist's computer. All information UpVoice 2021 receives comes

3  from the Panelist's browser. *See, e.g.*, Ex. F, ¶¶ 481-488 (Facebook's technical expert explaining

4  how UpVoice 2021 uses only "reactive" that collects data only from the Panelist's browser

5  Document Object Model). Thus UpVoice 2021 only accesses the panelist's computer; ***at no point***

6  ***does UpVoice 2021 contact any Facebook server***. Consequently, neither of Facebook's CFAA

7  theories can prevail as to UpVoice 2021, since both require that BrandTotal "accesses" a Facebook

8  computer. *See* 18 U.S.C. § 1030(a)(2), § 1030(a)(4).[19]

9      Facebook's CFAA claims also fail as to BrandTotal's ongoing server-side data collection.

10  As explained above, BrandTotal's ongoing server-side collection is strictly limited to accessing

11  public URLs that do not require a username or password to access. Consequently, since Facebook

12  provides that data to the public, BrandTotal—like anyone else— is authorized to access it. *See*

13  *hiQ*, 938 F.3d at 1003 ("It is likely that when a computer network generally permits public access

14  to its data, a user's accessing that publicly available data will not constitute access without

15  authorization under the CFAA.").

16      That Facebook has created technical impediments to BrandTotal's methods of accessing

17  that public data does not change the analysis. In *hiQ*, the Court explained that LinkedIn built a

18  number of technical barriers to automated collection of information from members' public

19  profiles; "[f]or example, LinkedIn's Quicksand system detects non-human activity indicative of

20  scraping; its Sentinel system throttles (slows or limits) or even blocks activity from suspicious IP

21  addresses; and its Org Block system generates a list of known 'bad' IP addresses serving as large-

22  scale scrapers." *Id.* at 991. None of these circumstances ultimately mattered, the Ninth Circuit

23  concluded, because the information *hiQ* collected was available to the public on a generally

24  accessible website. *Id.* at 1002-03 ("[W]hen a computer network generally permits public access to

25  its data, a user's accessing that publicly available data will not constitute access without

26  authorization under the CFAA."). So too here. Because information on these URLs is "open to all

27  _____

28  [19] Facebook's theories fail for other reasons as well, including that BrandTotal lacks any "intent to defraud" and its actions do not further any fraud under 18 U.S.C. § 1030(a)(4).

Defendants' Motion for Partial Summary Judgment          34          Case No. 3:20-CV-07182-JCS

**PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1    comers," BrandTotal cannot be subject to CFAA liability for accessing it.

2        Facebook's CDAFA claim as to UpVoice 2021 and BrandTotal's server-side collection fail

3    for fundamentally the same reasons as its CFAA claims. UpVoice 2021 never accesses Facebook's

4    servers, and BrandTotal's server-side collection is of purely public information that Facebook has

5    given BrandTotal "permission," within the meaning of California Penal Code § 502(c), to access.

6    **IV.    BRANDTOTAL IS ENTITLED TO SUMMARY JUDGMENT ON FACEBOOK'S**
     **UNFAIR BUSINESS PRACTICE CLAIM (COA 6)**
7
         Facebook's cause of action under California's Business and Professions Code § 17200,
8
     hinges on allegations that BrandTotal deceived its panelists about BrandTotal's relationship with
9
     Facebook. Dkt. 148 at ¶¶ 121, 123. Putting aside that these allegations are untrue, they do not
10
     pertain to UpVoice 2021. BrandTotal removed the language purportedly suggesting an affiliation
11
     with Facebook months before the launch of UpVoice 2021. Dkt. 26-5 at ¶ 29. BrandTotal is
12
     unaware of any other alleged unfair act that would apply to UpVoice 2021. In short, there is no
13
     factual basis for any claim that UpVoice 2021 deceived panelists about BrandTotal's relationship
14
     with Facebook, or any other aspect of its services. Facebook cannot prevail on its unfair
15
     competition claim as to UpVoice 2021 as a matter of law.
16
                                   **CONCLUSION**
17
         For the foregoing reasons, BrandTotal asks that the Court enter judgment in its favor that:
18
         **(i)** Section 3.2.3 is either unenforceable as against public policy or unconscionable and
19
     thus, BrandTotal is entitled to judgment as a matter of law on the breach of contract (Count 1),
20
     tortious interference with contractual relations (Count 5), and unjust enrichment (Count 2) that are
21
     based on violation of that term of service; **(ii)** the claims under the Computer Fraud and Abuse Act
22
     (Count 3) and the California Penal Code § 502 (Count 4) fail as a matter of law as to UpVoice
23
     2021 due to the lack of server access; and **(iii)** that the claim as to Unfair Business Practices
24
     (Count 6) fails as a matter of law as to UpVoice 2021, which does not utilize the language at issue.
25

26

27

28

Date: March 11, 2022

Respectfully submitted,

By: */s/ Rudolph A. Telscher, Jr.*
Rudolph A. Telscher, Jr.*
rudy.telscher@huschblackwell.com
Kara R. Fussner*
kara.fussner@huschblackwell.com
HUSCH BLACKWELL LLP
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
314-480-1500 Telephone

Ryan B. Hauer*
ryan.hauer@huschblackwell.com
David E. Anderson**
david.anderson@huschblackwell.com
HUSCH BLACKWELL LLP
120 South Riverside Plaza Suite 2200
Chicago, IL 60606
312-526-1572 Telephone

David Stauss*
david.stauss@huschblackwell.com
Dustin L. Taylor*
dustin.taylor@huschblackwell.com
HUSCH BLACKWELL LLP
180 1 Wewatta Street, Suite 1000
Denver, CO 80202
303-749-7200 Telephone
*admitted *pro hac vice*
***pro hac vice* application pending

Karl Kronenberger (CA Bar No. 226112)
karl@krinternetlaw.com
Jeffrey M. Rosenfeld (CA Bar No. 222187)
jeff@krinternetlaw.com
KRONENBERGER ROSENFELD, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
415-955-1155 Telephone
415-955-1158 Facsimile

***Attorneys for Defendants/Counterclaim Plaintiffs BrandTotal, Ltd. and Unimania, Inc.***

**PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1

<u>**CERTIFICATE OF SERVICE**</u>

2

I hereby certify that on this 11th day of March 2022, I caused the foregoing to be filed

3

electronically with the Clerk of Court and to be served via the Court's Electronic Filing System

4

upon all counsel of record:

5
6
7
8
9
10
11
12

WILMER CUTLER PICKERING
HALE AND DORR LLP
SONAL N. MEHTA (SBN 222086)
sonal.mehta@wilmerhale.com
THOMAS G. SPRANKLING (SBN
294831)
thomas.sprankling@wilmerhale.com
JOSEPH M. LEVY (SBN 329318)
joseph.levy@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

HUNTON ANDREWS KURTH LLP
Ann Marie Mortimer (State Bar No.
169077)
amortimer@HuntonAK.com
Jason J. Kim (State Bar No. 221476)
kimj@HuntonAK.com
Jeff R. R. Nelson (State Bar No. 301546)
jnelson@HuntonAK.com
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627
Telephone: (213) 532-2000
Facsimile: (213) 532-2020

13
14
15
16
17
18

ARI HOLTZBLATT
Ari.Holtzblatt@wilmerhale.com
ALLISON SCHULTZ
Allison.Schultz@wilmerhale.com
ROBIN C. BURRELL
robin.burrell@wilmerhale.com
1875 Pennsylvania Ave, NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

19
20
21

CINDY PAN
cindy.pan@wilmerhale.com
250 Greenwich Street
New York, NY 10007
Telephone (212) 937-7275

22
23
24
25

ANDRES ROSSO O'LAUGHLIN
andy.olaughlin@wilmerhale.com
60 State Street
Boston, MA 02109
Telephone (617) 526-6220

26

***Attorneys for Plaintiff/Counterclaim
Defendant Meta Platforms, Inc.***

27

*/s/ Rudolph A. Telscher, Jr.*

28