WILMER CUTLER PICKERING
  HALE AND DORR LLP
SONAL N. MEHTA (SBN 222086)
Sonal.Mehta@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

ARI HOLTZBLATT (*pro hac vice*)
Ari.Holtzblatt@wilmerhale.com
ALLISON SCHULTZ (*pro hac vice*)
Allison.Schultz@wilmerhale.com
ROBIN C. BURRELL (*pro hac vice*)
robin.burrell@wilmerhale.com
1875 Pennsylvania Ave, NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

ANDY R. O'LAUGHLIN (*pro hac vice*)
andy.olaughlin@wilmerhale.com
60 State Street
Boston, MA 02109
Telephone: (617) 526-6220
Facsimile: (617) 526-5000

CINDY PAN (*pro hac vice*)
cindy.pan@wilmerhale.com
250 Greenwich Street
New York, NY 10007
Telephone: (212) 937-7275
Facsimile: (212) 230-8888

*Attorneys for Plaintiff/Counterclaim Defendant
Meta Platforms, Inc.*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| META PLATFORMS, INC., a Delaware corporation,<br><br>       Plaintiff/Counterclaim Defendant,<br><br>  v.<br><br>BRANDTOTAL, LTD., an Israel corporation, and UNIMANIA, INC., a Delaware corporation,<br><br>       Defendants/Counterclaim Plaintiffs. | Case No. 3:20-cv-07182-JCS<br><br>**META PLATFORMS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Hon. Joseph C. Spero<br>Courtroom F – 15th Floor<br>Date:    April 29, 2022<br>Time:   9:30 a.m. |

1

## **TABLE OF CONTENTS**

2    MEMORANDUM OF POINTS AND AUTHORITIES .................................................... 1

3    INTRODUCTION AND STATEMENT OF ISSUES TO BE DECIDED ................................. 1

4    STATEMENT OF FACTS .................................................................................... 3

      A.  Facebook and Instagram Terms ................................................................ 3

5             1.   Meta's Terms Prohibit Unauthorized Automated Collection ................... 3

6             2.   Meta's Interest In Protecting Data On Its Platform ........................... 3

7             3.   BrandTotal Agreed To Meta's Terms When It Created
             Accounts ................................................................................ 4

8          B.  BrandTotal Scraped Data Using "Automated Means" ................................... 4

9             1.   BrandTotal Used Applications And Extensions To Scrape Data .............. 4

10            2.   BrandTotal Made Unauthorized Automated Requests For Data
             From Its Computers To Meta Computers ......................................... 5

11         C.  BrandTotal's Scraping Tools Pose Security Risks to Meta and Its Users ................... 5

12         D.  BrandTotal Proceeded Contrary To Legal Advice ....................................... 7

13         E.  BrandTotal's Violations Continue After Meta Discovers BrandTotal's Data
        Scraping Operation And Sues To Enforce Its Terms ..................................... 7

14            1.   Meta's Investigation And Technical Enforcement Actions ....................... 7

15            2.   Meta's Lawsuit ........................................................................ 8

16            3.   BrandTotal's Continued Violations of Meta's Terms Despite
             Technical and Legal Enforcement Actions ...................................... 8

17

18   ARGUMENT .................................................................................................. 10

  I.    Meta Is Entitled To Summary Judgment On Its Breach of Contract Claim ................... 10

19         A.  There Is No Dispute That BrandTotal Has Breached Its Contracts with
        Meta ............................................................................................. 10

20            1.   Meta And BrandTotal Have Valid Contracts And Meta

21                Performed ............................................................................... 10

22            2.   BrandTotal Breached The Contract When It Scraped Data
             Using Automated Means Without Meta's Permission ......................... 11

23            3.   Meta Suffered Damages Because Of BrandTotal's Breaches ................. 11

24         B.  BrandTotal's Affirmative Defenses Fail As A Matter of Law ........................... 12

25            1.   BrandTotal's Contract-Termination Defense Must Be Rejected .............. 12

         2.   Meta's Contract Terms Are Enforceable .................................... 13

26     II.   Meta Is Entitled To Summary Judgment On Its CFAA Claim ......................... 16

27

28

A. BrandTotal Accessed And Obtained Information From Meta's Protected Computers After Meta Revoked Authorization For Its Access ........................... 16

   1. BrandTotal Intentionally Accessed And Obtained Information From Meta's Computers ............................................................. 16

   2. BrandTotal Accessed Meta Computers Without Authorization .............. 17

B. BrandTotal Caused A Loss Of $5,000 Or More .......................................... 18

C. BrandTotal's Defenses Are Meritless .......................................................... 18

   1. Meta's Claim Is Timely ................................................................ 19

   2. BrandTotal Cannot Avoid CFAA Liability On The Ground That Its Applications and Extensions Circumvent No Technical Barriers ................................................................................... 19

   3. BrandTotal Violates The CFAA By Using UpVoice 2021 ...................... 20

   4. BrandTotal's Server-Side Collection Also Violates The CFAA ............. 20

III. Meta Is Entitled To Summary Judgment On Its CDAFA Claim ...................................... 22

IV. Meta Is Entitled To Partial Summary Judgment On Its UCL Claim ............................... 22

V. Judgment On BrandTotal's Interference Counterclaims Is Warranted ............................ 23

A. BrandTotal's Unlawful Contracts Cannot Support An Interference Claim ............... 23

B. Any Alleged Interference By Meta Was Justified ....................................... 25

C. BrandTotal's Contracts With Customers .................................................... 26

   1. Because BrandTotal's Contracts Are Unenforceable, BrandTotal's Claim Must At Least Satisfy The Elements Of Interference With Prospective Economic Advantage—But The Undisputed Facts Do Not Support Such A Claim ................................... 26

   2. Even If BrandTotal's Customer Contracts Were Not Unenforceable, BrandTotal's Interference Claim Would Fail As A Matter Of Law ............................................................................ 31

D. Contracts With UpVoice Panelists ............................................................ 33

   1. BrandTotal's Claim Must Satisfy The Elements Of IIPEA, But The Undisputed Facts Support Do Not Support Such A Claim ............... 33

   2. Even if BrandTotal's Panelist Contracts Were Enforceable And Its Claims Were Viewed As Interference With Contract Claims, Meta Is Entitled To Judgment As A Matter Of Law ................................ 34

E. BrandTotal's Contracts With Google ........................................................ 35

   1. Because Its Contract with Google Is Unenforceable, BrandTotal's Claim Must At Least Satisfy The Elements Of Interference With Prospective Economic Advantage, But The Undisputed Evidence Supports No Such Claim ......................................... 35

2.   Even if BrandTotal's Google Contract Were Enforceable And
Its Claim Were Viewed As An Interference With Contract
Claim, The Undisputed Evidence Supports No Such Claim ................... 35

VI.   Judgement Is Warranted On BrandTotal's UCL Claim.................................................... 35

CONCLUSION.................................................................................................................. 35

## <u>TABLE OF AUTHORITIES</u>

Page(s)

### CASES

*Arntz Contracting Co. v. St. Paul Fire and Marine Insurance Co.*,
    47 Cal. App. 4th 464 (1996) ............................................................31

*Batts v. Bankers Life & Casualty Co.*,
    2015 WL 166869 (N.D. Cal. Jan. 13, 2015) ....................................13

*Beaver v. Tarsadia Hotels*,
    816 F.3d 1170 (9th Cir. 2016) ........................................................23

*Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture Partners*,
    52 Cal. App. 4th 867 (1997) .............................................24, 26, 33, 35

*Brodsky v. Apple Inc.*,
    445 F. Supp. 3d 110 (N.D. Cal. 2020) .............................................22

*Calhoun v. Google LLC*,
    526 F. Supp. 3d 605 (N.D. Cal. 2021) .............................................19

*Cappello v. Walmart Inc.*,
    394 F. Supp. 3d 1015 (N.D. Cal. 2019) ...........................................22

*Castillo v. Nationstar Mortgage LLC*,
    2016 WL 6873526 (N.D. Cal. Nov. 22, 2016) .................................12

*City and County of San Francisco v. Philip Morris, Inc.*,
    957 F. Supp. 1130 (N.D. Cal. 1997) ...............................................28

*City of Santa Barbara v. Superior Court of Santa Barbara County*,
    41 Cal. 4th 747 (2007) ....................................................................13

*Craigslist Inc. v. 3Taps Inc.*,
    964 F. Supp. 2d 1178 (N.D. Cal. 2013) .....................................21, 22

*Craigslist, Inc. v. Naturemarket, Inc.*,
    694 F. Supp. 2d 1039 (N.D. Cal. 2010) ..........................................15

*Davis v. Nadrich*,
    174 Cal. App. 4th 1 (2009) ..............................................................27

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*,
    11 Cal. 4th 376 (1995) ..............................................................30, 33

*Dual Diagnosis Treatment Center, Inc. v. Centene Corp.*,
    2021 WL 4464204 (C.D. Cal. May 7, 2021) ...................................31

*E. & J. Gallo Winery v. Instituut Voor Landbouw-En Visserijonderzoek*,
  2018 WL 2463869 (E.D. Cal. June 1, 2018) ................................................................12

*EF Cultural Travel BV v. Zefer Corp.*,
  318 F.3d 58 (1st Cir. 2003)........................................................................................21

*Epic Games, Inc. v. Apple Inc*,
  2021 WL 4128925 (N.D. Cal. Sept. 10, 2021) ...........................................................14

*Facebook, Inc. v. Grunin*,
  77 F. Supp. 3d 965 (N.D. Cal. 2015) ........................................................................22

*Facebook, Inc. v. Power Ventures, Inc.*,
  252 F. Supp. 3d 765 (N.D. Cal. 2017) ......................................................................15

*Facebook, Inc. v. Power Ventures, Inc.*,
  844 F.3d 1058 (9th Cir. 2016) ..............................................................16, 18, 20, 22

*Facebook, Inc. v. Sluchevsky*,
  2020 WL 5823277 (N.D. Cal. Aug. 28, 2020) ...........................................................15

*Foster Poultry Farms, Inc. v. SunTrust Bank*,
  377 Fed. App'x 665 (9th Cir. 2010) ..........................................................................12

*In re Aureal, Inc.*,
  2006 WL 2130903 (N.D. Cal. July 25, 2006)..............................................................13

*In re Facebook Biometric Information Privacy Litigation*,
  185 F. Supp. 3d 1155 (N.D. Cal. 2016) ....................................................................13

*Ixchel Pharma, LLC v. Biogen, Inc.*,
  9 Cal. 5th 1130 (2020) ..........................................................................30, 32, 33, 34

*KARBZ, Inc. v. MRP of Michigan, Inc.*,
  2013 WL 12086317 (C.D. Cal. Aug. 26, 2013)..........................................................28

*Korea Supply Co. v. Lockheed Martin Corp.*,
  29 Cal. 4th 1134 (2003) ....................................................................27, 28, 31, 34

*Lear, Inc. v. Adkins*,
  395 U.S. 653 (1969)....................................................................................................14

*Lovesy v. Armed Forces Benefit Association*,
  2008 WL 696991 (N.D. Cal. Mar. 13, 2008)........................................................33, 34

*Martinez v. California*,
  444 U.S. 277 (1980)....................................................................................................28

*Multiven, Inc. v. Cisco Systems, Inc.*,
    725 F. Supp. 2d 887 (N.D. Cal. 2010) ............................................................17

*Niantic, Inc. v. Global++*,
    2019 WL 8333451 (N.D. Cal. Sept. 26, 2019) ................................................15

*O'Brien as Trustee of Raymond F. O'Brien Revocable Trust v. XPO CNW, Inc.*,
    362 F. Supp. 3d 778 (N.D. Cal. 2018) ............................................................10

*Oakley, Inc. v. Nike, Inc.*,
    988 F. Supp. 2d 1130 (C.D. Cal. 2013) ..........................................................35

*Planned Parenthood Federal of America, Inc. v. Center for Medical Progress*,
    402 F. Supp. 3d 615 (N.D. Cal. 2019) ............................................................14

*Reeves v. Hanlon*,
    33 Cal. 4th 1140 (2004) ..............................................................25, 30, 32, 35

*Rose v. Bank of America, N.A.*,
    57 Cal. 4th 390 (2013) ....................................................................................22

*S & J Rentals, Inc. v. Hilti, Inc.*,
    294 F. Supp. 3d 978 (Mar. 23, 2018) ..............................................................13

*Sanchez v. County of San Bernardino*,
    98 Cal. Rptr. 3d 96 (2009) ..............................................................................14

*Santisas v. Goodin*,
    17 Cal. 4th 599 (1998) ....................................................................................14

*Shuman v. Squaretrade Inc.*,
    2020 WL 12894954 (N.D. Cal. Aug. 31, 2020) ..............................................24

*SIC Metals, Inc. v. Hyundai Steel Co.*,
    442 F. Supp. 3d 1251 (C.D. Cal. 2020) ..........................................................25

*Stackla, Inc. v. Facebook Inc.*,
    2019 WL 4738288 (N.D. Cal. Sept. 27, 2019) ................................................15

*UCP International Co. v. Balsam Brands Inc.*,
    420 F. Supp. 3d 966 (N.D. Cal. 2019) ......................................................30, 33

*United States v. Christensen*,
    828 F.3d 763 (9th Cir. 2015) ..........................................................................22

*United States v. Nosal*,
    930 F. Supp. 2d 1051 (N.D. Cal. 2013) ....................................................16, 20

*United States v. Nosal,*
    844 F.3d 1024 (9th Cir. 2016) ........................................................20

*Webber v. Inland Empire Investments,*
    74 Cal. App. 4th 884 (1999) ........................................................25

*Western Filter Corp. v. Argan, Inc.,*
    540 F.3d 947 (9th Cir. 2008) ....................................................12, 13

*Weststeyn Dairy 2 v. Eades Commodities Co.,*
    280 F. Supp. 2d 1044 (E.D. Cal. 2003)........................................25

*Williams v. Eaze Solutions, Inc.,*
    417 F. Supp. 3d 1233 (N.D. Cal. 2019) ........................................24

*Winchester Mystery House, LLC v. Global Asylum, Inc.,*
    210 Cal. App. 4th 579 (2012) ....................................................27

*Yoo v. Jho,*
    147 Cal. App. 4th 1249 (2007) ..............................................23, 24

## STATUTES, RULES, AND REGULATIONS

California Comprehensive Computer Data Access and Fraud Act (CDAFA) ..................... *passim*

Computer Fraud and Abuse Act (CFAA) .............................................................. *passim*

Fed. R. Civ. P. 56.................................................................................................1

## OTHER AUTHORITIES

Amazon, *Conditions Of Use,*
    https://www.amazon.com/gp/help/customer/display.html/?nodeId=508088
    (last accessed Mar. 11, 2022) ....................................................15

LinkedIn, *LinkedIn Service Terms*, https://www.linkedin.com/legal/l/service-
    terms (last accessed Mar. 11, 2022)............................................15

Restatement of Contracts § 576 & cmt. a ..........................................................24

YouTube, *Terms Of Service,*
    https://www.youtube.com/t/terms (last accessed Mar. 11, 2022).......................14

## NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT

PLEASE TAKE NOTICE THAT, on April 29, 2022 at 9:30 a.m. or as soon thereafter as the matter may be heard, in Courtroom F of the U.S. District Court for the Northern District of California, San Francisco Division, at 450 Golden Gate Avenue, San Francisco, California, Plaintiff/Counterclaim Defendant Meta Platforms, Inc. ("Meta") will and hereby does move for partial summary judgment pursuant to Federal Rule of Civil Procedure 56. This Motion is based upon this Notice of Motion, the Memorandum of Points and Authorities filed herewith, and the Declarations of Allison Schultz, Sanchit Karve, Andrew Herter, Dr. Stephen Prowse, and Benjamin Ackerman filed herewith along with the accompanying exhibits.

Meta requests that this Court grant partial summary judgment in Meta's favor on its claims for Breach of Contract, violation of the Computer Fraud and Abuse Act ("CFAA"), violation of the California Comprehensive Computer Data Access and Fraud Act ("CDAFA"), violation of the unlawful prong of California's unfair competition law ("UCL") (Counts I, III, IV, and VI), and Defendants/Counterclaim Plaintiffs BrandTotal Ltd. and Unimania, Inc.'s (collectively "BrandTotal") counterclaims for Intentional Interference with Contract, Intentional Interference with Prospective Economic Advantage, and violation of the UCL (Counts I, II and III).

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION AND STATEMENT OF ISSUES TO BE DECIDED

Since 2017, BrandTotal has intentionally engaged in an extensive data scraping operation collecting user- and advertising-related data from Facebook and Instagram without Meta's authorization. BrandTotal scraped data from the Facebook and Instagram platforms including data about the performance of posts (such as shares, likes, comments, views) and data about Meta users (such as their interests, gender, month and year of birth, interactions with posts, and location) through mobile applications and browser extensions created or owned by BrandTotal that users installed. *See* Ex. 1 ¶¶ 20-27.[1] BrandTotal also sent ███████████████████████ ████████████████████████████████████████. BrandTotal sold the scraped data, for profit, in the form of marketing "insights" to its customers. BrandTotal designed its business

---

[1] All exhibits are attached to the Declaration of Allison Schultz, which is filed herewith.

1   knowing that its scraping practices violated Facebook's Terms of Service ("Facebook Terms") and

2   Instagram's Terms of Use ("Instagram Terms") and went to great lengths to conceal its conduct.

3   BrandTotal continues to scrape and sell data from Meta to this day even after Meta took technical

4   and legal measures to revoke access to its platforms. Meta is entitled to summary judgment as to

5   liability on its breach of contract claim, its claims under the CFAA, CDAFA, and the unlawful

6   prong of the UCL, and on BrandTotal's tortious interference and UCL counterclaims.

7   　　　***First,*** BrandTotal is liable for breach of contract because it is undisputed that BrandTotal

8   agreed to and violated Meta's terms from 2017 and through the present. BrandTotal concedes that

9   it agreed to the Facebook and Instagram Terms, that those terms prohibit the automated collection

10   of data from Meta products without Meta's permission, and that it collected and continues to

11   collect data from Meta products using automated means without Meta's permission. BrandTotal

12   seeks to excuse its breach based on two affirmative defenses: that (1) Meta's decision to disable

13   some of its accounts relieved BrandTotal of its contractual obligations and (2) Meta's applicable

14   terms are void as a matter of public policy. The first defense is irrelevant because it is uncontested

15   that BrandTotal breached the Meta terms before any of its accounts were disabled, and because

16   BrandTotal has active accounts to this day. BrandTotal also agreed to a survival clause in the

17   Facebook Terms that makes the prohibition against automated collection enforceable even after

18   an account is disabled. The second defense fails as a matter of law because BrandTotal cannot

19   demonstrate that Meta's prohibition against automated collection without permission is contrary

20   to public policy. Prohibitions against automated collection like Meta's are commonplace (and even

21   used by BrandTotal) and are regularly found enforceable because they provide an important tool

22   for companies like Meta to police their platforms in furtherance of important public interests.

23   　　　***Second***, Meta is entitled to judgment on its claims under the CFAA, CDAFA, and the

24   UCL's unlawful prong. The undisputed evidence establishes that BrandTotal violated the CFAA

25   and CDAFA because it continued to access and obtain data from Meta's computers—including

26   from password-protected parts of Facebook and Instagram—after Meta revoked BrandTotal's

27   permission to do so as of October 1, 2020 when Meta took technical and legal enforcement

28   measures. And BrandTotal's violation of the CFAA and CDAFA also warrants judgment on the

1   UCL's unlawful prong, which makes violations of state and federal law independently actionable.

2       **Third**, Meta is entitled to summary judgment on BrandTotal's interference counterclaims.

3   The BrandTotal contracts that Meta purportedly disrupted are unlawful because they have the

4   object of illegally scraping data from Meta, and any supposed interference with them was justified

5   to address BrandTotal's widespread unlawful conduct in any event. Nor can BrandTotal establish

6   the element of causation because its alleged harms resulted from the independent acts of itself and

7   third parties, not Meta. For the same reasons, Meta is entitled to judgment on BrandTotal's UCL

8   claim, which depends entirely upon BrandTotal's meritless interference claims.

9                               **STATEMENT OF FACTS**

10      **A.     Facebook and Instagram Terms**

11          1.   Meta's Terms Prohibit Unauthorized Automated Collection

12          The Facebook and Instagram Terms each limit **_how_** data can be collected, prohibiting users

13   from "access[ing] or collect[ing] data from [Meta's] Products using automated means (without

14   [its] permission)," and it is uncontested that that prohibition has been in place since before

15   BrandTotal's began scraping data in 2017 and are still in place today. Exs. 2-6, Ex. 7 at 35:3-19.

16   And they limit **_what_** data can be collected, prohibiting users from "attempt[ing] to access data you

17   do not have permission to access." Ex. 3; Ex. 5.

18          2.   Meta's Interest In Protecting Data On Its Platform

19          These terms protect Meta's products, services, and users and are consistent with industry

20   standards. _See infra_ pp. 5-6, 14-16. Unauthorized collection of user data through automated means

21   (or "scraping"), degrades public trust in Meta's platforms; undermines the integrity and operation

22   of Meta's networks; takes away users' control of their data; and harms users' privacy interests and

23   free expression. Ex. 8 ¶ 5. Scraping also harms advertisers on Meta's platforms who maintain as

24   confidential, information about their advertising campaigns and strategies. Ex. 9 at 27:9-13. In

25   many circumstances, Meta does not publicly disclose information about an advertiser's campaign

26   (for example, targeting criteria or budget). Ex. 9 at 74:15-20, Ex. 10 at 56:4-14. Meta makes

27   available advertising analytics information to advertisers through authorized means that protect

28   both user privacy and advertisers' proprietary interests. Ex. 10 at 35:4-14.

3. BrandTotal Agreed To Meta's Terms When It Created Accounts

BrandTotal admits that a user agrees to the Facebook and Instagram Terms when signing up for an account, Ex. 35 at 3, and that BrandTotal created a Facebook account in June 2017 and an Instagram account in December 2016, Dkt. 23 ¶¶ 37-42; Ex. 7 at 20:8-21:9. It is also undisputed that prior to the filing of this lawsuit in October 2020, BrandTotal itself ███████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████ until at least January 2021 or later. Ex. 13 at 143:14-18, 216:6-218:1; Ex. 14 at 53:9-21, 94:7-102:9, 103:4-104:7, 182-183; Ex. 15.

**B.      BrandTotal Scraped Data Using "Automated Means"**

None of BrandTotal's pre-litigation scraping conduct is disputed. BrandTotal concedes that it began scraping data from Facebook and Instagram beginning in 2017 (and continues to do so today). BrandTotal's scraping conduct was extensive and distributed through different types of online infrastructure and methods, in part to ██████████████████████████████ ████████████████████████████. In short, BrandTotal used a comprehensive and adversarial technical strategy to scrape different types of data from Meta. To Meta's knowledge, this included ██████████████████████████████████████████████ ████████████████████████████ over the span of at least a year or more, *see infra* pp. 5, 8-10. Defendants also supplemented their ███████████████ through the development and use of mobile applications and browser extensions that their users installed, which allowed Defendants to scrape data that was not otherwise accessible to BrandTotal (because it was content accessible only to authenticated Facebook or Instagram users), including after Meta took technical and legal enforcement measures, *see infra* pp. 4-5, 8-10.

1. BrandTotal Used Applications And Extensions To Scrape Data

Between 2017 and October 2020, BrandTotal developed, promoted, and distributed at least eleven browser extensions and mobile applications that scraped data from Facebook and Instagram. Ex. 16; Ex. 1 ¶ 51. It is undisputed that those applications and extensions engaged in the automated collection of data from Facebook and Instagram without Meta's permission. Ex. 11

at 4; Ex. 21 at 1; Ex. 20 ¶ 77; *see also* Dkt. 63 at 29 ("BrandTotal used 'automated means' to access and collect data from Facebook's website without obtaining Facebook's permission ...."). They did so in two primary ways. ***First***, BrandTotal's applications and extensions monitored logged-in users on Facebook and Instagram and surreptitiously scraped data while the user browsed those platforms. Ex. 22 at 108:11-14; Ex. 1 ¶¶ 34-35. ***Second***, BrandTotal sent unauthorized automated requests for the demographic data of the Meta user—including age, relationship status, location, and advertising interests—using the user's log-in credentials. Ex. 22 at 113:12-114:19, Ex. 1 ¶¶ 99-102, 541; Ex. 23 ¶ 39. As discussed *infra* pp. 8-10, BrandTotal continues to use many of its applications and extensions to scrape data using both methods today. Ex. 24; Ex. 1 ¶¶ 20, 51; Ex. 13 at 167:20-168:16.

2. <u>BrandTotal Made Unauthorized Automated Requests For Data From Its Computers To Meta Computers</u>

BrandTotal also scraped data by ███████████████████████████████████████████████ ████████████████████████████████████████████████████████████. Ex. 1 ¶¶ 108-110; Ex. 13 at 201:11-22. BrandTotal admitted that it ██████████████████████████████████████████████ ████████████████████████████████████████████████████████████. Ex. 13 at 216:4-218:1, Ex. 14 at 94:7-102:9. █████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████. Ex. 13 at 218:2-4; Ex. 1 ¶ 248. █ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████ Ex. 20 ¶ 99; Ex. 13 at 213:17-214:4; Ex. 1 ¶ 246; Ex. 14 at 148:12-149:2, 150:9-12; Ex. 25 at 36:15-37:1.

**C.     BrandTotal's Scraping Tools Pose Security Risks to Meta and Its Users**

Meta has a dedicated team and has implemented a number of technical measures (including

1   authentication requirements, IP blockers, and rate limits), consistent with industry standards, to

2   combat data scraping. Ex. 8 ¶ 5. BrandTotal does not contest that Meta's terms against scraping

3   are important to protect user data or that Meta has an interest in doing so—in fact, its own

4   "advertising" expert concedes that ███████████████████████████████████████████

5   ████████████████████████████████████. Ex. 26 at 160:10-14. BrandTotal's applications

6   and browser extensions pose the precise security risks that Meta's terms are designed to avoid.

7        For example, BrandTotal ██████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████████████████████████████.

13  Ex. 13 at 189:21-196:3; Ex. 1 at ¶¶ 389-394. Meta protects its platforms and user data by using

14  authentication barriers (a username and password), █████████████████████████████████

15  ████████████████████████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████████████████████████

17  ████████████████ Ex. 13 at 145:20-146:2. ██████████████████████████████████████

18  ██████████████████████████████████████████████████████████████████████ Its privacy

19  policy represented that data collected was "automatically rendered anonymized and non-personal,"

20  Ex. 24, ██████████████████████████████████ Ex. 13 at 167:20-168:16. ██████████████

21  ████████████████████████████████████ Ex. 30. ███████████████████████████████████

22  ████████████████████████████████████████████████████████████████████████████████

23  ██████████████████████████ Ex. 27 ¶¶ 22-23; Ex. 13 at 147:1-148:15; Ex. 1 ¶¶ 268-270.

24        To take another example, BrandTotal's browser extensions presented serious security risks

25  to Meta's users because they allowed BrandTotal to scrape data from Meta users who share a

26  common browser (such as family members who use the same browser on the same computer) even

27  if only one of those users actually installed the browser extension (the "Shared Computer

28  Problem"). Ex. 22 at 110:2-8; Ex. 1 ¶¶ 46-47, 250-254; Ex. 20 ¶¶ 116-118; Ex. 23. BrandTotal's

30(b)(6) designee acknowledged its extensions created this security vulnerability and admitted that BrandTotal attempted to "fix" the problem, only **after** Meta's lawsuit, by requiring a user to opt-in with each new log-in to Facebook or Instagram. Ex. 22 at 110:2-111:22; Ex. 31.

### D. BrandTotal Proceeded Contrary To Legal Advice

BrandTotal received express legal advice that its scraping practices are prohibited under the Facebook and Instagram Terms, or at best operate in "a grey area." In April 2019, BrandTotal received a legal opinion ███████████████████████████—i.e., "from a direct link by BT [BrandTotal] to a Facebook API" "and not via End User"—"is prohibited" under the Facebook Terms. Ex. 32 at 1858. With respect to collection via BrandTotal's applications and extensions, the opinion stated that collection where BrandTotal actively "uses the extension to connect with Facebook via API and/or 'calls' to gather data" operates in at best "a grey area." Ex. 32 at 1857. BrandTotal nonetheless scraped data from Facebook and Instagram at a massive scale, and it concedes that it ████████████████████████████████ ████████████████████████████████. Ex. 7 at 90:11-20.

### E. BrandTotal's Violations Continue After Meta Discovers BrandTotal's Data Scraping Operation And Sues To Enforce Its Terms

#### 1. Meta's Investigation And Technical Enforcement Actions

After detecting a fraction of BrandTotal's sprawling scraping operation, Meta launched an investigation to determine the scope and nature of the violations and determined that BrandTotal violated its terms. Ex. 27 ¶16. Its investigators concluded that BrandTotal's applications and extensions evaded Meta's anti-scraping protections by piggybacking on actual user activity. Ex. 33 at 54:25-55:11. The investigators concluded that BrandTotal was exfiltrating user profile data (e.g., gender, UserID, Ad Interests) and misrepresenting its identity (as an authenticated user) while contacting the Meta's computers. Ex. 27 ¶¶ 13, 17; Ex. 33 at 39:3-12.

Meta took various technical enforcement measures against BrandTotal including disabling BrandTotal's known Facebook and Instagram accounts, Karve Decl. ¶ 5, and reporting two of BrandTotal's extensions to Google, Ex. 34. ████████████████████████████████ ████████████████████████████████████████████████████████

1    ███████████████. *See* Ex. 13 at 216:4-9; Karve Decl. ¶¶ 11-15. After receiving Meta's

2    report, Google conducted its own independent investigations into the reported extensions in line

3    with its standard practice. Ackerman Decl. ¶¶ 5, 6, 12. Google determined that BrandTotal's

4    extensions did not properly disclose their collection of user data and removed them from the

5    Chrome store. *Id.* ¶ 13.

6             2.   Meta's Lawsuit

7         Meta filed suit in the Superior Court of California on October 1, 2020, alleging that

8    BrandTotal's scraping extensions violated its terms and putting BrandTotal on notice that Meta

9    had revoked BrandTotal's access to its platforms. Dkt. 148 ¶ 71; Ex. 36 at 13; Dkt. 183 (conceding

10   that Meta "Facebook … revoked access"). On October 14, 2020, Meta refiled its complaint in this

11   Court, adding claims under the CFAA, CDAFA, UCL, and for tortious interference with contract.

12   Dkt. 1. Less than a month later, this Court denied BrandTotal's motion for a temporary restraining

13   order, declining to approve BrandTotal's ongoing scraping and recognizing that "BrandTotal built

14   its business on ignoring Facebook's prohibition on automated access without permission." Dkt. 63

15   at 34. Throughout the litigation, Meta has reiterated to BrandTotal that it does not have permission

16   to collect data from Facebook or Instagram, including *inter alia* through a March 4, 2021 letter

17   from counsel emphasizing that "BrandTotal's access to Facebook" (including via UpVoice 2021)

18   "remains revoked." Ex. 78; *see also* Dkt. 156 at 16; Ex. 37.

19             3.   BrandTotal's Continued Violations of Meta's Terms Despite Technical and
                   Legal Enforcement Actions
20

21        Nonetheless, BrandTotal continues its unauthorized scraping operation to this day. It is

22   undisputed that BrandTotal used its █████████████████████████████████

23   ████████████████████████████████████████████████████████

24   ████████████████████████. Ex. 14 at 182:2-183:13; Ex. 25 at 143:14-18.[2] And

25   BrandTotal continues to this day ██████████████████████████████

26   ████████████████████████████████████████████████████████

27

28
     ──────────────────────
     [2] ████████████████████████████████████████████████████████
     ████████████. Ex. 25 at 49:14-16, 113:5-18; Ex. 14 at 184:8-12.

1 ███████████████████████████ Ex. 20 ¶ 67.

2 ████████████████████████████ Ex. 14 at 148:12-150:12.

3        BrandTotal also continues to scrape data using its applications and extensions. After its

4 extensions were removed by Google, BrandTotal continued to scrape data through approximately

5 10 to 15% of previously installed UpVoice extensions that remained operational and continued

6 collecting password-protected data through approximately mid-February 2021. Ex. 22 at 91:19-

7 94:5, Ex. 47 at 23:23-24:12. ████████████████████████

8 ██████████████████████████. Ex. 13 at 281:16-20, 282:2-8; Ex. 79

9 at 5495. ████████████████████████████████████████

10 ████████████████████████████████████████████

11 ████████████████████████████████████████. Ex.

12 25 at 40:18-45:21. ███████████████████████████████

13 ████████████████████████. Ex. 14 at 166:11-21.

14        In February 2021, months after Meta revoked its access, BrandTotal launched another

15 scraping tool called UpVoice 2021. BrandTotal admits that UpVoice 2021 relies on logged in users

16 in order to scrape data from password-protected areas of Facebook and does so "automatically."

17 Ex. 21 at 2-3; Ex. 20 ¶ 77. Unbeknownst to Meta (and undisclosed to the Court),[3] BrandTotal

18 ████████████████████████████████████████████

19 ████████████████████ Ex. 20 ¶ 102; Ex. 25 at 143:14-18. In the words of

20 one of its developers, ████████████████████████████

21 ████████████████ Ex. 17 at 5487. ████████████████

22 ████████████████████████████████████████████

23 ████████████████████████████████████████████

24 ████████████████████████████████████████████

25 ████████████ Ex. 14 at 178:9-16, 183:13-185:11; Ex. 16; Ex. 20 ¶ 102.

26

27 [3] During discovery, BrandTotal disclosed the existence of eleven applications and extensions. *See*
   Ex. 16. Although BrandTotal repeatedly represented throughout discovery that it had disclosed
28 every application and extension that scraped data from Facebook and Instagram, *see e.g.*, Ex. 13
   at 279:15-280:8, Meta learned after the discovery period had closed that BrandTotal had concealed
   the existence of ████████████████████████████████ Exs.16-18.

1    In addition, BrandTotal maintains ███████████████████████████████████

2    ████████████████████████████████████████████████████████████████████

3    ████████████████████████████████████████████████████████████████████

4    ███████ Ex. 81; Ex. 1 ¶¶ 647-648, ██████████████████████████████████

5    ███████████████████████████████ Ex. 25 at 64:2-11, 81:16-82:3.

## ARGUMENT

## I.   META IS ENTITLED TO SUMMARY JUDGMENT ON ITS BREACH OF CONTRACT CLAIM

BrandTotal does not dispute *any* element of Meta's breach of contract claim. It concedes that it agreed to Facebook and Instagram Terms prohibiting the automated collection of data and that it collects data from Meta's products using automated means to this day. *See* Ex. 12; Ex. 28 at 6; Ex. 36 at 9-12; Ex. 20 ¶¶ 53-57. In response to Meta's interrogatory asking for "the full basis for [BrandTotal's] contention" that it "did not breach any contracts with [Meta]," BrandTotal only identified two defenses: that (1) Meta's decision to disable some of its accounts relieved BrandTotal of its contractual obligations and (2) the provisions that BrandTotal continues to breach are void as a matter of public policy. Ex. 36 at 9-12. Both fail as a matter of law.

### A.   There Is No Dispute That BrandTotal Has Breached Its Contracts with Meta

To prevail on a claim for breach of contract, a plaintiff must establish: "(1) the existence of a contract, (2) plaintiff's performance or excuse for non-performance, (3) defendant's breach, and (4) resulting damages to plaintiff." *O'Brien as Tr. of Raymond F. O'Brien Revocable Tr. v. XPO CNW, Inc.*, 362 F. Supp. 3d 778, 784 (N.D. Cal. 2018). No element is in dispute.

#### 1.   Meta And BrandTotal Have Valid Contracts And Meta Performed

BrandTotal admits it agreed to Meta's terms when, beginning in December 2016, it created numerous Facebook and Instagram accounts for its business—███████████████████ ████████████████████████████████ Ex. 7 at 20:8-17; Ex. 12; Ex. 13 at 216:4-9; Ex. 14 at 143:22-145:16; Karve Decl. ¶ 11-18; Dkt. 23 ¶¶ 68 (admitting creation of accounts), 36-40; *see also* Dkt. 154 (reaffirming Answer). BrandTotal also admits that Meta performed under the contract at least until September 30, 2020. Ex. 35 at 1-2.

2. <u>BrandTotal Breached The Contract When It Scraped Data Using Automated Means Without Meta's Permission</u>

BrandTotal breached, and continues to breach, Meta's prohibition on automated collection of data from Meta products without permission. Ex. 5 ("You may not access or collect data from our Products using automated means (without our prior permission)."); Ex. 3 ("You can't attempt to … collect[] information in an automated way without our express permission."); Ex. 11 at 3-4; Ex. 20 ¶ 77. BrandTotal deployed at least thirteen browser extensions and mobile applications programmed to scrape data using automated means from Facebook and Instagram. BrandTotal's own technical expert concedes that BrandTotal "automatically collects this information." Ex. 20 ¶ 77. ██████████████████████████████████████████████████████████████████████ ████████████████████████████. *Id.* ¶ 100 (conceding collection through "backend" code); Ex. 1 ¶¶ 36-39. BrandTotal concedes that it ████████████████████████████████ ████████████████████████" before the filing of this lawsuit. Ex. 7 at 90:8-20. This Court has already found that Defendants "used 'automated means' to access and collect data from Facebook's website without obtaining Facebook's permission as required by the terms of service." Dkt. 63 at 29; Dkt. 108 at 7. All of BrandTotal's existing and past scraping tools—including UpVoice (2019), UpVoice 2021, Social One, Phoenix, Anonymous Story Viewer, Story Savebox, ████████████████████████████████████████████████████████████—breach the prohibition against automated collection.

BrandTotal also breached other contract terms. It is undisputed BrandTotal breached Meta's prohibition on accounts created with false information. *See* Ex. 5 § 3.1; Ex. 3. BrandTotal's 30(b)(6) designee testified BrandTotal ██████████████████████████████████████████ ██████████ Ex. 13 at 217:20-218:1; *see also id.* at 216:6-9. BrandTotal also undisputedly violated Meta's prohibition on creating accounts after having an account disabled for violation of the platform terms, Ex. 5 § 3.1; Ex. 3; Ex. 20 ¶ 104. There is also no dispute that BrandTotal accessed data it did not have permission to access. Ex. 5 § 3.2.3; Ex. 3; Ex. 7 at 90:9-20.

3. <u>Meta Suffered Damages Because Of BrandTotal's Breaches</u>

Nor can there be any material factual dispute that Meta suffered damages as a result of

BrandTotal's breaches. **First,** it is undisputed that Meta expended resources investigating and remediating BrandTotal's breaches. Ex. 80 at 1-5; Ex. 82; Prowse Decl. Ex. A ¶¶ 21-38; Herter Decl. at ¶ 4; Karve Decl. ¶ 4; Ex. 29; *see E. & J. Gallo Winery v. Instituut Voor Landbouw-En Visserijonderzoek*, 2018 WL 2463869, at *9 (E.D. Cal. June 1, 2018) ("security and investigation costs" constitute breach of contract damages). **Second,** BrandTotal has been unjustly enriched as a result of its automated collection. Prowse Decl. Ex. A at ¶¶ 39-59; *Foster Poultry Farms, Inc. v. SunTrust Bank*, 377 Fed. App'x 665, 669 (9th Cir. 2010) ("[U]nder California law, a defendant's unjust enrichment can satisfy the 'damages' element of a breach of contract claim, such that disgorgement is a proper remedy."). While BrandTotal disputes **how much** money it earned by selling Facebook and Instagram data, there is no dispute that it monetized that data. Ex. 19 at 167:11-23. That is sufficient to award summary judgment as to BrandTotal's **liability** independent of the amount of damages to be proven at trial. *See Castillo v. Nationstar Mortg. LLC*, 2016 WL 6873526, at *4 (N.D. Cal. Nov. 22, 2016) (granting summary judgment on breach of contract claim where the "undisputed evidence" was "sufficient to demonstrate the fact of damages").

### B.    BrandTotal's Affirmative Defenses Fail As A Matter of Law

#### 1.    BrandTotal's Contract-Termination Defense Must Be Rejected

Unable to dispute that it breached its contractual obligations, BrandTotal seeks to escape liability by arguing that its contract with Meta was terminated by Meta's enforcement actions and thus there can be no liability. Not so.

**First**, Brand Total's contract-termination defense fails as to its pre-litigation conduct because BrandTotal concedes it was bound by the Facebook and Instagram Terms before its accounts were disabled. Ex. 36 at 10. That alone establishes liability.

**Second**, as to its post-litigation conduct directed at Facebook, BrandTotal's obligations survive the termination of any account under the plain language of the Facebook Terms. Section 4.2 of Facebook Terms provides that "[i]f you delete or we disable your account, these Terms shall terminate as an agreement between you and us, but the following provisions will remain in place: 3, 4.2-4.5." Ex. 5. This survival clause makes Facebook's anti-scraping provision (§ 3.2.3) enforceable following termination of the contract. *See, e.g., Western Filter Corp. v. Argan, Inc.,*

540 F.3d 947, 952 (9th Cir. 2008) (a valid survival clause extends contractual obligations under California law); *In re Aureal, Inc.*, 2006 WL 2130903, at *4 (N.D. Cal. July 25, 2006) (similar).

***Third***, BrandTotal's contract-termination defense would also fail in all events because it is undisputed that BrandTotal ███████████████████████████. BrandTotal admits it "███████████████████████████████████, Ex. 13 at 216:6-9, ████████████████████████████████████████████. Ex. 14 at 102:13-21; 143:22-144:1; 145:10-16; *see also* Karve Decl. ¶¶ 11-15. BrandTotal's technical expert concedes that ████████████████████████████ Ex. 20 ¶ 104; Ex. 7 at 20:6-20:22.[4] BrandTotal admits that it necessarily agreed to the Facebook and Instagram Terms each time it created accounts, including the still-active accounts created in 2018 or before. Ex. 7 at 20:6-20:22; Ex. 12; Karve Decl. ¶¶ 11-15; *see also In re Facebook Biometric Info. Privacy Litig.*, 185 F. Supp. 3d 1155, 1164-67 (N.D. Cal. 2016) (finding Facebook's user-registration process constitutes a binding contract on the user). Thus, BrandTotal's contractual relationship with Meta is ongoing.

### 2.  Meta's Contract Terms Are Enforceable

BrandTotal also contends that Meta's terms are void for public policy. Ex. 36 at 9-12. That is an exceptional defense that BrandTotal comes nowhere near establishing. A court will not void a contract "'unless it is entirely plain that a contract is violative of sound public policy'" because public policy ***also*** favors the enforcement of contracts entered into by private parties. *City of Santa Barbara v. Superior Ct.*, 41 Cal. 4th 747, 777 n.53 (2007); *S & J Rentals, Inc. v. Hilti, Inc.*, 294 F. Supp. 3d 978, 990 (Mar. 23, 2018) (noting importance of "freedom of contract," especially among "sophisticated entit[ies]"). BrandTotal is a sophisticated entity that sought and obtained legal advice that the scraping at issue in this case clearly or at least potentially violates Meta's terms and proceeded anyway. *See supra* p. 7. "[C]ourts are … reluctant to declare a contract void as against public policy," *Batts v. Bankers Life & Casualty Co.*, 2015 WL 166869, at *4 (N.D. Cal. Jan. 13, 2015), and "[t]he authorities all agree that a contract is not void as against public policy unless it

---

[4] BrandTotal also continues to pay individuals in India to use its Restricted Panel extension while logged-in to a Facebook account, further binding BrandTotal to Facebook's terms. Ex. 14 at 185:4-15.

is injurious to the interests of the public as a whole or contravenes some established interest of society," *Epic Games, Inc. v. Apple Inc*, 2021 WL 4128925, at *121 (N.D. Cal. Sept. 10, 2021) (citation omitted). "[W]hether a contract is against public policy 'is a question of law'" amenable to summary judgment. *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 402 F. Supp. 3d 615, 670-674 (N.D. Cal. 2019).

BrandTotal boldly claims that "the public policy favoring competition and the free flow of information in the public domain" allows this Court to invalidate Meta's prohibition against automated collection (and by implication the terms of other countless other websites, including BrandTotal's). Ex. 36 at 10. But this Court should not "declare contractual provisions void or unenforceable on public policy grounds without firm legislative guidance," *Santisas v. Goodin*, 17 Cal. 4th 599, 621 (1998), of which BrandTotal offers none. BrandTotal points only to an entirely inapposite U.S. Supreme Court case balancing the "competing demands of patent and contract law," *Lear, Inc. v. Adkins*, 395 U.S. 653, 674-675 (1969), and suggests that "expert testimony, and materials relating to the history of advertising transparency" might substantiate its claim, Ex. 36 at 10-11. But expert testimony about the history of advertising transparency says nothing about the public interest in prohibiting unauthorized scraping, and BrandTotal's own expert undermines its argument in any event.[5] In the absence of any clear legislative guidance, this Court should not hold that anti-scraping provisions like Meta's void for public policy. *See Sanchez v. County of San Bernardino*, 98 Cal. Rptr. 3d 96, 104 (2009) (reversing summary judgment that contract provision was void "in the absence of a statute" in support of position).

Moreover, Meta's prohibition on unauthorized automated data collection is commonplace. Websites ranging from YouTube and Amazon to the United States Congress and the New York Times prohibit automated collection of data from their websites.[6] Even ***BrandTotal's own terms***

---

[5] BrandTotal's own expert ███████████████████████████████████████████ ███████ Ex. 26 at 160:6-14.

[6] *See* YouTube, *Terms Of Service*, https://www.youtube.com/t/terms (last accessed Mar. 11, 2022); Amazon, *Conditions Of Use*, https://www.amazon.com/gp/help/customer/display.html/?nodeId= 508088 (last accessed Mar. 11, 2022); and LinkedIn, *LinkedIn Service Terms*, https://www.linkedin.com/legal/l/service-terms (last accessed Mar. 11, 2022); *see also* Ex. 84 at 10 n.48 (collecting entities, including Twitter, United States Congress, and the New York Times,

include such a restriction. *See* Ex. 83. Courts, including in this District, routinely enforce these terms. *See, e.g.*, *Niantic, Inc. v. Global++*, 2019 WL 8333451, at *7 (N.D. Cal. Sept. 26, 2019) (granting preliminary injunction based on scraping in violation of terms of service); *Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1069 (N.D. Cal. 2010) (granting permanent injunction). And in enforcing Facebook's Terms, in particular, courts in this District have found that the "public has an interest in ensuring that computers are not accessed without authorization." *Facebook, Inc. v. Power Ventures, Inc*., 252 F. Supp. 3d 765, 785 (N.D. Cal. 2017); *Facebook, Inc. v. Sluchevsky*, 2020 WL 5823277, at *7 (N.D. Cal. Aug. 28, 2020) (public interest supports permanent injunction against unauthorized data scraping). Indeed, "Facebook's ability to decisively police the integrity of its platforms **is without question a pressing public interest**." *Sluchevsky*, 2020 WL 5823277, at *9 (*quoting Stackla, Inc. v. Facebook Inc*., 2019 WL 4738288, at *6 (N.D. Cal. Sept. 27, 2019)) (emphasis added); *accord* Dkt. 63 at 30 (finding "a significant public policy supports allowing Facebook to police automated access to password-protected platforms").

The egregious nature of BrandTotal's conduct only underscores the importance of these contractual provisions. It is undisputed that two of BrandTotal's applications ████████████ ███████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ Ex. 1 ¶¶ 43-44; Ex. 13 at 189:21-196:3. It is undisputed that BrandTotal ████████████████████████████████ █████████████████████████████████████ Ex. 24, Ex. 13 at 167:11-8. It is undisputed that BrandTotal designed its browser extensions to collect data regardless of whether the person using the browser actually installed the extension. Ex. 22 at 110:2-111:22. And it is undisputed that BrandTotal stopped those practices only **after** Meta filed this lawsuit. *Id.* Even with respect to the data BrandTotal contends it obtained with user consent through a Meta user's decision to self-compromise their accounts by downloading an extension or application, this Court has recognized that Meta has an interest in "policing access" to its network. Dkt. 63 at 23.

Far from undermining public policy, Facebook and Instagram's terms have been good

---

that prohibit automated collection).

1   public policy—allowing Meta to protect its users and its platform against the security risks raised

2   by data scraping, including through judicial enforcement. Dkt. 63 at 30. BrandTotal's attempt to

3   void these terms would have staggering consequences, not only by allowing BrandTotal to

4   continue its own violative conduct but by eliminating a critical tool that Meta and countless other

5   websites use to police their products to protect users and the integrity of their sites.

6   **II.    META IS ENTITLED TO SUMMARY JUDGMENT ON ITS CFAA CLAIM**

7          The CFAA prohibits intentionally accessing and obtaining information from a protected

8   computer without authorization. *See* 18 U.S.C. § 1030(a)(2)(C). Because the undisputed evidence

9   shows that BrandTotal accessed and scraped data from Meta's computers after Meta expressly

10  revoked authorization, Meta is entitled to judgment on its CFAA claim. *See Facebook, Inc. v.*

11  *Power Ventures, Inc.*, 844 F.3d 1058, 1067-69 (9th Cir. 2016).

12          **A.    BrandTotal Accessed And Obtained Information From Meta's Protected**
13                  **Computers After Meta Revoked Authorization For Its Access**

14         Meta revoked any authorization BrandTotal might have had to access Meta's computers

15  when Meta disabled BrandTotal's known Facebook and Instagram accounts on September 30,

16  2020, Ex. 27 ¶¶ 27-33; Karve Decl. ¶¶ 11-15, and then filed suit on October 1, 2020, Ex. 36 at 13;

17  Dkt. 40-2. Because the undisputed facts show that BrandTotal nonetheless continued intentionally

18  accessing and obtaining information from Meta's computers, Meta is entitled to judgment.

19                  1.   BrandTotal Intentionally Accessed And Obtained Information From Meta's
20                       Computers

21         "Access" as used in the CFAA means "to gain entrance to or use a system," or "to enter,

22  approach, pass to and from, or communicate with." *United States v. Nosal*, 930 F. Supp. 2d 1051,

23  1063 (N.D. Cal. 2013) (emphasis and citation omitted). It encompasses, therefore, "not only the

24  moment of entry, but also the ongoing use of a computer system," for example, using a computer

25  after another has logged onto it. *Id.* And "obtaining information" is broadly construed to include

26  not only taking but also "merely reading.'" *Id.* at 1062 (quoting Sen Rep. No. 104-357, at 7 (1996)).

27         Here, the undisputed facts show that BrandTotal intentionally accessed and obtained

28  information from Meta's computers. BrandTotal admits that at least its mobile applications and

so-called "legacy" extensions (UpVoice 2019 and the related extensions) accessed Meta's computers and scraped information by "ma[king] background requests … to the Facebook [or Instagram] server[s]" to "request … information." Ex. 16 at 2-4; *see also* Ex. 20 ¶ 39; Ex. 1 §§ 7.3, 9.3, 10.3. "Background requests" are "calls made" directly by BrandTotal's applications and extensions "to the Facebook [or Instagram] server[s]," independent of any action on behalf of the application or extension's user. *See* Ex. 22 at 113:9-114:17; *see also* Ex. 1 at § 4.7.1 (defining this as "Active Collection"). In addition, ███████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████ Ex. 20 ¶ 90, and "pars[ing] different elements" from "Facebook's social feed," Ex. 47 at 44:14-45:11; *see also* Ex. 85 at 111:6-114:11; Ex. 25 at 86:21-88:2, 131:8-140:15(████████████████████████); Ex. 17. Finally, BrandTotal uses its server-side collection technique to "call the URL" for "advertisement[s]" on "Facebook's website." Ex. 16 at 3; *see also* Ex. 14 at 36:10-38:11 ███████████████████████████████████

███████████████████████).[7]

### 2.   BrandTotal Accessed Meta Computers Without Authorization

It is also undisputed that BrandTotal continued to access Meta's protected computers after Meta revoked (through technical and legal means) its access to Facebook and Instagram on October 1, 2020. BrandTotal concedes that two "Legacy" applications (Phoenix and Social One) were never removed by Google and continue "collecting information from the Facebook platform" to this day. *See* Ex. 22 at 76:13-80:13. It is, moreover, undisputed that even among those apps and extensions that Google stopped distributing in October 2020, BrandTotal continued scraping data for months afterward through 10-15% of its installed applications and extensions, which were not removed from users' devices and continued "send[ing] request[s] to the Facebook servers for information and send[ing] that information to BrandTotal." *Id.* at 91:19-95:4. For example, ███████████████████████████████████████████████████████████████

---

[7] There is no dispute that Meta's computers are "protected" within the meaning of the statute, which encompasses any computer or network connected to the Internet. *See Multiven, Inc. v. Cisco Sys., Inc.*, 725 F. Supp. 2d 887, 891 (N.D. Cal. 2010).

1 ███████████████████████████████████████████. Ex.

2 47 at 23:25-24:4. And BrandTotal continues ████████████████████████

3 ██████████████████████████████████. Ex. 25 at 40:18-22; Ex. 86 at 6.

4       BrandTotal even developed ██████████████████████████████

5 ████████████████████████████████████████████████

6 ██████████████████████████████████. *See* Ex. 25 at 25:16-26:9, 87:8-88:2;

7 Ex. 87. And ██████████████████████████████████████

8 ████████████████████████████████████████████████

9 ████████████████████████████████████████████████

10 ██████████████████ Ex. 20 ¶ 102; Ex. 25 at 135:8-140:4, 143:14-18; Ex. 14 at 178:9-179:14.

11 Whether BrandTotal's "panelists" agreed to BrandTotal's scraping by downloading its

12 applications and extensions is legally irrelevant. After Meta revoked access, "[p]ermission from

13 the users alone was not sufficient to constitute authorization." *Power Ventures*, 844 F.3d at 1068.

14       BrandTotal also ████████████████████████████████████

15 ██████████████████████████████. *See* Ex. 20 ¶ 100; Ex. 88; Ex. 1 §§ 6.1-6.5.

16 This flagrant collection after Meta indisputably revoked BrandTotal's authorization to access its

17 computers requires judgment on Meta's CFAA claim.

18       **B.     BrandTotal Caused A Loss Of $5,000 Or More**

19       Civil remedies are available under the CFAA whenever the defendant's unauthorized

20 access caused a loss of $5,000 or more in any one-year period. *See Brekka*, 581 F.3d at 1131-32.

21 A "loss" includes "any reasonable cost to any victim, including the cost of responding to an

22 offense," 18 U.S.C. § 1030(e)(11), such as costs incurred "analyzing" and "investigating" a

23 defendant's actions. *See Power Ventures*, 844 F.3d at 1066. The undisputed evidence shows that

24 in the one-year period after October 1, 2020, Meta incurred $95,784 in losses identifying,

25 analyzing, and responding to BrandTotal's conduct. *See* Prowse Decl. Ex. A ¶ 38 & Exs. 3-4; Ex.

26 33 at 61:20-62:24, 74:25-134:24.

27       **C.     BrandTotal's Defenses Are Meritless**

28       BrandTotal has offered a laundry list of excuses in an attempt to avoid liability under the

1    CFAA. *See* Ex. 36 at 12-14. Each one fails under the undisputed facts and applicable law.

2              1.   Meta's Claim Is Timely

3        BrandTotal does not dispute that, at least prior to this litigation, its "legacy" applications

4    and extensions accessed and obtained information from Meta's computers. Instead, it contends

5    that ███████████████████████████████████████████████████████████

6    ███████████████████████████████████████████████████████████

7    ███████████████████. Ex. 36 at 13-14. That argument fails on all fronts. To start, as

8    discussed above, it is undisputed that ██████████████████████████████

9    ███████████████████████████████████████████████████████████

10   ███████████████████. *See supra* pp. 17-18. That post-revocation scraping alone is

11   alone sufficient to enter judgment for Meta on its CFAA claim.

12       As for Phoenix and Social One, Meta's CFAA claim is timely because it was filed "within

13   2 years of the date of the act complained of." 18 U.S.C. § 1030(g). The "act complained of" is

14   BrandTotal's access to Meta's computers without authorization, and each separate act of access

15   "trigger[s] [its] own separate statute of limitations." *Calhoun v. Google LLC*, 526 F. Supp. 3d 605,

16   625 (N.D. Cal. 2021). Thus, because BrandTotal does not dispute that ████████████████

17   ████████████████████████████, Meta's CFAA claim—filed on

18   October 14, 2020—would be timely even if it depended on only those two applications.

19             2.   BrandTotal Cannot Avoid CFAA Liability On The Ground That Its

20                  Applications and Extensions Circumvent No Technical Barriers

21       BrandTotal also contends that ████████████████████████████████

22   ████████████████████████" but is silent on its other extensions and applications.

23   Ex. 36 at 14. That cannot defeat judgment on Meta's CFAA claim for two reasons.

24       ***First***, Social One and Phoenix (and BrandTotal's other technologies) ***have*** circumvented

25   technical barriers. Authentication requirements, for example, are a "specific type of authorization

26   … which turn[] on whether a user's credentials allow him to proceed past a computer's access

27   gate." *Van Buren*, 141 S. Ct. at 1659 n.9. ██████████████████████████████

28   ███████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████. *See* Ex. 1 at §§ 4.1, 4.13,

10.4;  Ex.  13  at  98:2-117:2  (██████████████████████████████████

████████). Moreover, to prevent Meta's systems from detecting BrandTotal's access, ███████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████. *See* Ex. 13 at 234:9-235:9; Ex. 1 §§ 4.14.2, 10.7.2 **Second**, in any case, a requirement

to circumvent "technological access barrier[s]" is "missing from the statutory language" and not

required, at least where, as here, there has been an express revocation of authorization. *United*

*States v. Nosal*, 844 F.3d 1024, 1038-39 (9th Cir. 2016).

### 3.   BrandTotal Violates The CFAA By Using UpVoice 2021

BrandTotal contends ██████████████████████████████████████████

██████████████████████████████████████████████████████ Ex. 36

at 13. That argument fails both on the undisputed facts and the law. On the facts, BrandTotal

concedes  that  UpVoice  2021 ███████████████████████████████████

█████████████████████ Ex. 20 ¶ 90; *see also* Ex. 47 at 44:14-45:11. In other words,

BrandTotal uses UpVoice 2021 to "access" and "communicate with" Meta's computers by passing

information from Meta's computers to BrandTotal. *Nosal*, 930 F. Supp. 2d at 1063. And on the

law, it is well established that "[o]nce permission has been revoked, technological gamesmanship

or the enlisting of a third party to aid in access will not excuse liability." *Power Ventures*, 844 F.3d

at 1067; *accord Nosal*, 844 F.3d at 1028. Just as BrandTotal may not itself directly send data

requests to Meta's computers, nor may it ██████████████████████████████

█████████████ as a means to access that to which its permission has been revoked.

### 4.   BrandTotal's Server-Side Collection Also Violates The CFAA

Finally, as to its server-side collection technique, BrandTotal argues that ████████

███████████████████████████." Ex. 36 at 13. As a threshold matter, that is

not  true.  BrandTotal  admitted  that ████████████████████████████████

█████████████████████████████████████. *See* Ex. 13 at 215:8-

228:13 ██████████████████████████████████████████████████

██████████████████████████████████████); Ex. 14 at 181:18-183:13, 189:5-

194:6 (███████████████████████████████████████████████).

BrandTotal's server-side collection violated the CFAA, even under BrandTotal's view of the law.

In any event, it is legally irrelevant whether BrandTotal has ██████████████

███████████████████████████████████████████ While the Ninth Circuit

previously suggested in *hiQ Labs, Inc. v. LinkedIn Corp.* that publicly facing webpages were

beyond the CFAA's reach, 938 F.3d 985, 999-1004 (9th Cir. 2019), that opinion has since been

vacated, *see* 141 S. Ct. 2752 (Mem.), and its reasoning is inconsistent with the Supreme Court's

explication of the CFAA in *Van Buren*. Specifically, *hiQ*'s distinction between public and non-

public webpages is irreconcilable with *Van Buren*'s clear statement that the CFAA applies "to *all*

information from all computers that connect to the Internet," 141 S. Ct. at 1652 (emphasis added).

Congress could have limited the CFAA's protections to only nonpublic computers, but did not—

despite its awareness of the significance of such a distinction in certain circumstances, *see* 18

U.S.C. § 1030(a)(3) (prohibiting unauthorized access to "any nonpublic" government computer).

Accordingly, BrandTotal violated the CFAA by continuing to access and obtain information from

any portion of Facebook and Instagram after Meta expressly revoked its authorization to do so.

*See Craigslist Inc. v. 3Taps Inc.*, 964 F. Supp. 2d 1178, 1181-84 (N.D. Cal. 2013) (cease-and-

desist letter revoked access to otherwise publicly accessible website); *see also EF Cultural Travel*

*BV v. Zefer Corp.*, 318 F.3d 58, 63-64 (1st Cir. 2003).

Independently, though not necessary to establish a violation where there has been an

express revocation of authorization, BrandTotal's server-side collection technique also

circumvents technical barriers to accessing Meta's computers. The undisputed evidence confirms

that, to prevent Meta's systems from detecting and stopping BrandTotal's access, BrandTotal

designed its sever-side collection technique to █████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████. *See* Ex. 13 at 234:9-235:9; Ex. 1 §§ 4.14.2, 6.6.2, 7.7.1, 10.7.2. BrandTotal also

uses ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████); Ex. 14 at 148:23-156:6; Ex. 1 §§ 4.14.3, 6.6.2. And

BrandTotal used ██████████████████████████████████████

█████████████████████████████████, including after Meta revoked BrandTotal's

authorization to access Meta computers in October 2020. *See* Ex. 14 at 52:25-66:6, 79:9-85:13,

189:5-194:6. The deliberate circumvention of these barriers to access confirms that BrandTotal's

access was "without authorization." *Facebook, Inc. v. Grunin*, 77 F. Supp. 3d 965, 973 (N.D. Cal.

2015); *accord Power Ventures*, 844 F.3d at 1068 (circumventing IP block demonstrates lack of

authorization); *3Taps*, 964 F. Supp. 2d at 1186 n.7 (IP blocking "is a real barrier" to access).

## III.   META IS ENTITLED TO SUMMARY JUDGMENT ON ITS CDAFA CLAIM

Like the CFAA, the CDAFA prohibits "access[ing] and "tak[ing]" or otherwise "us[ing]"
"any data from a computer" "without permission." Cal. Penal Code § 502. Given the statutes' close
similarity, conduct that violates the CFAA also necessarily violates the CDAFA. *See Brodsky v.
Apple Inc.*, 445 F. Supp. 3d 110, 131 (N.D. Cal. 2020). Meta is therefore entitled to summary
judgment on its CDAFA claim for the reasons stated *supra* pp. 18-22. *See United States v.
Christensen*, 828 F.3d 763, 789 (9th Cir. 2015) (accessing with a valid password and then taking
or using information improperly violates CDAFA).

## IV.   META IS ENTITLED TO PARTIAL SUMMARY JUDGMENT ON ITS UCL CLAIM

BrandTotal's CFAA and CDAFA violations also require judgment on Meta's claim under
the unlawful prong of the UCL. "By proscribing 'any unlawful' business practice," the UCL
"borrows violations of other laws and treats them as unlawful practices" that are "*independently
actionable*" under the UCL. *Rose v. Bank of Am., N.A.*, 57 Cal. 4th 390, 396 (2013) (quotation
marks and citation omitted). And Meta has suffered a financial loss sufficient to establish standing
under the UCL. *See supra* p. 18; *Cappello v. Walmart Inc.*, 394 F. Supp. 3d 1015, 1019 (N.D. Cal.
2019). Meta is therefore entitled to summary judgment on its claim under the unlawful prong of
the UCL because the undisputed facts establish that BrandTotal violated the CFAA and CDAFA.

1  *See Beaver v. Tarsadia Hotels*, 816 F.3d 1170, 1188 (9th Cir. 2016) (affirming summary judgment

2  on UCL unlawful claim based on violation of federal law).

3  **V.   JUDGMENT ON BRANDTOTAL'S INTERFERENCE COUNTERCLAIMS IS WARRANTED**

4        After investigating BrandTotal's conduct, Meta disabled BrandTotal's Facebook and

5  Instagram accounts, and, because that alone would do nothing to stop the operation of the

6  extensions and thus the ongoing violation, Meta also reported the extensions to the Google Chrome

7  Web Store. Ex. 34; Karve Decl. ¶¶ 5-8. There is no factual dispute that Google then conducted its

8  own investigation and, based on that investigation, removed BrandTotal's extensions from the

9  Chrome Web Store. *See* Ackerman Decl. ¶¶ 12-14; Ex. 38 at 11-13; Ex. 39.

10        BrandTotal claims that Meta's email to Google caused disruption to BrandTotal's contracts

11  with customers, individuals who used UpVoice (whom BrandTotal refers to as "panelists"),[8] and

12  Google. Its interference claims fail for myriad reasons. At the threshold, Meta is entitled to

13  judgment both because the object of BrandTotal's contracts is unlawful and therefore cannot

14  support any interference claim and because any interference was justified in light of Meta's own

15  contractual rights. Alternatively, at the very least, the absence of any valid contract means that

16  BrandTotal must, but cannot, satisfy the elements of an intentional interference with prospective

17  economic advantage ("IIPEA") claim, which requires, among other things, that Meta's actions

18  proximately caused any harm resulting from the purported interference.

19      **A.   BrandTotal's Unlawful Contracts Cannot Support An Interference Claim**

20        As this Court has recognized, "BrandTotal built its business on ignoring [Meta's]

21  prohibition on automated access without permission." Dkt. 63 at 34. BrandTotal nonetheless

22  brazenly claims that Meta tortiously interfered with contractual relationships that, like its entire

23  business, are predicated on the breach of Meta's terms. In essence, BrandTotal asks the Court to

24  grant it the fruits from its unlawful business, but "[n]o principle of law is better settled than that a

25  party to an illegal contract cannot come into a court of law and ask to have its illegal objects carried

26  out." *Yoo v. Jho*, 147 Cal. App. 4th 1249, 1251 (2007); *see also Shuman v. Squaretrade Inc.*, 2020

27

28  ─────────────────────────
  [8] ████████████████████████████████████████████
████████████ *See* Ex. 36 at 3-6.

WL 12894954, at *12 (N.D. Cal. Aug. 31, 2020). That foundational principle defeats each of BrandTotal's interference claims as a matter of law.

A "cause of action for intentional interference with contractual relations requires an underlying *enforceable* contract." *Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture Partners*, 52 Cal. App. 4th 867, 879 (1997) (emphasis added). Any contract the "performance of which involves a breach of contract of a third person is illegal" and unenforceable. Restatement of Contracts § 576 & cmt. a; *accord Williams v. Eaze Solutions, Inc.*, 417 F. Supp. 3d 1233, 1239-40 (N.D. Cal. 2019). That is precisely the case here.

BrandTotal contends that its contractual relationships were disrupted when, following Google's removal of its applications and extensions, BrandTotal ████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████. Ex. 36 at 3-6. But the performance of any contractual obligation to obtain or "████" data from Facebook or Instagram by automated means requires unlawful conduct, including the breach of Meta's terms. *See supra* pp. 18. Similarly, BrandTotal has no valid, enforceable right to promote its applications and extensions on Google's platforms; those applications and extensions violate both Google's own terms, *see* Ackerman Decl ¶¶ 3, 13; Ex. 38 at 13, and Meta's terms, and thus any agreement to distribute the unlawful extensions is itself unenforceable. *See Yoo*, 147 Cal. App. 4th at 1255.

BrandTotal's interference claims cannot be reconfigured into IIPEA claims. As this Court has recognized, a claim based on interference with an unenforceable contract can sometimes be converted into an IIPEA claim. *See Bed, Bath & Beyond*, 52 Cal. App. 4th at 879; *see also* Dkt. 158 at 23. Not here. Unlike in *Bed, Bath & Beyond*, BrandTotal's contracts are unenforceable based on illegality, not a mere technical defect. *See* 52 Cal. App. 4th at 873-74 (contract unenforceable due to party's failure to execute). Whether formalized in a binding contract or not, the relationships BrandTotal claims Meta disrupted are premised upon BrandTotal breaching its contracts with Meta. Because there is no public interest in protecting such unlawful relationships, they cannot support an IIPEA claim, which serves to "protect the public interest in stable economic

1  relationships," *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1152 (2004). Meta is entitled to judgment on

2  BrandTotal's tortious interference claims, however framed, on this basis alone.

3        **B.**    **Any Alleged Interference By Meta Was Justified**

4        BrandTotal's interference claims independently fail as a matter of law because Meta may

5  not be held liable for simply acting to enforce its own contracts with BrandTotal. "[I]f a

6  defendant's 'conduct was lawful and undertaken to enforce its rights,' it cannot be held liable for

7  intentional interference with a contract even if it knew that such conduct might interrupt a third

8  party's contract." *SIC Metals, Inc. v. Hyundai Steel Co.*, 442 F. Supp. 3d 1251, 1256 (C.D. Cal.

9  2020) (granting summary judgment based on justification defense); *accord Weststeyn Dairy 2 v.*

10  *Eades Commodities Co.*, 280 F. Supp. 2d 1044, 1089 (E.D. Cal. 2003) (same). Here, Meta

11  investigated BrandTotal's conduct and determined that BrandTotal was violating the terms

12  governing BrandTotal's use of Meta's platforms. *See* Ex. 40; *see also supra* pp. 10-12 Indeed,

13  Meta determined that BrandTotal was "one of the most aggressive scrapers" it had encountered,

14  "deceptively collect[ing] Facebook user metadata and ad targeting data" through multiple

15  extensions and "across different surfaces." *See* Ex. 41 at -169. To enforce its own contractual

16  rights, Meta developed an "Enforcement Plan" that included "[c]ontact[ing] [the] Google CWS,"

17  or Chrome Web Store. *See* Ex. 40 at -716; Karve Decl. ¶¶ 5-9.

18        Meta cannot be held liable for these actions unless BrandTotal can show they were a "sham

19  … designed for the specific purpose" of interfering with BrandTotal's contracts. *See Webber v.*

20  *Inland Empire Investments*, 74 Cal. App. 4th 884, 902 (1999). BrandTotal contends that Meta's

21  actions were wrongful because Meta ██████████████████████████████████

22  ████████████████████████ Ex. 36 at 5. That fails for two reasons. ***First***, the precise

23  wording of the email is irrelevant; the undisputed evidence shows that Meta was acting to enforce

24  its legitimate contractual rights, *see* Ex. 40, and its actions were therefore not a "sham." BrandTotal

25  earlier contended that Meta acted for the improper purpose of shutting down a competitor, *see,*

26  *e.g.*, Dkt. 138 at 12, but discovery has produced ***no*** evidence of any such motivation. Instead, the

27  record shows only that Meta took legitimate steps to investigate and enforce against BrandTotal's

28  undisputed breach of Meta's terms. *See* Exs. 40, 41.

**Second**, and in any event, no reasonable factfinder could agree that Meta's email was fraudulent. Meta communicated to Google that it "believe[d]" several of BrandTotal's extensions were "improperly scraping user PII (*e.g.*, gender, relationship status, ad interests, etc.), without proper disclosure." Ex. 34 at -961. BrandTotal has pointed to nothing suggesting Meta did not genuinely hold that belief. It is undisputed that BrandTotal's was collecting "PII" as defined in that email to Google. *See* Ex. 20 ¶ 76. It is also undisputed that BrandTotal represented to its users that its extensions collected only "anonymous" demographic and profile information. Exs. 42, 43; *see also* Ex. 44 at 125; Ex. 24. Following its investigation, Meta understood those representations to be "misleading" because "[u]ser ID hashing is considered 'pseudo anonymized' since you can still correlate information from multiple entries bearing the same hashed user ID and discover the user identity." Ex. 41 at -169; *see also* Ex. 40 at -702 (contemporaneous investigatory document stating Meta's understanding that, although hashed, "the user id is still easily recoverable"); Karve Decl. ¶ 7. Meta also understood that BrandTotal's method of "data extraction was not targeted," meaning that BrandTotal collected "a lot more information" than specifically intended and disclosed, Ex. 52 at 93:22-95:16,[9] and that UpVoice could scrape data from users of shared household computers without their knowledge or consent, *see* Karve Decl. ¶ 7; Ex. 45 at 141. In light of this undisputed evidence, Meta's actions were justified and judgment should be entered on the interference counterclaims on this basis alone.

### C.    BrandTotal's Contracts With Customers

1.    <u>Because BrandTotal's Contracts Are Unenforceable, BrandTotal's Claim Must At Least Satisfy The Elements Of Interference With Prospective Economic Advantage—But The Undisputed Facts Do Not Support Such A Claim</u>

If it can pursue its claims at all (it cannot), at the very least, BrandTotal must establish the elements of an IIPEA claim. *See Bed, Bath & Beyond*, 52 Cal. App. 4th at 879. Therefore, BrandTotal must establish: (1) an economic relationship with the probability of future economic benefit, (2) Meta's knowledge of the relationship, (3) an intentional act designed to disrupt the relationship, (4) actual disruption to the relationship, (5) economic harm to BrandTotal

---

[9] Contrary to BrandTotal's contention, *see* Ex. 36 at 5, Meta did not misrepresent the affiliation of BrandTotal's extensions but simply noted that they were "closely related behaviorally to five extensions created by ***another*** developer." Ex. 34 (emphasis added).

proximately caused by Meta's acts, and (6) that Meta's purportedly interfering conduct was independently "wrongful by some legal measure. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153-54 (2003). BrandTotal's claim fails as a matter of law.

> a. <u>The undisputed facts show Meta did not intend to induce a breach or disruption of BrandTotal's economic relationships</u>

To satisfy the third element of its interference claim, BrandTotal must prove that Meta either acted specifically "with the purpose or desire to interfere" or acted with the knowledge that "interference [was] certain or substantially certain to occur as a result of [its] action." *Korea Supply Co.*, 29 Cal. 4th at 1155-56. But after almost 18 months of litigation, there is no direct evidence that Meta intended to interfere with any contractual relationships. To the contrary, the undisputed evidence shows that Meta reported BrandTotal's extensions to Google because of the extensions' numerous violations of Meta's terms. *See* Ex. 40. And no reasonable factfinder could conclude that Meta knew that emailing Google about two of BrandTotal's ten then-active extensions and applications would cause any disruption to any of BrandTotal's customer relationships.

***First***, Meta did not know whether or how Google would respond to its email. *See* Karve Decl. ¶ 8. As Mr. Karve, one of the Meta employees who emailed Google, stated days after the email, ███████████████████████████████████████████████████████████ ████████. Ex. 45 at -143.

***Second***, Meta did not know that Google removing the extensions would cause BrandTotal to be unable to perform any contractual obligations. Meta understood generally that BrandTotal sold competitive marketing analytics, *see* Ex. 41, but there is no evidence that Meta "was sufficiently aware of the details" of BrandTotal's relationships—for example, whether BrandTotal had any obligation to provide any particular volume of data or whether BrandTotal depended upon data collected through its extensions as opposed to by other means—"to form an intent to harm" BrandTotal. *Davis v. Nadrich*, 174 Cal. App. 4th 1, 11 (2009); *accord Winchester Mystery House, LLC v. Global Asylum, Inc.*, 210 Cal. App. 4th 579, 596-97 (2012) (affirming summary judgment on this basis). And, as discussed below, the chain of events connecting the removal of BrandTotal's extensions to any harm to its customer relationships was too long and contingent upon too many

unknown circumstances to permit any inference that Meta knew with the requisite certainty that its email to Google would cause the disruption of any customer relationships.

        b.   <u>No reasonable factfinder could conclude that Meta proximately caused the disruption of any customer relationship</u>

Under California law, proximate cause is assessed based on, among other things, "the connection between defendants' conduct, the harm intended, and the harm actually caused." *San Francisco v. Philip Morris, Inc.*, 957 F. Supp. 1130, 1142 (N.D. Cal. 1997). "[I]nterference becomes less certain as the time frame expands, the identity of potential victims becomes more vague, [and] the causal sequence becomes more attenuated." *Korea Supply*, 29 Cal. 4th at 1165. Summary judgment is required on an IIPEA claim where the "logical string" connecting the purportedly interfering act with any resulting harm is "too attenuated." *KARBZ, Inc. v. MRP of Mich., Inc.*, 2013 WL 12086317, at *6 (C.D. Cal. Aug. 26, 2013); *cf. Martinez v. California*, 444 U.S. 277, 284-85 (1980) (holding five-month delay broke causation).

BrandTotal contends that ████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████ Ex. 36 at 5-6. But these purported disruptions occurred ████████████████ after Meta's September 21, 2020 email to Google, and the chain of events connecting those events is too long and disjointed to support any finding of proximate cause. *See Korea Supply*, 29 Cal. 4th at 1166.

For any reasonable factfinder to find that Meta's September 21, 2020 email proximately caused the disruption of BrandTotal's customer relationships, BrandTotal would have to show that (1) Google removed UpVoice from the Chrome Store at Meta's request, rather than for its own independent reasons; (2) BrandTotal could not obtain sufficient data after Google removed UpVoice; and (3) any contract cancelations or credits offered months later were caused primarily by the removal of the extensions and not subsequent data disruptions caused by other factors. The undisputed evidence breaks every link in this already implausible chain of causation.

*First*, Google did not remove UpVoice at the behest of Meta. Instead, the undisputed

1   evidence shows that Google first independently investigated the two extensions (UpVoice and

2   Who's Following Me) and independently determined that ████████████████████████████

3   ████████████████████████████████████████████████████████████████████████████████

4   ██████████████████. Ex. 38 at 03, 11-13; Ackerman Decl. ¶¶ 12-14. Notably, Google's

5   reasons for removing UpVoice and Who's Following Me included concerns different from those

6   Meta had flagged. While Google's review confirmed that BrandTotal did not adequately disclose

7   its collection of user data (████████████████████████████████████████████████████

8   ████████), Google also determined that BrandTotal ████████████████████████████████

9   ██████████████████████████████ Ex. 38 at 10-13.

       ***Second***, BrandTotal continued to receive the data it needed from multiple sources

11  notwithstanding Google's removal of some of its extensions. For example, Google did not remove

12  BrandTotal's Phoenix and Social One applications, which continue to provide data to BrandTotal

13  to this day. *See* Ex. 22 at 77:4-80:13, 97:10-11. And for many users of the removed extensions,

14  the extensions remained installed and operational long after they were taken off the Chrome Web

15  Store. *See id.* at 91:19-92:19, 96:9-22. Indeed, BrandTotal told its customers ███████████████

16  ████████████████████████████████████████████████████████████████████████████████

17  ██████████████████████████████ Ex. 46 at 104.

       ***Third***, even if a subsequent disruption to BrandTotal's ability to scrape data occurred, the

19  undisputed facts show that factors other than Google's removal of UpVoice and Who's Following

20  Me caused it. According to BrandTotal, disruptions to its ability to scrape data first arose after

21  routine changes to the structure of data on Twitter and Facebook around January 2021 caused

22  BrandTotal's still-operational applications and extensions to no longer collect data from those

23  platforms. *See* Ex. 22 at 91:19-95:14; Ex. 47 at 23:25-24:4; Ex. 48 178:17-180:6; *see also id.* at

24  159:15-160:16 (testifying that ████████████████████████████████████████). It was not

25  until these independent events affected BrandTotal's access to data that any customer ███████

26  ████████████████████████████████████████████████████████████████████████████████

27  _____

28  [10] BrandTotal's damages expert ████████████████████████████████████" Ex. 62 at 25, but
    the undisputed evidence shows no actionable terminations. ████████████████████████████

1     ███████ . *See* Exs. 50, 51, 53, 54; *see also* Ex. 55 at 280:12-296:25. Moreover, BrandTotal

2     expressly communicated to its customers that it was ████████████████████████

3     ████████████████████████████████████████████████████████████████

4     ████████████████████████████████████████████████████████████████

5     ██████████████████████ . *See* Ex. 50; *see also* Ex. 47 at 41:15-42:4 (████████████

6     ████████████████████████████████████████████████████████████████

7     ████████████████████ ). And BrandTotal's own head of customer success testified that disruptions

8     to BrandTotal's customer relationships were caused ████████████████████████████

9     ████████████████ Ex. 48 at 37:18-20, 96:18-98:10, 184:9-187:7; *see UCP Int'l Co. v. Balsam*

10    *Brands Inc.*, 420 F. Supp. 3d 966, 980-82 (N.D. Cal. 2019) (non-frivolous litigation activity cannot

11    support an interference claim).

12          In light of all of this, no reasonable factfinder could conclude that Meta's September 21,

13    2020 email, as opposed to the myriad other reasons why customers might decline to renew or

14    accept credits on contract renewals, caused BrandTotal's purported harm. Indeed, BrandTotal's

15    own documents show that it ████████████████████████████████████████████████

16    ████████████████████████████████████████████████████████████████

17    ████████████████████████████████████████████████████████████████

18    ████████████████████████████████████████████████████████████████

19    ████████████████████████████████████████████████████████████████

20    ████████████████████████████████████████████████████████████████

21    Unsurprisingly, in light of all of these factors, BrandTotal ████████████████████████

22    ────────────────────────────

23    ████████████████████████████████████ *See* Ex. 46. █████

24    ████ long after Meta's purportedly interfering act, and then ████████████████████

25    ████████████████████████████████████████████████████████████████

26    ██████████████████████████████████ Ex. 48 at 104:3-11, 201:5-202:2; Ex. 60. Contract

27    renewals, contracts that did not exist at the time of the purportedly interfering act, and at-will

     contracts cannot support an interference with contract claim. *See Ixchel Pharma, LLC v. Biogen,*

28    *Inc.*, 9 Cal. 5th 1130, 1147 (2020) (contract renewal); *Reeves*, 33 Cal. 4th at 1152 (at-will contact);

     *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 392-93 (1995) (prospective

     contractual relationship).

1      █████████████. *See* Ex. 7 at 152:19-153:7. And, tellingly, BrandTotal's head of

2  customer success could not say ███████████████████████████████████

3  ███████████████████████. *See* Ex. 55 at 281:11-18, 290:15-25, 296:5-

4  297:7, 300:25-301:11.

5      Because no reasonable factfinder could find from this undisputed evidence that Meta's

6  purportedly tortious September 2020 email to Google proximately caused any disruption to

7  BrandTotal's customer relationships months later, Meta is entitled to judgment as a matter of law.

8  *See Dual Diagnosis Treatment Ctr., Inc. v. Centene Corp.*, 2021 WL 4464204, at *2 (C.D. Cal.

9  May 7, 2021) (multiple months and intervening discretionary decisions break proximate cause).

10                  c.  <u>Meta's purportedly interfering act was not independently wrongful</u>

11      Meta is also entitled to judgment because no reasonable factfinder could conclude that

12  Meta's conduct was independently wrongful. *See Korea Supply*, 29 Cal. 4th at 1158-59 (an act is

13  wrongful if "unlawful, that is, … proscribed by some constitutional, statutory, regulatory, common

14  law, or other determinable legal standard").

15      BrandTotal contends that Meta's purported interference was independently wrongful

16  because its September 2020 email to Google ███████████████████████████████

17  █████████████████" Ex. 36 at 5. But as discussed above (at 25-26), no reasonable factfinder

18  could conclude based on the undisputed evidence that Meta knew at the time of the email that any

19  statement made regarding Meta's understanding of the operation of BrandTotal's extensions was

20  false or recklessly made, and the email was therefore not independently unlawful. *See Arntz*

21  *Contracting Co. v. St. Paul Fire & Marine Ins. Co.*, 47 Cal. App. 4th 464, 480 (1996).

22          2.  <u>Even If BrandTotal's Customer Contracts Were Not Unenforceable,</u>
<u>BrandTotal's Interference Claim Would Fail As A Matter Of Law</u>

23

24      BrandTotal's claim still fails as a matter of law even if viewed as an interference with

25  contract claim. To prove an interference with contract claim, BrandTotal must establish: (1) the

26  existence of a valid contract, (2) that Meta knew of that contract, (3) that Meta's intentional acts

27  were designed to induce a breach or disruption of the contractual relationship, (4) an actual breach

28  or disruption of the contractual relationship, and (5) that the breach or disruption resulted from

1   Meta's interfering act. *Reeves v. Hanlon*, 33 Cal. 4th at 1148.

2         The undisputed evidence shows that BrandTotal cannot satisfy at least two of these

3   elements. The third element overlaps with an IIPEA claim, and Meta is entitled to judgment on the

4   basis of that element for the reasons already stated. *See supra* pp. 27-28 And on the fourth element,

5   BrandTotal cannot establish the breach or disruption of any ongoing contractual relationship with

6   respect to all but two of the customer relationships purported interfered with. BrandTotal identifies

7   ███████████████████████████████████████████████████████████

8   ███████████████████████████████████████████████████████████

9   ███████████████████████████████████████████████████████████

10  ███████████████████████████████████████████████████████████

11  ██████ *See* Ex. 36 at 4; Ex. 62 at 25-39.[11] The undisputed facts show that for all but two of those

12  customers ████████████████████████████████████████████████████

13  ████████████████████ and cannot therefore support an interference with contract claim. *See Ixchel*

14  *Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1147 (2020).

15        BrandTotal contends that its contracts with ███████████████████████████

16  ███████████████████████████████████████████████████████████

17  ████████████████████████████████████████████. *See* Ex. 36 at 6; Ex. 62 at 31, 39;

18  *see also* Ex. 68.[12] But ███████████████████████████████████████

19  ████████████████████ ██████████████████████████████████████

20  ████████████████████████████████. Exs. 69, 70, 71; *see also* Ex. 55 at

21  _____

22  [11] BrandTotal's interrogatory responses identify two customers, ██████████████████

23  ████████████, not included in its damages report. *See* Ex. 36 at 4. Because BrandTotal claims no harm in connection with these relationships, Meta understands BrandTotal to no longer pursue any interference claim as to them. Regardless, BrandTotal could not state an interference with contract

24  claim as to either because ██████████████████████████████, *see* Ex. 63, and the only possible harm associated with BrandTotal's contract with ██████████████████

25  ████████████████████████. *See* Ex. 68.

26  [12] Mr. Hoffman's report categorizes all loss associated with ██████ as loss due to contract termination, *see* Ex. 62 at 29, but the undisputed evidence shows that ████████████████████

27  ████████████████████████████████████████. *See* Ex. 60; *see also* Ex 48 at 103:5-15.

28  [13] BrandTotal's contracts with ████████████████████████████████████████████████
    ██████████ *See* Ex. 65 (████████); Exs. 66 & 67 (████████); Exs. 58 & 59 (██████████████).

1  274:23-276, 281:4-6 (█████████████████████). The same is

2  true of ████, *see* Exs. 53, 68, 72, ████████, *see* Exs. 49, 68, 73, L'Oreal, *see* Exs. 67, 68,

3  ████, *see* Ex. 60, and ████████, *see* Exs. 68, 74. And ████████████████

4  █████████████████ Ex. 19 at 56:17-20; Ex. 46.[14] These contracts therefore cannot

5  support an interference with contact claim. *See Ixchel Pharma, LLC,* 9 Cal. 5th at 1147.[15]

6       As for ████████████, the undisputed evidence shows that ████████

7  ████████████████████████████████████████████

8  ████████ *See* Ex. 55 at 324:21-331:13; Ex. 76. ████████████

9  ████ *See* Ex. 55 at 331:7-13.

10      **D.**   **Contracts With UpVoice Panelists**

11           1.  <u>BrandTotal's Claim Must Satisfy The Elements Of IIPEA, But The Undisputed</u>
                <u>Facts Support Do Not Support Such A Claim</u>

12

13      As with BrandTotal's customer contracts, its panelist contracts cannot support any

14  interference claim because they have as their object the breach of BrandTotal's (and panelists')

15  contracts with Meta. *See Bed, Bath & Beyond,* 52 Cal. App. 4th at 879. At the very least,

16  BrandTotal's claim as to panelists must satisfy the elements of an IIPEA claim both because its

17  contracts are unlawful, *id.*, and also terminable at will, *see* Ex. 77 at -402; *see also Ixchel Parm.*,

18  9 Cal. 5th at 1147; *Lovesy v. Armed Forces Ben. Ass'n,* 2008 WL 696991, at *11 (N.D. Cal. Mar.

19  13, 2008) ("As a matter of law, a claim for interference with contract is improper if the contract is

20  'at-will.'"). The undisputed facts support no such claim.

21

22

23  [14] Additionally, ████████ *See* Ex. 55 at 307:2-25; Ex. 75 at 15; *see also UCP Int'l Co.*, 420 F. Supp.

24  3d at 980-82 (non-frivolous litigation activity cannot support an interference claim).

25  [15] BrandTotal claims harm associated with two additional ████████ contracts (for the ████

26  ████████) that were entered *after* Meta's purportedly interfering act. *See*
    Ex. 62 at 25; Ex. 56 (████████████████); Ex. 57 (████

27  ████). The same is true of BrandTotal's contract with ████
    *See* Ex. 64 (████████████████).

28  Because these contracts were at most prospective business relationships at the time of Meta's
    purportedly interfering act, they cannot support an interference with contract claim. *See Della
    Penna v. Toyota Motor Sales, U.S.A., Inc,* 11 Cal. 4th 376, 392-93 (1995).

1

2

      a.  No reasonable factfinder could conclude that Meta proximately caused the disruption of any panelist relationships or any harm therefrom

3

4

5

6

BrandTotal contends that Meta caused the disruption of its relationships with panelists because, after Google removed UpVoice from the Chrome Web Store, ███████████ ████████████████████████████████████████████████████████████████████ ██████████████. Ex. 36 at 5. To prevail on its claim, BrandTotal must prove that it suffered

7

8

9

10

"economic harm … proximately caused by" Meta's purported interference. *Korea Supply*, 29 Cal. 4th at 1153. But no reasonable factfinder could find any such harm. BrandTotal contends that it was harmed because it had to ██████████████████████████████████████████ ████████████████████████████████████████████████████████████████ Ex.

11

12

13

36 at 5. BrandTotal, however, has identified no evidence substantiating any such economic harm; rather, the only harm BrandTotal has even attempted to substantiate concerns its relationships with *customers,* not panelists. *See generally* Ex. 62.

14

15

16

     ***Second***, even if economic harm purportedly suffered in connection with customer relationships could somehow also support BrandTotal's interference claim as to panelists, no reasonable factfinder would find the requisite proximate causation. *See supra* pp. 28-31.

17

      b.  Meta's purportedly interfering act was not independently wrongful

18

19

     For the reasons stated above, Meta is also entitled to judgment because no reasonable factfinder could conclude that Meta's conduct was independently wrongful. *See supra* pp. 31.

20

21

    2.  Even if BrandTotal's Panelist Contracts Were Enforceable And Its Claims Were Viewed As Interference With Contract Claims, Meta Is Entitled To Judgment As A Matter Of Law

22

23

24

25

26

27

28

     Meta is entitled to judgment even viewing this as an interference with contract claim because no reasonable factfinder could conclude that Meta intended to induce the breach or disruption of BrandTotal's contracts with panelists. BrandTotal does not contend that Meta had any specific intent to induce a breach of its contracts with panelists. *See* Ex. 36 at 3-6. Further, the record shows that Meta knew that it was ***not*** certain that Google would respond to its email by removing BrandTotal's extensions. *See* Ex. 45 at -143; Karve Decl. ¶ 8. And though the evidence generally shows that Meta was aware that BrandTotal agreed to pay panelists for using UpVoice,

1   *see* Ex. 40 at -694-95, there is no evidence from which a factfinder could infer that Meta knew that

2   the removal of UpVoice would cause panelists ███████████████████████████████████████

3   (through, for example, the UpVoice website instead of the extension itself).

### E.   BrandTotal's Contracts With Google

1.   <u>Because Its Contract with Google Is Unenforceable, BrandTotal's Claim Must At Least Satisfy The Elements Of Interference With Prospective Economic Advantage, But The Undisputed Evidence Supports No Such Claim</u>

Once again, at the very least, BrandTotal's claim must satisfy the elements of an IIPEA claim. In additional to the relevant rights being unenforceable, BrandTotal's contracts with Google are also terminable at will. *See* Ackerman Decl. ¶¶ 20-21; *see also Bed, Bath & Beyond*, 52 Cal. App. 4th at 879; *Reeves*, Cal. 4th at 1152. The undisputed record, however, supports no IIPEA claim. As already discussed, no reasonable factfinder could conclude that Meta's conduct was independently wrongful, and therefore Meta is entitled to judgement as a matter of law on BrandTotal's interference claim. *See supra*, p. 31.

2.   <u>Even if BrandTotal's Google Contract Were Enforceable And Its Claim Were Viewed As An Interference With Contract Claim, The Undisputed Evidence Supports No Such Claim</u>

Even viewed as an interference with contract claim, Meta is entitled to summary judgment. As discussed above, the undisputed facts show that Meta did not know whether or how Google would respond to its request to look into BrandTotal's extensions. *See* Ex. 45 at -143. Accordingly, there is no triable dispute of fact and Meta is entitled to judgment as a matter of law. *See Oakley, Inc. v. Nike, Inc.*, 988 F. Supp. 2d 1130, 1138 (C.D. Cal. 2013) (granting summary judgment where evidence showed defendant did not know interference was substantially certain).

## VI.   JUDGEMENT IS WARRANTED ON BRANDTOTAL'S UCL CLAIM

BrandTotal contends Meta violated the unlawful prong of the UCL by interfering with its business relationships. *See* Dkt. 183 ¶¶ 140-146. This claim falls with the interference claim.

### CONCLUSION

For these reasons, the Court should grant Meta's motion for partial summary judgment.

1    Dated: March 11, 2022                    Respectfully submitted,

2                                             /s/ Sonal N. Mehta

3
     ARI HOLTZBLATT (*pro hac vice*)           WILMER CUTLER PICKERING
4    Ari.Holtzblatt@wilmerhale.com             HALE AND DORR LLP
     ALLISON SCHULTZ (pro hac vice)            SONAL N. MEHTA (SBN 222086)
5    Allison.Schultz@wilmerhale.com            Sonal.Mehta@wilmerhale.com
     ROBIN C. BURRELL (pro hac vice)           2600 El Camino Real, Suite 400
6    robin.burrell@wilmerhale.com              Palo Alto, California 94306
     1875 Pennsylvania Ave, NW                 Telephone: (650) 858-6000
7    Washington, DC 20006                      Facsimile: (650) 858-6100
     Telephone: (202) 663-6000
8    Facsimile: (202) 663-6363                 ANDY R. O'LAUGHLIN (*pro hac vice*)
                                               andy.olaughlin@wilmerhale.com
9    *Attorneys for Plaintiff/Counterclaim Defendant*   60 State Street
10   *Meta Platforms, Inc.*                    Boston, MA 02109
                                               Telephone: (617) 526-6220
11                                             Facsimile: (617) 526-5000

12                                             CINDY PAN (*pro hac vice*)
13                                             cindy.pan@wilmerhale.com
                                               250 Greenwich Street
14                                             New York, NY 10007
                                               Telephone: (212) 937-7275
15                                             Facsimile: (212) 230-8888

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 11, 2012 electronically filed the above document with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all registered counsel.

Dated:   March 11, 2022           By:    *Sonal N. Mehta*
                                       Sonal N. Mehta