## REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Rudolph A. Telscher, Jr.*
rudy.telscher@huschblackwell.com
Kara R. Fussner*
kara.fussner@huschblackwell.com
HUSCH BLACKWELL LLP
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
314-480-1500 Telephone

Ryan B. Hauer*
ryan.hauer@huschblackwell.com
David E. Anderson*
david.anderson@huschblackwell.com
HUSCH BLACKWELL LLP
120 South Riverside Plaza Suite 2200
Chicago, IL 60606
312-655-1500 Telephone

David Stauss*
david.stauss@huschblackwell.com
Dustin L. Taylor*
dustin.taylor@huschblackwell.com
HUSCH BLACKWELL LLP
180 1 Wewatta Street, Suite 1000
Denver, CO 80202
303-749-7200 Telephone
*admitted *pro hac vice*

Stephen P. Bosco*
stephen.bosco@huschblackwell.com
HUSCH BLACKWELL LLP
750 17th Street, NW, Suite 900
Washington, DC 20006
202-378-2300 Telephone

Karl Kronenberger (CA Bar No. 226112)
karl@krinternetlaw.com
Jeffrey M. Rosenfeld (CA Bar No. 222187)
jeff@krinternetlaw.com
KRONENBERGER ROSENFELD, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
415-955-1155 Telephone
415-955-1158 Facsimile

*Attorneys for Defendants/Counterclaim
Plaintiffs BrandTotal, Ltd. and Unimania,
Inc.*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO/OAKLAND DIVISION

| | |
|---|---|
| META PLATFORMS, INC., a Delaware corporation,<br><br>    *Plaintiff/Counterclaim Defendant*,<br><br>v.<br><br>BRANDTOTAL, LTD., an Israeli corporation, and UNIMANIA, INC., a Delaware corporation,<br><br>    *Defendants/Counterclaim Plaintiffs*. | Case No.: 3:20-CV-07182-JCS<br><br>**BRANDTOTAL'S OPPOSITION TO META PLATFORMS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Judge:  The Hon. Joseph C. Spero<br>Ctrm.:  Courtroom F – 15th Floor<br>Date:   April 29, 2022<br>Time:   9:30 A.M. |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

<u>**TABLE OF CONTENTS**</u>

Page

TABLE OF CONTENTS ............................................................................................ i

TABLE OF AUTHORITIES ..................................................................................... iii

I.      INTRODUCTION & STATEMENT OF ISSUES ......................................... 1

II.     STATEMENT OF FACTS ............................................................................ 2

    A.      Meta Never Grants "Permission" for Automatic Collection Outside Its APIs ....... 2

    B.      BrandTotal Carefully Designed Its Applications and Extensions to Collect Only What Users Agreed to Share and to Protect That Information ............................. 3

    C.      Investigations into BrandTotal ............................................................ 5

    D.      Meta's Conduct Directly Caused BrandTotal Severe Harm ................................. 8

III.    ARGUMENT ............................................................................................... 10

    A.      Meta is Not Entitled to Summary Judgment on Its Breach of Contract Claim ..... 10

        1.      Meta's Terms of Service Are Unenforceable ............................................. 10

        2.      Meta Has Not Carried Its Burden to Prove Any Damages Attributable to BrandTotal's Alleged Breach ............................................................... 13

            a.      None of Meta's Alleged Compensatory Damages Were Caused by BrandTotal's Alleged Breach ........................................................ 14

            b.      Meta's Manifestly Unfair Unjust Enrichment Claim Cannot Preserve Its Deficient Damages Claim ........................................... 17

        3.      BrandTotal's Contract Termination Defense is Meritorious and at a Minimum Involves Disputed Factual Issues That Preclude Summary Judgment ........................................................... 20

        4.      Other Factual Issues Preclude Summary Judgment ................................... 22

    B.      Judgment is Not Warranted on Meta's CFAA Claims........................................ 22

        1.      Meta Has Not Shown that BrandTotal Caused a Loss of $5,000 or More 22

        2.      BrandTotal's Current Collection Software Does Not Violate the CFAA. 23

            a.      BrandTotal's Extensions Do Not Access Meta's Computers ....... 23

            b.      BrandTotal's Server-Side Collection Does Not Violate the CFAA ................................................................................................ 25

    C.      Meta Is Not Entitled to Summary Judgment on Its CDAFA and UCL Claims .... 26

    D.      Judgment for Meta is Not Warranted on BrandTotal's Interference Claims ........ 26

        1.      BrandTotal's Contracts are Not Unlawful ............................................... 27

        2.      Meta Was Not "Justified" in Making False Statements to Google........... 29

        3.      A Reasonable Juror Could Find Meta Interfered with BrandTotal's Customer Contracts ........................................................... 31

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

a.      Reasonable Inferences Show Meta Intended to Interfere with BrandTotal's Customer Contracts ................................................... 31

b.      The Evidence Supports a Jury Finding that the Disruption to BrandTotal was the Direct Result of Meta's Interference ............ 32

c.      The Evidence Supports a Jury Finding that Existing Customer Contracts Were Lost and BrandTotal Damaged by Meta's Actions ............................................................................................. 34

4.     Meta Interfered with UpVoice Panelists and BrandTotal's Google Offerings ...................................................................................... 34

E.     Summary Judgment Should Be Denied on BrandTotal's UCL Claim ................. 35

IV.    CONCLUSION ............................................................................................... 35

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aguilera v. Pirelli Armstrong Tire Corp.*,
   223 F.3d 1010 (9th Cir. 2000)....................................................................................14, 16

*Altera Corp. v. Clear Logic, Inc*.,
   424 F.3d 1079 (9th Cir. 2005)............................................................................................32

*AtPac, Inc. v. Aptitude Solutions, Inc.*,
   730 F. Supp. 2d 1174 (E.D. Cal. 2010)..............................................................................22

*Attebury Grain LLC v. Grayn Co.*,
   721 F. App'x 669 (9th Cir. 2018) ................................................................................18, 19

*Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture Partners*,
   52 Cal. App. 4th 867 (1997) ..............................................................................................28

*Bittman v. Fox*,
   107 F. Supp. 3d 896 (N.D. Ill. 2015) .................................................................................23

*Castillo v. CleanNet USA, Inc.*,
   358 F. Supp. 3d 912 (N.D. Cal. 2018) ...............................................................................21

*Congdon v. Uber Techs., Inc.*,
   291 F. Supp. 3d 1012 (N.D. Cal. 2018) .............................................................................21

*Dao v. Liberty Life Assurance Co. of Bos.*,
   No. 14-CV-04749-SI, 2015 WL 5882056 (N.D. Cal. Oct. 8, 2015)..........................................16

*E. & J. Gallo Winery v. Instituut Voor Landbouw-En Visserijonderzoek*,
   No. 1:17-cv-00808-DAD-EPG, 2018 WL 2463869 (E.D. Cal. June 1, 2018) ..........................16

*Experian Mktg. Sols., Inc. v. Lehman*,
   No. 1:15-CV-476, 2015 WL 5714541 (W.D. Mich. Sept. 29, 2015) ........................................25

*Facebook, Inc. v. Power Ventures, Inc.*,
   844 F.3d 1058 (9th Cir. 2016)............................................................................................24

*Facebook, Inc. v. Power Ventures, Inc.*,
   252 F. Supp. 3d 765 (N.D. Cal. 2017) ...............................................................................13

*Facebook, Inc. v. Sluchevsky*,
   Case No. 19-cv-01277-JSC, 2020 WL 5823277 (N. D. Cal. Aug. 28, 2020)............................13

*Foster Poultry Farms, Inc. v. SunTrust Bank*,
   377 F. App'x 665 (9th Cir. 2010) ................................................................................18, 19

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

*hiQ Labs, Inc. v. LinkedIn Corp.*,
938 F.3d 985 (9th Cir. 2019) .................................................................................. 11, 25

*In re Facebook Priv. Litig.*,
791 F. Supp. 2d 705 (N.D. Cal. 2011) ........................................................................ 18

*In re Facebook Priv. Litig.*,
No. 12-15619, 2012 WL 4764112 (9th Cir. Sept. 26, 2012) ...................................... 17

*In re iPhone Application Litig.*,
844 F. Supp. 2d 1040 (N.D. Cal. 2012) ...................................................................... 22

*Int'l Airport Centers, L.L.C. v. Citrin*,
440 F.3d 418 (7th Cir. 2006) ...................................................................................... 23

*Ixchel Pharma, LLC v. Biogen, Inc.*,
9 Cal. 5th 1130 (2020) .......................................................................................... 34, 35

*Johnston v. Kimberly-Clark Glob. Sales, LLC*,
542 F. App'x 600 (9th Cir. 2013) ............................................................................... 31

*Kendall-Jackson Winery, Ltd. v. Superior Ct.*,
76 Cal. App. 4th 970, (1999) ............................................................................... 19, 20

*Klein v. Chevron U.S.A., Inc.*,
202 Cal. App. 4th 1342, 137 Cal. Rptr. 3d 293 (2012) .............................................. 18

*Kluber Skahan & Associates, Inc. v. Cordogen, Clark & Assoc., Inc.*,
No. 08–CV–1529, 2009 WL 466812 (N.D. Ill. Feb. 25, 2009) .................................. 23

*Koninklijke Philips N.V. v. Elec-Tech Int'l Co.*,
No. 14-CV-02737-BLF, 2015 WL 1289984 (N.D. Cal. Mar. 20, 2015) ..................... 24

*Konop v. Hawaiian Airlines, Inc.*,
302 F.3d 868 (9th Cir. 2002) ...................................................................................... 26

*LinkedIn Corp. v. hiQ Labs., Inc.*,
141 S. Ct. 2752 (2021) ................................................................................................ 25

*Luxul Tech. Inc. v. NectarLux*, LLC,
No. 14-CV-03656-LHK, 2016 WL 3345464 (N.D. Cal. June 16, 2016) ................... 14

*Morgan Hill Concerned Parents Ass'n v. California Dep't of Educ.*,
258 F. Supp. 3d 1114 (E.D. Cal. 2017) ...................................................................... 20

*Oracle Corp. v. SAP AG*,
734 F. Supp. 2d 956 (N.D. Cal. 2010) ........................................................................ 23

*Packingham v. North Carolina*,
137 S. Ct. 1730, (2017) ............................................................................................... 12

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

*Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*,
  96 F.3d 1151 (9th Cir. 1996) .......................................................................................... 18

*Quelimane Co. v. Stewart Title Guaranty Co.*,
  19 Cal. 4th 26 (1998) ..................................................................................................... 29

*Reeves v. Hanlon*,
  33 Cal. 4th 1140 (2004) .................................................................................................. 34

*Rock River Commc'ns, Inc. v. Universal Music Grp., Inc.*,
  745 F.3d 343 (9th Cir. 2014) .......................................................................................... 27

*Ruiz v. Gap, Inc.*,
  622 F. Supp. 2d 908 (N.D. Cal. 2009) ............................................................................ 17

*Saroya v. Univ. of the Pac.*,
  503 F. Supp. 3d 986 (N.D. Cal. 2020) ............................................................................ 18

*Shamrock Foods Co. v. Gast*,
  535 F. Supp. 2d 962 (D. Ariz. 2008) .............................................................................. 24

*Shuman v. SquareTrade Inc.*,
  Case No. 20-cv-02725-JCS, 2020 WL 12894954 (N.D. Cal. Aug 31, 2020) ................ 28

*SIC Metals, Inc. v. Hyundai Steel Co.*,
  442 F. Supp. 3d 1251 (C.D. Cal. 2020) .......................................................................... 29

*St. Paul Fire & Marine Ins. Co. v. Am. Dynasty Surplus Lines Ins. Co.*,
  101 Cal. App. 4th 1038, (2002) ...................................................................................... 15

*Stackla, Inc. v. Facebook Inc.*,
  19-CV-05849-PJH, 2019 WL 4738288 (N.D. Cal. Sept. 27, 2019) ............................. 13

*Steelduct Co. v. Henger-Seltzer Co.*,
  26 Cal. 2d 634 (1945) ..................................................................................................... 14

*Svenson v. Google Inc.*,
  65 F. Supp. 3d 717 (N.D. Cal. 2014) .............................................................................. 18

*United States v. Nosal*,
  676 F.3d 854 (9th Cir. 2012) .......................................................................................... 24

*United States v. Nosal*,
  No. CR-08-0237 EMC, 2014 WL 121519 (N.D. Cal. Jan. 13, 2014) ........................... 22

*Van Buren v. United States*,
  141 S. Ct. 1648 (2021) .................................................................................................... 25

*Welenco, Inc. v. Corbell*,
  126 F. Supp. 3d 1154 (E.D. Cal. 2015) .......................................................................... 22

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

*Williams v. Eaze Solutions, Inc.*,
  417 F. Supp. 3d 1233 (N.D. Cal. 2019) .......................................................................28

*Yoo v. Jho*,
  147 Cal. App. 4th 1249 (2007) ...................................................................................28

**Statutes**

18 U.S.C. § 1030(c)(4)(A)(i)(1) .....................................................................................22

Cal. Civ. Code § 3300 ...................................................................................................14

Cal. Penal Code § 502 ...................................................................................................26

**Rules**

Fed. R. Civ. P. 8 ............................................................................................................18

**Other Authorities**

Restatement 2d of Torts § 766 ......................................................................................29

Restatement of Contracts § 576 ....................................................................................28

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

I.    **INTRODUCTION & STATEMENT OF ISSUES**

The core legal and policy issues in this case have never been clearer. Meta's position is that it has an absolute, unfettered right to use its Terms of Service and the CFAA to foreclose not only (1) all automated collection of data from any part of its platforms—regardless of whether the data is otherwise public or whether the collection is user-authorized—but also (2) all automated collection of data from user' computers, regardless of whether the collection is user-authorized. Not only that, but Meta claims it can do so with impunity even if the only "harm" it experienced from the collection are the costs generated by its own enforcement efforts. This is wrong as matter of law, policy, and fundamental fairness.

*First*, Meta's claim that it entitled to summary judgment on its breach of contract claim fails at the outset because its Terms of Service ("ToS") are unenforceable. As explained in BrandTotal's summary judgment brief and further discussed below, enforcement of the ToS in the manner Meta seeks would subvert core public policy interests in user autonomy, competition in the data analytics market, and the free flow of information. Meta's brief does not meaningfully engage with these issues—even though they have been central to the case from the outset—and Meta has notably backed away from its prior argument that enforcement against BrandTotal was necessary to comply with its FTC obligations. Meta's request for summary judgment should also be denied because it has failed to establish the existence of cognizable damages, and because of contested facts about BrandTotal's data collection.

*Second*, Meta's request for judgment on its CFAA, CDAFA and UCL claims should be denied because they hinge on an extreme interpretation of these statutes that would allow Meta to use them to regulate data collection outside of computer systems it controls—a result that is contrary to Ninth Circuit and Supreme Court case law. At a minimum, disputed facts about technical aspects of BrandTotal's collection preclude summary judgment.

*Third*, Meta's contention that it's entitled to judgment on BrandTotal's counterclaims fails both because it hinges on argument that BrandTotal's collection activities are unlawful in the first instance—they are not—and because it impermissibly seeks to deprive the jury of the

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   opportunity to decide contested factual issues related to Meta's efforts to induce Google to

2   remove BrandTotal's products from its platform, and the resulting harm from that action.

3   **II.      STATEMENT OF FACTS**

4          **A.      Meta Never Grants "Permission" for Automatic Collection Outside Its APIs**

5          Meta's Terms of Service ("ToS") for the Facebook platform provide that anyone who

6   agrees to the ToS cannot collect data using automated means without Meta's permission. Ex. 5[1];

7   Dkt. 272 at 3. Similarly, Section VII of Meta's consent judgment with the Federal Trade

8   Commission ("FTC") mandates a "privacy program" under which an entity that accesses Covered

9   Information from Meta "for use in an independent, third-party consumer application or website"

10  must self-certify compliance with Meta's platform terms and identify the purpose(s) or use(s) for

11  each Covered Information to which it requests or continues to have access. Dkt. 161-5. Under this

12  system, Meta must monitor third-party compliance with its terms "through measures including,

13  but not limited to, ongoing manual reviews and automated scans, and regular assessments, audits,

14  or other technical and operational testing at least once every twelve (12) months." *Id*. at 9. Despite

15  these programs that envision a review process and the ability for third parties to obtain

16  information, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18         Much of the information on Meta's platforms is public. Information Meta contends

19  belongs to advertisers on Meta's platforms is the same information advertisers have recognized is

20  public for decades. Ex. M at § VI.A. This information is commonly publicly accessible by simply

21  driving down the highway (billboards), picking up a magazine (print), or turning on the TV or

22  radio (TV/radio spots). *Id*.[2] Meta places this otherwise-public information behind the "walled

23  garden" of its sites and declares it to be Meta's property. BrandTotal's Panelists, who are users of

24  Facebook and/or Instagram, agree to share information with BrandTotal, including their

25

26  [1] Citations to Ex. 1, 2, 3, etc. refer to exhibits to Meta's brief in support of its Motion for Partial
    Summary Judgment. Dkt. 272. Citations to Ex. A, B, C, etc. refer to exhibits to the Declaration of
27  Dustin L. Taylor in Support of BrandTotal's Opposition.
    [2] Although Meta's expert, Dr. Thaw, claimed that it was the order in which the advertisements
28  appeared in the news feed that was proprietary, Ex. L, 107:4–109:5, this is no different than the
    order of ads in a magazine or on tv.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1  demographic information (UpVoice (Legacy), Phoenix, and Social One) and information about

2  the advertisements they are shown (all applications/extensions, including UpVoice (2021)). Ex.

3  20. Meta prohibits its users from sharing this information under the guise of "sharing their

4  account." Ex. 80, Response to ROG No. 21. Meta even takes steps to block access to portions of

5  its website that are *not* part of a users' feed. For example, for portions of its website that are not

6  password protected, such as the advertisement-URL, if Meta detects that a computer is requesting

7  to access the advertisement-URL, it requires entry of a password when one is otherwise not

8  required. Ex. 1 at § 4.13.4. ██████████████████████████████

9  ██████████████  Ex. A, 81:11-82:4, 84:20-85:23.[3]

**B.      BrandTotal Carefully Designed Its Applications and Extensions to Collect**

**Only What Users Agreed to Share and to Protect That Information**

12        BrandTotal has been collecting data from the Facebook and other on-line social media sites

13  since April 2018. Ex. J, 274:4–9; Ex. 1, ¶ 604. Throughout this time, BrandTotal has diligently

14  worked to protect the privacy of its users and the data that it collects. It worked to comply with

15  GDPR and CCPA requirements and promoted this compliance when pitching new business. Ex. Q

16  at BT0049263 ("partnering with an EU GDPR representative"); Ex. R at BT0069904. It also

17  transmitted data securely over a HTTPS connection. Ex. J, 144:12–145:14.

18        BrandTotal has also diligently and quickly addressed any data security issues of which it

19  became aware. BrandTotal upgraded its hashing function that is used to encrypt transmitted

20  information by changing from a static to a random salt in response to an *AdGuard* article in 2018.

21  Ex. C, 148:10–13, 151:9–14; Ex. J, 119:17–121:4. BrandTotal implemented a secondary consent

22  notification that asks Panelists to opt-in each time the Panelist uses UpVoice (2021) with a new

23  account. Ex. 20, ¶¶ 34–36. BrandTotal maintains that such a secondary opt-in notice was not

24  required because its extensions and applications operated on the Chrome browser and Android

25  applications, respectively, both of which are user-profile specific. Indeed, the use of such an opt-in

26  notification each time a new account is used is contrary to the industry standard. Google Chrome

27  saves passwords (including to bank accounts), without this opt-in safeguard. Ex. GG. Meta itself

---

[3] Meta also specifically blocked IP addresses associated with BrandTotal. Dkt. 272 at 5.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1  allows a user to access whatever account was last logged-in or to switch accounts on the shared

2  computer. Ex. HH. Regardless, to address concerns stated by Meta and this Court *after* the

3  litigation began, BrandTotal implemented this feature. BrandTotal also corrected a "logger"

4  functionality that transmitted user information to a BrandTotal resource that was accessible only

5  by BrandTotal's developmental team for use in troubleshooting BrandTotal's software. Ex. J,

6  172:20–174:16. This functionality was present in code for four months and removed by

7  BrandTotal. *Id.*; *see also* Ex. 1 at ¶¶ 458, 460. Although Meta argues BrandTotal made these

8  changes only after the risks were brought to BrandTotal's attention, Dkt. 272 at 5–7, it ignores that

9  software companies (including Meta) often have bugs that present unintentional risks and are

10  corrected once the issue is brought to their attention. *See* Ex. FF (discussing history of Meta

11  security breaches, many of which were due to "bugs" or the actions of Meta employees, such as

12  storing as many as 600 million Facebook user passwords in plaintext files).

13  In early 2021, BrandTotal redesigned and launched its flagship UpVoice program. Later

14  that year, BrandTotal also modified its "backend" or "server side" collection software and

15  launched a new extension, to which the parties refer as the "Restricted Panel Extension" ("RPE"),

16  that followed the same guidelines as UpVoice (2021). Ex. J, 108:17–109:3, 137:22–138:5, 139:9–

17  140:19. Collectively these revisions address many of the criticisms Meta has made during this

18  litigation (despite not previously bringing them to BrandTotal's attention).

19  UpVoice (2021) does not make any calls to Meta servers. Ex. 1 at ¶ 472; *see also* Ex. F,

20  97:6–18. It exfiltrates only limited information relating to the advertisements the user has seen.

21  Ex. 1, ¶¶ 491–496. It does not collect any user-demographic information from Meta and instead

22  uses information the panelist provided during the sign-up and qualification process. *Id.* at ¶ 494.

23  As noted above, UpVoice (2021) also utilizes a secondary opt-in requirement, even after the

24  panelist has gone through BrandTotal's qualification process. Ex. 20 at ¶¶ 34–36. Before

25  BrandTotal began allowing panelists to share their Facebook data via UpVoice (2021),

26  BrandTotal sought Meta's permission to collect data via automated means. Exs. J–K to Dkt. 183.

27  Meta refused. *Id.*

28  BrandTotal also modified its backend code. BrandTotal's backend code used the creative

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1  ID that panelists shared with BrandTotal via the UpVoice (2021) or other applications/extensions

2  to visit the advertisement-URL. Ex. 20, ¶¶ 53–55. In the vast majority of instances, the

3  information is accessible without requiring the entry of a username or password. Ex. K, 155:10–

4  156:5.[4] In some limited instances, however, the advertisement-URL may be limited because the

5  content of the advertisement is restricted (such as alcohol). Ex. 1, ¶¶ 222–229.

6

7  Ex. K, 109:10–112:12.

8  Ex. 14, 51:2–17.

9  . Ex. K,

10  109:16–110:3, 143:14–18.

11  *Id.* at 135:8–138:5. Like UpVoice (2021), RPE exfiltrates and sends to

12  BrandTotal information that the panelist sees without making requests to Meta-controlled servers.

13  *Id.* at 137:22–140:19. The RPE collects the same information BrandTotal's backend collects from

14  non-password protected URLS. *Id.*; *see also* Ex. 23, ¶¶ 13, 18.

15      **C.    Investigations into BrandTotal**

16          Meta's internal documents show that Meta was not only aware of BrandTotal's data

17  collection since at least April 2018 but had also "investigated" BrandTotal and its software

18  shortly thereafter. Ex. O, Response to RFA No. 12.

19

20  Ex. T at FB_BRTL_00014655

21

22

23  Ex. 40 at

24  FB_BRTL_28694

25  ; *id.* at 28703

26

27  ─────────────

[4] Although Meta also employs "lockout" mechanisms when it detects the entity trying to access
the advertisement URL is not human, it does not require a password for the same URL if a
human visits the URL. Ex. F, 120:11–22.

28  [5] *See* Ex. EE at i (discussing use of fake accounts with Facebook).

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1    ████████████████████████████████████ Ex. S at FB_BRTL_00000053 ██████

2    ████████████████████████████████████████████

3    ██████████████████████████████████████████████

4    ██ (Dkt. 42 at ¶ 4), ████████████████████████████████

5    █████████████████████████████████████████

6    ████████████ Dkt. 205 at 3.

7    Meta's investigation further shows that Meta █████████████████████

8    ███████████████████████████████████████████████

9    ████████████████████████████████ Ex. W at

10   FB_BRTL_00025146. Documents Meta produced from its investigation into BrandTotal also

11   show Meta knew of BrandTotal and its relationships with specific customers. *See* Ex. X; Ex. Y;

12   Ex. Z. Meta often engaged in communications with BrandTotal and its customers. Ex. AA.

13   Companies that were both advertisers on Facebook.com and BrandTotal customers asked Meta

14   about BrandTotal. For example, on September 22, 2020, BrandTotal customer and Facebook-

15   advertiser FCA's advertising agency asked Meta to send any "watch outs they should be aware of

16   now that the clients are using" BrandTotal. Ex. U. Meta employees found BrandTotal "intriguing.

17   At least for us to understand methodology so we can be prepared to address these reports and

18   even better, potentially to engage in a partnership with Brand Total [sic] to proactively bring

19   insights for marketers." *Id*. Moreover, these internal documents show that ████████████████

20   ████████████████████████████████████████████

21   ████████ Ex. BB at FB_BRTL_00028738 █████████████████

22   ██████████████████████████████████████████

23   ████████    On September 24, 2020, Ms. Stephanie Elise Dailey contacted Mr. Karve, who was

24   on the team responsible for investigating BrandTotal, asking for information about

25   BrandTotal/UpVoice because "they've had several advertiser partners asking our sales team for

26   their POV on it's capabilities." Ex. V at FB_BRTL_00019356. Mr. Karve responded "[w]e're

27   enforcing on them this week." *Id*.

28   As part of Meta's "enforcement plan" against BrandTotal, Meta planned to ████████

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1    ███████████████████████████████████████ FB_BRTL_00028723 at 726

2    ██████████████████████████████████████████████████

3    ████████████████████████, Ex. T at FB_BRTL_00014657 █████

4    ██████████████████████████ Ex W at FB_BRTL_00025146 ████

5    █████████████████████████████████████ On Monday, September

6    21, 2020, Jeremy Brewer, a Meta employee, emailed a contact at Google, Ben Ackerman. Ex. 34

7    at FB_BRTL_00016961. Mr. Brewer represented that Meta had "found some Chrome extensions

8    we believe are improperly scraping user PII (e.g., gender, relationship status, ad interests, etc.)

9    without proper disclosure." *Id*. Another Meta employee, Sanchit Karve, also emailed Mr.

10   Ackerman that same day and stated that "[t]he extensions Jeremy mentioned [UpVoice and

11   AdsFeed] are closely related behaviorally to five extensions created by another developer

12   (OinkAndStuff) that have been removed recently." *Id*. at 960–961. When Mr. Ackerman did not

13   respond, Meta's Mr. Karve emailed him again on September 25[6] asking "if you've had a chance

14   to look into our request." *Id*. at 960. The following Tuesday, Google's Mr. Ackerman responded

15   "Ah . . . I'm familiar with them, I will get the three that are live looked at." *Id*.

16   ██████████████████████████████████████████████████

17   ██████████████████████████████████████████

18   ██████████████████████████████████████████████████

19   ████████████████████████████████████████████

20   ██████████████████████████████████████████████

21   ████████████████████████████████████████████████

22   ██████████████████████████████████████████████████

23   ██████████████████████████████████████

24   ██████████████████████████████████████████████

25   ██████████████████████████████████████████████

26   ██████████████████████████████████████████████

27   ────────────────────────

28   [6] This is the day after Mr. Karve was asked to share information about BrandTotal/UpVoice with Meta's sales team in response to several advertiser partners asking the sales team for their POV on its capabilities. Ex. V at FB_BRTL_00019356.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

In addition to going through Google to have the extensions removed from the Chrome Store, Meta also took "technical measures" against BrandTotal by terminating not only the business pages of BrandTotal but also the personal pages of its principals. Ex. D, 127:12–128:16, 129:11–15. ▮▮▮. *Id.* at 137:17–24. ▮▮▮ Ex. I, 33:24-34:16, 64:7-65:8.

**D.    Meta's Conduct Directly Caused BrandTotal Severe Harm**

BrandTotal provides advertising analytics services. BrandTotal's value proposition is its 'ability to aggregate the publicly available information,' including the information seen in users'

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1    social feed, but that would otherwise be difficult to access 'because of the volume of data and the

2    myriad of platforms that are available.'" Ex. M at ¶ 81 (citing Mansfield Dep. Tr. (Ex. E), 12:6–

3    19). BrandTotal provides several services to its customers, including ██████████████████

4    ████████████████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████████

6    ████████████████████. *Id.* at ¶¶ 100, 103; Ex. E, 81:7–16. ██████████████████

7    ████████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████████████

9    ████████████████████████████

10   ████████████. Ex. M, ¶ 104. To provide these services, BrandTotal collects data not only from

11   Facebook and Instagram, but also from Twitter, YouTube, LinkedIn, and also from non-social

12   channels Amazon and display banners. *Id.* at ¶ 84. ████████████████████████████

13   ████████████████████. Ex. H, 154:7–17, 182:21–183:3.

14       BrandTotal's UpVoice product allows Panelists to share data from multiple social media

15   platforms. Ex. 1 at 24–27. ████████████████████████████████████████████████████

16   ████████████████████████████████████████████. Dkt. 125, Dor Decl.,

17   ¶ 13; *see also* Ex. J, 282:2–8 (stating mobile collection from Phoenix and Social One is very low).

18   BrandTotal had previously lost the ability to control applications and extensions that had been

19   removed from the Google Chrome and Play Store. Ex. 22 at 95:15–18.

20       The UpVoice (Legacy) extension was removed from the Google Chrome Store on

21   October 1, 2020. Dkt. 148, ¶ 72. BrandTotal immediately lost its ability to not only receive data

22   from Panelists, but to provide Panelists with the gift cards they had already earned. Dkt. 26-5,

23   ¶ 26. BrandTotal lost its ability to receive Panelist-shared information across all channels, not

24   just Facebook and Instagram. Ex. H, 179:10–20. This severely compromised BrandTotal's

25   ability to provide its advertising analytics services, due to the lack of robust, reliable data. *Id.* at

26   154:7–17, 182:21–183:3. To address its inability to provide these services, BrandTotal ██████

27   ████████████████████████████████. *Id.* at 159:9–160:16. ████████████████████

28   ████████████████████████████████████████████. *Id.* at 162:16–163:20.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1

2 . *Id.* at 159:15–160:16. Despite these efforts, some customers ended their relationship

3 with BrandTotal. *See e.g.*, *id.* at 99:4–100:10, 103:8–23.

4 **III.    ARGUMENT**

5     **A.    Meta is Not Entitled to Summary Judgment on Its Breach of Contract Claim**

6         As BrandTotal explained in its motion for partial summary judgment—the relevant

7 portions of which BrandTotal incorporates by reference—Meta's terms of service are

8 unenforceable for two independent reasons—they are both contrary to public policy and

9 unconscionable.[8] Judgment in BrandTotal's favor on either theory disposes of Meta's motion as

10 to is breach of contract count. Further, Meta's damages theories are fatally flawed and do not

11 support a finding that Meta has experienced harm because of BrandTotal's alleged breach —a

12 necessary element of Meta's breach of contract claim. For at least these reasons, Meta's request

13 for summary judgment as to its breach of contract claim should be denied.

14         **1.    Meta's Terms of Service Are Unenforceable**

15         In its motion for summary judgment, BrandTotal explained at length why Meta's ToS are

16 unenforceable under the unconscionability doctrine and as contrary to three powerful public

17 policy goals: (1) promotion of user control over online data, (2) promotion of competition in the

18 market for advertising analytics, and (3) promotion of the free flow of information online.

19 Nothing in the truncated section of Meta's summary judgment brief dedicated to unenforceability

20 challenges these conclusions. Indeed, Meta does not fully engage with public policy arguments

21 that BrandTotal already made in prior filings, much less the arguments in BrandTotal's summary

22 judgment brief. Instead, Meta caricatures BrandTotal's arguments and ignores key evidence.

23         Meta's first argument against unenforceability is that, because of the countervailing public

24 interest in enforcing contracts, "[i]n the absence of any clear legislative guidance, this court should

25

26 ───────────

[8] *See* Dkt. 268 at 1-33. To narrow and simplify the issues before the Court, BrandTotal sought
27 summary judgment with respect to Meta's breach of contract claim as to BrandTotal's flagship
UpVoice (2021) product and related server-side collection. However, the public policy and
28 unconscionability arguments underlying BrandTotal's summary judgment motion apply more
broadly and render Meta's ToS wholly unenforceable as to BrandTotal.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   not hold that anti-scraping provisions like Meta's are void for public policy." Dkt. 272 at 14.

2   Putting aside Meta's reflexive and inaccurate use of the term "scraping," there *is* clear legislative

3   guidance. The text and legislative history of the CCPA reflects the strong public interest in user

4   control over online data—a goal that the Section 3.2.3 automated collection ban frustrates. *See*

5   TRO Brief at 2, 11-13. And as set forth in BrandTotal's summary judgment brief, the people of

6   California amplified that guidance in the soon-to-be-effective CPRA. Dkt. 268 at 15-18. Meta

7   simply ignores this clear legislative guidance.

8          Meta likewise ignores other record sources of public policy guidance—including the

9   FTC's August 5, 2021, letter to Mark Zuckerberg that both highlighted that agency's recognition

10  of the importance of "efforts to shed light on opaque business practices, especially around

11  surveillance-based advertising" and admonished Meta for apparently "invoking privacy - much

12  less the FTC consent order – as a pretext to advance other aims." Dkt. 268-20; *see also* Ex. DD

13  (March 14, 2022 letter from FTC chair stating "I agree that it is improper for firms under order to

14  use FTC consent decrees as cover for business decisions that may constitute unfair methods of

15  competition or that may unjustifiably deny the public access to information."). Meta ignores

16  repeated, bipartisan Congressional statements reiterating the public interest in competition and

17  transparency in the advertising analytics market. Dkt. 268-22; Dkt. 268-33. And, perhaps most

18  egregious of all, Meta ignores both (1) the Ninth Circuit's prior finding that giving social media

19  companies "free rein to decide, on any basis, who can collect and use data—data that the

20  companies do not own, that they otherwise make publicly available to viewers, and that the

21  companies themselves collect and use—risks the possible creation of information monopolies that

22  would disserve the public interest," *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 1005 (9th Cir.

23  2019), and (2) this Court's application of that finding to conclude that "[a]llowing a third party

24  like BrandTotal to compete with Facebook to provide data analytics services about advertising

25  campaigns on Facebook's networks—advertising for which Facebook is already compensated by

26  the advertisers—would be consistent with a strong public interest in 'maximizing the free flow of

27  information on the Internet' and fostering competition and innovation." Dkt. 63 at 33 (quoting

28  *hiQ*, 938 F.3d at 1004). Rather than meaningfully engaging with these policy findings, Meta

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   pretends they do not exist. They do and, for all the reasons set forth in BrandTotal's summary

2   judgment brief, heavily outweigh the generalized public interest in contract enforcement—which

3   is weak here since the ToS is an unconscionable adhesion contract. *See* Dkt. 268 at 30-32.

4         Meta's next argument in favor of its automated collection ban is an inapposite "everybody

5   does it" defense. Dkt. 272 at 14 ("Moreover, Meta's prohibition on unauthorized automated data

6   collection is commonplace…"). Putting aside other infirmities with that argument, it fails at the

7   outset because BrandTotal's policy arguments are tailored to Meta's unique position as the

8   world's largest—by far—social media network and the way it enforces the provision. As Senator

9   Cantwell explained in a letter requesting an FTC investigation into Meta's advertising metrics,

10   "Facebook reportedly controlled approximately 74 percent of the social media market in July

11   2020 and now reportedly controls 24.1 percent of all of U.S. digital advertising spending." Dkt.

12   268-33 at 1. Because of this dominant position, Meta reaped a whopping $115 *billion* in

13   advertising revenue in 2021 alone. Dkt. 268 at 18. As BrandTotal explained in its summary

14   judgment brief, the public has a deep interest in policing Meta's own demonstrably flawed

15   assertions about the effectiveness of advertisements that advertisers are spending such massive

16   sums to purchase. *See* Dkt. 268 at 12-13, 18-22; *see also* Ex. NN; Ex. OO. Indeed, internal emails

17   among Meta executives—emails that Meta withheld from production in this litigation—confirm

18   both Meta's awareness of the flaws in its in-house advertising analytics and the intense public

19   interest in the issue. Ex. JJ; Ex. KK; Ex. LL. And the public has an equally deep interest in

20   promoting the flow of advertising and other information in what the Supreme Court has

21   recognized is the "modern public square." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1732

22   (2017); Dkt. 68 at 22-30. Meta has made no showing that other platforms and entities that it

23   alleges include similar automated collection bans in their terms of service present anything

24   approaching these public policy concerns.[9] Accordingly, its scaremongering about the potential

25   far-reaching impact of an unenforceability finding on public policy grounds here is baseless.[10]

26

27   [9] Ironically, the most analogous entity Meta cites is LinkedIn (Dkt. 272 at 14, n.6), the same
company whose platform the Ninth Circuit in *hiQ* found the public had an interest in accessing.

28   [10] The same is true of the vague, inchoate concerns expressed by Dr. Thaw, which Meta does not
rely upon, but references indirectly in a footnote. Dkt. 272 at 14, n.6. As explained in

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    The prior decisions involving Meta that it cites (*see* Dkt. 272 at 15) are all eminently

2   distinguishable. *Facebook, Inc. v. Power Ventures, Inc.*, 252 F. Supp. 3d 765 (N.D. Cal. 2017) did

3   not involve Meta's ToS or any breach of contract allegations and did not involve the

4   circumstances presented by UpVoice (2021)—user-authorized data collection from a user's

5   browser, not from Facebook. *Facebook, Inc.* v. *Sluchevsky*, Case No. 19-cv-01277-JSC, 2020 WL

6   5823277 (N. D. Cal. Aug. 28, 2020) did involve breach of contract claims but is otherwise even

7   less on point—it was a default judgment case in which the Court simply repeated as true Meta's

8   unrebutted allegations, none of which involved user-authorized data collection. *Sluchevsky*, 2020

9   WL 5823277, at *1. As for *Stackla, Inc. v. Facebook Inc.*, the Court's public interest analysis

10   focused on policy concerns expressed by Congress and the FTC which, as explained above,

11   counsel in favor of an unenforceability finding, rather than against. No. 19-CV-05849-PJH, 2019

12   WL 4738288, at *6 (N.D. Cal. Sept. 27, 2019).

13    As to Meta's invocation of the parties' conduct (Dkt. 272 at 15), to the extent it has any

14   relevance to the public policy analysis, it only undercuts Meta's position. Aside from being rife

15   with mischaracterizations and even outright falsehoods, the isolated BrandTotal data collection

16   errors Meta highlights underscore BrandTotal's good faith efforts to correct and improve its

17   service. BrandTotal would have been more than happy to address these issues cooperatively with

18   Meta and did provide Meta with pre-launch code for UpVoice (2021). Meta's response—

19   intensified efforts to drive BrandTotal out of business via litigation—only confirms that it has no

20   intent of ever approving automated collection from its platform.

21    **2.    Meta Has Not Carried Its Burden to Prove Any Damages Attributable**

22        **to BrandTotal's Alleged Breach**

23    Even if Meta's ToS were enforceable, its request for summary judgment should still be

24   denied because it has failed to establish an essential element of its cause of action—harm

25   attributable to BrandTotal's alleged breach. Under California law, it is well-settled that the

26   _____

27   BrandTotal's motion to exclude, Dr. Thaw's proposed testimony is completely speculative and
    unmoored from the facts of this case and should be excluded. Dkt. 248 at 17-22. Given that Meta

28   did not cite Dr. Thaw's analysis directly, it appears to agree that his analysis is of limited
    probative value on the public interest question.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1    plaintiff in a breach of contract action is entitled only to damages sufficient to return the parties

2    to the situation they would have been in if both performed under the contract, ***and nothing more***:

> The measure of damages for defendants' breach of contract is the amount which will compensate plaintiff for all ***the detriment proximately caused thereby***, or which, in the ordinary course of things, would be likely to result therefrom. ***Plaintiff is entitled to all the benefits which it would have obtained if the contract had been performed by both parties but not to more than it would have received by such performance***. Plaintiff cannot recover for loss which by reasonable means it could have avoided…often called the duty to mitigate damages.

7    *Steelduct Co. v. Henger-Seltzer Co.*, 26 Cal. 2d 634, 648–49 (1945) (citations and quotation marks

8    omitted); *see also* Cal. Civ. Code § 3300. Further, "to establish contractual damages, a plaintiff

9    must establish 'appreciable and actual damage.'" *Luxul Tech. Inc. v. NectarLux*, LLC, No. 14-CV-

10   03656-LHK, 2016 WL 3345464, at *11 (N.D. Cal. June 16, 2016) (citing *Aguilera v. Pirelli*

11   *Armstrong Tire Corp.*, 223 F.3d 1010, 1015 (9th Cir. 2000)). "Nominal damages, speculative

12   harm, or threat of future harm do not suffice to show legally cognizable injury." *Luxul*, 2016 WL

13   3345464, at *11. Meta has failed to proffer evidence that meeting these standards.

                a.       **None of Meta's Alleged Compensatory Damages Were Caused by BrandTotal's Alleged Breach**

16         Meta's compensatory damages claim is limited to ███████ that, according to Meta's

17   damages expert, "represents the value or cost of the investigation [of BrandTotal] to Meta." Dkt.

18   272-5, Ex. A to Prowse Decl., ¶ 3. Meta does not seek money to compensate it for harm to its

19   servers or other computer systems—because Meta has failed to identify any such damage.[11] It

20   does not include money to compensate Meta for lost advertisers, revenue, or any other form of

21   actual loss resulting from BrandTotal's alleged breach—because no such losses occurred. The

22   only theory of harm that Meta's extensive team of lawyers could come up with was the "harm"

23   caused by Meta's conscious choice to build its case against and sue BrandTotal.

---

[11] Meta's damages expert made vague references to other alleged "███████████████████████ ██████████████████ (Dkt. 272-5 at ¶ 38), but neither he nor Meta's corporate witness identified ███████████████████████████████████████████████████████████████ Ex. B, pp. 35–36, 43–44. Unrebutted analysis by BrandTotal's technical expert, moreover, shows that the aggregate network "burden" of BrandTotal's collection is the equivalent of a single additional user. Ex. 20, § 5.3. This undetectably small impact cannot meet the "actual and ascertainable" requirement that the law imposes—which is presumably why Meta does not even attempt to rely on it.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1    This circular theory fails as a matter of law. Meta's alleged damages were not proximately

2    caused by BrandTotal's alleged breach. Instead, they were caused Meta's conscious decision to

3    persecute a company that—as the record now indisputably shows—was not in fact causing Meta

4    any harm. Review of the specific line items of "costs" for which Meta seeks compensation

5    underscores this point. Of the ▮▮▮▮ that Meta seeks, by its own admission only ▮▮▮ stem

6    from activities that occurred before Meta filed this lawsuit. Every dollar out of this ▮▮▮ in

7    purported pre-suit "damages" is completely attributable to work performed by full-time, salaried

8    Meta employees in the ordinary course of their duties. Dkt. 272-5, ¶ 35. These salaried employees

9    are ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11   ▮▮▮▮▮▮▮▮▮▮▮ *Id.*, ¶¶ 23-35. It is undisputed that BrandTotal has nothing to do

12   with Meta's decision to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. In other

13   words, ***the*** ▮▮▮▮ ***Meta seeks in pre-suit "damages" is money that Meta*** ▮▮▮▮▮

14   ▮▮▮▮▮▮▮▮▮▮▮▮ ***and money that would have been paid regardless of***

15   ***whether BrandTotal ever existed***. BrandTotal's alleged breach plainly did not proximately cause

16   these costs and they cannot satisfy the damages element of a breach of contract claim. *See St.*

17   *Paul Fire & Marine Ins. Co. v. Am. Dynasty Surplus Lines Ins. Co.*, 101 Cal. App. 4th 1038,

18   1060, (2002) ("An essential element of a claim for breach of contract are damages *resulting from*

19   *the breach*. Causation of damages in contract cases requires that the damages be proximately

20   caused by the defendant's breach." (emphasis in original, citation omitted)).

21       The approximately ▮▮▮▮ in post-litigation alleged damages that Meta seeks are even

22   less justifiable. A portion of this ▮▮▮▮ is made up of permanent employee salaries and fails

23   for the reasons discussed above. Dkt. 272-5, ¶ 35. The balance comprises ▮▮▮▮▮▮▮

24   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. In other

25   words, these are simply litigation expenses that parties bear in the ordinary course of litigation,

26   and in any event are costs that Meta, not BrandTotal, caused by choosing to initiate this litigation

27   and engaging in scorched earth tactics throughout. Further, Meta has claimed that

28   communications relating to these investigative activities are privileged and refused to produce

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1    them. Dkt. 205. Indeed, it has claimed that its legal team ████████████████

2    ████████████ (*id.* at 3), even further undermining its claim for damages. This confirms that these

3    "damages" are simply litigation costs no different in principle from attorneys' fees, and thus

4    cannot satisfy the harm element of an ordinary breach of contract action.[12] *Accord Dao v. Liberty*

5    *Life Assurance Co. of Bos.*, No. 14-CV-04749-SI, 2015 WL 5882056, at *2 (N.D. Cal. Oct. 8,

6    2015) ("The Court concludes that plaintiff cannot seek attorneys' fees as consequential damages

7    [in a breach of contract action].").[13] Indeed, since every breach of contract claim requires some

8    type of pre-suit investigation (at least in order to comply with Rule 11), a holding that the pre- and

9    post-litigation investigative costs Meta relies upon here are cognizable damages would reduce the

10   damages element of the breach of contract cause of action to mere surplusage—a result that is

11   contrary to California law. *Aguilera*, 223 F.3d at 1015  ("Under California law, a breach of

12   contract claim requires a showing of appreciable and actual damage."). If the damages

13   requirement is to have any force as an independent element of a breach of contract claim, the

14   compensatory damages that Meta seeks cannot be sufficient. At the very least, a reasonable

15   dispute exists over whether these costs arise from BrandTotal's alleged breach or Meta's litigation

16   decisions and summary judgment in Meta's favor is inappropriate.

17       The single district court case that Meta cites for the proposition that "'security and

18   investigation costs' constitute breach of contract damages" is not on point. Dkt. 272 at 12 (citing

19   *E. & J. Gallo Winery v. Instituut Voor Landbouw-En Visserijonderzoek*, No. 1:17-cv-00808-

20   DAD-EPG, 2018 WL 2463869, at *9 (E.D. Cal. June 1, 2018)). *Gallo* was decided at the

21   pleadings stage, included minimal analysis, and stands for nothing more than that a plaintiff's

22   allegations that "as a result of the breach, [it has] incurred 'security and investigation costs'…are

23   sufficient to state a breach of contract claim." *Gallo*, 2018 WL 2463869, at *9. Further, *Gallo*

24   makes clear that any cognizable "security and investigation costs" must still be caused by the

25   alleged breach. As explained above, the investigation costs Meta relies upon fail this causation

26   _____

27   [12] The exception to this general rule, inapplicable here, is breach of certain insurance agreements in which compensation for investigation and attorney fees is a material part of the underlying contract.

28   [13] This issue also defeats Meta's claim for summary judgment as to its CFAA claim. *See* § II.A.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1  requirement.

2      Far more instructive is *Ruiz v. Gap, Inc.*, 622 F. Supp. 2d 908 (N.D. Cal. 2009), *aff'd,* 380

3  F. App'x 689 (9th Cir. 2010)—a case on which Meta has repeatedly relied in other litigations

4  when defending against claims by its customers that Meta has breached its own ToS. *See e.g.*, *In*

5  *Re Facebook Privacy Litigation*, No. 12-15619, 2012 WL 4764112, at *18 (9th Cir. Sept. 26,

6  2012); Ex. MM at 10. In *Ruiz*, the theft of certain laptops, which allegedly occurred because of a

7  breach of contract relating to data security and confidentiality, resulted in disclosure of the

8  plaintiff's personal information. *Ruiz*, 622 F. Supp. 2d at 910–11. The plaintiff in *Ruiz* alleged

9  that this disclosure had caused harm, and cited the cost of credit monitoring services purchased as

10 a result of the alleged breach of contract as a compensable effort to mitigate damages. *Id.* at 918.

11 The *Ruiz* court rejected that argument, finding that "Ruiz has no actual damages to mitigate since

12 he has never been a victim of identity theft," and holding that because "Ruiz has presented no

13 evidence of legally cognizable damage under California contract law…[defendant] is entitled to

14 summary judgment…" *Id.*

15     The same logic applies here. The most favorable (from Meta's point of view)

16 interpretation of Meta's investigative costs is that they—much like the credit monitoring service

17 in *Ruiz*—were an effort to determine if BrandTotal's alleged breach had caused Meta harm.

18 Under *Ruiz*, costs associated with such efforts to determine if harm occurred, without more, are

19 insufficient to support a breach of contract claim.

        **b.**     **Meta's Manifestly Unfair Unjust Enrichment Claim Cannot**

20

21                         **Preserve Its Deficient Damages Claim**

22     Perhaps recognizing the frailty of its compensatory damages claim, Meta proffers a second

23 basis for its assertion that the fact of damages has been established—the existence of its unjust

24 enrichment claim. This argument fares no better. As an initial matter, under a long line of

25 California authority, unjust enrichment is *per se* unavailable as a breach of contract remedy, unless

26 the Plaintiff itself avers that the contract is unenforceable:

27         Additionally, Plaintiff's alternative allegation that she and the Class are entitled to
        restitution as a result of Defendants' breach of contract is simply incorrect as a

28         matter of law. Generally, if two parties have a valid and enforceable written contract,

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

the plaintiff may not proceed on a claim in quasi-contract, *i.e.*, a claim of restitution or unjust enrichment. ***A plaintiff may not plead the existence of an enforceable contract and maintain a quasi-contract claim at the same time***, unless the plaintiff has pled facts suggesting that the contract may be unenforceable or invalid.

*Svenson v. Google Inc.*, 65 F. Supp. 3d 717, 723–24 (N.D. Cal. 2014) (citation, brackets, and quotations omitted); *see also Saroya v. Univ. of the Pac.*, 503 F. Supp. 3d 986, 998 (N.D. Cal. 2020) (same); *In re Facebook Priv. Litig.*, 791 F. Supp. 2d 705, 718 (N.D. Cal. 2011), *aff'd*, 572 F. App'x 494 (9th Cir. 2014) ("***Under California law, unjust enrichment is an action in quasi-contract***…[a]lthough Rule 8 of the Federal Rules of Civil Procedure allows a party to state multiple, even inconsistent claims, ***the rule does not allow a plaintiff invoking state law to assert an unjust enrichment claim while also alleging an express contract***."); *Klein v. Chevron U.S.A., Inc.*, 202 Cal. App. 4th 1342, 1389–90, 137 Cal. Rptr. 3d 293, 332 (2012) ("[P]laintiffs' breach of contract claim pleaded the existence of an enforceable agreement and their unjust enrichment claim did not deny the existence or enforceability of that agreement. Plaintiffs are therefore precluded from asserting a quasi-contract claim under the theory of unjust enrichment."). Here, far from admitting unenforceability, Meta has done just the opposite and opposed BrandTotal's unenforceability arguments.[14] The Court should follow the great weight of authority and find that Meta's unjust enrichment claim is precluded as a matter of law.

Meta's invocation of *Foster Poultry Farms, Inc. v. SunTrust Bank*, 377 F. App'x 665, 669 (9th Cir. 2010) does not necessitate a different result. That unpublished decision is non-precedential, and did not even examine the long line of cases—including Ninth Circuit cases—holding that unjust enrichment claims cannot coexist with claims that an allegedly enforceable contract has been breached. *See, e.g.*, *Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*, 96 F.3d 1151, 1167 (9th Cir. 1996) ("Under both California and New York law, unjust enrichment is an action in quasi-contract, which does not lie when an enforceable, binding agreement exists defining the rights of the parties."); *Attebury Grain LLC v. Grayn Co.*, 721 F. App'x 669, 672 (9th Cir. 2018) (reversing summary judgment and ordering dismissal of plaintiff's "legally deficient unjust

---

[14] To be clear, the Court should find that Meta is wrong and BrandTotal is correct, and that Meta's ToS are unenforceable as to BrandTotal. As the authorities cited above establish, however, it is Plaintiff's insistence that its contract is enforceable—not the ultimate legal outcome of the unenforceability analysis—that dooms its unjust enrichment claim.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1    enrichment claim" because "Attebury's relationship with Superior was defined by contract, so

2    Attebury cannot advance a quasi-contract action premised on Superior's breach of that contract").

3    Further, *Foster Poultry* by its own terms is limited to instances where a party entrusted with trade

4    secrets or other confidential or proprietary information breaches a related confidentiality

5    agreement, and profits from information that it effectively held in trust for the plaintiff. 377 F.

6    App'x at 668. Nothing like those facts is present here; instead Meta's breach of contract

7    allegations focus on a particular method (automated collection) that BrandTotal uses to obtain

8    information that does not belong to Meta.

9         Even if unjust enrichment damages can under some circumstances be cognizable for

10   breach of contract purposes, the Court should use its discretion to categorically reject any award

11   of unjust enrichment here. Unjust enrichment is an equitable remedy, and those that seek

12   equitable relief "must come into court with clean hands, and keep them clean, or [they] will be

13   denied relief, regardless of the merits of his claim." *Kendall-Jackson Winery, Ltd. v. Superior Ct.*,

14   76 Cal. App. 4th 970, 978, (1999), *as modified on denial of reh'g* (Jan. 3, 2000). Meta's hands are

15   anything but clean.

16        To the contrary, Meta demeans and smears BrandTotal for "data scraping," yet its business

17   model relies upon scraping and monetizing user data, including user data from activity *off of Meta*

18   *products*. Dkt. 268 at 11-12. Whereas BrandTotal is transparent with its panelists about its data

19   collection and compensates them for the use of their data, Meta lures users into its platforms

20   through promises of free access to a global community, while obscuring the latent price of that

21   access—constant surveillance and data scraping by Meta, on and off Meta products. *Id.* at 10-12.

22   And while Meta makes much of purely hypothetical concerns about BrandTotal's data

23   collection—even though there is no evidence that BrandTotal has misused any information with

24   which its Panelists have entrusted it or that any third-party has improperly obtained any of this

25   information—Meta itself has a documented record of exposing user's sensitive information. *See,*

26   *e.g.*, Ex. II.

27        Meta's conduct towards BrandTotal has also been deeply inequitable. Meta knew of

28   BrandTotal since at least May 2018 and had investigated BrandTotal and its business model, yet

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   it delayed in bringing this lawsuit until late 2020. In the almost two years that elapsed between

2   Meta's initial investigation (which identified no harm to Meta and even prompted one Meta

3   employee to recommend a partnership with BrandTotal) and its initiation of this litigation,

4   BrandTotal invested millions of dollars into its business—including █████████████

5   dollars spent on Facebook.com advertisements—and built a thriving advertising analytics

6   company. Meta happily accepted BrandTotal's advertising money and never said a word to

7   BrandTotal about any concerns it had with BrandTotal's business model—until it sued them

8   without warning. Ex. 40 at FB_BRTL_00028694. In other words, despite having actual

9   knowledge of BrandTotal's activities, Meta remained silent, signaled acquiescence to

10  BrandTotal's activities by accepting BrandTotal's advertising payments, and prejudicially lay in

11  wait while BrandTotal built a business around conduct that Meta now alleges amount to a breach

12  of contract. These undisputed facts are more than sufficient to establish the equitable defenses of

13  unclean hands and laches. *Accord Kendall-Jackson Winery*, 76 Cal. App. at 979 ("Any conduct

14  that violates conscience, or good faith, or other equitable standards of conduct is sufficient cause

15  to invoke the doctrine [of unclean hands]."); *Morgan Hill Concerned Parents Ass'n v. California*

16  *Dep't of Educ.*, 258 F. Supp. 3d 1114, 1132 (E.D. Cal. 2017) ("To successfully establish laches,

17  a party must show (1) there was inexcusable delay in the assertion of a known right and (2) the

18  party asserting laches has been prejudiced."). The Court has discretion to use these doctrines to

19  bar Meta's entire claim and should at a minimum hold that they preclude Meta from receiving

20  the equitable remedy of unjust enrichment.

 **3.    BrandTotal's Contract Termination Defense is Meritorious and at a**
 **Minimum Involves Disputed Factual Issues That Preclude Summary**
 **Judgment**

24      It is undisputed that Meta cancelled BrandTotal's Facebook and Instagram accounts at the

25  outset of this litigation and has not reactivated any of them. Accordingly, to the extent there ever

26  was an enforceable agreement between BrandTotal and Meta, it terminated on the date of

27  cancellation. *See* Dkt. 272-5, §4.2. Meta's reliance on the "survival clause" of ToS § 4.2, which

28  states that "the following provisions will remain in place [post-termination]: 3, 4.2-4.5," is

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    misplaced. This language does not point out section 3.2.3 specifically and instead broadly states

2    that an entire section of the agreement "will remain in place." The relevant section, 3, is titled

3    "Your commitments to Facebook and our community," addresses a wide variety of issues—most

4    of which are only relevant if one has an active Facebook account—and begins with the statement

5    that "[w]e *provide these services to you* and others to help advance our mission. *In exchange*, we

6    need you to make the following commitments." Dkt. 272-5, § 3. In other words, by its own terms,

7    *Section 3's "commitments" are conditional on Meta's agreement to "provide these services.*"

8             Under California law, "[w]hen a court interprets a contract to determine the parties' intent,

9    the whole of the contract is to be taken together, so as to give effect to every part, if reasonably

10   practicable, each clause helping to interpret the other." *Congdon v. Uber Techs., Inc.*, 291 F. Supp.

11   3d 1012, 1021 (N.D. Cal. 2018) (brackets and quotation marks omitted). With these principles in

12   mind, the Court should not interpret the ToS to create life-long prohibitions on automated

13   collection for every Facebook user—something that no Facebook user could reasonably have

14   intended or expected, and that is inconsistent with the preamble of Section 3. At a minimum, the

15   tension between Section 4.2 and Section 3 creates ambiguity, and it is well-settled in California

16   that "ambiguities in written agreements are to be construed against their drafters." *Castillo v.*

17   *CleanNet USA, Inc.*, 358 F. Supp. 3d 912, 946 (N.D. Cal. 2018). That canon "applies with

18   particular force where the contract is one of adhesion, that is, one where one party has

19   disproportionate bargaining power relative to the other." *Id.* If the Court were inclined to interpret

20   the ToS to create lifelong automated collection prohibitions for former users, it should find that

21   provision both procedurally and substantively unconscionable, for all the reasons set forth in

22   BrandTotal's summary judgment brief. Dkt. 263 at 30-32

23            Finally, Meta's contention that BrandTotal is still bound by the ToS because of still-active

24   accounts is not supported by the facts of record. BrandTotal disputes—and none of the evidence

25   Meta cites establishes—that any of those accounts belong to BrandTotal. Indeed, BrandTotal could

26   not possibly have created one of the accounts since—by Meta's own admission—it was created in

27   2007, almost a decade before BrandTotal existed. Karve Decl. ¶ 13. Plainly, disputed facts

28   preclude summary determination of this issue.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1

### 4.   Other Factual Issues Preclude Summary Judgment

2   As explained in BrandTotal's affirmative brief, UpVoice (2021) collects information from

3   a user's browser—not from Facebook. Dkt. 268 at 6-7. Meta's summary judgment motion as to

4   UpVoice (2021) should be denied for that independent reason. Meta's broad, thinly supported

5   assertions regarding "other contract terms" besides Section 3.2.3 are also hotly disputed. Dkt. 272

6   at 11. For example, BrandTotal denies that products like UpVoice (2021) accessed data it did not

7   have permission to access—all data was user authorized and/or public—and that the accounts

8   BrandTotal cites as having been created after termination belonged to BrandTotal. Further, Meta

9   has identified no damages specifically attributable to these alleged breaches.

10

### B.   Judgment is Not Warranted on Meta's CFAA Claims.

11

### 1.   Meta Has Not Shown that BrandTotal Caused a Loss of $5,000 or More

12   To maintain a civil CFAA claim, Meta must establish loss "aggregating at least $5,000 in

13   value." 18 U.S.C. § 1030(c)(4)(A)(i)(1). Meta (unsurprisingly) does not claim any harm to its

14   servers. "At least one court has noted '[t]he definition of 'loss' itself makes clear Congress's

15   intent to restrict civil actions under subsection (I) to the traditional computer 'hacker' scenario—

16   where the hacker deletes information, infects computers, or crashes networks.'" *Welenco, Inc. v.*

17   *Corbell*, 126 F. Supp. 3d 1154, 1169 (E.D. Cal. 2015) (citing *AtPac, Inc. v. Aptitude Solutions,*

18   *Inc.*, 730 F. Supp. 2d 1174, 1185 (E.D. Cal. 2010); *In re iPhone Application Litig.*, 844 F. Supp.

19   2d 1040, 1067 (N.D. Cal. 2012) (citing *AtPac*, 730 F. Supp. 2d at 1185)). Meta cannot show any

20   such "loss."

21   Meta instead claims only costs spent in "investigating" BrandTotal. Dkt. 272 at 18 ("[I]n

22   the one-year period after October 1, 2020, Meta incurred $95,784 in losses identifying, analyzing,

23   and responding to BrandTotal's conduct."). Yet these costs also cannot be considered "loss"

24   under the CFAA "because the CFAA gives victims a civil remedy, it is likely that at some point, a

25   victim's actions will shift away from responding directly to an offense and toward building a civil

26   case against the offender. Costs incurred for the purpose of building or supporting the victim's

27   civil case should not be considered 'loss' for purposes of the Guidelines calculation." *United*

28   *States v. Nosal*, No. CR-08-0237 EMC, 2014 WL 121519, at *6 (N.D. Cal. Jan. 13, 2014). The

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

only costs identified in Meta's summary judgment motion are costs it purportedly incurred after October 1, 2020, when it sued BrandTotal. Dkt. 272 at 18. Moreover, by Meta's own admission, ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ Dkt. 205 at 3. Meta has not shown that it has met the jurisdictional loss amount. At the very least, a reasonable dispute exists over whether the costs Meta claims to have incurred are properly considered "losses." Meta is therefore not entitled to summary judgment on its CFAA claims as to any of BrandTotal's applications, extensions, or server-side collection software and the Court need not reach BrandTotal's other defenses regarding whether Meta's claims are untimely and whether BrandTotal's software circumvents any technical barriers.

### 2.     BrandTotal's Current Collection Software Does Not Violate the CFAA

Meta's improperly attempts to expand[15] the Computer Fraud and Abuse Act ("CFAA") from an anti-hacking statute to cover BrandTotal's behavior. "The statutory purpose of the CFAA is to punish trespassers and hackers." *Bittman v. Fox*, 107 F. Supp. 3d 896, 900–01 (N.D. Ill. 2015) (citing *Kluber Skahan & Associates, Inc. v. Cordogen*, *Clark & Assoc., Inc.*, No. 08–CV–1529, 2009 WL 466812, at *8 (N.D. Ill. Feb. 25, 2009); *Int'l Airport Centers, L.L.C. v. Citrin*, 440 F.3d 418, 420 (7th Cir. 2006) ("Congress was concerned with . . . attacks by virus and worm writers, on the one hand, which come mainly from the outside, and attacks by disgruntled programmers who decide to trash the employer's data system on the way out . . . .").

### a.     BrandTotal's Extensions Do Not Access Meta's Computers

There is no dispute that UpVoice (2021) and the extensions that share the same collection code as UpVoice (2021)[16] do not directly communicate with Meta's computers. Despite conducting copious amount of "network tracing," Meta's expert Mr. Martens opined only that UpVoice (2021) engaged in "reactive collection," Ex. 1 at ¶ 481. Although Meta now argues

---

[15] *Oracle Corp. v. SAP AG*, 734 F. Supp. 2d 956, 967 (N.D. Cal. 2010) ("Because the CFAA has both criminal and noncriminal applications, the court finds that the statute should be construed narrowly, as opposed to broadly.").

[16] These extensions include Calix and the Restricted Panel extensions plus the modified Social One and Phoenix applications.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1  UpVoice (2021) "intercepts" data from Meta's computers, Dkt. 272 at 20, and "inject[s] itself in

2  communications between third-parties and Meta's computers," *id.*, its claims are contradicted by

3  the opinions of its own expert. Mr. Martens confirmed that UpVoice (2021) simply "monitors"

4  the "content UpVoice users see and interact with through Facebook . . . ." Ex. 1 at ¶ 472; *see also*

5  Ex. F, 97:6–18 ("I'm not aware of an instance where UpVoice 2021 initiates communication on

6  its own initiative to Facebook or Instagram servers and receives information back, you know, akin

7  to what I've called active collection."). And when describing the operation of UpVoice (2021),

8  Mr. Martens confirmed that UpVoice (2021) does not "intercept" anything. Ex. 1 at ¶¶ 484–485.

9  Rather, the browser first "retreiv[es] all incorporated-by-reference components for the main

10  HTML document," which then issues an event notifying installed extensions that a HTML

11  document has been loaded. *Id*. at ¶ 484. UpVoice (2021) then "responds" to this event. *Id*. at

12  ¶ 485. UpVoice (2021) "accesses" only the computer of the Panelist, who has given BrandTotal

13  permission to do so.

14       BrandTotal's current extensions thus do not access Meta-controlled servers and do not

15  violate the CFAA either "on the facts" or "on the law." Dkt. 272 at 20. To argue otherwise, Meta

16  drastically expands the meaning of "access" to cover the operation of BrandTotal's extensions. *Id*.

17  But the Ninth Circuit has already made clear that a violation of the CFAA requires access, not

18  merely misuse or misappropriation. *United States v. Nosal*, 676 F.3d 854, 863 (9th Cir. 2012)

19  ("[T]he plain language of the CFAA 'target[s] the unauthorized procurement or alteration of

20  information, not its misuse or misappropriation.'") (quoting *Shamrock Foods Co. v. Gast*, 535 F.

21  Supp. 2d 962, 965 (D. Ariz. 2008)). Interpreting *Nosal*, this Court has also rejected a similar

22  argument that an entity was merely "a conduit by which the CFAA Defendants engaged in their

23  own unauthorized access." *Koninklijke Philips N.V. v. Elec-Tech Int'l Co*., No. 14-CV-02737-BLF,

24  2015 WL 1289984, at *4 (N.D. Cal. Mar. 20, 2015).

25       Meta cannot transform this case into *Power Ventures* were the facts are nothing alike. Dkt.

26  272 at 16, 18, 20, 22 (citing *Facebook, Inc. v. Power Ventures*, 844 F.3d 1058 (9th Cir. 2016)).

27  There, the defendant continued to not only "interact with," but make use of Facebook resources to

28  "[c]ause a message to be transmitted to the user's friends within the Facebook system" and

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1  generate an e-mail message that "stated that the message came from Facebook" and was "signed,

2  'The Facebook Team.'" *Id.* at 1063. Here, BrandTotal's extensions do not interact with Meta's

3  computers and instead "monitors" and "reacts to" information on the Panelists' computer as those

4  Panelists browse Facebook. Meta has not withdrawn authorization for Panelists to access

5  Facebook. This case is thus governed by the reasoning of *Koninklijke* and Meta cannot show

6  BrandTotal violated the CFAA by obtaining information from Panelists, who were authorized to

7  access Facebook, through its UpVoice (2021) and related extensions when those extensions

8  themselves did not access Meta's computers. Meta "offers no legal authority for the proposition

9  that an entity or individual can violate the CFAA by obtaining information from a person who has

10  authorization to access a protected computer." *Experian Mktg. Sols., Inc. v. Lehman*, No. 1:15-CV-

11  476, 2015 WL 5714541, at *8 (W.D. Mich. Sept. 29, 2015)

12         **b.       BrandTotal's Server-Side Collection Does Not Violate the CFAA**

13         Meta also has not shown BrandTotal's backend or server-side collection software violates

14  the CFAA by accessing advertisement-URLs that do not require a username.[17] Meta argues that

15  the URLs do not require a password is "legally irrelevant" because the Ninth Circuit's *hiQ*

16  decision was vacated. Dkt. 272 at 21 (citing *hiQ Labs*, 938 F.3d 985; 141 S. Ct. 2752). Meta is

17  wrong.

18         Although the Supreme Court vacated the *hiQ* decision, *Van Buren* **narrowed** the scope of

19  the CFAA by holding that a police officer did not "exceed authorization" by obtaining

20  information for an improper purpose. *Van Buren v. United States*, 141 S. Ct. 1648, 1662 (2021).

21  Thus, far from being "irreconcilable" with *Van Buren*, Dkt. 272 at 21, both *Van Buren* and *hiQ*

22  interpret the CFAA consistent with its stated purpose to address hackers. Moreover, *Van Buren*

23  instructed courts to use a technical understanding of terms in the CFAA, 141 S. Ct. at 1658 n.7,

24  and there is at least a reasonable dispute regarding whether the use of IP-blocking in a public site

25

26  ───────────────

[17] As noted above, the Court need not reach Meta's claims that BrandTotal's server-side

27  collection accessed advertisement-URLs that were not public because Meta has not shown that it
meets the jurisdictional requirement to maintain the CFAA claim. Regardless, a genuine dispute

28  exists because a reasonable juror could find that placing a password over content that is otherwise
public does not transform the content from public to private.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   meets the technical meaning of "without authorization." The Ninth Circuit has since also heard

2   argument in the *hiQ* case on remand and was critical of LinkedIn's arguments, many of which

3   Meta repeats here.[18] At the very least, this issue presents a material dispute and summary

4   judgment is inappropriate. Regardless, the Ninth Circuit's reasoning in *hiQ* still supports

5   BrandTotal. It was not the first decision to distinguish between public websites and non-public

6   sites that are password-protected. *See Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 875 (9th

7   Cir. 2002). BrandTotal's backend accesses advertisement-URLs that are not password protected

8   and under prior precedent is collectable public data, no different than collecting billboard data

9   driving down the highway.

   **C.      Meta Is Not Entitled to Summary Judgment on Its CDAFA and UCL Claims**

11          Meta argues that it is also entitled to summary judgment on its CDAFA (Cal. Penal Code

12  § 502) claim "[g]iven the statutes' close similarity." Dkt. 272 at 22. Because Meta has failed to

13  show it is entitled to summary judgment on its CFAA, however, it has also failed to show it is

14  entitled to summary judgment on its CDAFA claim. Similarly, because Meta argues it is entitled to

15  summary judgment on its claim under the unlawful prong of the UCL solely because it argues

16  BrandTotal violated the CFAA and CDAFA, *id.*, its failure to show it is entitled to summary

17  judgment on these claims precludes judgment on the UCL claim.

   **D.      Judgment for Meta is Not Warranted on BrandTotal's Interference Claims**

19          On June 3, 2021, this Court examining much of the same evidence now before the Court,

20  found that BrandTotal stated a cause of action for interference with contracts and violation of

21  California's Unfair Competition Law. Dkt. 158. While that analysis was in the context of a motion

22  to dismiss where statements in the pleadings are accepted as true, BrandTotal's pleading cited and

23  relied on documentary and deposition evidence. For example, as alleged and supported by record

24  evidence, Meta investigated BrandTotal in 2018, and again in the Spring of 2020, yet it did not

25  take any action against BrandTotal until the Fall of 2020; the same point at which emails reflect

26  Meta advertisers asking it about BrandTotal. *Supra* § 2.C. Then, without any investigation of

27  BrandTotal's panelist consent program, it falsely told Google that it believed that BrandTotal was

28

---

[18] *See* https://www.ca9.uscourts.gov/media/video/?20211018/17-16783/.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   "improperly scraping user PII (e.g., gender, relationship status, ad interests, etc.), without proper

2   disclosure." Dkt. 272, Ex. 34 at FB_BRTL_00016961As found at the motion to dismiss stage, the

3   wording to Google combined with the timing and other evidence alleged "raises at least a specter

4   of bad faith sufficient to render BrandTotal's allegations plausible." Dkt. 158 at 15. Nothing

5   uncovered in discovery since that time alters this plausible inference from which a juror could find

6   interference.[19]

7                            **1.      BrandTotal's Contracts are Not Unlawful**

8            Latching onto this Court's statement in the motion to dismiss order preserving the

9   *prospective* economic interference counterclaims to the extent any contract was unenforceable,

10  Dkt. 158 at 23-24, Meta contends that BrandTotal's intentional interference counterclaims fail

11  because, according to Meta, all BrandTotal's contracts are "unlawful." Dkt. 272 at 23. Meta's

12  theory is that because BrandTotal's business is built upon automated data collection and Meta

13  forbids automated collection, BrandTotal's contracts are necessarily unlawful. *Id*. This argument

14  is wrong on the law and the facts.

15          As an initial matter, Meta never analyzes or even cites the language of the BrandTotal

16  contracts that it repeatedly asserts are unlawful and unenforceable. It never explains how

17  performance of the contracts is "predicated on the breach of Meta's terms." Dkt. 272 at 23.

18  Instead, it simply asserts illegality as a matter of fact and asks the Court to grant it summary

19  judgment based on its pure *ipse dixit*. That is inappropriate under normal circumstances, and is

20  particularly so here given that "the party who asserts the illegality of a contract bears the burden

21  of proof on that point." *Rock River Commc'ns, Inc. v. Universal Music Grp., Inc.*, 745 F.3d 343,

22  350 (9th Cir. 2014).

---

24  [19] Notably absent from Meta's summary judgment motion is any argument that it was justified in moving against BrandTotal due to the FTC Consent Order. *Compare* Dkt. 158 at 10-14

25  (discussing Meta's justification defense involving the FTC Order). After the motion to dismiss proceedings, the FTC cautioned Meta against "invoking privacy –much less the FTC consent

26  order – as a pretext to advance other aims," and emphasized that "efforts to shield targeted advertising practices from scrutiny run counter to [the FTC's] mission." Dkt. 268-20. Meta

27  noticeably has not reasserted its primary argument at the motion to dismiss stage despite the Court

28  calling it Meta's "clearest basis" for potentially dismissing BrandTotal's tortious interference counterclaims. Dkt. 158 at 10.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Meta could not make such a showing in any event because BrandTotal's contracts do not require any illegal activity. Its contracts with customer-companies require BrandTotal to provide social media analytics and insights; they do not specify any method for collecting the information used to generate the analytics and insights. Ex. P. As to its contracts with user-panelists, they require BrandTotal to provide gift cards in exchange for access to information that, under California law, belongs to panelists. Dkt. 268 at 16. Again, this is not unlawful. Further, Meta's argument that performance on BrandTotal's contracts requires breach of an enforceable contract fails in any event because Meta's Terms of Service are unenforceable and BrandTotal has not breached them, for all the reasons set forth above and in BrandTotal's affirmative summary judgment brief.

None of Meta's cited authority is to the contrary. The Restatement language Meta quotes is out of context; § 576 is titled "Bargain *Requiring* Breach of a Contract With a Third Person," and the cited comment reiterates that the section pertains only to contracts that "*require*[] for [their] performance breach of a contract with another." As discussed above, Meta has made no showing that any of the contracts in question *require* breach to be performed. Restatement of Contracts § 576 & cmt. A. Meta's reliance on *Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture Partners*, 52 Cal. App. 4th 867, 879 (1997) is unavailing because Meta has not shown that any BrandTotal contract is unenforceable. And its citation to *Williams v. Eaze Solutions, Inc.*, 417 F. Supp. 3d 1233, 1239-40 (N.D. Cal. 2019) is wholly misplaced. The portion of that case Meta cites provides no support for the proposition for which it is cited, and instead stands for the unremarkable proposition that "the consequence of a contract *with an unlawful object* under California law is that it is void and unenforceable." 417 F. Supp. 3d at 1240. Meta did not even directly argue, much less establish, that BrandTotal's contracts have "an unlawful object." Instead, its argument appears to be that performance on the contract may *involve* breach of Meta's terms of service, which is insufficient to establish illegality for all the reasons explained above.[20]

---

[20] *Yoo v. Jho*, 147 Cal. App. 4th 1249, 1251 (2007), which dealt with a contract to sell counterfeit goods, and *Shuman v. SquareTrade Inc.*, Case No. 20-cv-02725-JCS, 2020 WL 12894954 at *12

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

2. **Meta Was Not "Justified" in Making False Statements to Google**

Meta contends that because it was acting "to enforce its rights" — by which it means enforcing its own-handcrafted ToS – Meta cannot be liable for interference. Dkt. 272 at 25. Meta goes so far as to claim, "the precise wording of the email [to Google] is irrelevant," because it was enforcing its contractual rights and thus allegedly free to say and do anything whatsoever. *Id.* Unsurprisingly, this is not the law. The case on which Meta relies, *SIC Metals, Inc. v. Hyundai Steel Co.*, 442 F. Supp. 3d 1251, 1257 (C.D. Cal. 2020), *aff'd*, 838 F. App'x 315 (9th Cir. 2021), makes clear that a justification defense to a claim of interference only applies in the absence of "fraud" or "other means wrongful in themselves." *Quoting Quelimane Co. v. Stewart Title Guaranty Co.*, 19 Cal. 4th 26, 56 (1998) (quoting Restatement 2d of Torts § 766). Here, evidence supports the conclusion that Meta *falsely* represented BrandTotal's programs to Google, meaning Meta *cannot* prove its actions were justified.

Moreover, even if, as Meta contends, BrandTotal must show that Meta engaged in a "sham. . . designed for the specific purpose" of interfering with BrandTotal, Dkt. 272 at 25, this conclusion too may be reached in view of the evidence. Meta contends discovery has produced no evidence that Meta acted with improper purpose of shutting down a competitor, but this is not so. While there is no smoking gun admission—because Meta claimed privilege over a large swath of the investigation—there is certainly circumstantial evidence from which a jury could conclude that Meta's motives were *not* protecting consumers, but instead were anti-competitive in nature. This includes at least the following:

- Meta's ToS state that automated collection is not permitted "without permission" implying that permission would be granted in certain circumstances. Yet, discovery has shown that Meta *never* grants permission for automated collection outside its APIs, even after the FTC Order contemplated such a program. *Supra*, § 2.A.
- Meta deliberately does not make advertising analytics for commercial advertising available, even though it makes that information available for political ads and must

(N.D. Cal. Aug 31, 2020), which merely states the elements of a contract claim, are not on point for the same reason.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1    separately categorize the ads in order *not* to make the same information available for

2    commercial ads. Ex. G, 33:18–34:5, 94:15–21, 95:13–25; *supra*, § 2.A.

3    • Meta's "share-of-voice" program provides certain advertising analytics to large

4      advertisers paying to advertise on Facebook, and by design advertisers cannot test the

5      veracity of Meta's assertions. Ex. N, Supp. Resp. to ROG No. 5.

6    • Meta has faced censure for its misstatements about the reach of advertisements on its

7      platforms, a reach that the analytics would illuminate. Dkt. 268 at 12-13.

8    • Even the FTC has emphasized the public interest in transparency of targeted commercial

9      advertising (Dkt. 268-20), yet Meta persists.

10   Again, Meta's motives and overarching scheme is a credibility issue for the jury.

11       At the end of this section, Meta argues that the email to Google was not fraudulent. Dkt.

12   272 at 26. Meta previously argued the same to this Court, namely that its statements were

13   accurate due to what this Court called "issues around the margin" (i.e., arguments Meta

14   formulated during litigation about the "participating site" language, lack of consent from

15   advertisers and possible shared computers). Dkt. 158 at 15. This Court found that "[n]one of

16   those theories are necessarily what a reader of the phrase 'improperly scraping user PII (e.g.

17   gender, relationship status, ad interests, etc.), without proper disclosure,' FACC Ex. I, would

18   naturally take it to mean. . . ." *Id*. In the summary judgment brief Meta again tries to argue some

19   of these margin issues make the statement true. However, nothing in the contemporaneous

20   documents obtained since the motion to dismiss hearing suggest Meta "believed" BrandTotal

21   was collecting user PII "without proper disclosure." Rather, the investigation focused ███████

22   ████████████████████████████████████. Ex. D, 56:22–57:12, 80:16–89:17, 103:19–

23   105:13. The "shared computer" problem and other peripheral issues raised by Meta, did not

24   appear until litigation, as this Court readily appreciated before. What Meta meant, and whether it

25   was true or not, is ultimately a credibility determination and a jury should be able to hear and

26   determine the credibility of Meta's post-hac rationalizations for its email to Google.[21]

27   _____

28   [21] For these same reasons, a juror could readily find that Meta's interfering act was
     "independently wrongful", an element of a prospective interference claim, but not an existing
     interference claim . Dkt. 272 at 31.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

3.    **A Reasonable Juror Could Find Meta Interfered with BrandTotal's Customer Contracts**

Meta argues that because—according to it—the customer contracts are unenforceable, BrandTotal must show the elements for *prospective* economic interference. Dkt. 272 at 26. For the reasons stated above, the contracts are *not* unenforceable hence the relevant inquiry should surround the law of *existing* contract interference. To avoid confusion, however, BrandTotal generally addresses Meta's argument in the order presented.

a.    **Reasonable Inferences Show Meta Intended to Interfere with BrandTotal's Customer Contracts**

Meta claims that "after almost 18 months of litigation, there is no direct evidence that Meta intended to interfere with any contractual relationship." Dkt. 272 at 27. Yet the law does not require "direct evidence"; circumstantial evidence is often the only evidence but more than sufficient to support a jury finding and defeat a motion for summary judgment. *See, e.g.,* *Johnston v. Kimberly-Clark Glob. Sales, LLC*, 542 F. App'x 600, 601–02 (9th Cir. 2013) (finding in the contest of an interference claim that "circumstantial evidence is sufficient for [Plaintiff's] complaint to survive summary judgment"). Ample evidence, circumstantial or otherwise, supports the same conclusion here.

First, Meta contends that it did not know whether Google would respond to its email. Dkt. 272 at 27. But in fact, it did. The evidence shows Meta ███████████████████████ ██████████████████████████████ *Supra* § II.C.  Even the frequent and conversational tone of the emails shows the close relationship between Meta and Google, Ex. 34 at FB_BRTL_00016961, and supports a jury finding that Meta plainly expected that its correspondence would be acted upon.

Next Meta argues that it did not know that Google removing the extensions would cause BrandTotal harm. Again, this assertion strains credulity. Evidence indicates that Meta ████ ████████████████████████████████ (e.g., Ex. T at FB_BRTL_00014655; Ex. 40 at FB_BRTL_28694; Ex. S at FB_BRTL_00000053), and Meta concedes it "understood generally that BrandTotal sold competitive marketing analytics." Dkt.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

272 at 27. It did not have to know the details of BrandTotal's contracts (like whether there were "particular volume of data" requirements, as mentioned in Meta's brief), in order to know that cutting off the data collecting applications, would harm BrandTotal and interfere with its contracts. See *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1092 (9th Cir. 2005)("the defendant need not know exactly who is a party to the contract, so long as he knows he is interfering with a contractual relationship"). Here, Meta knew BrandTotal had contracts, knew it relied heavily on data from Meta to provide analytic services, and it had spoken to advertisers inquiring about BrandTotal. *See* § II.C. A reasonable juror could conclude Meta intended to interfere.

           **b.**      **The Evidence Supports a Jury Finding that the Disruption to BrandTotal was the Direct Result of Meta's Interference**

Meta argues that there is not proximate cause between Meta's actions and the disruption of customer relationships, implying that some long period of time elapsed between the actions and the disruption. Dkt. 272 at 28. This is not the case. After Meta sent the September 21 email, the extensions went down at the beginning of October, and BrandTotal immediately lost access to the UpVoice data stream, and the ability to compensate UpVoice panelists for the time that panelist has spent on social media sites (Facebook and other sites). *See* § II.D. This also compromised the robust analytics services it was able to offer its customers. Ex. H, 154:7–17, 179:10–20, 182:21–183:3 .[22] Over the next several months BrandTotal lost several customers and was forced to ███████████████████████████████████████████████████████████████ *Id.* at 159:9–160:16; 162:16–163:20. This was not some "disjointed" remote-in-time event, but directly followed from the actions of Meta as any juror could find. *See* Ex. 49 at BT0002996 (████████████████████████████████████████ ██████████████████████████████████████

With its summary judgment motion, Meta submits a declaration from a Google employee

---

[22] Meta argues that BrandTotal had other sources of data (Dkt. 272 at 29), but Meta is well aware that the vast majority of BrandTotal's data came through UpVoice. *Supra* § II.C. Moreover, the fact that a small trickle continued through January 2021 (Dkt. 272 at 29), does not alter the significant impact from the loss of data in October 2020.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   that states Google conducted an "independent" investigation of BrandTotal, see Ackerman Decl.,

2   and from this Meta argues it was not the cause of Google removing the extensions. Dkt. at 29.

3   This declaration was not provided in advance of summary judgment and BrandTotal did not have

4   a chance to depose this witness on the content of that statement. The assertion of independent

5   investigation in the declaration is belied by the correspondence reflecting a long-standing

6   relationship between Google and Meta (both before and after this case began),

7   , and the timing of

8   Google's actions (i.e., acting only after Meta's request). A reasonable juror could conclude that

9   Google's investigation was not truly independent, that it relied on Meta, and that it never

10  investigated the BrandTotal business and panelist consent in any meaningful way. Documents

11  produced by Google show

12  *Supra* § II.C; Ex. CC.

13  (Ex. CC), further supporting the inference

14  that it was Meta's actions, and not some independent Google investigation, that precipitated the

15  harm to BrandTotal. In any event, the credibility and accuracy of the Google witness will be

16  tested at trial and there remains at least a triable issue of fact for a jury.

17          Meta also contends "external factors" could be the cause of lost customers. Dkt. 272 at

18  30. Meta notes that 2020 was "turbulent" and cites factors like COVID-19, lack of good

19  customer service, and the litigation itself as possible causes for the customer loss. Dkt. 272 at 30.

20  Yet, BrandTotal identified specific customers and revenue it believes were lost due to the data

21  disruption, and documents produced in discovery support this belief. Ex. 62, §§ 3.2-3.3; Tab 3,

22  Schedule 310; Tab 4, Schedule 410; Tab 5, Schedule 510. Moreover, BrandTotal witnesses

23  testified that

24  . Ex. H, 154:7–17, 179:10–20, 182:21–183:3.Whether other factors contributed

25  to the loss of customers is for the jury to decide. Certainly, a reasonable juror could find that it

26  was due to loss of Facebook data, especially when this is reflected by the customer

27  correspondence.

28

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

**c.     The Evidence Supports a Jury Finding that Existing Customer Contracts Were Lost and BrandTotal Damaged by Meta's Actions**

Meta claims BrandTotal cannot state a claim for interference with contract because some of the customers on which the damage claim is based chose not to renew their contract, and some of ███████████████████████████████████████████████████████████████ ████████████████████████. Dkt. 272 at 32. Yet, BrandTotal indisputably had contractual relationships with each of the identified customers, and those relationships were disrupted. *See* Ex. 62, pp. 7-8. Interference with contract, under California law and as also cited by Meta, requires "breach or disruption of the contractual relationship." *See Reeves v. Hanlon*, 33 Cal. 4th 1140, 1148 (2004). That has occurred here. How the disruption played out in each case (i.e., whether the contract was put on hold, or a new contract with credits entered into, etc.) will be relevant to damages, but those details do not establish or deprive BrandTotal of its cause of action.

*Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1147 (2020), cited by Meta, does not hold otherwise. In *Ixchel* a company canceled an at-will joint venture agreement as part of a settlement with another company. The California Supreme Court held that in the case of a claim of interference with an at-will contract, the interference must be independently wrongful. Here the situation is very different. Meta interfered in a way that disrupted existing contracts, and even if some of those agreements could be categorized as "at-will," the actions of Meta were fraudulent and thus, independently wrongful. Neither BrandTotal nor its customers wanted the disruption, and there is more than ample evidence from which a jury could find Meta acted wrongfully.

**4.     Meta Interfered with UpVoice Panelists and BrandTotal's Google Offerings**

Meta's argument that its contracts with Panelists and Google are unlawful fails for the reasons described above. As to the issue of at-will termination, Meta ignores that Google's removal of UpVoice interfered with fully vested, non-terminable contractual obligations—such as

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1  Panelists' entitlement to tokens for past activity. Accordingly, BrandTotal need only satisfy the

2  elements of an interference with contract claim. Regardless, summary judgment is inappropriate

3  under either the intentional interference with contract or IIPEA lens.

4       Meta's claim that no reasonable factfinder could find that "Meta proximately caused the

5  disruption of any panelist relationships," Dkt. 272 at 34,  is groundless. BrandTotal witnesses

6  testified to the takedown's harmful impact on existing panelists and efforts to recruit new ones.

7  Dkt. 26-5 ¶ 26. As to causation, a reasonable jury could plainly find that Meta's inaccurate and

8  misleading communication to Google—which was wrongful for all the reasons stated above—

9  proximately caused this harm.

10       Meta's suggestion that an interference with contract claim requires specific intent to

11  induce breach, Dkt. 272 at 34, is wrong. *Ixchel*, 9 Cal. 5th at 1148 ("An actionable claim for

12  interference with contractual relations does not require that the defendant have the specific intent

13  to interfere with a contract."). All that is required is knowledge that interference was substantially

14  certain to occur; and a reasonable fact-finder could plainly reach that conclusion here based on

15  Meta's documented cozy relationship with Google, and Meta's investigation into and knowledge

16  of the workings of UpVoice. Indeed, the very document Meta cites as purportedly casting doubt

17  on whether Google would take action also includes language indicating that Meta assumed

18  Google would take action as a matter of course. Ex. 45 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."). Such factual uncertainty precludes summary judgment.

20       **E.**    **Summary Judgment Should Be Denied on BrandTotal's UCL Claim**

21       This Court has already found that the "unfair" prong of the UCL claim is based on

22  BrandTotal's theories of interference. Dkt. 158 at 24. For the reasons set forth above, summary

23  judgment on the UCL claim should thus similarly be denied.

24  **IV.**   **CONCLUSION**

25       For the foregoing reasons, BrandTotal respectfully requests that this Court DENY Meta's

26  motion for summary judgment.

27

28

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

Date: April 1, 2022

Respectfully submitted,

By: */s/ Rudolph A. Telscher, Jr.*
Rudolph A. Telscher, Jr.*
rudy.telscher@huschblackwell.com
Kara R. Fussner*
kara.fussner@huschblackwell.com
HUSCH BLACKWELL LLP
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
314-480-1500 Telephone

Ryan B. Hauer*
ryan.hauer@huschblackwell.com
David E. Anderson*
david.anderson@huschblackwell.com
HUSCH BLACKWELL LLP
120 South Riverside Plaza Suite 2200
Chicago, IL 60606
312-655-1500 Telephone

Dustin L. Taylor*
dustin.taylor@huschblackwell.com
HUSCH BLACKWELL LLP
180 1 Wewatta Street, Suite 1000
Denver, CO 80202
303-749-7200 Telephone
*admitted *pro hac vice*

Stephen P. Bosco*
stephen.bosco@huschblackwell.com
HUSCH BLACKWELL LLP
750 17th Street, NW, Suite 900
Washington, DC 20006

202-378-2300 Telephone
Karl Kronenberger (CA Bar No. 226112)
karl@krinternetlaw.com
Jeffrey M. Rosenfeld (CA Bar No. 222187)
jeff@krinternetlaw.com
KRONENBERGER ROSENFELD, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
415-955-1155 Telephone

***Attorneys for Defendants/Counterclaim Plaintiffs***
***BrandTotal, Ltd. and Unimania, Inc.***

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of April 2022, I caused the foregoing to be filed electronically with the Clerk of Court and to be served via email upon all counsel of record at the following:

WILMER CUTLER PICKERING
HALE AND DORR LLP
SONAL N. MEHTA (SBN 222086)
sonal.mehta@wilmerhale.com
THOMAS G. SPRANKLING (SBN 294831)
thomas.sprankling@wilmerhale.com
JOSEPH M. LEVY (SBN 329318)
joseph.levy@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

ARI HOLTZBLATT
Ari.Holtzblatt@wilmerhale.com
ALLISON SCHULTZ
Allison.Schultz@wilmerhale.com
ROBIN C. BURRELL
robin.burrell@wilmerhale.com
1875 Pennsylvania Ave, NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

CINDY PAN
cindy.pan@wilmerhale.com
250 Greenwich Street
New York, NY 10007
Telephone (212) 937-7275

ANDRES ROSSO O'LAUGHLIN
andy.olaughlin@wilmerhale.com
60 State Street
Boston, MA 02109
Telephone (617) 526-6220

*Attorneys for Plaintiff/Counterclaim Defendant Meta Platforms, Inc.*

SPENCER LLP
BRANDON L BOXLER
BBoxler@spencerllp.com
6802 Paragon Place, Suite 230
Richmond, VA 23230
Telephone: (804) 285-5236

*/s/ Rudolph A. Telscher, Jr.*