WILMER CUTLER PICKERING
 HALE AND DORR LLP
SONAL N. MEHTA (SBN 222086)
Sonal.Mehta@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

ARI HOLTZBLATT (*pro hac vice*)
Ari.Holtzblatt@wilmerhale.com
ALLISON SCHULTZ (*pro hac vice*)
Allison.Schultz@wilmerhale.com
ROBIN C. BURRELL (*pro hac vice*)
robin.burrell@wilmerhale.com
1875 Pennsylvania Ave, NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

ANDY R. O'LAUGHLIN (*pro hac vice*)
andy.olaughlin@wilmerhale.com
60 State Street
Boston, MA 02109
Telephone: (617) 526-6220
Facsimile: (617) 526-5000

CINDY PAN (*pro hac vice*)
cindy.pan@wilmerhale.com
250 Greenwich Street
New York, NY 10007
Telephone: (212) 937-7275
Facsimile: (212) 230-8888

*Attorneys for Plaintiff/Counterclaim Defendant
Meta Platforms, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| META PLATFORMS, INC., a Delaware corporation,<br><br>                Plaintiff/Counterclaim<br>                Defendant,<br><br>        v.<br><br>BRANDTOTAL, LTD., an Israel corporation, and UNIMANIA, INC., a Delaware corporation,<br><br>                Defendants/Counterclaim<br>                Plaintiffs. | Case No. 3:20-cv-07182-JCS<br><br>**META PLATFORMS, INC.'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Hon. Joseph C. Spero<br>Courtroom F – 15th Floor<br>Date:    April 29, 2022<br>Time:    9:30 a.m. |

**TABLE OF CONTENTS**

**Page(s)**

I. BRANDTOTAL IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS PUBLIC POLICY DEFENSE TO ITS BREACH OF SECTION 3.2.3 ............................................................. 3

   A. BrandTotal Identifies No Public Policy Requiring Platforms To Permit The Automated Collection of Data............................................................. 4

      1. Enforcement Of Section 3.2.3 Would Not Undermine Policy Of Promoting Competition............................................................. 5

      2. Section 3.2.3 Does Not Contravene Any Policy On User Control Over Online Data ............................................................. 6

      3. Public Interest In Free Flow Of Information On The Internet Does Not Justify Voiding Anti-Scraping Provision ............................... 8

   B. BrandTotal Has Not Met Its Burden To Demonstrate That Public's Strong Interests In Enforcing Contract Terms Are Outweighed........................ 10

      1. The Parties Expected That Section 3.2.3 Would Be Enforced............... 10

      2. The Public Interest Favors Enforcement ................................................. 11

      3. Advertising Users Who Rely On The Anti-Scraping Provision Would Be Deprived Of That Benefit If Enforcement Were Denied.............................................................................................................. 15

   C. If There Is Any Doubt, BrandTotal's Motion Must Be Denied Because Of Its Reliance On Disputed Facts About Its Current Conduct.......................... 16

   D. BrandTotal's Argument That Section 3.2.3 Is Void For Public Policy Is Not A Defense To Meta's Tortious Interference Claim.................................... 17

II. BRANDTOTAL'S UNCONSCIONABILITY DEFENSE FAILS AS A MATTER OF LAW......... 17

   A. BrandTotal Waived Its Unconscionability Defense............................................. 18

   B. Meta's Prohibition On Unauthorized Automated Data Collection Is Not Unconscionable ...................................................................................................... 19

      1. The Parties' Agreement Was Not Procedurally Unfair......................... 19

      2. Section 3.2.3 Is Not Substantively Unconscionable.............................. 22

   C. Unconscionability Of Section 3.2.3 Is Not A Defense To Meta's Tortious Interference Claim................................................................................... 25

III. BRANDTOTAL IS NOT ENTITLED TO SUMMARY JUDGMENT UNDER THE CFAA AND CDAFA WITH RESPECT TO UPVOICE 2021 AND ONGOING SERVER-SIDE COLLECTION .............................................................................................................. 26

   A. UpVoice 2021 Accesses Meta's Computers............................................................ 26

   B. BrandTotal's Server-Side Collection Violates The CFAA And CDAFA .......... 27

1.  The CFAA And CDAFA Protect All Information, Not Just Password-Protected Information............................................. 28

2.  BrandTotal Continues To Scrape Password-Protected Locations .......... 29

IV.  **BRANDTOTAL IS NOT ENTITLED TO SUMMARY JUDGMENT ON META'S UCL CLAIM AS TO UPVOICE 2021** ............................................................... 31

A.  BrandTotal Is Not Entitled To Judgment Regarding Its "Participating Site" Misrepresentation ................................................................. 31

B.  Meta's UCL Claim Is Not Limited To BrandTotal Misrepresenting Facebook as a "Participating Site" ........................................ 32

CONCLUSION ........................................................................................ 33

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Adkins v. Facebook, Inc.*,
2019 WL 3767455 (N.D. Cal. Aug. 9, 2019).............................................................19, 20

*Altschul v. Sabyle*,
83 Cal. App. 3d 153 (1978)............................................................................... 4

*Asia Vital Components Co. v. Asetek Danmark A/S*,
377 F. Supp. 3d 990 (N.D. Cal. 2019)............................................................... 18

*Bass v. Facebook, Inc.*,
394 F. Supp. 3d 1024 (N.D. Cal. 2019).............................................................. 24

*Beer Nuts, Inc. v. King Nut Co.*,
477 F.2d 326 (6th Cir. 1973).............................................................................. 9

*Bovard v. American Horse Enterprises, Inc.*,
201 Cal. App. 3d 832 (1988)..................................................................3, 11, 15

*Brisbane Lodging, L.P. v. Webcor Builders, Inc.*,
216 Cal. App. 4th 1249 (2013).................................................................3, 5, 6

*Britt v. ContextLogic, Inc.*,
2021 WL 1338553 (N.D. Cal. Apr. 9, 2021) ...................................................... 21

*Circuit City Stores, Inc. v. Mantor*,
335 F.3d 1101 (9th Cir. 2003)............................................................................ 19

*Craigslist Inc. v. 3Taps Inc.*,
964 F. Supp. 2d 1178 (N.D. Cal. 2013)................................................................ 29

*Craigslist, Inc. v. Naturemarket, Inc.*,
694 F. Supp. 2d 1039 (N.D. Cal. 2010)................................................................ 23

*Darnaa, LLC v. Google LLC*,
756 F. App'x 674 (9th Cir. 2018) .......................................................................... 22

*Dean Witter Reynolds, Inc. v. Superior Court of Alameda County*,
211 Cal. App. 3d 758 (1989)........................................................................21, 22

*Dunkin v. Boskey*,
82 Cal. App. 4th 171 (2000)..................................................................3, 10, 11

*EF Cultural Travel BV v. Zefer Corp.*,
  318 F.3d 58 (1st Cir. 2003) .................................................................................... 29

*Epic Games, Inc. v. Apple, Inc.*,
  2021 WL 4128925 (N.D. Cal. Sept. 10, 2021) ...................................................... 6, 24

*Facebook Inc. v. Power Ventures, Inc.*,
  844 F.3d 1058 (9th Cir. 2016) .............................................................................. 27, 29

*Facebook, Inc. v. Power Ventures, Inc.*,
  252 F. Supp. 3d 765 (N.D. Cal. 2017) .................................................................... 23

*Facebook, Inc. v. Sluchevsky*,
  2020 WL 5823277 (N.D. Cal. Aug. 28, 2020) ...................................................... 11, 23

*Fagerstrom v. Amazon.com, Inc.*,
  141 F. Supp. 3d 1051 (S.D. Cal. 2015) .................................................................. 21

*Ferguson v. Countrywide Credit Industries, Inc.*,
  298 F.3d 778 (9th Cir. 2002) .................................................................................. 25

*Golden Gate Way LLC v. Enercon Services, Inc.*,
  2021 WL 5407517 (N.D. Cal. Nov. 18, 2021) ...................................................... 3, 4

*Food Safety Net Services v. Eco Safe Systems USA, Inc.*,
  209 Cal. App. 4th 1118 (2012) .............................................................................. 24

*Grand Prospect Partners, L.P. v. Ross Dress for Less, Inc.*,
  232 Cal. App. 4th 1332 (2015) ........................................................................ 19, 22, 23

*Gregorie v. Alpine Meadows Ski Corp.*,
  2009 WL 2425960 (E.D. Cal. Aug. 7, 2009) .......................................................... 17

*Hadley v. Kellogg Sales Co.*,
  273 F. Supp. 3d 1052 (N.D. Cal. 2017) .............................................................. 32, 33

*Hill v. Westbrook's Estate*,
  247 P.2d 19 (Cal. 1952) .................................................................................... 16, 17

*hiQ Labs, Inc. v. LinkedIn Corp.*,
  938 F.3d 985 (9th Cir. 2019) ........................................................................ *passim*

*Huynh v. Quora, Inc.*,
  2019 WL 11502875 (N.D. Cal. Dec. 19, 2019) ...................................................... 24

*Idaho Potato Commission v. M&M Produce Farm & Sales*,
  335 F.3d 130 (2d Cir. 2003) .................................................................................. 9

*In re Marriage of Cauley*,
  138 Cal. App. 4th 1100 (2006)............................................................................3, 10

*In re Nexus 6P Products Liability Litigation*,
  293 F.Supp.3d 888 (N.D. Cal. 2018)........................................................... 20

*Kelton v. Stravinski*,
  138 Cal. App. 4th 941 (2006)......................................................................... 4

*Lanigan v. City of Los Angeles*,
  199 Cal. App. 4th 1020 (2011)...............................................................20, 25

*Lawman v. City & County of San Francisco*,
  159 F. Supp. 3d 1130 (N.D. Cal. 2016)........................................................ 18

*Lear, Inc. v. Adkins*,
  395 U.S. 653 (1969).................................................................................8, 9

*Loewen v. Lyft, Inc.*,
  129 F. Supp. 3d 945 (N.D. Cal. 2015)......................................................... 21

*Manhattan Community Access Corp. v. Halleck*,
  139 S. Ct. 1921 (2019)................................................................................. 8

*Maxim Crane Works, L.P. v. Tilbury Constructors*,
  208 Cal. App. 4th 286 (2012)...................................................................... 10

*McIlwain LLC v. Berman*,
  2020 WL 1308342 (N.D. Cal. Feb. 10, 2020).............................................. 4

*Moran v. Harris*,
  131 Cal. App. 3d 913 (1982).....................................................................4, 8

*Morris v. Redwood Empire Bancorp*,
  128 Cal. App. 4th 1305 (2005)..................................................19, 20, 21

*Muschany v. United States*,
  324 U.S. 49 (1945).................................................................................4, 5

*Nevarez v. Forty Niners Football Co., LLC*,
  2017 WL 3492110 (N.D. Cal. Aug. 15, 2017)............................................. 21

*Nguyen v. Barnes & Noble Inc.*,
  763 F.3d 1171 (9th Cir. 2014)..................................................................... 20

*Niantic, Inc. v. Global++*,
  2019 WL 8333451 (N.D. Cal. Sept. 26, 2019)............................................ 23

*Nissan Fire & Marine Insurance Co. v. Fritz Cos.*,
    210 F.3d 1099 (9th Cir. 2000) ...................................................................31, 32

*Parada v. Superior Court of Orange County*,
    176 Cal. App. 4th 1554 (2009 ................................................................. 20

*People's Choice Wireless, Inc. v. Verizon Wireless*,
    131 Cal. App. 4th 656 (2005) ................................................................. 6

*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC*,
    55 Cal. 4th 223 (2012) .....................................................................19, 22

*Planned Parenthood Federation of America, Inc. v. Center for Medical Progress*,
    402 F. Supp. 3d 615 (N.D. Cal. 2019) ...................................................... 16

*Poublon v. C.H. Robinson Co.*,
    846 F.3d 1251 (9th Cir. 2017) ............................................................. 19

*Prager University v. Google LLC*,
    951 F.3d 991 (9th Cir. 2020) ................................................................ 8

*Rent-A-Center, West, Inc. v. Jackson*,
    561 U.S. 63 (2010) ......................................................................... 23

*Sanchez v. Valencia Holding Co.*,
    61 Cal. 4th 899 (2015) ....................................................................2, 19

*Serpa v. California Surety Investigations, Inc.*,
    215 Cal. App. 4th 695 (2013) ............................................................... 23

*Sheppard, Mullin, Richter & Hampton, LLP v. J-M Manufacturing Co.*,
    6 Cal. 5th 59 (2018) ......................................................................4, 6, 7

*Simulados Software, Ltd. v. Photon Infotech Private, Ltd.*,
    40 F. Supp. 3d 1191 (N.D. Cal. 2014) ...................................................... 24

*Swift v. Zynga Game Network, Inc.*,
    805 F. Supp. 2d 904 (N.D. Cal. 2011) ...................................................... 21

*Tacori Enterprises v. Nerces Fine Jewelry*,
    2013 WL 12113229 (C.D. Cal. Sept. 20, 2013) ............................................ 9

*United States ex rel. Green v. Northrop Corp.*,
    59 F.3d 953 (9th Cir. 1995) ...............................................................11, 13

*United States v. Nosal*,
    844 F.3d 1024 (9th Cir. 2016) .............................................................27, 28

*United States v. Nosal*,
   930 F. Supp. 2d 1051 (N.D. Cal. 2013) ................................................................. 26

*Van Buren v. United States*,
   141 S. Ct. 1648 (2021) ....................................................................................2, 28, 29

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
   425 U.S. 748 (1976) .................................................................................................. 8

*VL Systems, Inc. v. Unisen, Inc.*,
   152 Cal. App. 4th 708 (2007) ................................................................................. 4

*Williams v. Gerber Products Co.*,
   552 F.3d 934 (9th Cir. 2008) ................................................................................. 31

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
   259 F.3d 1101 (9th Cir. 2001) ............................................................................... 18

**Statutes, Rules, Regulations**

18 U.S.C. § 1030(a)(2) ................................................................................................. 26

Cal. Bus. & Prof. Code § 16600 ................................................................................... 4

Cal. Civ. Code
   § 1798.100 ................................................................................................................ 7
   § 1798.105 ................................................................................................................ 7
   § 1798.110 ................................................................................................................ 7
   § 1798.115 ................................................................................................................ 7
   § 1798.125 ................................................................................................................ 7

Cal. Penal Code § 502(c) ............................................................................................ 26

California Privacy Rights Act (CPRA) ....................................................................6, 7

Fed. R. Civ. P. 12 ......................................................................................................... 6

Fed. R. Civ. P. 26(e) ................................................................................................... 18

**Constitutional Material**

U.S. Const. amend. I ...............................................................................................8, 17

BrandTotal reaped the benefits of contracting with Meta Platforms and opening Facebook accounts, knowing full well that the contracts prohibited the very conduct that is the cornerstone of BrandTotal's business: unauthorized data scraping from Facebook. BrandTotal made a conscious decision to build its business on violating that term, while actively taking advantage of its Facebook accounts to recruit panelists and attract customers. *See* Ex. 1 (Dor Jan. 13, 2021 Dep. Tr.) at 52:14-53:7. BrandTotal sought legal advice on the issue but proceeded to scrape data even after its lawyers advised it that its data harvesting operation violated, or risked violating, Meta's terms. And there is no reason to doubt that it would have continued to do so indefinitely had Meta not discovered BrandTotal's misconduct and initiated this lawsuit. Having enjoyed the benefits of its bargain with Meta for years, BrandTotal now seeks to evade Meta's prohibition against automated scraping on the grounds that it violates public policy and is unconscionable. Neither doctrine permits BrandTotal to void its contract with Meta now that its knowing violation of that agreement has been uncovered.

*First*, BrandTotal's public policy arguments fail. BrandTotal has not demonstrated that the public interests in enforcement of the anti-scraping provision (both in general and specifically to protect the integrity of Meta's platform) are clearly outweighed by any express public policy against enforcing that term. BrandTotal points to a wide range of highly generalized policy goals, including promoting user control over their own data, competition, and the free flow of ideas. None satisfy BrandTotal's burden to show that an express policy requires websites to allow third parties to scrape user data from the website for their own commercial gain. And BrandTotal entirely ignores the strong interests that favor enforcement of provisions prohibiting automated collection, which are an important and widespread tool for protecting websites and online platforms—one used by BrandTotal itself. BrandTotal's own conduct before and throughout this litigation demonstrates why Section 3.2.3 and similar prohibitions on automated data collection are necessary.

*Second*, BrandTotal cannot avoid liability for breach of contract on unconscionability grounds. BrandTotal waived this defense by failing to adequately disclose it during fact discovery. Regardless, it fails on the merits. BrandTotal cannot establish procedural unconscionability

because the undisputed facts show that it was aware of Section 3.2.3 and still chose to sign up for Meta's services. BrandTotal "cannot avoid a contractual obligation merely by complaining that the deal, in retrospect, was unfair or a bad bargain." *Sanchez v. Valencia Holding Co.*, 61 Cal. 4th 899, 911-912 (2015). And BrandTotal does not even try to argue that Section 3.2.3—a common prohibition on scraping that, again, BrandTotal's own terms included until it recently scrubbed them—is so harsh or one-sided that it shocks the conscience, as is required to establish substantive unconscionability. Instead, BrandTotal claims that it is unconscionable for that term to apply to former Facebook users by virtue of Section 4.2, a survival clause, when Meta limits its own liability under the contract. But BrandTotal is not a "former" Facebook user because it continues to have active Facebook accounts. And, in any case, survival clauses and limitations of liability do not shock the conscience. Indeed, BrandTotal itself includes both in its own terms.

*Third*, BrandTotal's arguments under the CFAA and CDAFA also fail. BrandTotal contends that UpVoice 2021 and BrandTotal's server-side collection technique either do not access Meta computers at all or do not access password-protected locations of those computers. But BrandTotal's own witnesses have admitted that UpVoice 2021 and BrandTotal's server-side collection technique access Meta's computers within the meaning of the CFAA and CDAFA, and it is legally irrelevant whether BrandTotal accesses password- or non-password protected locations. BrandTotal fails to mention that the Ninth Circuit's decision in *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985 (9th Cir. 2019), on which it exclusively relies has since been vacated and remanded, 141 S. Ct. 2752 (2021) (Mem.), in light of *Van Buren v. United States*, 141 S. Ct. 1648 (2021). Without that now-vacated decision, BrandTotal's request for summary judgment finds no support in the law. And because the record shows that both UpVoice 2021 and BrandTotal's server-side collection technique access and obtain information from Meta's computers without authorization to do so, the only judgment supported on the undisputed facts is that BrandTotal *has* violated the CFAA and the CDAFA.

*Finally*, BrandTotal is not entitled to judgment on Meta's claim under California's unfair competition claim ("UCL") because BrandTotal has not met its burden of presenting evidence to negate an essential element of Meta's claim or otherwise show that Meta will be unable to carry

1    its ultimate burden of persuasion at trial.

2    **I.    BRANDTOTAL IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS PUBLIC POLICY
3    DEFENSE TO ITS BREACH OF SECTION 3.2.3**

4        BrandTotal does not dispute—and indeed appears to concede—that it violated Facebook's

5    Terms of Service.[1] *See* Mot. 2 (conceding that UpVoice 2021 is impermissible under Section

6    3.2.3); *see also* Dkt. 272 at 10-12 (Meta's Mot. for Summ. J.) (explaining BrandTotal's breach

7    based on the undisputed facts). Instead, BrandTotal argues that it is entitled to summary judgment

8    on its affirmative defense that Section 3.2.3 of Facebook's Terms of Service is void for public

9    policy. Mot. 14-30.

10        "'The power of the courts to declare a contract void for being in contravention of sound

11    public policy is a very delicate and undefined power, and … should be exercised only in cases free

12    from doubt.'" *Golden Gate Way LLC v. Enercon Servs., Inc.*, 2021 WL 5407517, at *9 (N.D. Cal.

13    Nov. 18, 2021) (citation omitted). A contract is void only if "legislation provides that it is

14    unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a

15    public policy against the enforcement of such terms." *Dunkin v. Boskey*, 82 Cal. App. 4th 171, 174

16    (2000). As the party seeking to void the contract, BrandTotal bears the burden of demonstrating

17    that "its enforcement would be in violation of the *settled public policy* of this state." *Bovard v.*

18    *American Horse Enterprises, Inc.*, 201 Cal. App. 3d 832, 840 (1988) (emphasis added). In

19    evaluating that question, courts consider both "the public policy against enforcement" of the

20    contract term and whether that public policy clearly outweighs the countervailing "interest in

21    enforcement" of the term." *In re Marriage of Cauley*, 138 Cal. App. 4th 1100, 1106 (2006) (citing

22    Restatement 2d Contracts § 178).

23        BrandTotal falls far short of meeting that "heavy burden." *Brisbane Lodging, L.P. v.*

24    *Webcor Builders, Inc.*, 216 Cal. App. 4th 1249, 1261 (2013). It identifies no express policy that

---

[1] BrandTotal appears to make a public policy argument as to only the Facebook term prohibiting automated collection (Section 3.2.3), and not as to the Instagram term. While its motion purports to define "Facebook" to refer to "Plaintiff Meta Platforms, Inc.," BrandTotal's argument discusses only the Facebook Terms of Service, Section 3.2.3. It never cites nor addresses the Instagram Terms of Use or any provision therein.

Section 3.2.3 violates, instead pointing only to general policy goals that are far too amorphous to override a contract. Nor has BrandTotal demonstrated that any of these vague policy goals can clearly outweigh the strong public interest in enforcement of Section 3.2.3—an interest that BrandTotal's own conduct well illustrates. The Court should accordingly grant summary judgment on that defense in favor of Meta. *See, e.g.*, *Golden Gate Way LLC*, 2021 WL 5407517, at *12.

### A. BrandTotal Identifies No Public Policy Requiring Platforms To Permit The Automated Collection of Data

A contractual provision is void for public policy only "if it is '[c]ontrary to an *express* provision of law' or '[c]ontrary to the policy of *express* law, though not expressly prohibited.'" *Sheppard, Mullin, Richter & Hampton, LLP v. J-M Mfg. Co.*, 6 Cal. 5th 59, 73 (2018) (emphasis added); *see also Moran v. Harris*, 131 Cal. App. 3d 913, 921 (1982) ("We may not encroach upon the lawmaking branch of government in the guise of public policy unless the challenged transaction is contrary to a statute or some well-established rule of law."). BrandTotal's own cases demonstrate this requirement. For example, in *VL Systems, Inc. v. Unisen, Inc.*, 152 Cal. App. 4th 708, 713-714 (2007), the Court found that a no-hire provision designed to prevent competitors from soliciting a company's employees was unenforceable based on the *express* statutory command set forth in Cal. Bus. & Prof. Code § 16600 that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." *Id.* at 713 (quoting that statutory language).[2]

BrandTotal identifies no express statute or well-established rule of law that prohibits a ban on automated data collection. Instead, it relies exclusively on several broad policy goals: "user control over their data," Mot. 15-18, "competition," *id.* 18-22, and "the free flow of information," *id.* 22-26. That is not enough to meet BrandTotal's burden. "Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public

---

[2] *Kelton v. Stravinski*, 138 Cal. App. 4th 941, 881 (2006), voided a covenant not to compete based on same statutory provision. Similarly, in *Altschul v. Sabyle*, 83 Cal. App. 3d 153 (1978), the court held that an attorney-fee splitting contract violated public policy because it directly contravened an ethical canon from the American Bar Association that the State Bar had incorporated into its Rules of Professional Conduct. *See also McIlwain LLC v. Berman*, 2020 WL 1308342 (N.D. Cal. Feb. 10, 2020) (same).

---

interests." *Muschany v. United States*, 324 U.S. 49, 66 (1945). "A party seeking to avoid enforcement of a contract on public policy grounds has the burden 'to show that its enforcement would be in violation of the settled public policy of this state, or injurious to the morals of its people … [and BrandTotal] offers little insight into exactly which public policies would be violated by enforcement of [Section 3.2.3] under the facts and circumstances here." *Brisbane Lodging*, 216 Cal. App. 4th at 1261. None of BrandTotal's amorphous policy objectives establishes a policy against allowing a company to prohibit automated data scraping from its website. And none absolve BrandTotal of its contractual obligation to comply with Section 3.2.3.

        1.   <u>Enforcement Of Section 3.2.3 Would Not Undermine Policy Of Promoting Competition</u>

Next, BrandTotal argues that Section 3.2.3 is void because it "subverts the compelling public interest in competition," pointing generally to California's antitrust laws. Again, BrandTotal has not identified any express statutory provision, or policy of express law, that justifies voiding this contract term. The State's general interest in promoting competition does not invalidate Meta's prohibition against automated collection simply because BrandTotal designed its business to depend on that automated collection.

As a preliminary matter, BrandTotal should not be heard to use its "public policy" argument as a backdoor to revive its unfair competition claims, which the Court has dismissed with prejudice. *See* Dkt. 23, 120, 161. Dkt. 178 at 18 (Order Granting Motion to Dismiss with prejudice). In arguing (again) that Meta is extinguishing competition by failing to approve third-party automated data collection, BrandTotal is attempting to resurrect the refusal to deal theory that this Court has dismissed, *see* Dkt. 178. Mot. 20-21. The Court should reject that effort here as well.

Moreover, for the same reasons that Meta's alleged conduct did not amount to an antitrust violation, Section 3.2.3 is not contrary to the State's antitrust laws. As the Court previously explained, "BrandTotal has failed to identify any legislatively declared policy related to competition implicated by Facebook's failure to grant BrandTotal permission to access advertising data." Dkt. 178 at 13; *see also id.* at 12 ("BrandTotal has not identified any legislatively declared

policy *related to competition* implicated by Facebook's alleged conduct."). Having failed to meet even the liberal pleading standards under Rule 12 to bring a claim for unfair competition based on Meta's enforcement of its terms, BrandTotal's argument that Meta's terms are unenforceable because the violate the public policy of promoting "competition" is no more successful. *See e.g.*, *Epic Games, Inc. v. Apple, Inc.*, 2021 WL 4128925, at *122 (N.D. Cal. Sept. 10, 2021). Under California law, "the mere refusal to deal does not violate the spirit or policy of antitrust law." *People's Choice Wireless, Inc. v. Verizon Wireless*, 131 Cal. App. 4th 656, 667 (2005). To the contrary, the "right to refuse to deal remains sacrosanct." *Id.* BrandTotal still has provided no basis for disregarding that right here.

    *Epic Games* is illustrative. There, the Court declined to void provisions of a contract that it found had not violated the antitrust laws. 2021 WL 4128925, at *122. Then, because it had found that all but one provision of the licensing agreement at issue did not violate the antitrust laws, the court rejected Epic Games's "broad brush argument that it should not be bound by certain portions of the agreement" on its theory that they "contravene[d] some established interest of society, in the context of competition or otherwise." *Id.* BrandTotal's argument is even more of a stretch. In *Epic Games*, the antitrust claims were permitted to go to a bench trial on the merits. Here, BrandTotal's UCL claim for unfair competition did not even survive a pleading challenge. Its claim now that the provision prohibiting automated collection from Meta's platform violates an established policy on promoting competition when it could not even plead such a violation must be rejected as a matter of law. *See Brisbane*, 216 Cal. App. 4th at 1261 ("A party seeking to avoid enforcement of a contract on public policy grounds has the burden "'to show that its enforcement would be in violation of the settled public policy of this state[.]'" (citation omitted)).

    2.    <u>Section 3.2.3 Does Not Contravene Any Policy On User Control Over Online Data</u>

    BrandTotal first attempts and fails to justify invalidating Section 3.2.3 based on California's policy concerning "user control of online data," as expressed in the California Consumer Privacy Act ("CCPA") and California Privacy Rights Act ("CPRA"). But BrandTotal never points to any "express provision" or "policy of express law" contained in the statutes that

1   would void Section 3.2.3. *Sheppard, Mullin*, 6 Cal. 5th at 73. The mere fact that both the statutes

2   and the contract concern user data is of course insufficient. "The Court has previously rejected

3   BrandTotal's scattershot citations to the CCPA that failed to tie that law's actual requirements to

4   the conduct at issue in this case." Dkt. 178 at 12 (citing Dkt. 63 at 22 n.11). Indeed, this Court has

5   emphasized that "[t]he fact that information about advertising interactions falls within the statute's

6   definition of 'personal information' does not, in itself, say anything about whether Facebook must

7   provide BrandTotal access to such information." *Id.*

8          BrandTotal has done nothing to address these deficiencies—nor could it. Instead,

9   BrandTotal has abstracted California's "policy" to a level of generality that is meaningless. The

10   CCPA and CPRA do not stand for the proposition that consumers have the unfettered ability to

11   authorize third parties to scrape data from Meta, in violation of Meta's explicit terms. Instead, the

12   CCPA grants consumers specific rights to be informed about the personal information that a

13   company has collected or will collect about them, Cal. Civ. Code §§ 1798.100, 1798.110,

14   1798.115, to request that their personal information be deleted, *id.* § 1798.105, to "opt-out" of the

15   sale of their personal information, *id.* § 1798.120, and to not be discriminated against for exercising

16   their rights under the CCPA, *id.* § 1798.125. The CPRA, a ballot proposition approved in

17   November 2020, sets forth additional specific data privacy provisions. Those provisions create

18   duties and restrictions for businesses that collect personal information. *See e.g.*, § 1798.100 ("A

19   business that controls the collection of a consumer's personal information shall, at or before the

20   point of collection, inform consumers as to: (1) the categories of personal information collected

21   …"). BrandTotal does not point to *any* provision of those measures that establishes a policy of

22   California to allow consumers to authorize a third party to scrape data from websites they use, in

23   contravention of the website's terms of service.[3] Rather, the provisions they rely on relate

24

25

26

27   ────────────────
     [3] BrandTotal's reliance on these privacy statutes is ironic, ███████████████████████████

28   ██████████████████████████████████████████████████. Ex. 2 (Regev Nov. 18, 2021 Dep. Tr.) at
     167:20-168:16.

specifically to obligations between the user and the platform.[4] As it has done throughout this litigation, BrandTotal elides the critical distinction between a user controlling its own data on a platform and BrandTotal's ability to scrape that data in violation of Meta's explicit terms.

Ultimately, BrandTotal has not identified an explicit policy that would void a contractual term against the automated collection of data. Generalizations about "user control over data" are not enough. *See Moran*, 131 Cal. App. 3d at 919 (noting need for courts to exercise caution given that "'public policy' is a vague, somewhat troublesome and malleable expression").

### 3. Public Interest In Free Flow Of Information On The Internet Does Not Justify Voiding Anti-Scraping Provision

Finally, BrandTotal points to the public's "profound interest in promoting and maintaining the free flow of information," citing the First Amendment, patent law, and Ninth Circuit's now-abrogated decision in *hiQ*. Mot. 22-26. None could justify invalidating a contractual term preventing a method of data collection from a website.

To be sure, the First Amendment protects the "free flow of information." But the First Amendment accomplishes that objective in a specific way: restricting the *government's* ability to regulate speech.[5] For example, in *Virginia State Bd. of Pharm. v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976), the Court concluded that a state's ban on pharmacists advertising prescription drug prices violated the First Amendment. While BrandTotal cherry-picks language about the "strong interest in the free flow of commercial information," that case does not support the proposition that some generalized public interest in information flow supports invalidating Section 3.2.3—a private restriction on automated data collection.

For similar reasons, *Lear, Inc. v. Adkins*, 395 U.S. 653, 674-675 (1969) and its progeny do

---

[4] Meta in fact *has* extensive data portability protocols and tools which allow *users* to control their own data. Ex. 3 (FB_BRTL_00019487) (*Charting a Way Forward:  Data Portability and Privacy*).

[5] The First Amendment constrains government actors. "[A] private entity … who opens its property for speech by others is not transformed by that fact alone into a state actor." *Manhattan Comm. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1926 (2019); *see also Prager Univ. v. Google LLC*, 951 F.3d 991, 997 (9th Cir. 2020) (agreeing with courts that "have uniformly concluded that digital internet platforms that open their property to user-generated content do not become state actors" and holding that YouTube is not a state actor).

---

not bear the weight BrandTotal places on them. Those cases all address the enforceability of licensing provisions that preclude the licensee from challenging the validity of a patent or trademark. *See id.* (patent); *see also Idaho Potato Commission v. M&M Produce Farm & Sales*, 335 F.3d 130 (2d Cir. 2003) (certification mark). They do not stand for a general proposition that some policy of freedom of expression outweighs the public interest in the enforcing contracts. The inquiry in *Lear* was "whether federal patent policy bars a State from enforcing a contract regulating access to an unpatented secret idea." *Lear*, 359 U.S. at 672. Other courts in this Circuit have concluded that "*Lear*'s reasoning does not apply in other areas of law." *Tacori Enterprises v. Nerces Fine Jewelry*, 2013 WL 12113229, at *2 n.4 (C.D. Cal. Sept. 20, 2013). To wit, one of the cases BrandTotal cites as evidence that "[t]he *Lear* balancing approach has been applied to other areas of intellectual property law as well," Mot. 23, explicitly held that *Lear* did *not* apply in the trademark context, because "the public interest in guarding against the depletion of the general vocabulary available for the description of articles in commerce is not so great that it should take precedence over the rule of the law of contracts that a person should be held to his undertakings," *Beer Nuts, Inc. v. King Nut Co.*, 477 F.2d 326, 328-329 (6th Cir. 1973). BrandTotal has not and cannot explain why the federal patent policy at issue in *Lear* would require Meta to allow third parties to scrape data. Indeed, even if it were appropriate to generalize that balancing test to every other area of law, that policy would at most support the idea that users can express themselves freely—not that third parties must be allowed to scrape data from Facebook for commercial gain. And that is especially true here, because, according to BrandTotal, the "free flow of commercial information" extends only so far as BrandTotal's scraping the information from Facebook. From that point, the information does not flow freely at all; it flows only to those that pay BrandTotal for the "analytics" that BrandTotal offers based on the data it has taken from Facebook, Instagram, Google, Amazon, and others.

While BrandTotal relies on this Court's TRO Order citing to the now-abrogated *hiQ* opinion for the proposition that the public has "a strong public interest in maximizing the free flow of information," Mot. 23, that case actually *reiterated* that platforms could prevent data scraping through enforcement of their own contract rights. After holding that the CFAA provided no remedy

1  against scraping under the facts of that case (which are different from those here), the Ninth Circuit

2  in *hiQ* emphasized that "victims of data scraping" could still protect themselves using "other

3  causes of action, such as … breach of contract." 938 F.3d at 1004, *vacated and remanded*, 141 S.

4  Ct. 2752 (2021). To read that decision to support voiding such a contract term would thus turn the

5  court's analysis on its head.

**B.     BrandTotal Has Not Met Its Burden To Demonstrate That Public's Strong Interests In Enforcing Contract Terms Are Outweighed**

8  BrandTotal also fails to show as a matter of law that the interests in enforcement of this

9  contractual term are clearly outweighed by any of the purported public policies it identifies in its

10  motion. "Courts will examine the interest in enforcement of a contract term, taking into account

11  'the parties' justified expectations, ... any forfeiture that would result if enforcement were denied,

12  and ... any special public interest in the enforcement of the particular term.'" *In re Marriage of*

13  *Cauley*, 138 Cal. App. 4th at 1106 (citing Restatement 2d Contracts § 178(1)). Those factors all

14  counsel against finding Meta's terms void for public policy and BrandTotal has failed as a matter

15  of law to show otherwise.

1.     The Parties Expected That Section 3.2.3 Would Be Enforced

17  The parties' expectations weigh in favor of enforcement because BrandTotal simply cannot

18  show that it had any "justifiable expectations" that Section 3.2.3 would not be enforced. *In re*

19  *Marriage of Cauley*, 138 Cal. App. 4th at 1106. "The basic policy in the field of contracts is

20  protection of the justified expectations of the parties. Parties will generally enter into a contract

21  with the expectation that the provisions of the contract will be binding on them." *Maxim Crane*

22  *Works, L.P. v. Tilbury Constructors*, 208 Cal. App. 4th 286, 291 (2012). Remarkably here, there

23  is clear evidence that BrandTotal expected to be bound by the Section 3.2.3. In 2019, it sought and

24  received a legal opinion about Facebook's terms and was told that "any data collected, using

25  automated means, from what is defined products, cannot be collected." Ex. 4 (BT0001854) at

26  1856.

27  It would be especially brazen for BrandTotal to suggest it did not expect to be bound by its

28  contract with Facebook where BrandTotal *benefited* from its contracts with Meta. *See Dunkin*, 82

Cal. App. 4th at 191 (concluding that "respondent had the *benefit* of appellant's contractual obligation to care for and support the child" so the court could not "now countenance her repudiation of appellant's rights under the agreement"). BrandTotal created and operated multiple Facebook Pages and an Instagram account for years, which it used to recruit panelists and attract customers. *See* Dkt. 23 ¶ 6 (admitting that BrandTotal "promot[ed]" its products through its Facebook profiles); Ex. 5 (admitting BrandTotal used Facebook to promote its application); Ex. 1 (Dor Jan. 13, 2021 Dep. Tr.) at 52:14-53:7. Having secured the benefit of its bargain, BrandTotal now conveniently seeks to avoid its obligations under its agreement with Meta by voiding its contract. Public policy supports enforcement of contracts and the parties' settled expectations precisely to avoid this sort of opportunism. *See Dunkin*, 82 Cal. App. 4th at 191. BrandTotal's public policy defense should be rejected on this basis alone.

## 2.   The Public Interest Favors Enforcement

The public interest also weighs in favor of enforcement. To determine the public's interest in enforcement of a contract term, courts also must "look more broadly than to the facts of this case." *United States ex rel. Green v. Northrop Corp.*, 59 F.3d 953, 967 (9th Cir. 1995). Here, because Meta's anti-scraping provision applies to *all* Meta's users, and not only BrandTotal and its interest in its so-called "advertising intelligence," there is a strong public interest in its enforcement that BrandTotal has failed to show is outweighed by any contrary public policy. As a general matter, the public has a strong interest in the established principle that contracts are enforceable. *Bovard*, 201 Cal. App. 3d at 838-839 ("[P]ublic policy requires and encourages the making of contracts by competent parties upon all valid and lawful considerations, and courts so recognizing have allowed parties the widest latitude in this regard; and, unless it is entirely plain that a contract is violative of sound public policy, a court will never so declare."). That interest alone would warrant rejecting BrandTotal's motion.

But even beyond that general interest, there is a more specific public interest at play: "Facebook's ability to decisively police the integrity of its platforms is without question a pressing public interest." *Facebook, Inc. v. Sluchevsky*, 2020 WL 5823277, at *9 (N.D. Cal. Aug. 28, 2020) (*quoting Stackla, Inc. v. Facebook Inc.*, 2019 WL 4738288, at *6 (N.D. Cal. Sept. 27, 2019)); *see*

1    *also* Dkt. 63 at 30 (finding "a significant public policy supports allowing Facebook to police

2    automated access to password-protected platforms"). BrandTotal dismisses the public's interest in

3    enforcing the prohibition against unauthorized automated collection out-of-hand. Mot. 27-30. But

4    it cannot be set aside as easily as BrandTotal would like. The prevalence of terms prohibiting

5    automated collection demonstrate the enormous public interest in protecting platforms like

6    Facebook and Instagram. *See e.g.*, Ex. 6, YouTube, *Terms Of Service*; Ex. 7, Amazon, *Conditions*

7    *Of Use*; and Ex. 8, LinkedIn, *LinkedIn Service Terms*; *see also* Ex. 9 (Thaw Rep.) at 10 n.48

8    (collecting entities, including Twitter, United States Congress, and the New York Times, that

9    prohibit automated collection). The federal courts' docketing system prohibits misuse on its

10   website, including "using *an automated process to repeatedly access* those portions of the PACER

11   application that do not assess a fee (i.e., calendar events report or case header information) for

12   purposes of collecting case information." Ex. 10, PACER, *Policy & Procedures*. And BrandTotal's

13   *own terms* prevented the automated collection of data from its website until February 23, 2022,

14   when it apparently decided to remove that term given its litigation posture here. *Compare* Ex. 11

15   (BrandTotal, June 2018 *Terms and Conditions*, FB_BRTL_00025352) ("You may not … use or

16   launch any automated system (including without limitation, 'robots' and 'spiders') to access the

17   Site"), *with* Ex. 12 (BrandTotal, Feb. 2022 *Terms and Conditions*,

18   https://privacy.brandtotal.com/service_terms.pdf).

19        There are good reasons why platform companies like Meta and others that operate websites

20   include anti-scraping provisions in their terms. Scraping presents a serious concern for its users,

21   their security, and the security of Meta's platforms. Ex. 13 (Oct. 21, 2020 Clark Decl.) ¶ 6; *see*

22   *also* Ex. 9 (Thaw Rep.) at 15-24 (summarizing risks and harms associated with BrandTotal's

23   conduct). Scraping can circumvent restrictions websites put in place and adversely impact the

24   website's integrity; it can make it easier to deploy coordinated inauthentic behavior; it degrades

25   public trust and confidence; it can target personal and private data as well as content protected by

26   copyright; it disassociates content from the user; and it undermines the integrity of the network by

27   limiting the functionality of the network. Ex. 13 (Oct. 21, 2020 Clark Decl.) ¶ 5(a)-(g). To help

28   mitigate these risks, Meta prohibits automated scraping of data from its platforms and makes

substantial investments in technological measures and enforcement teams to prevent scraping and protect the interests of its users and its own platform. *Id.* ¶ 6. Facebook enforces its term against unauthorized scraping precisely because it can be difficult or impossible to determine whether the scraping is for a benign or malicious purpose. *Id.* ¶ 9. ██████████████████████████ ███████████████████████████████████. Ex. 14 (Wilcox Feb. 9, 2022 Dep. Tr.) at 160:6-14. And Meta's expert on cybersecurity risks, Dr. Thaw, describes the significant risks that allowing data scraping creates, including system impairment which can expose networks to denial-of-service or other attacks. Ex. 9 (Thaw Rep.) at 15-26.

Despite these serious concerns, BrandTotal argues that because its new, made-for-litigation extension, UpVoice 2021, is (according to BrandTotal) "benign," the Facebook term prohibiting unauthorized automated scraping must be void for public policy. But the public policy inquiry to void Meta's term requires the Court to look beyond just the narrow set of conduct that BrandTotal wants sanctioned. *See Northrop Corp.*, 59 F.3d at 967. BrandTotal is thus wrong that the Court should limit its analysis to only ***one*** of its browser extensions and ***part*** of its server-side scraping operation. And examining all of BrandTotal's conduct in this case provides ample reason why the public and Meta have a strong interest in enforcing the terms.

For example, BrandTotal ████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████. *See* Ex. 2 (Regev Nov. 18, 2021 Dep. Tr.) at 189:21-196:3. For all of its current emphasis on the consent it receives from users, there is no dispute that BrandTotal's privacy policy previously represented that data collected was "automatically rendered anonymized and non-personal," Ex. 15 (BrandTotal Privacy Policy, BT0000114), ████████████████████████, Ex. 2 (Regev Nov. 18, 2021 Dep. Tr.) at 167:20-168:16. ██████████████████████████████ ████████████████████████████████████████████████████████ ████████ *Id.* at 147:1-148:15.

BrandTotal's browser extensions also presented security risks because they allowed BrandTotal to scrape data from ███████ of Meta users who share a common browser on the same

1   computer, even if only one of those users actually installed the browser extension (the "Shared

2   Computer Problem"). Ex. 16 at 15 (Martens Rebuttal Rep.) ███████████████████████████████

3   ████████████). Like its ███████████████████████████████████████████

4   ████████████████████████████████████████████████████████████████████████

5   ████████████████ Ex. 1 (Dor Jan. 13, 2021 Dep. Tr.) at 110:2-111:22.

6        BrandTotal has also engaged in a number of other deceptive and insecure data collection

7   practices. For example, BrandTotal's applications and extensions previously exfiltrated user data

8   using an insecure method of anonymization, and BrandTotal only changed its anonymization

9   technique *after* an article was published making that conduct public. Ex. 17 (Oct. 21, 2020 Karve

10  Decl.) at ¶ 6 & Ex. 1; Ex. 1 (Dor Jan. 13, 2021 Dep. Tr.) at 156:4-15. BrandTotal also hid the

11  relationship between BrandTotal (the name under Defendants provided advertising analytics

12  services to customers) and Unimania (the name under which Defendants distributed extensions)

13  from competitors and users of its apps and extensions. Ex. 1 (Dor Jan. 13, 2021 Dep. Tr.) at 159:13-

14  161:10. And BrandTotal uses ████████████████████████████████████████████

15  ████████████████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████████████████

17  ██████████████████████████████. Ex. 18 (Martens Opening Rep.) ¶¶ 240-246;

18  Ex. 2 (Regev Nov. 18, 2021 Dep. Tr.) at 213:17-214:4; Ex. 19 (Vardi Feb. 20, 2022 Dep. Tr.) at

19  153:22-155:19.

20        In addition, since at least 2018, Google has removed a number of BrandTotal extensions

21  and applications from the Chrome Store or Play Store for noncompliance with various policies,

22  even before Meta reported BrandTotal to Google. *See* Ex. 1 (Dor Jan. 13, 2021 Dep. Tr.) at 154:17-

23  156:3 (Google removed Video Downloader for Facebook, Album and Photo Merger for Facebook,

24  PDF Merge-PDF Files Merger, and Tex Cam-Web Cam Effects in May or June 2018, following

25  the Ad Guard report); *see also, e.g.*, Ex. 20 ████████████████████████████████

26  ████████████████████, Ex. 21 (BT0020755, ████████████████████████████████

27  ████████████████████). ████████████████████████████████████████

28  ████████████████ Ex. 22 (BT0000235); Ex. 23. BrandTotal also ████████████████

1 ████████████████████████████████████████████████

2 ████████████████████. Mot. 8. ███████████████████

3 ████████████████████████████████████████████████ Ex.

4 24 (BT005486) at -87.[6]

5       3.    <u>Advertising Users Who Rely On The Anti-Scraping Provision Would Be Deprived</u>

6             <u>Of That Benefit If Enforcement Were Denied</u>

7      BrandTotal argues that there is no legitimate interest in enforcing Section 3.2.3 because

8 advertisers do not view the information it scrapes as proprietary. Mot. 28. But Meta has introduced

9 evidence that advertisers *do consider* "how they execute their advertising to be proprietary." Ex.

10 25 (Leach Nov. 18, 2021 Dep. Tr.) at 59:4-9. Thus, even focusing on UpVoice 2021 alone, voiding

11 Section 3.2.3 would result in forfeiture of a benefit that users who advertise on Facebook depend

12 on. *Bovard*, 201 Cal. App. 3d at 838 (in "weighing the interest of enforcement of a term," court

13 should consider "any forfeiture that would result if enforcement were denied").

14      Meta limits access to an advertiser's data to the advertiser itself and does not share that

15 data with an advertiser's competitors. Leach Decl. ¶ 5. It does this both by limiting access the

16 information that is available through approved channels and by prohibiting the unauthorized

17 scraping of advertisements and engagement information from Facebook and Instagram. Leach

18 Decl. ¶¶ 5-7. Meta limits access to advertising information because when a third-party gains access

19 that information, the third-party can reverse engineer an advertiser's proprietary advertising

20 strategies, including for example, decisions about how an advertiser develops or deploys a specific

21 advertising campaign and the decisions about the reach of that campaign. Leach Decl. ¶ 5.

22 Advertising users view information about those decisions as proprietary and valuable. *Id*. Even

23 BrandTotal's own "advertising expert" admits that one advertiser would not want another

24 advertiser accessing engagement information about its advertising campaign like that scraped by

25 BrandTotal. Ex. 14 (Wilcox Feb. 9, 2022 Dep. Tr.) at 120:4-8. BrandTotal itself touts the value of

26

27 [6] And while BrandTotal suggests that its "backend no longer collects data" from restricted pages, instead using the ████████████████████████████████████████

28 ████████████████████████████████████████████. Ex. 19 (Vardi Feb. 20, 2022 Dep. Tr.) at 178:9-16, 183:13-185:11.

the proprietary data it scrapes, advertising that it allows advertisers to "unlock" the "entire social advertising performance and strategy" of their competitors. Ex. 26 (BrandTotal, *Social Advertising Powered By Your Competitors' Data*, Padilla Nov. 11, 2021 Dep. Ex. 2).

### C. If There Is Any Doubt, BrandTotal's Motion Must Be Denied Because Of Its Reliance On Disputed Facts About Its Current Conduct

BrandTotal has not met its heavy burden to demonstrate that any express policy overrides the prohibition of unauthorized automated data scraping or that the interests in enforcement are clearly outweighed by a public policy against enforcement of that prohibition. For that reason, the Court should not only deny BrandTotal's motion, but it should grant Meta's motion for summary judgment, Dkt. 274, seeking summary judgment on that question of law. *Planned Parenthood Fed'n of Am., Inc. v. Center for Med. Progress*, 402 F. Supp. 3d 615, 670-674 (N.D. Cal. 2019) ("[W]hether a contract is against public policy 'is a question of law'" amenable to summary judgment).

But even if there were any doubt about whether Meta is entitled to summary judgment (there is not), BrandTotal would still not entitled to summary judgment on its public policy defense as to UpVoice 2021 because in pressing that defense, BrandTotal relies on two disputed facts about its current use of UpVoice 2021 and server-side scraping. First, it contends that users who advertise on Facebook have no interest in Facebook's ability to prevent scraping of advertising information through enforcement of its prohibition on automated collection. But, as explained above, Meta has produced evidence directly to the contrary. *Supra* pp. 15-16. Second, BrandTotal's motion assumes that its current server-side collection scrapes only data that "does not require a Facebook log-in or password." Mot. 7. But here again, as explained below, Meta has produced evidence—via its technical expert Mr. Martens— ████████████████████████████ ██████████████████████████████. *See infra* pp. 29-30.

The Court need not resolve either of these discrete factual issues to hold that Meta's prohibition on scraping is enforceable as a matter of law because BrandTotal has failed to meet its burden regardless of these facts. But because BrandTotal has made clear that each of these points are material to *its* public policy defense, it cannot be awarded summary judgment. *See e.g.*, *Hill v.*

1    *Westbrook's Estate*, 247 P.2d 19, 21 (Cal. 1952) (holding that when the facts surrounding the

2    parties' decision to enter into a contract were in dispute, that was a question for the jury); *see also*

3    *Gregorie v. Alpine Meadows Ski Corp.*, 2009 WL 2425960, at *17 (E.D. Cal. Aug. 7, 2009), *aff'd*,

4    405 F. App'x 187 (9th Cir. 2010) (holding that non-moving party had not presented evidence that

5    a ski resort boundary was within Forest Service land such that a statutory provision applied to

6    make a waiver unenforceable). Because BrandTotal's public policy defense fails as a matter of

7    law, Meta, and not BrandTotal, is entitled to summary judgment. But at a minimum, because

8    BrandTotal has premised its public policy defense on disputed facts, its motion for summary

9    judgment should be denied.

10          **D.    BrandTotal's Argument That Section 3.2.3 Is Void For Public Policy Is Not A**
11          **Defense To Meta's Tortious Interference Claim**

12          BrandTotal contends that its public policy defense also entitles it to summary judgment on

13    Meta's tortious interference with contract claim "to the extent" that claim is "based on violation

14    of" Section 3.2.3. Mot. at 1. But even if BrandTotal's public policy defense had merit (it does not),

15    the defense would not be sufficient to grant summary judgment in favor of BrandTotal. Section

16    3.2.3 is the only term that BrandTotal claims is void for public policy but Meta's tortious

17    interference with contract claim is premised on BrandTotal's violation of other terms as well. *See*

18    Dkt. 148 ¶ 114 (Meta's First Amendment Complaint) (citing provision in Facebook Terms of

19    Service under which Facebook users agree to "[n]ot share [their] password, give access to [their]

20    Facebook account to others, or transfer [their] account to anyone else (without [Facebook's]

21    permission)"); Ex. 27 at 12-15 (Nov. 19, 2021 Meta Response to Rog 21). Therefore, even if

22    Section 3.2.3 were void (it is not), it would not entitle BrandTotal to summary judgment on Meta's

23    tortious interference claim.

24    **II.   BRANDTOTAL'S UNCONSCIONABILITY DEFENSE FAILS AS A MATTER OF LAW**

25          BrandTotal designed its business with full knowledge that it violated Section 3.2.3. Now,

26    it seeks to avoid the consequences of its decision by arguing that Section 3.2.3 is unconscionable.

27    This argument fails as a matter of law for three reasons: (1) BrandTotal waived the defense; (2) the

28    defense fails on the merits because BrandTotal has the burden to establish both procedural and

1
2
3

substantive unconscionability and has established neither; and (3) BrandTotal's unconscionability arguments cannot entitle BrandTotal to summary judgment on Meta's tortious interference with contractual relations claim because that claim does not depend on Section 3.2.3.

4

### A.    BrandTotal Waived Its Unconscionability Defense

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

BrandTotal waived its unconscionability argument by failing to raise it in response to Meta's contention interrogatory. BrandTotal was required to, but did not, identify unconscionability as an affirmative defense in response to Meta's interrogatory seeking the complete basis for BrandTotal's contention that it did not breach any contracts with Meta. *See* Ex. 28 (Oct. 21, 2021 Response to Meta Interrogatories) at 9-12 (identifying only two defenses: (1) Meta's decision to disable some of its accounts relieved BrandTotal of its contractual obligations; and (2) the provisions that BrandTotal continues to breach are void as a matter of public policy). Nor did BrandTotal correct or supplement its responses, which Rule 26(e) requires a party to do "as theories mature and as the relevance of various items of evidence changes." *See* Fed. R. Civ. P. 26(e); *see Asia Vital Components Co. v. Asetek Danmark A/S*, 377 F. Supp. 3d 990, 1004 (N.D. Cal. 2019) (it is "particularly" necessary that contention interrogatories "be corrected or supplemented"). BrandTotal cannot now attempt to introduce additional defenses that it failed to disclose during discovery. *See, e.g.*, *Lawman v. City & County of San Francisco*, 159 F. Supp. 3d 1130, 1141 (N.D. Cal. 2016) (declining to consider theory not identified in interrogatory response and denying motion for summary judgment as to that theory).[7] It is BrandTotal's burden to prove that this failure was substantially justified or harmless, and BrandTotal has done nothing to meet that burden. *See Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001) (citing Fed. R. Civ. P. 37(c)(1)).

23
24
25
26
27
28

---

[7] BrandTotal identified unconscionability as a basis for its own tortious interference with contract claim, *see* Ex. 29 (Nov. 19, 2021 Response to Meta Interrogatories) at 6, but that did not put Meta on notice that BrandTotal would raise unconscionability as a defense to any of Meta's claims. To the contrary, BrandTotal's decision to rely on the doctrine for its counterclaims and specifically to omit the defense from its contentions on Meta's affirmative claims actually cuts the other way.

### B.   Meta's Prohibition On Unauthorized Automated Data Collection Is Not Unconscionable

If the Court were to consider BrandTotal's unconscionability defense, it should reject it on the merits. To invalidate Section 3.2.3, BrandTotal has the burden to establish that the term is both procedurally and substantively unconscionable. *See Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1260 (9th Cir. 2017) (the party opposing enforcement "must demonstrate that the contract as a whole or a specific clause in the contract is both procedurally and substantively unconscionable"). It has established neither. Unconscionability is a "'safety valve' to prevent gross injustice." *Morris v. Redwood Empire Bancorp*, 128 Cal. App. 4th 1305, 1316 (2005). It does not permit a party to "avoid [its] contractual obligation merely by complaining that the deal, in retrospect, was unfair or a bad bargain." *Sanchez v. Valencia Holding Co., LLC*, 61 Cal.4th 899, 911-12 (2015).

#### 1.   The Parties' Agreement Was Not Procedurally Unfair

Procedural unconscionability "focuses on 'oppression or surprise due to unequal bargaining power.'" *Poublon*, 846 F.3d at 1260 (quoting *Pinnacle Museum Tower Assn. v. Pinnacle Mkt. Dev. (US), LLC*, 55 Cal. 4th 223, 246 (2012)). "[C]ourts evaluating procedural unconscionability must consider the totality of the circumstances surrounding the negotiation and formation of the contract, giving particular consideration to factors that affect the presence of oppression or the absence of a meaningful choice." *Grand Prospect Partners, L.P. v. Ross Dress for Less, Inc.*, 232 Cal. App. 4th 1332, 1349 (2015); *see also Circuit City Stores, Inc. v. Mantor*, 335 F.3d 1101, 1106 (9th Cir. 2003) (the court "must evaluate how the parties negotiated the contract and 'the circumstances of the parties at that time.'") (citation omitted). The circumstances of BrandTotal and Meta's agreement—which BrandTotal's brief entirely ignores—do not reflect the "absence of a meaningful choice." Instead, they reflect BrandTotal's deliberate choice to get the benefit of the bargain for as long as it could, and then, when caught violating them, seek to repudiate its terms.

*First*, BrandTotal was not "surprised" by Section 3.2.3, the term that it now challenges. Far from it. "'Unfair surprise results from misleading bargaining conduct or other circumstances indicating that party's consent was not an informed choice.'" *Adkins v. Facebook, Inc.*, 2019 WL

1   3767455, at *2 (N.D. Cal. Aug. 9, 2019) (quoting *Dotson v. Amgen, Inc.*, 181 Cal. App. 4th 975,

2   980 (2010))); *see also Parada v. Superior Ct.*, 176 Cal. App. 4th 1554, 1570 (2009) ("'Procedural

3   surprise focuses on whether *the challenged term* is hidden in a prolix printed form or is otherwise

4   beyond the reasonable expectation of the weaker party.'" (emphasis added) (quoting *Morris*, 128

5   Cal. App. 4th at 1321)). BrandTotal's consent to Section 3.2.3 was well-informed. The undisputed

6   facts show that BrandTotal not only knew that it needed to agree to Meta's terms but also "asked

7   [its] lawyers to review." Ex. 30 (Leibovich Nov. 9, 2021 Dep. Tr.) at 23:9-22; *see also id.* at 20:11-

8   22:11 (███████████████████████████████████████████████████████████

9   ████████); Ex. 4 (BT0001854) (response of BrandTotal's counsel). And BrandTotal's lawyers

10   advised them that Section 3.2.3 is "[t]he main prohibition under the Facebook Terms," which

11   "means that any data collected, using automated means, from what is defined products, cannot be

12   collected." *Id.* at 1855-56. After receiving this legal advice about Section 3.2.3 in March 2019,

13   ████████████████████████████████████████████████████████████████████

14   ██████████████████████████████████████████████, Ex. 19 (Vardi Feb. 20,

15   2022 Dep. Tr.) at 48:18-49:1, 50:20-22, fully aware that doing so obligated BrandTotal to comply

16   with the Facebook Terms, Ex. 30 (Leibovich Nov. 9, 2021 Dep. Tr.) at 20:11-22:11; Ex. 31

17   (BrandTotal Nov. 19, 2021 Response to RFA No. 21) at 3. On these facts, BrandTotal cannot argue

18   that its consent to Section 3.2.3 was not informed. *See, e.g.*, *In re Nexus 6P Products Liability*

19   *Litigation*, 293 F.Supp.3d 888, 945 (N.D. Cal. 2018) (finding no surprise where plaintiffs did not

20   allege they were "surprised" by the terms or "that they could not or did not access" the terms "at

21   the time of purchase"); *Lanigan v. City of Los Angeles*, 199 Cal. App. 4th 1020, 1036 (2011)

22   (concluding that agreement could not have surprised plaintiff because the challenged terms were

23   "fully disclosed" to him); *cf. Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014)

24   ("[C]ourts have consistently enforced browsewrap agreements where the user had *actual notice* of

25   the agreement." (emphasis added)).

26        Indeed, BrandTotal does not argue that its own consent to Section 3.2.3 was not informed.

27   Instead, its brief assumes (erroneously) that the relevant question is whether an ordinary user

28   would be surprised. *See* Mot. 32 (discussing what a "prospective Facebook user could reasonably

expect"). That is not the relevant question, but even if it were, BrandTotal would still fail to establish any element of surprise. Meta's sign-up process is transparent. Every user who signs up for a Facebook account sees that they must agree to the terms prior to signing up for an account. *See* Ex. 30 (Leibovich Nov. 9, 2021 Dep. Tr.) at 20:11-22:11; Ex. 31 (BrandTotal Nov. 19, 2021 Response to RFA No. 21) at 3. The notice is provided in a dark grey font in a legible size. *See* Ex. 18 (Martens Opening Rep.) ¶ 64. Meta requires any individual who signs up for a Facebook account to acknowledge that it is agreeing to Meta's Terms of Service, Data Policy, and Cookies Policy. *Id.* ¶ 66. Each of the terms is linked on Facebook's Sign-Up page. *Id.*

BrandTotal claims that this sign-up process does not provide sufficient notice because there is no "separate box that users must check to signify their affirmative agreement to the TOS." Mot. 31. But courts routinely conclude that sign-up flows like Meta's are sufficient to bind users to terms of service. *See, e.g.*, *Britt v. ContextLogic, Inc.*, 2021 WL 1338553, at *3-5 (N.D. Cal. Apr. 9, 2021); *Nevarez v. Forty Niners Football Co., LLC*, 2017 WL 3492110, at *8 (N.D. Cal. Aug. 15, 2017); *Loewen v. Lyft, Inc.*, 129 F. Supp. 3d 945, 957 (N.D. Cal. 2015); *Fagerstrom v. Amazon.com, Inc.*, 141 F. Supp. 3d 1051, 1069 (S.D. Cal. 2015), *aff'd sub nom. Wiseley v. Amazon.com, Inc.*, 709 F. App'x 862 (9th Cir. 2017); *Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 911-12 (N.D. Cal. 2011). BrandTotal cites no case holding otherwise.[8]

*Second*, BrandTotal's agreement to the Facebook Terms did not involve any oppression because BrandTotal could have avoided the Terms by obtaining services elsewhere. Even a contract of adhesion is not oppressive when reasonable alternatives exist. *See Morris*, 128 Cal. App. 4th at 1320. A contract is oppressive only where one party lacks a meaningful choice about *both* the terms of the agreement *and* whether to enter into the agreement at all. *Id.* "[T]he existence of a 'meaningful choice' to do business elsewhere … tend[s] to defeat any claim of oppression."

---

[8] Nor is the text informing users of Meta's terms confusing. It states: "By clicking Sign Up, you agree to our Terms, Data Policy and Cookies Policy. You may receive SMS notices from us and can opt out any time." Dkt. 267-5 (Ex. F to BrandTotal's Mot. for Summ. J.) ¶ 66. BrandTotal asserts that the second sentence "confusingly suggests that the user 'can opt out any time' from the 'Terms, Data Policy and Cookies' referenced in the prior sentence." Mot. at 32. That is not a serious argument. And even if it were, BrandTotal does not claim that *it* was confused by the fine print, which is the relevant question for the unconscionability analysis.

1  *Dean Witter Reynolds, Inc. v. Superior Ct.*, 211 Cal. App. 3d 758, 768 (1989); *see also Darnaa,*

2  *LLC v. Google LLC*, 756 F. App'x 674, 676 (9th Cir. 2018) ("A term is not oppressive where …

3  the customer has 'reasonably available alternative sources of supply from which to obtain the

4  desired goods and services free of the terms claimed to be unconscionable.'") (quoting *Lennar*

5  *Homes of Cal., Inc. v. Stephens*, 232 Cal. App. 4th 673 (2014)).

6      Here, BrandTotal has failed to establish that it lacked alternatives to Facebook. It claims

7  (at 33) that "users," in general, are effectively forced to sign up for Facebook because of its

8  popularity and value as a public forum, but the "the relevant standard is whether 'reasonably

9  available' alternatives exist, not equally dominant or popular alternatives." *Daarna LLC*, 756 F.

10  App'x at 676. Nor could BrandTotal meet its burden to establish that there are no available market

11  alternatives. BrandTotal ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12  ▮▮▮▮. *See* Ex. 5; Ex. 1 (Dor Jan. 13, 2021 Dep. Tr.) at 52:14-53:7

13  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). Because these

14  alternatives are available, BrandTotal has been able to ▮▮▮▮▮▮▮▮▮▮

15  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. 32

16  (BrandTotal ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Ex. 33 at 4 ▮▮▮▮▮▮▮

18  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

19      In sum, BrandTotal has not met its burden to demonstrate that its agreement to Section

20  3.2.3 was the product of surprise or oppression. That, alone, is a sufficient basis to reject its

21  unconscionability defense.

22          2.    <u>Section 3.2.3 Is Not Substantively Unconscionable</u>

23      Even if the Court were to find that the parties' agreement involved a minimal degree of

24  procedural unconscionability (it should not), BrandTotal's unconscionability argument still would

25  fail as a matter of law because BrandTotal has not established substantive unconscionability. "A

26  contract term is not substantively unconscionable when it merely gives one side a greater benefit."

27  *Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US), LLC*, 55 Cal. 4th 223, 246 (2012).

28  Rather, substantive unconscionability involves contract terms that are "unduly oppressive, overly

harsh, so one-sided as to shock the conscience, and unreasonably favorable to the more powerful party." *Grand Prospect Partners*, 232 Cal. App. 4th at 1349 (internal quotation marks omitted). And where "the degree of procedural unconscionability is low," an agreement is enforceable "unless the degree of substantive unconscionability is high." *See Serpa v. Cal. Surety Investigations, Inc.*, 215 Cal. App. 4th 695, 704 (2013) (citation omitted). BrandTotal has not met this demanding standard.

As an initial matter, BrandTotal does not challenge Section 3.2.3 itself. Instead, it argues that Section 3.2.3 is substantively unconscionable because a *different* provision (Section 4.2) makes certain terms (including Section 3.2.3) apply to former Facebook users and *yet another* provision (Section 4.3) limits the amount that Meta can be liable in damages. Because BrandTotal has not directly challenged Section 3.2.3, the Court should find the provision valid and enforceable. *See Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 72-74 (2010) (declining to assess party's arguments over unconscionability because they were not tailored specifically to the challenged provision).

BrandTotal takes this indirect approach to attacking Section 3.2.3 because it cannot credibly argue that Section 3.2.3 itself is substantively unconscionable. BrandTotal's own terms included a ban on automated data collection, at least until the beginning of this litigation. Ex. 11 (FB_BRTL_00025352). That is not surprising because bans on unauthorized automated data collection are common and have been routinely upheld by California courts. *See, e.g., Niantic, Inc. v. Global++*, 2019 WL 8333451, at *7 (N.D. Cal. Sept. 26, 2019) (granting preliminary injunction based on scraping in violation of terms of service); *Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1069 (N.D. Cal. 2010) (granting permanent injunction). And with respect to Meta's terms in particular, courts in this District have held that it serves the public—which includes Meta's users—to enforce prohibitions against unauthorized data scraping. *Facebook, Inc. v. Power Ventures, Inc.*, 252 F. Supp. 3d 765, 785 (N.D. Cal. 2017); *Facebook, Inc. v. Sluchevsky*, 2020 WL 5823277, at *7 (N.D. Cal. Aug. 28, 2020) (public interest supports permanent injunction against unauthorized data scraping). These prohibitions protect individuals' privacy interests, the security of Meta's platforms, and the proprietary interests of users who advertise on Meta's platforms. *See*

1   *supra* pp. 15-16. BrandTotal "points to no authority in which a court has held that contractual

2   provisions similar to the one[] at issue, despite [its] longevity and relative ubiquity, [is]

3   unenforceable on the ground that [it is] unconscionable." *Epic Games, Inc. v. Apple Inc.*, 2021 WL

4   4128925, at *123 (N.D. Cal. Sept. 10, 2021). And it points to no other evidence or authority that

5   could support a conclusion that Section 3.2.3—a term that promotes the public interest—"shocks

6   the conscience."

7        BrandTotal's argument also fails on its own terms for two reasons. *First*, BrandTotal argues

8   it is "grossly one-sided and unfair," Mot. at 32-33, for Facebook to prohibit former users from

9   scraping data from its platform while limiting its own liability. But even if that were right (it is

10  not), it would mean, at most, that Section 3.2.3 could not apply to former Facebook users. *See* Mot.

11  33, n.18. That would not entitle BrandTotal to summary judgment on Meta's breach of contract

12  claim because BrandTotal still has active accounts. Ex. 19 (Vardi Feb. 20, 2022 Dep. Tr.) at

13  102:13-21; 143:22-144:1; 145:10-16; *see also* Ex. 34 (March 11, 2022 Karve Decl.) ¶¶ 11-15

14  (identifying active BrandTotal accounts).

15       *Second*, these provisions are not so harsh or so one-sided as to shock the conscience

16  whether considered individually or collectively. BrandTotal's own terms include a survival clause

17  and limit its liability for damages. *See* Ex. 12 (BrandTotal, *Terms and Conditions*,

18  https://privacy.brandtotal.com/service_terms.pdf (Sections 8, 10.4)). And Meta's survival clause

19  is a critical enforcement tool against repeat violators of Section 3.2.3. For example, the survival

20  clause makes unequivocally clear that Meta can take enforcement action against an unauthorized

21  scraper by terminating their accounts while still retaining the ability to sue to enjoin the scraper

22  under the contract if its scraping nonetheless continues even after the accounts have been

23  terminated. As for the limitation of liability clause, courts have routinely held that such clauses are

24  not unconscionable, particularly where, as here, the defendant allows for some recovery. *See, e.g.*,

25  *Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024, 1037-1038 (N.D. Cal. 2019); *Huynh v. Quora, Inc.*,

26  2019 WL 11502875, at *11 (N.D. Cal. Dec. 19, 2019); *Simulados Software, Ltd. v. Photon Infotech*

27  *Private, Ltd.*, 40 F. Supp. 3d 1191, 1199 (N.D. Cal. 2014); *see also Food Safety Net Servs. v. Eco*

28  *Safe Sys. USA, Inc.*, 209 Cal. App. 4th 1118, 1126 (2012) (limitation of liability provisions "have

long been recognized as valid in California"). BrandTotal offers no cases, evidence, or authority indicating that either term is "so one-sided as to '*shock the conscience*.'" *Ferguson v. Countrywide Credit Indus., Inc.*, 298 F.3d 778, 784 (9th Cir. 2002). Nor are the terms, considered in combination, "unfairly one-sided." There is nothing "unfair" or conscience-shocking about Meta capping its damages liability while preserving its ability to take action against companies like BrandTotal to protect the integrity of its platform.[9] And finally, BrandTotal cannot, after having enjoyed the full benefits of its bargain with Meta, turn around and claim that the agreement was unfairly one-sided. *See, e.g., Lanigan,* 199 Cal. App. 4th at 1036 (holding that agreement was not substantively unconscionable where defendant provided plaintiff with benefits and plaintiff, in fact, received the full benefit of the bargain).

### C.     Unconscionability Of Section 3.2.3 Is Not A Defense To Meta's Tortious Interference Claim

Finally, as with its public policy defense, BrandTotal contends that the doctrine of unconscionability also entitles it to summary judgment on Meta's tortious interference with contract claim "to the extent" that claim is "based on violation of" Section 3.2.3. Mot. at 1. As an initial matter, that argument is also waived. BrandTotal did not identify unconscionability as an affirmative defense in response to Meta's interrogatory seeking the basis for BrandTotal's contention that it did not intentionally interfere with the contracts between Meta and its users. *See* Ex. 28 (Oct. 21, 2021 Response to Meta Interrogatories) at 14-15. But even if the defense were not waived, BrandTotal's unconscionability defense would not be sufficient to grant summary judgment on Meta's tortious interference claim for the same reasons that its public policy defense would not be sufficient to grant summary judgment on that claim. *See supra* p. 17.

---

[9] BrandTotal does not purport to seek invalidation of the survival clause or the limitation-of-liability clause. But if it were to make that argument, it should be rejected. For all the reasons discussed above, those terms are not unconscionable. And, in any event, BrandTotal would not be entitled to summary judgment on Meta's breach of contract claim if they were. The survival clause is unnecessary to Meta's breach of contract claim because BrandTotal still has operable accounts. *See* Dkt. 272 (Meta's Mot. for Summ. J.) at 12-13. And the limitation-of-liability provision is indisputably not at issue here.

**III.     BRANDTOTAL IS NOT ENTITLED TO SUMMARY JUDGMENT UNDER THE CFAA AND CDAFA WITH RESPECT TO UPVOICE 2021 AND ONGOING SERVER-SIDE COLLECTION**

BrandTotal does not dispute that Meta revoked its authorization to access Meta's computers as of October 1, 2020. *See* Ex. 28 (Oct. 21, 2021 Response to Meta's Interrogatories) at 12-14. It nonetheless contends that it is entitled to summary judgment on Meta's CFAA and CDAFA claims with respect to two (and only two) of its collection technologies that rely on accessing Meta's computers to scrape data:  UpVoice 2021 and its ongoing server-side collection. BrandTotal's arguments, however, ignore facts contrary to its position here and rely on vacated authority. BrandTotal has not, therefore, shown that it is entitled to judgment as a matter of law and its motion should be denied as to Meta's claims under the CFAA and CDAFA.

**A.     UpVoice 2021 Accesses Meta's Computers**

BrandTotal seeks summary judgment on Meta's CFAA and CDAFA claims as to UpVoice 2021 on only one ground:  that UpVoice 2021 does not "access" Meta's computers, as is required for liability under the CFAA and CDAFA. *See* Mot. 33-34; *see also* 18 U.S.C. § 1030(a)(2); Cal. Penal Code § 502(c). Instead, BrandTotal contends, UpVoice 2021 accesses only a "panelist's computer." Mot. 34. BrandTotal is wrong on both the facts and the law and its motion should therefore be denied.

*First*, on the facts, BrandTotal simply ignores contrary and uncontested evidence in the record that plainly establishes that BrandTotal continued to access Meta computers after revocation. Accessing a panelist's computer might be *part* of the method by which UpVoice 2021 collects data, but it is not the only part. According to BrandTotal's own witnesses, UpVoice 2021 also inserts itself in communications between Meta's computers and panelists' computers, "listening to network data being transmitted over the wire" from Meta's computers, Ex. 35 (Sherwood Rebuttal Rep.) ¶ 90, and "pars[ing] different elements" from "Facebook's social feed," Ex. 36 (Dor March 10, 2021 Dep. Tr.) at 44:14-45:11. UpVoice 2021 thus accesses Meta's computers within the meaning of the CFAA and CDAFA by "communicat[ing] with" Meta's computers. *United States v. Nosal*, 930 F. Supp. 2d 1051, 1063 (N.D. Cal. 2013). It is therefore *Meta*, not BrandTotal, that is entitled to summary judgment.

*Second*, on the law, the Ninth Circuit has made clear that a company cannot evade Meta's revocation of authorization by simply "enlisting [ ] a third party to aid in [its] access." *Facebook Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067 (9th Cir. 2016). "[O]nce authorization has been affirmatively revoked, [a defendant] cannot sidestep the statute by going through the back door and accessing the computer through a third party." *United States v. Nosal*, 844 F.3d 1024, 1028 (9th Cir. 2016). That is precisely what BrandTotal does through UpVoice 2021. BrandTotal employs proxies, namely users of UpVoice 2021, who log in to Facebook and access Meta's computer to allow BrandTotal to scrape data. Ex. 36 (Dor March 10, 2021 Dep. Tr.) at 18:24-21:18; Ex. 37 (Sherwood Feb. 17, 2022 Dep. Tr.) at 113:17-114:8. In short, UpVoice 2021 is a tool designed by BrandTotal for the express purpose of accessing Meta's computers through panelists and "re-collect[ing] ad-related data from Facebook," Ex. 36 (Dor March 10, 2021 Dep. Tr.) at 27:7-14, without any authorization from Meta and after Meta took legal and technical measures to revoke BrandTotal's access. To contend that BrandTotal does not access Meta's computers through UpVoice 2021 within the meaning of the CFAA and CDAFA is thus a fiction.

**B.    BrandTotal's Server-Side Collection Violates The CFAA And CDAFA**

BrandTotal does not dispute that its ongoing (and unauthorized) server-side collection both accesses and obtains information from Meta's computers, post-revocation. That is enough for liability. BrandTotal's only argument as to why that does not violate the CFAA and CDAFA is that its "ongoing server-side collection is strictly limited to accessing public URLs that do not require a username or password to access." Mot. 34. Here, again, BrandTotal is wrong on both the law and the facts. Liability under the CFAA and CDAFA turns on whether a defendant accesses computers without authorization, not on whether it accesses password-protected locations. And because it is undisputed that BrandTotal has continued to use its server-side collection technique to access Meta's computers after Meta revoked authorization, it is Meta, not BrandTotal, that is entitled to summary judgment as to BrandTotal's *current* server-side collection operation. *See* Dkt. 272 (Meta's Mot. for Summ. J.) at 16-18. Regardless, even if BrandTotal were correct that CFAA and CDAFA liability depends on accessing password-protected locations, that would still not entitle BrandTotal to summary judgment. That is because in contending that its ongoing server-

side collection does not access password-protected locations, BrandTotal ignores contrary evidence, and so, at the very least, its motion must be denied.

        1.   <u>The CFAA And CDAFA Protect All Information, Not Just Password-Protected Information</u>

BrandTotal misstates the law in arguing that it can evade liability under the CFAA and CDAFA by accessing and obtaining information only from non-password-protected locations on Meta's computers. To support its argument, BrandTotal relies exclusively on *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985 (9th Cir. 2019), which has been vacated by the Supreme Court and remanded for reconsideration in light of *Van Buren, see* 141 S. Ct. 2752 (2021) (Mem.). And the Ninth Circuit's reasoning in *hiQ* cannot be squared with the Supreme Court's decision in *Van Buren* for two reasons.

*First*, the Supreme Court instructed that the CFAA applies "to *all* information"—not just password-protected information—"from all computers that connect to the Internet." *Van Buren v. United States*, 141 S. Ct. 1648, 1652 (2021) (emphasis added). Because BrandTotal's ongoing server-side collection indisputably accesses and obtains information from Meta's computers, which are connected to the Internet, it violates the CFAA.

*Second*, *Van Buren* rejected the tripartite view of the Internet relied upon in *hiQ*. In *hiQ*, the Ninth Circuit reasoned that the Internet consists of "(1) information for which access is open to the general public and permission is not required, (2) information for which authorization is required and has been given, and (3) information for which authorization is required and has not been given." 938 F.3d at 1001. As to the first category, the Ninth Circuit reasoned that "the concept of 'without authorization' is inapt." *Id.* at 1002. But as *Van Buren* explains, the Internet—at least for CFAA purposes—is binary: authorization under the CFAA turns on a "gates-up-or-down inquiry—one either can or cannot access a computer system." 141 S. Ct. at 1658. Thus, while the gates to non-password protected locations may presumptively be up and access therefore presumptively authorized, "[i]mplicit in the definition of authorization is the notion that someone, including an entity, can … revoke that permission." *Nosal*, 844 F.3d at 1035. Even as to non-password protected locations, therefore, the gates can be lowered and permission to access revoked

1  through, for example, legal action. S*ee Craigslist Inc. v. 3Taps Inc.*, 964 F. Supp. 2d 1178, 1181-

2  84 (N.D. Cal. 2013) (cease-and-desist letter revoked access to otherwise publicly accessible

3  website); s*ee also Power Ventures*, 844 F.3d at 1067 n.2 (recognizing that permission to access

4  websites that "are presumptively open to all comers" can be "revoked expressly"); *EF Cultural*

5  *Travel BV v. Zefer Corp.*, 318 F.3d 58, 63-64 (1st Cir. 2003). That is precisely the case here.

6  　　　　And BrandTotal did not just continue using its server-side collection technique to access

7  Meta's computers after Meta revoked access, it also circumvented numerous technological barriers

8  to access. It is undisputed that BrandTotal designed its server-side collection technique to

9  ████████████████████████████████ in order to deceive Meta into thinking that its requests

10 ████████████████████████████████████. *See* Ex. 2 (Regev

11 Nov. 18, 2021 Dep. Tr.) at 234:9-235:9. BrandTotal also uses ███████████ to evade Meta's

12 restrictions on access from the overuse of IP addresses. *See id.* at 212:21-214:10; Ex. 19 (Feb. 20,

13 2022 Vardi Dep. Tr.) at 148:23-156:12. ██████

14 ████████████████████████ Ex. 19 (Feb. 20, 2022 Vardi Dep. Tr.) at 156:3-12. Thus,

15 even as to non-password protected locations, BrandTotal's circumvention of technological barriers

16 to access demonstrates that its access was without authorization. *See 3Taps*, 964 F. Supp. 2d at

17 1186 & n.7. Therefore, BrandTotal's conduct is not authorized under *Van Buren* and its motion

18 should be denied with respect to the CFAA claims. Moreover, because Meta's CDAFA claims are

19 based on the same definition of authorization, BrandTotal's motion should be denied as to these

20 claims as well.

21 　　　　　　　　　　2.　　<u>BrandTotal Continues To Scrape Password-Protected Locations</u>

22 　　　　Even if it were legally relevant whether BrandTotal currently accesses password-protected

23 locations through its server-side collection technique (it is not), BrandTotal simply ignores

24 contrary evidence in arguing that it does not.

25 　　　　*First*, Meta's technical expert, David Martens, opined that BrandTotal continues to ███

26 ████████████████████████████████████████████

27 *to this day*. Ex. 18 (Martens Opening Rep.) ¶¶ 358-369. He reviewed the logs documenting

28 BrandTotal's server-side collection activities and identified "tens of thousands" of instances of

1   BrandTotal's ███████████████████████████████ *after* October 20, 2021. Ex. 38

2   (Feb. 24, 2022 Martens Decl.) ¶¶ 33-35. And BrandTotal's own witness admitted that BrandTotal

3   employees ████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████████████

5   Ex. 39 (Regev Feb. 22, 2022 Dep. Tr.) at 157:16-159:10; *see also* Ex. 18 (Martens Opening Rep.)

6   ¶¶ 364-366. There is, thus, at least a dispute of fact regarding whether BrandTotal ███████████

7   ███████████ to access password-protected areas of Meta's computers directly from

8   BrandTotal's own servers.[10]

9        *Second*, it is undisputed that BrandTotal has not stopped scraping from password-protected

10  Facebook pages, it has simply shifted its method of collection. BrandTotal concedes that it now

11  uses its Restricted Panel extension to scrape password-protected "restricted" pages, including

12  pages accessible only to logged in Facebook users over a certain age. Mot. 8; *see also* Ex. 39

13  (Regev Feb. 22, 2022 Dep. Tr.) at 109:3-9. And that extension is no ordinary browser extension.

14  It is not distributed to "panelists" through the Google Chrome Web Store because ██████████████

15  ██████████████████████████████████" Ex. 24 (BT0005486) at -87. Instead, Restricted

16  Panel is an ██████████████████████████████████. Ex. 19 (Feb. 20, 2022

17  Vardi Dep. Tr.) at 178:9-16; *see also* Ex. 39 (Regev Feb. 22, 2022 Dep. Tr.) at 134:3-11. As with

18  UpVoice 2021, BrandTotal cannot evade liability under the CFAA and CFAA by using an agent

19  who accesses Meta's computers at BrandTotal's direction.

20

21  [10] There is no dispute that BrandTotal ████████████████████████ in its server-side

22  collection after Meta revoked access in October 2020. *See* Ex. 2 (Nov. 18, 2021 Regev Dep. Tr.)
    at 215:8-228:13 (testifying that BrandTotal's server-side collection software ██████████████████

23  ████████████████████████████████████. Indeed, BrandTotal's Senior

24  Backend Engineer testified that BrandTotal ████████████████████ to scrape from password
    protected Facebook pages as recently as January 2021, and also admitted that it was "possible"

25  that BrandTotal continued to do so throughout "the first six months of 2021." *See* Ex. 19 (Feb. 20,
    2022 Vardi Dep. Tr.) at 182:19-22-183:3, 193:13-194:6. BrandTotal's thus indisputably violated

26  the CFAA and the only question is whether it's server-side collection continues to do so today.
    Moreover, BrandTotal failed to preserve the only evidence that would have conclusively

27  established its continuous use of access credentials between October 2020 and October 2021,
    thereby warranting an adverse inference that BrandTotal did continue to use access credentials in

28  its server-side collection throughout that period. *See* Dkt. 246 (Meta's Mot. for Sanctions) at 15-
    20.

.     *     *     *

In sum, because the undisputed facts show that both UpVoice 2021 and BrandTotal's ongoing server-side collection access and obtain information from Meta's computers within the meaning of the CFAA and CDAFA—and have continued to do so long after Meta expressly revoked BrandTotal's permission to access—it is *Meta*, not BrandTotal, that is entitled to summary judgment on these claims. But at the very least, BrandTotal's motion for judgment on Meta's claims under the CFAA and CDAFA as to UpVoice 2021 and BrandTotal's current server-side collection operation should be denied because BrandTotal's arguments—that UpVoice 2021 does not access Meta's computers and that its ongoing server-side collection accesses only public webpages—ignore contrary evidence and BrandTotal has thus not shown that it is entitled to judgment as a matter of law.

## IV.   BRANDTOTAL IS NOT ENTITLED TO SUMMARY JUDGMENT ON META'S UCL CLAIM AS TO UPVOICE 2021

BrandTotal contends that UpVoice 2021 does not violate the UCL because "BrandTotal removed the language purportedly suggesting an affiliation with Facebook months before the launch of UpVoice 2021." Mot. 35. That argument fails for two reasons.

### A.   BrandTotal Is Not Entitled To Judgment Regarding Its "Participating Site" Misrepresentation

First, BrandTotal cannot evade liability on the basis that it has stopped falsely stating that Facebook was a "participating site." Removing a deceptive statement does not preclude UCL liability. *See Williams v. Gerber Prods. Co.*, 552 F.3d 934, 936 n.2 938-940 (9th Cir. 2008) (holding that plaintiffs stated a claim that statements removed from products' labeling after initiation of litigation were deceptive). Because BrandTotal has not presented any evidence showing the "participating site" statement was not likely to deceive a reasonable person nor otherwise shown that Meta will be unable to carry its ultimate burden at trial, BrandTotal has not met its burden and is not entitled to summary judgment on Meta's UCL claim. *See Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

**B.**   **Meta's UCL Claim Is Not Limited To BrandTotal Misrepresenting Facebook as a "Participating Site"**

Moreover, BrandTotal ignores the full scope of Meta's UCL claim. In addition to misrepresenting Facebook as a "participating site," Meta has alleged that BrandTotal violated the UCL in at least two other ways. Because BrandTotal has not shown that it is entitled to judgment as a matter of law under these other theories of liability, it is not entitled to summary judgment on Meta's UCL claim.

*First*, Meta has alleged that BrandTotal's conduct is unfair and fraudulent because BrandTotal has "solicited and deceived users into installing Defendants' extensions which enabled Defendants to use the users' browsers as a proxy to access [Meta] computers, without [Meta]'s authorization, meanwhile pretending to be a legitimate user in order to scrape data from Facebook." Dkt. 148 ¶¶ 121, 123; *see also* Ex. 27 (Nov. 19, 2021 Meta Responses to Interrogatories) at 9-12. BrandTotal has not even attempted to identify "evidence negating an essential element" of this claim nor shown that Meta would be unable "to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1102. BrandTotal's motion should be denied on that basis alone. And in any event, there is at least a dispute of material fact regarding whether BrandTotal deceived both its users and Meta through its scraping practices. The evidence shows that BrandTotal did not fully disclose to its users the nature and scope of the data that BrandTotal collected through its apps and extensions. *See* Dkt. 272 (Meta's Mot. for Summ. J.) at 26. BrandTotal's apps, extensions, and server-side collection technique also



*See, e.g.*, Ex. 18 (Martens Opening Rep.) at §§ 4.7.1

*accord* Ex. 2 (Nov. 18, 2021 Regev Dep. Tr.) at 234:9-235:9. There is, therefore,

1   at least a dispute of fact as to whether BrandTotal practices were "likely to deceive" a reasonable

2   person, *Hadley v. Kellogg Sales Co.*, 273 F. Supp. 3d 1052, 1063 (N.D. Cal. 2017).

3        *Second*, Meta has also alleged that BrandTotal has violated the unlawful prong of the UCL

4   by violating the CFAA and CDAFA. *See* Dkt. 148 ¶ 124. The undisputed evidence shows that

5   BrandTotal has violated the CFAA and CDAFA. *See* Dkt. 272 (Meta's Mot. for Summ. J.) at 16-

6   22. BrandTotal is not entitled to summary judgment on Meta's claim under the unlawful prong of

7   the UCL. Meta is.

8                                   **CONCLUSION**

9        For all of these reasons, the Court should deny BrandTotal's motion for partial summary

10  judgment with respect to Counts 1-6 of Meta's First Amended Complaint.

11

12

13  Dated: April 1, 2022                    Respectfully submitted,

14                                          */s/ Sonal N. Mehta*

15

16  ARI HOLTZBLATT (*pro hac vice*)         WILMER CUTLER PICKERING
    Ari.Holtzblatt@wilmerhale.com            HALE AND DORR LLP
17  ALLISON SCHULTZ (pro hac vice)          SONAL N. MEHTA (SBN 222086)
    Allison.Schultz@wilmerhale.com          Sonal.Mehta@wilmerhale.com
18  ROBIN C. BURRELL (pro hac vice)         2600 El Camino Real, Suite 400
    robin.burrell@wilmerhale.com            Palo Alto, California 94306
19  1875 Pennsylvania Ave, NW               Telephone: (650) 858-6000
    Washington, DC 20006                    Facsimile: (650) 858-6100
20  Telephone: (202) 663-6000
    Facsimile: (202) 663-6363
21                                          ANDY R. O'LAUGHLIN (*pro hac vice*)
                                            andy.olaughlin@wilmerhale.com
22  *Attorneys for Plaintiff/Counterclaim Defendant*   60 State Street
    *Meta Platforms, Inc.*                  Boston, MA 02109
23                                          Telephone: (617) 526-6220
                                            Facsimile: (617) 526-5000
24

25                                          CINDY PAN (*pro hac vice*)
                                            cindy.pan@wilmerhale.com
26                                          250 Greenwich Street
                                            New York, NY 10007
27                                          Telephone: (212) 937-7275
                                            Facsimile: (212) 230-8888
28

1

## CERTIFICATE OF SERVICE

2     I hereby certify that on April 1, 2022 electronically filed the above document with the

3  Clerk of the Court using CM/ECF which will send electronic notification of such filing to all

4  registered counsel.

5

6

7   Dated:  April 1, 2022                    By:  *Sonal N. Mehta*

8                                                 Sonal N. Mehta

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28